CADES SCHUTTE LLP

MILTON M. YASUNAGA    3058-0
ALLISON MIZUO LEE     7619-0
1000 Bishop Street, Suite 1200
Honolulu, HI 96813-4216
Telephone: (808) 544-3833
E-mail: myasunaga@cades.com

Attorneys for WILLIAM R. KOWALSKI and
HAWAII INTERNATIONAL SEAFOOD, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI et al.,<br>v.<br>MOMMY GINA TUNA<br>RESOURCES, et al. | CIVIL NO. 05-00679 BMK<br>CIVIL NO. 06-00182 BMK<br>CIVIL NO. 05-00787 BMK<br>CIVIL NO. 05-00517 BMK |
| WILLIAM R. KOWALSKI, et al.,<br>v.<br>INTEGRAL SEAFOOD LLC et al. | WILLIAM R. KOWALSKI AND<br>HAWAII INTERNATIONAL<br>SEAFOOD, INC.'S MOTION FOR<br>CLARIFICATION AND |
| WILLIAM R. KOWALSKI, et al.,<br>v.<br>RICHARD FRIEND et al. | RECONSIDERATION OF THE<br>CLAIMS CONSTRUCTION ORDER<br>FOR THE YAMAOKA AND<br>KOWALSKI PATENTS, FILED |
| TUNA PROCESSORS, INC.,<br>Plaintiff,<br>v.<br>HAWAII INTERNATIONAL<br>SEAFOOD, INC.<br>Defendant/Counterclaim<br>Plaintiff,<br><br>and WILLIAM R. KOWALSKI<br>Additional Counterclaim<br>Plaintiff. | 10/17/07; MEMORANDUM IN<br>SUPPORT OF MOTION;<br>DECLARATION OF MILTON M.<br>YASUNAGA; EXHIBITS "1" – "13";<br>CERTIFICATE OF SERVICE<br><br>Heard<br>Date:    August 9-10, 2007<br>Time:    9:00 a.m.<br>Judge:  The Hon. Barry M. Kurren |

Exhibit "E"

WILLIAM R. KOWALSKI AND HAWAII INTERNATIONAL
SEAFOOD, INC.'S MOTION FOR CLARIFICATION AND
RECONSIDERATION OF THE CLAIMS CONSTRUCTION ORDER
<u>FOR THE YAMAOKA AND KOWALSKI PATENTS, FILED 10/17/07</u>

WILLIAM R. KOWALSKI (Kowalski) and HAWAII INTERNATIONAL

SEAFOOD, INC. (HISI) (jointly, "***Plaintiffs***") move for clarification and

reconsideration of the Claims Construction Order for the Yamaoka and Kowalski

Patents, filed 10/17/07 (the "***Claims Construction Order***").  The scope of this

Motion is limited to the portion of the Claims Construction Order, pages 18 to 20,

discussing the term "heating" and deeming Claims 1 and 67 of the Kowalski Patent

(U.S. Patent 5,972,401) invalid ("***finding of invalidity***").  Movants respectfully

request that the Court:

(1)     clarify that the term "heating," properly construed, is not limited to a
        specific numerical temperature range, and therefore, "heating organic
        material to generate smoke" means "heating carbon containing
        material (including wood, wood sawdust, and wood charcoal) to make
        smoke"; and

(2)     vacate the finding of invalidity.

This Motion is brought pursuant to Rule 7 of the Federal Rules of Civil

Procedure, and Local Rules 7.9 and 60.1, and is based on the attached

memorandum in support, declaration, exhibits, and the records and files herein.

2

DATED:  Honolulu, Hawaii, October 30, 2007.

CADES SCHUTTE LLP


/s/ Milton M. Yasunaga
MILTON M. YASUNAGA
MARTIN E. HSIA
ALLISON MIZUO LEE
Attorneys for
WILLIAM R. KOWALSKI and HAWAII
INTERNATIONAL SEAFOOD, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI et al.,<br>v.<br>MOMMY GINA TUNA<br>RESOURCES, et al. | CIVIL NO. 05-00679 BMK<br>CIVIL NO. 06-00182 BMK<br>CIVIL NO. 05-00787 BMK<br>CIVIL NO. 05-00517 BMK |
| WILLIAM R. KOWALSKI, et al.,<br>v.<br>INTEGRAL SEAFOOD LLC et al. | MEMORANDUM IN SUPPORT OF<br>MOTION |
| WILLIAM R. KOWALSKI, et al.,<br>v.<br>RICHARD FRIEND et al. | |
| TUNA PROCESSORS, INC.,<br>    Plaintiff,<br>v.<br>HAWAII INTERNATIONAL<br>SEAFOOD, INC.<br>    Defendant/Counterclaim<br>    Plaintiff,<br><br>and WILLIAM R. KOWALSKI<br>    Additional Counterclaim<br>    Plaintiff. | |

## **MEMORANDUM IN SUPPORT OF MOTION**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................ 1

II.  RELEVANT PROCEDURAL BACKGROUND ........................................ 1

III. ARGUMENT ................................................................................... 3

A.   The Court Properly Construed The Term "Heating" In Claims 1 and 67 of Kowalski's Patent As Not Being Limited To A Specific Numerical Temperature Limitation ....................................... 3

B.   The Finding Of Invalidity Was Procedurally Improper Because Defendants Must Prevail On A Properly Noticed Motion For Summary Judgment To Invalidate Claims 1 and 67 For Failure to Meet The Written Description Requirement .................................... 8

C.   Even Assuming Arguendo That Defendants Are Permitted To Assert Invalidity For Failure To Meet The Written Description Requirement Despite Their Failure To Plead, Mention In Interrogatory Responses, And Move On This Defense, Plaintiffs Have Strong Arguments And Evidence To Support That The Written Description Requirement Is Satisfied ................... 14

1.   The specification does not clearly state that Kowalski's tasteless smoke invention is possible only if the smoke is generated by heating organic material between the temperatures of 204 to 510 degrees Centigrade ...................... 19

2.   Smoke generated by heating organic material at temperatures outside of the 204 to 510 degree Centigrade range is within the stated purpose of Kowalski's invention ................................................................................. 23

3.   A person skilled in the art would understand that smoke could be generated by heating organic material at temperatures outside of 204 to 510 degrees Centigrade and that the 204 to 510 degree Centigrade temperature range was not essential to Kowalski's invention of not imparting smoke taste and odor ............................................. 25

IV.  CONCLUSION ............................................................................ 30

# TABLE OF AUTHORITIES

## CASES

Abbott Lab. v. Syntron Bioresearch, Inc., 334 F.3d 1343 (Fed. Cir. 2003) ......... 8, 9

Amgen Inc. v. Hoechst Marion Roussell, Inc., 314 F.3d 1313 (Fed .Cir. 2003)...................................................................................... 10, 14, 18, 22

Applera Corp. v. MJ Research Inc., 292 F.Supp.2d 348 (D. Conn. 2003) ............... 6

Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443 (Fed. Cir. 1986) ................................................................................................ 8

Capon v. Eshhar, 418 F.3d 1349 (Fed. Cir. 2005) ................................................. 26

Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., No. IP-96-1718-C-H/G, 2000 WL 1765358 (S.D. Ind. Nov. 29, 2000) ................................................ 7

Conoco, Inc. v. Energy & Envtl. Int'l, 460 F.3d 1349 (Fed. Cir. 2006) .............. 5, 6

Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc., 291 F.3d 1317 (Fed. Cir. 2002) ............................................................................ 3, 11, 18, 21, 22

Cordis Corp. v. Medtronic Ave., Inc., 339 F.3d 1352 (Fed. Cir. 2003) ........................................................9, 10, 15, 16, 17, 18, 30

D.M.I., Inc. v. Deere & Co., 755 F.2d 1570 (Fed. Cir. 1985).................................. 5

Eli Lilly & Co. v. Barr Lab., Inc., 251 F.3d 955 (Fed. Cir. 2001) ......................... 11

Falko-Gunter Falkner v. Inglis, 448 F.3d 1357 (Fed. Cir. 2006)............................ 29

Fin Control Sys. Pty, Ltd. v. OAM Inc., 265 F.3d 1311 (Fed .Cir. 2001)........ 13, 14

Fonar Corp. v. General Electric Co., 107 F.3d 1543 (Fed. Cir. 1997).............. 26, 27

Gentry Gallery v. Berkline Corp., 134 F.3d 1473 (Fed. Cir. 1998)................ passim

Grinnel Corp. v. American Monorail Co., , 285 F.Supp. 219 (D. S.C. 1967) .......... 8

Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367
    (Fed. Cir. 1986) ............................................................... 26, 27

Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985
    (Fed. Cir. 1999) ................................................................. 17

Kao Corp. v. Unilever United States, Inc., 441 F.3d 963
    (Fed. Cir. 2006) ......................................................... 14, 15, 26

Koito Mfg.  Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142
    (Fed. Cir. 2004) ........................................................... 14, 15

Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.,
    730 F.2d 1452 (Fed. Cir. 1984) ......................................... 26

Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361 (Fed. Cir. 2004) ............... 4

Markman v. Westview Instruments, Inc., 517 U.S. 370 (1991) ............................ 10

Massey v. Del Lab., Inc., 118 F.3d 1568 (Fed. Cir. 1997) ................................ 12, 14

Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306 (Fed. Cir. 2003) .......... 10

Northern Telcom, Inc. v. Datapoint Corp., 908 F.2d 931 (Fed. Cir. 1990) ............ 20

Nova Measurement Instr. Ltd. v. Nanometrics, Inc., Civ. No. C-05-0986
    MMC, 2006 WL 757977 (N.D. Cal. Mar. 23, 2006) ....................................... 4

Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) ................................ 4, 5, 6

Rhine v. Casio, Incorp., 183 F.3d 1342 (Fed. Cir. 1999) ........................................ 12

Specialty Composites v. Cabot Corp., 845 F.2d 981 (Fed. Cir. 1988) .................... 5

Superguide Corp. v. DirecTV, 358 F.3d 870 (Fed. Cir. 2004) ................................ 6

Wolens v. F.W. Woolworth Co., 703 F.2d 983 (7th Cir. 1983) ............................... 5

# STATUTES

35 U.S.C. § 112 ....................................................................2, 3, 4, 9, 14, 15, 20, 27

35 U.S.C. § 282(3)....................................................................... 8, 9, 10, 11

## I.    **INTRODUCTION**

WILLIAM R. KOWALSKI ("***Kowalski***") and HAWAII INTERNATIONAL SEAFOOD, INC. ("***HISI***") (jointly, "***Plaintiffs***") move for clarification and reconsideration of the Claims Construction Order for the Yamaoka and Kowalski Patents, filed 10/17/07 (the "***Claims Construction Order***"), specifically, the portion of the Claims Construction Order, pages 18 to 20, deeming Claims 1 and 67 of the Kowalski Patent (U.S. Patent 5,972,401) invalid for lack of a sufficient written description ("***finding of invalidity***").  The Motion should be granted because:

A.    The Court properly construed the term "heating" as not limited to a specific numerical temperature range limitation,

B.    The finding of invalidity was procedurally improper because Defendants must prevail on a properly noticed Motion for Summary Judgment in order to invalidate Claims 1 and 67 for lack of an adequate written description, and

C.    Plaintiffs have strong legal arguments and factual evidence to support that the specification of the Kowalski Patent supports claim language that does not contain a heating temperature limitation.

## II.    **RELEVANT PROCEDURAL BACKGROUND**

On May 30, 2007, Plaintiffs filed their Motion for Claim Construction requesting that the Court construe claims 1 and 67 of the Kowalski Patent.

Relevant to this Motion, Plaintiffs requested construction of the claim limitation "heating organic material to generate smoke" without any reference to a specific temperature range. See Plt's Mot. for Claim Construction, filed 5/30/07, at 16. In response, Defendants argued that the term "heating" should be limited to the range of 204-510 degrees centigrade based on references in the specification of the Kowalski Patent. See Defs' Response to Kowalski et al's Claim Construction Brief, filed 7/23/07, at 13-14.

In reply, Plaintiffs pointed out that the 204-510 degree Centigrade range was applicable only with respect to the option of minimization of the **formation of** possibly carcinogenic (PAH and VOC) compounds (not Kowalski's invention itself) and constituted an improper attempt by Defendants to re-write the claim language that did not include any temperature references. See Plts' Reply in Support of Mot. for Claim Construction, filed 8/22/07, at 1-2. Plaintiffs further argued that Defendants' proffered claim construction was contrary to the doctrine of claim differentiation and well-established claim construction rules that prohibit limiting general descriptive words in a claim based on numerical ranges provided in just potions of the written description and reading particular embodiments into a broad claim. See id. at 2-4.

The Court issued its Claims Construction Order on October 17, 2007. As to construction of the term "heating," the Court implicitly adopted Plaintiffs'

interpretation, i.e. without the numerical temperature range 204-510 degrees

centigrade limitation, and then *sua sponte* engaged in an invalidity analysis under

Gentry Gallery v. Berkline Corp., 134 F.3d 1473, 1479 (Fed. Cir. 1998),

concluding as follows:

> Here, then, just as in Gentry, the "entirety of the specification clearly
> indicates that the invention is of a much narrower scope," Cooper
> Cameron Corp., 291 F.3d at 1323, than what is claimed in Claims 1
> and 67. The specifications do not support the broad claim language of
> "heating"; accordingly these claims are deemed invalid on this
> ground. See Gentry Gallery, 134 F.3d at 1479.

Claim Construction Order, filed 10/17/07, at 20.

In effect, the Court *sua sponte* raised the defense of invalidity for failure to

meet the written description requirement and granted summary judgment in

Defendants' favor. For the reasons discussed below, Plaintiffs respectfully submit

that while the Court correctly construed the term "heating" as not referring to a

specific numerical temperature range, the finding of invalidity constitutes a

manifest error of law warranting reconsideration.

## III.    ARGUMENT

### A.    The Court Properly Construed The Term "Heating" In Claims 1 and 67 of Kowalski's Patent As Not Being Limited To A Specific Numerical Temperature Limitation.

The Court's construction of the term "heating" as not encompassing the

numerical temperature range limitation urged by Defendants is implicit in the

Court's finding that "[t]he specifications do not support the broad claim language

of 'heating.'"[1]  See Claim Construction Order, filed 10/17/07, at 20.  For the

following reasons, the Court was correct to reject Defendants' request for

construction of the term "heating" to be limited to the temperature of 510 degrees

Centigrade or less.

First, because the term "heating" is plain and clear, there is no need to resort

to the specifications or anything else to ascertain its meaning.  See, e.g., Phillips v.

AWH Corp., 415 F.3d 1303, 1314, 1324 (Fed. Cir. 2005) (Recognizing such

situations where claims do "not require elaborate interpretation" and holding that

specifications and other "sources are not [to be] used to contradict claim

meaning."); Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361, 1368 (Fed.

Cir. 2004) (reversing district court "[b]ecause the plain language of the claim was

clear and uncontradicted by anything in the written description or the figures, [and

thus] the district court should not have relied upon the written description, the

figures, or the prosecution history to add limitations to the claim.").

Second, the doctrine of claim differentiation prohibits construction of the

---

[1] Generally, courts will construe the claim before engaging in an invalidity
analysis.  See Nova Measurement Instr. Ltd. v. Nanometrics, Inc., Civ. No. C-05-
0986 MMC, 2006 WL 757977 *1, *1-2 (N.D. Cal. Mar. 23, 2006) ("Because the
written description inquiry 'focuses on a comparison between the specification and
the invention referenced by the terms of the claim,' such inquiry normally begins
with a construction of the claims" and "the Court declines to deviate from the
general rule that claims should be construed before a motion seeking a finding of
invalidity is entertained.").

term "heating" in claims 1 and 67 in the manner urged by Defendants because

Claim 34 expressly contains the 204-510 °C temperature limitation. See D.M.I.,

Inc. v. Deere & Co., 755 F.2d 1570, 1574 (Fed. Cir. 1985) ("Where, as here, the

limitation sought to be "read into" a claim already appears in another claim, the

rule is far more than "general." It is fixed. It is long and well established. It

enjoys an immutable and universally applicable status comparatively rare among

rules of law. Without it, the entire statutory and regulatory structure governing the

drafting , submission, examination, allowance, and enforceability of claims would

crumble. [citations omitted.]"), Phillips, 415 F.3d at 1315 (Because of the

principle of claim differentiation, "the presence of a dependent claim that adds a

particular limitation gives rise to a presumption that the limitation in question is

not present in the independent claim."); see also, Wolens v. F.W. Woolworth Co.,

703 F.2d 983, 988 (7th Cir. 1983) ("The additional limitation(s) of a dependent

claim will not be read into the broader claim(s)."; Specialty Composites v. Cabot

Corp., 845 F.2d 981, 988 (Fed. Cir. 1988) ("An accepted rule of claim construction

suggests that, since the dependent claims 8 and 16 add an external plasticizer as a

limitation, the broader independent claims 1 and 11 do not have this limitation.").

Third, "when a claim term is expressed in general descriptive words, [the

Federal Circuit] will not ordinarily limit the term to a numerical range that may

appear in the written description or in other claims." See Conoco, Inc. v. Energy &

Envtl. Int'l, 460 F.3d 1349, 1358 (Fed. Cir. 2006) (rejecting the defendant's

contention that the term "water-alcohol mixture" should be construed as meaning

"water-alcohol mixture with the amount of alcohol limited to between 0 and 70

percent" even though the specifications mentioned those numbers) [2]. "[A]

particular embodiment may not be read into a claim when the claim language is

broader than the embodiment." Superguide Corp. v. DirecTV, 358 F.3d 870, 875

(Fed. Cir. 2004), see also Phillips, 415 F.3d at 1323; see also Applera Corp. v. MJ

Research Inc., 292 F.Supp.2d 348, 369 (D. Conn. 2003) ("Defendants' proposal to

---

[2] In Conoco, the Federal Circuit commented that:

> the specification states that the 'amount of alcohol employed in the
> suspending material *may vary widely* but it *usually* forms between
> about 0 and 70 percent of the suspending material, and more usually
> between about 30 and about 50 weight percent. . . . . EEI maintains
> that this language explicitly limits the amount of alcohol in the
> suspending medium to a numerical range between 0 and 70 percent.
> However, this language refers to a preferred embodiment of the
> invention, and the given numerical ranges are not used in a context
> meant to limit the claims. In fact, the language itself inherently
> recognizes that the numerical range should not limit the claim by
> noting that the amount of alcohol 'may vary widely' and 'usually'
> falls within a numerical range. Thus, the patentee did not limit the
> claim term as EEI suggests . . . .

460 F.3d at 1358. Similarly, the numerical language in portions of the
specification of Kowalski's Patent refers to a preferred embodiment of his
invention (Col. 16, L. 13-14, 38-40: "Best Mode ... heating the cylinders ... to an
operable temperature range of ... 204 to 510 degrees centigrade") and the language
of the Kowalski Patent itself recognizes that the numerical range should not limit
the claim by noting that "If [higher temperatures are used and PAH and VOC]
compounds are formed, they can be successfully filtered later in the process." (Col.
6, L. 60-62).

import precise numerical limitations from the preferred embodiments of the

claimed invention is inappropriate.  Reading numerical precision into imprecise

claims is usually incorrect.").

Notably, the Court was correct to construe the term "heating" broadly

despite its apparent concern regarding validity.  See, e.g., Cardiac Pacemakers, Inc.

v. St. Jude Med., Inc., No. IP-96-1718-C-H/G, 2000 WL 1765358 (S.D. Ind. Nov.

29, 2000) ("the deliberate use of broad language in the claims and prosecution

history show a clear choice to write claims that would apply to the entire heart,

including the ventricles.  To the extent that the broad claim language raises issues

of validity, those issues may be addressed later in the case.  They would not

support an artificially narrowed reading of the deliberately broad claim language

applying to the entire heart.").  The prosecution history of the Kowalski patent

shows that the term "heating" was deliberately selected and examined by the

USPTO Claims Officer.  See Ex. "10" (Request for Amendment) at K00042

("Claim 1 has been amended to change "combusting to - - heating - - (basis is

provided by page 28, line 19) because certain non-combusting methods of heating

may not produce a particulate phase . . . .").  Kowalski sought and the USPTO

agreed that broad claim language (without a numeric temperature limitation)[3] was

---

[3] As discussed infra Section III.C.3., "heating an organic material to generate
smoke" is not improperly broad because persons with skill in the art of food
smoking understand how to carry out a process step described in such language

warranted and valid.  <u>See</u> Ex. "5" (Notice of Allowability).

Based on the foregoing, Plaintiffs request that the Court confirm/clarify its ruling that the term "heating" in claims 1 and 67 of the Kowalski Patent, properly construed, is not limited to a specific numerical temperature range, and therefore "heating organic material to generate smoke" means "heating carbon containing material (including wood, wood sawdust, and wood charcoal) to make smoke."

**B.      The Finding Of Invalidity Was Procedurally Improper Because Defendants Must Prevail On A Properly Noticed Motion For Summary Judgment To Invalidate Claims 1 and 67 For Failure to Meet The Written Description Requirement.**

Patents, and all claims contained therein, are endowed by statute with a presumption of validity.  <u>See</u> 35 U.S.C. § 282 ("A patent shall be presumed valid. **Each claim** of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims . . . .") (emphasis added); <u>see</u> <u>also</u> <u>Abbott Lab. v. Syntron Bioresearch, Inc.</u>, 334 F.3d 1343, 1357 (Fed. Cir. 2003) ("all issued claims are presumed valid.").  The presumption of validity is based in part on the recognition of the PTO's examiners' "expertise in interpreting the references and ... familiarity with the level of skill in the art."  <u>Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.</u>, 796 F.2d 443, 447 (Fed. Cir. 1986).  As explained in <u>Grinnel Corp. v. American Monorail Co.</u>,

and understand from experience and the literature that smoke can be generated at many different heating temperatures.

285 F.Supp. 219 (D. S.C. 1967):

> The presumption of validity, and the severe burden it places on defendant, are based largely on the fact that to hold a patent invalid in an infringement action involves overruling of a decision by an arm of a co-ordinate branch of Government specially empowered to pass upon patentability and specially trained in the technical questions involved.  Thus, it is the duty of the Patent Office carefully to examine each patent application in the light of all statutory requirements for patentability and to withhold issuance unless "it appears that the applicant is entitled to patent under the law" (35 U.S.C. section 131).

