25-214

EXPRESS MAIL NO. EI193403988US

PTO/SB/16 (2-97)
Approved for use through 01/31/98. OMB 0651-0037
Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

MAIL ROOM
MAR 12 1997

**PROVISIONAL APPLICATION FOR PATENT COVER SHEET**

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53 (b)(2).

60040731
03/12/97

| Docket Number | 97-PROV-1 | Type a plus sign (+) inside this box --> | + |
|---|---|---|---|

### INVENTOR(s)/APPLICANT(s)

| LAST NAME | FIRST NAME | MIDDLE NAME/INITIAL | RESIDENCE (CITY AND EITHER STATE OR FOREIGN COUNTRY) |
|---|---|---|---|
| KOWALSKI | WILLIAM | R. | 371 Aokea Place Honolulu, Hawaii 96819 |

### TITLE OF THE INVENTION (280 characters max)

PROCESS FOR MANUFACTURING TASTELESS SUPER-PURIFIED SMOKE FOR TREATING SEAFOOD TO BE FROZEN AND THAWED

### CORRESPONDENCE ADDRESS (including country if not United States)

Martin E. Hsia
Cades Schutte Fleming & Wright
P. O. Box 939
Honolulu, Hawaii  96808

### ENCLOSED APPLICATION PARTS (check all that apply)

| | | | |
|---|---|---|---|
| X Specification | Number of Pages | 40 | X Small Entity Statement (2) |
| X Drawing(s) | Number of Sheets | 3 | X Other (specify)  Postcard receipt |

### METHOD OF PAYMENT OF FILING FEES FOR THIS PROVISIONAL APPLICATION FOR PATENT (check one)

| X | A check or money order is enclosed to cover the filing fees | | |
|---|---|---|---|
| ☐ | The Commissioner is hereby authorized to charge filing fees and credit Deposit Account Number: | FILING FEE AMOUNT ($) | $75.00 |

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☒ No.

☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

Respectfully submitted,

SIGNATURE _____     Date  3/12/97

TYPED or PRINTED NAME  Martin E. Hsia     REGISTRATION NO. (if appropriate)  32,471

☐ Additional inventors are being named on separately numbered sheets attached hereto

## USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

Burden Hour Statement: This form is estimated to take 2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Box Provisional Application, Assistant Commissioner for Patents, Washington, DC 20231.

A

Exhibit "3"

K00359



## PROVISIONAL APPLICATION COVER SHEET
### Additional Page

| Docket Number | | Type a plus sign ( + ) inside this box => | |
|---|---|---|---|
| INVENTOR(s)/APPLICANT(s) | | | |
| LAST NAME | FIRST NAME | MIDDLE INITIAL | RESIDENCE (CITY AND EITHER STATE OR FOREIGN COUNTRY) |
| | | | |

A

K00359



XPRESS MAIL NO. EI193403988US

## DESCRIPTION

PROCESS FOR MANUFACTURING TASTELESS SUPER-PURIFIED SMOKE FOR TREATING SEAFOOD TO BE FROZEN AND THAWED.

### Technical Field

5

This invention relates to a process for manufacturing tasteless super-purified smoke for treating seafood to preserve the freshness, color, texture, natural flavor,

10    moisture retention, and shelf life after the seafood is frozen and thawed.  These characteristics are the vital signs of quality in seafood, hereinafter referred to as "vitality."

15    The super-purified smoke treatment process is effective in prolonging the vitality of fresh seafood.  However, this invention is uniquely valuable in that the vitality preserving effects of the treatment process survive freezing and thawing.  The primary seafood species to be treated is tuna and other seafood containing red color flesh that would

20    tend to turn brown after being frozen and thawed without the treatment described herein. Although this tasteless super-purified smoke is primarily intended to be used to treat seafood, it can also be used with meat and poultry.

25    The intention of treatment with our tasteless super-purified smoke is to preserve the vitality of the seafood so it appears and tastes similar to fresh after it is frozen and thawed.  In all cases seafood should be wholesome. However, seafood that is consumed uncooked for sashimi must be visually attractive in its raw form. The purpose of

30    improving the aesthetic qualities is to create a seafood product which is visually suitable for sashimi after freezing and thawing.  The result will be a sashimi quality seafood product delivered to the consumer equal to, or superior to, fresh seafood in regards to vitality, quality,

35    safety, and convenience.

This invention further relates to an apparatus and process to manufacture tasteless super-purified smoke and subsequent processes to treat seafood with the manufactured

A

K003600

39

degrees Fahrenheit (1 to 10 degrees Centigrade), a preferred range of 35 to 40 degrees Fahrenheit (2 to 4 degrees Centigrade), and an optimal temperature of 37 degrees Fahrenheit (3 degrees Centigrade) for twelve hours or

5    longer. The semi-permeable vacuum pouch is designed to allow oxygen to permeate into the pouch after partial thawing as its plastic becomes more malleable. This slight thawing begins normal decomposition of the seafood. This is a safety feature for both the retailer and the consumer. If

10   the product is left in the pouch after thawing for too long, or if it is abused by temperatures above the operable range, then the normal signs of decomposition and spoilage, such as developing a bad smell, will occur similar to fresh product.

Thus, the present process for manufacturing tasteless

15   super-purified smoke for treating seafood meets the objectives of preserving the vitality characteristics of freshness, color, texture, natural flavor, moisture retention, and shelf life of the seafood, particularly after it is frozen and thawed. In addition, the tasteless super-

20   purified smoke, which can be stored and transported in canisters 40, greatly reduces equipment and facility costs enabling low cost treatment of seafood to be convenient and affordable throughout the seafood industry.

25   Industrial Applicability

This invention can be used to treat varying types of tuna species and other seafood containing red color flesh that would tend to turn brown after being frozen and thawed without this treatment. Although this tasteless super-

30   purified smoke is primarily intended to be used to treat seafood it can also be used with meat and poultry.

What is claimed is:

1.    A process comprising burning organic smoking

35   material to produce smoke; filtering substantially all taste imparting particulates and vapors such that the super-purified smoke does not impart a smoked taste to food subsequently treated;  treating whole or filleted seafood

A

K00363



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**March 29, 2001**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

**APPLICATION NUMBER:** *08/980,392*
**FILING DATE:** *November 28, 1997*
**PATENT NUMBER:** *5972401*
**ISSUE DATE:** *October 26, 1999*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

*E. Bornett*

**E. BORNETT**
**Certifying Officer**    Exhibit "4"

**PART (2) OF (3) PART(S)**

10'5

# Interview Summary

| | Application No. | Applicant(s) |
|---|---|---|
| | 08/980392 | Kowalski |
| | Examiner | Group Art Unit |
| | Drew Becker | 1761 |

All participants (applicant, applicant's representative, PTO personnel):

(1) __Drew Becker__        (3) __Martin Hsia__

(2) __David Lacey__        (4) _____

Date of Interview __3-23-99__

Type:  ☒ Telephonic   ☐ Personal (copy is given to   ☐ applicant   ☐ applicant's representative).

Exhibit shown or demonstration conducted:   ☐ Yes   ☒ No.   If yes, brief description:

_____

_____

Agreement  ☒ was reached.   ☐ was not reached.

Claim(s) discussed: __1, 11, 73__

Identification of prior art discussed:

__Yamaoka, Smits et al__

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:

_limitations of Yamaoka & Smits (liquid/gaseous smoke), so what "substantially tasteless" defines, applicant defines over prior art of record by not importing smoke taste & flavor & odor, attorney so will file amendment with expanded Maga reference (taste & odor ranges), discussio meat being used as opposed to just fish,_

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached.  Also, where no copy of the amendents which would render the claims allowable is available, a summary thereof must be attached.)

1. ☐  It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph above has been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW.  (See MPEP Section 713.04).  If a response to the last Office action has already been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.

2. ☐  Since the Examiner's interview summary above (including any attachments) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.  Applicant is not relieved from providing a separate record of the substance of the interview unless box 1 above is also checked.

Examiner Note:  You must sign and stamp this form unless it is an attachment to a signed Office action.



IM 359016

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

### UNITED STATES DEPARTMENT OF COMMERCE
#### United States Patent and Trademark Office

**March 29, 2001**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

**APPLICATION NUMBER:** *08/980,392*
**FILING DATE:** *November 28, 1997*
**PATENT NUMBER:** *5972401*
**ISSUE DATE:** *October 26, 1999*



By Authority of the
**COMMISSIONER OF PATENTS AND TRADEMARKS**

*E. Bornett*

**E. BORNETT**
**Certifying Officer**

PART ③ OF ③ PART(S)

Exhibit "5"

13/6

| *Notice of Allowability* | Application No. 08/980,392 | Applicant(s) Kowalski |
|---|---|---|
| | Examiner Drew Becker | Group Art Unit 1761 |

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance and Issue Fee Due or other appropriate communication will be mailed in due course.

[X] This communication is responsive to *amendment filed March 29, 1999.*

[X] The allowed claim(s) is/are *1-66 and 71-77 renumbered as claims 1-73.*

[ ] The drawings filed on _____ are acceptable.

[ ] Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).
    [ ] All  [ ] Some*  [ ] None  of the CERTIFIED copies of the priority documents have been
        [ ] received.
        [ ] received in Application No. (Series Code/Serial Number) _____ .
        [ ] received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
    *Certified copies not received: _____ .

[ ] Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE **THREE MONTHS** FROM THE "DATE MAILED" of this Office action. Failure to timely comply will result in ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

[ ] Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.

[X] Applicant MUST submit NEW FORMAL DRAWINGS
    [ ] because the originally filed drawings were declared by applicant to be informal.
    [X] including changes required by the Notice of Draftsperson's Patent Drawing Review, PTO-948, attached hereto or to Paper No. _10_ .
    [ ] including changes required by the proposed drawing correction filed on _____ , which has been approved by the examiner.
    [ ] including changes required by the attached Examiner's Amendment/Comment.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the reverse side of the drawings. The drawings should be filed as a separate paper with a transmittal letter addressed to the Official Draftsperson.**

[ ] Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

Any response to this letter should include, in the upper right hand corner, the APPLICATION NUMBER (SERIES CODE/SERIAL NUMBER). If applicant has received a Notice of Allowance and Issue Fee Due, the ISSUE BATCH NUMBER and DATE of the NOTICE OF ALLOWANCE should also be included.

Attachment(s)
    [ ] Notice of References Cited, PTO-892
    [ ] Information Disclosure Statement(s), PTO-1449, Paper No(s). _____
    [ ] Notice of Draftsperson's Patent Drawing Review, PTO-948
    [ ] Notice of Informal Patent Application, PTO-152
    [ ] Interview Summary, PTO-413
    [X] Examiner's Amendment/Comment
    [ ] Examiner's Comment Regarding Requirement for Deposit of Biological Material
    [X] Examiner's Statement of Reasons for Allowance

Application/Control Number: 08/980,392

Page 2

Art Unit: 1761

## DETAILED ACTION

1.     An examiner's amendment to the record appears below.  Should the changes and/or

additions be unacceptable to applicant, an amendment may be filed as provided by 37

CFR 1.312.  To ensure consideration of such an amendment, it MUST be submitted no later than

the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview with

Martin Hsia on June 15, 1999.

2.     The application has been amended as follows:

Claim 1, line 1 after "process" insert --for treating meat--.

Claim 38, line 4 before "super" insert --said tasteless--.

Claim 40, line 3 before "super" insert --said tasteless--.

Claim 46, line 1 after "process" insert --for treating meat--.

Claim 46, line 4 before "eliminating" insert --super purifying said smoke by--.

Claim 58, line 1 after "process" insert --for treating seafood--.

Claim 61, line 1 after "process" insert --for treating seafood--.

Claim 61, line 9 delete "tuna" and insert --seafood,--.

Claim 61, line 9 delete "point" and insert --point,--.

Claim 71, line 1 after "process" insert --for treating food--.

Claim 72, line 1 after "process" insert --for treating food--.

Application/Control Number: 08/980,392

Art Unit: 1761

Claim 73, line 1 after "process" insert --for treating food--.

Claim 47 (amended): [50]

A process for treating meat comprising:

heating organic material to generate smoke, wherein said smoke contains taste compounds;

[treating meat with said smoke; and]

super purifying said smoke by eliminating smoke taste compounds from said smoke;

treating meat with said smoke; and

whereby said treated meat does not retain a smoky taste.

### Allowable Subject Matter

3.    Claims 1-66 and 71-77 renumbered as claims 1-73 are allowed.

4.    The following is an examiner's statement of reasons for allowance: the claimed process for treating food defines over the prior art of record by comprising the steps of generating smoke, removing smoke odor and/or taste compounds from said smoke, and treating a food with said smoke such that the food does not retain a smoky odor or taste.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue

Application/Control Number: 08/980,392

Art Unit: 1761

Page 4

fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

5.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to Drew Becker whose telephone number is (703)-305-0300. The examiner can normally be reached on Monday-Thursday from 7:00 am to 4:00 pm and every other Friday from 7:00 am to 3:00 pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, David Lacey, can be reached on (703)-308-3535. The fax number for this Group is (703)-305-3602.

Any inquiry of a general nature or relating to the status of this application or proceeding should be directed to the Group receptionist whose telephone number is (703) 308-0651.

David Lacey
Supervisory Patent Examiner
Technology Center 1700
6/17/99

Drew Becker

June 16, 1999

# Smoke
# in
# Food
# Processing

Author

**Joseph A. Maga**

Professor
Department of Food Science and
Human Nutrition
Colorado State University
Fort Collins, Colorado



CRC Press, Inc.
Boca Raton, Florida

K004644

Library of Congress Cataloging-in-Publication Data

Maga, Joseph A.
  Smoke in food processing.

  Includes bibliographies and index.
  1. Meat, Smoked. 2. Fish, Smoked. I. Title.
TP371.44.M34   1988      664′.0286      87-24231
ISBN 0-8493-5155-3

This book represents information obtained from authentic and highly regarded sources. Reprinted material is quoted with permission, and sources are indicated. A wide variety of references are listed. Every reasonable effort has been made to give reliable data and information, but the author and the publisher cannot assume responsibility for the validity of all materials or for the consequences of their use.

All rights reserved. This book, or any parts thereof, may not be reproduced in any form without written consent from the publisher.

Direct all inquiries to CRC Press, Inc., 2000 Corporate Blvd., N.W., Boca Raton, Florida, 33431.

© 1988 by CRC Press, Inc.

International Standard Book Number 0-8493-5155-3

Library of Congress Card Number 87-24231
Printed in the United States

K004645

## Table 11
## THERMAL DEGRADATION PRODUCTS OF FERULIC ACID



Adapted from Gilbert, J. and Knowles, M. E., *J. Food Technol.*, 10, 245, 1975.

found that initial lignin decomposition occurred at 120 to 300°C. Compounds associated with this stage included formic acid, formaldehyde, carbon dioxide, and water, primarily resulting from single-bond fragmentation in the phenylpropane sidechains.

The major decomposition of lignin extended over the temperature range of 300 to 480°C and was maximum at 385°C. Compounds observed in this stage included methanol, carbon dioxide, carbon monoxide, water, methane, guaiacol, 2-methoxy-4-alkyl-substituted phenol, acetone, and acetic acid. They postulated that methanol was derived directly from the methoxyl substituents of lignin, whereas the other compounds were derived as fragmentation products of major chain linkages releasing monomeric phenol units into the vapor phase which undergo further secondary degradation. Maximum phenolic compound formation was observed at approximately 320°C, while at higher temperatures secondary degradation products began to appear, thus suggesting that temperatures above 320°C should not be used if one is trying to maximize phenolic yield in smoke, even though lignin will further decompose to temperatures approaching 500°C.

The thermal degradation products of wood can be grouped into the combustible volatiles, tar, and char. Tar, upon further degradation, can be converted to volatiles and char.

## V. COMBUSTION

In addition, Shafizadeh[a] has shown that the char remaining after lignin pyrolysis is highly reactive and chemically different, dependent upon pyrolysis temperature, and can undergo smoldering or glowing combustion, or if the temperature is high enough and air conditions are adequate, flaming combustion can occur.

Since lignin is the primary constituent contributing to char formation, while cellulose and hemicellulose primarily contribute to the formation of volatile pyrolysis products that are responsible for flaming combustion, the higher the lignin content of wood, the higher its flaming combustion temperature requirement.

As would be expected, the higher the combustion temperature, the higher the amount of gases produced. As seen in Table 12, tar content is not significantly influenced by temperature but other components are altered.

K004687

**Table 12**
**INFLUENCE OF COMBUSTION**
**TEMPERATURE ON PRODUCT**
**YIELDS**

| | Temp (°C) | | | |
|---|---|---|---|---|
| | 540 | 650 | 760 | 870 |
| Gases (% yield) | 25 | 28 | 32 | 34 |
| Char (% yield) | 33 | 31 | 29 | 29 |
| Water (% yield) | 27 | 25 | 23 | 22 |
| Tar (% yield) | 16 | 16 | 19 | 16 |

Adapted from Fengel, D. and Wegener, G., in *Wood: Chemistry, Ultrastructure, Reactions*. Walter de Gruyter, Berlin, 1984, chap. 12.

## REFERENCES

1. **Baltes, W., Wittkowski, R., Sochtig, I., Block, H., and Toth, L.,** Ingredients of smoke and smoke flavor, in *The Quality of Food and Beverages*, Vol. 2, Charalambous, G. and Inglett, G., Eds., Academic Press, New York, 1981, chap. 1.
2. **Wistreich, H. E.,** Smoking of meats, Proc. Meat Ind. Res. Conf., Chicago, 1977, 37.
3. **Goos, A. W.,** The thermal decomposition of wood, in *Wood Chemistry*, Vol. 2, Wise, L. E. and Jahn, E. C., Eds., Reinhold, New York, 1952, chap. 20.
4. **Gilbert, J. and Knowles, M. E.,** The chemistry of smoked foods: a review, *J. Food Technol.*, 10, 245, 1975.
5. **Browning, B. L.,** Composition and chemical reactions of wood, in *The Chemistry of Wood*, Browning, B. L., Ed., R. E. Krieger, Huntington, N.Y., 1975, chap. 3.
6. **Shafizadeh, F.,** The chemistry of pyrolysis and combustion, in *The Chemistry of Solid Wood*, Rowell, R., Ed., American Chemical Society, Washington, D.C., 1984, chap. 13.
7. **Russell, J. A., Miller, R. K., and Molton, P. M.,** Formation of aromatic compounds from condensation reactions of cellulose degradation products, *Biomass*, 3, 43, 1983.
8. **Fenner, R. A. and Lephardt, J. O.,** Examination of the thermal decomposition of kraft pine lignin by fourier transform infrared evolved gas analysis, *J. Agric. Food Chem.*, 29, 846, 1981.
9. **Fengel, D. and Wegener, G.,** Influence of temperature, in *Wood: Chemistry, Ultrastructure, Reactions*, Walter de Gruyter, Berlin, 1984, chap. 12.

K004688

Adapted from Schmeltz, I. and Hoffman, D., *Carcinogenesis,*
Vol. 1, Frendental, R. I. and Jones, P. W., Eds., Raven Press,
New York, 1976.

## Table 3
## COMMON FOOD PAH

| | |
|---|---|
| Indene | Fluoranthene |
| Methylindene | Benzo[a]anthracene |
| Ethylindene | Chrysene |
| Naphthalene | Benzo[b]fluoranthene |
| Methylnaphthalene | Benzo[k]fluoranthene |
| Dimethylnaphthalene | Benzo[j]fluoranthene |
| Ethylnaphthalene | 1,2-Benzpyrene |
| Naphthylene | 3,4-Benzyprene |
| Napthene | Perylene |
| Ethylnaphthalene | 7,12-Dimethylbenz[a]anthracene |
| Methylnaphthylene | Methylchloroanthrene |
| Trimethylnaphthalene | Indenopyrene |
| Fluorene | Benzo[g,h,i]perylene |
| Methylfluorene | Anthranthrene |
| Phenanthrene | Dibenzo[a,c]anthracene |
| Anthracene | Dibenzo[a,j]anthracene |
| 2-Methylanthracene | Dibenzo[a,h]anthracene |
| 9-Methylanthracene | Coronene |
| Methylphenanthrene | 3,4,9,10-Dibenzpyrene |
| Pyrene | Benzo[c]phenanthrene |
| Dimethylanthracene | Dibenzo[a,h]pyrene |
| Dimethylphenanthrene | Dibenzo[a,i]pyrene |
| 1-Methylpyrene | Dibenzo[e,l]pyrene |
| 11-H-benzo[a]fluorene | Cholanthrene |

In the case of a frankfurter-type product, Simon et al.[1] demonstrated that the type of casing used during the smoking process could significantly influence benzo[a]pyrene concentrations in the resulting product. As seen in Table 5, sheep casing apparently permitted the passage of PAH into the product while the synthetic cellulose casing retarded PAH penetration. Also, as would be expected, increased smoking time increased product PAH concentrations. Apparently, the structure of the cellulose casing was such that the rather large molecular weight PAH could not effectively pass into the product. Thus, based on these data, the use of certain natural casings should be discouraged with smoked foods.

Rusz et al.[2] clearly demonstrated that electrostatic precipitators operating at a voltage of 10 kV and a temperature of 75 to 80°C were quite effective in removing PAH from smoke streams. Lenges[3] also promoted the use of electrostatic precipitators for PAH reduction.

Toth and Blaas[4] reported on numerous smoke-processing techniques that can significantly lower PAH levels. They noted a linear increase in benzo[a]pyrene concentration as smoke

K004766

generation temperature was increased from 400 to 1000°C. At the higher temperatures, primarily four- and five-membered PAH compounds were formed. Thus, it appears that smoke generation temperature is the key factor influencing PAH formation. They[4] demonstrated that when smoke generation temperature was 400°C, smoked meat had 0.4 ppb PAH, while if smoke generation temperature was reduced to 300°C, PAH levels in the meat fell to 0.09 ppb. Other significant factors resulting in reductions of smoke-generated PAH included cooling, which reduced PAH levels 25%, washing which resulted in a 20 to 30% reduction, increasing distance from the smoke generator — 40%, and filtering smoke for a 90% reduction. As would be expected, they[4] also reported that more PAH was deposited on food during hot smoking vs. cold smoking and a very high buildup of PAH during the dark smoking of food was observed due to soot buildup on the product surface. Raja et al.[18] and Potthast[19] have also clearly demonstrated that moistening the wood source during smoking effectively lowers smoke generation temperature, and thus, also PAH levels.

K004767

# Smoke in Food Processing

Author

## Joseph A. Maga

Professor
Department of Food Science and
Human Nutrition
Colorado State University
Fort Collins, Colorado



CRC Press, Inc.
Boca Raton, Florida

K004644

Exhibit "7"

**Library of Congress Cataloging-in-Publication Data**

Maga, Joseph A.
  Smoke in food processing.

  Includes bibliographies and index.
    1. Meat, Smoked. 2. Fish, Smoked. I. Title.
TP371.44.M34   1988       664'.0286      87-24231
ISBN 0-8493-5155-3

     This book represents information obtained from authentic and highly regarded sources. Reprinted material is
quoted with permission, and sources are indicated. A wide variety of references are listed. Every reasonable effort
has been made to give reliable data and information, but the author and the publisher cannot assume responsibility
for the validity of all materials or for the consequences of their use.

     All rights reserved. This book, or any parts thereof, may not be reproduced in any form without written consent
from the publisher.

     Direct all inquiries to CRC Press, Inc., 2000 Corporate Blvd., N.W., Boca Raton, Florida, 33431.

© 1988 by CRC Press, Inc.

International Standard Book Number 0-8493-5155-3

Library of Congress Card Number 87-24231
Printed in the United States

K004645

Chapter 10

## POTENTIAL HEALTH CONCERNS ASSOCIATED WITH SMOKE

### I. INTRODUCTION

Up until now we have primarily talked about the positive aspects of wood smoke. However, in all fairness, we should also look at the reported negative aspects of wood smoke relative to human health. Since we are talking of humans, one must realize that moral and legal limitations make this an extremely difficult area to gather scientific evidence from well-designed studies. Therefore, mainly inferences have been made from animal studies and human death rate statistics. One can argue that humans have been consuming smoked foods for literally centuries and anyone would have an extremely difficult time in proving beyond a doubt that man has significantly threatened his life because of this practice.

However, based on the chemistry of certain compounds that can be formed in smoke, namely polycyclic aromatic hydrocarbons (PAH) and nitrosamines, a rational approach would be to minimize the ingestion of such compounds not especially by decreasing the amount of smoked foods consumed, but by reducing the levels of such compounds in our total commercial and home-processed food supply.

It should be noted that certain countries have established maximum limits for these compounds in commercial foods, but little if anything is done to educate the general public as to how these compounds can be reduced in home processed and prepared foods.

