110207Kowalski.txt

1

```
 1   *CONFIDENTIAL- ROUGH DRAFT - NOT OFFICIAL USE*
 2           THE VIDEOGRAPHER:  This is the deposition of
 3   William Kowalski in the matter of William Kowalski and
 4   Hawaii International Seafood versus Ocean Duke
 5   Corporation.  We are located at Alston, Hunt, Floyd, and
 6   Ing, 1001 Bishop Street, Suite 1800, Honolulu, Hawaii
 7   96813.  My name is Ray Hollowell, video specialist for
 8   Certified Legal Video Services.  Will counsel please
 9   state your names.
10           MR. MARKS:  Paul Marks with Neufeld Law Group
11   on behalf of Defendant, Ocean Duke Corporation.  And
12   also present is Roger Lin of Ocean Duke Corporation.
13           MR. YASUNAGA:  Milton Yasunaga, attorney for
14   Plaintiffs, William Kowalski and Hawaii International
15   Seafood, Inc.
16           THE VIDEOGRAPHER:  We're on the record at 9:40
17   a.m.  Will the Court Reporter please swear in the
18   deponent.
19                   WILLIAM KOWALSKI
20   called as a witness at the instance of the Defendant
21   being first duly sworn to tell the truth, the whole
22   truth, and nothing but the truth testified as follows:
23                   CONTINUED EXAMINATION
24   BY MR. MARKS:
25       Q.  Good morning, again, Mr. Kowalski.
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090

2

EXHIBIT A

110207Kowalski.txt
20   A.   Repeat it again, please.
21   Q.   Okay. Well, rather than going through that,
22 why don't we -- let me just ask some follow-up questions
23 about that subject matter.
24   A.   Okay.
25   Q.   As I understand it, the agreement that we've

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090

38

1 just been talking about, whether we described it
2 accurately or not, is a written agreement; is that
3 right?
4   A.   Yes.
5   Q.   Do you know, or Mr. Yasunaga can help us out
6 here, whether that agreement was turned over in the
7 document -- the large document production, it was turned
8 over to the Defendants in this -- these lawsuits?
9   A.   I believe it was.
10   Q.   Okay. And was there just one written agreement
11 or were there amendments to it?
12   A.   There's one agreement and then there was a
13 cancellation of the agreement.
14   Q.   And other than that one written agreement, am I
15 correct there are no other written agreements between
16 you and your company that relate to royalties for the
17 401 patent?
18   A.   None that I can think of.
19   Q.   Okay. Same question, but that relates to
20 licensing of the patent. In other words, no written
21 agreements between you and your company related to the
Page 36

110207Kowalski.txt

22  licensing of the patent?
23     A.  Not that I can think of.
24     Q.  Okay. Same question, but relating to the right
25  to assert claims under the patent. In other words, are

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090

39

1   there any written agreements between you, the patent
2   owner, and Hawaii International Seafood that relate to
3   either your right or Hawaii International Seafood's
4   right to make claims for infringement of the patent?
5      A.  I can't think of any.
6      Q.  Okay. Do you know, as you sit here today, and
7   if you don't know, then you don't know, do you know the
8   basis upon which Hawaii International Seafood, which is
9   not an owner of the patent, is making a claim in this
10  lawsuit for patent infringement?
11     A.  Yes, I believe I do. Yes.
12     Q.  Okay. And what is your understanding or what
13  is your belief based on?
14     A.  Well, I own the patent and I own the company,
15  so if -- if it weren't for their infringement then, you
16  know, I would personally benefit from additional
17  business HIS would do, which I own.
18     Q.  Okay. Is there any agreement between you and
19  Hawaii International Seafood that is not in writing that
20  relates to the ability of Hawaii International Seafood
21  to bring claims for patent infringement under the 401
22  patent?

Page 37

110207Kowalski.txt

```
23      A.   I'm not sure I understand the question.
24           MR. MARKS:  Could you read that one back.
25           (Reporter read back)
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090

40

```
 1           THE WITNESS:  I still don't understand the
 2   question, relates to the ability.
 3   BY MR. YASUNAGA:
 4      Q.   Yeah.  I mean, let me -- you understand that
 5   agreements can be written.  They also can be oral,
 6   right?
 7      A.   Yes.
 8      Q.   And so I asked you if there was an agreement
 9   between you and your company that was in writing that
10   related to, in any way, the company's ability to bring
11   a -- a claim for patent infringement or patent
12   infringement lawsuit and you say you were not aware of
13   any; is that right?
14      A.   Right.
15      Q.   And I'm just asking the same, but I'm not
16   limiting it to written agreements.  I'm now talking
17   about oral agreements.
18      A.   Yeah.  I'm still confused about the word
19   ability.  Whether or not I would -- an agreement
20   whether or not I would be able to?
21      Q.   Yeah.  Is there an agreement between you and
22   the company that would allow the company to file a
23   patent infringement lawsuit, that's just my question?
24      A.   Yes, there is.
```

Page 38

110207Kowalski.txt

25    Q.    What is that agreement?

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090

41

1    A.    Just as you said, an agreement that Hawaii
2  International can file a suit.
3    Q.    And was that agreement made at any particular
4  time?
5        MR. YASUNAGA:  Actually, I'd like to lodge an
6  objection to the -- this whole line of questions as
7  vague, confusing, and ambiguous, and calling for legal
8  conclusions.
9  BY MR. MARKS:
10   Q.    So when was that -- sorry.
11   A.    Well, when we filed the suit. When HIS filed
12  the suit. It had to have my agreement in order to do
13  that.
14   Q.    Okay. What --
15   A.    Or it had my agreement in order to do that.
16   Q.    What was the -- what were the terms of the
17  agreement?
18       MR. YASUNAGA:  Objection. Vague, confusing,
19  and ambiguous. Calls for legal conclusions.
20       THE WITNESS:  I still don't understand the
21  question, what were the terms of the agreement?
22  BY MR. MARKS:
23   Q.    Well, yeah. You said that there was an
24  agreement between you and the company that would allow
25  the company to bring the lawsuit. Was that the extent

Page 39

110207Kowalski.txt

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii   (808) 524-2090

42

```
 1   of the agreement or was there more to the agreement?
 2       A.   I think that's the essence of the agreement.
 3       Q.   Okay.  And am I correct that there's nothing in
 4   writing that is from that time frame when the agreement
 5   was made that confirms or refers to the agreement?
 6       A.   Yes.
 7       Q.   I'm correct?
 8       A.   I believe you're correct.
 9       Q.   Okay.  Does your company have meetings of the
10   board of directors?  Or is there even a board of
11   directors?
12       A.   No, there's not.
13       Q.   And that's not required because it's a closed
14   company?
15       A.   Right.
16       Q.   Okay.  So you don't have meeting minutes or
17   anything like that?
18       A.   We do minutes once a year --
19       Q.   Okay.
20       A.   -- between the officers.
21       Q.   Okay.  All right.  Does your company own any
22   trademarks?
23       A.   Can't think of any trademarks the company owns.
24       Q.   Do you personally own any?
25       A.   I own the trademark cryofresh.
```