Id. at 223.

Failure to meet 35 U.S.C. § 112's written description requirement constitutes an affirmative defense.  See 35 U.S.C. § 282(3).  As such, Defendants carry the burden of establishing invalidity for failure to satisfy the written description requirement.  Their burden is a high one.  Given the presumption of validity, Defendants must come forth with proof rising to the level of clear and convincing evidence.  See Cordis Corp. v. Medtronic Ave., Inc., 339 F.3d 1352, 1363 (Fed. Cir. 2003) ("The burden at trial was on AVE to establish by clear and convincing evidence that the written description requirement was not met, in light of the presumption of validity."); Abbott Lab., 334 F.3d at 1357 ("Syntron [the accused infringer] failed to prove that, in light of the presumption of validity, no reasonable jury could have decided that Syntron failed to prove by clear and convincing evidence that the claims are invalid for failure to meet the written description requirement.").  Moreover, to avail themselves of the defense of invalidity for lack

of a sufficient written description , 35 U.S.C. § 282(3) requires that Defendants plead it.  See id. ("The following shall be defenses in any action involving the validity or infringement of a patent **and shall be pleaded**: . . . . (3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title. . . .") (emphasis added).

In contrast to claim construction, which is strictly a question of law and "an issue for the judge, not the jury," see Markman v. Westview Instruments, Inc., 517 U.S. 370, 391 (1991), it is well-settled in the Federal Circuit that **whether a patent complies with the written description requirement is a question of fact.**  See Amgen Inc., 314 F.3d at 1330 ("Compliance with the written description requirement is essentially a fact-based inquiry that will necessarily vary depending on the nature of the invention claimed."), Cordis Corp., 339 F.3d at 1364 ("whether the written description requirement has been satisfied is a question of fact"), Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1319 (Fed. Cir. 2003) ("Whether a specification complies with the written description requirement of § 112, ¶ 1 is a question of fact that this court reviews for substantial evidence."), Gentry Gallery, Inc., 134 F.3d at 1479 ("Whether a specification complies with the written description requirement of § 112, ¶ 1, is a question of fact, which we review for clear error on appeal from a bench trial.").

Thus, to invalidate a patent short of a trial, defendants must show on a

motion for summary judgment that "no genuine issue exists as to any material fact, and [they] are entitled to judgment as a matter of law." <u>Eli Lilly & Co. v. Barr Lab., Inc.</u>, 251 F.3d 955, 962 (Fed. Cir. 2001).  Because the court views the record of evidence through the prism of the evidentiary standard of proof that would pertain at trial on the merits, parties "seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." <u>Id.</u>; <u>see also</u> <u>Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc.</u>, 291 F.3d 1317, 1323 (Fed. Cir. 2002) ("Because no reasonable fact-finder could find that Kvaener demonstrated invalidity of the 119 claims by clear and convincing evidence, we reverse the court's grant of summary judgment and conclude that the claims are not invalid for inadequate description as a matter of law.").

In this case, Defendants did not plead invalidity for lack of a sufficient written description in their Answers to the Complaint, despite that they were required to by statute.  <u>See</u> 35 U.S.C. § 282(3).  Further, none of the Defendants even remotely referred to this defense in their responses to Interrogatory #3 of Plaintiffs' first request for answers to interrogatories which required Defendants to "[e]xplain with particularity and identify all bases/facts relating to each of [Defendant's] claims, contentions, positions, defenses, or affirmative defenses in this litigation, **including but not limited to those mentioned in your answers to**

the complaint . . . ." See Yasunaga Decl., attached hereto, at ¶ 2-4.  Moreover,

Defendants did not even move for summary judgment on grounds that Claim 1 and

67 are invalid for failure to meet the written description requirement.

The finding of invalidity arose out of Plaintiffs' motion for claim

construction of the term "heating" in claims 1 and 67 of the Kowalski patent.

Defendants cannot short cut the invalidity analysis, and **their** attendant burden of

overcoming the presumption of invalidity with clear and convincing evidence, by

"raising the specter of invalidity" in the context of a claim construction motion.

Cf. Rhine v. Casio, Incorp., 183 F.3d 1342, 1346 (Fed. Cir. 1999) ("Casio also

argues that, under our construction, claim 1 is invalid because the recited

combination is obvious.  This argument is premature.  **Casio cannot avoid a full-**

**blown validity analysis by raising the specter of invalidity during the claim**

**construction phase.**") (emphasis added).

Finally, it is well-settled that summary judgment against the patent holder on

the issue of validity is improper *sua sponte* where, as here, a full and fair

opportunity to proffer material evidence and make argument was not ensured.  See

Massey v. Del Lab., Inc., 118 F.3d 1568, 1570, 1573 (Fed. Cir. 1997) (relying on

Ninth Circuit law for the proposition that "the district court may grant summary

judgment without notice if the losing party has had a "'full and fair opportunity to

ventilate the issues involved in the motion'" and noting that "[i]n a further effort to

decide whether Massey [the patent holder] received its full and fair opportunity to show [a] factual or legal issue precluding a summary judgment of obviousness, this court also examines the associated burdens in the pending motions" including that "the patent itself carries a presumption of validity, which requires proof of facts supporting invalidity to raise to the level of clear and convincing evidence."), Fin Control Sys. Pty. Ltd. v. OAM Inc., 265 F.3d 1311, 1312 (Fed .Cir. 2001) ("However, OAM's defenses of invalidity and unenforceability were not the subject of any motion before the district court, nor does the record indicate that these aspects of the case had been fully litigated at the time that the district court entered judgment. Therefore, the district court's *sua sponte* grant of summary judgment of invalidity and unenforceability was procedurally improper because it did not provide the parties with adequate notice or an opportunity for FCS to present evidence and argument in opposition to the motion.").

Plaintiffs were not on notice of the possibility that claims 1 and 67 would be deemed invalid for failure to meet the written description requirement in connection with construction of the term "heating." Plaintiffs did not anticipate the need for legal argument or submission of evidence supporting that the specification of the Kowaski Patent adequately supports "heating" at temperatures outside of 204 to 510 degrees Centigrade, especially since Defendants did not plead the written description defense, did not mention this defense in their answers to

interrogatories, did not move for summary judgment, and did not argue that

Plaintiffs' proffered construction of "heating" ran afoul of the written description

requirement in their response to Plaintiffs' Motion for Claim Construction.  In

short, Plaintiffs have not had a "full and fair opportunity" to present legal argument

and evidentiary support to show that genuine issues of material fact exist with

respect to satisfaction of the written description requirement.  The finding of

invalidity was procedurally improper and should be vacated.  See Massey, 118

F.3d at 1573, Fin Control Sys. Pty, Ltd., 265 F.3d at 1312.

> **C.  Even Assuming *Arguendo* That Defendants Are Permitted To Assert Invalidity For Failure To Meet The Written Description Requirement Despite Their Failure To Plead, Mention In Interrogatory Responses, And Move On This Defense, Plaintiffs Have Strong Arguments And Evidence To Support That The Written Description Requirement Is Satisfied.**

The written description requirement derives from 35 U.S.C. § 112, which

provides in relevant part that "[t]he specification shall contain a written description

of the invention." 35 U.S.C. § 112, see also Kao Corp. v. Unilever United States,

Inc., 441 F.3d 963, 967-68 (Fed. Cir. 2006).  "The purpose of the written

description requirement is to prevent an applicant from later asserting that he

invented that which he did not[.]"  Amgen Inc. v. Hoechst Marion Roussell, Inc.,

314 F.3d 1313, 1330 (Fed .Cir. 2003).

Section 112 requires "the patent specification to 'describe the claimed

invention so that one skilled in the art can recognize what is claimed."  Koito Mfg.

Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1154 (Fed. Cir. 2004). "In

evaluating whether a patentee has fulfilled this requirement, [the Federal Circuit's]

standard is that the patent's disclosure must allow one skilled in the art to visualize

or recognize the identify of the subject matter purportedly described." Id.  The

Federal Circuit cautions that "the disclosure as originally filed does not have to

provide *in haec verba* support for the claimed subject matter at issue," Kao Corp.,

441 F.3d at 968, and "[a] specification may, within the meaning of 35 U.S.C. §

112, para. 1, contain a written description of a broadly claimed invention without

describing all species that the claim encompasses." Cordis Corp., 339 F.3d at 1365

(citation omitted).

The finding of invalidity apparently rested on the Federal Circuit's decision

in Gentry Gallery.  See Claims Construction Order, filed 10/17/07, at 19-20.  In

Gentry Gallery, the Federal Circuit held that claim language that did not limit the

location of controls to the console between the two seats was not supported by the

written description based on the following reasoning:

> In this case, **the original disclosure clearly identifies the console as
> the only possible location for the controls.**  It provides for only the
> most minor variation in the location of the controls, noting that the
> control "may be mounted on top or side surfaces of the console rather
> than on the front wall ... without departing from this invention." '244
> patent, col. 2, line 68 to col. 3, line 3.  **No similar variation beyond
> the console is even suggested.  Additionally, the only discernible
> purpose for the console is to house the controls.**  As the disclosure
> states, **identifying the only purpose relevant to the console,**
> "[a]nother object of the present invention is to provide ... a console

positioned between [the reclining seats] that accommodates the controls for both of the reclining seats." *Id.* at col. 1, ll. 33-37. Thus, **locating the controls anywhere but on the console is outside the stated purpose of the invention.** . . . .

. . . . It is true, as Gentry observes, that we noted that "an applicant ... is generally allowed claims, when the art permits, which cover more than the specific embodiment shown." *Ethicon*, 93 F.3d at 1582 n. 7, 40 USPQ2d at 1027 n. 7 (quoting *In re Vickers*, 141 F.2d 522, 525, 61 USPQ2d 122, 125 (CCPA 1944)). However, we were also careful to point out in that opinion that the applicant "was free to draft claim[s] broadly (within the limits imposed by the prior art) to exclude the lockout's exact location as a limitation of the claimed invention" only because he "did not consider the precise location of the lockout to be an element of his invention." *Id.* Here, as indicated above, **it is clear that Sproule considered the location of the recliner controls on the console to be an essential element of his invention.** . . . .

Similarly, *In re Rasmussen* does not support Gentry's position. . . . . The claims at issue in *Rasmussen*, which were limited to the generic step of "adheringly applying" one layer to an adjacent layer, satisfied the written description requirement only because "one skilled in the art who read [the] specification would understand that it is unimportant how the layers are adhered, so long as they are adhered." **Here, on the contrary, one skilled in the art would clearly understand that it was not only important, but essential to Sproule's invention, for the controls to be on the console.**

Id. at 1479-80 (bold emphasis added). Thus, deviation from the well-settled "truism that a claim need not be limited to a preferred embodiment," see id. at 1479, was sanctioned in Gentry Gallery based on the following critical factors present in that case: (1) the original disclosure identified the console between the two seats as the **only** possible location for the controls, (2) the claimed matter (locating the controls anywhere but on the console between the two seats) was **outside the stated purpose of the invention**, i.e. the patent holder considered the

location of the recliner controls on the console between the two seats to be an **essential element** of his invention, and (3) a person skilled in the art would clearly understand that it was **not only important, but essential**, to the invention for the controls to be on the console between the two seats.  See id. at 1479-80.

Numerous Federal Circuit decisions have since distinguished Gentry Gallery where the above factors were not present, holding the written description requirement fulfilled notwithstanding broad claim language.  For example, in Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985 (Fed. Cir. 1999), the Federal Circuit reasoned and held:

> Thus, this case, unlike *Gentry Gallery*, in which this court's determination that the patent disclosure did not support a broad meaning for the disputed claim terms was premised on clear statements in the written description that described the location of a claim element – the "control means" – as "the only possible location" and that variations were **"outside the stated purpose of the invention."**  *Gentry Gallery*, then, considers the situation **where the patent's disclosure makes crystal clear that** a particular (*i.e.* narrow) understanding of a claim term is **an "essential element of the inventor's invention."**  Here, however, the patent disclosure provide ample support for the breadth of the term 'heading' it does not "unambiguously limit" the meaning of "heading" to the direction of the motor.

Id. at 993 (internal citations omitted) (bold emphasis added).

Similarly, in Cordis Corp. v. Medtronic Ave., Inc., 339 F.3d 1352 (Fed. Cir. 2003), the Federal Circuit held that the "substantial evidence supports a finding that AVE failed to prove by clear and convincing evidence that the claims are

invalid for failure to satisfy the written description requirement" and distinguished

Gentry Gallery as follows:

> In *Gentry Gallery*, we concluded that the written description requirement was not satisfied because while the "original disclosure clearly identifies the console as the only possible location for the controls," the claims did not limit the location of the control to the console. *Gentry Gallery* thus applied "the proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope. In the present case, the entirety of the specification does not reflect that the invention goes to the narrower scope of a mixture of half and complete slots. Such a mixture was not conveyed as critical to the invention nor was it described as the only feasible design in the disclosure.

Id. at 1365 (internal citations omitted); see also Cooper Cameron Corp., 291 F.3d

at 1323 ("We are not persuaded by Kvaerner's arguments, relying on *Gentry*, that

it is essential to the invention for the workover port to enter the assembly 'between

the two plugs' and that claims reciting a location other than 'between the two

plugs' are therefore invalid for inadequate description. . . . . There was no

description or support whatever in the *Gentry* patent of the controls being other

than on the console. In contrast, in this case, Cooper's claims to the location of the

workover port in the 119 patent are supported by the figures showing that the

workover port is in fact above the tubing hanger and below the BOP bore."); 

Amgen Inc., 314 F.3d at 1333-34 ("Here, to be sure, Amgen made statements that

its invention is 'uniquely characterized' by exogenous expression of DNA. When

considered in context, however, these statements do not lead to the same

conclusion as in *Gentry*.  Amgen's statements simply do not clearly indicate that exogenous expression is the *only* possible mode of the invention or that other methods were outside the stated purpose of the invention.").

As discussed in detail below, the facts of this case are similarly distinguishable from Gentry Gallery.  The specification adequately supports Kowalski's claim to heating organic materials at temperatures not limited to the 204 to 510 degree Centigrade range.

> 1.  The specification does not clearly state that Kowalski's tasteless smoke invention is possible only if the smoke is generated by heating organic material between the temperatures of 204 to 510 degrees Centigrade.

Unlike the original disclosure of the patent in Gentry Gallery, which "clearly identifie[d] the console as the only possible location for the controls," 134 F.3d at 1479, the specification of the Kowalski Patent does not clearly state that Kowalski's invention is possible only if the smoke is generated by burning organic material at specific temperatures, i.e. between 204 and 510 degrees Centigrade.

The specific temperature ranges discussed in portions of the specification expressly pertain to minimization of the **formation** of deleterious polycyclic aromatic hydrocarbons (PAHS), and oxidation or organic vapors, including both condensable organic compounds as well as volatile organic compounds (VOCs), see Ex. "1" (Kowalski Patent) Col. 6 ln. 63-67, Col. 7, ln. 1-3 ("**To minimize formation of these compounds** . . . an operable combustion temperature range of

400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade) and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) are established for the process described herein.") (emphasis added).  The Kowalski Patent referred to 204 to 510° C as a range one might use **IF** one wanted to try "To minimize formation of these compounds."  The word "operable" was used as a label for that range of temperatures that might be used if one wanted to try to minimize formation of the compounds, the word "operable" certainly did not indicate that the Kowalski process only worked within that temperature range.

This is clear because the specification unambiguously states that "**If wood is combusted above this temperature level and these compounds are formed, they can be successfully filtered later in the process.**"  Id. at Col. 6, ln. 60-63. Thus, far from stating that the specific temperature ranges are the only possible way to accomplish Kowalski's process, the specification discloses that it is entirely possible to produce smoke by burning at higher temperature levels because the compounds can be **successfully** filtered later in the process.

Furthermore, "[t]he original claims as filed are part of the patent specification."  Northern Telcom, Inc. v. Datapoint Corp., 908 F.2d 931, 938 (Fed. Cir. 1990) (citing 35 U.S.C. § 112, ¶ 2 – "The specification shall conclude with one or more claims").  The claims in Kowalski's original November 28, 1997

application do not contain a temperature limitation as to the "heating" step.  See Ex. "2" at 41.  In fact, even Kowalski's March 12, 1997 provisional application claims "a process comprising burning organic smoking material to produce smoke," which does not contain a temperature limitation.  See Ex. "3" at 39.  Thus, the specification of Kowalski's patent does support that the process is possible at heating temperatures not limited to the 204 to 510 degree Centigrade temperature range.

Finally, Figure 1 of the Kowalski Patent, entitled "Smoke Emissions," refers to smoke generation at temperatures as high as 871° Centigrade and the Abstract refers to a preferable range of 260° to 571° Centigrade.  See Ex. "1" at Fig. 1 and Abstract ("The smoke is generated by burning an organic smoking material at **preferably** . . . (260 to 571 degrees C) in a smoke generator") (emphasis added).  Thus, the specification discloses that it is possible, and even preferable, to generate smoke by heating organic material at temperatures above 510° Centigrade.  See Cooper Cameron Corp., 291 F.3d at 1323 ("In contrast . . . Cooper's claims to the location of the workover port in the 119 patent are supported by the figures . . . .").

The above-discussed evidence conclusively shows that the temperature range (204° to 510° Centigrade) mentioned in the specification is directed only toward the option of minimization of the **formation** of certain compounds [PAHs and VOCs]," **not** the only possible temperatures at which smoke can be generated

to accomplish Kowalski's process of using smoke to treat food without adding smoke taste or flavor.

In fact, that temperature range is specifically described as being a preferred embodiment, see Ex. "1" (Kowalski Patent) at Col. 16, ln. 39-44 ("Best Mode For Carrying Out Invention . . . . The sawdust . . . is combusted by heating . . . to an operable temperature range of . . . 204 to 510 degrees centigrade"), while the "Background Act" portion explains that "if wood is combusted above this temperature and these compounds [PAHs and VOCs] are formed, they can be successfully filtered later in the process." Id. at Col. 6, ln. 60-63.

At the very least, the above evidence shows that reference in the specification to a 204 to 510 degree Centigrade "operable" temperature range is merely a preferred embodiment of Kowalski's process in which formation of the compounds is minimized during the smoke generation step (reducing need for removal in a subsequent step), **not** an essential or critical element or the only possible mode of Kowalski's invention. See Amgen Inc., 314 F.3d at 1333-34 ("Amgen made statements that its invention is 'uniquely characterized' by exogenous expression of DNA. . . . . Amgen's statements simply do not clearly indicate that exogenous expression is the *only* possible mode of the invention or that other methods were outside the stated purpose of the invention."). As such, Gentry Gallery is distinguishable on this ground.

2.      Smoke generated by heating organic material at temperatures outside of the 204 to 510 degree Centigrade range is within the stated purpose of Kowalski's invention.

In Gentry Gallery, the patentee was not allowed to claim matter that was "outside the stated purpose of the invention." 134 F.3d at 1479. Unlike in Gentry Gallery, however, smoke generated by heating organic material at temperatures outside of the 204 to 510 degree Centigrade range is within the stated purpose of Kowalski's tasteless smoke invention.

Nowhere in the specification of the Kowalski Patent, particularly the section that recites the objects of the of the invention, see id. at Col. 2, ln. 66-67, Col. 3, ln. 1-67, Col. 4, ln. 1-17, is it stated that the purpose of the invention is to avoid the formation of carcinogenic compounds (PAHs and VOCs). Rather, the specification of Kowalski's Patent states:

It is therefore an object of the present invention to provide a process of manufacturing **tasteless** super-purified smoke for the treatment of . . . . seafood species (and other meat . . . ) to be frozen and thawed.

It is a further object of this invention to select a fuel, or fuels, and **a combustion process that will generate an all natural, organic smoke that can be filtered.**

It is a still further object of this invention **to purify the smoke by filtering out a substantial amount of odor and taste imparting particulate matter and gaseous vapors, recovering super-purified smoke in a tasteless form.**

It is a still further object of this invention **to super purify the smoke to be completely non-toxic by separating out or absorbing out certain undesirable components that may be carcinogenic.**

Ex. "1" (Kowalski Patent) at Col. 2, ln 66-67, Col. 3, ln. 1-13 (emphasis added). The only objective regarding carcinogenic compounds relates to "separating" or "absorbing" out those compounds, thus supporting that burning at high temperatures (at which the compounds are formed) is within the purpose of the invention. None of the stated objectives includes limiting formation of possibly carcinogenic compounds. All of them support the step of heating organic material to generate smoke without limitation to any specific numeric temperature range.

The above-cited "objectives" show that the creation of tasteless smoke – i.e. smoke that does not leave the food with a smoke taste or odor – is the "essential element" of Kowalski's invention. See id. An interview summary, attached hereto as Ex. "4," reinforces this point by stating that "applicant [Kowalski] defines over prior art of record by not imparting smoke taste & flavor & odor[.]" Furthermore, Kowalski's claims, including Claims 1 and 67, were expressly allowed by the patent examiner because "the claimed process for treating food defines over the prior art of record by comprising the steps of generating smoke, removing smoke odor and/or taste compounds from said smoke, and treating food with said smoke such that the food does not retain a smoky odor or taste." See Ex. "5" (Notice of Allowability) at 3. Thus, the main purpose of Kowalski's invention is clearly using smoke to treat foods without leaving the food with a smoke taste or odor, not the minimization of the formation of possibly carcinogenic substances.

Neither Kowalski's Patent nor its prosecution history indicate that minimization of the formation of possibly carcinogenic compounds is "essential" to Kowalski's invention. Heating at temperatures above 510° Centigrade is still within the stated purpose of Kowalski's invention, i.e. tasteless smoke, because if **"the [possibly carcinogenic] compounds are formed, they can be successfully filtered later in the process."** Ex. "1" (Kowalski Patent) at Col. 6, ln. 60-63. Heating at temperatures of 204 to 510 degrees Centigrade is simply one way (not the only way) to achieve the generic step of smoke generation. Thus, <u>Gentry Gallery</u> is also distinguishable on this ground.