Human nature is unique in that a commercial food processing operation can quickly receive condemnation for marketing food that contains potentially harmful compounds, but no publicity or outrage is voiced to the individual or entire society who produces these same compounds in their homes. For example, PAH can be generated from various sources, and thus, can enter our food supply via several routes. PAH can be thermally produced by both high temperature pyrolysis and from the incomplete combustion of materials containing carbon and hydrogen. Various forms of air pollution can be a significant source of PAH. In addition, PAH are naturally associated with petroleum and coal tar products which can also be environmental pollutants, thus resulting in contaminated food supplies.

Health hazards associated with smoke, soot, and tar products were apparent long before the compounds responsible were known. For example, skin cancer was considered to be an occupational hazard of chimney sweeps centuries ago but the actual cause was not realized until the 1930s. Researchers discovered that PAH isolated from combustion residues were carcinogenic in animal tests.[40] The problem is compounded by the fact that apparently PAH is not acutely toxic and thus time is required for symptoms to develop.

Relative to the general thermal formation of PAH, it is generally thought that during the pyrolysis of organic matter the compound acetylene is a key intermediate, as outlined in Table 1. Since acetylene can be derived from many forms of organic starting materials, it is then not surprising that the occurrence of PAH is widespread. In fact, it has been shown, as seen in Table 2, that a relatively simple compound, such as glucose, can produce benzo[a]pyrene when pyrolyzed, and as structure complexity increases, so does the amount of PAH formed. Thus, in the heating or smoking of a food, which contains a vast number of potential reactants, PAH formation is a standard fact of life.

### II. SMOKING METHODS VS. PAH CONCENTRATION

PAH is composed of multiple fuzed benzene rings and at least on a theoretical basis hundreds of such compounds can exist. To date, 40 to 60 such compounds have actually

K004764

### Table 1
### PYROSYNTHESIS OF BENZO[A]PYRENE



Adapted from Badger, G., Kimber, R., and Spotswood, T., *Nature*, 187, 663, 1960.

been identified although up to 100 have actually been detected. Some of the more common PAH are listed in Table 3.

Since it has been known for quite some time that some PAH act as potent chemical carcinogens (Table 4), their presence in food is of major concern. Smoked foods are a special area of concern since it has been well documented that smoke generation conditions can dramatically influence the level of resulting PAH in the smoke and consequently, in smoked foods.[1-21] At this point, certain of these studies will be discussed.

K004765

## Table 2
## BENZO[A]PYRENE GENERATION FROM THE PYROLYSIS (840°C) OF VARIOUS ORGANICS

| Compound pyrolyzed | μg benzo[a]pyrene/kg pyrolyzate |
|---|---|
| Glucose | 48 |
| Stearic acid | 1200 |
| β-Sitosterol | 3750 |

Adapted from Schmeltz. I. and Hoffman. D.. *Carcinogenesis.* Vol. I. Frendenttal. R. I. and Jones. P. W.: Eds.. Raven Press. New York. 1976.

## Table 3
## COMMON FOOD PAH

| | |
|---|---|
| Indene | Fluoranthene |
| Methylindene | Benzo[a]anthracene |
| Ethylidene | Chrysene |
| Naphthalene | Benzo(b)fluoranthene |
| Methylnaphthalene | Benzo(k)fluoranthene |
| Dimethylnaphthalene | Benzo(j)fluoranthene |
| Ethylnaphthalene | 1.2-Benzpyrene |
| Naphthylene | 3.4-Benzyprene |
| Napthene | Perylene |
| Ethylnaphthalene | 7.12-Dimethylbenz[a]anthracene |
| Methylnaphthylene | Methylchloroanthrene |
| Trimethylnaphthalene | Indenopyrene |
| Fluorene | Benzo(g.h.i)perylene |
| Methylfluorene | Anthranthrene |
| Phenanthrene | Dibenzo[a.c]anthracene |
| Anthracene | Dibenzo[a.j]anthracene |
| 2-Methylanthracene | Dibenzo[a.h]anthracene |
| 9-Methylanthracene | Coronene |
| Methylphenanthrene | 3.4.9.10-Dibenzpyrene |
| Pyrene | Benzo[c]phenanthrene |
| Dimethylanthracene | Dibenzo[a.h]pyrene |
| Dimethylphenanthrene | Dibenzo[a.i]pyrene |
| 1-Methylpyrene | Dibenzo[e.l]pyrene |
| 11-H-benzo[a]fluorene | Cholanthrene |

In the case of a frankfurter-type product. Simon et al.[1] demonstrated that the type of casing used during the smoking process could significantly influence benzo[a]pyrene concentrations in the resulting product. As seen in Table 5, sheep casing apparently permitted the passage of PAH into the product while the synthetic cellulose casing retarded PAH penetration. Also. as would be expected, increased smoking time increased product PAH concentrations. Apparently, the structure of the cellulose casing was such that the rather large molecular weight PAH could not effectively pass into the product. Thus, based on these data, the use of certain natural casings should be discouraged with smoked foods.

Rusz et al.[2] clearly demonstrated that electrostatic precipitators operating at a voltage of 10 kV and a temperature of 75 to 80°C were quite effective in removing PAH from smoke streams. Lenges[3] also promoted the use of electrostatic precipitators for PAH reduction. Toth and Blaas[4] reported on numerous smoke-processing techniques that can significantly lower PAH levels. They noted a linear increase in benzo[a]pyrene concentration as smoke

K004766

### Table 4
### DEGREE OF CARCINOGENICITY AMONG
### CERTAIN PAH

| Compound | Degree of carcinogenicity |
|---|---|
| 7,12-Dimethylbenz[a]anthracene | + + + + |
| 3-Methylcholanthrene | + + + + |
| Benzo[a]pyrene | + + + |
| Dibenz[a,h]anthracene | + + + |
| Dibenzo[a,i]pyrene | + + + |
| Benzo[a]phenanthrene | + + + |
| Benzo[y]anthracene | + |
| Indeno[1,2,3-c,d]pyrene | + |
| Benzo[b]fluoranthene | + |
| Pyrene | − |
| Benzo[a]fluorene | − |

*Note:*  + + + + extremely carcinogenic; + + + very carcinogenic;
+ + carcinogenic; + somewhat carcinogenic; − not
carcinogenic.

Adapted from Toth, L. and Potthast, K., *Adv. Food Res.*, 29, 87,
1984.

### Table 5
### INFLUENCE OF CASING
### TYPE AND SMOKING TIME
### ON BENZO[A]PYRENE
### LEVELS (ppb) IN SMOKED
### FRANKFURTERS

| Type of casing | Smoking time (min) | |
|---|---|---|
| | 5 | 10 |
| Sheep | 4.0 | 13.0 |
| Cellulose | 1.6 | 1.6 |

Adapted from Simon, S., Rypinski, A. A.,
Tauber, F. W., Pencyla, R. M., and Wes-
terberg, D. O., *J. Agric. Food Chem.*, 17,
1128, 1969.

generation temperature was increased from 400 to 1000°C. At the higher temperatures,
primarily four- and five-membered PAH compounds were formed. Thus, it appears that
smoke generation temperature is the key factor influencing PAH formation. They[4] dem-
onstrated that when smoke generation temperature was 400°C, smoked meat had 0.4 ppb
PAH, while if smoke generation temperature was reduced to 300°C, PAH levels in the meat
fell to 0.09 ppb. Other significant factors resulting in reductions of smoke-generated PAH
included cooling, which reduced PAH levels 25%, washing which resulted in a 20 to 30%
reduction, increasing distance from the smoke generator — 40%, and filtering smoke for a
90% reduction. As would be expected, they[4] also reported that more PAH was deposited
on food during hot smoking vs. cold smoking and a very high buildup of PAH during the
dark smoking of food was observed due to soot buildup on the product surface. Raja et al.[18]
and Potthast[19] have also clearly demonstrated that moistening the wood source during smok-
ing effectively lowers smoke generation temperature, and thus, also PAH levels.

K004767

They[36] also measured the benzo[a]pyrene level in smoked meats traditionally prepared by using soft wood as the smoke source by a Slovenian minority known to have a higher incidence of stomach cancer than the general population and these products were found to contain on the average 4.16 μg/kg.

As mentioned elsewhere, the filtration of smoke can significantly lower PAH concentration. For example, Steinig and Schreiber[11] evaluated the effectiveness of various types of metal (perforated sheets, steel wool, and expanded metal) and fiberglass filters. The fiberglass filters were found to be more effective, but more wood was needed to produce the equivalent amount of smoke as when no filter was used. Also, although more effective, the fiberglass filters could not be effectively cleaned to be reused whereas the metal filters could be reused upon cleaning.

Direct and indirect smoking conditions relative to resulting benzo[a]pyrene concentration in smoked fish was evaluated by Steinig.[9] It was found that the direct method gave levels greater than 1 ppb whereas indirect smoking produced products that had less than 1 ppb.

Toth and Blaas[5] examined benzo[a]pyrene levels in cold-, hot-, and black-smoked meats and found quite a range in levels with the black-smoked meats having the highest amounts. Traditional cold-smoked meats had an average of 0.6 ppb with a high of 1.6 ppb while hot-smoked products averaged 0.4 ppb with a high of 1.1 ppb. Since the cold-smoked meats were smoked for a longer period of time, they had higher levels than the hot-smoked products. In contrast, the black-smoked products ranged from 0.3 to 55 ppb.

Dikun et al.[20] demonstrated with fish products that using liquid smoke produced lower benzpyrene levels (1 to 1.2 μg/kg of fish) than by smoking using two commercial smoking units whose levels ranged from 1.6 to 39.0 μg/kg and averaged 9.7 μg/kg. Similar results with liquid smoke were reported by Ruchkovskii et al.[48] Thus, if product quality can be maintained, good quality liquid smoke can be used to minimize PAH.

Larsson[47] evaluted PAH types and amounts in Swedish commercially smoked fish as influenced by wood source. Either alder or spruce/juniper was used. Surprisingly, fish smoked over alder had a higher total PAH concentration (439 μg/kg of fish) than for spruce/juniper (271 μg/kg). However, there was a greater proportion of higher molecular weight PAH associated with the spruce/juniper wood source.

It is interesting to note that most commercial food smoking operations have routinely adopted many or all of the above steps to minimize PAH buildup in smoked foods, but the individual who is smoking foods for his own personal use usually smokes in a rather primitive manner, which in turn can lead to high PAH concentrations.

In light of the German maximum limit of 1 ppb 3,4-benzopyrene in smoked foods, Potthast[40] has summarized data obtained from several research groups on the influence of smoking method on resulting 3,4-benzopyrene content. A portion of his data is shown in Table 7, and as can be seen, overall, the method resulting in the lowest level is the wet smoke procedure. In contrast, either hot or cold dark smoking and the smoldering smoke method produced samples that had relatively high 3,4-benzopyrene amounts. Obviously, not all samples evaluated for each method had equal amounts of 3,4-benzopyrene as can be seen by the range of values found for each method, thus demonstrating that not only is the method of smoking important but the operator of the smoking unit also apparently plays an important role since these were commercial samples that were evaluated.

Potthast[7,15] has perhaps best summarized optimum smoke generation conditions required to minimize PAH. Since PAH generation is temperature dependent, he suggests generating smoke below 400°C, removing particulate matter through filtration or by means of a cold trap, wrapping products to be smoked in synthetic casings that are impermeable to PAH, using spatial separation of the product being smoked from the smoke source, and reducing the smoking time of products that have high surface-to-weight ratios.

Relative to filtration of smoke as a means of reducing PAH content, Potthast et al.[12] have

K004769

**Table 7**
**INFLUENCE OF SMOKING
METHOD ON RESULTING
3,4-BENZOPYRENE
CONTENT IN
COMMERCIAL SMOKED
MEAT PRODUCTS**

| Smoking method | 3,4-Benzopyrene ($\mu$g/kg) |
|---|---|
| Smoldering smoke | 0—36.23 |
| Wet smoke | 0.09—0.77 |
| Friction smoke | 0.01—4.56 |
| Hot smoke | |
|   Lightly smoked | 0—2.08 |
|   Dark smoked | 0.22—36.23 |
| Cold smoke | |
|   Lightly smoked | 0.10—3.16 |
|   Dark smoked | 0.10—56.04 |

Adapted from Potthast, K., *Fleischwirt-schaft*, 58, 38, 1978.

shown that the technique can reduce PAH levels up to 97% while cooling generated smoke can result in up to a 35% reduction. Also, the washing of smoke after generation can reduce PAH by 35%. Fedonin et al.[192] have also demonstrated the effectiveness of filtering smoke.

Another potential method for reducing the PAH level in smoked foods in through the use of smoke-flavored seasonings.[34] These seasonings were found to contain up to 20 $\mu$g/kg of benzopyrene, but when used at a maximum dose of 5 g of seasoning per kilogram of meat product, the resulting benzopyrene content was below the German 1 ppb standard.

Also to be added to the list is the use of hardwoods instead of softwoods for smoke generation, and in the case of smoking fish, removal of the skin since fish smoked without skin contained an average of 1 to 39 $\mu$/kg of benzopyrene whereas the same fish smoked with the skin on contained 8.55 $\mu$g/kg.[55] Obviously, rapid hot smoking and black smoking result in high PAH levels[4] as does smoke generation with an open flame.

As discussed elsewhere, food lipid content is another factor that can contribute to PAH formation during smoking, and thus where possible, the lipid content of the food being smoked should be kept to a minimum. This appears to be especially true for smoked fish.

## III. PAH IN WOOD SMOKE

Since PAH can be associated with wood smoke, numerous researchers have attempted to separate, identify, and quantitate such compounds. For example, Obiedzinski and Borys[23] detected 27 PAH while Potthast[17] identified 25 PAH compounds in smoke condensates. The major PAH in smoke appears to be phenanthrene[17,24] and closely related compounds. The same observation was noted earlier by Rhee and Bratzler,[22] and as can be seen in Table 8, whole smoke had approximately twice the PAH as the vapor phase thus again reinforcing the concept that the level of smoke particulate matter permitted to reach a food surface should be minimized.

The other major research area has been to evaluate PAH composition of liquid smoke since, in theory, techniques described in the previous section are available to reduce PAH levels. For example, as seen in Table 9, a tar recovered from a liquid smoke preparation

K004770

# United States Patent Office

**3,462,282**
**Patented Aug. 19, 1969**

1

**3,462,282**
**PROCESS AND APPARATUS FOR PREPARING A SMOKING FLUID AND SMOKING FOODSTUFFS THEREWITH**
Gerhard Fessmann, Mozartstrasse 16, 7012
Fellbach, near Stuttgart, Germany
Filed Dec. 20, 1965, Ser. No. 515,126
Claims priority, application Germany, Dec. 23, 1964,
F 44,795; Feb. 18, 1965, F 45,276; June 16,
1965, F 46,346; Apr. 6, 1965, F 45,739; Dec. 10,
1965, F 47,888
Int. Cl. A23b 1/04
U.S. Cl. 99—229                                    46 Claims

## ABSTRACT OF THE DISCLOSURE

A process and apparatus for treating foodstuffs which includes a contacting finely divided wood chips or sawdust with superheated steam to effect thermal decomposition of at least a portion thereof and thereby create a smoking fluid. The smoking fluid is then brought into contact with the foodstuffs to be treated and imparts a smoke flavoring thereto in conjunction with the simultaneous cooking thereof when so desired.

This invention relates to a process of preparing and utilisation of a fluid for smoking foodstuffs, such as meat, sausage, fish, ham, cheese, and the like, which are to be subjected to the action of the smoking fluid produced with the aid of sawdust. This process serves to impart to foodstuffs a smoked flavor, which is the same as or similar to the flavor which is produced by smoking these foodstuffs with wood smoke.

It is known to use as a smoking fluid a liquid, which is obtained by introducing wood smoke into water. This has the disadvantage that saw chips or saw dust must be burnt, just as when the foodstuffs are directly treated with wood smoke. Such burning requires fireproof containers. The combustion process, particularly the combustion temperature, and the composition of the smoking fluid, which depends on said temperature, can be controlled only with difficulty. Soot and other tar-containing substances tend to deposit on the walls of the container and may give rise to undesired secondary combustion processes.

In another known process, wood is heated to produce wood gas, which is then condensed and subjected to fractional distillation. The resulting distillate is diluted with water. This process is so complicated that the production of the smoking fluid is expensive, and the process requires a combustion, which has the above-mentioned disadvantages.

In the known smoke gas process there must be a flue for discharging the flue gases. The soot and tar components deposit on the walls of the smoking chambers and on the sensing and heating means incorporated in said chambers so that they can no longer satisfactorily perform their function after some time. It has also been found that the apparatus for carrying out the known processes cannot be put into and out of operation as quickly as desired because the initiation of the combustion or heating of the sawdust takes considerable time and the combustion temperature varies continually. Owing to this fact, a constant quality of the smoking fluid as to the percentage composition of its components cannot be ensured.

Another disadvantage of the known processes resides in that the surplus gas or vapor which escapes from the boiling and/or smoking chamber is discharged through a relief valve so that there is an obnoxious smell and contamination of the surroundings of the smoking chamber, or flue connections are required.

2

It is an object of the invention to provide a simple process of producing a smoking fluid. More specifically, it is an object to provide a process of producing a smoking fluid which is free at least of most of the substances which are injurious to health, such as cancerogenic substances. It is another object to provide a process of the type set forth above which can be carried out independently of fixed connections, such as flue connections, and which permits of a storage of the produced smoking fluid.

It is desired to supply flavors or the like in a predetermined manner to the foodstuffs to be smoked. More specifically, it is desired to enable an exact predetermination of the intensity and concentration in which the flavors or the like are to be taken up by the foodstuffs.

It should be possible to smoke the foodstuffs within a short time. The surplus vapor escaping from the smoking chamber or a boiling cabinet or the like should be discharged in a simple manner so that the surplus vapor condenses quickly and can then be discarded, e.g., through a sewer system. An accurate control of the pressure in the smoking chamber should be possible and a reliable protection is required against a re-entrance of atmosphere from the sewer system.

It is another object of the invention to provide an apparatus for carrying out the process and for continuously or intermittently producing the smoking fluid in a uniform and predetermined or adjustable quality. The apparatus should be simple in structure and enable a direct use of the gaseous fluid after its production or a simple storage of the fluid.

In a process of producing a fluid for smoking foodstuffs such as meat, sausage, fish, ham, cheese and the like, in which process the foodstuff is subjected to the action of the smoking fluid produced from sawdust, superheated steam of at least 180° C., preferably 250° C. to 390° C. is used according to the invention for the thermal decomposition of sawdust. This has the advantage that the temperature at which flavors or the like are extracted from the sawdust can be exactly controlled so that only the desired substances are recovered from the sawdust. Owing to the use of water vapor, the sawdust cannot be inflamed so that the smoking chambers containing the foodstuffs to be smoked remain clean.

According to a further feature of the invention, the smoking fluid is saturated with moisture to about 100% at 70–100° C., preferably 80° C., so that the smoking fluid can condense on the foodstuffs to be smoked and a much faster and more intensive transfer of the substances contained in the smoking fluid and their uniform distribution on the surface of the foodstuffs is ensured.

According to a further proposal according to the invention, air or another neutral gas is admixed to the superheated steam before it passes through the sawdust in order to vary the moisture content and the flavor of the smoking fluid.

The steam which has been enriched with flavors, i.e., the smoking fluid, may have water vapor, air or another neutral gas admixed thereto before it contacts the foodstuffs so that the concentration, composition and intensity of action can be controlled. Depending on the amount and temperature of the neutral gas admixed to the smoking fluid, the latter will have a larger or smaller depth of penetration into the foodstuffs so that the taste and moisture content can be selectively changed.

The admixing of water vapor, air or another neutral gas is preferably effected before the liquefaction of the smoking fluid because this ensures a particularly good mixing.

A particularly fast and intense smoking of the foodstuffs will be enabled if the smoking fluid is transferred to the foodstuffs to be smoked by dewing or condensing.

3,462,282

3

This avoids an excessive loss of smoking fluid in a vapor state and ensures a uniform distribution of the smoking fluid on the foodstuffs.

If the smoking fluid is intermittently applied to the foodstuffs during periods of time which succeed in timed intervals, an optimum action of the smoking fluid on the foodstuffs to be smoked will be obtained. The foodstuffs are only slightly heated. This process can be carried out in a simple manner with the aid of a timer which controls the supply of the smoking fluid.

According to another proposal according to the invention, the surplus smoking fluid vapor escaping during the smoking of the foodstuffs is liquefied with water. For this purpose, the escaping fluid which is vaporus or entrained by a vapor is suitably passed into a vesel or the like which is filled with water and which communicates below the water level with an overflow. The water level and the water temperature in the vessel are sensed by a thermometer and are automatically controlled. This ensures a reliable condensation of the vaporous surplus fluid in a simple manner before said fluid is discharged. The selection of the water level at the overflow enables an exact determination of the pressure in the vessel and in the boiling cabinet connected to it.

In an advantageous development of the process according to the invention, the sawdust contained, e.g., in a hopper, is subjected to a continuous stream of the superheated stream passing therethrough, and the rate of the continuously flowing sawdust and of the superheated steam can be controlled. This ensures a constant quality of the resulting smoking fluid. The height of the stream of sawdust is preferably so large that the uppermost layer of the sawdust is not thermally decomposed by the superheated steam but acts as a filter layer for the smoking fluid evolved under this layer. This ensures a filtering of the smoking fluid and a removal of undesired substances therefrom so that the quality of the smoking fluid is improved.

Another important feature of the process according to the invention resides in that the vaporous smoking fluid is liquefied at temperatures above 0° C. The known processes enable a liquefaction of the smoking gas only at very low temperature. The gaseous smoking fluids must be cooled to at least −80° C., as a rule, for liquefaction. Another advantage will thus be obtained by the liquefaction of the vaporous smoking fluid at temperatures above 0° C. according to the invention, e.g., by an indirect cooling with water or air.

An apparatus for producing a fluid for smoking foodstuffs, such as meat, sausage, cheese or the like, with the aid of sawdust and superheated steam, is characterized according to the invention in that the apparatus comprises a feeder, which supplies the sawdust into the steam zone and automatically and continuously feeds fresh sawdust to the apparatus so that a constant quality of the resulting smoking fluid is ensured.

According to another feature of the invention, the feeder comprises a trough, which is disposed in the steam path and extends preferably transversely thereto. At the inlet end of said trough, a preferably funnel-shaped hopper for the sawdust is provided. This hopper is disposed outside the steam path and can be re-filled from time to time. From the hopper, the sawdust is continuously supplied to the steam.

In a further development of the invention, the trough is downwardly inclined from the hopper so that the velocity at which the sawdust flows in the trough can be predetermined in a simple manner. The angle of inclination of the trough and with it the velocity of flow of the sawdust is preferably adjustable, e.g., by adjusting the entire apparatus to a suitable inclination.

According to a further feature of the invention, the trough and/or the hopper are vibratably mounted and connected to a vibrator or the like. The vibration of the

4

trough and of the hopper causes the sawdust to flow from the hopper into the trough. The vibration causes also a conveyance of the sawdust in the trough.

In another desirable embodiment of the invention, a motor-driven conveyor screw is provided at the inlet end of the trough and this screw is preferably disposed in a duct, which conforms to the outside diameter of the screw and which communicates with the outlet of the hopper for the sawdust and with the inlet of the trough. This enables a supply of sawdust at a metered rate from the hopper into the trough. The sawdust provides for a perfect seal between the hopper and the trough so that no steam can enter the hopper.

According to another feature of the invention, the hopper is succeeded in the direction of flow of the sawdust by an adjustable height limiter, e.g., in the form of a plate, which is urged onto the surface of the sawdust conveyed in the trough and enables an exact adjustment of the height of the sawdust layer which is being conveyed in the trough.

A container for collecting the exhausted sawdust is preferably provided under the output end of the conveyor trough, and the exhausted sawdust drops at the outlet end of the trough into the collecting container. This arrangement enables a substantially uninterrupted operation of the apparatus because the sawdust is continuously supplied to the trough and leaves the same when it has been consumed.

The cross-section of the trough is suitably open at the top and the trough is formed in its bottom with apertures for the discharge of the steam. Under the bottom apertures of the trough, a controllable superheater for the steam is suitably provided and a controlled steam supply conduit opens into this superheater. The superheater may be preceded by an evaporator, e.g., a continuous evaporator, so that it is sufficient to supply water to the apparatus, which water is first evaporated, then superheated and thereafter supplied to the sawdust through the bottom apertures of the trough.

According to another proposal according to the invention, the trough, the superheater and the container for collecting the exhausted sawdust are disposed in an insulated housing, which has at the top an opening for discharging the smoking fluid.

It is particularly advantageous if the conveyor trough has lateral apertures for the passage of the steam because the sawdust conveyed in the trough is then prevented from falling down from the trough and a particularly uniform contact between the sawdust and the water vapor is ensured.