> 3.   A person skilled in the art would understand that smoke could be generated by heating organic material at temperatures outside of 204 to 510 degrees Centigrade and that the 204 to 510 degree Centigrade temperature range was not essential to Kowalski's invention of not imparting smoke taste and odor.

In <u>Gentry Gallery</u>, the Federal Circuit reasoned that "one skilled in the art would clearly understand that it was not only important, but essential to [the] invention, for the controls to be on the console." 134 F.3d at 1480. In this case, however, the evidence discussed below supports that a person with skill in the art would readily understand that the temperature at which the organic material is heated to generate smoke is not only unessential, but unimportant because it was known in the food smoking industry at the time of Kowalski's patent application in 1997-1999 that suitable smoke can be generated at temperatures outside of the 204

to 510 degree Centigrade temperature range.  See id.  Put another way, there was

no need for Kowalski to state a broader numeric range of heating temperatures

because it was already well-known in the food smoking industry.  See Hybritech

Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("[A]

patent need not teach, and preferably omits, what is well known in the art.");

Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co., 730 F.2d

1452, 1463 (Fed. Cir. 1984) ("[T]he specification need not disclose what is well

known in the art."); Fonar Corp. v. General Electric Co., 107 F.3d 1543, 1549

(Fed. Cir. 1997) (where a patent concerns software, a description disclosing merely

the function of the software but not the actual source code is sufficient because

"normally, writing code for such software is within the skill of the art, … once its

functions have been disclosed.").

Given the state of knowledge in the field at the time, see Capon v. Eshhar,

418 F.3d 1349, 1357 (Fed. Cir. 2005) ("The descriptive text needed to meet these

[written description] requirements varies with the nature and scope of the invention

at issue, and with the scientific and technologic knowledge already in existence."),

the phrase "heating organic material to generate smoke" is sufficiently

straightforward that a "detailed description in the specification was not necessary."

Kao Corp., 441 F.3d at 968.  The U.S. Patent and Trademark Office's Manual of

Patent Examining Procedure (8th Ed. 2006) ("PTO Manual") states:

The following Guidelines establish the policies and procedures to be followed by Office personnel in the evaluation of any patent application for compliance with the written description requirement of 35 U.S.C. 112…

The description need only describe in detail that which is new or not conventional.  See Hybritech Inc. v. Monoclonal Antibodies, 802 F.2d at 1384 …; Fonar Corp. v. General Electric Co., 107 F.3d at 1549 … (source code description not required 1367, 1384 (Fed. Cir. 1986)…

What is conventional or well known to one of ordinary skill in the art need not be disclosed in detail.  See Hybritech Inc. v. Monoclonal Antibodies, 802 F.2d at 1384 ….

Thus, it is common for the USPTO to issue patents that contain steps very similar to the Kowalski patent's "heating an organic material to generate smoke." See, e.g., Ex. "11" (US Patent No. 3,615,729, issued in 1976, directed to "Smoking of Food Products") at Col. 8, ln. 14 (claiming "generating smoke by subjecting a desired wood to heat" as a step in the process without any specific numerical temperature limitation), Ex. "12" (US Patent 4,883,676, issued in 1989, directed to "Method of Forming Liquid Smoke") at Col. 9, ln. 66-68 (claiming "heating said combustion zone to a temperature at least sufficient to effect combustion of said sawdust" as a step in the process without any specific numerical temperature limitation), Ex. "13" (US Patent 5,135,770, issued in 1992, directed to High Browning Liquid Smoke Composition and Method of Making a High Browning Liquid Smoke Composition) at Col. 16, ln. 25-29 (claiming "collecting the condensable liquids produced by the fast pyrolysis of wood or cellulose to give a raw liquid" without describing the smoke generation step at all).

The above patents show that it was well-known in the art that smoke can be generated by heating at all kinds of temperatures, including above and below the range of 204 degrees C and 510 degrees C.  This point is also established by Professor Joseph A. Maga's ("**Prof. Maga**") book entitled "Smoke in Food Processing," published in 1988, which teaches that "the higher the combustion temperature, the higher the amount of gases produced," Ex. "6" at K004687, and demonstrates that smoke generation by heating at temperatures such as 540, 650, 760 and 870, and as high as 1000 degrees Centigrade was known to persons of ordinary skill in the art.  See id. at K004688 (Table 12 – Influence of Combustion Temperature On Product Yields) and K004766-67 ("They noted a linear increase in benzo[a]pyrene concentration as smoke generation temperature was increased from 400 to 1000°C.).  Persons skilled in the art also understood that carcinogenic compounds such as PAHs generated at higher temperatures could be filtered or removed.  See Ex. "7" at K004769 ("As mentioned elsewhere, the filtration of smoke can significantly lower PAH concentration."), id. at K004766 ("Toth and Blaas reported on numerous smoke-processing techniques that can significantly lower PAH levels."), id. at K004769 ("Relative to filtration of smoke as a means of reducing PAH content, Potthast et al. have shown that the technique can reduce PAH levels up to 97%").

Generating smoke at temperatures below 204 degrees Centigrade was also

well-known by persons skilled in the art of food smoking. United States Patent No. 3,462,282, issued in 1969 to Fessmann, et al. and directed to "a process and apparatus for preparing smoking fluid and smoking foodstuffs therewith," disclosed for a process for creating a liquid smoke by heating sawdust with steam at **180 degrees C**. See Ex. "8" (Fessman Patent) at Col. 2, ln. 35-37 (emphasis added). Also, Prof. Maga, in "Smoke in Food Processing," in 1988 discussed earlier studies showing that "[e]ven at a temperature **slightly above 100° C**, significant changes [relating to pyrolysis] can occur in wood," Ex. "9" at K004680 (emphasis added), and that "[a]ctual loss of cellulose polymerization can occur in the **150 to 190°C** temperature range in the absence or presence of air." Id. at K004681 (emphasis added); see also id. at K004686-87 ("Fenner and Lephardt followed lignin decomposition over a wide temperature range and found that initial lignin decomposition occurred at **120** to 300°C.").

Where, as here, the literature provides the non-disclosed information, "the written description requirement does not require either the recitation or incorporation by reference (where permitted) [of that information]." Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1368 (Fed. Cir. 2006).

The above-discussed evidence[4] shows that the specification of Kowalski's patent described his invention in sufficient detail that one skilled in the art could

---

[4] See also Yasunaga Decl. at ¶ 5 (discussing Prof. Maga's declaration).

clearly conclude that Kowalski's invented process encompassed smoke generated by heating organic material at temperatures outside of the 204° to 510° Centigrade range. See Cordis Corp., 339 F.3d at 1364. Persons with ordinary skill in the art, reading the phrase "heating organic material to generate smoke," would understand how to perform that step and understand that it is unessential to Kowalski's invention to generate the smoke by heating organic material at the specific temperature range of 204° to 510° Centigrade. Thus, Gentry Gallery is distinguishable on this ground as well.

## IV.    **CONCLUSION**

For the foregoing reasons the Court should grant the Motion and:

(1)    clarify that the term "heating," properly construed, is not limited to a specific numerical temperature range, and therefore, "heating organic material to generate smoke" means "heating carbon containing material (including wood, wood sawdust, and wood charcoal) to make smoke", and

(2)    vacate the portion of the Claims Construction Order holding that Claims 1 and 67 of the Kowalski Patent are invalid.

DATED:  Honolulu, Hawaii, October 30, 2007.

CADES SCHUTTE LLP

/s/ Milton M. Yasunaga
MILTON M. YASUNAGA
ALLISON MIZUO LEE
Attorneys for WILLIAM R. KOWALSKI
and HAWAII INTERNATIONAL
SEAFOOD, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI et al.,<br>v.<br>MOMMY GINA TUNA<br>RESOURCES, et al. | CIVIL NO. 05-00679 BMK<br>CIVIL NO. 06-00182 BMK<br>CIVIL NO. 05-00787 BMK<br>CIVIL NO. 05-00517 BMK |
| | DECLARATION OF MILTON M.<br>YASUNAGA |
| WILLIAM R. KOWALSKI, et al.,<br>v.<br>INTEGRAL SEAFOOD LLC et al. | |
| WILLIAM R. KOWALSKI, et al.,<br>v.<br>RICHARD FRIEND et al. | |
| TUNA PROCESSORS, INC.,<br>          Plaintiff,<br>v.<br>HAWAII INTERNATIONAL<br>SEAFOOD, INC.<br>          Defendant/Counterclaim<br>          Plaintiff,<br><br>and WILLIAM R. KOWALSKI<br>          Additional Counterclaim<br>          Plaintiff. | |

## DECLARATION OF MILTON M. YASUNAGA

MILTON M. YASUNAGA, hereby declares:

1.     I am a partner in Cades Schutte, LLP, counsel for Hawaii

International Seafood, Inc. ("HISI") and William R. Kowalski ("Kowalski")

(jointly, "Plaintiffs"). I make this declaration based upon my personal knowledge,

unless otherwise stated, and am competent to testify to the facts related herein.

2.      Defendants Mommy Gina Tuna Resources ("MGTR") and Joaquin Lu
("Lu") filed an Answer to Plaintiffs' Complaint in Civ. No. 05-679 BMK on May
26, 2006.  Defendant King Tuna Inc. ("King Tuna") filed its answer on March 9,
2006.  King Tuna, MGTR and Lu did not plead the defense of invalidity for lack of
a sufficient written description in their Answers.  Furthermore, Defendants King
Tuna, MGTR and Lu served their responses to Kowalski's First Request For
Answers To Interrogatories on or about August 17, 2006.  King Tuna, MGTR and
Lu's responses to Interrogatory No. 3, which inquired "Explain with particularity
and identify all bases/facts relating to each defendant's claims, contentions,
positions, defenses or affirmative defenses in this litigation, including but not
limited to those mentioned in your answer to the complaint, and identify each
witness with knowledge of any of those matters and the substance of each
witness's knowledge," did not state, explain or refer to the defense of invalidity for
failure to meet the written description requirement of 35 U.S.C. § 112.

3.      Defendants Integral Seafood LLC ("Integral") and Citra Mina
Seafood Corp. ("Citra Mina") filed an Answer to Plaintiffs' Complaint in Civ. No.
05-00182 BMK on July 15, 2006.  Integral and Citra Mina did not plead the
defense of invalidity for lack of a sufficient written description in their Answer.
Furthermore, Integral and Citra Mina served their Answers to Plaintiffs' First

Request For Answers to Interrogatories on or about August 31, 2006. Integral and Citra Mina's responses to Interrogatory No. 3, which inquired "Explain with particularity and identify all bases/facts relating to each defendant's claims, contentions, positions, defenses or affirmative defenses in this litigation, including but not limited to those mentioned in your answer to the complaint, and identify each witness with knowledge of any of those matters and the substance of each witness's knowledge," did not state, explain or refer to the defense of invalidity for failure to meet the written description requirement of 35 U.S.C. § 112.

4.    Defendants Richard Friend ("Friend") and Seafriend filed an Answer to Plaintiffs' Complaint in Civ. No. 05-00787 BMK on February 10, 2006. Friend and Seafriend did not plead the defense of invalidity for lack of a sufficient written description in their Answer. Furthermore, Friend and Seafriend served their Answers to Plaintiffs' First Request For Answers to Interrogatories on or about June 1, 2006, and Supplemental Response to Kowalski's First Request for Answers to Interrogatories on or about August 17, 2006. Friend and Seafriend's responses to Interrogatory No. 3, which inquired "Explain with particularity and identify all bases/facts relating to each defendant's claims, contentions, positions, defenses or affirmative defenses in this litigation, including but not limited to those mentioned in your answer to the complaint, and identify each witness with knowledge of any of those matters and the substance of each witness's knowledge," did not state,

explain or refer to the defense of invalidity for failure to meet the written description requirement of 35 U.S.C. § 112.

5.      Since the Court issued its Claims Construction Order for the Yamaoka and Kowalski Patents and the issue of failure to meet the written description requirement was raised *sua sponte* on October 17, 2007, Plaintiffs' expert, Dr. Joseph A. Maga ("Prof. Maga"), has been working in Europe until recently. Plaintiffs have not had an opportunity to secure a declaration from Prof. Maga, but have a good faith belief, based Prof. Maga's treatise "Smoke in Food Processing" and a brief telephone discussion with Prof. Maga, that Prof. Maga would provide testimony in the form of a declaration supporting, among other things, that it was well-known in the smoked food industry that smoke suitable for Kowalski's invention could be generated at temperatures outside of the 204 to 510 degree Centigrade temperature range and that given the state of knowledge in the field at the time of Kowalski's invention, the phrase "heating organic material to generate smoke" would be understood and could be performed even though it does not state a specific numerical temperature limitation.  I plan to submit a declaration to this effect by Dr. Maga shortly.

6.      Attached as Exhibit "1" is a true and correct copy of United States Patent No. 5,972,401 ("Kowalski Patent").

7.      Attached hereto as Exhibit "2" is a true and correct copy of the new

application transmittal and pages 1 and 41 Kowalski's original patent application

for the Kowalski Patent submitted to the United States Patent and Trademark

Office ("USPTO") on or about November 28, 1997. The non-claims portion of the

original patent application remained the same throughout the application process

and became the non-claims portion of the issued patent.

8.      Attached hereto as Exhibit "3" is a true and correct copy of the

provisional application cover sheet and pages 1 and 39 of Kowalski's provisional

application for the Kowalski Patent submitted to USPTO on or about March 12,

1997. The non-claims portion of the provisional patent application remained the

same throughout the application process and became the non-claims portion of the

issued patent.

9.      Attached as Exhibit "4" is a true and correct copy of the Interview

Summary prepared by the USPTO in the course of the application of the Kowalski

Patent.

10.      Attached hereto as Exhibit "5" is a true and correct copy of the Notice

of Allowability by USPTO examiner Drew Becker, and signed by USPTO

Supervisory Patent Examiner David Lacey.

11.      Attached hereto as Exhibit "6" is a true and correct copy of the title

pages and pages 36 (K004687), 37 (K004688), and portions of pages 115

(K004766) and 116 (K004767) of the treatise Joseph A. Maga, <u>Smoke in Food</u>

Processing (1988).

12.    Attached hereto as Exhibit "7" is a true and correct copy of the title pages and pages 113 (K004764), 114 (K004765), 115 (K004766), and 116 (K004767) of the treatise Joseph A. Maga, Smoke in Food Processing (1988).

13.    Attached hereto as Exhibit "8" is a true and correct copy of United States Patent No. 3,462,282 issued to Fessman et al. on August 19, 1969 and directed to a "process and apparatus for preparing a smoking fluid and smoking foodstuffs therewith."

14.    Attached hereto as Exhibit "9" is a true and correct copy of the title pages and pages 29 (K004680), 30 (K004681), 35 (K004686), and 47 (K004687) of the treatise Joseph A. Maga, Smoke in Food Processing (1988).

15.    Attached hereto as Exhibit "10" is a true and correct copy of a request for amendment of Kowalski's application submitted by Martin Hsia, Esq. to the USPTO on or about March 25, 1999.

16.    Attached hereto as Exhibit "11" is a true and correct copy of United States Patent No. 3,615,729 issued to Baker, et al. on October 26, 1971 and directed to "smoking of food products."

17.    Attached hereto as Exhibit "12" is a true and correct copy of United States Patent No. 4,883,676 issued to Sophianopoulos et al. on November 28, 1989 and directed to a "method of forming liquid smoke."

18.    Attached hereto as Exhibit "13" is a true and correct copy of United States Patent No. 5,135,770 issued to Underwood, on August 4, 1992 and directed to "high browning liquid smoke composition and method of making a high browning liquid smoke composition."

I, MILTON M. YASUNAGA, declare, verify, certify, and state under penalty of perjury that the foregoing is true and correct.

DATED:  Honolulu, Hawaii, October 30, 2007.

/s/ Milton M. Yasunaga
MILTON M. YASUNAGA

US005972401A

# United States Patent [19]

## Kowalski

[11] **Patent Number:** **5,972,401**

[45] **Date of Patent:** **Oct. 26, 1999**

[54] **PROCESS FOR MANUFACTURING TASTELESS SUPER-PURIFIED SMOKE FOR TREATING SEAFOOD TO BE FROZEN AND THAWED**

[76] Inventor: **William R. Kowalski**, 2161 Kalia Rd., No. 306, Honolulu, Hi. 96815

[21] Appl. No.: **08/980,392**

[22] Filed: **Nov. 28, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/733,844, Oct. 18, 1996.

[60] Provisional application No. 60/040,731, Mar. 12, 1997.

[51] Int. Cl.⁶ ................................................. **A23B 4/044**

[52] U.S. Cl. ...................... **426/314**; 426/478; 426/486; 426/524; 426/315

[58] Field of Search ................................ 426/314, 315, 426/478, 486, 524

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 889,828 | 6/1908 | Trescott . |
| 3,122,748 | 6/1959 | Beebe, Jr. . |
| 3,663,237 | 5/1972 | Moller . |
| 3,851,078 | 11/1974 | Khayat et al. . |
| 4,359,481 | 11/1982 | Smits et al. ........................ 426/533 |
| 4,522,835 | 6/1985 | Woodruff et al. . |
| 4,751,097 | 6/1988 | Melcer ............................. 426/650 |
| 5,484,619 | 1/1996 | Yamaoka et al. . |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1717058 | 8/1970 | Germany . |
| 3010473C1 | 5/1982 | Germany . |
| 3010473C2 | 2/1991 | Germany . |
| 4104953A1 | 5/1992 | Germany . |
| 097944 | 12/1984 | Japan . |
| 251682 | 5/1987 | Japan . |
| 047667 | 9/1988 | Japan . |
| 406292503 | 10/1994 | Japan . |
| 847973 | 7/1923 | U.S.S.R. . |
| 11778395 | 9/1985 | U.S.S.R. . |
| 1360609 | 7/1974 | United Kingdom . |

### OTHER PUBLICATIONS

Iowa State University, *"Minimum Specifications For One Truck Laboratory Oven For Iowa State University"*, Section I, 1988, p. 6.

The Kartridg Pak Co. flyer, *"There Is No Substitute For The Flavor Of Natural Wood Smoke"*, 1989.

Smoke In Food Processing, Table 15, *"Odor And Taste Recognition Thresholds (ppm) And Most Desirable Concentrations (ppm) Of The Phenolic Fraction Isolated From The Vapor And Particualte Phases Of Wood Smoke"*, p. 74.

*"Cured, Salted, and Smoked Fish Establishments Good Manufacturing Practices: An Association of Food and Drug Official Model Code adopted Jun. 1991"*, Section 5.4.

Andrade, et al., *"Technological Utilization of Mandi Fish: Cold Smoking,"* English Abstract of Purtuguese lecture, 1975.

PescaRich Global Marketing Corporation,"The PescaRich Process" brochure.

Primary Examiner—David Lacey
Assistant Examiner—Drew Becker
Attorney, Agent, or Firm—Martin E. Hsia

[57] **ABSTRACT**

Tasteless super-purified smoke is manufactured to treat seafood and meat to preserve the freshness, color, texture, and natural flavor, particularly after the food is frozen and thawed. The smoke is generated by burning an organic smoking material at preferably 500 to 800 degrees F. (260 to 571 degrees C.) in a smoke generator **1**. It is then passed through a precipitation filtering tower **2** comprised of filters of ice, cloth, and activated carbon to remove taste imparting, and carcinogenic, particulates and vapors. The super-purified smoke is then stored and aged in a temporary pressure pot **3** or in canisters for treatment at the same time or at another place and time. The super-purified smoke is used to treat seafood or meat in plastic bags at temperatures between its variable freezing point and 46 degrees F. (7.8 degrees C.) for twelve to forty-eight hours, or until the desired effect is achieved. The product is then frozen, stored for up to one year, and quick or slow thawed with little degradation of the treated seafood or meat.

**73 Claims, 3 Drawing Sheets**





*Fig. 1*



**Fig. 2(a)**

**Fig. 2(b)**

**Fig. 2(c)**



Fig. 3(b)

Fig. 3(c)

Fig. 3(a)

5,972,401

**1**

## PROCESS FOR MANUFACTURING TASTELESS SUPER-PURIFIED SMOKE FOR TREATING SEAFOOD TO BE FROZEN AND THAWED

This application claims the benefit of U.S. Provisional Application No. 60/040,731 Mar. 12, 1997.

This application is a continuation-in-part of copending application number 08/733,844 filed on Oct. 18, 1996.

### TECHNICAL FIELD

This invention relates to a process for manufacturing tasteless super-purified smoke for treating seafood to preserve the freshness, color, texture, natural flavor, moisture retention, and shelf life after the seafood is frozen and thawed. These characteristics are the vital signs of quality in seafood, hereinafter referred to as "vitality."

The super-purified smoke treatment process is effective in prolonging the vitality of fresh seafood. However, this invention is uniquely valuable in that the vitality preserving effects of the treatment process survive freezing and thawing. The primary seafood species to be treated is tuna and other seafood containing red color flesh that would tend to turn brown after being frozen and thawed without the treatment described herein. Although this tasteless super-purified smoke is primarily intended to be used to treat seafood, it can also be used with meat and poultry.

The intention of treatment with our tasteless super-purified smoke is to preserve the vitality of the seafood so it appears and tastes similar to fresh after it is frozen and thawed. In all cases seafood should be wholesome. However, seafood that is consumed uncooked for sashimi must be visually attractive in its raw form. The purpose of improving the aesthetic qualities is to create a seafood product which is visually suitable for sashimi after freezing and thawing. The result will be a sashimi quality seafood product delivered to the consumer equal to, or superior to, fresh seafood in regards to vitality, quality, safety, and convenience.

This invention further relates to an apparatus and process to manufacture tasteless super-purified smoke and subsequent processes to treat seafood with the manufactured smoke at the same time or at another place and time. The tasteless super-purified smoke can be stored at room temperature and transported in canisters simplifying the treatment steps and making them more convenient and affordable for various applications within the seafood industry. Two products can be generated with this invention:

1. The bottled tasteless super-purified smoke itself.
2. seafood (or other meat) treated and preferably frozen, and sold for resale after thawing.