The opening for discharging the smoking fluid from the insulated housing is preferably connected to a cooling device for cooling the smoking fluid through its boiling point because the smoking fluid can easily be stored and handled in a liquid state. The cooling device comprises suitably a pipe coil for the smoking fluid, which coil extends in a coolant container, and the latter is provided with a thermometer for controlling a solenoid valve, which is incorporated in the coolant supply conduit. This enables an exact control of the coolant contained in the coolant container, such as water, at a constant temperature.

The invention will now be explained more fully with reference to illustrative embodiments shown in the accompanying drawings, in which

FIG. 1 is a simplified sectional representation of an apparatus according to the invention,

FIG. 2 is a view similar to FIG. 1 and shows another embodiment of the invention.

FIGS. 3 to 5 are simplified fragmentary views illustrating further embodiments of the invention and

FIG. 6 shows a device according to the invention for cooling the smoking fluid.

Two further embodiments of the conveyor trough are shown in FIGS. 7 and 8.

FIG. 7 is a simplified transverse sectional view showing an apparatus according to the invention, and

3,462,282

FIG. 8 is a view similar to FIG. 7 and shows another embodiment of the invention.

As is shown in FIG. 1, an apparatus according to the invention for producing a smoking fluid comprises a conveyor trough 1, which communicates with a hopper 2 for the sawdust 3 and which further communicates through apertures 5 in the bottom 4 of the trough with a superheater 6. Preferably, the aperture 5 nearest the discharge end 14 of the trough 1 is positioned therefrom a distance greater than that of the vertical height of the sawdust 3. Such a placement of the aperture 5 with respect to the discharge end 14 insures that the entering steam will pass upwardly through the sawdust 3 since the pressure differential therebetween is less than that between the end 14 and the nearest aperture 5. The trough is accommodated in a housing 7, which has an outlet 8 for the smoking fluid.

The conveyor trough 1 communicates with the hopper 2 disposed outside the housing 7 and is connected by vibration-permitting mountings, e.g., in the form of spring elements 10, to the housing 7 or a control cabinet 9 associated with the apparatus. The trough 1 is mounted so as to be capable of vibration. A magnetic vibrator 11 is provided for producing the vibration. The velocity and rate of conveyance can be changed in a simple manner by adjusting the amplitude of vibration of this magnetic vibrator.

As is also shown in FIG. 1, that portion of the bottom 4 of the conveyor trough 1 which is provided with the apertures 5 is connected by a bellows 12 to the superheater 6. That end 14 of the conveyor trough 1 which is accommodated in the housing 7 is disposed over a container 15 for collecting the exhausted sawdust. The housing 7 is provided with insulation 13.

When sawdust 3 is contained in the hopper 2 disposed outside the housing 7 and the vibrator is in operation, the sawdust 3 is fed into the trough 1. The trough 1 is inclined toward its end 14 disposed in the housing 7 so that the sawdust 3 is conveyed by the vibration in the trough in the direction of the arrow 16 past the bottom apertures and finally falls into the container 15. Superheated steam flows from the superheater 6 through the bottom apertures 5 in the direction of arrow 17 into the trough 1 and contacts the sawdust in the trough. As a result of this contact, the steam extracts flavors and the like from the sawdust so that a smoking fluid is obtained, which can then be removed through the outlet 8 provided on the housing 7.

To enable an exact adjustment of the height of the layer of sawdust which moves in the trough 1, a gate 19 extends into the opening 18 which is formed in the hopper 2 and connects the same to the trough 1. This gate determines the height of the layer of sawdust. The hopper 2 is tightly sealed by a cover 20. Thus the steam and the smoking fluid cannot enter the hopper 2 nor escape through the same.

The superheater 6 comprises a heater 21, which is contained in a housing 22. A steam conduit 23 opens into the housing 22. A temperature sensing element 24 is provided behind the heater 21 in the direction of flow of the steam (arrow 17). The rate of the steam flowing into the superheater is exactly controlled by a solenoid valve, not shown, and a rate control valve 25. This steam is heated by the heater 21 to an adjustable temperature and is then passed in the direction of the arrow 17 to the sawdust 3 moving in the trough 1. The temperature sensing element 24 is connected to a temperature controller 26, which is disposed in the control cabinet 9 and controls the temperature of the heater 21. This enables a maintenance of a constant temperature of the steam which is supplied to the sawdust 3.

As is also shown in FIG. 1, an evaporator 27 is disposed under the superheater 6 and communicates with the superheater 6 through an opening 28 in an insulated partition 29. This evaporator 27 is required if no steam supply is available at the location of the apparatus. The continuous evaporator 27 comprises a heater 30. A water conduit

31 incorporating the rate control valve 25 opens into the continuous evaporator 27. An overflow pipe 32 extends into the continuous evaporator. The water entering through conduit 31 into the continuous evaporator 27 is evaporated by the heater 30 and is then passed through the opening 28 to the superheater 6. The water level in the continuous evaporator 27 is maintained constant by the overflow pipe 32.

The control cabinet 9 contains a horn 33 or a similar signalling device, which is controlled by a means for checking the level of the sawdust in the funnel-shaped hopper 2. A capacitive or photo-electric measuring method may be used to generate a signal when the sawdust level has dropped below a predetermined value and new sawdust must be charged.

In the embodiment of the invention shown in FIG. 2, a screw 35 is disposed in a duct 34, which connects the outlet of the funnel-shaped hopper 2a to the trough 1. The crest diameter of the conveyor screw 35 is about the same as the inside diameter of the duct 34.

The conveyor screw 35 is driven by an electric motor 37 and a change-speed transmission 36.

The height of the sawdust 3 in the conveyor trough 1 of FIG. 2 is determined by the plate 38, which is mounted on and adjustable by a screw 39 provided with a hand-wheel 40.

A particularly good seal between the hopper 2a and the conveyor trough 1 will be obtained if the pitch of the conveyor screw 35 decreases in the direction of conveyance (arrow 16) and/or its root diameter increases in the direction of conveyance (arrow 16) according to a cone. In this case, the sawdust will be forced against the surrounding wall of the duct 34 and will thus form a seal preventing steam losses. The rate at which sawdust is moved from the hopper 2a into the conveyor trough 1 can be exactly controlled by the speed of the conveyor screw 35.

A particularly desirable embodiment of the invention will be obtained if the conveyor trough 1 extends into the superheater 6, as is shown in FIG. 3. In this case, the side walls 1a of the conveyor trough are exposed to the steam which is produced in the superheater 6 so that the walls 1a are heated to the temperature of said steam. Owing to the comparatively high temperature of the side walls 1a of the conveyor trough 1, a condensation involving a deposition of exhausted sawdust on the walls of the conveyor trough 1 is avoided. By a natural, intensive scavenging with steam the trough is kept clean and does not require attention. A similar embodiment is shown in FIG. 5, where the conveyor trough 1 is not disposed over the heater 21 but laterally offset from the same to avoid a falling of sawdust particles into the superheater.

In the embodiment shown in FIG. 4, the side walls 1a of the conveyor trough 1 are disposed outside the superheater 6.

FIG. 6 shows an apparatus for cooling the vaporous smoking fluid below its boiling point. The cooling device 41 comprises a pipe coil 43 for the smoking fluid. This coil is disposed in the coolant container 42. A coolant supply conduit 44 incorporates a solenoid valve 45 and opens into the coolant container 42. An outlet 46 is provided in the upper portion of the coolant container 42. The temperature sensing element 47 of a temperature controller 48 for controlling the solenoid valve 45 extends into the coolant container 42. By the opening and closing of the solenoid valve, a temperature set at the temperature controller 48 is maintained constant. The pipe coil 43 may be connected, e.g., directly to the outlet 8 of the housing 7 of the apparatus described hereinbefore so that the smoking fluid is liquefied immediately after it has been made and can then be stored.

Instead of the conveyor trough 1 shown in the drawings and having a U-shaped cross-section, a conveyor trough may be used which has a closed rectangular, oval, cylindrical or similar cross-section, provided that it is formed with apertures for the discharge of the steam from the conveyor trough 1. Such apertures may be dis-

3,462,282

7

posed opposite to the bottom apertures 5. Other means for conveying the sawdust may be provided, such as a revolving grate or the like.

Another aspect of the invention is concerned with the use of a smoking fluid produced according to the process and/or by the apparatus described hereinbefore for smoking foodstuffs such as meat, sausage, ham or the like. This process is characterized according to the invention in that the material to be smoked is steam cooked during the smoking treatment. Contrary to the known processes, in which the material to be smoked is first smoked and then boiled, the need for an additional boiling treatment is entirely eliminated because of the steam cooking. The liquid or gaseous state of the smoking fluid enables the foodstuff to be both smoke flavored and steam cooked simultaneously, thereby combining the smoking treatment and the boiling treatment so that substantial time is saved.

According to FIG. 7 an apparatus according to the invention comprises a conveyor trough 101, which is rectangular in cross-section and has side walls 101a disposed in a sealed chamber 102, which communicates with a steam superheater 106, which is disposed under the conveyor trough 101. Water is evaporated in a continuous evaporator 127, which is disposed under the superheater 106. The resulting steam is fed to the superheater 106 through an opening 128 in a partition 129.

The conveyor trough 101 has openings for the entrance of steam from the superheater 105 into the conveyor trough 101 only in the lower portion of the side walls 101a of the trough. The sawdust moving through the conveyor trough 101 is thus uniformly supplied with steam from both sides and is completely utilized.

The junctures 103 from the side wall 101a to the bottom 104 of the conveyor trough 101 are rounded so that a particularly low sliding friction of the sawdust flowing through the conveyor trough 101 is obtained.

In the embodiment shown in FIG. 8, the upper portions of the side walls 101b of the conveyor trough diverge upwardly and the apertures 105 for the entrance of the steam are formed only in the parallel lower portions of the conveyor trough 101.

When reference is made herein to sawdust or wood solids, it is to be understood that finely divided wood chips or other equivalent materials may be readily substituted and remain within the scope of the invention.

What is claimed is:

1. A process of producing a smoking fluid for smoking foodstuffs, which comprises contacting particulate wood solids with superheated steam at a temperature of at least 180° C. to effect a thermal decomposition of said wood solids without inflammation sufficient to produce an open flame and form said smoking fluid, withdrawing said smoking fluid from said wood solids and contacting said foodstuffs therewith.

2. A process as set forth in claim 1, in which said wood solids are contacted with superheated steam at a temperature of 250–390° C.

3. A process as set forth in claim 1, in which the temperature of said smoking fluid is lowered after being withdrawn from said wood solids to a point wherein said smoking fluid is saturated to a moisture content of approximately 100%.

4. A process as set forth in claim 3, in which the temperature of said smoking fluid is lowered to about 70–100° C.

5. A process as set forth in claim 1, which comprises admixing a gas to said superheated steam before contacting the same with said wood solids.

6. A process as set forth in claim 5, in which said gas is air.

7. A process as set forth in claim 1, in which said smoking fluid is removed as a vapor from said wood solids and a neutral gas is admixed to said smoking fluid.

8. A process as set forth in claim 7, in which said neutral gas is water vapor.

9. A process as set forth in claim 1, in which said

8

smoking fluid is removed from said wood solids and air is subsequently admixed therewith.

10. A process as set forth in claim 1, in which said smoking fluid is liquified after being withdrawn from said wood solids.

11. A process as set forth in claim 10, in which said smoking fluid is liquified at a temperature above 0° C.

12. A process as set forth in claim 1, in which a continuous stream of said wood solids is contacted with said superheated steam.

13. A process as set forth in claim 12, in which said stream is supplied at a controlled rate.

14. A process as set forth in claim 1, in which said superheated steam is supplied to said wood solids at a controlled rate.

15. A process as set forth in claim 1, in which said superheated steam is supplied to said wood solids at a controlled temperature.

16. A process as set forth in claim 1 wherein only a portion of said particulate wood solids are thermally decomposed by the contacting thereof with said superheated steam, and said smoking fluid is guided through a portion of the remaining wood solids that were not thermally decomposed thereby causing a filtering of said smoking fluid.

17. A process according to claim 16 wherein said superheated steam is contacted with the bottom of the lower layer of said particulate wood solids and said smoking fluid is discharged and filtered through the upper layer of said wood solids.

18. A process according to claim 1, in which the temperature of said smoking fluid is lowered prior to contacting said foodstuffs, said temperature being lowered to a point which causes the deposit of liquid on said foodstuffs.

19. A process of smoking foodstuffs, which comprises contacting particulate wood solids with superheated steam at a temperature of at least 180° C. to effect a thermal decomposition of said wood solids without inflammation sufficient to produce an open flame and form said smoking fluid, withdrawing said smoking fluid from said wood solids, supplying said smoking fluid to said foodstuffs, withdrawing surplus smoking fluid spaced about said foodstuffs and liquifying said surplus.

20. A process of smoking foodstuffs, by means of a smoking fluid which comprises contacting particulate wood solids with superheated steam at a temperature of at least 180° C. to effect a thermal decomposition of said wood solids without inflammation sufficient to produce an open flame and form said smoking fluid, withdrawing said smoking fluid as a vapor from said wood solids, at least substantially saturating said vapor with moisture, and then contacting said foodstuffs with said at least substantially saturated vapor.

21. A process as set forth in claim 20, wherein said foodstuffs are contacted with said at least substantially saturated vapor until the atmosphere thereabout is established to be substantially saturated with liquid and said foodstuffs are thereby steam cooked.

22. Apparatus for producing a smoking fluid for smoking foodstuffs, which comprises means defining a steaming zone, a steam source for supplying superheated steam at a temperature of at least 180° C. to said steaming zone, and feeding means for feeding particulate wood solids to said steaming zone into contact with said steam whereby said superheated steam effects a thermal decomposition of said wood solids to form said smoking fluid.

23. Apparatus as set forth in claim 22, in which said means defining said steaming zone comprise a trough having an inlet end and said feeding means comprises a hopper connected to said inlet end, said trough having at least one inlet opening for said superheated steam and at least one outlet opening for said smoking fluid.

24. Apparatus as set forth in claim 23, in which said trough is mounted so as to permit of an adjustment of its inclination.

3,462,282

**9**

25. Apparatus as set forth in claim 23, in which said feeding means comprises a conveyor screw disposed between said hopper and said inlet end, and a driving means operable to drive said conveyor screw.

26. Apparatus as set forth in claim 25, which comprises a duct containing said conveyor screw and connecting said hopper to said inlet end and having an inside diameter corresponding substantially to the crest diameter of said screw.

27. Apparatus as set forth in claim 26, in which the pitch of said screw decreases in the direction from said hopper to said inlet end.

28. Apparatus as set forth in claim 26, in which the root diameter of said conveyor screw increases in the direction from said hopper to said inlet end.

29. Apparatus as set forth in claim 23, which comprises limiting means for limiting the height of the stream of said wood solids in said trough.

30. An apparatus according to claim 29, wherein said trough has the discharge end thereof spaced from the nearest steam inlet opening a distance greater than the vertical height of said stream of said wood solids being passed therethrough.

31. Apparatus as set forth in claim 23, in which said trough is at least partially open-topped and has a bottom formed with apertures through which said steam source communicates with the interior of said trough.

32. Apparatus as set forth in claim 23, in which said trough comprises side walls and a bottom wall, the outside surfaces of said side and bottom walls being directly exposed to said superheated steam and at least one of said walls having at least one inlet opening for said steam.

33. Apparatus as set forth in claim 23, in which said trough has lateral openings through which it communicates with said superheated steam.

34. Apparatus as set forth in claim 23, in which said trough has a side wall which is at least partially tapered upwardly and outwardly.

35. Apparatus as set forth in claim 23, which said trough has a bottom and side walls and rounded junctures from said bottom to said side walls.

36. Apparatus as set forth in claim 23, which comprises means for limiting the height of the stream of said wood solids in said trough to a value which is less than the length of said trough.

37. An apparatus according to claim 23, wherein said trough is an enclosed conduit and said wood solids are passed in a longitudinal direction therethrough, said superheated steam is introduced into the interior of said conduit transverse to the feeding direction of said wood solids, and said smoking fluid is withdrawn from the interior of said conduit transverse to said feeding direction of said wood solids.

**10**

38. An apparatus according to claim 37, wherein said smoking fluid is withdrawn from the interior of said conduit through at least one outlet opening, said outlet opening being located on the wall opposite that wherein said superheated steam is introduced.

39. Apparatus as set forth in claim 22, in which said steam source comprises a superheater disposed close to said trough, said superheater having means for controlling the temperature of said steam.

40. Apparatus as set forth in claim 39, which includes a steam supply means to supply steam to said superheater.

41. Apparatus as set forth in claim 39, in which said trough has a discharge end opposite to said inlet end and in which a container for collecting exhausted wood solids is disposed under said discharge end, and an insulated housing containing said trough, superheater and container and formed with an outlet opening for the smoking fluid.

42. Apparatus as set forth in claim 22 in which said steam source comprises a superheater and an evaporator preceding said superheater.

43. Apparatus as set forth in claim 22, in which said means defining a steaming zone comprises a trough which is downwardly inclined from said feeding means.

44. Apparatus as set forth in claim 22, which comprises means vibratably mounting said means defining a steaming zone and a vibrator operable to vibrate said means defining a steaming zone.

45. Apparatus as set forth in claim 22, which comprises means vibratably mounting said feeding means and a vibrator operable to vibrate said feeding means.

46. Apparatus as set forth in claim 22, in which said means defining a steaming zone are formed with an outlet and which comprises a cooling device arranged to receive said smoking fluid through said outlet from said steaming zone and adapted to cool said smoking fluid through its boiling point.

**References Cited**

**UNITED STATES PATENTS**

| 110,627 | 1/1871 | Bruce _____ 99—260 X |
|---|---|---|
| 1,290,421 | 1/1919 | Ullin _____ 99—229 X |
| 1,811,191 | 6/1931 | Taylor _____ 99—259 X |
| 1,960,516 | 5/1934 | Taylor _____ 99—229 |
| 2,464,614 | 3/1949 | Sala _____ 99—229 |
| 2,558,307 | 6/1951 | McMullen. |
| 2,677,038 | 4/1954 | Reynoldson _____ 99—259 X |

HYMAN LORD, Primary Examiner

U.S. Cl. X.R.

99—259

Aug. 19, 1969                    G. FESSMANN                    3,462,282
                PROCESS AND APPARATUS FOR PREPARING A SMOKING FLUID AND
                        SMOKING FOODSTUFFS THEREWITH
Filed Dec. 20, 1965                                        4 Sheets-Sheet 1



Fig.1

Aug. 19, 1969          G. FESSMANN          3,462,282
PROCESS AND APPARATUS FOR PREPARING A SMOKING FLUID AND
SMOKING FOODSTUFFS THEREWITH
Filed Dec. 20, 1965                    4 Sheets-Sheet 2



Fig. 2

Case 1:05-cv-00039-BMK    Document 94-11    Filed 11/03/2007    Page 32 of 76



Aug. 19, 1969                    G. FESSMANN                    3,462,282
                    PROCESS AND APPARATUS FOR PREPARING A SMOKING FLUID AND
                    SMOKING FOODSTUFFS THEREWITH
Filed Dec. 20, 1965                                        4 Sheets-Sheet 4

*Fig. 7*



*Fig. 8*



# Smoke in Food Processing

Author
**Joseph A. Maga**
Professor
Department of Food Science and
Human Nutrition
Colorado State University
Fort Collins, Colorado



**CRC Press, Inc.**
**Boca Raton, Florida**

K004644

**Library of Congress Cataloging-in-Publication Data**

Maga, Joseph A.
    Smoke in food processing.

    Includes bibliographies and index.
    1. Meat, Smoked. 2. Fish, Smoked. I. Title.
TP371.44.M34   1988        664'.0286      87-24231
ISBN 0-8493-5155-3

    This book represents information obtained from authentic and highly regarded sources. Reprinted material is quoted with permission, and sources are indicated. A wide variety of references are listed. Every reasonable effort has been made to give reliable data and information, but the author and the publisher cannot assume responsibility for the validity of all materials or for the consequences of their use.

    All rights reserved. This book, or any parts thereof, may not be reproduced in any form without written consent from the publisher.

    Direct all inquiries to CRC Press, Inc., 2000 Corporate Blvd., N.W., Boca Raton, Florida, 33431.

© 1988 by CRC Press, Inc.

International Standard Book Number 0-8493-5155-3

Library of Congress Card Number 87-24231
Printed in the United States

K004645

Chapter 2

# THERMAL REACTIONS OF WOOD

## I. INTRODUCTION

As would be expected, the thermal decomposition of wood can be influenced by numerous factors including obviously temperature, wood composition, amount of oxygen present, and amount of water vapor available during actual pyrolysis.

Probably of the above factors, temperature is the most important, as can be seen in Table 1, the hemicellulose fraction is the first major wood fraction to undergo degradation, while the lignin fraction is the most resistant. Thus, if a relatively low temperature is used, lignin may not be completely degraded, and therefore, the resulting smoke will have a different chemical composition than if a higher temperature was used. In general, the pyrolysis of wood is fairly complete at 500°C.

Even at a temperature slightly above 100°C, significant changes can occur in wood. First, hygroscopic water is evaporated, and then bound water is released. In addition, water can be split from the hydroxyl groups of adjacent polysaccharide chains, thus forming new hydrogen bonds. At low temperatures, acetic acid also forms, while at higher temperatures (200 to 280°C), both acetic and formic acids occur, and at above approximately 280°C, the reaction can become exothermic.[2] Through the use of differential thermal analysis it has been demonstrated that during the thermal degradation of wood an endothermal maximum occurs at 120 to 150°C due to the evaporation of water. This is followed by several exothermal peaks at approximately 200 to 250°C, 280 to 320°C, and 400°C which represent the degradation of hemicellulose, cellulose, and lignin, respectively.[9]

The thermal decomposition of wood has been shown to follow an overall first-order reaction.[9] In the lower temperature range an activation energy of 105 kJ/mol was calculated while in the higher temperature range activation energy drops to 63 kJ/mol.[9]

As would be expected, the heat of combustion for wood and its components are different. As seen in Table 2, lignin is the major contributor and softwoods generally have higher values than hardwoods.

The presence or absence of air also has a significant effect on the thermal reactivity of wood. If air is not present, a combination of water vapor, organic liquids, and gases is released, while a mixture of tar, pitch, and charcoal remain. Charcoal, in turn, can undergo further chemical changes up to 1000°C.[3] In the presence of air, as temperature is increased, combustion results. Perhaps at this point more detail should be given to the thermal reactions associated with the three major components of wood.

## II. THERMAL DECOMPOSITION OF HEMICELLULOSE

As shown in Table 1, the first major component to undergo thermal decomposition is hemicellulose. In general, hemicellulose thermally decomposes to yield furan and its derivatives, as well as a series of aliphatic carboxylic acids.[4] In addition, since hardwoods contain primarily pentosan-based hemicellulose compared to hexosan-based hemicellulose in softwoods, the latter produce more acids than softwoods upon decomposition. Thus, by combining a low temperature (less than 260°C) and using hardwood, one can generate a smoke source that is high in furans and acids, however, many furan derivatives are not stable and can undergo extensive oxidation reactions.

During the thermal degradation of hemicellulose both the acetyl and o-methyl groups can react to form volatile degradation products. As seen in Table 3, furan derivatives are the major intermediates.

K004680

**Table 1**
## INFLUENCE OF TEMPERATURE ON THE THERMAL DESTRUCTION OF WOOD

| Temperature (C°) | Reaction |
|---|---|
| Up to 170 | Loss of water, drying |
| 200—260 | Decomposition of hemicellulose |
| 260—310 | Decomposition of cellulose |
| 310—500 | Decomposition of lignin |
| Above 500 | Secondary reactions including oxidation, polymerization, condensation, and pyrolysis |

Adapted from Baltes, W., Wittkowski, R., Sochtig, I., Block, H., and Toth, L., in *The Quality of Food and Beverages*, Vol. 2, Charalambous, G. and Inglett, G., Eds., Academic Press, New York, 1981, chap. 1.

**Table 2**
## HEATS OF COMBUSTION FOR VARIOUS WOODS AND FRACTIONS

| Source | Char (cal/g) | Gas (cal/g) | Total (cal/g) |
|---|---|---|---|
| Softwood | −1987 | −3169 | −5156 |
| Hardwood | −1546 | −3072 | −4618 |
| Lignin | −4375 | −1995 | −6370 |
| Cellulose | −1050 | −3093 | −4143 |

Adapted from Fengel, D. and Wegener, G., in *Wood: Chemistry, Ultrastructre, Reactions*, Walter de Gruyter, Berlin, 1984, chap. 12.