For centuries, seafood served raw as sashimi has been a staple of the Japanese diet. The Japanese sashimi market draws the highest price among all seafood markets. Red color bluefin tuna meat with high oil content sometimes sells for over $100 per kilogram. This price is five to ten times higher than the price of lobster.

Tuna is the primary species consumed raw for sashimi. However, marlin, snapper, salmon, yellowtail, and other species are also eaten raw. The Japanese imports of tuna increased three times in quantity and five times in value from 1984 to 1993. The increase in value is directly associated with the increased demand for imported tuna needed to supply the Japanese sashimi market. At the same time the U.S. market for sashimi has expanded. The numbers of sushi bars, Japanese restaurants and American restaurants serving sashimi has increased dramatically over the past five years.

**2**

In Japan, the freshness of seafood has been preserved using super cold freezing temperatures below –76 degrees Fahrenheit (–60 degrees Centigrade) to freeze and to store the seafood before thawing and consuming. Holding sashimi tuna at these super low temperatures is very effective in maintaining the natural bright red color of the flesh for up to one year. However, this technology has not been useful in the U.S. because the seafood industry lacks the commercial infrastructure to maintain seafood below –76 degrees Fahrenheit (–60 degrees Centigrade). Thus, until now, the U.S. seafood industry has been limited to using only fresh seafood for sashimi.

Some disadvantages of fresh seafood for sashimi as opposed to frozen are:

1) Sashimi markets are widely distributed around the world, often very far from fishing resources. It is difficult to maintain peak freshness, color, and wholesomeness of fresh seafood because of time, exposure, and wear-and-tear suffered in delivering the fresh product through the various distribution channels to the consumer. This delivery process often takes five to eight days, during which time contamination and decomposition occurs. The present distribution process for fresh seafood compromises the quality of sashimi reaching the consumer.

2) There is an increasing concern among leading health authorities regarding the safety of consuming seafood raw because of possible parasite infestation. The presence of harmful parasites in raw seafood is evidenced by medical records reporting many cases of parasite infection. Responding to this concern, the U.S. Food and Drug Administration (F.D.A.) is supporting a legislative initiative requiring that tuna and other seafood be frozen before being served raw as sashimi, for the health and safety of the consumer.

According to the F.D.A., freezing the seafood at –4 degrees Fahrenheit (–20 degrees centigrade) or below for seven days kills parasites living in the flesh. However, freezing of tuna, the primary species for sashimi, turns the attractive bright red color to an ugly brown color after being thawed. The tuna will be safe to eat but it will not be acceptable for sashimi. In addition to the commercial importance of the sashimi market, the use of sashimi is as culturally important to the Japanese during the New Year season as turkey is to Americans at Thanksgiving. If a U.S.F.D.A. mandate is passed, it may impose commercial and cultural hardship unless new technologies are introduced to preserve the vitality of frozen and thawed seafood.

The bright red color of sashimi tuna meat is a key factor in determining quality. If a tuna is very fresh and wholesome, but lacks red color, then it has no value for sashimi. From an economic point of view, the value of the tuna is established based on the degree of redness in the flesh.

Implementing the Japanese method of super cold freezing (–76 degrees Fahrenheit or less) (–60 degrees Centigrade or less) and storage is impractical in the U.S. because of the retrofitting and capital investment required. It would cost billions of dollars to add super cold freezers to every cold storage facility, seafood distributor facility, restaurant, sushi bar, and supermarket across the U.S. Because of this high cost relative to the size of the U.S. market, super freezers are not a practical solution.

Therefore, there is a need for new technologies to preserve the vitality of seafood, particularly the color characteristic of sashimi tuna meat after being frozen and thawed.

It is therefore an object of the present invention to provide a process of manufacturing tasteless super-purified smoke

5,972,401

3

for the treatment of filleted tuna and other seafood species (and other meat, and meat products) to be frozen and thawed.

It is a further object of this invention to select a fuel, or fuels, and a combustion process that will generate an all natural, organic smoke that can be filtered.

It is a still further object of this invention to purify the smoke by filtering out a substantial amount of odor and taste imparting particulate matter and gaseous vapors, recovering super-purified smoke in a tasteless form.

It is a still further object of this invention to super purify the smoke to be completely non-toxic by separating out or absorbing out certain undesirable components that may be carcinogenic.

It is a still further object of this invention to store the tasteless super-purified smoke in either a temporary storage vessel or to pump it into canisters kept at ambient room temperature for future treatment of seafood (and other meat, and meat products).

It is a still further object of this invention to use the tasteless super-purified smoke to treat seafood, particularly filleted tuna, (and other meat, and meat products) without imparting a smoky taste to the food.

It is a still further object of this invention to use the tasteless super-purified smoke to make seafood (and other meat, and meat products) more organoleptically fresh and stable. organoleptic relates to the sensory organs' perception of freshness—smell, taste, tactile feel, and visual appearance.

It is a still further object of this invention to use the tasteless super-purified smoke to make the color of seafood (and other meat, and meat products) more stable.

It is a still further object of this invention to provide a process to efficiently treat with tasteless super-purified smoke, vacuum pack, freeze, and thaw tuna and other seafood species (and other meat, and meat products).

It is a still further object of this invention prior to treatment with tasteless super-purified smoke to dip tuna and other seafood sashimi slices in a solution to stabilize color, enhance flavor, and firm texture.

It is a still further object of this invention to use the tasteless super-purified smoke for treatment of seafood in a plastic bag, in other forms of treatment vessels, or by direct injection.

It is a still further object of this invention to expose seafood to the tasteless super-purified smoke for a duration suitable to cause the below effects but not so long as to be deleterious to the wholesomeness of the seafood:

1. To allow penetration of the smoke into the seafood, significantly delaying the development of aerobic bacteria during processing and storage.
2. To allow the smoke to be absorbed or retained into the flesh of the seafood extending the preservative effect after exposure.
3. To preserve the freshness, flavor, and shelf life of the seafood by inhibiting bacteria and decomposition after exposure.
4. To preserve the color by absorption of smoke into the seafood, minimizing oxidation.
5. To prolong the vitality of the seafood and achieve a similar look to fresh seafood after the seafood is frozen and thawed.

It is a still further object of this invention to vacuum pack the seafood, preferably in a semi-permeable vacuum pouch immediately after treatment exposure, to protect the seafood from contamination, and to seal in any smoke components absorbed or retained in the flesh of the seafood.

4

It is a still further object of this invention to provide an absorbent material inside the vacuum pouch to absorb excess moisture lost during thawing and to prevent the seafood from soaking in such liquid.

It is a still further object of this invention to initially freeze the seafood at a sufficiently low temperature, −76 degrees Fahrenheit (−60 degrees Centigrade) or less, to allow later storage at normal freezing temperatures of −4 degrees Fahrenheit (−20 degrees Centigrade) or less for up to one year without any degradation in its vitality.

It is a still further object of this invention to provide a slow thaw and quick thaw technique to thaw the seafood while maintaining vitality.

It is a still further object of this invention to allow a small amount of oxygen to penetrate through the semi-permeable vacuum bag after thawing to allow for normal decomposition of the seafood.

## BACKGROUND ART

Various aspects of the individual steps of the multiple step process of this invention are known in the art, and various aspects appear to be new, useful, and not obvious. However, no reference could be located that describes the combination of process steps disclosed herein to super-purify smoke by removing the high quantity of particulate matter and taste imparting vapors necessary to produce a substantially tasteless smoke that will not impart a smoked taste to treated food.

Dating back thousands of years, before the invention of refrigeration, freezing and canning processes, various foods were cured by natural smoke. Natural smoke can preserve the nutritional components and wholesomeness of meats and seafood, while at the same time retarding spoilage. Smoked meats such as ham, bacon, beef jerky, sausage, poultry and smoked seafood are all examples of popular foods treated by smoke. The shelf life of meats can be extended to over one year (without refrigeration) by smoking. The taste of sausage and the color of ham are enhanced by smoking.

Following the invention of refrigeration, the vitality of whole or filleted seafood and other meats have been prolonged by maintaining the foods in cold storage of 28 to 40 degrees Fahrenheit (−2 to 5 degrees Centigrade). Seafood, in particular, in its raw state begins decomposition quickly at temperatures above 50 degrees Fahrenheit (10 degrees Centigrade). Seafood can be maintained fresh and unfrozen for up to two to three weeks at temperatures of 27 to 32 degrees Fahrenheit (−3 to 0 degrees Centigrade) due to the salt content in the meat. However, decomposition is inevitable and rapid after this time period and other methods of freezing, canning, and smoking have been necessary to extend the shelf life of the food.

Many types of smoking have been taught over the years to produce a variety of effects. Hot smoke will cook, dry, and dehydrate the flesh. Cold smoke will keep the meat moist and succulent. Components of the smoke emitted from various types of fuel will enhance the taste and preserve the color of the food. The combinations and variations in temperature from sub-freezing to over 200 degrees Fahrenheit (111 degrees Centigrade), fuel types, humidity, circulation and exposure times are great. In every case prior to this invention the result has been a smoke flavored food.

On Jun. 18, 1991, the Association of Food and Drug Officials, a national U.S. public sector organization, adopted a model code prepared by its Retail Food Subcommittee entitled "Good Manufacturing Practices for Cured, Salted, and Smoked Fish Establishments." Section 5.4 (a) (2) of this

5,972,401

5

model code states that "The temperature in the smoking chamber does not exceed 50 degrees Fahrenheit (10 degrees Centigrade) during a drying and smoking period that does not exceed 24 hours," . . .

The longer the smoking period in this model code, the lower the maximum smoking temperature. For smoking periods of 30 to 48 hours the maximum smoking temperature declines to as low as 32 degrees Fahrenheit (0 degrees Centigrade). Thus, it has been established since 1991 that maximum cold smoking temperatures for smoking periods of 24 to 48 hours can vary from 32 to 50 degrees Fahrenheit (0 to 10 degrees Centigrade) in order to keep the meat moist, succulent, and free from bacterial degeneration or contamination.

Cold smoking is an obvious choice for fresh seafood which normally requires constant cold storage to slow down decomposition and discoloration as evidenced by Section 4.1 (c) of this model code which states "Fresh fish, except those to be immediately processed, shall be iced or otherwise refrigerated to an internal temperature of 38 degrees Fahrenheit or below (3 degrees Centigrade or below) upon receipt and shall be maintained at that temperature until the fish are to be processed."

Section 4.2 states that "all operations involving the receiving, holding, processing and packaging of processed fish shall be conducted utilizing clean and sanitary methods and shall be conducted as rapidly as practical and at temperatures that will not cause any material increase in bacterial or other micro organic content or any degeneration or contamination of such processed fish." In addition, the 1994 U.S. Food and Drug Administration (F.D.A.) Fish and Fishery Products Hazards and controls Guide recommends a thorough organoleptic examination of seafood product that exceeds 40 degrees Fahrenheit (4.4 degrees Centigrade) at any time during processing.

In 1989 Alkar Inc. of Wisconsin designed and built a laboratory smokehouse for Iowa State University with specifications allowing for smoking at temperatures as low as 32 degrees Fahrenheit (0 degrees Centigrade). In this design Alkar utilized a refrigeration coil inside the smoking chamber to cool the smoke down and maintain it at these low temperatures. Subsequent commercial smokehouses throughout the industry have been outfitted with return air ducts with cooling coils to allow for cold smoking of fresh fish at temperatures specified in the model code above.

Furthermore, smokehouses have equipment for purifying the smoke during, and at the exhaust, of the smoking process. In 1995 Alkar presented a paper entitled "An Overview of Air Pollution Control Equipment for Smokehouses" and described all current types of exhaust control equipment divided into two major classes—particulate collection equipment, and gaseous control equipment. Particulate collection equipment includes electrostatic precipitators, venturi scrubbers, and ionizing wet scrubbers. Gaseous control equipment includes absorption systems such as packed columns and incinerators.

U.S. Pat. No. 5,484,619 to Yamaoka et al discloses a method and apparatus that use extra low temperature smoking of fish and meat to sterilize and prevent decomposition and discoloration while imparting an agreeable smoked taste and smell.

U.S. Pat. No. 889,828 to Trescott discloses a device for curing edible matter comprised of a curing apartment, a smoke supply source, and a combined smoke cooling, purifying, and drying chamber where a portion of moisture and carbon soot condenses on the walls of the chamber.

6

Trescott's method and apparatus, as with Yamaoka's, utilizes partially purified smoke containing odor and taste imparting particulate matter and vapors flowing freely in contact with the edible matter, imparting a smoke flavored taste.

U.S. Pat. No. 4,522,835 to Woodruff et al teaches a method of maintaining redness in fish and red meat by first subjecting such fish or meat to an oxygen deprived atmosphere and then exposing the fish or meat to a modified atmosphere containing a small amount of carbon monoxide. Industrially manufactured carbon monoxide gas is produced using caustic chemicals and can contain toxic impurities. Treatment of seafood or meats with carbon monoxide gas is therefore prohibited by the U.S. F.D.A. and the Japan Ministry of Public Health.

U.S. Pat. No. 3,122,748 to Beebe relates to a method of treating red meat with carbon monoxide to achieve the appearance of meat that has been freshly cut. As with Woodruff, Beebe's method utilizes a gas that is prohibited for such use in the U.S. and Japan. Conversely, treatment of seafood, poultry, or meat with a natural smoking process is generally recognized as safe (GRAS) by the U.S. F.D.A. and the Japan Ministry of Public Health.

Soviet Patent SU 847973 to Kichkar, Nasibov, and Bunin discloses a method for the cold curing of fish products by stabilizing the temperature and velocity of the smoke in a smoking chamber kept in a range of approximately 32 to 36 degrees Fahrenheit (0 to 2 degrees Centigrade). Kichkar et al's cold smoking process results in phenol levels rising in the body of salmon more quickly than earlier methods reducing processing time and producing quality smoked taste, color, and preservative characteristics.

German Patent DE 3826211 to Schich teaches a smoking process using a condenser cooled filtered smoke. Smoke from a smoke generator is passed through a cooling condenser maintained at 5 to 14 degrees Fahrenheit (−10 to −15 degrees Centigrade) to form a condensate of carbon, other suspended materials, tar and gum which is discharged. Schich's method removes substantially all tar, pollutants and carcinogens and does not impact the taste and aroma imparting ingredients in the smoke.

The burning of wood sawdust, in an oxygen restricted retort has been empirically discovered to be the most efficient way to produce high quality smoke from an organic material. However, other organic materials such as leaves, bagasse from sugar cane, pineapple husks, and rice hulls can all be used successfully to produce a volume of smoke in any substantially oxygen free chamber at a lesser amount than the volume achieved from burning wood sawdust in a retort.

The smoke produced from burning wood and other organic material fuels is a function of combustion temperature and amount of air intake. FIG. 1 shows the composition of wood smoke emissions at varying combustion temperatures. The formation of deleterious polycyclic aromatic hydrocarbons (PAHS), and oxidation of organic vapors, including both condensable organic compounds as well as volatile organic compounds (VOCs) can be prevented by combusting below 850 degrees Fahrenheit (454 degrees Centigrade). If wood is combusted above this temperature level and these compounds are formed, they can be successfully filtered later in the process.

To minimize formation of these compounds and to conform to empirical data from our laboratory tests, an operable combustion temperature range of 400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees

5,972,401

7

Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) are established for the process described herein.

Typical wood fuels for smoking contain primarily a hydrocarbon composition of hydrogen and carbon along with other elements of sulfur, nitrogen, oxygen, and ash compounds of silicon dioxide, ferrous trioxide, titanium dioxide, aluminum trioxide, manganese tetrioxide, calcium oxide, magnesium oxide, sodium oxide, potassium oxide, sulfur dioxide, and chloride as shown in Table is

TABLE 1

TYPICAL WOOD FUEL CHEMICAL ANALYSIS

| | Oak Chips | Spruce Chips |
|---|---|---|
| Analysis (dry basis), % by weight Proximate | | |
| Volatile matter | 76.0 | 69.5 |
| Fixed carbon | 18.7 | 26.6 |
| Ash | 5.3 | 3.8 |
| Ultimate | | |
| Hydrogen | 5.4 | 5.7 |
| Carbon | 49.7 | 51.8 |
| Sulfur | 0.1 | 0.1 |
| Nitrogen | 0.2 | 0.2 |
| Oxygen | 39.3 | 38.4 |
| Ash | 5.3 | 3.8 |
| Heating value, Btu/lb | 8,370 | 8,740 |
| Ash Analysis % by wt | | |
| $SiO_2$ | 11.1 | 32.0 |
| $Fe_2O_3$ | 3.3 | 6.4 |
| $TiO_2$ | 0.1 | 0.6 |
| $Al_2O_3$ | 0.1 | 11.0 |
| $Mn_3O_4$ | Trace | 1.5 |
| CaO | 64.5 | 25.3 |
| MgO | 1.2 | 4.1 |
| $Na_2O$ | 8.0 | 8.0 |
| $K_2O$ | 0.2 | 2.4 |
| $SO_3$ | 2.0 | 2.1 |
| Cl | Trace | Trace |

Source: "Wood residue—fired steam generator particulate matter control technology assessment, U.S. E.P.A., 1978.

The smoke produced from burning wood and other organic material fuels contains water vapor, $CO_2$, CO, $CH_4$ (methane); tiny particulates of creosote, tar, soot, and trace elements; and over 390 microscopic compounds occurring in either, or both, particulate and gaseous (vapor) phases. Larson and Koenig compiled "A Summary of the Emissions Characterization and Noncancer Respiratory Effects of Wood Smoke" in 1993. Table 2 from this report summarizes all the reported constituents in wood smoke and the ranges of their emission rates.

$CO_2$, CO, $NO_2$, NO, and monoaromatic phenols constituents in wood smoke all have preservative effects on treated seafood and meat. $CO_2$ is the preservative of choice in modified atmosphere packaging of fresh seafood as it is easily absorbed into the meat displacing oxygen and inhibiting bacterial growth. Phenols, which are present in much smaller amounts than $CO_2$, operate similarly as bacteria inhibitors. CO, $NO_2$, and NO undergo chemical reactions with myoglobin to retard decomposition.

The invention described herein is primarily concerned with super-purifying smoke to eliminate the flavor and

8

aroma components of both the smoke and the seafood or meat subsequently smoked. Maga compiled a comprehensive review of the literature in 1988 in "Smoke in Food Processing." In this review, he cites thirteen researchers who conclude that the most important flavor components of smoke are monoaromatic phenols occurring in both the particulate and gaseous vapor phases.

The phenolic particulate phase has lower odor and taste recognition thresholds than the gaseous vapor phase indicating that a smaller quantity of particulate is required to produce the same level of smoke odor and taste as the gaseous vapor phase. The particulate phase also contains high levels of undesirable pollutants including tar, soot, ash, and char which are desirably filtered.

Therefore, it is typical in smoking of foods to filter pollutants from the phenolic particulate phase while retaining the gaseous vapor phase for characteristic smoke flavoring. The amounts of tar, soot, ash, char and other microscopic particulates have been filtered and minimized by many methods in current practice including tar settling systems, baffling systems, and washing systems in the line from the smoke generator to the smoking chamber. In addition, cooling and storage reduces the concentrations of phenolic particulate through settling. Some of these filtering methods remove substantially all the tar and particulate from wood smoke leaving only the gaseous vapor phase which produces the characteristic smoke flavor.

Daun isolated the phenolic fraction from both the vapor and particulate phases of wood smoke and through dilution determined, with the aid of a sensory panel, their recognition threshold and most desirable concentration for both odor and taste sensations. These data are summarized in Table 3.

Yamaoka et al claim a smoking method comprising a step "passing the produced smoke through a filter to remove mainly tar." Such tar filters are standard elements in smoke generating systems sold today. However, since the flavor producing, monoaromatic phenols in the gaseous vapor phase remain, Yamaoka's method imparts an "agreeable taste and smell" and does not produce tasteless smoke or tasteless food as does the process described herein.

Kichkar et al achieve up to 304 milligrams of phenols combined from both the particulate and gaseous vapor phases of wood smoke absorbed into the body of a salmon of approximately five kilograms, or 60.8 parts per million (ppm). This is the desirable concentration for quality smoked taste. Since the invention described herein is concerned with eliminating any flavor or aroma imparted to the treated seafood or meat, we have determined empirically that the recognition threshold for phenols in seafood or meat is approximately 9.4 ppm. However, even if the phenols in the seafood or meat are below this recognition threshold, they still exert positive preservative effects as bacteria inhibitors.