## III. THERMAL DECOMPOSITION OF CELLULOSE

Cellulose is the next major wood component to undergo thermal decomposition and it appears to occur by two distinct pathways, with one pathway being prevalent at lower temperatures, and the other pathway dominating at temperatures above 300°C.[6]

At temperatures below 300°C, cellulose is decomposed by the reduction in the degree of polymerization by bond scission; elimination of water; formation of free radical, carbonyl, carboxyl, and hydroperoxide groups; evolution of carbon monoxide and carbon dioxide; and production of a char residue.[5] Actual loss of cellulose polymerization can occur in the 150 to 190°C temperature range in the absence or presence of air.

Bond scission and the formation of carbon monoxide and carbon dioxide in turn occur at different rates, dependent upon the absence or presence of air. For example, carbon monoxide and carbon dioxide are produced at a faster rate in air than in its absence; however, in the presence of nitrogen, the rate of bond scission is greater than the amount of combined carbon monoxide and carbon dioxide produced.[6] The generation of carbon monoxide and carbon dioxide is due to decarbonylation and decarboxylation, respectively.

In addition, Shafizadeh[6] has proposed that the thermal degradation of cellulose may also involve a free radical mechanism. Although free radicals have been isolated, their si-

K004681

**Table 9**
**PYROLYSIS PRODUCTS (600°C)**
**OF CELLULOSE**

| Compound | Relative % |
|---|---|
| Acetaldehyde | 2.3 |
| Furan | 1.6 |
| Acetone/propionaldehyde | 1.5 |
| Propenal | 3.2 |
| Methanol | 2.1 |
| 2,3-Butanedione | 2.0 |
| 1-Hydroxy-2-propanone | 2.1 |
| Glyoxal | 2.2 |
| Acetic acid | 6.7 |
| 2-Furaldehyde | 1.1 |
| Formic acid | 0.9 |
| 5-Methyl-2-furaldehyde | 0.7 |
| 2-Furfuryl alcohol | 0.5 |
| Carbon dioxide | 12.0 |
| Water | 18.0 |
| Char | 15.0 |
| Tar | 28.0 |

Adapted from Shafizadeh, F., in *The Chemistry of Solid Wood*, Rowell, R., Ed., American Chemical Society, Washington, D.C., 1984, chap. 13.

**Table 10**
**THE PYROLYSIS AND COMBUSTION OF CELLULOSE**



Adapted from Shafizadeh, F., in *The Chemistry of Solid Wood*, Rowell, R., Ed., American Chemical Society, Washington, D.C., 1984, chap. 13.

In the case of hardwoods which have higher amounts of methoxy substituents, the presence of dimethoxy rings can result in the production of syringol and a whole series of *para*-substituted compounds, in addition to guaiacols.[4]

The release of ferulic acid is a key intermediate in the thermal degradation of lignin, since it can undergo further decarboxylation to yield the series of compounds seen in Table 11. However, the oxygenated compounds vanillin, vanillic acid, and acetovanillone were only found when the reaction occurred in the presence of air. Therefore, it would appear that dependent on the amount of air present during the pyrolysis of lignin, the end product composition can be controlled.

Fenner and Lephardt[a] followed lignin decomposition over a wide temperature range and

**Table 11**
**THERMAL DEGRADATION PRODUCTS OF FERULIC ACID**



Adapted from Gilbert, J. and Knowles, M. E., *J. Food Technol.*, 10, 245, 1975.

found that initial lignin decomposition occurred at 120 to 300°C. Compounds associated with this stage included formic acid, formaldehyde, carbon dioxide, and water, primarily resulting from single-bond fragmentation in the phenylpropane sidechains.

The major decomposition of lignin extended over the temperature range of 300 to 480°C and was maximum at 385°C. Compounds observed in this stage included methanol, carbon dioxide, carbon monoxide, water, methane, guaiacol, 2-methoxy-4-alkyl-substituted phenol, acetone, and acetic acid. They postulated that methanol was derived directly from the methoxyl substituents of lignin, whereas the other compounds were derived as fragmentation products of major chain linkages releasing monomeric phenol units into the vapor phase which undergo further secondary degradation. Maximum phenolic compound formation was observed at approximately 320°C, while at higher temperatures secondary degradation products began to appear, thus suggesting that temperatures above 320°C should not be used if one is trying to maximize phenolic yield in smoke, even though lignin will further decompose to temperatures approaching 500°C.

The thermal degradation products of wood can be grouped into the combustible volatiles, tar, and char. Tar, upon further degradation, can be converted to volatiles and char.

## V. COMBUSTION

In addition, Shafizadeh[6] has shown that the char remaining after lignin pyrolysis is highly reactive and chemically different, dependent upon pyrolysis temperature, and can undergo smoldering or glowing combustion, or if the temperature is high enough and air conditions are adequate, flaming combustion can occur.

Since lignin is the primary constituent contributing to char formation, while cellulose and hemicellulose primarily contribute to the formation of volatile pyrolysis products that are responsible for flaming combustion, the higher the lignin content of wood, the higher its flaming combustion temperature requirement.

As would be expected, the higher the combustion temperature, the higher the amount of gases produced. As seen in Table 12, tar content is not significantly influenced by temperature but other components are altered.

K004687

( EXPRESS MAIL NO. EE642686626US (

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:
    William R. Kowalski                Examiner: D. Becker
Filed:    November 28, 1997      Group No. 1761
Serial No. 08/980,392           Attorney Docket No.: 97-5

For: Process for Manufacturing Tasteless Super Purified Smoke for
Treating Seafood to be Frozen and Thawed

Assistant Commissioner for Patents
Washington, D. C. 20231

COPY

AMENDMENT UNDER 37 C.F.R. 1.111

Dear Sir:

    In response to the office action of October 1, 1998, please

amend this application as follows:

IN THE CLAIMS

RECEIVED
APR 2 1999
GROUP 1700

    Please amend the claims as follows:

    1.  (Once amended).  A process, comprising:

    heating [combusting] organic material to generate smoke

having [a particulate phase and] a gaseous vapor phase;

    super purifying said smoke to reduce [substantially all]

taste imparting components [particulates and vapors] below

[recognition] thresholds for imparting smoke odor and taste,

whereby a substantially tasteless super-purified smoke is created;

and

    treating meat having a freezing point with said tasteless

super-purified smoke.

    11.  (Once amended).  A process according to any one of

claims 1 to 3, [further comprising:]

03/31/1999 RNAGAY    00000104 08980392
02 FC:203                    171.00 OP

Exhibit "10"

K00042

(                          (

wherein said heating step generates smoke also having a
particulate phase, further comprising:

filtering the particulate phase of said smoke to eliminate
tar, moisture, particulate and other solid matter residue after
said [combusting] heating step.

13.   (Once amended).  A process according to any one of
claims 1 to 3, wherein said super purifying step is carried out by
reducing phenols in said smoke to concentrations below recognition
thresholds for imparting smoke odor to said meat.

Claim 17, line 1, please delete "13" and insert - - 11 - - in
lieu thereof.

Claim 18, line 1, please delete "13" and insert - - 11 - - in
lieu thereof.

Claim 19, line 1, please delete "13" and insert - - 11 - - in
lieu thereof.

27.   (Once amended)  A process according to any one of claims
1 to 3, wherein said treating step is carried out to prevent smoke
odor or taste from being imparted to said meat while preserving
[preserves] said meat, whereby said meat tastes fresh, without
[any] smoke odor or taste from said smoke, when said meat is
thawed and eaten raw.

Claim 33, line 2, please delete "combusting" and insert - -
heating - -.

Claim 33, line 2, please delete "burning" and insert - -
heating - -.

Claim 34, line 2, please delete "combusting" and insert - -
heating - -.

2

K00042

Claim 34, line 2, please delete "burning" and insert - -
heating - -.

Claim 35, line 2, please delete "combusting" and insert - -
heating - -.

Claim 35, line 2, please delete "burning" and insert - -
heating - -.

39. (Once amended). A process according to any one of claims
1 to 3, wherein said treating step limits the quantity of said
tasteless super purified smoke exposed to said meat [quantity
used], whereby [and minimizes] the total amount of said flavor
imparting components exposed to said meat is minimized to prevent
imparting smoke flavor or odor to said meat.

Claim 46, line 2, please delete "combusting" and insert - -
heating - - in lieu thereof.

Claim 47, line 2, please delete "combusting" and insert - -
heating - - in lieu thereof.

Claim 61, line 2, please delete "combusting" and insert - -
heating - - in lieu thereof.

Please cancel claims 67-70, without prejudice or disclaimer.

Please add the following new claims:

--71. A process comprising:

heating organic material to generate smoke;

filtering components that impart smoke flavor from said smoke
to below limits for imparting smoke flavoring to food; and

exposing said filtered smoke to food without imparting a
smoke flavor to said food.

72. A process comprising:

3

K00042

heating organic material to generate smoke;

removing components that impart smoke odor from said smoke;
and

exposing food to said smoke, whereby the quantity of smoke
odor imparting components removed from said smoke is adequate to
prevent imparting a smoke odor to said food.

73.  A process comprising:

heating organic material to generate smoke that contains a
vapor phase having smoke odor and flavor imparting components;

filtering said smoke to remove a portion of said smoke odor
and flavor imparting components;

exposing food to said filtered smoke so as to prevent smoke
flavoring of said food by reducing the quantity of said filtered
smoke exposed to said food.

74.  A process according to one of any claims 1, 2, 3, 46, or
47, wherein said heating step combusts said organic material.

75.  A process according to one of any claims 1, 2, 3, 46, or
47, wherein said heating step pyrolyses said organic material.

76.  A process according to one of any claims 1, 2, 3, 46, or
47, wherein said heating step burns said organic material.

77.  A process according to one of any claims 1, 2, 3, 46, or
47, wherein said heating step thermally decomposes said organic
material.--

REMARKS

This amendment is in response to the office action of October
1, 1998.

4

K00042

(                                    (

The office action set forth a restriction requirement between
Group I (claims 1-66, drawn to a process of making tasteless
smoke); Group II (claims 67-68, drawn to an apparatus for making
tasteless smoke); and Group III (claims 69-70, drawn to a
composition of matter and a canister containing the composition),
and applicant's election of Group I (claims 1-66), without
traverse. As required in the office action, applicant hereby
affirms the election of Group I, without traverse.

Claims 1, 11-22/1, 28/1, 38-47/1 and 53/1 were rejected as
obvious over Smits et al. Claims 2-10, 24-27, 33-35, 48-52, 54,
57 and 63-66 were rejected as obvious over Smits et al in view of
Yamaoka. Claims 55-56 were rejected as obvious over Smits et al
and Yamaoka in view of Woodruff et al. Claims 23, 29-32, 36-37
and 58-62 were rejected as obvious over Smits et al and Yamaoka et
al in view of Melcer.

Corrected formal drawings responding to the Notice of
Draftperson's Patent Drawing Review will be submitted when this
application is allowed.

Claim 1 has been amended to change "combusting" to - -
heating - - (basis is provided by page 28, line 19) because
certain non-combusting methods of heating may not produce a
particulate phase; to indicate that the smoke has a gaseous vapor
phase with flavor components (basis is provided by page 13, lines
30-31); to indicate that components that impart flavor are reduced
below thresholds for imparting smoke odor or taste to foods (basis
for flavor imparting components is provided by page 12, line 30,
to page 13, line 20, and page 7, line 5, while basis for reducing

5

K00042

below thresholds for imparting flavor is provided by page 7, line 5, and page 20, lines 13 to 16).

Claim 11 has been amended to introduce a particulate phase because certain methods of heating may produce smoke with both a vapor and a particulate phase (while other methods may produce smoke that contains only a gaseous vapor phase), and because smoke may retain only a gaseous vapor phase (basis is provided by page 13, lines 30-31). Claims 17-19 have been amended to depend on claim 11 to provide antecedent basis for the recitation of a particulate phase in claims 17-19.

Claim 13 has been amended to indicate that the phenol concentration is reduced below the threshold for imparting smoke odor to meat. Basis is provided by page 20, line 15.

Claim 27 has been amended to add the limitation of preventing smoke odor or taste from being imparted to the meat while preserving the meat. Basis is provided by original claim 39, page 7, line 5, and page 20, line 15.

Claims 33-35 and 46-47 have been amended to delete "combusting" and "burning" and substituting - - heating - -. Basis is provided by page 28, line 19).

Claim 39 has been amended for clarity.

Claims 46, 47 and 61 have been amended to change "combusting" to - -heating — -.

Claims 67-70 have been cancelled, without prejudice or disclaimer, only because they are drawn to non-elected claims that have been withdrawn from consideration in response to the restriction requirement described above. Claims 67-70 would need

6

K00043

to be cancelled to allow this application to be issued, MPEP
821.02, so they have been cancelled in this amendment to save the
Examiner the trouble of telephoning the Examiner's attorney for
permission to enter an Examiner's Amendment cancelling them
(especially in view of the time difference). Claims 67-70 will be
filed in a timely divisional application, and their cancellation
shall not affect the scope or validity of the claims remaining in
this application.

New claims 71 to 80 have been presented for the Examiner's
consideration.

The rejection of claims 1, 11-22/1, 28/1, 38-47/1 and 53/1 as
obvious over Smits et al. must be withdrawn because Smits et al.
teaches against the present invention. Smits is directed to a
liquid smoke product that concentrates the aroma and taste
constituents that impart smoke flavor. For example, at column 1,
lines 38-47, Smits et al. indicates that prior liquid smoke
treatments were not successful because the processes to remove
physiologically harmful ingredients also removed valuable aroma
constituents. Thus, although Smits et al. recognizes that too low
a concentration of phenolic compounds does not "lead to a real
smoked product aroma and/or taste" (col. 1, line 66), the entire
purpose of Smits et al. is to provide a liquid smoke that imparts
real smoked aroma and/or taste (see, for example, col. 5, lines
31-36, and Abstract, last sentence). Further, Smits et al.
teaches against treating food directly with a smoke (col. 1, lines
21-25) in favor of liquid smoke preparations, while the present
invention specifically requires the use of smoke (which is

7

K00043

inherently gaseous). A person having ordinary skill in the art would not have been motivated by Smits et al. to reduce the phenolic compounds to create a smoke that does not impart taste, or to use a gaseous smoke. Such a person would have been motivated by Smits et al. to make a liquid smoke having taste. Because Smits et al. teaches against the invention of a tasteless smoke, and also teaches against the use of a gaseous smoke, Smits et al. cannot render the present invention obvious. Further, Smits et al. does not teach or suggest limiting exposure of the meat to smoke to prevent imparting a smoke taste and odor.

The rejection of claims 2-10, 24-27, 33-35, 48-52, 54, 57 and 63-66 as obvious over Smits et al in view of Yamaoka must be withdrawn because Yamaoka also teaches against the use of a tasteless smoke. Specifically, column 2, lines 7 to 9; column 2, line 20; column 3, lines 25-30; column 6, line 45; and column 7, lines 4 to 8, indicate that the method and apparatus of Yamaoka's invention "impart agreeable taste and smell." Because both Smits et al. and Yamaoka both are directed to imparting smoke taste and smell, their combination does not teach or suggest reducing smoke taste and odor to below thresholds for imparting smoke taste and odor. Further, there is no teaching, suggestion or incentive to combine or modify Smits et al. and Yamaoka to achieve the present invention, so their combination or modification is impermissible hindsight reconstruction. Indeed, an ordinary artisan would have been led by the liquid smoke of Smits et al. away from the gaseous smoke of Yamaoka, so the references teach away from each other. In

8

K00043

any event, these claims depend on allowable claims and therefore should be allowable.

The rejection of claims 55-56 as obvious over Smits et al and Yamaoka in view of Woodruff et al. must be withdrawn because there is no teaching, suggestion or incentive to combine the references to achieve the present invention, so that their combination is impermissible hindsight reconstruction. Again, because Smits et al. is directed to a liquid smoke, while Yamaoka and Woodruff relate to gaseous smokes (Woodruff column 3, line 56, explicitly refers to a gaseous atmosphere, and all Woodruff's claims recite a modified atmosphere), they teach against such a combination. Further, claims 55 to 56 depend on allowable claims and therefore should be allowable.

The rejection of claims 23, 29-32, 36-37 and 58-62 as obvious over Smits et al and Yamaoka et al in view of Melcer must be withdrawn because Melcer is directed to a liquid smoke, not a gaseous smoke as in the present invention. Indeed, column 1, lines 33-35, specifically teach against the use of a gaseous smoke. Because the references teach against their combination, they cannot be combined to render the invention obvious. Moreover, there is no teaching, suggestion or incentive to combine the references, so that their combination is impermissible hindsight reconstruction. Finally, all of these claims (except 58 and 61) are dependent on allowable claims and therefore should be allowable.

The courtesy of a telephone interview with the Examiner and the Examiner's supervisor, Mr. David Lacy, on March 23, 1999, is

9

K00043

gratefully acknowledged.  During the interview, a prior draft of
this amendment was discussed and it was agreed that the arguments
set forth above patentably distinguished the invention from the
prior art of record.  The applicant's attorney pointed out that
certain methods of heating, such as steam heating, may result in
smoke without a particulate phase, so that the reference to
particulate phase was deleted from claim 1 to broaden its
coverage, but that this required that claim 11 be amended to
provide antecedent basis for the recitations of particulate phase
in claims 17 to 19.  The Examiners indicated that these amendments
were acceptable.  The Examiners also confirmed that the Petition
to Make Special (including the prior art cited therein)had been
considered.  The applicant's attorney then presented the arguments
about Smits set forth above, and explained that the invention
applies to meat, generally, not just seafood.  The applicant's
attorney cited the Maga reference as showing that a person of
ordinary skill in the art would know the thresholds for imparting
smoke odor and taste, and agreed to submit a copy of relevant
portions of that reference with the response.  Those portions are
enclosed (together with the original of the Information Disclosure
Statement that was initialed by the Examiner and inadvertently
enclosed with the office action).  The applicant's attorney then
argued that the other cited references (Yamaoka, Woodruff and
Melcer)taught against their combination with Smits.  The Examiners
indicated that the amendment should be revised to reflect the
interview and filed.  Finally, the applicant's attorney invited

10

K00043

the Examiner to telephone with any minor amendments that may be necessary to place the application in condition for allowance.

In view of the above, it is respectfully submitted that the claims are now in condition for allowance. Reconsideration and withdrawal of the rejections is requested. Allowance of the claims at an early date is earnestly solicited. If this application would be allowable with minor revisions, the applicant's attorney courteously invites a telephone interview initiated by the examiner so that such revisions can be effected by Examiner's amendment.

Respectfully submitted,

Martin E. Hsia
Registration No. 32,471
CADES SCHUTTE FLEMING & WRIGHT
P.O. BOX 939
Honolulu, Hawaii  96808
Telephone (808) 544-3835

11

K00043

# United States Patent

[11] 3,615,729

[72] Inventors Harvey O. Baker
Fort Wayne, Ind.;
Johan E. Hoff, West Lafayette, Ind.
[21] Appl. No. 829,285
[22] Filed June 2, 1969
[45] Patented Oct. 26, 1971
[73] Assignee Peter Eckrich & Sons, Inc.

[54] SMOKING OF FOOD PRODUCTS
6 Claims, 2 Drawing Figs.

[52] U.S. Cl. ............................................. 99/229
[51] Int. Cl. ...................................... A23b 1/04,
A23b 3/04
[50] Field of Search ................................ 99/229,
259, 260, 261, 262

[56] References Cited
UNITED STATES PATENTS
3,503,760    3/1970    Allen........................... 99/229

Primary Examiner—Hyman Lord
Attorney—Hofgren, Wegner, Allen, Stellman and McCord

ABSTRACT: A method of providing a low carcinogen content smoke aerosol for use in the smoking of food products. The removal of carcinogens from natural hardwood smoke is effected by cycloning conventionally generated smoke to remove a substantial portion of the particulate phase thereof and/or by regenerating a condensed natural hardwood smoke in the presence of heat. Products may be smoked in the conventional manner or by application of a condensed liquid smoke to a product by dipping, spraying or mixing the condensed liquid smoke into the product as an ingredient thereof. The process also provides the advantages of increasing the cleanliness of a smoke generating operation, reducing the fire hazard thereof and providing a smoking process that can be closely controlled thereby enhancing reproducibility.



3,615,729

SHEET 1 OF 2



*Fig. 1.*

**Inventors:**
*Harvey O. Baker.*
*Johan E. Hoff*
*By Hofgren, Wegner,*
*Allen, Stellman & McCord*
*Attys*

PATENTED OCT 26 1971                    3,615,729

SHEET 2 OF 2



Fig. 2.

CONSTANT
PRESSURE
PUMP

LIQUID
SMOKE
RESERVOIR

REGENERATED
SMOKE

3,615,729

1

## SMOKING OF FOOD PRODUCTS

### BACKGROUND OF THE INVENTION

For centuries, the flavor of various food products has been enhanced by smoking the same. Generally, this involved subjecting the food product, such as cheese, fish, or meat, and products made from the foregoing, to a dense smoke aerosol generally obtained by the oxidation of hardwood.

In those food industries utilizing smoking as a means for flavoring various products, large smoke generating devices are utilized to heat sawdust which is generally formed of fairly finely divided wood bits from hardwood trees. In such operations, the sawdust will quite often be heated at some point in the smoke generating process to a glow point but normally, open combustion is undesirable.

The resulting smoke is then fed from the generator to a smokehouse in which the product may be placed to be subjected to the smoky atmosphere for a desired period of time.

Such smoke may be generally considered to consist of three different types of matter. The first is flyash which is relatively large in size and approaches the size of the sawdust particles being destructively distilled. The flyash quite normally is virtually pure carbon along with some residue contained in the wood that will not distil or combust in the smoke generator. Of course, the deposition of flyash on a product is to be avoided and generally, some steps are taken to remove the flyash from the smoke conveyed to the smokehouse. Typically, such means includes a trap through which the smoke passes at a relatively low velocity thereby enabling the flyash to settle out, or a large cyclone through which the smoke passes at a relatively low velocity which is just sufficient for the flyash to drop out of its entrained state in the smoke stream.

A second portion of the smoke is the visible, so-called "particulate" phase thereof which consists of relatively small particles of a colloidal size, which particles are generally composed of the higher boiling constituents of the smoke commonly known as "tars."

The third constituent of smoke is the vapor phase thereof. This phase is in a true vapor form as opposed to a colloidal form and it has been found that this phase principally contains the aromatic flavoring constituents which are desirably deposited on the product to give the product a characteristic smoke flavor.

The particulate phase or tars of smoke have been found to be relatively high in carcinogen content. A typical carcinogen found primarily in the particulate phase of smoke is 3:4 benzypyrene. As is well known, carcinogenic material, when present at sufficiently high levels, can induce cancer and there is increasing suspicion that even low levels of carcinogenic material can cause cancer after prolonged exposure thereto.

### SUMMARY OF THE INVENTION

The invention concerns itself principally with the removal of carcinogenic material from smoke to be applied to food products without diminishing or altering the characteristic "-smoked" flavor found in conventionally smoked products.

Furthermore, this invention concerns itself with the elimination of other problems long associated with the smoking of food products such as the maintenance of sanitary conditions and the fire hazards attendant a smoking process.

In a smoke process according to the invention, smoke may be generated by the destructive distillation of hardwood such as sawdust by any suitable means. The smoke thus generated is then run to a cyclone of sufficiently small size so that the smoke velocity therein is sufficiently high to not only drop out flyash as has been heretofore done, but additionally, to precipitate out a substantial portion of the particulate phase of smoke containing the majority of the carcinogens found therein.

According to one embodiment of the invention, the smoke material still on stream from the cyclone, which will principally be comprised of the vapor smoke of smoke, may

2

then be conveyed to a smokehouse for the smoking of the product in any suitable manner.

According to a second embodiment of the invention, the on stream smoke from the cyclone may then be fed to a condenser which will condense the smoke to a liquid form. The liquid condensed smoke may then be applied to a product by dipping the product therein, spraying the product therewith or mixing the liquid smoke in the product material makeup as an ingredient.

Alternatively, the liquid smoke may then be regenerated by dispersing the same whereupon it may be conveyed to a smokehouse for the smoking of a product.

If the dispersion of the smoke regeneration process takes place in a heated zone, it has been found that carcinogen content is further lowered apparently due to a "cracking" effect of the heat on the carcinogenic material then remaining in the smoke.

As an additional alternative, the cycloning of the originally generated smoke may be omitted with the smoke being fed directly to the condenser.

Various advantages in addition to carcinogen removal are present in the foregoing process wherein the originally generated smoke is condensed. For example, the smoke in a liquid form may be easily stored and/or transported to a remote location. As a result, the original smoke generation process may take place in a plant specifically designed for that purpose and wherein no food processing takes place. Thereafter, the smoke may be shipped to the food processing plant for regeneration and application to the product. As a result, unsanitary conditions and/or fire hazards due to the presence of smoke generating equipment in a food processing plant may be eliminated.