TABLE 2

CHEMICAL COMPOSITION OF WOOD SMOKE

| Species 1 | g/kg wood 2 | Physical State 3 | Reference |
|---|---|---|---|
| Water Vapor | 35–105 | v | 2 |
| Carbon Dioxide | 70–200 | v | 2 |
| Carbon Monoxide | 80–370 | v | 4,5 |
| Methane | 14–25 | v | 5 |
| VOCs (C2–C&) | 7–27 | v | 5 |
| Aldehydes | 0.6–5.4 | v | 4,6 |
| Formaldehyde | 0.1–0.7 | v | 4,6 |
| Acrolein | 0.02–01 | v | 6 |

5,972,401

**9**

### TABLE 2-continued

#### CHEMICAL COMPOSITION OF WOOD SMOKE

| Species 1 | g/kg wood 2 | Physical State 3 | Reference |
|---|---|---|---|
| Propionaldehyde | 0.1–0.3 | v | 4,6 |
| Butyraldehyde | 0.01–1.7 | v | 4,6 |
| Acetaldehyde | 0.03–0.6 | v | 4,6 |
| Furfural | 0.2–1.6 | v | 7,8 |
| Substituted Furans | 0.15–1.7 | v | 5 |
| Benzene | 0.6–4.0 | v | 9 |
| Alkyl Benzenes | 1–6 | v | 9 |
| Toluene | 0.15–1.0 | v | 7 |
| Acetic Acid | 1.8–2.4 | v | 7 |
| Formic Acid | 0.06–0.08 | v | 4,5 |
| Nitrogen Oxides (NO, NO2) | 0.2–0.9 | v | 4 |
| Sulfur Dioxide | 0.16–0.24 | v | 10 |
| Methyl chloride | 0.0–0.04 | v | 9 |
| Napthalene | 0.24–1.6 | v | 9 |
| Substituted Napthalenes | 0.3–2.1 | v/P | 9 |
| Oxygenated Monoaromatics | 1–7 | v/P | 11 |
| Guaiacols | 0.4–1.6 | v/P | 11 |
| Phenols | 0.2–0.8 | v/P | 11 |
| Syringols | 0.7–2.7 | v/P | 11 |
| Catechols | 0.2–0.8 | v/P | 5 |
| Total Particulate Mass | 7–30 | P | 12 |
| Oxygenated PAHs PAHS | 0.15–1.0 | v/P | 13 |
| Fluorene | 0.00004–0.017 | v/P | 13 |
| Phenanthrene | 0.00002–0.034 | v/P | 13 |
| Anthracene | 0.0005–0.021 | v/P | 13 |
| Methylan-thracenes | 0.00007–0.008 | v/P | 13 |
| Fluoranthene | 0.0007–0.042 | v/P | 13 |
| Pyrene | 0.0008–0.031 | v/P | 13 |
| Benzo(a) anthracene | 0.0004–0.002 | v/P | 13 |
| Chrysene | 0.0005–0.01 | v/P | 13 |
| Benzo-fluranthenes | 0.0006–0.005 | v/P | 13 |
| Benzo(e)pyrene | 0.0002–0.004 | v/P | 13 |
| Benzo(a)pyrene | 0.0003–0.005 | v/P | 13 |
| Perylene | 0.00005–0.003 | v/P | 13 |
| Ideno(1,2,3-cd)pyrene | 0.0002–0.013 | v/P | 13 |
| Benz(ghi) perylene | 0.0005–0.011 | v/P | 13 |
| Coronene | 0.0008–0.003 | v/P | 13 |
| Dibenzo(a,h) pyrene | 0.0003–0.001 | v/P | 13 |
| Retene | 0.007–10.03 | v/P | 14 |
| Dibenz (a,h) anthracene | 0.00002–0.002 | v/P | 13 |
| Trace Elements | | | |
| Na | 0.003–0.018 | P | 15 |
| Mg | 0.0002–0.003 | P | 15 |
| Al | 0.0001–0.024 | P | 15 |
| Si | 0.0003–0.031 | P | 15 |
| S | 0.001–0.029 | P | 15 |
| Cl | 0.0007–0.21 | P | 15 |
| K | 0.003–0.086 | P | 15 |
| Ca | 0.0009–0.018 | P | 15 |
| Ti | 0.00004–0.003 | P | 15 |
| V | 0.0002–0.004 | P | 15 |
| Cr | 0.00002–0.003 | P | 15 |
| Mn | 0.00007–0.004 | P | 15 |
| Fe | 0.0003–0.005 | P | 15 |
| Ni | 0.000001–0.001 | P | 15 |
| Cu | 0.0002–0.0009 | P | 15 |
| Zn | 0.0007–0.004 | P | 15 |
| Br | 0.00007–0.0009 | P | 15 |
| Pb | 0.0001–0.003 | P | 15 |
| Particulate Elemental Carbon | 0.3–5 | P | 16 |
| Normal Alkanes | 0.001–0.006 | P | 17 |

**10**

### TABLE 2-continued

#### CHEMICAL COMPOSITION OF WOOD SMOKE

| Species 1 | g/kg wood 2 | Physical State 3 | Reference |
|---|---|---|---|
| (C24-C30) Cyclic di- and triterpenoids | | | |
| Dehydroabietic acid | 0.001–0.006 | P | 18 |
| Isopimaric acid | 0.02–0.10 | P | 18 |
| Lupenone | 0.002–0.008 | P | 18 |
| Friedelin | 0.000004–0.00002 | P | 18 |
| Chlorinated dioxins | 0.00001–0.00004 | P | 19 |
| Particulate Acidity | 0.007–0.07 | P | 20 |

1. Some species are grouped into general classes as indicated by italics.

2. To estimate the weight percentage in the exhaust, divide the g/kg value by 80. This assumes that there are 7.3 kg combustion air per kg of wood. Carbon dioxide and water vapor average 12 and 7 weight percent respectively.

3. At ambient conditions: V=vapor, P=particulate, and V/P= vapor and/or particulate (i.e., semi-volatile).

4. DeAngelis (1980)

5. OMNI (1988)

6. Lipari (1984), values for fireplaces

7. Edye et al (1991), smoldering conditions; other substituted furans include 2-furanmenthanol, 2 acetylfuran, 5-methyl-2furaldehyde, and benzofuran.

8. value estimated for pine from Edye et al (1991) from reported yield relative to guaiacol, from guaiacol values of Hawthorne (1989) and assuming particulate organic carbon is 50% of total particle mass.

9. Steiber et al (1992), values computed assuming a range of 3–20 g of total extractable, speciated mass per kg wood.

10. Khalil (1983)

11. Hawthorne (1989), values for syringol or hardwood fuel; see also Hawthorne (1988)

12. Core (1989), DeAngelis (1980), Kalman and Larson (1987)

13. From one or more of the following studies: Cooke (1981), Truesdale (1984), Alfheim et al (1984), Zeedijk (1986), Core (1989), Kalman and Larson (1987); assuming a range of 7 to 30 grams particulate mass per kg wood when values were reported in grams per gram of particulate mass. Similar assumptions apply to references **14, 15,** and references **17–19.**

14. Core (1989), Kalman and Larson (1987)

15. Watson (1979), Core (1989, Kalman and Larson (1987)

16. Rau (1989), Core (1989)

17. Core (1989)

18. Standley and Simoneit (1990); Dehydroabietic acid values for pine smoke, lupenone and isopimaric acid values for alder smoke, and friedelin values for oak soot.

19. Nestrick and Lamparski (1982), from particulate condensed on flue pipes; includes TCDDS, HCDDS, H7CDDs and OCDDs.

20. Burnet et al (1986); one gram of acid =one equivalent of acid needed to reach a pH of 5.6 in extract solution.

### TABLE 3

| ODOR AND TASTE RECOGNITION THRESHOLDS (ppm) AND MOST DESIRABLE CONCENTRATIONS (ppm) OF THE PHENOLIC FRACTION ISOLATED FROM THE VAPOR AND PARTICULATE PHASES OF WOOD SMOKE | | | |
|---|---|---|---|
| Recognition threshold | | Most desirable concentration | |
| Odor | | | |
| Vapor | Particulate | Vapor | Particulate |
| 10.4 | 7.8 | 20.8 | 16.7 |
| Taste | | | |
| Vapor | Particulate | Vapor | Particulate |
| 2.3 | 1.4 | 15.6 | 8.3 |

Adapted from Daun, H., Lebensm. Wiss. Technol., 5, 102, 1972

The seafood or meat treated with wood smoke has myoglobin molecules with open receptors that can undergo a chemical reaction with a variety of compounds present in the smoke—$O_2$, CO, NO, $NO_2$ and $H_2O$. It is important in cold smoking to keep the meat raw and uncooked to maximize the amount of vital cells available for this reaction. The myoglobin in its natural state is purple. When the myoglobin binds with $O_2$ it produces oxymyoglobin which is bright red; with CO it produces carboxymyoglobin which is red; with NO and $NO_2$ it produces nitric oxide myoglobin and nitrogen dioxide myoglobin which are also red; and with $H_2O$ it produces metmyoglobin which is brown.

Carboxymyoglobin is preferred because of its stable organoleptic freshness characteristics as well as its stable red color. The organoleptic "sniff test" shows significant retardation of decomposition of cold smoked product high in carboxymyoglobin. For example, cold smoked and vacuum packed salmon can be refrigerated for several months without any decomposition.

## SUMMARY OF THE INVENTION

The above and other objects are achieved by a process comprising the manufacturing of tasteless super-purified smoke, utilizing such manufactured smoke to treat seafood, and freezing and thawing of the treated seafood.

The manufacturing process begins with the smoke generating part of the apparatus using a natural gas or electric burner to combust wood sawdust packed into a multiple cylinder retort at temperatures in an operable range of 400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) in an oxygen deprived environment.

The apparatus can be adjusted to utilize wood sawdust or other organic burning materials producing less dense smoke by varying the number of cylinders in the retort from as little as one to as many as necessary to produce the volume of smoke desired. In addition, any substantially oxygen free chamber besides a retort can be used. Combusting a five cylinder retort packed with wood sawdust is the preferred embodiment described herein.

The pyrolysis of the wood sawdust into smoke creates byproducts of tar, moisture, and particulate residue at the outlet of the smoke generating subsystem. These byproducts are collected in liquid form in a tar/moisture/residue condensation chamber and drained out a purge valve near the end of the process. This valve also serves the dual purpose

of being a flush valve to allow air into the airtight system after the liquid residue is drained.

The smoke is next super-purified such that the phenols in both particulate and gaseous vapor phases are reduced to concentrations below recognition thresholds for odor and taste that impart a smoked flavor to the treated food. Commercial air pollution control equipment such as electrostatic precipitators, venturi scrubbers, ionizing wet scrubbers, and packed columns, normally used to clean smokehouse exhaust, can be used after smoke generation and before treatment of the product to remove a portion of these flavor imparting phenols from the smoke.

Complete super purification of smoke can be accomplished using one method, or a combination of methods, in current practice, including filtering, separating, distilling, scrubbing, cooling, freezing, inertial impact, centrifugal force, or settling. Filtering techniques of adsorption or molecular sieve absorption can be used effectively. For example, a very large activated carbon filter alone can substantially super-purify smoke, yet this method is expensive and requires extensive maintenance. Successful combinations include bubbling the smoke through a water filter and then a smaller activated carbon filter; using a water vapor wash and an activated carbon filter; and using the above combinations with cloth filters. Smoke can be super-purified by any method, or combination of methods, that reduce both the flavor imparting particulate and gaseous vapor phase phenols below their odor and taste recognition thresholds, or by using the preferred embodiment described as follows:

The smoke is most efficiently super-purified by flowing through a precipitation tower which washes and filters the smoke through ice and a combination of adsorbent and molecular sieve filters of cloth and activated carbon. Adsorption is the accumulation of gases, liquids, or solutes on the surface of a solid or liquid and occurs when the smoke flows through the activated carbon. The activated carbon filter in our invention effectively adsorbs phenols in the gaseous vapor phase to concentrations below their odor and taste recognition thresholds. The molecular sieve cloth filters absorb gaseous vapor and particulate matter.

The precipitation tower is preferably longer than it is wide and is positioned on a vertical axis. The tower has an ice chamber with a square cross section smaller at the bottom entry of the perforated smoke intake pipe and larger at the top entry to the activated carbon and cloth filters to ensure that the smoke flows evenly throughout the ice. Alternatively, a precipitation tower with an ice chamber that is wider than it is long, or positioned on a horizontal axis, can work successfully by using a series of horizontally spaced vertical intake pipes, using a horizontal intake pipe with spaced perforated dispensing holes, or by replacing the ice with another filtering material. In addition, an agitator can be installed to prevent clustering and clumping of filtering materials.

To maximize the yield of tasteless super-purified smoke, the ice, carbon, or any other filtering medium utilized should displace as much air space as possible inside the precipitation tower to minimize places where smoke can be trapped in the system. The filtering materials in the precipitation tower displace an operable range of more than 50%, a preferred range of more than 75%, and an optimal range of more than 90% of the tower's inner volume.

The precipitation tower operates as a miniature controlled earth atmosphere where ice is violently vaporized by hot smoke into steam. A portion of this "steamified" smoke

5,972,401

**13**

condenses as it cools and washes a large amount of particulate matter from the smoke by raining down through the system.

The sudden vaporization of the ice by the hot smoke results in high humidity in the precipitation tower. This increases the average size, weight, and adhesiveness of the particulate matter in the smoke making it easier to filter. Some oxidation occurs increasing the amount of $CO_2$ while decreasing the amount of CO. This washed smoke next passes through activated carbon and cloth filters to adsorb and absorb odor and taste imparting phenols and other carcinogenic particulates and gases.

At this point, substantially tasteless super-purified smoke can be used to directly flood a smoking treatment chamber filled with seafood or other meats to produce an acceptable result. There is no limit on the volume, or continuous flow of smoke that can be used as long as the phenol concentrations remain below the odor and taste recognition thresholds in both the smoke and the treated product. By minimizing the amount of smoke to produce the desired result, the amount of remaining phenols can also be minimized and kept below these recognition threshold levels. Such an abbreviated process is possibly better suited for high production volume situations.

Alternatively, the smoke can be pumped into an expandable, or fixed, storage chamber for short term storage, or into a canister for long term storage. An analysis of capital equipment costs, labor costs, and production volume requirements will determine the treatment method to be used with the tasteless super-purified smoke. In most cases, the preferred embodiment is to further purify the smoke in a settling pot and to allow for more versatility, convenience and economy by either using the smoke to treat seafood in plastic bags or by transferring the smoke to canisters for storage and future use.

In a preferred embodiment, a temporary pressure pot with an inner collapsible accordion bladder is evacuated by a two way vacuum pump to collapse the bladder up to the top of the pot. This pot is equal in size to the volume of smoke produced by the pyrolysis of the wood sawdust in the five cylinder retort. The pressure pot with collapsed bladder remains evacuated until the smoke reaches a certain concentration and flow as indicated by a smoke sensor and a flow meter in the line.

The smoke is pumped out an exhaust pipe until it reaches the desired concentration and flow. At this time the exhaust valve closes and three valves in the line to the pressure pot open. The smoke flows naturally to this evacuated temporary storage chamber filling the inner bladder as long as the concentration and flow levels exceed the prescribed levels. The natural expansion of the combustion into smoke from pre-combustible wood sawdust creates a natural pressure in the system. Therefore, tasteless super-purified smoke pressure builds in the temporary pressure pot in the preferred embodiment, or in alternative expandable or fixed temporary storage chambers.

When the smoke concentration and flow fall below the prescribed levels, the purge valve opens to allow the liquid residue to drain and flush air to enter the system. At the same time the two way pump in the line pumps the remaining smoke in the system into the pressure pot. This pump turns off when the smoke sensor indicates the system has been flushed and the last valve to the pressure pot closes containing the tasteless super-purified smoke in the temporary storage chamber.

At this point the tasteless super-purified smoke has been purified to below the odor and taste recognition threshold

**14**

levels by the precipitation tower. However, several backup steps occur during storage until the treatment of the seafood or meat to ensure that the flavor imparting phenol levels are reduced even further below the recognition threshold levels.

The inner accordion bladder of the pressure pot is lined with absorbent material to absorb remaining flavor imparting gaseous vapor or particulate phase phenols in the smoke in the temporary storage chamber. The flavor imparting character of the smoke declines in three ways. Flavor imparting gaseous phase phenols are absorbed through contact with the absorbent material on all surfaces of the bladder's lining; particulate phase phenols settle by gravity over time and are also absorbed by the absorbent material primarily at the bottom of the bladder's lining; and, both gaseous vapor and particulate phase phenols naturally lose flavor-imparting potency over time. This weakening potency is due to the unstable characteristic of phenols which chemically react with other compounds and structurally decompose over time.

Therefore, allowing the phenols, and any other remaining carcinogens, in the smoke to settle, or "age", in the inner accordion bladder or in storage canisters for future use, is the final backup filtering step in the process. It is analogous to sediment settling in wine making.

If immediate treatment of seafood by the super-purified smoke is desired directly from the inner accordion bladder, the aging time is in an operable range of one hour to 72 hours, a preferable range of 12 hours to 60 hours, and an optimal range of 24 hours to 48 hours. If treatment at another time or place from storage canisters is desired, the aging time is in an operable range of greater than one hour, a preferable range of one week to one year, and an optimal range of two weeks to six months.

Practical process considerations have empirically determined that the shorter aging times are best when treatment is done directly from the inner accordion bladder. Since aging is a backup process as long as the flavor imparting phenols are below the odor and taste recognition thresholds, successful treatment can occur shortly after the tasteless super-purified smoke is stored in the temporary storage chamber, optimally in one to two days.

If treatment at another time or place is desired the aging continues in storage canisters and the flavor imparting phenol levels decline even further through decomposition. However, these canisters can not be kept indefinitely, since phenols that have a beneficial preservative effect will begin to degrade as well. Treatment from canisters may be done after one hour of aging and preferably within one year of aging. Therefore, the use of tasteless super-purified smoke does not have to correspond to the operation of the smoke manufacturing part of the process allowing for much flexibility and versatility industry wide.

If immediate treatment is desired, each whole tuna or other seafood species is taken from cold storage, filleted into loins, and then filleted into sashimi slices and steaks (smaller fish can be treated whole). sashimi slices are placed in a dipping solution to stabilize color, enhance flavor and firm the texture of the fish. Steaks, which are ultimately cooked and not consumed raw, do not require this step.

The filleted seafood is then placed in plastic bags. The air in each bag is substantially removed, a hose and dispensing nozzle from the pressure pot are inserted, and the valve is opened to flush the seafood with an operable rage of 0.05:1 or greater, a preferred range of 1:1 to 100:1, and an optimal range of 1.5:1 to 20:1 ratios of volume of tasteless, super-purified smoke to volume of seafood. The bag is then sealed.

The super-purified smoke treatment occurs until the desired penetration of tasteless super-purified smoke into the

fish is complete. This desired penetration is complete after approximately twelve to forty-eight hours.

The minimum temperature during treatment varies with the type of seafood being treated and is approximately 0.2 degrees Fahrenheit (0.1 degree centigrade) above its variable freezing point. The treatment temperature is an operable range from above the variable seafood freezing point to 46 degrees Fahrenheit (7.8 degrees centigrade), a preferred range from above the variable seafood freezing point to 38 degrees Fahrenheit (3.4 degrees centigrade), and an optimal range from above the variable seafood freezing point to 35 degrees Fahrenheit (1.7 degrees centigrade).

If treatment at another time and/or place is desired, a compressor can be attached to the outlet hose from the pressure pot or, in an abbreviated process, to the carbon and cloth filter outlet of the precipitation tower. The compressor compresses the tasteless super-purified smoke into canisters at a desired pressure level. Utilizing these canisters, the following treatment procedure requires a delivery system consisting of a regulator, hose with injection nozzle, plastic bags, and a heat sealer.

As an alternative to the preferred treatment in plastic bags, the tasteless super-purified smoke can go from the storage canisters into any type of sealed treatment chamber containing the seafood. As a still further alternative to a smoke flushing treatment in plastic bags or other chambers, the tasteless super-purified smoke can be administered successfully by injection needles directly into the seafood. This alternative is preferable for thicker loin fillets where multiple injections of tasteless super-purified smoke treat the meat completely with overlapping conical areas.

After treatment is complete in the preferred embodiment, each plastic bag is emptied and the fish is sealed, preferably with an absorbent material in a semi-permeable vacuum pouch.

These vacuum packed pouches are next ideally frozen cryogenically at −76 degrees Fahrenheit (−60 degrees centigrade) or less and stored at −4 degrees Fahrenheit (−20 degrees centigrade) or less for up to one year without losing their vitality characteristics of freshness, flavor, color, and moisture retention after thawing.

Preferably, five pouches of steaks of 5.0 pounds (2.27 kilograms) each or 10 pouches of sashimi of 2.2 pounds (1.0 kilogram) each are packed in each master carton with optional instructions for either quick or slow thawing printed on the vacuum packs or included with the product.

The seafood product retailer, restaurant, or sushi bar either quick thaws only the number of pouches needed in cold water, preferably with a salt solution for approximately twenty to forty minutes or until the product is partially thawed; or slow thaws in a refrigerator, generally overnight for twelve to twenty-four hours. Each pouch is dried, cut open, and the sashimi slices or steaks are displayed for sale in a store or served in a restaurant. The product can also be retailed in frozen packages.

The carboxymyoglobin, nitric oxide myoglobin, and nitrogen dioxide myoglobin present in the treated product, as well as absorbed $CO_2$ and phenols from the super-purified smoke, result in both stable organoleptic freshness characteristics and stable red color after freezing and thawing. Such product will organoleptically stay fresh longer than untreated product before decomposition begins. However, this characteristic of enhanced freshness longevity does not often come into play since the product is thawed in small quantities only as needed and does not require extended shelf life in its thawed state.

## BRIEF DESCRIPTION OF THE DRAWINGS AND CHARTS

FIG. 1 is a graph showing the composition of wood and hardwood charcoal smoke emissions at varying temperatures..

FIG. 2 (a) shows a presently preferred embodiment of a tasteless super-purified smoke manufacturing apparatus used in the practiced process.

FIG. 2 (b) shows the flush treatment plastic barrier bag subsystem.

FIG. 2 (c) shows the compressor and storage canister subsystem.

FIG. 3 (a) shows a front view of the retort subsystem of the super-purified smoke manufacturing process.

FIG. 3 (b) shows a top view of the retort subsystem.

FIG. 3 (c) shows a side view of the retort subsystem.

## BEST MODE FOR CARRYING OUT INVENTION

The presently preferred embodiment of the tasteless super-purified smoke manufacturing apparatus used in the practiced process shown in FIG. 2 (a) is comprised of a smoke generator 1, a precipitation filtering tower 2, and a temporary pressure pot storage chamber 3. FIG. 2 (b) shows a flush treatment plastic bag subsystem and FIG. 2 (c) shows an alternative intermediate step of a compressor and storage canister subsystem.

The smoke generator 1 is comprised of a 10" high by 15" wide by 24" (15.4 cm×38.1 cm×61.0 cm) deep shell lined with refractory insulation 5, a refractory insulated door 6 with air vents, a retort subsystem 7 (shown in detail in FIGS. 3 (a–c)), a shelf 8, a natural gas burner 9, and thermostat 10.

In the preferred embodiment the retort subsystem 7 is made up of five parallel cylinders approximately 1 ½" (3.8 cm) in diameter and 21" (53.3 cm) long packed full of a measured amount of wood sawdust. The length of each cylinder is preferably greater than its diameter, with an operable range of the ratio of length to diameter from 1.1:1 to 50:1, a preferred range from 2:1 to 25:1, and an optimal range from 10:1 to 16:1.