Furthermore, when a process according to the invention utilizing regeneration is practiced, significantly more control over the smoking operation than previously possible may be excercised. This is due to the fact that the amount of smoke, and the conditions under which it is regenerated may be much more closely controlled than can be standard smoke generating devices. By the same token, the composition of the liquid smoke used in regeneration can be made more uniform.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flow diagram indicating the steps taken in practicing the invention; and

FIG. 2 is a vertical section of a smoke regenerating device which may be used in practicing the method illustrated in FIG. 1.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

#### Smoke Generation

In the method of generating a smoke aerosol according to the invention, a smoke generator 10 performs the first step in the method. The step of smoke generation can be performed by any suitable means known in the art and generally will consist of the destructive distillation of hardwood normally in the form of sawdust. Of course, woods other than hardwood could be used if they produce the desired smoke flavor in the final product.

As one example of suitable means by which the smoke may be generated, so-called "hardwood" sawdust was utilized in a commercially available Kartridge Pak smoke generator, Model No. 17, which includes three heated plates on which sawdust is progressively heated. In the commercially available Kartridge Pak generator, the temperature of only the third and final plate is controlled. However, in order to take advantage of reproducibility flowing from other subsequent steps used in this invention, it may be desirable to modify such a generator by controlling the temperature of each of the three plates to insure that consistent smoke aerosol is generated. Normally, a plate temperature of around 750° F. on all three plates will be suitable for purposes of this invention although it will be appreciated that variety of plate temperatures could be used.

3,615,729

3

## Cycloning The Smoke

The smoke produced by the smoke generator may then be fed through a cyclone 12 to effect removal of flyash entrained in the smoke as well as the carcinogen bearing tars found in the particulate phase of the smoke. The upper limit of the temperature at which the smoke aerosol produced by the smoke generation step is subjected to a cyclone 12 is somewhat critical to the removal of carcinogens but the lower limit need only be sufficiently high to preclude significant condensation in duct work. A temperature of at least 180° F. is normally sufficient to preclude undesirable condensation.

To effect significant carcinogen removal, the temperature of the smoke when introduced into the cyclone should preferably not be higher than about 300° F. The significance of this figure becomes apparent when it is considered that the cyclonic step removes a portion of the particulate phase of the smoke and the percent of the total smoke generated in the particulate phase at any given time depends upon the smoke temperature. For higher temperatures, many of the undesirable higher boiling tars will be vaporized and then become a portion of the gaseous phase of the smoke. Of course, the cyclone cannot effect a separation of gases and as a result, the higher the temperature of the smoke when subjected to the cyclone, the less carcinogenic material will be removed.

In terms of effecting the best temperatures so as to maximize carcinogen removal and yet preclude significant condensation of the smoke within duct work, it has been found that an optimum temperature range for the smoke upon its entry into the cyclone is on the order of 220°–230° F.

Other factors also have an effect on the separation of the particulate phase in the cyclonic. For example, the concentration of the smoke will have an effect on the amount of coalescence of discrete particles and therefore on particle size. And of course, in a cyclone, the larger the particle size, the greater the separation efficiency.

Similarly, the flow rate of the smoke will have an effect on the separation. The flow rate must be sufficiently high with respect to the geometry of the cyclone so that the velocity of the smoke stream introduced into the cyclone is sufficient to cause the colloidal size particles in the particulate phase to be separated out. This is in contrast to heretofore known systems wherein cyclones have been used for the purpose of separating out flyash without separating out the particulate phase of the smoke.

Of course, cyclone size has an effect on separation. For relatively large cyclones such as those heretofore used in the separation of flyash, the velocities obtained within a cyclone are insufficient to cause the separation of the particulate phase of the smoke from the gaseous phase to any appreciable degree notwithstanding any of the foregoing factors. Thus, the cyclone should be extremely small so that high velocities may be obtained therein. As one example of a suitable cyclone which may be used in the method, it has been found that a so-called "4-inch cyclone" may be used with success without particular regard to the factors of concentration and flow rate which are extremely difficult to determine.

The operation of the cyclonic step will become apparent from the following examples.

### EXAMPLE I

Smoke was generated in a standard Kartridge Pak Model 17 generator operated at 2.75 r.p.m. and which included at its output, a tar trap or pot having a standard draft opening so that the smoke generated was admixed with air. The smoke and air mixture was then conveyed through a 2 and ½ inch duct work to a 4 inch cyclone located approximately 10 feet away and the pressure drop across the cyclone was in the range from 1.0 to 1.25 inches of water. The smoke temperature at the cyclone was in the range of 180°–200° F. The emerging gaseous phase of the smoke together with that portion of the particulate phase which was not separated out was then condensed and analyzed for carcinogens and the resulting figure, when compared with smoke generated under

4

similar conditions but not passed through the cyclone indicated that 70 percent of the carcinogenic material, measured in terms of the presence of 3:4 benzpyrene, was removed.

### EXAMPLE II

Smoke was generated using three modified Kartridge Pak Model 17 generators wherein all three plates were controlled at a temperature of 750° F. All three generators were operated at 2.5 r.p.m. and the resulting three streams were combined and fed directly to a 4 inch cyclone located twenty feet away through 2½-inch duct work without the admission of air. The temperature of the smoke at a tar trap located next to the generators was in the range of 350°–500° F. and the pressure drop across the cyclone was 0.5–0.75 inches of water with the smoke emerging at a temperature in the range from 180°–230° F. Again, 70 percent of the carcinogens measured on the same basis were removed.

Depending upon production methods of those using a smoke aerosol made according to the invention, the outflow from the cyclone consisting of the gaseous phase of the smoke with or without entrained air and a small amount of the particulate phase of the smoke, may then be fed directly to a smokehouse for smoking of the product or, according to the preferred embodiment utilized as the input material for the step of condensing, described hereinafter.

### Condensing the Smoke

The smoke material emerging from the cyclone 12 and comprised primarily of the gaseous phase of the smoke with or without entrained air may then be fed to a multiple stage condenser 14. According to one embodiment of the invention, three stages of condensers are used with the first being water-cooled at about 40° F., the second being ammonia-cooled at a lesser temperature and the third being ammonia-cooled at a temperature of about 15°–20° F. Of course, a single condenser could be used and there is intended to be no restriction on the type of cooling, or the number of stages involved in the condenser. However, it is generally desirable to use a multiple stage system insofar as the constituents of the smoke flowing into the condensing system have different condensing temperatures and the possibility that these constituents condensing at a relatively higher temperature might not only proceed to the liquid phase but to the solid phase and thereby clogging of the condensing system is avoided. Specifically, through the use of multiple stages, liquified smoke fractions may be taken from each stage at a temperature above that at which they would cease to flow to preclude such clogging.

It is also desirable that the temperature of the final stage of the condenser be on the order of 15°–20° F. as mentioned previously for the reason that such a temperature will effect condensation of 90–95 percent of the smoke aerosol.

Where multiple stages are used, the outlet streams may then be recombined to provide a liquid smoke composition virtually identical to the original smoke except, of course, for the lower content of carcinogenic material. However, depending upon the flavor desired to be imparted to a product, the various fractions need not be recombined but may be used separately. For example, in a comminuted meat product, use of the fraction obtained from a high temperature stage results in what may best be characterized as a "sweet" taste and as the temperature of the stage decreases to the lowest temperature, the taste of the comminuted meat product treated with the same will gradually go from the "sweet" taste to a so-called "phenolic" taste.

The smoke fractions emerging from the condenser may be separately or in recombined form used as an input material for the step of smoke regeneration as will hereinafter appear. Alternatively, the streams either separately or collectively may be used for product flavoring by application as liquid to the product. For example, the product may be dipped in the liquid smoke, sprayed with the liquid smoke, or the liquid smoke

## 3,615,729

5

may be mixed in the makeup of the product as an ingredient. In the case of dipping and spraying, it may be desirable to dilute the liquid smoke as necessary to obtain desired flavor.

### Smoke Regeneration

The liquid smoke had from the condenser system may be regenerated by dispersing the same by a smoke regenerator 16. The dispersion may be effected by any of a variety of mechanical means and once dispersed, a smoke aerosol suitable for smoking of a product is provided.

A further reduction in carcinogen content measured in terms of the presence of 3:4 benzpyrene may be effected during the smoke regeneration step if the dispersion takes place in a heated zone. The following examples illustrate the reduction.

### EXAMPLE III

A condensed liquid smoke had sufficient 3:4 benzpyrene added thereto to have a concentration of about 1.05 p.p.m. to facilitate analysis. The same was mechanically vaporized in a zone at a temperature of about 400° F. and the resulting smoke aerosol was then condensed and again analyzed for 3:4 benzpyrene which was found to be present at a level of 0.08 p.p.m.

### EXAMPLE IV

Procedures of the foregoing example were repeated except that the zone temperature at which the dispersion took place was 600° F. The resulting smoke aerosol had a concentration of 3:4 benzpyrene of 0.06 p.p.m.

### EXAMPLE V

The procedure of example III was again repeated except that a zone having a temperature of 700° F. was utilized. The resulting smoke aerosol had a 3:4 benzpyrene concentration of less than 0.01 p.p.m.

### EXAMPLE VI

The procedure of example III was again repeated except using a zone with a temperature of 800° F. The resulting smoke aerosol had a 3:4 benzpyrene concentration of about 0.01 p.p.m.

### EXAMPLE VII

The procedure of example III was again repeated utilizing a zone at a temperature of 825° F. The resulting smoke aerosol had a 3:4 benzpyrene concentration of about 0.02 p.p.m.

### EXAMPLE VII

A liquid smoke condensate having sufficient 3:4 benzpyrene added thereto to provide a level of 0.54 p.p.m. was regenerated in a zone heated to a temperature of 225° F. The resulting smoke aerosol was condensed and analyzed for 3:4 benzpyrene. The analysis indicated that the regeneration process destroyed 56 percent of the 3:4 benzpyrene.

### EXAMPLE IX

A condensed, cycloned liquid smoke containing 33.0 parts per billion (p.p.b.) was regenerated by spraying the same at a plate heated to a temperature of 750° F. to regenerate the same. After regeneration, the smoke aerosol was condensed and when analyzed was found to contain 1.67 p.p.b. of 3:4 benzpyrene.

### EXAMPLE X

Condensed, cycloned smoke containing 33.5 p.p.b. of 3:4 benzpyrene was regenerated by spraying the same at a plate heated to 750° F. to regenerate the same. Upon condensation, the regenerated smoke as found to contain 0.74 p.p.b. of 3:4 benzpyrene.

6

When the regenerating procedure was attempted utilizing zone temperatures of 850° F. and more, the liquid smoke burned with fire and flashing, and at a temperature on the order of 900° F., the dispersion was accompanied by an explosion.

The mechanism by which 3:4 benzpyrene concentration is reduced by dispersing in a heated zone is not fully understood but it is believed that a certain amount of thermal cracking takes place. That is, carcinogens such as 3:4 benzpyrene can be broken down into compounds of lesser molecular weight which are not classified as carcinogens.

Furthermore, while it is not totally clear due to the inability of generating the smoke aerosol at temperatures of 850° F. or more, the fact that such regeneration attempts resulted in combustion and the fact that a slight upswing was noticed in the 3:4 benzpyrene concentration at zone temperatures of about 700° F., it is also considered that at temperatures higher than 850° F., formation of 3:4 benzpyrene may actually be encouraged due to combustion of the liquid smoke.

Suitable means for regenerating smoke by dispersing the same in heated zone will be described in greater detail hereinafter.

### Smoking of the Product

The regenerated smoke having a low carcinogen content may then be directed to a smokehouse 18 for smoking products in any suitable manner.

### EXAMPLE XI

Various cycloned, condensed liquid smoke compositions having an average 3:4 benzpyrene level of 32.9 p.p.b. were regenerated in the manner generally described in Examples IX and X above and were applied to all beef franks in a conventional smoke house in conventional manner. The resulting smoked franks were then analyzed to determine the extent of deposition of 3:4 benzpyrene using analysis techniques having as detection limit of 0.37 p.p.b. of 3:4 benzpyrene. No 3:4 benzpyrene was detectable on the franks thereby indicating that the level of the same on the smoked franks was less than 0.37 p.p.b.

### Smoke Generator Structure

One form of a smoke generating device which may be used in practicing the method of smoked air according to the invention is illustrated in FIG. 2 and is generally designated 30. The smoke generator 30 includes a base plate 32 which is centrally apertured at 34 to provide an air or inert gas inlet 36.

The base 32 mounts rectangular housing section 38 which has its upper end terminating in a truncated pyramid section 40. The truncated pyramid section 40, in turn, terminates in a square to round transition section 42, the upper end of which is connected to a tee 44 having one end blocked by a plate 6 so that the tee 44 serves as an elbow.

The plate 46 includes an aperture 48 through which an elongated pipe 50 extends. A collar 52 is welded to the upper surface of the plate 46 and includes a central aperture 54 which is aligned with the aperture 48 to receive the pipe 50. A setscrew 56 is associated with the collar 52 and the aperture 54 so that the vertical position of the pipe 50 may be set as desired.

At approximately the junction of the truncated pyramid section 40 and the square to round transition section 42 there is provided sleeve 58 which surrounds the pipe 50. Spacing means 60 connected to the inner wall of the square to round transition section 42 centrally locate the sleeve 58.

At the lower end of the pipe 50 there is located a conventional spray head 62 which is adapted to have a spray pattern as indicated by the dotted lines 64.

The spray pattern 64 is within a heated zone defined by a metal box, generally designated 66. The metal box 66 is comprised of four sideplates 68 (only three of which are shown) and a bottom plate 70. Electrical strip heaters 72 are in con-

3,615,729

7

tact with the outermost sides of the plates 68 and 70 and held in such position by clamping plates 74 mounted to the plates 68 and 70 by means of threaded members 76 welded to the plates 68 and 70 and bearing nuts 78.

Leg means 80 elevate the box 66 and the strip heaters 72 associated therewith above the base plate 32. Suitable securing means, generally designated 82, are used to secure the leg means to the base 32 to center the box 66 within the rectangular housing portion 38.

A temperature sensor (not shown) may be mounted by any suitable means (not shown) within the zone defined by the box 66. Through any conventional control circuit, he temperature sensor may be utilized to control the flow of electrical current to the strip heater 72 to provide control of the temperature within the one defined by the box 66.

The pipe 50 provides conduit for liquid smoke to the spray head 62 so that the same may be dispersed through the heating zone defined by the box 66. Control of he flow of the liquid smoke may be exercised by providing constant pressure pump means 90, which can be of a mechanical nature or fluid nature, in communication with a reservoir 92 containing the liquid smoke. A line 94 is in fluid communication with the pipe 50, the liquid reservoir 92 and the pump means 90 and for controlling the flow of liquid smoke therein. There may be provided a metering valve 96 and a pressure gauge 98. The rate of flow of the liquid smoke to the spray head 62 may then be regulated by appropriate adjustment of the metering valve 96 with the pressure gauge 98 providing an indication of the pressure drop across the metering valve 96 and thus, an indication of the flow rate.

In use, the smoke generator will be preheated by the strip heater 72 so that the plates 68 and 70 defining the heated zone and heated thereby to a desired temperature. After the desired temperature of the heated zone is attained, the spray system may be activated to cause liquid smoke to be dispersed and vaporized within the heated zone. Air or an inert gas is permitted to flow into the smoke generator through the pipe 36, beneath the plate 70, and along the sides of the plates 68 and upwardly and outwardly of the open end of the tee 44 from which it may then be conveyed to a smokehouse for smoking the product. In such an operation, it is desirable that the flow rate of the liquid smoke to the spray head 62, and the temperature of the heated zone defined by the box 66 be such that the dispersed liquid smoke will be completely vaporized before it impinges upon the plates 68 and 70.

SUMMARY

From the foregoing, it will be appreciated that smoke generation according to the invention provides number of advantages. For example, the cycloning step requires very little additional equipment than that heretofore used and with the capability of reducing the carcinogen content of smoke by 70 percent. As pointed out previously, the smoke from the cycloning may be, if desired, fed directly to a smokehouse for the smoking or a product.

Alternatively, and more preferably, the smoke from the cycloning may be condensed to a liquid form which may then be stored and/or transported to a remote food processing site for regeneration thereby enabling the construction of single plant for the purposes of smoke generation so that the smoke

8

generation operation can be removed from the food processing plants. Accordingly, the attendant fire hazards and sanitation problems in a food processing plant can be avoided.

Regeneration of smoke according to the invention by dispersing the same in a heated zone provides for further carcinogen removal if desired. Of course, if additional carcinogen removal is not required, dispersion need not take place in a heated zone and in either case the advantages of eliminating the fire hazards and unsanitary conditions are still present.

As another alternative, the cycloning step may be omitted and if he smoke is then condensed, the advantages of elimination of the fire hazard and the unsanitary condition may still be present and, if desired carcinogen removal can be effected solely by regeneration by dispersion in a heated zone.

Finally, the liquid smoke obtained from he condensation process need not be regenerated if desired but may be added directly with or without dilution to the food product to be processed in a variety of known ways to arrive at a product having the characteristic smoked taste.

We claim:

1. A method of making a reduced carcinogen content smoke aerosol for use in the smoking of food products comprising the steps of:
   a. generating smoke by subjecting a desired wood to heat;
   b. removing a substantial portion of the particulate phase of the smoke containing the majority of the carcinogens found therein;
   c. condensing the remaining smoke to a liquid by subjecting said remaining smoke to a temperature in the range of 15°–40° F., and
   d. vaporizing the liquid smoke at an elevated temperature in the range of 220°–850° F.

2. The method of claim wherein step (b) is accomplished by feeding the smoke from step (a) through a cyclone of a sufficiently small size to separate out colloidal size particles at a temperature in the range of about 180°–300° F.

3. A method of making a reduced carcinogen content smoke aerosol for use in the smoking of foods comprising the step of vaporizing a liquid smoke composition at an elevated temperature in the range of about 220° to 850° F. to generate smoke aerosol having a carcinogen content reduced from that of the liquid smoke composition prior to its vaporization.

4. A method of preparing a reduced carcinogen content smoked foodstuff utilizing the method of claim 3 to generate a smoke aerosol, and thereafter subjecting a foodstuff to the smoke aerosol to smoke the same.

5. A method of making reduced carcinogen content smoked foodstuff comprising the steps of:
   a. subjecting a desired wood to heat to generate smoke;
   b. passing the smoke through a cyclone of sufficiently small size at a temperature in the range of about 180°–300° F. to remove substantial portion of the particulate phase of the smoke containing the majority of the carcinogens found therein; and
   c. thereafter subjecting a foodstuff to the remaining smoke.

6. The method of claim 5 wherein the step of subjecting a foodstuff to the smoke is preceded by the steps of condensing the reduced carcinogen content smoke to a liquid, and dispersing the liquid smoke; and the foodstuff is subjected to the smoke by contact with the dispersed liquid smoke.

* * * * *

# United States Patent [19]

## Sophianopoulos et al.

| | |
|---|---|
| [11] | Patent Number: **4,883,676** |
| [45] | Date of Patent: **Nov. 28, 1989** |

[54] **METHOD OF FORMING LIQUID SMOKE**

[75] Inventors: **Spyros Sophianopoulos**, Willowdale; **Kenneth S. Darley**, Ajax, both of Canada; **Louis Sair**, Evergreen Park, Ill.

[73] Assignee: **The Griffith Laboratories, Limited**, Scarborough, Canada

[21] Appl. No.: **52,065**

[22] Filed: **May 21, 1987**

[51] Int. Cl.⁴ ............................................... A23B 4/04
[52] U.S. Cl. ...................................... **426/314**; 426/650
[58] Field of Search .............. 426/314, 650, 655, 332; 201/2.5, 30, 32, 37, 40

[56] **References Cited**

### U.S. PATENT DOCUMENTS

3,152,914 10/1964 Taylor ................................ 426/314

3,462,282 8/1969 Fessmann ............................ 426/314
4,270,464 6/1981 Kerres ................................ 426/314

### FOREIGN PATENT DOCUMENTS

2834081 2/1980 Fed. Rep. of Germany ...... 426/314
862891 9/1981 U.S.S.R. ............................. 426/332

*Primary Examiner*—George Yeung
*Attorney, Agent, or Firm*—Sim & McBurney

[57] **ABSTRACT**

Liquid smoke, useful for imparting flavor to a food product, is produced by condensing the products of combustion of dry sawdust which is maintained as an undisturbed thin layer in a combination zone while a sweeping air stream passes through the combustion zone. Much higher yields are obtained at much lower char levels than are possible using prior art procedures.

**11 Claims, No Drawings**

4,883,676

1

# METHOD OF FORMING LIQUID SMOKE

## FIELD OF INVENTION

The present invention relates to a new method of forming liquid smoke.

## BACKGROUND OF THE INVENTION

A common method of imparting a wood smoke flavour to foods is by contacting the food directly with the smoke produced upon combustion of wood or sawdust. The food, thus exposed to the smoke, gradually takes on the desired smokey flavour and character, and also a smoked appearance.

The smoke produced from wood fires in smoke generators cannot readily be controlled and the flavour imparted depends on a number of variable factors, including intensity and type of wood smoke, the area, time and temperature of contact, and the extent of deposition of wood tars on the food surface.

For these reasons, there have been developed aqueous smoke flavour solutions, or "liquid smoke", for use in achieving the controlled imparting of flavour to the food product being treated by contact therewith.

In U.S. Pat. No. 3,106,473, there is described a process for producing an aqueous wood smoke flavoured solution in which wood smoke produced on burning sawdust is subjected to repetitive countercurrent extraction with water.

U.S. Pat. No. 3,873,741 describes a controlled carbonizing combustion of sawdust in the presence of a regulated air supply, and an aqueous extraction system, so as to obtain a liquid having improved flavour and an enhanced ability to colour food products treated therewith. The product is said to be readily dilutable, produced in high yield and completely free from carcinogenic materials.

U.S. Pat. No. 4,298,435 indicates that problems were associated with the batch processes described in U.S. Pat. No. 3,873,741, including the variability of the quality of the liquid smoke product obtained and a serious fire and explosion hazard associated with the large amounts of air used therein. In the process described in U.S. Pat. No. 4,298,435, dry hardwood sawdust having a moisture content below 5% is fed into one end of a rotary calciner wherein it is calcined at a temperature below 925° F. (about 500° C.) in the absence of added air.

Smoke produced by the combustion passes into a packed tower through which an aqueous liquid containing condensed smoke is recycled until the desired smoke concentration is reached, along the lines described in U.S. Pat. No. 3,106,473. Tar is allowed to settle out to eliminate carcinogens.

In all the prior art liquid smoke producing processes of which the applicants are aware, char is produced along with the liquid smoke, possibly as a result of decomposition of volatiles in the heating chamber. The production of the char as well as non-condensible combustion products significantly decreases the theoretical yield of liquid smoke product based on sawdust. Generally, the prior art processes produced yields of liquid smoke based on sawdust of only about 45 to 50%.

## SUMMARY OF INVENTION

We have now surprisingly found that, by effecting combustion of sawdust under certain controlled conditions, a significantly higher yield of liquid smoke can be

2

attained with very little char or ash production. Yields of liquid smoke of 90% or greater based on sawdust are readily attainable.

In particular, we have found that by effecting combustion of dry sawdust as a thin layer in a sweeping dry air stream, we produce a product gas stream which contains a high proportion of condensible vapours and little or no by-product char is formed.

While not wishing to be bound by any theory as to why the present invention is effective, it is thought that the thin layer of sawdust permits efficient heat transfer to the sawdust and efficient volatilization of volatile combustion products and that the flow of air provides not only oxygen for the combustion but also acts as a sweeping gas to purge the volatile materials from the exposed surface of the sawdust before they are able to decompose.

The condensibles present in the product gas stream from the combustion operation may be recovered by direct condensation by cooling or by contact with water to effect dissolution. It is preferred to effect condensation by cooling, since the use of extraneous water to dissolve the smoke results in unnecessary dilution of the smoke, and may inhibit maximum retention of organic compounds. Different fractions may be recovered from the product gas stream, if desired.

## GENERAL DESCRIPTION OF INVENTION

The present invention effects combustion of sawdust of any desired wood, for example, hickory or maple. The sawdust is combusted dry, generally at a moisture content of less than about 5 wt. %, while the air also is provided dry, typically at a moisture content of less than about 1.

If the sawdust is not used dry, then the heating of the sawdust initially drives off the moisture, which, upon condensation, dilutes the product and hence is undesirable. The reference to the sawdust as being dry herein, refers to its condition during combustion. It is preferred, therefore, to predry the sawdust to the dry condition prior to feed to the combustion zone.

Moisture in the air stream is also disadvantageous in that it tends to dampen the combustion and again is present as diluent in the product. Reference is made herein to the use of an air stream, since this is the most convenient form of molecular oxygen-containing gas stream. Oxygen is required to sustain combustion while a gas flow rate through the combustion zone is required to remove the products of combustion, so as to minimize char formation.