The sawdust packed in this highly oxygen restricted closed system retort is combusted by heating the cylinders with the natural gas burner 9 to an operable temperature range of 400 to 950 degrees Fahrenheit (204 to 510 degrees centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees centigrade). The thermostat 10 controls the combustion temperature.

The apparatus is highly duplicable and scalable with measured amounts of wood sawdust, ice, and activated carbon used in the smoke manufacturing apparatus described herein. The dimensions of the elements of the apparatus may vary proportionally with one another to create greater or lesser amounts of tasteless super-purified smoke. In other words, a proportionally larger or smaller smoke generator 1 with a greater or lesser number of retort cylinders 7, each of a larger or smaller diameter, filled with a greater or lesser amount of sawdust and super-purified by a larger or smaller filtering tower 2 will fill a proportionally larger or smaller temporary pressure pot storage chamber 3.

The combustion within the retort cylinders packed full of wood sawdust produces water vapor and the smoke emissions described in Table 2. Closing the vent to outside air produces a highly oxygen restricted environment where all of the sawdust is pyrolyzed completely and flows out of the smoke generator 1 towards the precipitation tower 2.

A percentage of the tar, moisture, and residue byproducts of the combustion condense as liquid immediately and flow into the residue condensation chamber 11 which is sealed at

the bottom by the purge valve **12** until near the end of the process. This residue liquid acts as an interior barrier to ensure the air tightness of the system until valve **12** is opened for liquid draining and final air flushing of the system

The precipitation tower **2** is preferably comprised of an approximately 12" long by ¾" diameter (30.5 cm×1.9 cm diameter) vertical intake pipe **13** with the last 6" (15.2 cm) perforated with approximately ⅛" diameter (0.32 cm) dispensing holes ¼" (0.64 cm) apart, a crushed ice filter **14** within a tapered and glass enclosed chamber **19**, an activated carbon filter **21**, two cloth filters **20**, and a water and particulate residue reservoir **16**.

This stage of the process substantially filters the phenols in both gaseous vapor and particulate phases to concentrations below recognition thresholds for odor and taste that impart a smoked flavor to the treated food. Such recognition thresholds vary with the olfactory and taste senses of each individual. We have determined empirically an operable range of less than 15.6 parts per million (ppm) of the phenolic fraction of the gaseous vapor phase of wood smoke for odor recognition, a preferred range of less than 10.4 ppm, and an optimal range of less than 5.2 ppm. We have further determined empirically an operable range of less than 11.7 ppm of the phenolic fraction of the particulate phase for odor recognition, a preferred range of less than 7.8 ppm, and an optimal range of less than 3.9 ppm.

With respect to taste recognition threshold of the phenolic gaseous vapor phase of wood smoke, we have determined an operable range of less than 4.5 ppm, a preferred range of less than 2.3 ppm, and an optimal range of less than 1.2 ppm. Lastly, we have determined an operable range for taste recognition threshold of the phenolic particulate phase of less than 2.1 ppm; a preferred range of less than 1.4 ppm; and an optimal range of less than 0.7 ppm.

Alternative methods described in the summary above can effectively accomplish this object. The preferred embodiment has been found to be the most efficient and cost effective method, in addition to its versatility and practicality due to the use of easily obtainable materials—sawdust, natural gas, ice, and activated carbon.

The length of the precipitation tower **2** is preferably greater than its width, with an operable ratio ranging from 1.1:1 to 30:1, a preferred ratio ranging from 2:1 to 15:1, and an optimal ratio ranging from 3:1 to 7:1. It is ideally positioned on a vertical axis with an operable angle of less than 50 degrees from vertical, a preferred angle of less than 25 degrees from vertical, and an optimal angle less than 10 degrees from vertical.

Within the precipitation tower **2**, the smoke flows out the perforated holes and upwards through the crushed ice filter **14**. This tapered and glass enclosed ice chamber is approximately 42" long (106.7 cm) and has a 9" (22.9 cm) substantially square cross section at the bottom increasing to a 12" (30.5 cm) substantially square cross section at the top. A screen **15** acts as an ice shelf and as an outlet for the water and particulate residue. The ice chamber **19** is enclosed with glass to visually monitor that the smoke is flowing evenly through the ice turning it a consistent yellow as the desired reaction occurs.

The ratio of smoke that can be super-purified by each batch of ice is in an operable range of 1:1 to 20:1, a preferable range of 2:1 to 10:1, and an optimal range of 3:1 to 6:1.

The ice chamber **19** tapering proportions have been developed to the presently preferred relative dimensions

through experimentation. The smaller cross section at the bottom is necessary to ensure that the smoke flows evenly through the ice. Although the ice chamber **19** will work most of the time with no taper and equal dimension cross sections at the bottom and top, problems may arise where the smoke adheres to the side walls and develops flow channels that avoid the cleansing reaction and even penetration of the smoke through the ice mass.

Therefore, the angle of the sides of the ice chamber **19** relative to its vertical axis is in an operable range of 0 to 50 degrees, a preferred range of 1 to 25 degrees, and an optimal range of 2 to 10 degrees.

When the smoke reacts with the ice **14**, it turns a portion into water vapor and a portion into water. This water vapor saturates the smoke creating a "steamified" smoke rising in the tower. A portion of this "steamified" smoke then precipitates down as a "rains washing a large amount of particulate matter from the smoke and passing through to the water and particulate residue reservoir **16** which comprises approximately 18" (45.7 cm) below the ice chamber **19** at the bottom of the tower **2**. This reservoir can be drained after the process is complete through drain valve **17**.

The humidity of the smoke is increased as it blends with the water vapor produced in the precipitation tower **2**. This humidity saturates and moistens the remaining particulate matter in the smoke increasing the particulate average size, weight, and adhesiveness and making it easier to filter as the smoke rises in the precipitation tower **2**. In addition, oxidation of a portion of the natural gas components of the smoke occurs in this step with $CO_2$ increasing and CO decreasing approximately ten percent.

The smoke partially filtered by the ice and condensing water vapor next passes through a screen **18** at the bottom of the cloth **20**, activated carbon **21**, and cloth **20** filters to remove some of the water vapor and adsorb and absorb microscopic taste imparting and carcinogenic particulate and gaseous vapor compounds listed in Table 2. The screen **18** serves as intake to this stage of the filtering process and also as a shelf to support these filters.

For loading and maintenance of the precipitation tower **2**, the sections can be disassembled, cleaned and refilled with new ice, cloth, and activated carbon for each cycle of the process. This batch process for the manufacturing of the super-purified smoke is necessary to replenish the filtering materials.

The temporary pressure pot storage chamber **3** is comprised of a 15 gallon pot **31**, a rubber "O" ring seal **32** between the lid and the pot, intake valve **30**, outlet valve **34**, and an inner collapsible accordion bladder with absorbent liner pad **33** which expands down and contracts up inside the pot **31**. A series of smoke sensors, flow meters, valves, exhaust pipes, and pumps control the flow of the tasteless super-purified smoke from the precipitation tower **2** into the temporary pressure pot storage chamber **3**.

Prior to combusting the wood sawdust in the retort, the temporary pressure pot **31** is evacuated by a two way vacuum pump **28** drawing the inner collapsible accordion bladder up to the top of the pot **31**. This is accomplished by isolating the temporary pressure pot storage chamber **3** from the earlier stages of the system by closing three way valve **26** in the direction of the precipitation tower **2** and opening it in the directions of the outside environment and of the temporary pressure pot **31**. The valve to the outside environment **27** is opened, the intake valve **30** is opened, and the outlet valve **34** is closed. Air is pumped out to the atmosphere with pump **28** until pressure gauge **29** indicates that

approximately 90% of the air has been evacuated and the accordion bladder 33 collapses towards the top of the pressure pot 31. Then valves 27 and 30 are closed to contain the vacuum holding on the collapsed bladder 33 in the temporary pressure pot storage chamber 3.

The temporary pressure pot storage chamber 3 is equal in size to the volume of sufficiently concentrated smoke produced by the smoke generator 1. The storage chamber 3 remains at the slightly evacuated pressure with its inner bladder 33 collapsed until the smoke passing through the precipitation tower 2 reaches a desired concentration and flow as indicated by the smoke sensor 21 and the flow meter 22 in the line.

The smoke is pumped out the exhaust pipe 24 by pump 23 with three way valve 25 open in the exhaust and precipitation tower 2 directions and closed in the temporary storage chamber 3 direction until the smoke reaches the desired concentration and flow. At this time, valve 25 closes the exhaust pipe 24, valve 26 opens the pipe in the direction of the storage chamber 3, and valve 30 opens to allow the smoke to naturally flow to the reduced pressure temporary storage chamber 3 with its inner bladder 33 expanding. As long as the concentration and flow levels as measured by the smoke sensor 21 and the flow meter 22 meet or exceed the minimum desired, the smoke flows on its own.

When the smoke falls below the prescribed levels, the purge valve 12 opens, the liquid residue drains, and flush air is allowed to enter the system. At the same time, the two way pump 28 begins pumping the remaining smoke in the system into the pressure pot storage chamber 3. This pump 28 turns off when the smoke sensor 21 indicates the system has been flushed and valve 30 is closed to contain the smoke in the inner bladder 33 of the temporary pressure pot 31 in a slightly pressurized state in an operable range of 37 to 107 psi (2.58 to 7.45 kg per square centimeter) and a preferred range of 52 to 72 psi (3.62 to 5.01 kg per square centimeter).

The inner accordion bladder 33 of the temporary pressure pot storage chamber 3 is preferably lined with absorbent material to absorb remaining flavor imparting gaseous vapor or particulate phase phenols, and any other remaining carcinogens, in the smoke as they settle.

This settling step of aging the smoke for treatment directly from the inner accordion bladder 33 has an operable range of one hour to 72 hours, a preferable range of 12 hours to 60 hours, and an optimal range of 24 hours to 48 hours. Aging the smoke for treatment at another time or place from storage canisters 40 has an operable range of greater than one hour, a preferable range of one week to one year, and an optimal range of two weeks to six months.

The shorter preferable aging time range for smoke directly from the inner accordion bladder 33 is a function of practical process design efficiencies. The longer preferable aging time range for smoke in storage canisters 40 is a function of the further reduction of flavor imparting phenols which lose potency due to decomposition and chemical reaction with other compounds over time. This longer aging time range in storage canisters 40 has an upper limit of preferably one year or less due to a reduction of beneficial phenols over time which contribute to the preservative effect on the seafood.

This substantially tasteless, super-purified smoke may now be used for the immediate treatment of seafood shown in FIG. 2 (b) flush treatment plastic bag subsystem, or stored in canisters as shown in FIG. 2 (c).

If immediate treatment is desired, whole small fish may be used, or each whole tuna or other seafood species is filleted,

generally into four loins, and then a percentage is filleted into sashimi slices and a percentage is filleted into tuna or other seafood steaks. Seafood needs to be kept chilled during the filleting process to avoid spoilage. Therefore, the fish are kept chilled at temperatures immediately above their freezing points which vary from fish to fish as a function of the salt content of the meat. Such freezing points can be as low as 27 degrees Fahrenheit (−2 degrees Centigrade). The operable range is between the fish's freezing point and ten degrees greater than its freezing point; the preferred range is between its freezing point and five degrees greater than its freezing point; and the optimal range is between its freezing point and two degrees greater than its freezing point.

Each sashimi slice is next placed in a dipping solution to stabilize color, enhance flavor and firm the texture of the sashimi. This added step of dipping is used for sashimi slices and not for tuna steaks, since the enhanced flavor is noticeable when the sashimi slices are thawed and eaten raw and would not be noticeable for cooked tuna steaks.

As shown in FIG. 2 (b), the filleted and dipped sashimi slices or the filleted tuna steaks 37 are placed in plastic bags 36. The air in each bag 36 is removed and a hose with dispensing nozzle 35 from the pressure pot 31 are inserted. The hose with dispensing nozzle 35 has a control at the dispensing point similar to the air nozzles for tires at gas stations. If pressures above 40 psi (2.79 kg per square centimeter) are used a regulator is also required.

The outlet valve 34 to the temporary storage chamber 3 is opened and the hose with dispensing nozzle control 35 is inserted in a plastic bag 36 and opened to flush the seafood with a volume of tasteless super-purified smoke with the gaseous vapor and particulate phenol concentrations below both the odor and taste recognition thresholds cited above. Most smoking processes have a continuous flow of smoke passing in contact with the seafood or meat. The process described herein limits the amount of smoke and as a result minimizes the total amount of flavor imparting phenols remaining in the smoke that come in contact with the seafood or meat.

The volume of tasteless super-purified smoke that flushes the seafood is in an operable range of the ratio of volume of smoke to seafood of 0.05:1 or greater; in a preferred range from 1:1 to 100:1; and in an optimal range from 1.5:1 to 20:1. When sufficient smoke is dispensed, the dispensing control nozzle 35 is closed, the outlet valve 34 is closed and the plastic bag 36 is sealed.

Desired penetration of the super-purified smoke in the seafood is achieved in an operable range from 1 second to 60 hours; a preferred range of 12 hours to 54 hours; and an optimal range of 24 to 48 hours. This treatment period is an additional period of aging the smoke as the flavor imparting phenols continue to lose potency. Empirical evidence indicates the treatment time to achieve the desired penetration varies with the seafood to be treated. In addition, the minimum temperature during treatment varies with the type of seafood being treated and is approximately 0.2 degrees Fahrenheit (0.1 degree Centigrade) above its variable freezing point.

Therefore, the treatment temperature is an operable range from 0.2 degree Fahrenheit (0.1 degree Centigrade) above the variable seafood freezing point to 46 degrees Fahrenheit (7.8 degrees Centigrade), a preferred range from 0.2 degree Fahrenheit (0.1 degree Centigrade) above the variable seafood freezing point to 38 degrees Fahrenheit (3.4 degrees Centigrade), and an optimal range from 0.2 degree Fahrenheit (0.1 degree Centigrade) above the variable seafood freezing point to 35 degrees Fahrenheit (1.7 degrees Centigrade).

21

Desired penetration of the super-purified smoke in the seafood is achieved while imparting total phenols from both gaseous vapor and particulate phases at concentrations below flavor and aroma recognition thresholds into the seafood. The phenol levels within the treated product are of concern here, whereas the phenol levels within the wood smoke are of concern during the super-purifying filtering process. Such recognition thresholds of phenols within the treated product also vary with the olfactory and taste senses of each individual. We have determined empirically an operable range of less than 14.1 parts per million (ppm) of total phenol weight per total weight of seafood, a preferred range of less than 9.4 ppm, and an optimal range of less than 4.7 ppm.

If treatment at another time and/or place is desired a compressor 38 as shown in FIG. 2 (c) is preferably attached to the outlet hose from the pressure pot 31 with its expandable inner bladder, or directly to the outlet of the precipitation tower 2 in an abbreviated process. In the preferred embodiment the outlet valve 34 is opened and the tasteless super-purified smoke is compressed and pumped through the pressure valve/gauge 39 into the canister 40 to a desired pressure in an operable range of 200 to 2,500 psi (13.9 to 174.1 kg per square centimeter) and a preferred range of 1,800 to 2,200 psi (125.4 to 153.2 kg per square centimeter). Then the outlet valve 34 and the pressure valve 39 are closed.

Each canister 40 can be used at a future time and place with a delivery system consisting of a regulator and a hose with dispensing nozzle 35 which is attached to an evacuated plastic bag 36 filled with filleted seafood 37 as described in FIG. 2 (b). The pressure valve 39 is opened and the regulator regulates the flow rate into the bag 36 until the ratio of the volume of tasteless super-purified smoke to seafood being treated is in an operable range of 0.05:1 or greater, a preferred range of 1:1 to 100:1; and an optimal range of 1.5:1 to 20:1 with the gaseous vapor and particulate phenol concentrations below both the odor and taste recognition thresholds cited above. When sufficient smoke is dispensed, the pressure valve 39 is closed and the bag 36 is sealed.

The treated seafood is next stored as described above for an operable range from 1 second to 60 hours; a preferred range of 12 hours to 54 hours; and an optimal range of 24 to 48 hours, or until the desired penetration of tasteless super-purified smoke into the fish is complete.

After treatment is complete, each bag 36 is opened and emptied and the seafood is repackaged preferably with an absorbent material in a semi-permeable vacuum pouch. The absorbent material absorbs excess moisture lost during freezing and thawing and prevents the seafood from soaking in such liquid resulting in a texture similar to fresh product after thawing.

The vacuum packed pouches are next frozen at an operable range of 10 degrees Fahrenheit or less (−12 degrees Centigrade or less), a preferred range of −40 degrees Fahrenheit or less (−40 degrees Centigrade or less), and an optimal range of cryogenic freezing of −76 degrees Fahrenheit or less (−60 degrees Centigrade or less). The frozen pouches can then be stored at an operable range of 25 degrees Fahrenheit or less (−4 degrees Centigrade or less), a preferred range of −10 degrees Fahrenheit or less (−23 degrees Centigrade or less, and an optimal range of −40 degrees Fahrenheit or less (−40 degrees Centigrade or less) for up to one year optimally without losing their vitality characteristics of freshness, flavor, color, and moisture retention after thawing.

22

Preferably, five pouches of tuna steaks of approximately 5.0 pounds (2.27 kilograms) each or 10 pouches of sashimi of approximately 2.2 pounds (1.0 kilogram) each are packed in master shipping cartons which are waxed or treated with a water resistant coating to prevent deterioration. Within each carton layers of cushioning material are placed between the packaged seafood to cushion the layers of product.

The quick thawing procedure is identical for frozen sashimi slice or steak pouches. The retailer, restaurant, or sushi bar thaws only enough for immediate sale by preparing a solution of cold water and one tablespoon of salt per gallon of cold water for each pouch to be thawed. The salt prevents discoloration if the meat contacts the solution which is in an operable range of 33 to 65 degrees Fahrenheit (1 to 18 degrees Centigrade), a preferred range of 40 to 50 degrees Fahrenheit (4 to 10 degrees Centigrade), and an optimal temperature of 45 degrees Fahrenheit (7 degrees Centigrade).

Each pouch of approximately 5.0 pounds (2.27 kilograms) of seafood steaks is submersed for approximately fifty minutes or until partially thawed with the pieces inside easily separated. Each pouch of approximately 2.2 pounds (1.0 kilogram) of sashimi slices requires approximately twenty-five minutes of quick thawing. Each pouch is then removed from the solution and dried with a paper towel. The vacuum pouch is then cut open, the sashimi slices or steaks towel dried if necessary, and displayed for sale in a refrigerated seafood section or prepared for sale in a restaurant or sushi bar.

The slow thawing procedure involves leaving the vacuum pouch in a refrigerator in an operable range of 33 to 50 degrees Fahrenheit (1 to 10 degrees Centigrade), a preferred range of 35 to 40 degrees Fahrenheit (2 to 4 degrees Centigrade), and an optimal temperature of 37 degrees Fahrenheit (3 degrees Centigrade) for twelve hours or longer. The semi-permeable vacuum pouch is designed to allow oxygen to permeate into the pouch after partial thawing as its plastic becomes more malleable. This slight thawing begins normal decomposition of the seafood. This is a safety feature for both the retailer and the consumer. If the product is left in the pouch after thawing for too long, or if it is abused by temperatures above the operable range, then the normal signs of decomposition and spoilage, such as developing a bad smell, will occur similar to fresh product.

Thus, the present process for manufacturing tasteless super-purified smoke or treating seafood meets the objectives of preserving the vitality characteristics of freshness, color, texture, natural flavor, moisture retention, and shelf life of the seafood, particularly after it is frozen and thawed. In addition, the tasteless super-purified smoke, which can be stored and transported in canisters 40, greatly reduces equipment and facility costs enabling low cost treatment of seafood to be convenient and affordable throughout the seafood industry.

Industrial Applicability

This invention can be used to treat varying types of tuna species and other seafood containing red color flesh that would tend to turn brown after being frozen and thawed without this treatment. Although this tasteless super-purified smoke is primarily intended to be used to treat seafood it can also be used with meat and poultry.

What is claimed is:

1. A process for treating meat comprising:
   heating organic material to generate smoke having a gaseous vapor phase;

5,972,401

| 23 | 24 |

super purifying said smoke to reduce taste imparting components below thresholds for imparting smoke odor and taste, whereby a substantially tasteless super-purified smoke is created; and

treating meat having a freezing point with said tasteless super-purified smoke.

**2.** A process according to claim **1,** wherein said treating step occurs for between approximately 1 second and approximately 60 hours, at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 46 degrees Fahrenheit (7.8 degrees Centigrade).

**3.** A process according to claim **2,** further comprising:

freezing said treated meat for storage, whereby frozen meat is created.

**4.** A process according to claim **2** or **3,** wherein said treating step occurs at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 38 degrees Fahrenheit (3.4 degrees Centigrade).

**5.** A process according to claim **2** or **3,** wherein said treating step occurs at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 35 degrees Fahrenheit (1.7 degrees Centigrade).

**6.** A process according to any one of claims **1** to **3,** wherein said treating step is carried out for between approximately 12 hours and approximately 54 hours.

**7.** A process according to any one of claims **1** to **3,** wherein said treating step is carried out for between approximately 24 hours and approximately 48 hours.

**8.** A process according to claim **3,** wherein said freezing step occurs at a temperature of at most approximately 10 degrees Fahrenheit (−12 degrees Centigrade).

**9.** A process according to claim **3,** wherein said freezing step occurs at a temperature of at most approximately −40 degrees Fahrenheit (−40 degrees Centigrade).

**10.** A process according to claim **3,** wherein said freezing step occurs at a temperature of at most approximately −76 degrees Fahrenheit (−60 degrees Centigrade).

**11.** A process according to any one of claims **1** to **3,** wherein said heating step generates smoke also having a particulate phase, further comprising:

filtering the particulate phase of said smoke to eliminate tar, moisture, particulate and other solid matter residue after said heating step.

**12.** A process according to claim **11,** further comprising:

filtering the gaseous vapor phase of said smoke to eliminate any remaining odor and taste imparting gaseous vapor compounds and phenols.

**13.** A process according to any one of claims **1** to **3,** wherein said super purifying step is carried out by reducing phenols in said smoke to concentrations below recognition thresholds for imparting smoke odor to said meat.