Any desired oxygen-containing gas stream having any desired oxygen concentration and any desired flow rate of such stream consistent with the above-noted criteria can be employed. For an air stream, we have found satisfactory results can be obtained if a linear velocity of about 1.25 to about 2.5 ft/min. is employed. Depending on oxygen concentration in the gas stream and the equipment employed, a linear velocity outside this range may be appropriate.

The combustion of the sawdust to produce the liquid smoke on condensation of the condensibles may be carried out in a batch manner. From the practical standpoint of the production of commercial quantities of the liquid smoke, this is impractical and, accordingly, attempts have been made to effect combustion continuously by continuously feeding sawdust to a combustion

4,883,676

**3**

zone and continuously conveying the sawdust through the combustion zone as it is combusted.

Operation in this manner produced a more dilute product having a lesser staining power than was achieved using a batch operation. It is preferred, therefore, that the thin sawdust layer be undisturbed during combustion.

One method of effecting the process of the invention to produce commercial quantities of liquid smoke which we have found to be satisfactory is a so-called "continuous batch" operation wherein individual changes or batches of sawdust are successively deployed in the combustion zone, each as a thin layer in a suitable container, combusted and then removed from the combustion zone to be replaced by the next container. However, any other desired procedure for providing undisturbed sawdust in the combustion zone, for example, a belt on which the sawdust is provided and which continuously passes through the combustion zone.

A thin layer of sawdust in the combustion zone is essential to the obtaining of a high yield product. The thickness of the layer should be no greater than will permit efficient heat transfer and efficient volatilization of volatile combustion products. We have obtained satisfactory results using a thickness of sawdust layer of about 1 to about 2 cm, however other thicknesses may be appropriate in other equipment. If insufficient sawdust is present, combustion is too rapid and large amounts of water are produced while, if the amount of sawdust is too high, the smoke produced becomes trapped and is destroyed, which decreases the yield of liquid smoke produced.

The sawdust generally of a particle size as supplied from the sawing of wood and may be pre-sieved to remove chips and other oversize particles. We have used sawdust having a particle size of about −5 mesh but larger particle sizes may be used. While the particle size distribution may vary widely within the sawdust, it is preferred to employ wood particles having a relatively uniform particle size, since such materials produce a higher quality liquid smoke product.

Sawdust from any desired wood species, including both hardwood and softwood species, may be employed to produce liquid smoke capable of imparting to food the smokey flavour characteristic of the wood species. Examples of wood species useful in the present invention are maple, hickory and beech.

The sawdust may be combusted to produce the condensible smoke on a batch basis, a continuous basis, or, preferably, a semi-continuous basis, as described above. The combustion temperature may vary widely generally up to about 1000° C., typically about 600° C. on a batch basis and typically about 300° C. on a continuous basis, to effect the combustion.

For a batch operation, higher temperatures generally are necessary and satisfactory results have been obtained at about 600° C. For continuous and semi-continuous operation, lower temperatures are appropriate, generally within a range of about 250° C. to about 350° C., preferably about 290° C. to 300° C. Higher temperatures within this range tend to result in more dilute liquid smoke.

The combustion zone in which the sawdust combustion is effected may be of any desired construction consistent with the ability to provide the sawdust as a thin layer exposed to an air stream flowing over the surface of the sawdust through the combustor. In one preferred

**4**

aspect of the present invention, the combustion is effected in a heated chamber having an inlet for the air stream flowing through the chamber and an outlet is connected to a downwardly-extending pipe or conduit to drain any condensed volatiles and to minimize tar formation. We have observed that contact between metals and the sawdust has a deleterious effect both on yield and quality of liquid smoke. It is preferred, therefore, to provide the sawdust in contact with glass or similar material to improve the yield and product quality.

A by-product common to all prior art processes is insoluble tar. The process of the present invention generally significantly produces less tar than prior art processes.

The present invention, therefore, represents a significant breakthrough in the production of liquid smoke, in that significantly greater yields are obtained with little or no solid by-product.

## EXAMPLES

### Example 1:

This Example illustrates the production of liquid smoke in a batch process.

An experimental smoke generator and recovery unit was set up comprising a tubular generator sized 25 cm×7 cm, located with its axis horizontal and surrounded by a heating jacket. An air flow stream was provided through the generator and an outlet was connected to a downwardly-sloped pipe which lead to a series of five condensor flasks cooled by liquid nitrogen for condensing liquid smoke produced by the generator.

In one set of experiments, the generator was constructed of stainless steel No. 304 while, in a second set of experiments, the stainless steel tube was fitted with a quartz glass liner. A series of batch runs was conducted for each generator, using 25 g of maple sawdust, dried to 3% moisture in each run, an air flow of 4 SCFH, and at a temperature rising initially from ambient to about 600° C. over about an 0.5 hour period and then held at 600° C. for about an hour.

The total quantity of smoke produced from the runs was determined along with the efficiency of conversion of the sawdust to liquid smoke. The results obtained are reproduced in the following Table I:

### TABLE I

| Generator | # of Runs | Total Amount of Sawdust (g) | Collected Smoke (g) | % Eff. |
|---|---|---|---|---|
| Stainless Steel | 42 | 1050 | 788 | 75.0 |
| Quartz-liner Stainless Steel | 60 | 1500 | 1345 | 89.6 |

The lower efficiency for the stainless steel generator resulted from a reaction between the smoke and the steel, which was evident from observed surface corrosion of the interior of the stainless steel tube. Nevertheless, the efficiencies obtained are remarkably higher than conventionally obtained in liquid smoke production of about 45 to 50%. Physical examination of the generators did not reveal any significant char formation in either generator.

The condensed smoke obtained was analyzed and the analysis is set forth in the following Table II:

4,883,676

| | 5 | |
| --- | --- | --- |

## TABLE II

| | Stainless Steel | Quartz Liner |
| --- | --- | --- |
| Acidity % | 12.2 | 13.2 |
| Moisture % | 56.6 | 53.6 |
| Phenols (as 2,4- | | |
| dimethoxyphenol) mg/ml | 15.0 | 20.4 |
| Carbonyls % | 22.2 | 25.2 |
| Staining index 525 nm | 55 | 114.8 |
| Staining index 440 nm | 73 | 140.8 |
| Acetone % | | 0.52 |
| Methanol % | | 3.58 |
| Formaldehyde ppm | | 4813 |

The results of this Table II show the superior quality of the liquid smoke produced in the presence of the quartz liner.

In the above Table II and in the remainder of the Examples below, the various parameters were measured in the following manner:

(a) Acidity:

1 ml of liquid smoke is diluted with 100 ml of distilled water. The solution is titrated to pH 8.15, as determined by a pH meter, using 0.1N sodium hydroxide solution. The titration is considered complete when the pH remains at or near 8.15 for at least 15 seconds. The total acidity is calculated as percent by weight of acetic acid on the basis of 1 ml of 0.1N NaOH=60.06 mg of acetic acid.

(b) Moisture:

Standard Karl Fischer method.

(c) Phenols:

1 ml of liquid smoke is diluted to 100 ml with distilled water and 5 ml of this water is diluted again to 100 ml with distilled water. To 5 ml of the latter solution is added 1 ml of 0.05% w/v of cupric sulfate solution as colour stabilizer, 5 ml of borate buffer and 0.1 ml of Gibb's reagent in a 25 ml screw cap tube. The borate buffer is formed by dissolving 34.8 g of sodium borate decahydrate in 900 ml of distilled water, adjusting to pH 9.8 with concentrated sodium hydroxide solution and diluting to 1 liter using distilled water. Gibb's reagent is formed by adding 40 ml of absolute alcohol to 160 mg of 2,6-dibromo-n-chloro-p-benzoquinoneimine. The contents of the tube are mixed by gently inverting about ten times. The tube is stored in a dark place for 30 minutes, 10 ml of n-butanol then is added and the contents of the tube mixed by gently inverting about ten times. The tube is placed in a dark place and the phases allowed to separate for 10 minutes. The contents of the butanol layer then is transferred to a cuvette and the absorbance at 630 nanometers is measured in a spectrophotometer.

The absorbance is converted to mg of 2,6-dimethoxy-phenol per 100 ml of solution by comparison to a standard curve produced using known quantities of 2,6-dimethoxyphenol, after deducting for absorbance of a blank sample. The value read from the curve then is divided by the volume of liquid smoke per 100 ml of final dilution to provide the quantity of phenols in mg per ml of liquid smoke.

(c) Carbonyls:

About 25 ml of crushed ice is placed in a 300 ml conical flask along with 10 ml of dilute phosphoric acid. The dilute phosphoric acid is produced by diluting 10 ml of 85 percent phosphoric acid with 90 ml of distilled water. 20 ml of 0.1N iodine solution and 5 ml of sample solution are added and the solution titrated with 0.05N thiosulphate solution. The iodine solution is prepared by completely dissolving 20 g of potassium iodide using 30 to 40 ml of distilled water, adding 12.7 g of iodine

| | 6 | |
| --- | --- | --- |

and stirring until completely dissolved, and diluting to 1 liter with distilled water. The thiosulphate solution was prepared by dissolving 12.4 g of sodium thiosulphate pentahydrate and 0.1 g of sodium carbonate in distilled water and diluting to 1 liter with distilled water. The starch solution is prepared by making a paste of 1 g of soluble starch and a little cold water, pouring the paste into 100 ml of boiling water and boiling for one minute. The sample solution is prepared by diluting 10 ml of liquid smoke to 50 ml with methanol and adding 10 ml of buffered bisulfite to 10 ml of the methanol solution. The buffered bisulfite solution is prepared by dissolving 47.5 g of sodium bisulfite and 75 g of sodium phosphate in 500 ml of distilled water and adjusting to pH 6.5±0.1. A blank titration is done for correction.

The concentration of carbonyls in the sample then is provided by the following formulae and converted to a percentage:

$$g/100 \text{ ml of sample} = M \times MW \times \frac{100}{1000}$$

$$M = \frac{(S - B)}{\text{ml of sample}} \times \frac{50}{10} \times \frac{50}{5} \times \frac{N}{2}$$

wherein

S=sample titration volume, ml thiosulphate
B=blank titration volume, ml thiosulphate
N=normality of thiosulphate solution
M=molarity of carbonyls in liquid smoke
MW=average molecular weight of carbonyls (assumed to be 100)

(e) Staining Index:

10 ml of a 2.5% w/v glycine solution in acetic acid is added to 1 ml of liquid smoke in a test tube and immersed in a water bath at 85° C. for 30 minutes. 10 ml of glacial acetic acid is added and the test tube cooled immediately in cold running water for 2 to 3 minutes. The sample is diluted to 25 ml with distilled water. Using water as a reference solvent to set the spectrophotometer at zero absorbance at the chosen wavelength (525 nm or 440 nm), absorbance of the solution is measured. The staining index then is calculated, as follows:

$$SI = net \text{ absorbance} \times 1.8 \times C \times 100$$

where the net absorbance is calculated by subtracting the reading for an unheated sample and C is the correction factor arrived at by calibration of the spectrophotometer.

### Example 2:

This Example illustrates the formation of liquid smoke by a semi-continuous process.

The apparatus described in Example 1 was employed in a further set of experiments wherein the stainless steel tube was fitted with a glass liner. A series of semi-continuous runs was performed in which successive batches of maple sawdust were fed to the generator in trays made from Pyrex (trademark) glass semi-circular in shape and measuring 23.5 cm long and 5 cm diameter. In each tray, the sawdust was spread evenly throughout the length of the tray as a thin layer.

Each tray was introduced through a door at the air inlet end of the generator and the door immediately closed. The sawdust at an initial moisture content of 3% was combusted under the reaction conditions for a pre-

4,883,676

7

determined period of time, after which the glass tray was removed and replaced by a fresh batch of sawdust and the process repeated. In this way, semi-continuous processing of sawdust was achieved.

The results obtained in a first series of experiments using the semi-continuous process at an air flow rate of 6 SCFH are set forth in the following Table III:

### TABLE III

| Batch Weight g | No. | Time Per Batch hrs | Staining Index 525 nm | Water % | Maximum temp. °C. | Base temp. °C. | Yield % |
|---|---|---|---|---|---|---|---|
| 15 | 4 | 1.25 | 47.7 | 70.9 | 340 | 290 | 92.4 |
| 15 | 3 | 1.67 | 51.7 | 69.3 | 346 | 290 | 93.8 |
| 15 | 4 | 1.5 | 49.4 | 61.2 | 321 | 290 | 95.6 |
| 25 | 2 | 2.5 | 52.7 | 66.3 | 306 | 270 | 92.7 |
| 25 | 3 | 2.0 | 61.5 | 62.4 | 312 | 270 | 88.9 |
| 25 | 3 | 2.0 | 56.3 | 61.7 | 311 | 270 | 84.9 |
| 15 | 4 | 1.5 | 41.9 | 68.1 | 320 | 270 | 90.5 |
| 15 | 4 | 1.5 | 40.4 | 69.7 | 310 | 260 | 93.7 |
| 25 | 3 | 2.0 | 45.2 | 65.5 | 306 | 260 | 92.5 |
| 25 | 3 | 2.0 | 47.5 | 64.0 | 316 | 250 | 93.7 |
| 20 | 3 | 2.0 | 51.4 | 61.6 | 321 | 260 | 90.8 |

From the data presented in Table III, batch size evidently has an effect on liquid smoke quality, with a higher staining index being obtained with the larger batch. In addition, it would appear that about 290° C. is the optimum base temperature at this air flow rate, in view of the lower water production achieved.

In an additional series of experiments, the air flow rate was decreased to about 5 SCFH and the effect observed for different batch weights at the same base temperature but with different maximum temperatures. The results obtained are reproduced in the following Table IV:

### TABLE IV

| Batch Weight g | No. | Time Per Batch hrs | Staining Index 525 nm | Water % | Maximum temp. °C. | Base temp. °C. | Yield % |
|---|---|---|---|---|---|---|---|
| 25 | 2 | 3.0 | 68.1 | 56.7 | 322 | 290 | 90.1 |
| 25 | 3 | 2.0 | 67.4 | 56.0 | 331 | 290 | 94.4 |
| 25 | 2 | 3.0 | 67.1 | 60.7 | 338 | 290 | 90.1 |
| 25 | 3 | 2.0 | 65.0 | 58.2 | 346 | 290 | 58.2* |
| 20 | 3 | 2.0 | 64.1 | 58.7 | 338 | 290 | 94.8 |
| 20 | 2 | 3.0 | 65.3 | 58.2 | 321 | 290 | 89.9 |

*Pure nitrogen gas streams. This shows that the presence of oxygen in the gas streams is required.

As may be seen from the data presented in Table IV, the lower flow rate produced an improvement in the staining index for the liquid smoke produced.

The effect of particle size on liquid smoke quality was tested in a yet further series of experiments. The sawdust was initially screened through a 12 mesh screen into a coarse fraction and a fine fraction and each fraction was processed at a base temperature of 290° C., an air flow rate of 5 SCFH and a 25 g batch size.

The results obtained are set forth in the following Table V:

### TABLE V

| Particle Size | No. of Batches | Time Per Batch hrs | Staining Index 525 nm | Water % | Maximum temp. °C. | Yield % |
|---|---|---|---|---|---|---|
| Coarse | 2 | 3.0 | 75.1 | 59.8 | 343 | 94.7 |
| Coarse | 2 | 3.0 | 81.5 | 56.1 | 342 | 90.6 |
| Coarse | 3 | 2.0 | 73.4 | 57.3 | 334 | 95.5 |
| Fine | 3 | 2.0 | 79.4 | 56.1 | 330 | 96.1 |

8

### TABLE V-continued

| Particle Size | No. of Batches | Time Per Batch hrs | Staining Index 525 nm | Water % | Maximum temp. °C. | Yield % |
|---|---|---|---|---|---|---|
| Fine | 3 | 2.0 | 81.4 | 55.8 | 349 | 94.1 |
| Fine | 3 | 2.0 | 76.0 | 57.3 | 348 | 93.7 |

As may be seen by comparison between the results of Table V and those set forth in Table IV, a significant positive effect on liquid smoke quality is achieved as a result of particle size uniformity. For the coarse fraction in Table V, the yields as a percentage of sawdust were calculated and are set forth in the following Table VI:

### TABLE VI

| Parameter | wt. % of Sawdust |
|---|---|
| Total condensate | 94.1 |
| Ash | 2.2 |
| Mass balance | 96.8 |
| Liquid smoke yield | 89.3 |
| Tar estimate | 2.8 |

note: Total condensate was measured gravimetrically in the collection flasks and for this reason is a higher value than the total smoke yield plus tar, which are measured after decantation.

In addition, the liquid smoke was analyzed and compared with a commercial liquid smoke manufactured and sold by the applicants following the prior art procedures, identified as GL 1250, and this comparison is tabulated as Table VII below:

### TABLE VII

| | Product of Invention | GL 1250 |
|---|---|---|
| Acidity % | 11.1 | 12.4 |
| Phenols, DMP, mg/ml | 21.3 | 19.2 |
| Staining Index, 525 nm | 81.4 | 79.2 |
| Carbonyls % | 24.1 | 21.8 |
| Moisture % | 55.8 | 50 to 55 |

As may be seem from this Table VII, the liquid smoke produced by the method of the invention has comparable properties to those of the commercial product. However, the product of the invention is obtained in a significantly greater yield with no char formation.

### Example 3:

This Example illustrates the application of the process of the invention to an alternate wood species.

The semi-continuous procedure of Example 2 was repeated to fourteen 25 g batches of beechwood, coarse ground in the laboratory. The operating parameters are set forth in the following Table VIII:

### TABLE VIII

| Parameter | Value |
|---|---|
| Sawdust moisture content | 3% |
| Base temperature | 290° C. |
| Air flow | 4 SCFH |
| Run time per batch | 2 hrs |
| Maximum temperature | 346° C. |

The yields of product were calculated as a percentage of sawdust and the liquid smoke was analyzed. This data is presented in the following Tables IX and X:

### TABLE IX

| | |
|---|---|
| Total condensate | 94.2% |

4,883,676

**9**

### TABLE IX-continued

| | |
|---|---|
| Ash | 1.3% |
| Mass balance | 95.5% |
| Liquid smoke yield | 88% |
| Tar estimate | 1.3% |

### TABLE X

| | |
|---|---|
| Acidity % | 13.7 |
| Phenols, DMP, mg/ml | 27.8 |
| Staining Index, 525 nm | 83.2 |
| Carbonyls % | 24.0 |
| Moisture % | 42.4 |

The effect of a further decrease in air flow rate on product quality was investigated for this wood species by lowering the flow rate to 2 SCFH for a further series of sawdust batches. The yields of product were calculated as a percentage of sawdust and the liquid smoke obtained was analyzed. The results obtained are set forth in the following Tables XI and XII:

### TABLE XI

| | |
|---|---|
| Total condensate | 78.4 |
| Ash (char) | 6.0 |
| Mass balance | 84.5 |
| Liquid smoke yield | 75.2 |
| Tar estimate | 3.0 |

### TABLE XII

| | |
|---|---|
| Acidity % | 13.1 |
| Phenols, DMP, mg/ml | 31.1 |
| Staining Index, 525 nm | 103.3 |
| Carbonyls % | 18.5 |
| Moisture % | 49.9 |

As may be seen by comparison of Tables XI and XII with Tables IX and X, a stronger smoke was obtained at the lower flow rate but at the expense of a lower mass balance resulting from the production of non-condensible gases and incomplete ashing.

#### Example 4:

This Example illustrates the use of the liquid smoke of the invention in the smoking of meats.

A combined sample of liquid smoke from repetitive runs according to Example 1 was used to assess performance on product in comparison with GL 1250 (see Example 2). Use of the liquid smoke by conventional means in an atomization system using a laboratory smokehouse on bacon showed no difference in product between the test and GL 1250. Dipping tests showed the test smoke to be at least as good in staining performance as GL 1250.

#### SUMMARY OF THE DISCLOSURE

In summary of this disclosure, the present invention provides a novel method of producing liquid smoke by using a unique combination of process conditions for the combustion of sawdust. Modifications are possible within the scope of this invention.

We claim:

1. A method of forming a liquid smoke, which comprises:
   feeding dry sawdust to a combustion zone and forming a thin layer thereof having an exposed upper surface in said combustion zone,
   feeding a dry molecular oxygen-containing gas stream to said combustion zone,
   heating said combustion zone to a temperature at least sufficient to effect combustion of said sawdust,

**10**

combusting said sawdust in said thin layer while said molecular oxygen-containing gas stream sweeps over said exposed surface of the combusting sawdust in said combustion zone from an inlet thereto to an outlet therefrom to produce a combustion product gas stream containing condensible vapors, said sawdust layer having a thickness no greater than that which will permit efficient heat transfer to the sawdust layer in said combustion zone and efficient volatilization of volatile combustion products from the sawdust layer into the sweeping molecular oxygen-containing gas stream to form said product gas stream while the formation of char and ash in said combustion zone is substantially avoided,
removing said product gas stream from said combustion zone from said outlet therefrom, and
condensing said condensible vapors from said removed product gas stream to produce liquid smoke.

2. The method of claim 1 wherein said layer of sawdust is maintained substantially undisturbed during said combustion.

3. The method of claim 2 carried out continuously.

4. The method of claim 2 carried out semi-continuously on successive batches of sawdust.

5. The method of claim 1 wherein said combustion is effected at a temperature of about 250° to about 350° C.

6. The method of claim 1 carried out continuously or semi-continuously and said combustion is effected at a temperature of about 290° to about 300° C.

7. The method of claim 1 wherein said dry gas stream is air.

8. The method of claim 7 wherein said air has a linear velocity of about 1.25 to about 2.5 ft/min.

9. A method of forming liquid smoke, which comprises:
   providing a plurality of batches of dry sawdust in the form of thin layers, each said sawdust layer having a thickness no greater than that which will permit efficient heat transfer to the sawdust and efficient volatilization of volatile combustion products while the formation of char and ash is substantially avoided,
   heating a combustion zone to a temperature of about 280° C. to about 350° C.,
   flowing a dry air stream into said combustion zone and passing said air stream from an inlet to said combustion zone to an outlet from said combustion zone,
   introducing successive ones of said batches to said combustion zone,
   effecting combustion of said sawdust in each successively-introduced batch while said gas stream sweeps over the exposed surface of the combusting sawdust to produce a product gas stream containing condensible vapors while char production is avoided,
   removing the product gas stream from said outlet from the combustion zone, and
   condensing said condensible vapors from said removed product gas stream to produce an aqueous liquid smoke in high yield greater than about 90%.

10. The method of claim 9 wherein said sawdust has a moisture content of less than 5 wt. %, said air stream has a linear velocity of about 1.25 to about 2.5 ft/min., each sawdust layer is undisturbed during said combustion and each sawdust layer has a thickness of about 1 to about 2 cm.

11. The method of claim 10 wherein each batch of said sawdust is in contact with glass during said combustion.

* * * * *



US005135770A

# United States Patent [19]

## Underwood

[11] **Patent Number:** 5,135,770

[45] **Date of Patent:** * Aug. 4, 1992

[54] **HIGH BROWNING LIQUID SMOKE COMPOSITION AND METHOD OF MAKING A HIGH BROWNING LIQUID SMOKE COMPOSITION**

[75] Inventor: **Gary L. Underwood,** Manitowoc, Wis.

[73] Assignee: **Red Arrow Products Co. Inc.,** Manitowoc, Wis.

[ * ] Notice: The portion of the term of this patent subsequent to Sep. 25, 2007 has been disclaimed.

[21] Appl. No.: **711,150**

[22] Filed: **Jun. 6, 1991**

### Related U.S. Application Data

[60] Continuation of Ser. No. 416,963, Oct. 4, 1989, Pat. No. 5,039,537, which is a continuation-in-part of Ser. No. 358,650, May 26, 1989, Pat. No. 4,959,232, and a continuation-in-part of Ser. No. 343,928, Apr. 26, 1989, Pat. No. 4,994,297, which is a division of Ser. No. 119,673, Nov. 12, 1987, Pat. No. 4,876,108.