**14.** A process according to claim **13,** wherein said super purifying step is carried out until the gaseous vapor phase of said super purified smoke contains less than approximately 15.6 parts per million of aromatic phenols.

**15.** A process according to claim **13,** wherein said super purifying step is carried out until the gaseous vapor phase of said super purified smoke contains less than approximately 10.4 parts per million of aromatic phenols.

**16.** A process according to claim **13,** wherein said super purifying step is carried out until the gaseous vapor phase of said super purified smoke contains less than approximately 5.2 parts per million of aromatic phenols.

**17.** A process according to claim **11,** wherein said super purifying step is carried out until the particulate phase of said super purified smoke contains less than approximately 11.7 parts per million of aromatic phenols.

**18.** A process according to claim **11,** wherein said super purifying step is carried out until the particulate phase of said super purified smoke contains less than approximately 7.8 parts per million of aromatic phenols.

**19.** A process according to claim **11,** wherein said super purifying step is carried out until the particulate phase of said super purified smoke contains less than approximately 3.9 parts per million of aromatic phenols.

**20.** A process according to claim **13,** wherein said treating step is carried out so that said meat contains less than 14.1 parts per million of total aromatic phenols by weight per total weight of the meat.

**21.** A process according to claim **13,** wherein said treating step is carried out so that said meat contains less than 9.4 parts per million of total aromatic phenols by weight per total weight of the meat.

**22.** A process according to claim **13,** wherein said treating step is carried out so that said meat contains less than 4.7 parts per million of total aromatic phenols by weight per total weight of the meat.

**23.** A process according to any one of claims **1** to **3,** further comprising:

aging said smoke for more than one hour before said treating step.

**24.** A process according to claim **3,** further comprising:

storing said frozen meat at a temperature of at most 25 degrees Fahrenheit (−4 degrees Centigrade) for up to one year; and

thawing said meat, whereby said meat retains vitality after said thawing step.

**25.** A process according to claim **3,** further comprising:

storing said frozen meat at a temperature of at most −10 degrees Fahrenheit (23 degrees Centigrade) for up to one year; and

thawing said meat, whereby said meat retains vitality after said thawing step.

**26.** A process according to claim **3,** further comprising:

storing said frozen meat at a temperature of at most −40 degrees Fahrenheit (−40 degrees Centigrade) for up to one year; and

thawing said meat, whereby said meat retains vitality after said thawing step.

**27.** A process according to any one of claims **1** to **3,** wherein said treating step is carried out to prevent smoke odor or taste from being imparted to said meat while preserving said meat, whereby said meat tastes fresh, without smoke odor or taste from said smoke, when said meat is thawed and eaten raw.

**28.** A process according to any one of claims **1** to **3,** wherein said treating step is carried out by injecting said super purified smoke into said meat.

**29.** A process according to any one of claims **1** to **3,** further comprising:

compressing said tasteless super purified smoke after said super purifying step; and

storing said compressed tasteless super purified smoke in canisters.

**30.** A process according claim **29,** wherein said treating step is carried out with said compressed tasteless super-purified smoke.

**31.** A process according to claim **29,** wherein said compressed tasteless super purified smoke is compressed and

5,972,401

25

stored in a canister at a pressure range of approximately 200 pounds per square inch (13.9 kilograms per square centimeter) to approximately 2,500 pounds per square inch (174.1 kilograms per square centimeter).

**32.** A process according to claim 29, wherein said compressed tasteless super purified smoke is compressed and stored in a canister at a pressure range of approximately 1,800 pounds per square inch (125.4 kilograms per square centimeter) to approximately 2,200 pounds per square inch (153.2 kilograms per square centimeter).

**33.** A process according to any one of claims 1 to 3, wherein said heating step is carried out by heating said organic material at between approximately 400 degrees Fahrenheit (204 degrees Centigrade) and approximately 950 degrees Fahrenheit (510 degrees Centigrade).

**34.** A process according to any one of claims 1 to 3, wherein said heating step is carried out by heating said organic material at between approximately 500 degrees Fahrenheit (260 degrees Centigrade) and approximately 800 degrees Fahrenheit (571 degrees Centigrade).

**35.** A process according to any one of claims 1 to 3, wherein said heating step is carried out by heating said organic material at between approximately 650 degrees Fahrenheit (242 degrees Centigrade) and approximately 750 degrees Fahrenheit (399 degrees Centigrade).

**36.** A process according to any one of claims 1 to 3, further comprising:

aging said tasteless super purified smoke for 1 week to 1 year prior to said treating step.

**37.** A process according to any one of claims 1 to 3, further comprising:

aging said tasteless super purified smoke for from 2 weeks to 6 months prior to said treating step.

**38.** A process according to any one of claims 1 to 3, wherein said treating step comprises exposing said meat to tasteless super purified smoke, and said treating step is carried out until penetration of said tasteless super purified smoke into said meat is complete enough to maintain vitality after said meat is frozen and thawed.

**39.** A process according to any one of claims 1 to 3, wherein said treating step limits the quantity of said tasteless super purified smoke exposed to said meat, whereby the total amount of said flavor imparting components exposed to said meat is minimized to prevent imparting smoke flavor or odor to said meat.

**40.** A process according to claim 39, wherein said treating step uses said tasteless super purified smoke in a ratio of at least approximately 0.05:1 of volume of said tasteless super purified smoke to volume of meat.

**41.** A process according to claim 39, wherein said treating step uses said tasteless super purified smoke in a ratio of approximately 1:1 to approximately 100:1 of volume of super purified smoke to volume of meat.

**42.** A process according to claim 39, wherein said treating step uses said tasteless super purified smoke in a ratio of approximately 1.5:1 to approximately 20:1 of volume of super purified smoke to volume of meat.

**43.** A process according to any one of claims 1 to 3, wherein said treating step is carried out by flooding a smoke treatment chamber containing said meat with said tasteless super purified smoke.

**44.** A process according to any one of claims 1 to 3, wherein said smoke generation and super purification steps are carried out at a different time and place than said treating step.

**45.** A process according to any one of claims 1 to 3, wherein said super purifying step is carried out using a precipitation tower.

26

**46.** A process according to any one of claims 1 to 3, wherein said treating step smokes said meat with said super purified smoke, without imparting a smoky taste to said meat.

**47.** A process according to any one of claims 3, 8, 9, or 10, wherein said frozen meat is thawed in a refrigerator at a temperature between approximately 33 degrees Fahrenheit (1 degree centigrade) and approximately 50 degrees Fahrenheit (10 degrees centigrade).

**48.** A process according to any one of claims 3, 8, 9, or 10, wherein said frozen meat is thawed in cold water at a temperature between 33 degrees Fahrenheit (1 degree centigrade) and approximately 65 degrees Fahrenheit (18 degrees centigrade).

**49.** A process for treating meat, comprising:

heating organic material to generate smoke containing smoke taste compounds;

super purifying said smoke by eliminating said smoke taste compounds from said smoke; and

treating meat with said smoke, whereby said treated meat does not have a smoky taste.

**50.** A process for treating meat comprising:

heating organic material to generate smoke, wherein said smoke contains taste compounds;

super purifying said smoke by eliminating smoke taste compounds from said smoke; and

treating meat with said smoke; and

whereby said treated meat does not retain a smoky taste.

**51.** A process according to any one of claims 1, 2, 3, 49, or 50, wherein said super purifying step is carried out using a molecular sieve filter.

**52.** A process according to any one of claims 1, 2, 3, 49, or 50, wherein said super purifying step is carried out using an adsorbent filter.

**53.** A process according to any one of claims 1, 2, 3, 49, or 50, wherein said super purifying step is carried out using a water filter.

**54.** A process according to any one of claims 1, 2, 3, 49, or 50, wherein said super purifying step is carried out using an absorbent filter and an adsorbent filter.

**55.** A process according to any one of claims 1, 2, 3, 49 or 50, wherein said super purifying step is carried out using a water filter, an adsorbent filter, and an absorbent filter.

**56.** A process according to any one of claims 1, 2, 3, 49 or 50, wherein said treating step fixes red meat color.

**57.** A process according to claim 56, wherein said meat with said fixed red meat color contains carboxymyoglobin concentrations at least 50% higher than untreated meat; and said red meat color remains fixed at a temperature at most −4 degrees Fahrenheit (−20 degrees Centigrade) for up to one year.

**58.** A process according to claim 57, wherein said meat is fresh, raw, and abundant in vital cells.

**59.** A process according to any one of claims 1, 2, 3, 8, 9, 10, 24, 25, 26, 49 or 50, wherein said meat comprises seafood.

**60.** A process for treating seafood comprising:

burning organic material to create smoke;

condensing tar, moisture and particulate residue out of said smoke;

super purifying said smoke to reduce taste and odor imparting particulates and vapors below taste and odor recognition thresholds, thereby creating a tasteless super purified smoke;

aging said tasteless super purified smoke for between approximately one hour and approximately 72 hours;

5,972,401

27

treating seafood having a freezing point with said aged tasteless super purified smoke at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said freezing point and approximately 46 degrees Fahrenheit (7.8 degrees Centigrade) for between approximately 1 second and approximately 60 hours;

freezing said seafood for storage at a temperature of at most approximately 10 degrees Fahrenheit (−12 degrees Centigrade); and

storing said seafood at a temperature of at most approximately 25 degrees Fahrenheit (−4 degrees Centigrade) for at most approximately 1 year.

61. A process according to claim 60, wherein said freezing step is carried out at a temperature of at most approximately −40 degrees Fahrenheit (−40 degrees Centigrade).

62. A process according to claim 60, wherein said freezing step is carried out at a temperature of at most approximately −76 degrees Fahrenheit (−60 degrees Centigrade).

63. A process for treating seafood, comprising:

heating sawdust to create smoke;

condensing tar, moisture and particulate residue out of said smoke, super purifying said smoke to reduce particulate and vapor phenols below taste and odor recognition thresholds, thereby creating a tasteless super purified smoke;

aging said tasteless super purified smoke for between approximately 12 hours to approximately 60 hours;

filleting seafood, shaving a freezing point, at a temperature between said freezing point and approximately five degrees greater than said freezing point to form fillets;

placing said fillets in treatment chambers;

flushing said fillets with said tasteless super purified smoke at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said freezing point and approximately 46 degrees Fahrenheit (7.8 degrees Centigrade) for between approximately 1 second and approximately 60 hours;

freezing said seafood for storage at a temperature of at most approximately 10 degrees Fahrenheit (−12 degrees Centigrade); and

storing said seafood at a temperature of at most approximately 25 degrees Fahrenheit (−4 degrees Centigrade).

64. A process according to claim 60 or 63, wherein said super-purifying step removes microscopic particulate and gaseous vapor compounds remaining in said smoke that impart smoked flavor to foods.

28

65. A process according to claim 60 or 63, wherein said frozen super purified smoke treated seafood is thawed in a refrigerator at a temperature between 33 degrees Fahrenheit (1 degree centigrade) and approximately 50 degrees Fahrenheit (10 degrees centigrade).

66. A process according to claim 60 or 63, wherein said frozen super purified smoke treated seafood is thawed in cold water at a temperature between approximately 33 degrees Fahrenheit (1 degree centigrade) and approximately 65 degrees Fahrenheit (18 degrees centigrade).

67. A process for treating food comprising:

heating organic material to generate smoke;

filtering components that impart smoke flavor from said smoke to below limits for imparting smoke flavoring to food; and

exposing said filtered smoke to food without imparting a smoke flavor to said food.

68. A process for treating food comprising:

heating organic material to generate smoke;

removing components that impart smoke odor from said smoke; and

exposing food to said smoke, whereby the quantity of smoke odor imparting components removed from said smoke is adequate to prevent imparting a smoke odor to said food.

69. A process for treating food comprising:

heating organic material to generate smoke that contains a vapor phase having smoke odor and flavor imparting components;

filtering said smoke to remove a portion of said smoke odor and flavor imparting components;

exposing food to said filtered smoke so as to prevent smoke flavoring of said food by reducing the quantity of said filtered smoke exposed to said food.

70. A process according to one of any claims 1, 2, 3, 49, or 50, wherein said heating step combusts said organic material.

71. A process according to one of any claims 1, 2, 3, 49, or 50, wherein said heating step pyrolyses said organic material.

72. A process according to one of any claims 1, 2, 3, 49, or 50, wherein said heating step burns said organic material.

73. A process according to one of any claims 1, 2, 3, 49, or 50, wherein said heating step thermally decomposes said organic material.

* * * * *

201 - 395.00
202 - 240.(?)
203 - 1903.( 173)
264 - 135.00

Practitioner's Docket No. _____97-5_____

**PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Box Patent Application
Assistant Commissioner for Patents
Washington, D.C. 20231

### NEW APPLICATION TRANSMITTAL

Transmitted herewith for filing is the patent application of
Inventor(s): William R. Kowalski

*WARNING: Patent must be applied for in the name(s) of all of the actual inventor(s). 37 CFR 1.41(a) and 1.53(b).*

For (title):    Process For Manufacturing Tasteless Super-Purified Smoke
For Treating Seafood To Be Frozen And Thawed

---

**CERTIFICATION UNDER 37 C.F.R. 1.10***
*(Express Mail label number is mandatory.)*
*(Express Mail certification is optional.)*

I hereby certify that this New Application Transmittal and the documents referred to as attached therein are being deposited with the United States Postal Service on this date November 28, 1997 _____ in an envelope as "Express Mail Post Office to Addressee," mailing Label Number EI721877092US _____ addressed to the: Assistant Commissioner for Patents, Washington, D.C. 20231.

Martin E. Hsia
*(type or print name of person mailing paper)*

**Signature of person mailing paper**

*WARNING:* Certificate of mailing (first class) or facsimile transmission procedures of 37 C.F.R. 1.8 cannot be used to obtain a date of mailing or transmission for this correspondence.

*WARNING:* Each paper or fee filed by "Express Mail" **must** have the number of the "Express Mail" mailing label placed thereon prior to mailing. 37 C.F.R. 1.10(b).
*Since the filing of correspondence under § 1.10 without the Express Mail mailing label thereon is an oversight that can be avoided by the exercise of reasonable care, requests for waiver of this requirement will not be granted on petition." Notice of Oct. 24, 1996, 60 Fed. Reg. 56,439, at 56,442.

(Application Transmittal [4-1]—page 1 of 9)

Exhibit "2"

K00002

## 1.  Type of Application

This new application is for a(n)

*(check one applicable item below)*

☒  Original (nonprovisional)

☐  Design

   ☐  Plant

*WARNING:  Do not use this transmittal for a completion in the U.S. of an International Application under 35 U.S.C. 371(c)(4), unless the International Application is being filed as a divisional, continuation or continuation-in-part application.*

*WARNING:  Do not use this transmittal for the filing of a provisional application.*

*NOTE:  If one of the following 3 items apply, then complete and attach ADDED PAGES FOR NEW APPLICATION TRANSMITTAL WHERE BENEFIT OF A PRIOR U.S. APPLICATION CLAIMED and a NOTIFICATION IN PARENT APPLICATION OF THE FILING OF THIS CONTINUATION APPLICATION.*

☐  Divisional.

☒  Continuation.

☐  Continuation-in-part (C-I-P).

## 2.  Benefit of Prior U.S. Application(s) (35 U.S.C. 119(e), 120, or 121)

*NOTE:  If the new application being transmitted is a divisional, continuation or a continuation-in-part of a parent case, or where the parent case is an International Application which designated the U.S., or benefit of a prior provisional application is claimed, then check the following item and complete and attach ADDED PAGES FOR NEW APPLICATION TRANSMITTAL WHERE BENEFIT OF PRIOR U.S. APPLICATION(S) CLAIMED.*

*WARNING:  If an application claims the benefit of the filing date of an earlier filed application under 35 U.S.C. 120, 121 or 365(c), the 20-year term of that application will be based upon the filing date of the earliest U.S. application that the application makes reference to under 35 U.S.C. 120, 121 or 365(c). (35 U.S.C. 154(a)(2) does not take into account, for the determination of the patent term, any application on which priority is claimed under 35 U.S.C. 119, 365(a) or 365(b).) For a c-i-p application, applicant should review whether any claim in the patent that will issue is supported by an earlier application and, if not, the applicant should consider canceling the reference to the earlier filed application. The term of a patent is not based on a claim-by-claim approach. See Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,205.*

*WARNING:  When the last day of pendency of a provisional application falls on a Saturday, Sunday, or Federal holiday within the District of Columbia, any nonprovisional application claiming benefit of the provisional application must be filed prior to the Saturday, Sunday, or Federal holiday within the District of Columbia. See 37 C.F.R. § 1.78(a)(3).*

☒  The new application being transmitted claims the benefit of prior U.S. application(s). Enclosed are ADDED PAGES FOR NEW APPLICATION TRANSMITTAL WHERE BENEFIT OF PRIOR U.S. APPLICATION(S) CLAIMED.

## 3.  Papers Enclosed That Are Required for Filing Date under 37 C.F.R. 1.53(b) (Regular) or 37 C.F.R. 1.153 (Design) Application

_40_  Pages of specification

_13_  Pages of claims

_1_  Pages of Abstract

_3_  Sheets of drawing

   ☐  formal

   ☒  informal

*(Application Transmittal [4-1]—page 2 of 9)*

K00002

**WARNING:** *DO NOT submit original drawings. A high quality copy of the drawings should be supplied when filing a patent application. The drawings that are submitted to the Office must be on strong, white, smooth, and non-shiny paper and meet the standards according to § 1.84. If corrections to the drawings are necessary, they should be made to the original drawing and a high-quality copy of the corrected original drawing then submitted to the Office. Only one copy is required or desired. Comments on proposed new 37 CFR 1.84. Notice of March 9, 1988 (1990 O.G. 57-62).*

**NOTE:** *"Identifying indicia, if provided, should include the application number or the title of the invention, inventor's name, docket number (if any), and the name and telephone number of a person to call if the Office is unable to match the drawings to the proper application. This information should be placed on the back of each sheet of drawing a minimum distance of 1.5 cm. (5/8 inch) down from the top of the page." 37 C.F.R. 1.84(c).*

### (complete the following, if applicable)

☐ The enclosed drawing(s) are photograph(s), and there is also attached a "PETITION TO ACCEPT PHOTOGRAPH(S) AS DRAWING(S)." 37 C.F.R. 1.84(b).

**4.    Additional papers enclosed**

- ☐ Preliminary Amendment
- ☐ Information Disclosure Statement (37 C.F.R. 1.98)
- ☐ Form PTO-1449 (PTO/SB/08A and 08B)
- ☐ Citations
- ☐ Declaration of Biological Deposit
- ☐ Submission of "Sequence Listing," computer readable copy and/or amendment pertaining thereto for biotechnology invention containing nucleotide and/or amino acid sequence.
- ☐ Authorization of Attorney(s) to Accept and Follow Instructions from Representative
- ☐ Special Comments
- ☐ Other

**5.    Declaration or oath**

- ☒ Enclosed

  Executed by

  ### (check all applicable boxes)

  - ☒ inventor(s).
  - ☐ legal representative of inventor(s). 37 CFR 1.42 or 1.43.
  - ☐ joint inventor or person showing a proprietary interest on behalf of inventor who refused to sign or cannot be reached.
    - ☐ This is the petition required by 37 CFR 1.47 and the statement required by 37 CFR 1.47 is also attached. *See item 13 below for fee.*

- ☐ Not Enclosed.

**WARNING:** *Where the filing is a completion in the U.S. of an International Application, but where a declaration is not available, or where the completion of the U.S. application contains subject matter in addition to the International Application, the application may be treated as a continuation or continuation-in-part, as the case may be, utilizing ADDED PAGE FOR NEW APPLICATION TRANSMITTAL WHERE BENEFIT OF PRIOR U.S. APPLICATION CLAIMED.*

(Application Transmittal [4-1]—page 3 of 9)

K00002

☐ Application made by a person authorized under 37 CFR 1.41(c) on behalf of *all* the above named inventor(s).

*(The declaration or oath, along with the surcharge required by 37 CFR 1.16(e) can be filed subsequently).*

NOTE:   *It is important that all the correct inventor(s) are named for filing under 37 CFR 1.41(c) and 1.53(b).*

☐ Showing that the filing is authorized.
*(not required unless called into question. 37 CFR 1.41(d))*

**6.  Inventorship Statement**

WARNING:   *If the named inventors are each not the inventors of all the claims an explanation, including the ownership of the various claims at the time the last claimed invention was made, should be submitted.*

The inventorship for all the claims in this application are:

☒  The same.

**or**

☐  Not the same. An explanation, including the ownership of the various claims at the time the last claimed invention was made.

☐  is submitted.

☐  will be submitted.

**7.  Language**

NOTE:   *An application including a signed oath or declaration may be filed in a language other than English. A verified English translation of the non-English language application and the processing fee of $130.00 required by 37 CFR 1.17(k) is required to be filed with the application, or within such time as may be set by the Office. 37 CFR 1.52(d).*

NOTE:   *A non-English oath or declaration in the form provided or approved by the PTO need not be translated. 37 CFR 1.69(b).*

☒  English

☐  Non-English

☐  The attached translation is a verified translation. 37 C.F.R. 1.52(d).

**8.  Assignment**

☐  An assignment of the invention to _____

_____

☐  is attached. A separate ☐ "COVER SHEET FOR ASSIGNMENT (DOCUMENT) ACCOMPANYING NEW PATENT APPLICATION" or ☐ FORM PTO 1595 is also attached.

☐  will follow.

NOTE:   *"If an assignment is submitted with a new application, send two separate letters-one for the application and one for the assignment." Notice of May 4, 1990 (1114 O.G. 77-78).*

WARNING:   *A newly executed "CERTIFICATE UNDER 37 CFR 3.73(b)" must be filed when a continuation-in-part application is filed by an assignee. Notice of April 30, 1993, 1150 O.G. 62-64.*

(Application Transmittal [4-1]—page 4 of 9)

K00002

**9. Certified Copy**

Certified copy(ies) of application(s)

| Country | Appln. no. | Filed |
|---|---|---|
| Country | Appln. no. | Filed |
| Country | Appln. no. | Filed |

from which priority is claimed

☐ is (are) attached.