[51] Int. Cl.$^5$ .............................................. A23L 1/22

[52] U.S. Cl. .................................... **426/650;** 426/315; 426/431; 426/655

[58] Field of Search .............. 426/271, 314, 490, 650, 426/431, 520, 524, 655, 534

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,106,473 | 10/1963 | Hollenbeck . |
| 3,330,669 | 7/1967 | Hollenbeck . |
| 3,531,463 | 9/1970 | Gustafson ........................ 260/211.5 |
| 3,806,609 | 4/1974 | Goblik et al. . |
| 4,224,415 | 9/1980 | Meitzner et al. ..................... 521/38 |
| 4,297,220 | 10/1981 | Meitzner et al. ..................... 210/690 |
| 4,359,481 | 11/1982 | Smits et al. . |
| 4,431,032 | 2/1984 | Nicholson . |
| 4,431,033 | 2/1984 | Nicholson . |
| 4,496,595 | 1/1985 | Nicholson . |
| 4,504,500 | 3/1985 | Schneck et al. . |
| 4,504,501 | 3/1985 | Nicholson . |
| 4,504,507 | 3/1985 | Nicholson . |
| 4,505,939 | 3/1985 | Chiu . |
| 4,525,397 | 6/1985 | Chiu . |
| 4,657,765 | 4/1987 | Nicholson et al. . |

| | | |
|---|---|---|
| 4,717,576 | 6/1988 | Nicholson et al. . |
| 4,876,108 | 10/1989 | Underwood ...................... 426/315 |
| 4,883,676 | 11/1989 | Sophianopoulos et al. . |
| 4,959,232 | 9/1990 | Underwood ...................... 426/314 |
| 4,994,297 | 2/1991 | Underwood ...................... 426/314 |
| 5,039,537 | 8/1991 | Underwood . |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 932686 | 8/1973 | Canada . |
| 1121650 | 4/1982 | Canada . |
| 1193131 | 9/1985 | Canada . |
| WO88/00935 | 2/1988 | PCT Int'l Appl. . |
| 1137637 | 12/1968 | United Kingdom . |

#### OTHER PUBLICATIONS

Arseneu et al., "A study of Reaction Mechanisms by DSC and TG", *Thermal Analysis,* vol. 3, Proceedings Third ICTA Davos, 1971, pp. 319–326.

Beaumont et al., "Influence of Physical and Chemical Parameters on Wood Pyrolysis," *Ind. Eng. Chem. Process Des. Dev.,* vol. 23, No. 4, 1984, pp. 637–641.

Berg et al., "Rapid Mixing Studies Between Transported Solids in an Ultra-Rapid Fluidized Reactor," Powder & Bulk Solids Conference, Rosemont, Ill., May 1985.

Berg et al., "Characterization of Solids Mixing in an Ultra-Rapid Fluidized Reactor," Paper presented in London, Ontario, Canada, May 12–15, 1986.

(List continued on next page.)

*Primary Examiner*—Carolyn Paden
*Attorney, Agent, or Firm*—Marshall, O'Toole, Gerstein, Murray & Bicknell

[57] **ABSTRACT**

This invention relates to a high browning liquid smoke composition made from the condensable liquids of pyrolyed wood or cellulose. The high browning liquid smoke composition has the capability to flavor and to impart characteristic smoke color to a foodstuff and has a brix less than about 50, a browning index greater than about 30, and a transmittance value of greater than about 50% at 590 nm. A method of making the high browning liquid smoke composition and the use of the composition with a food product is also disclosed.

**11 Claims, 1 Drawing Sheet**



# 5,135,770

## OTHER PUBLICATIONS

Byrne et al., "The Pyrolysis of Cellulose and the Action of Flame Retardants," *J. Appl. Chem.*, vol. 16, Mar. 1966, pp. 81–88.

Evans et al., "New Approaches to the Study of Cellulose Pyrolysis," *American Chemical Society*, vol. 36, No. 2, 1991, pp. 714–724.

Glassner et al., "Gas Chromotographic Analysis of Products from Controlled Application of Heat to Paper and Levoglucosan," *Analytical Chemistry*, vol. 37, No. 4, Apr. 1965, pp. 525–527.

Graham et al., "Fast Pyrolysis of Biomass," *Journal of Analytical and Applied Pyrolysis* 6, (1984), pp. 95–135.

Kang et al., "Ketene Formation From the Pyrolysis of Carbohydrates," research paper, Philip Morris Research Center, Richmond, Va., pp. 261–273.

Maga et al., "Pyrazine Composition of Wood Smoke as Influenced by Wood Source and Smoke Generation Variables," *Flavour and Fragrance Journal*, vol. 1, pp. 37–42, (1985).

Menard et al., "Characterization of Pyrolytic Liquids from Different Wood Conversion Processes," Fifth Canadian Bioenergy R&D Seminar, undated, pp. 418–434.

Piskorz et al., "On the Mechanism of the Rapid Pyrolysis of Cellulose," *Journal of Analytical and Applied Pyrolysis*, 9 (1986) pp. 121–137.

Richards et al., "Influence of sodium chloride on volatile products formed by pyrolysis of cellulose: Identification of hydroxybenzes and 1-hydroxy-2-propanone as major products," Carbohydrate Research, 117 (1983) pp. 322–327.

Roy et al., "The Pyrolysis under Vacuum as Aspen Poplar," paper published in Fundamentals of Thermochemical Biomass Conversion, Edited by R. P. Overend, (1985) pp. 237–256.

Scott et al., Chemicals and Fuels from Biomass Flash Pyrolysis, Renewable Energy Branch, Energy Mines and Resource Canada, Ottawa, Canada, pp. 12–78 (1988).

Scott et al., "Sugars From Biomass Cellulose by a Thermal Conversion Process," paper published in Energy From Biomass and Wastes XIII Edited by Donald L. Klass, presented at conference in New Orleans Feb. 13–17, 1989, pp. 1349–1363.

Scott, D. S. et al. "Production of Liquids from Biomass by Continuous Fast Pyrolysis", *Bioenergy vol. 3 Biomass Conversion*, pp. 15–22.

Shafizadeh, "Industrial Pyrolysis of Cellulosic Materials," *Applied Polymer Symposium*, No. 28 (1975) pp. 153–174.

Shafizadeh et al., "Pyrolysis of Cellulose," *Carbohydrate Research*, 29 (1973) pp. 113–122.

Wodley, "Pyrolysis Products of Untreated and Flame Retardant-Treated α–Cellulose and Levoglucosan," Naval Radiological Defense Laboratory, pp. 835–851.

FIGURE 1



5,135,770

**1**

### HIGH BROWNING LIQUID SMOKE COMPOSITION AND METHOD OF MAKING A HIGH BROWNING LIQUID SMOKE COMPOSITION

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 07/416,963 filed Oct. 4, 1989, U.S. Pat. No. 5,039,537, which is a continuation in part of U.S. application Ser. No. 358,650, filed May 26, 1989 U.S. Pat. No. 4,959,232 and U.S. application Ser. No. 343,928, filed Apr. 26, 1989 U.S. Pat. No. 4,994,297, which is a divisional application of U.S. application Ser. No. 119,673, filed Nov. 12, 1987, U.S. Pat. No. 4,876,108.

#### BACKGROUND

The present invention generally relates to a method of making a liquid smoke composition from the condensable products resulting from the fast pyrolysis of wood or cellulose and, more particularly, to a method of making a high browning liquid smoke composition. The high browning liquid smoke composition of this invention may be used to color flavor edible foodstuffs.

Use of liquid smoke solutions as a replacement for smoking food by direct contact with wood smoke has become a standard industry practice. When applied to the surface of meats, proteinaceous foodstuffs and food casings, liquid smoke will give the food a characteristic smoke flavor and produce a dark smoked color. The achievement of a smokehouse-like product by application of a liquid smoke solution to food requires controlling and balancing many related variables such as the food composition, the temperature and humidity, the processing and contact time, and the amount and concentration of smoke solution applied.

For example, when applying a liquid smoke solution to a meat, the processor normally must compromise the smoke color or browning of the meat to keep the flavor at a desired level because the flavor imparting ability of known liquid smoke solutions is generally too intense at a desired smoked color. There is a need in the industry for a liquid smoke solution with good coloring or browning properties that has acceptable flavoring properties.

Liquid smoke is a complex and variable mixture of chemicals produced during pyrolysis and includes many compounds, some of which are normally liquid at room temperature. Pyrolysis is a general term for the thermal decomposition of any organic matter, such as wood, plants, or fossil fuels, which occurs either during combustion or in the absence of combustion. Combustion uses the oxidation or burning of a portion of the organic matter to provide the thermal energy required to vaporize and decompose the remainder of the matter. For pyrolysis without combustion, thermal energy must be supplied indirectly from an external source, such as radiation, solid, or gaseous heat carriers, or from thermal conduction through reactor walls. The externally supplied thermal energy vaporizes and decomposes the organic matter without directly oxidizing or burning it.

Either method of pyrolysis produces condensable liquids, non-condensable gases and solids in varying proportions depending upon reaction conditions. The condensable liquids from pyrolyzed wood can be further sub-divided into water soluble organics and water insoluble tars. It is known that the desirable active in-

**2**

gredients for flavoring foodstuffs found in smoke solutions are among the water soluble organics.

The production of commercially produced liquid smoke solutions typically begins with smoke made by pyrolysis and limited combustion of wood. After pyrolysis or combustion, the smoke is subsequently collected and fed through a column countercurrent to the flow of recirculating water. The resulting dilution of the condensable smoke components in water results in the removal of undesired tars and water insoluble components; however, further refinement of the liquid solution is needed for the food flavoring or coloring applications described above. A typical commercial liquid smoke preparation for surface applications to foodstuffs is the liquid smoke flavoring described in U.S. Pat. No. 3,106,473 to Hollenbeck.

Current conventional pyrolysis methods are characterized by relatively slow thermal reactions which occur at moderate temperatures. In a typical commercial process for example, wood feedstock, generally dried ground sawdust, is fed into a pyrolysis system at elevated temperatures. The sawdust is maintained at these temperatures for more than one minute. These conventional pyrolysis methods suffer from relatively poor yields of liquid smoke products and which have less than desired browning or flavoring properties.

Improved pyrolysis products may be obtained using fast or flash pyrolysis methods. Fast pyrolysis methods employ extremely fast heating rates and short material and vapor residence times to yield high quality liquid smoke compositions. The heating rate for fast or flash pyrolysis may be greater than 1000° C. per second and vapor residence times may be less than 2 seconds. The liquid smoke solutions produced by fast pyrolysis methods are generally preferred to liquid smoke solutions made using conventional pyrolysis methods. A method of making fast pyrolysis liquid smoke is described in U.S. Pat. No. 4,876,108 and the related divisional application Ser. No. 07/358,650 filed May 26, 1989. The entire contents of both applications are incorporated by reference herein.

The color and flavor chemistry of liquid smoke compositions is highly complex as evidenced by the over four hundred compounds identified as constituents of these compositions. A summary of the many constituents found in liquid smoke is listed by Maga in "Smoke in Food Processing" *CRC Press*, pp. 61–68 (1968).

Although there are hundreds of different chemical species present in liquid smoke, the species are generally divided into five classes based on chemicals having distinct functional groups. The five classes generally are acids, carbonyls, phenols, basics and neutrals. A majority of researchers skilled in the art of smoke solutions have concluded that phenols are primarily flavoring and aroma compounds, carbonyls are mainly responsible for surface coloration, and acids are principally preservatives and pH controlling agents. Acids and carbonyls also make a secondary contribution to flavor and many enhance the surface characteristics of smoked meat products.

A representative commercial liquid smoke product, for example, with a titratable acidity level of about 11% contains about 13% carbonyls, about 1.5% phenols, and at least 70% water. The remaining constituents, about 4.5% of the total mass balance of the smoke, include basic and neutral organic compounds.

5,135,770

3

Where surface coloring is important, measuring the amount of active carbonyls in a solution may determine the browning or coloring properties of a liquid smoke composition. The active carbonyls are believed to initially react with the available amino groups on surface proteins of a foodstuff. Subsequent reactions occurring under drying and heating conditions lead to the formation of the characteristic brown smoked color. The concentration of a specific carbonyl species, hydroxyacetaldehyde, is also a good indicator of the coloring or browning potential of a liquid smoke solution.

Another measurement that is used to characterize liquid smoke is the browning index defined according to procedures described below. The browning index is also used in the smoke flavoring industry to measure the browning or coloring performance of a liquid smoke solution.

Liquid smoke solutions may be used to color and flavor comestible food products by treating the food in a variety of ways. The application of liquid smoke may be done on individual items in batch or continuous modes by spraying or dipping. For large batches, the atomized cloud of liquid smoke may be used. In addition, sausages, bologna and hams may be processed in casings into which liquid smoke solutions have been incorporated.

## SUMMARY OF THE INVENTION

This invention encompasses a high browning liquid smoke composition having a brix less than about 50, a browning index greater than about 30 and a transmittance value of greater than about 50% at 590 nm. Preferably, the browning index is greater than about 35 for a liquid smoke composition having a brix less than about 45.

This invention also encompasses a method for making a very high browning liquid smoke composition comprising the steps of:

collecting the condensable liquids produced by the fast pyrolysis of wood or cellulose to give a raw liquid smoke composition;

diluting the raw liquid smoke with water to substantially separate water insoluble smoke components from water soluble components to give a diluted liquid smoke of less than about 40 brix;

contacting the diluted liquid smoke mixture with a nonionic polymeric resin to give a treated liquid smoke composition; and

concentrating the treated liquid smoke to give a high browning liquid smoke composition having a brix less than about 50, a browning index greater than about 30, and a transmittance value of greater than about 50% at 590 nm.

The pyrolysis products of cellulose may not need to be contacted with a nonionic polymeric resin but may simply be filtered in order to provide a concentrated liquid smoke having a transmittance value greater than 50% at 590 nm.

Thus, the present invention also provides for a method of making a high browning liquid smoke composition comprising the steps of:

collecting the condensable liquids produced by the fast pyrolysis of cellulose to give a raw cellulose liquid smoke composition;

diluting the raw cellulose liquid cellulose liquid smoke with water to substantially separate water insoluble smoke components from water soluble

4

components to give a diluted cellulose liquid smoke of less than 40 brix; and

concentrating the diluted cellulose liquid smoke to give a high browning liquid smoke composition having a brix less than about 50, a browning index greater than about 30, and a transmittance value of greater than about 50% at 590 nm.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 schematically illustrates the steps of a process of this invention to produce a high browning liquid smoke composition.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention provides a high browning liquid smoke composition having a brix less than about 50, a browning index greater than about 30 and a transmittance value greater than 50% at 590 nm. A preferred liquid smoke composition has a brix less than about 45, and a browning index greater than 35. A more preferred liquid smoke composition has a brix less than about 45 and a browning index between 30–65.

This invention also provides a method for making high browning liquid smoke compositions by collecting the raw condensable products obtained from the fast pyrolysis of wood or cellulose, diluting the raw condensable products with water to substantially separate the undesired tar components, contacting the water soluble components with a nonionic polymeric resin to give a treated liquid smoke solution, and concentrating the treated liquid smoke solution to give the desired high browning, liquid smoke composition. Alternatively, when cellulose is pyrolyzed, contact with the nonionic resin may not be required if the transmittance value is still greater than 50% at 590 nm after concentrating to a desired brix. Preferably, the diluted cellulose liquid smoke is filtered to remove unwanted particulates which may lower the transmittance value after concentrating to a desired brix.

The sequence of process steps is schematically illustrated in FIG. 1. The starting materials used to produce the compositions of this invention are prepared by pyrolyzing a feedstock 10 and collecting the pyrolysis products 20 to give the raw liquid smoke starting materials. The raw liquid smoke starting materials are further processed by diluting with water 30 to give a diluted liquid smoke and contacting the diluted liquid smoke with a nonionic polymeric resin 40, if needed, to give a treated liquid smoke. In a last step, concentrating the treated liquid smoke 50 gives a high browning liquid smoke composition.

## PREPARATION OF STARTING MATERIALS

The high browning liquid smoke composition of this invention is preferably made from the condensable products of the fast pyrolysis of wood or cellulose. In addition, other lignin-cellulose sources are also acceptable for use as pyrolysis feedstock. The pyrolysis feedstock may be any suitable wood product, but is preferably hardwoods such as maple, hickory, birch, oak, beech or poplar.

The fast pyrolysis process is designed to achieve a very high temperature in a minimum time and to have a relatively short residence time at the high temperature. The parameters that are preferably optimized in a fast pyrolysis method to produce suitable raw liquid smoke for use as starting materials include:

5,135,770

5        6

1) a high heating rate of the wood feedstock, preferably greater than 1000° C. per second;

2) a short vapor residence time, preferably an average time such that the gas/vapor phase remains in the reactor greater than about 0.15 second and less than about one second and more preferably less than about 0.6 second;

3) an isothermal reactor temperature between about 400°–800° C.; and

4) a quenching of the gas/vapor product to a temperature of about less than about 300° C., preferably in less than about 0.6 seconds, in order to preserve the high liquid yield.

A short residence time at a high temperature has been achieved by a number of systems. One system is a vacuum pyrolysis process that is based on the principle that primary products can be withdrawn from the reactor under vacuum conditions before they have a chance to react further and produce secondary pyrolysis products. This method is described by Roy, et al., "Pyrolysis under Vacuum of Aspen Poplar," *Fundamentals of Thermol-Chemical Biomass Conversion*, Elsevier Publishers, (1985). In this method, the wood feedstock remains in the reactor until completely reacted. Total liquid yields of between 68–74% by mass of the total wood feedstock are reported at reaction temperatures of 450° C. and a solid heating rate of 10° C. per minute, and a residence time of up to 2 seconds. At a vapor residence time of about 2 seconds the char yields were between 16–20% by mass of the wood feed material.

When a vacuum pyrolysis apparatus is used, the heating rate of the wood or cellulose is much slower compared with rapid thermal processing apparatus or with a fluidized bed reactor. Secondary pyrolysis reactions, however, are reduced by quickly removing and cooling the primary pyrolysis vapors. Accordingly, the fast heating rate is not essential as long as the secondary reactions are limited.

A second system for obtaining fast pyrolysis is "flash" pyrolysis, using a fluidized bed reactor system operating at bed temperatures between 400°–650° C. Total liquid yields of between 60–70% of the wood feedstock have been obtained with an average vapor residence time of 0.5 seconds. The char yield was typically between 10–20% of the wood mass. Residence times of up to 3 seconds may be achieved. See for example, Scott, et a., "Production of Liquids from Biomass by Continuous Fast Pyrolysis," *Bioenergy* 84, Vol. 3, *Biomass Conversion.*

A third system is a fast pyrolysis process which uses hot particulate solids and/or inert gases tot rapidly transfer heat to the wood feedstock in a reactor system. This process results in very high gas or very high liquid yields from biomass depending upon the reactor conditions. Char yields are from 0–6% depending upon the feedstock, reactor temperatures and residence time. Maximum gas yields may be about 90% of the feedstock mass at 900° C. and maximum liquid yields may be about 85% of the feedstock mass at 600°–650° C. This type of apparatus can be operated at a temperature between 350°–1000° C. with a residence time between 0.03–3 seconds. A suitable apparatus for this process is described in patent application Ser. No. 07/358,650 filed May 26, 1989 and U.S. Pat. No. 4,876,108.

## DILUTION OF RAW LIQUID SMOKE

After collection of the raw liquid smoke starting materials, water is added to the raw liquid smoke to cause a substantial phase separation and to allow separation of benzo(a)pyrene and undesired tars from the desired liquids. The amount of water added beyond that necessary to achieve effective phase separation is a matter of choice. The more water added, the greater the precipitation of higher molecular weight components. Preferably, the level of undesired benzo(a)pyrene and tars in the fast pyrolysis liquids after phase separation is sufficiently lowered to allow a more concentrated high browning product to be produced.

After dilution and phase separation, the ratio of carbonyls to phenols is relatively high, which is indicative of the high browning potential relative to the amount of flavor. The ratio of carbonyls to phenols is generally higher than the ratio of carbonyls to phenols found in a commercially available liquid smoke composition. For example, an unconcentrated commercial liquid smoke may have a total carbonyls concentration between about 4–15% and a browning index between about 3–13. While methods are available for concentrating commercial liquid smoke to achieve a browning index of up to about 25, unconcentrated liquid smoke has a practical upper limit for the browning index of about 13 because the benzo(a)pyrene levels become excessive if the liquid smoke is concentrated above this level in the water collection baths.

Through the use of fast pyrolysis methods, browning indexes of up to about 50 may be achieved without using any concentration steps and with acceptably low levels of benzo(a)pyrenes, preferably below 0.5 ppb.

The presence of hydroxyacetaldehyde is useful as an index to rate the value of the liquid for smoke coloring applications. The yield of this compound by fast or flash pyrolysis methods increases with a decrease in both pyrolysis temperature and residence time. Yields of hydroxyacetaldehyde in excess of 8% by total mass may be obtained at reaction temperatures of about 550°–600° C. and a vapor residence time of about 0.1 second.

The yield of hydroxyacetaldehyde is much greater from fast pyrolysis methods than from conventional methods. A comparison of yields of hydroxyacetaldehyde from two fast pyrolysis methods and a commercial liquid smoke are set out in Table 1. As can be noted, yields up to about 4 times higher are achieved using fast pyrolysis. Hydroxyacetaldehyde is one of the predominant carbonyls in wood or cellulose pyrolysis liquids and is therefore used as an index to assess a liquid's browning potential.

### TABLE 1

| CHEMICAL ANALYSIS OF PYROLYSIS LIQUIDS (Hydroxyacetaldehyde Yields) | |
| --- | --- |
| Sample Source | Hydroxyacetaldehyde Yield (% w/w) |
| 1. Fluidized Bed (450 to 550° C., 0.5 s) | 7.5–8.5 |
| 2. Rapid Thermal Processing (550 to 700° C., 0.2 s) | 7.0–8.0 |
| 3. Commercial Liquid Smoke | less than 1 |

## RESIN TREATMENT OF DILUTED LIQUID SMOKE

After dilution, the liquid smoke solutions which may be treated with nonionic polymeric resin will generally

7

be in a range of about 4–40 brix, preferably in a range of about 5–30 brix and most preferably in a range of about 20–25 brix. Brix is an indication of the percentage of soluble organics in solution. While normally used in measuring sugar solutions, a brix value or number is an effective approximation of the non-water smoke components in a liquid smoke composition or solution. The usual limit of brix beyond which polycyclic aromatic hydrocarbons, harsh flavored phenols and tars become soluble in liquid solutions of smoke during production from vaporous smoke is about 30 brix.

It has been found that nonionic polymeric resins are effective in removing undesired components, such as phenols, from solutions up to about 40 brix. Above this limit, the solvating effect of the organics in solution begins to overcome the ability of the polymeric resins to remove these compounds.

One skilled in the art would readily recognize there are different ways to contact the nonionic polymeric resins with the diluted liquid smoke. Both batch and flow processes are acceptable methods.

The preferred method of treatment of liquid smoke solutions to produce the compositions of this invention is to pass a liquid smoke solution through a column of a suitable nonionic polymeric resins. In this way, the maximum amount of solution may be treated with a given amount of polymeric resin before regeneration, due to adsorption of undesired components, is required. A water rinse may be employed before regeneration in order to maximize product yield.

Treatment with the nonionic polymeric resins increases the transmittance values and decreases the brix of the treated solutions. Thus, a 25 brix diluted liquid smoke solution having a phenol range of about 14–20 mg/ml may yield a composition having about 18–23 35 brix, a transmittance value of about 50–90% at 590 nm, and a browning index substantially about the same as before polymeric resin treatment. Thus, treated compositions will have essentially the same capability of browning meats both before and after contact with the polymeric resin. Solutions of commercially available liquid smoke with brix values of about 25–30 generally have browning index values of about 10–12. The liquid smoke solutions of the present invention have brix values less than 50 and browning indexes greater than 30.

Polymeric resins suitable for practicing the present invention are know in the art. U.S. Pat. No. 3,531,463 to Gustafson, describes processes for preparing nonionic polymeric resins and using the polymeric resins to separate an organic component from an aqueous solution. U.S. Pat. Nos. 4,297,220, issued Oct. 27, 1981 and 4,224,415, issued Sep. 23, 1980 both to Meitzner, et al. describe water insoluble, macroreticulated polymeric resins. These patents generally describe polymeric resins useful for the process of the present invention.

The polymeric resins described in U.S. Pat. Nos. 3,531,463, 4,297,220, and 4,224,415 are suspension polymerized copolymers of a monoethylenically unsaturated monomer and a cross-linking polyvinylidene monomer. Suitable monoethylenically unsaturated monomers are alkyl acrylates and alkyl acrylate esters, cyclo-alkyl acrylates, substituted phenyl acrylates and benzyl acrylate.

Preferably the polymeric resin is made of lower alkyl esters of acrylic acid in which the alkyl group contains from one to five carbon atoms.

Copolymers of the above monomers with monovinylene compounds such as dialkyl maleates, dialkyl fuma-

8

rates, dialkyl crotonates, dialkyl itaconates, and dialkyl glutaconates, are also possible.

Suitable polyvinylidene compounds include unsubstituted and substituted divinylbenzenes and divinylpyridines. Particularly preferred polyvinylidene monomers, commonly known as "cross-linkers", include polyvinylaromatic hydrocarbons, such as divinylbenzene and trivinylbenzene. Glycol dimethacrylates, such as ethylene glycol dimethacrylate, and polyvinyl ethers of polyhydric alcohols, such as divinyloxyethane and trivinyloxypropane are also useful cross-linkers.