☐ will follow.

*NOTE: The foreign application forming the basis for the claim for priority must be referred to in the oath or declaration. 37 CFR 1.55(a) and 1.63.*

*NOTE: This item is for any foreign priority for which the application being filed directly relates. If any parent U.S. application or International Application from which this application claims benefit under 35 U.S.C. 120 is itself entitled to priority from a prior foreign application, then complete item 18 on the ADDED PAGES FOR NEW APPLICATION TRANSMITTAL WHERE BENEFIT OF PRIOR U.S. APPLICATION(S) CLAIMED.*

**10. Fee Calculation (37 C.F.R. 1.16)**

**A.** ☒ Regular application

| CLAIMS AS FILED | | | |
|---|---|---|---|
| Number filed | Number Extra | Rate | Basic Fee 37 C.F.R. 1.16(a) ~~$770.00~~ 790.00 |
| Total Claims (37 CFR 1.16(c)) 193 - 20 = 173 | × | $ 22.00 | $3,806.00 |
| Independent Claims (37 CFR 1.16(b)) 9 - 3 = 6 | × | 82.00 ~~$ 80.00~~ | $   492.00 |
| Multiple dependent claim(s), if any (37 CFR 1.16(d)) | + | 270.00 ~~$260.00~~ | $   270.00 |

☐ Amendment cancelling extra claims is enclosed.

☐ Amendment deleting multiple-dependencies is enclosed.

☐ Fee for extra claims is not being paid at this time.

*NOTE: If the fees for extra claims are not paid on filing they must be paid or the claims cancelled by amendment, prior to the expiration of the time period set for response by the Patent and Trademark Office in any notice of fee deficiency. 37 CFR 1.16(d).*

Filing Fee Calculation          $   5,358.00

(Application Transmittal [4-1]—page 5 of 9)

00980392.112897

B. ☐ Design application
($320.00—37 CFR 1.16(f))

Filing Fee Calculation                    $_____

C. ☐ Plant application
($530.00—37 CFR 1.16(g))

Filing fee calculation                    $_____

**11. Small Entity Statement(s)**

☐ Verified Statement(s) that this is a filing by a small entity under 37 CFR 1.9 and 1.27 is (are) attached.

*WARNING:* *"Status as a small entity in one application or patent does not affect any other application or patent, including applications or patents which are directly or indirectly dependent upon the application or patent in which the status has been established. A nonprovisional application claiming benefit under 35 U.S.C. 119(e), 120, 121 or 365(c) of a prior application may rely on a verified statement filed in the prior application if the nonprovisional application includes a reference to a verified statement in the prior application or includes a copy of the verified statement filed in the prior application if status as a small entity is still proper and desired." 37 C.F.R. § 1.28(a).*

*(complete the following, if applicable)*

☒ Status as a small entity was claimed in prior application

___60__ / ___040,731___, filed on __March 12, 1997__ from which benefit is being claimed for this application under:

35 U.S.C. ☒ 119(e),
          ☐ 120,
          ☐ 121,
          ☐ 365(c),

and which status as a small entity is still proper and desired.

☒ A copy of the verified statement in the prior application is included.

Filing Fee Calculation (50% of **A, B** or **C** above)

$ __2,679.00__

*NOTE:* *Any excess of the full fee paid will be refunded if a verified statement and a refund request are filed within 2 months of the date of timely payment of a full fee. The two-month period is not extendable under § 1.136. 37 CFR 1.28(a).*

**12. Request for International-Type Search (37 C.F.R. 1.104(d))**

*(complete, if applicable)*

☐ Please prepare an international-type search report for this application at the time when national examination on the merits takes place.

(Application Transmittal [4-1]—page 6 of 9)

K000030

**13. Fee Payment Being Made at This Time**

☐ Not Enclosed

    ☐ No filing fee is to be paid at this time.
       *(This and the surcharge required by 37 C.F.R. 1.16(e) can be paid subse-*
       *quently.)*

☒ Enclosed

    ☒ Basic filing fee                     $ 2,679.00

    ☐ Recording assignment
       ($40.00; 37 C.F.R. 1.21(h))
       (See attached "COVER SHEET FOR
       ASSIGNMENT ACCOMPANYING NEW
       APPLICATION".)                 $ _____

    ☐ Petition fee for filing by other than all the
       inventors or person on behalf of the inventor
       where inventor refused to sign or cannot be
       reached
       ($130.00; 37 C.F.R. 1.47 and 1.17(h))    $ _____

    ☐ For processing an application with a
       specification in
       a non-English language
       ($130.00; 37 C.F.R. 1.52(d) and 1.17(k))   $ _____

    ☐ Processing and retention fee
       ($130.00; 37 C.F.R. 1.53(d) and 1.21(l))   $ _____

    ☐ Fee for international-type search report
       ($40.00; 37 C.F.R. 1.21(e))          $ _____

*NOTE: 37 CFR 1.21(l) establishes a fee for processing and retaining any application that is abandoned for failing to complete the application pursuant to 37 CFR 1.53(d) and this, as well as the changes to 37 CFR 1.53 and 1.78, indicate that in order to obtain the benefit of a prior U.S. application, either the basic filing fee must be paid, or the processing and retention fee of § 1.21(l) must be paid, within 1 year from notification under § 53(d).*

              Total fees enclosed        $ _____

**14. Method of Payment of Fees**

☒ Check in the amount of $ 2,679.00

☐ Charge Account No. _____ in the amount of
   $ _____
   A duplicate of this transmittal is attached.

*NOTE: Fees should be itemized in such a manner that it is clear for which purpose the fees are paid. 37 CFR 1.22(b).*

K00003

**15. Authorization to Charge Additional Fees**

*WARNING: If no fees are to be paid on filing, the following items should not be completed.*

*WARNING: Accurately count claims, especially multiple dependent claims, to avoid unexpected high charges, if extra claim charges are authorized.*

☐ The Commissioner is hereby authorized to charge the following additional fees by this paper and during the entire pendency of this application to Account No. _____

☐ 37 C.F.R. 1.16(a), (f) or (g) (filing fees)

☐ 37 C.F.R. 1.16(b), (c) and (d) (presentation of extra claims)

*NOTE: Because additional fees for excess or multiple dependent claims not paid on filing or on later presentation must only be paid or these claims cancelled by amendment prior to the expiration of the time period set for response by the PTO in any notice of fee deficiency (37 CFR 1.16(d)), it might be best not to authorize the PTO to charge additional claim fees, except possibly when dealing with amendments after final action.*

☐ 37 C.F.R. 1.16(e) (surcharge for filing the basic filing fee and/or declaration on a date later than the filing date of the application)

☐ 37 C.F.R. 1.17 (application processing fees)

*WARNING: While 37 CFR 1.17(a), (b), (c) and (d) deal with extensions of time under § 1.136(a), this authorization should be made only with the knowledge that: "Submission of the appropriate extension fee under 37 C.F.R. 1.136(a) is to no avail unless a request or petition for extension is filed." (Emphasis added). Notice of November 5, 1985 (1060 O.G. 27).*

☐ 37 C.F.R. 1.18 (issue fee at or before mailing of Notice of Allowance, pursuant to 37 C.F.R. 1.311(b))

*NOTE: Where an authorization to charge the issue fee to a deposit account has been filed before the mailing of a Notice of Allowance, the issue fee will be automatically charged to the deposit account at the time of mailing the notice of allowance. 37 CFR 1.311(b).*

*NOTE: 37 CFR 1.28(b) requires "Notification of any change in status resulting in loss of entitlement to small entity status must be filed in the application . . . prior to paying, or at the time of paying, . . . issue fee." From the wording of 37 CFR 1.28(b), (a) notification of change of status must be made even if the fee is paid as "other than a small entity" and (b) no notification is required if the change is to another small entity.*

**16. Instructions as to Overpayment**

☐ Credit Account No. _____

☐ Refund

Reg. No. 32,471

Tel. No. ( 808) 544-3835

Customer No.

**SIGNATURE OF PRACTITIONER**

Martin E. Hsia
*(type or print name of attorney)*
Cades Schutte Fleming & Wright
P.O. Box 939
P.O. Address

Honolulu, Hawaii  96808

*(Application Transmittal [4-1]—page 8 of 9)*

080808092.112897

K00003

⊠    **Incorporation by reference of added pages**

*(check the following item if the application in this transmittal claims the benefit of prior U.S. application(s) (including an international application entering the U.S. stage as a continuation, divisional or C-I-P application) and complete and attach the ADDED PAGES FOR NEW APPLICATION TRANS-MITTAL WHERE BENEFIT OF PRIOR U.S. APPLICATION(S) CLAIMED)*

   ⊠  Plus Added Pages for New Application Transmittal Where Benefit of Prior U.S. Application(s) Claimed

                  Number of pages added _____5_____

   ☐  Plus Added Pages for Papers Referred to in Item 4 Above

                  Number of pages added _____

   ☐  Plus "Assignment Cover Letter Accompanying New Application"

                  Number of pages added _____

☐    **Statement Where No Further Pages Added**

*(If no further pages form a part of this Transmittal, then end this Transmittal with this page and check the following item)*

   ☐  This transmittal ends with this page.

(Application Transmittal [4-1]—page 9 of 9)

08980392.112897

Practitioner's Docket No. _97-5_____          **PATENT**

## ADDED PAGES FOR APPLICATION TRANSMITTAL WHERE BENEFIT OF PRIOR U.S. APPLICATION(S) CLAIMED

*NOTE: See 37 CFR 1.78(a).*

### 17. Relate Back

*WARNING: If an application claims the benefit of the filing date of an earlier filed application under 35 U.S.C. 120, 121 or 365(c), the 20-year term of that application will be based upon the filing date of the earliest U.S. application that the application makes reference to under 35 U.S.C. 120, 121 or 365(c). (35 U.S.C. 154(a)(2) does not take into account, for the determination of the patent term, any application on which priority is claimed under 35 U.S.C. 119, 365(a) or 365(b).) For a c-i-p application, applicant should review whether any claim in the patent that will issue is supported by an earlier application and, if not, the applicant should consider canceling the reference to the earlier filed application. The term of a patent is not based on a claim-by-claim approach. See Notice of April 14, 1995, 60 Fed. Reg. 20,195, at 20,205.*

**(complete the following, if applicable)**

☒   Amend the specification by inserting, before the first line, the following sentence:

### A.  35 U.S.C. 119(e)

*NOTE:  "Any nonprovisional application claiming the benefit of one or more prior filed copending provisional applications must contain or be amended to contain in the first sentence of the specification following the title a reference to each such prior provisional application, identifying it as a provisional application, and including the provisional application number (consisting of series code and serial number)." 37 C.F.R. § 1.78(a)(4).*

☒   "This application claims the benefit of U.S. Provisional Application(s) No(s).:

| APPLICATION NO(S).: | | FILING DATE |
|---|---|---|
| 60 / 040,731 | | March 12, 1997 " |
| _____ / _____ | | _____ " |
| _____ / _____ | | _____ " |

Added Pages for Application Transmittal Where Benefit of Prior U.S. Application(s) Claimed
[4-1.1]—page 1 of 5

K00003

B.   35 U.S.C. 120, 121 and 365(c)

NOTE:   "Any nonprovisional application claiming the benefit of one or more prior filed copending nonprovisional applications or international applications designating the United States of America must contain or be amended to contain in the first sentence of the specification following the title a reference to each such prior application, identifying it by application number (consisting of the series code and serial number) or international application number and international filing date and indicating the relationship of the applications. Cross-references to other related applications may be made when appropriate." (See § 1.14(b)). 37 C.F.R. § 1.78(a)(2).

☒  "This application is a

- ☐  continuation
- ☒  continuation-in-part
- ☐  divisional

of copending application(s)

☒  application number 0 8 / 733,844 _____ filed on 10-18-96 ”

☐  International Application _____ filed on _____ and which designated the U.S."

NOTE:   The proper reference to a prior filed PCT application that entered the U.S. national phase is the U.S. serial number and the filing date of the PCT application that designated the U.S.

NOTE:   (1) Where the application being transmitted adds subject matter to the International Application, then the filing can be as a continuation-in-part or (2) if it is desired to do so for other reasons then the filing can be as a continuation.

☐  "The nonprovisional application designated above, namely application _____ / _____ filed _____, claims the benefit of U.S. Provisional Application(s) No(s).:

**APPLICATION NO(S).:**                                    **FILING DATE**

_____ / _____                    _____ ”

_____ / _____                    _____ ”

_____ / _____                    _____ ”

NOTE:   The deadline for entering the national phase in the U.S. for an international application was clarified in the Notice of April 28, 1987 (1079 O.G. 32 to 48) as follows:

"The Patent and Trademark Office considers the International application to be pending until the 22nd month from the priority date if the United States has been designated and no Demand for International Preliminary Examination has been filed prior to the expiration of the 19th month from the priority date and until the 32nd month from the priority date if a Demand for International Preliminary Examination which elected the United States of America has been filed prior to the expiration of the 19th month from the priority date, provided that a copy of the international application has been communicated to the Patent and Trademark Office within the 20 or 30 month period respectively. If a copy of the international application has not been communicated to the Patent and Trademark Office within the 20 or 30 month period respectively, the international application becomes abandoned as to the United States 20 or 30 months from the priority date respectively. These periods have been placed in the rules as paragraph (h) of § 1.494 and paragraph (i) of § 1.495. A continuing application under 35 U.S.C. 365(c) and 120 may be filed anytime during the pendency of the international application."

Added Pages for Application Transmittal Where Benefit of Prior U.S. Application(s) Claimed
[4-1.1]—page 2 of 5)

## 18.  Relate Back—35 U.S.C. 119 Priority Claim for Prior Application

The prior U.S. application(s), including any prior International Application designating the U.S., identified above in Item 17B, in turn itself claim(s) foreign priority(ies) as follows:

| Country | Appln. no. | Filed on |
|---------|-----------|----------|

The certified copy(ies) has (have)

☐ been filed on _____, in prior application 0 / _____, which was filed on _____

☐ is (are) attached.

*WARNING:  The certified copy of the priority application that may have been communicated to the PTO by the International Bureau may not be relied on without any need to file a certified copy of the priority application in the continuing application. This is so because the certified copy of the priority application communicated by the International Bureau is placed in a folder and is not assigned a U.S. serial number unless the national stage is entered. Such folders are disposed of if the national stage is not entered. Therefore, such certified copies may not be available if needed later in the prosecution of a continuing application. An alternative would be to physically remove the priority documents from the folders and transfer them to the continuing application. The resources required to request transfer, retrieve the folders, make suitable record notations, transfer the certified copies, enter and make a record of such copies in the Continuing Application are substantial. Accordingly, the priority documents in folders of international applications that have not entered the national stage may not be relied on. Notice of April 28, 1987 (1079 O.G. 32 to 46).*

## 19.  Maintenance of Copendency of Prior Application

*NOTE:  The PTO finds it useful if a copy of the petition filed in the prior application extending the term for response is filed with the papers constituting the filing of the continuation application. Notice of November 5, 1985 (1060 O.G. 27).*

**A.** ☐  Extension of time in prior application

*(This item **must** be completed and the papers filed **in the prior application,** if the period set in the prior application has run.)*

☐  A petition, fee and response extends the term in the pending **prior application** until _____

☐  A copy of the petition filed in prior application is attached.

**B.** ☐  Conditional Petition for Extension of Time in Prior Application

*(complete this item, if previous item not applicable)*

☐  A conditional petition for extension of time is being filed in the pending **prior** application.

☐  A **copy** of the conditional petition filed in the prior application is attached.

*Added Pages for Application Transmittal Where Benefit of Prior U.S. Application(s) Claimed*
*[4-1.1]—page 3 of 5)*

K00003

## 20. Further Inventorship Statement Where Benefit of Prior Application(s) Claimed

NOTE: *"If the continuation, continuation-in-part, or divisional application is filed by less than all the inventors named in the prior application a statement must accompany the application when filed requesting deletion of the names of the person or persons who are not inventors of the invention being claimed in the continuation, continuation-in-part, or divisional application." 37 CFR 1.62(a) [emphasis added] (dealing with the file wrapper continuation situation).*

NOTE: *"In the case of a continuation-in-part application which adds and claims additional disclosure by amendment, an oath or declaration as required by § 1.63 must be filed. In those situations where a new oath or declaration is required due to additional subject matter being claimed, additional inventors may be named in the continuing application. In a continuation or divisional application which discloses and claims only subject matter disclosed in a prior application, no additional oath or declaration is required and the application must name as inventors the same or less than all the inventors in the prior application." 37 CFR 1.62(c) (dealing with the continuation situation).*

### *(complete applicable item (a), (b) and/or (c) below)*

(a) ☒ This application discloses and claims only subject matter disclosed in the prior application whose particulars are set out above and the inventor(s) in this application are

    ☐ the same.

    ☒ less than those named in the prior application. It is requested that the following inventor(s) identified for the prior application be deleted:

_____
*(type name(s) of inventor(s) to be deleted)*

(b) ☐ This application discloses and claims additional disclosure by amendment and a new declaration or oath is being filed. With respect to the prior application, the inventor(s) in this application are

    ☐ the same.

    ☐ the following additional inventor(s) have been added:

_____
*(type name(s) of inventor(s) to be added)*

(c) The inventorship for all the claims in this application are

    ☒ the same.

    ☐ not the same. An explanation, including the ownership of the various claims at the time the last claimed invention was made

        ☐ is submitted.

        ☐ will be submitted.

Added Pages for Application Transmittal Where Benefit of Prior U.S. Application(s) Claimed
[4-1.1]—page 4 of 5)

08980392 . 112897

**21.  Abandonment of Prior Application** *(if applicable)*

☐  Please abandon the prior application at a time while the prior application is pending, or when the petition for extension of time or to revive in that application is granted, and when this application is granted a filing date, so as to make this application copending with said prior application.

*NOTE:  According to the Notice of May 13, 1983 (103, TMOG 6-7), the filing of a continuation or continuation-in-part application is a proper response with respect to a petition for extension of time or a petition to revive and should include the express abandonment of the prior application conditioned upon the granting of the petition and the granting of a filing date to the continuing application.*

**22.  Petition for Suspension of Prosecution for the Time Necessary to File an Amendment**

*WARNING:  "The claims of a new application may be finally rejected in the first Office action in those situations where (1) the new application is a continuing application of, or a substitute for, an earlier application, and (2) all the claims of the new application (a) are drawn to the same invention claimed in the earlier application, and (b) would have been properly finally rejected on the grounds of art of record in the next Office action if they had been entered in the earlier application." MPEP, § 706.07(b).*

*NOTE:  Where it is possible that the claims on file will give rise to a first action final for this continuation application and for some reason an amendment cannot be filed promptly (e.g., experimental data is being gathered) it may be desirable to file a petition for suspension of prosecution for the time necessary.*

*(check the next item, if applicable)*

☐  There is provided herewith a Petition To Suspend Prosecution for the Time Necessary to File An Amendment (New Application Filed Concurrently)

**23.  Small Entity** (37 CFR § 1.28(a))

☒  Applicant has established small entity status by the filing of a verified statement in parent application  60/ 040,731  on  3/12/97 .

  ☒  A copy of the verified statement previously filed is included.

*WARNING:  See 37 CFR § 1.28(a).*

**24.  NOTIFICATION IN PARENT APPLICATION OF THIS FILING**

☐  A notification of the filing of this
  *(check one of the following)*

    ☐  continuation

    ☐  continuation-in-part

    ☐  divisional

is being filed in the parent application, from which this application claims priority under 35 U.S.C. § 120.

Added Pages for Application Transmittal Where Benefit of Prior U.S. Application(s) Claimed
[4-1.1]—page 5 of 5)

K00003

EXPRESS MAIL NO. EI721877092US

Ins A¹

Ins A²

## DESCRIPTION

PROCESS FOR MANUFACTURING TASTELESS SUPER-PURIFIED SMOKE FOR
TREATING SEAFOOD TO BE FROZEN AND THAWED.

5

### Technical Field

This invention relates to a process for manufacturing
tasteless super-purified smoke for treating seafood to
preserve the freshness, color, texture, natural flavor,
10  moisture retention, and shelf life after the seafood is
frozen and thawed. These characteristics are the vital
signs of quality in seafood, hereinafter referred to as
"vitality."

The super-purified smoke treatment process is effective
15  in prolonging the vitality of fresh seafood. However, this
invention is uniquely valuable in that the vitality
preserving effects of the treatment process survive freezing
and thawing. The primary seafood species to be treated is
tuna and other seafood containing red color flesh that would
20  tend to turn brown after being frozen and thawed without the
treatment described herein. Although this tasteless super-
purified smoke is primarily intended to be used to treat
seafood, it can also be used with meat and poultry.

The intention of treatment with our tasteless super-
25  purified smoke is to preserve the vitality of the seafood so
it appears and tastes similar to fresh after it is frozen
and thawed. In all cases seafood should be wholesome.
However, seafood that is consumed uncooked for sashimi must
be visually attractive in its raw form. The purpose of
30  improving the aesthetic qualities is to create a seafood
product which is visually suitable for sashimi after
freezing and thawing. The result will be a sashimi quality
seafood product delivered to the consumer equal to, or
superior to, fresh seafood in regards to vitality, quality,
35  safety, and convenience.

This invention further relates to an apparatus and
process to manufacture tasteless super-purified smoke and
subsequent processes to treat seafood with the manufactured

K00004

41

## CLAIMS

What is claimed is:

1. A process, comprising:

combusting organic material to generate smoke having a particulate phase and a gaseous vapor phase;

super purifying said smoke to reduce substantially all taste imparting particulates and vapors below recognition thresholds for odor and taste, whereby a substantially tasteless super-purified smoke is created; and

treating meat having a freezing point with said tasteless super-purified smoke.

2. A process according to claim 1, wherein said treating step occurs for between approximately 1 second and approximately 60 hours, at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 46 degrees Fahrenheit (7.8 degrees Centigrade).

3. A process according to claim 2, further comprising:

freezing said treated meat for storage, whereby frozen meat is created.

4. A process according to claim 2 or 3, wherein said treating step occurs at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 38 degrees Fahrenheit (3.4 degrees Centigrade).

K00008