If a monovinylacromatic hydrocarbon, such as the monovinylidene monomer, and a divinylaromatic hydrocarbon, such as a divinylbenzene, are used, a cross-linked polystyrene is formed by copolymerization in the presence of a precipitant.

The polymeric resins may be modified by attaching charged or polar groups to the polymer. The type of charged or polar group is selected to provide variable polymeric properties.

The polymeric adsorbents are typically hard, insoluble beads which have high porosity and high surface area. A bead will have a nominal mesh size of about 20–60 and the polymeric surface may be chemically modified to provide beads having varying polarities and surface characteristics. The polymeric resins may be available in other formats, such as gels.

Commercially available nonionic polymeric resins are useful to practice this invention. Resins sold by Rohm and Haas under the trade names XAD-2, XAD-4, XAD-7, XAD-8 and XAD-16 are all suitable polymeric resins which provide selective removal of undesired components from liquid smoke solution. The XAD-4 polymeric resin is a preferred polymeric resin.

## CONCENTRATION OF TREATED LIQUID SMOKE

After dilution or after contacting the polymeric resin, if needed or desired, the diluted or resin treated liquid smoke solution is concentrated until the browning index reaches a desired value, preferably until the browning index value is greater than 30. The browning index of a liquid smoke solution may be lowered by exposure to elevated temperatures for extended time periods, therefore, the diluted or resin treated liquid smoke is concentrated at reduced pressures in order to perform the concentration at reduced temperatures. Preferably, the concentration temperature is below 100° C. and most preferably below about 50° C. A preferred concentration of the liquid smoke composition occurs when using a reduced pressure of about 29 inches of mercury and a temperature of about 50° C.

After concentration, a preferred liquid smoke compositions has a transmittance value greater than about 50% at 590 nm. The transmittance value is determined from a sample diluted 1:10 with water.

## APPLICATION TO FOODS CASINGS

Food casings that are suitable for use in the present invention are tubular casings, and preferably tubular cellulosic casings, that are prepared by any one of the methods well known in the art. Such casings are generally flexible, thin-walled seamless casings formed of regenerated cellulose or cellulose ethers, such as hydroxyethyl cellulose, in a variety of diameters. Also suitable are tubular cellulosic casings having a fibrous reinforcing web embedded in the wall of the casings, commonly called fibrous food casings. Cellulosic cas-

**9**

ings without the fibrous reinforcement are commonly called non-fibrous cellulosic casings.

The high browning liquid smoke may be applied to the outer surface of the food casing by passing the casing through a bath of the liquid smoke composition. The liquid smoke is generally allowed to soak into the casing before doctoring off any excess liquid smoke by passing the casing through squeeze rolls or wipers for an amount of time sufficient for the casing to incorporate the desired amount of smoke coloring and flavoring into the casing. The high browning liquid smoke composition may also be externally applied to the casing by methods other than dipping, such as spraying, brushing, or roll-coating.

One method of treating the casing with the liquid smoke of this invention involves passing a flattened, tubular, cellulose sausage casing over guide rolls through a dip tank which contains the liquid smoke composition. The casing passes over additional guide rolls after exiting the dip tank, and then passes between squeeze rolls which minimize any excess carryover of the liquid smoke composition. The total contact time of the casing with the liquid smoke composition in the dip tank, and with excess liquid smoke composition on the casing passing over the guide rolls before the casing passes through the squeeze rolls, typically determines the amount of smoke coloring and flavoring of the liquid smoke composition that the casing will incorporate. The casing is then sent on to conventional further processing, including conventional humidification, as may be required, and conventional shirring.

Alternatively, the high browning liquid smoke composition may be applied to the internal surface of the casing by any of several well-known procedures. These include slugging or bubble coating, spraying, and coating while shirring. The slugging method for coating the inside of a casing involves filling a portion of the casing with the coating material, so that the slug of coating material generally resides at the bottom of a "U" shape formed by the casing being draped over two parallel rollers, and then moving the continuous indefinite length of casing so that the slug of coating material remains confined within the casing, while the casing moves past the slug and is coated on its inside wall by the coating material contained within the slug.

It may be shirred by conventional methods or, prior to shirring, it may dried or humidified before shirring to a water content suitable for shirring or further processing. The need for conventional drying or humidification after the external liquid smoke treatment depends on the water content of the casing after treatment and the type of casing. If the casing is a non-fibrous casing, a water content within the range of from about 8-18 wt. % water immediately before shirring is typical, and for fibrous casing a water content within the range of from about 11-35 wt. % water immediately before shirring is typical, where percent is based on the total weight of casing including water.

It is to be noted that the liquid smoke which is coated on the casing surface, whether externally coated or internally coated, does not exist solely as a surface coating. Color and flavor components of the liquid smoke composition which are coated on the surface penetrate the cellulosic structure of the casing as the cellulose absorbs the moisture of the smoke solution.

**10**

The following examples are provided to further illustrate specific aspects and practices of this invention. These examples describe particular embodiments of the invention, but are not to be construed as limitations of the appended claims.

### EXAMPLE 1

#### Fast Pyrolysis of Ground Wood

Example 1 shows a fast pyrolysis of a wood feedstock.

### FLUIDIZED BED OPERATION

#### Operating Parameters

Poplar wood was ground to about 595 microns (30 mesh)

Wood moisture content was about 6% (wet basis)

Wood was fed at a rate of 1–2.5 kg/h

Reaction temperatures in the bed were in the range of 400°–650° C.

Vapor residence times were typically in the range of 500–700 milliseconds

The fluidized bed consisted of Ottawa silica sand with a mean particle size of about 720 microns

Recycled product gas (primarily CO, $CO_2$ and $CH_4$) was used to fluized the sand and to transport the wood feedstock into the reactor.

#### Equipment and Operating Procedure

Poplar wood, other wood species, straw, peat, or the like, is air dried, milled, and screened to about 595 micron particle size.

The prepared feedstock is conveyed from a hopper into a variable speed twin-screw feeder and discharged into a flow of recycled product gas. It is then conveyed into the fluidized bed reactor directly into the fluidized bed region.

The reactor bed contains highly spherical Ottawa silica sand with a mean particle size of about 720 um.

The fluidizing gas, primarily CO, $CO_2$ and $CH_4$ is preheated in the inlet line by electrical heaters and enters the bed through a porous stainless steel plate at a rate which is equivalent to 1.2–2 times the minimum fluidization velocity.

The reactor is wrapped with heating coils for supplemental heating.

Pyrolysis products and the recycle gases are swept from the top of the reactor into a cyclone where the dry char is removed from the gas/vapor phase. The gases and vapors are then directed to two condensers and finally to a series of filters.

The first condenser is normally maintained at 20° C. and the second condenser is maintained at about 0° C.

The filter train consists of an in-line 5 microns mesh screen followed by a filter vessel packed with glass wool.

The preferred operating temperature of the fluidized bed is between about 400°–600° C. with a relatively short residence time of about 0.030–0.06 second. However, good yields are achieved at higher temperatures and over a variety of residence times. The shorter the residence time, the higher the yields of the preferred liquid product.

A sample of the above liquid pyrolysate was diluted with water and the water soluble fraction was separated and analyzed. The results of the analysis are shown in Table 2.

5,135,770

11                                                                          12

## TABLE 2
### DILUTION OF FAST PYROLYSIS LIQUIDS

| Weight % Fast Pyrolysis Liquids in Total Solution | Acids % w/w | Phenols % w/w | Carbonyls % w/w | Browning Index Units | Specific Gravity @ 23° C. | Benzo(a) Pyrene ppb |
|---|---|---|---|---|---|---|
| 100 | 10.5 | 5.50 | 32.5 | 49.0 | 1.245 | 19.0 |
| 85 | 9.1 | 3.75 | 29.2 | 46.8 | 1.201 | 14.0 |
| 80 | 8.7 | 3.31 | 26.6 | 45.6 | 1.182 | 3.6 |
| 70 | 7.9 | 2.42 | 21.4 | 35.8 | 1.148 | 0.5 |
| 65 | 7.5 | 2.10 | 20.2 | 33.8 | 1.120 | 0.5 |
| 60 | 6.5 | 1.65 | 17.5 | 31.5 | 1.112 | 0.5 |
| 40 | 4.1 | 0.820 | 10.3 | 18.2 | 1.065 | 0.5 |
| 20 | 2.8 | 0.430 | 5.4 | 12.2 | 1.028 | 0.5 |
| 10 | 1.3 | 0.230 | 4.9 | 5.6 | 1.011 | 0.5 |

## EXAMPLE 2

Example 2 shows that no decrease in browning index results from treatment with nonionic polymeric resins over the entire range of phenol reduction which is possible. Also shown is the maximum amount of liquid smoke solution which can be processed with a given amount of a particular resin.

A 10.5″ diameter column was packed to 45″ height with Rohm and Haas XAD-4 polymeric resin. CharSol C-10 was passed down flow through the column at about 1400 ml/min. Samples were taken periodically and analyzed for phenols, carbonyls, browning index, and brix. Results are as follows:

## TABLE 3
### RESIN TREATMENT OF FAST PYROLYSIS LIQUIDS

| | Phenols mg/ml | Carbonyls % wt/vol | Browning Index | Brix |
|---|---|---|---|---|
| CharSol C-10 Feed | 17.0 | 12.4 | 9.9 | 25.9 |
| 10 gal. | 1.3 | 11.3 | 9.6 | 19.2 |
| 20 gal. | 2.4 | 11.1 | 10.1 | 21.0 |
| 30 gal. | 4.8 | 11.5 | 10.6 | 22.6 |
| 40 gal. | 6.3 | 11.5 | 10.4 | 23.2 |
| 50 gal. | 7.9 | 12.2 | 10.3 | 23.4 |
| 65 gal. | 12.5 | 11.8 | 9.5 | 24.4 |
| 75 gal. | 14.3 | NA | NA | 24.6 |
| 85 gal. | 15.3 | 11.3 | 9.5 | 24.6 |
| 95 gal. | 17.0 | NA | NA | 25.4 |
| 105 gal. | 16.8 | 12.6 | 9.3 | 26.0 |

NA = not analyzed

The results show that at about 95 gallons the polymeric resin is at maximum through-put capacity for the described column and that down to 1.3 mg/ml phenols no significant decrease in browning index is observed.

Alternatively, batch treatment of liquid smoke solutions with nonionic polymeric resins may be used. For example, 100 samples of CharSol C-10 were added to 10, 20, 30, and 40 gram portions of Rohm and Haas XAD-4. The samples were mixed on a magnetic stirrer for one hour and the desired liquids are separated from the polymeric resin by filtration.

## EXAMPLE 3

Example 3 shows a method of making fast pyrolysis liquids with sufficiently high browning index content to be of use as starting material for the present invention.

A circulating fluid bed reactor was operated at 525° C. with nitrogen as a carrier gas under appropriate conditions to provide a 1.3 second residence time for the vapors produced from the rapid pyrolysis of maple sawdust. The feed rate was about 30 pounds per hour of 5% moisture maple sawdust. The total liquid yield was about 70%.

The raw liquid smoke was then analyzed for water content prior to preparing a diluted liquid smoke. The water content was about 5% by weight. Subsequently, a water solution procedure was performed and the amounts of water soluble components were determined. Results reported below are the water soluble components as a weight to weight percent of the raw liquid smoke:

8.0% Organic acids
1.9% Phenols
22.7% Carbonyls

## EXAMPLE 4

This example shows the range of dilutions of raw liquid smoke which are useful in producing diluted liquid smoke. The diluted liquid smoke made in the manner described in this example provides intermediates in the production of the product of the present invention.

To fifty gram samples of the raw liquid smoke of Example 3 were added aliquots of water in amounts listed below. Addition of water with mixing was followed by settling of the undesired insoluble phase. The desired aqueous phase was decanted, filtered, and analyzed.

The results are as follows:

## TABLE 4
### DILUTIONS OF RAW LIQUIDS

| Water Add. g | Tit. Acid. (w/v %) | % T | Brix | Browning Index | Brix/ Browning Index |
|---|---|---|---|---|---|
| 20 | 7.2 | 0 | 34.0 | 19.5 | 1.74 |
| 40 | 5.1 | 2 | 25.0 | 14.6 | 1.71 |
| 50 | 4.6 | 15 | 21.9 | 11.2 | 1.96 |
| 100 | 2.9 | 77 | 14.0 | 7.5 | 1.87 |
| 150 | 2.1 | 85 | 10.8 | 6.0 | 1.80 |
| 200 | 1.8 | 89 | 9.9 | 5.7 | 1.74 |

The diluted fast pyrolysis liquids produced had a brix range of between 9.9–34.0. The average brix/browning index ratio for these samples was 1.8/1.0. This ratio is substantially below the typical 2.5/1.0 ratio for slow pyrolysis liquids.

## EXAMPLE 5

This example shows the method used to produce a resin treated liquid smoke which has greater than 50% transmittance when a 1:10 water dilution is measured spectrophotometrically at 590 nm.

The raw liquid smoke (6800 g) produced as in Example 3 was mixed with water (6000 g). After mixing, settling, and filtering as in Example 4, about 9.1 liters of 23.8 brix diluted liquid smoke were produced. The

5,135,770

**13**

transmittance was measured at a dilution of 1:10 at 590 nm and was about 6%.

An 8 cm diameter × 50 cm high column of Rohm and Haas XAD-4 polymeric resin was used to treat the diluted liquid smoke to produce a diluted liquid smoke having greater than 50% transmittance as defined above. The diluted liquid smoke was passed through a water filled polymeric resin column (XAD-4) at a flow rate of 250 ml/min. Desired product was collected beginning at about 10 brix. After the last portion of diluted liquid smoke was added to the column and no liquid head remained, water was added to maximize recovery and desired polymeric resin treated diluted liquid was collected down to about 10 brix. A total of 6.6 liters of 20 brix solution having about 91% transmittance was collected.

### EXAMPLE 6

This example shows using a high vacuum evaporative concentration to produce a high browning liquid smoke composition.

A one liter sample of the polymeric resin treated liquid smoke of Example 5 was placed on a rotary evaporator and a water aspirator was used to pull a 29 inches of mercury vacuum. The flask was placed in a 50° C. water bath and rotated until the brix of the sample was determined to be about 45.1. The concentration time was approximately two hours. The resulting high browning liquid smoke composition had the following analyses:

45.1 Brix
8.9 w/w % Acids
21.3 mg/ml Phenols
32.5 w/v % Carbonyls
52% Transmittance
38 Browning Index
5.7 cp. Viscosity

### EXAMPLE 7

This example shows the relationship between brix and other parameters for a high browning liquid smoke composition.

The polymeric resin treated diluted liquid smoke of Example 5 was concentrated under reduced pressure to various brix values and the resulting samples were analyzed for % transmittance, specific gravity, viscosity and browning index. The following results were obtained:

#### TABLE 5

| CONCENTRATION OF DILUTED LIQUIDS | | | | | |
|---|---|---|---|---|---|
| Brix | % T | Specific Gravity | Viscosity (cp) | Browning Index | Browning Index/Brix |
| 40.2 | 62 | 1.127 | 4.2 | 41 | 1.02 |
| 49.3 | 50 | 1.164 | 7.6 | 48 | .97 |
| 58.0 | 40 | 1.198 | 16.3 | 51 | .86 |
| 67.4 | 32 | 1.240 | 61.1 | 60 | .89 |
| 73.6 | 25 | 1.279 | 267.1 | 76 | 1.03 |

The maximum browning index for a liquid smoke solution may be obtained by optimizing the pyrolysis conditions. The longer vapor residence time in Example 3 of about 1.3 seconds produced an average browning index to acids radio of about 2.8:1. This ratio is considerably smaller than the browning index to acids ratio obtained using the shorter vapor residence time specified in Example 1. In Example 1, the diluted samples having a benzo(a) pyrene content less than 0.5 ppb had an average browning index to acids ratio of about 4.5:1.

**14**

The yield of acids from a given wood feedstock is relatively constant. Thus, use of raw liquid smoke having a 4.5:1 browning index to acids ratio may produce a final liquid smoke solution having a higher browning index at a given brix value than the liquid smoke solutions of Examples 3 to 7.

Resin treatment of a raw liquid smoke solution having a browning index to acids ratio of 4.5:1 and a browning index of about 21 may be concentrated according to the procedures described in Example 6 to yield a final product having a browning index of about 62 and a brix of about 45.

### EXAMPLE 8

Cellulose in the form of Avicel (TM) pH101 was pyrolyzed in an entrained flow reactor as described in U.S. Pat. No. 4,876,108 and Example 1 above. A reactor temperature of 500° C. was maintained. The vapor residence time was 600 msec. A total liquid yield of 86% was realized, with the remainder being char and non-condensable gases.

A water soluble extract was prepared by adding water (125 ml) to the raw condensate (50 g). The preparation was heated to 175° F. and stirred on a magnetic stirrer for 10 minutes. After centrifugation, the water soluble extraction (171.1 g) was decanted. The extract was filtered through Gelman (TM) type A-E glass fiber filters. The latter will retain 95% of 1 micron particles. After filtration, the transmittance was 78%. The solution was concentrated by evaporation under vacuum at 50° C. to yield a solution with the following properties:

Brix 42
% Transmittance 52
Browning Index 35
Carbonyls (% w/v) 21.3
Acids (% w/v) 1.9
Phenols (mg/ml) 3.9

The results show the preparation of a high browning liquid smoke solution which has greater than 50% transmittance. The solution was be prepared from liquids condensed from the fast pyrolysis of cellulose without the need for solvent extraction or resin treatment.

The analyses on the water soluble extract are:

Acids (% w/v) 1.0
Phenols (mg/ml) 2.8
Carbonyls (% w/v) 9.8
Browning Index 16.3
Brix 23.0

### EXAMPLE 9

The external surfaces of 21 mm. diameter cellulose frankfurter casings are treated with the high browning liquid smoke composition prepared in the manner of Example 8 by applying the liquid smoke composition to the external surfaces of the casings and allowing the heated casings to dry at about 80° C. The casings are conventionally moisturized to about 14-18 wt. % water and are shirred. The casings are stuffed with either an emulsion of the beef meats formulation of Table 6 or the high collagen meat formulation of Table 7.

#### TABLE 6

| BEEF FORMULATION | |
|---|---|
| Ingredients | Weight (g) |
| Beef Chuck | 22.68 |
| Beef Plate | 22.68 |
| Salt | 1.13 |
| Water | 13.61 |

15

## TABLE 6-continued

### BEEF FORMULATION

| Ingredients | Weight (g) |
|---|---|
| Seasoning | 0.45 |
| Sodium Nitrite | 0.11 |

## TABLE 7

### HIGH COLLAGEN FORMULATION

| Ingredients | Weight (g) |
|---|---|
| Beef Chuck | 9.98 |
| Beef Tripe | 7.26 |
| Beef Shank | 7.26 |
| Beef Cheek | 7.26 |
| Regular Pork | 13.61 |
| Water | 9.98 |
| Salt | 1.13 |
| Seasoning | 0.45 |
| Sodium Nitrite | 0.11 |

The stuffed casings are processed under normal conditions of temperature and humidity as commercially practiced, but without the conventional step of smoke treatment. The meat product is cooked to an internal temperature of 68° C., cold water showered at 8° C. for 10 minutes and showered for 10 minutes with chilled water of 1.6° C. Processing conditions are sufficient to cause the transfer of smoke color and flavor from the casing to the frankfurters.

### EXAMPLE 10

#### Application to Wieners

About 2.5 lb. strands of skinless wieners obtained from Cher-Make Sausage Co. (Manitowoc, Wis.) are dipped for 60 seconds in the high browning liquid smoke composition of Example 7.

The wieners were cooked to an internal temperature of 70° C. according to the following schedule: 43.3° C. for 10 minutes; 60.0° C. for 45 minutes; 71.1° C. for 25 minutes; and 82.2° C. until the internal temperature is 70° C.

After cooking, the wieners are placed in a 4.4° C. cooler overnight for subsequent evaluation and testing.

The following day, the wieners are peeled and found to have an appealing brown color and a desirable smoked appearance.

### ANALYTICAL PROCEDURES

The techniques used to analyze liquid smoke compositions are well known to those of ordinary skill in the art. The acids in liquid smoke are measured as titratable acidity calculated as acetic acid. The procedure for determining phenols is a modified Gibbs method which measured phenols as 2,6-dimethoxyphenol and is described in Tucker, I. W. "Estimation of Phenols in Meat and Fat", *Journal of the Association of Official Analytical Chemists, XXV,* 779 (1942). The procedure for determining carbonyls is a modified Lappan-Clark method which measures carbonyls as 2-butanone and is described in "Colorimetric Method for Determination of Traces of Carbonyl Compounds", *Analytical Chemistry,* 23, 541–542 (1959). Both procedures for determining carbonyls and phenols are fully described in U.S. Pat. No. 4,431,032, the disclosure of which is herein incorporated by reference.

16

The procedures used to determine the browning index of a sample are described in U.S. Pat. No. 4,876,108 the relevant portions describing analytical techniques and procedures which are herein incorporated by reference. Briefly, the browning index is a relative measure of the ability of carbonyls to react with the amino acid, glycine. Tests have shown good correlation between the browning index values of a solution of smoke flavoring and the extent of brown color formation on meat surfaces.

What is claimed is:

1. A high browning liquid composition comprising a liquid solution having a ratio of browning index to percentage of carbonyls in the liquid solution of greater than 0.8.

2. A high browning liquid composition of claim 1 wherein the ratio of browning index to percentage of carbonyls in the liquid solution of greater than 1.0.

3. A high browning liquid composition of claim 1 wherein the ratio of browning index to percentage of carbonyls in the liquid solution is greater than 1.5.

4. A high browning liquid composition of claim 1 wherein the ratio of browning index to percentage of carbonyls in the liquid solution is between 0.8–1.6.

5. A method for making a high browning liquid composition comprising the steps of:
   a) collecting the condensable liquids produced by the fast pyrolysis of wood or cellulose to give a raw liquid;
   b) diluting the raw liquid with water to give a diluted liquid;
   c) contacting the diluted liquid with a nonionic polymeric resin to give a high browning liquid composition having a browning index to percentage of carbonyls in the liquid composition of between 0.8–1.6.

6. A method according to claim 5 wherein the liquid composition has a browning index to percentage of carbonyls in the treated liquid ratio between 1.0–1.6.

7. A method according to claim 5 wherein the liquid composition has a ratio of browning index to percentage of carbonyls in the liquid between 1.5–1.6.

8. A process for flavoring and coloring a food product comprising the steps of:
   a) collecting the condensable liquids produced by the fast pyrolysis of wood or cellulose to give a raw liquid;
   b) diluting the raw liquid with water to give a diluted liquid);
   c) contacting the diluted liquid with a nonionic polymeric resin to give a treated liquid having a ratio of browning index to percentage of carbonyls in the treated liquid of about 0.8–1.6;
   d) concentrating the treated liquid give a high browning liquid composition; and
   e) contacting the food product with the high browning liquid composition.

9. A process of claim 8 wherein the food product is a casing.

10. A process of claim 8 wherein the casing is a cellulose casing.

11. A process of claim 8 wherein the food product is an edible foodstuff selected from the group consisting of meat, poultry, and fish.

\* \* \* \* \*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI et al.,<br>v.<br>MOMMY GINA TUNA<br>RESOURCES, et al. | CIVIL NO. 05-00679 BMK<br>CIVIL NO. 06-00182 BMK<br>CIVIL NO. 05-00787 BMK<br>CIVIL NO. 05-00517 BMK |

WILLIAM R. KOWALSKI, et al.,
v.
INTEGRAL SEAFOOD LLC et al.

WILLIAM R. KOWALSKI, et al.,
v.
RICHARD FRIEND et al.

TUNA PROCESSORS, INC.,
     Plaintiff,
    v.
HAWAII INTERNATIONAL
SEAFOOD, INC.
    Defendant/Counterclaim
    Plaintiff,

and WILLIAM R. KOWALSKI
    Additional Counterclaim
    Plaintiff.

CERTIFICATE OF SERVICE

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing

document was duly served by Electronically through CM/ECF on the following:

| | |
|---|---|
| Paul Alston | palston@ahfi.com |
| Louise K. Y. Ing | ling@ahfi.com |

Allison Kirk                    akirk@ahfi.com

Carl D. Crowell                 carl@kite.com, carl_crowell@yahoo.com

Michelle L. H. Ing              ming@kite.com

DATED:  Honolulu, Hawaii, October 30, 2007.

CADES SCHUTTE LLP


/s/ Milton M. Yasunaga
MILTON M. YASUNAGA
ALLISON MIZUO LEE
Attorneys for
WILLIAM R. KOWALSKI and HAWAII
INTERNATIONAL SEAFOOD, INC.