IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI and HAWAII INTERNATIONAL SEAFOOD, INC., | CIVIL NO. 04-00055 BMK |
| Plaintiffs, | MEMORANDUM IN SUPPORT OF MOTION |
| v. | |
| OCEAN DUKE CORPORATION, | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................ 1

II.   RELEVANT FACTUAL BACKGROUND ..................................... 1

  A.   Kowalski Devises A Solution For Retaining Color In Frozen
       Fish And Obtains A Patent For His Novel Tasteless Smoke
       Invention.......................................................................... 1

  B.   Plaintiffs Obtain Government Approval For The Tasteless
       Smoke Process And Competitors Use, Or Claim To Use,
       Kowalski's Tasteless Smoke Process To Avoid Regulation. .............. 3

  C.   Plaintiffs Enforce The Patent Against Those Claiming To Use
       Kowalski's Patented Process................................................ 5

  D.   Plaintiffs File This Lawsuit To Enforce The Patent; Ocean
       Duke Claims To Know, But Gives Varying And Conflicting
       Accounts Of The Process Used To Treat Its Imported Product .......... 7

    1.   Ocean Duke claims to have personal knowledge of the
         processing method used to treat its imported products,
         but discovery obtained by Plaintiffs reveals otherwise ............. 7

    2.   Documents produced by Ocean Duke and the testimony
         of its own witnesses and experts contradict Roger Lin's
         recitation of the process used to treat the products
         imported by Ocean Duke ........................................ 10

III.  ARGUMENT................................................................. 16

  A.   Presumption of Infringement Under 35 U.S.C. § 295 ...................... 16

  B.   A Substantial Likelihood Exists That The Product Ocean Duke
       Imports From Citra Perkasa Is Treated With A Process That
       Infringes Kowalski's Patent ............................................. 20

  C.   Plaintiffs Made A Reasonable Effort To Determine The Process
       Actually Used By Citra Perkasa But Were Unable To Do So ........... 26

IV.   CONCLUSION ............................................................. 28

# TABLE OF AUTHORITIES

## CASES

Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.,
     369 F. Supp. 2d 1075 (S.D. Iowa 2005) .......................................................... 19

Pfizer Inc. v. F & S. Alloys & Minerals Corp.,
     856 F. Supp. 808 (S.D.N.Y. 1994) ............................ 17, 19, 20, 21, 26, 27, 28

## STATUTES

35 U.S.C. § 271(g) ..................................................................................................... 16

35 U.S.C. § 295 ........................................................................... 1, 2, 17, 18, 19, 28

S. Rep. No. 83, 100th Cong., 1st Sess. 1987 ........................................................... 17

## I.    INTRODUCTION

Plaintiffs WILLIAM R. KOWALSKI ("*Kowalski*") and HAWAII INTERNATIONAL SEAFOOD, INC. ("*HISI*") (collectively "*Plaintiffs*") move the Court, *in limine*, for an Order applying the presumption of infringement under 35 U.S.C. § 295 such that the products imported by Defendant OCEAN DUKE CORPORATION ("*Ocean Duke*") from PT Inti Samudera Citra Perkasa ("*Citra Perkasa*") shall be presumed to have been made with Kowalski's patented process, and Ocean Duke shall have the burden at trial to establish that its imported product was not made by Kowalski's patented process (the "*Motion*").

The Motion should be granted because, as discussed in further detail below:

(1)    there is a substantial likelihood that the products imported by Ocean Duke are made by a process that is covered by Kowalski's Patent, and

(2)    Plaintiffs have made a reasonable effort to determine through discovery the precise method used to treat the products imported by Ocean Duke, but the actual process remains unknown.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Kowalski Devises A Solution For Retaining Color In Frozen Fish And Obtains A Patent For His Novel Tasteless Smoke Invention.

Most fishing resources are located far from consumers in the U.S., so before fish reaches a consumer, many days often pass, during which time contamination and decomposition can occur. See Ex. "1" (U.S. Patent 5,972,401 ["Kowalski

Patent"], at Column ["Col."] 2 (column numbers are at top of each column), Lines ["Ln."] 14-24). Air transport helps, but is much more expensive than surface shipping. Spoilage and the high cost of air transport can be avoided by freezing fish. However, when frozen and thawed, fish and other meats turn an ugly brown, lowering the value tremendously. See Ex. "1," Col. 1, Ln. 22-27, Col. 2, Ln. 35-42, 48-53.

Kowalski, president and owner of HISI, worked on a solution to this problem. He knew that smoking food was a common method of food preservation, long-accepted by government and consumers. Traditional smoking, however, gives the food a smoke taste not preferred by most people for most types of sashimi, sushi, and even cooked fish. Kowalski's novel invention was the process of using smoke that contained smoke taste imparting components at a sufficiently low level that the smoke would preserve food without giving the food a smoke taste. See Ex. "1."

Kowalski applied for his patent in early 1997 and was awarded U.S. Patent No. 5,972,401 (the *Kowalski Patent*") on October 26, 1999. See Ex. "1." The process subject to the Kowalski Patent is referred to herein and in the industry as the "tasteless smoke process." See Ex. "3" (USDC Ltr.) at 2-3 (remarking that "tasteless smoke" was "first coined by Hawaii International as part of their accepted method").

**B.**    **Plaintiffs Obtain Government Approval For The Tasteless Smoke Process And Competitors Use, Or Claim To Use, Kowalski's Tasteless Smoke Process To Avoid Regulation.**

In or about 1997, the United States Food and Drug Administration ("***FDA***") was concerned about the application of carbon monoxide ("***CO***") to frozen tuna products. <u>See</u> Ex. "2" (FDA Ltr.) at 1, Ex. "3" (USDC Ltr.) at 1 ("During the past few years, there has been an apparent increase in the practice of applying CO to tuna products such as steaks or sashimi cuts to enhance the color of the product"). CO was not approved for use in or on food. <u>See</u> Ex. "2" (FDA Ltr.) at 1. With respect to tuna, the FDA took the position that the use of CO results in economic adulteration under section 402(b)(4) of the Federal Food, Drug and Cosmetic Act (the "***Act***") because it makes the tuna "appear better or of greater value than it is." <u>Id.</u> The U.S. Department of Commerce's ("USDC") National Oceanic and Atmospheric Administration ("***NOAA***") observed that "considerable amounts of frozen tuna, usually in the form of steaks, are being imported from sources that utilize CO to enhance and fix the color of the flesh." Ex. "3" (USDC Ltr.) at 2. In response, NOAA employed a policy "not to lot inspect, apply marks, or certify product" treated with CO. <u>See id.</u> at 1.

Through their considerable efforts, however, Kowalski and HISI were able to establish to the satisfaction of the relevant government agencies that food treated with the tasteless smoke process did not violate the Act. <u>See</u> Exs. "2," (FDA Ltr.)

"4," (NFInsider) and "3" (USDC Ltr.). Among other things, Plaintiffs underwent verification inspections of their overseas plants that were using the "tasteless smoke" process and provided data to FDA to support the acceptability of the process. See Ex. "3" at 2 (USDC Ltr.).

To avoid government scrutiny, HISI's competitors did not waste time in availing themselves of Kowalski and HISI's efforts. As NOAA recognized in a memorandum dated September 3, 1998 to its Seafood Inspection Program Personnel, "[m]any firms are using statements such as 'tasteless smoke' which was first coined by Hawaii International as part of their accepted method, but has been 'borrowed' by others that have not followed the same acceptance procedure." Id. at 2-3. To combat this, NOAA inspected the overseas facilities and put together a list of facilities that demonstrated that they are treating tuna through a process having CO as a component of the gas which has been generated from smoke ("**approved tasteless smoke facilities list**"). For those parties that demonstrate that the imported product was processed by a firm on the approved tasteless smoke facilities list, NOAA sanctioned lot inspections, as opposed to requiring more careful inspections. See id. In January 1999, Ocean Duke's long-time supplier Citra Perkasa got on NOAA's approved tasteless smoke facilities list indicating that Citra Perkasa had demonstrated to NOAA that it treated its seafood product using the tasteless smoke process of having CO as a component of the gas which

has been generated by smoke. <u>See</u> Ex. "5" (approved tasteless smoke facilities list).

**C.     Plaintiffs Enforce The Patent Against Those Claiming To Use Kowalski's Patented Process.**

After obtaining the Kowalski Patent in October 1999, Kowalski and HISI began investigations to determine whether its competitors were infringing. On January 20, 2000, John Stalker, then an employee of HISI, made inquiry to Ocean Duke regarding the product Ocean Duke offered for sale as "Tasteless Smoke Processed Ahi Saku." <u>See</u> Ex. "6" (Stalker Survey). In a phone interview, Chris Ragone, the person responsible for Ocean Duke's marketing, <u>see</u> Ex. "15" (D. Lin Depo. Tr.) at 32: 24-25, 33: 1-9, responded to Stalker's inquiries as follows:

> The representative of the named company above represents the following:
>
> 1. They sell frozen seafood treated with tasteless smoke – YES.
>
> 2. Smoke flavor components have been removed from the smoke to make tasteless smoke – YES.
>
> 3. The tasteless smoke treated seafood does not retain a smoke flavor after smoke treatment – YES.
>
> 4. The tasteless smoke treated tuna they sell maintains its red color at -10f – YES.
>
> 5. Supplemental carbon monoxide has been added to the tasteless smoke – NO CO.

Ex "6" (Stalker Survey).

Based on the results of this inquiry, Kowalski and HISI sent a notice of infringement letter dated January 24, 2000 ("***Notice of Infringement***"), which was received by Ocean Duke the following day. <u>See</u> Ex. "7" (Notice of Infringement with FedEx confirmation of delivery sheet). The express purpose of the Notice of Infringement was to put Ocean Duke on notice of Kowalski and HISI's good faith belief that Ocean Duke was without authorization importing, offering to sell, selling or using a product which is made by the patented process. <u>See id.</u> Ocean Duke did not claim that the statements made by their marketing employee Ragone were inaccurate, deny Plaintiffs' accusations of infringement, or otherwise respond to the matters stated in the Notice of Infringement. [1] <u>See</u> Yasunaga Decl. ¶ 8.

---

[1] That Ocean Duke sells its product to Ahold, the giant supermarket consortium, is further confirmation that the product is treated with a process that infringes the Kowalski Patent because Ahold only accepts product meeting the specification of "Frozen Tasteless Cold Smoke (wood origin) Processed Yellowfin Skinless Tuna Steaks" properly described as "YELLOWFIN TUNA STEAKS - #1 cooking grade, natural tasteless wood smoke used to maintain fresh-like taste and color," and insists that the "Product must be free from supplemental processing with additional chemical carbon monoxide." Ex. "18" (Ahold specification); <u>see</u> <u>also</u> Ex. "24" (Listing Giant as an Ahold Co.), Ex. "19" (Giant label for Paradise/Ocean Duke Brand with price and ingredient label identifying the product as "THAWED TUNA AND PROCESSED WITH TASTELESS SMOKE (ADDED AS A PRESERVATIVE TO PROMOTE COLOR RETENTION")).

**D.**    **Plaintiffs File This Lawsuit To Enforce The Patent; Ocean Duke Claims To Know, But Gives Varying And Conflicting Accounts Of The Process Used To Treat Its Imported Product.**

1.    Ocean Duke claims to have personal knowledge of the processing method used to treat its imported products, but discovery obtained by Plaintiffs reveals otherwise.

Plaintiffs filed this lawsuit on January 27, 2004. Early on, in March 2004, Ocean Duke moved unsuccessfully for change of venue. See Ex. "8" (Order Denying Def's Mot. for Change of Venue, filed 6/07/04) (Ezra, J.). In support of its motion for change of venue, Roger Lin, Chief Operating Officer of Ocean Duke, represented to the Court that "All the witnesses . . . who will testify in the case on issues of importance live and work in Los Angeles, California, almost 2400 miles from this Court," Ex. "22" (R. Lin Decl., dated 3/1/04) at ¶ 3, and that "Ocean Duke's critical witnesses, documents and evidence relating to William Kowalski and Hawaii International Seafood Inc.'s lawsuit against Ocean Duke are located in Los Angeles County, California, not in the Philippines or Indonesia or Hawaii." Ex. "23" (R. Lin Decl., dated 5/19/04) at ¶ 3. These representations signaled to Plaintiffs that domestic persons were knowledgeable of the process used to treat Ocean Duke's imported product. Roger Lin confirmed this in his August 15, 2007 declaration, in which he stated under oath that:

5.    . . . . I **have traveled to Indonesia on several occasions and have visited our supplier's processing facilities on several occasions. In particular, after we received the demand letter**

relating to the Kowalski patent, **I visited our supplier's facilities in Bali as part of my investigation into this matter.**

6.    **As a result of my personal observations and inquiries at our supplier's facilities, I have learned that our supplier processes all of its seafood for color retention using a patented process known as [the Shih Patent].** . . . . I have known Mr. Shih for several years and have discussed the patented process with him.  Further, **I have seen the equipment used in the Shih process in our supplier's facilities in Bali, and have gained an understanding of how that equipment works to treat seafood for color retention.**  Specifically, to process fish for color retention, our supplier heats charcoal in a vacuum oven to a temperature of about 180°C.  The equipment separates the resulting carbon monoxide by removing water vapor in a separating device.  The carbon monoxide is then drawn into an airbag, and then into a seafood processing device, where the carbon monoxide treats the seafood for color retention.

7.    . . . . **The Shih patent process that I have seen in use in Bali** does not use anything resembling [Kowalski's] process, but instead involves a separating device that simply separates water vapor and carbon monoxide.  The Shih patent does not claim to "purify" the carbon monoxide by the method described in the Kowalski patent; rather, it separates carbon monoxide from water vapor and uses the resulting carbon monoxide to treat the food.

See Ex. "9" (R. Lin Decl., dated 8/15/07) at ¶¶ 5-7 (emphasis added).

When subjected to cross-examination in a deposition held less than two months later on October 8, 2007, however, Roger Lin had remarkably less confidence in his understanding of the process he claimed to have seen in Indonesia, admitting, among other things, that his personal observations were limited to looking at a machine from 20 feet away for about five minutes and that he did not know how Citra Perkasa was generating smoke and filtering it and processing fish apart from Mr. Shih telling him that they were following the Shih

patent:

> Q.    Let's talk about the first component.    Was that like a rectangular oven?
>
> A.    I'm having trouble answering the question because **I really don't recall exactly what the machine looks like**, so I don't know what is a first component versus there might be something before that.
>
> Q.    Well, tell me what you recall seeing.  Did you see anything in which charcoal had been placed?
>
> A.    I may have.
>
> Q.    You don't remember?
>
> A.    **Like I said, I was standing quite a distance away**.

Ex. "10" (R. Lin Depo. Tr.) at 75: 7-19 (emphasis added);

> Q.    And your personal observations, **you said you looked at the machine from 20 feet away for about five minutes, right?**
>
> **A.    Yes.**
>
> Q.    **And you don't know how PT Inti Samudera [Citra Perkasa] was generating smoke and filtering it and processing fish during all the other years that they've been selling smoke to Ocean Duke, right, aside from Mr. Shih telling you that they were following the Shih patent at all times; right**?
>
>                          . . .
>
> THE WITNESS:  **That's correct.**

Id. at 157: 1-13.  Roger Lin admitted that the statements outlining Citra Perkasa's process in his August 15, 2007 declaration were primarily based on looking at the Shih patent and his assumption, at the prompting of counsel, that the Shih Patent is being followed, not observation or personal knowledge of the actual method for

generating and filtering the smoke used to treat the products Ocean Duke imports:

> Q.    So these statements about the process in your [August 15, 2007] declaration, that information is just taken from looking at the Shih patent; correct?

> A.    That's correct.

> Q.    And did you look at the Shih patent, or did somebody help you in coming up with this information taking it from the Shih patent?

> A.    It would be yes to both.

> Q.    So who helped you look at the Shih patent to come up with the statements about PT Inti Samudera's processing of the fish that's stated in your declaration?

> A.    It was counsel.

> Q.    Do you know how the water vapor is removed from the carbon monoxide?

> A.    No, I do not.

Id. at 155: 23-25, 156: 1-13.

> 2.    Documents produced by Ocean Duke and the testimony of its own witnesses and experts contradict Roger Lin's recitation of the process used to treat the products imported by Ocean Duke.

In response to Plaintiffs' request for answers to interrogatories asking for a description (with particularity) of the treatment of processing of fish Ocean Duke sold and/or sells in the U.S. that was or is treated or processed with smoke or carbon monoxide for color retention and enhancement, Ocean Duke responded in conclusory fashion that "PT Inti Samudera Citra Perkasa produces its own filtered smoke using its own patented process [referring to the Shih Patent]." See Ex. "11"

(Ocean Duke's Suppl. Response to Plts' 1st RAI) at 2.[2]  The clearest statement of

the process employed to treat the products that Ocean Duke imports comes from

Roger Lin's August 15, 2007 declaration, which as discussed above is clearly not

based on his personal knowledge, but nevertheless says:

> Specifically, to process fish for color retention, our supplier heats
> charcoal in a vacuum oven to a temperature of about 180°C.  The
> equipment then separates the resulting carbon monoxide by removing
> water vapor in a separating device.  The carbon monoxide is then
> drawn into an airbag, and then into a seafood processing device,
> where the carbon monoxide treats the seafood for color retention.

Ex. "9" (R. Lin Decl., dated 8/15/07) at ¶ 6.

The evidence turned over by Ocean Duke itself in discovery, however,

indicates that Roger Lin's account of the process used to treat Ocean Duke's

imported product is neither accurate nor complete and that Ocean Duke has been

giving Plaintiffs the "run around" with respect to the precise process.  For example,

Ocean Duke produced evidence that shows in fact:

- **A small amount of air is let into the vacuum oven during the
  heating step**:  A document purporting to be the English translation of
  a PowerPoint presentation explaining Citra Perkasa's carbon
  monoxide generator includes the step (labeled "Slide 9") "Let a small
  amount of air enter the vacuum oven from the bottom right," which is
  not reflected in Roger Lin's description of the process.  Compare Ex.

---

[2]  Notably, the Court entered a Stipulated Order Compelling Discovery from
Defendant Ocean Duke Corporation on October 25, 2006 requiring Defendants to,
among other things, "provide Plaitniffs with full and substantive written responses
to Plaintiffs' First Request for Answers to Interrogatories."  See Ex. "29" (Stip.
Order Compelling) at 2.

"25" (Citra Perkasa PowerPoint) <u>with</u> Ex. "9" (R. Lin Decl., dated 8/15/07) at ¶ 6 ("our supplier heats charcoal in a vacuum oven to a temperature of about 180°C");

- **More than carbon monoxide and water vapor results from heating charcoal in the vacuum oven at 180° C**[3]:  Ocean Duke's expert Wayne Iwaoka admitted in his written report and deposition testimony that more than carbon monoxide and water vapor would result from burning charcoal. <u>Compare</u> Ex. "13" (Iwaoka Report) at 15 ("it is clear that the Shih process is producing carbon monoxide as well as other unidentified volatile compounds"), Ex. "14" (Iwaoka Depo. Tr.) at 46: 7-10 ("Q. But aren't there other volatile compounds also formed from heating the charcoal besides water and carbon monoxide?  A.  Probably, yes.") <u>with</u> Ex. "9" (R. Lin Decl., dated 8/15/07) at ¶ 6 ("The equipment then separates **the resulting carbon monoxide by removing water vapor** in a separating device.") (emphasis added);

- **Filtering/Purification Takes Place**:  Duke Lin testified during his deposition that he saw "filtering material" in the machine used by Citra Perkasa to make smoke and Dr. Iwaoka stated that the removal of water vapor removes not just water vapor but the particulate matter as well as other things that were generated. <u>Compare</u> Ex. "15" (D. Lin Depo. Tr.) at 41: 25, 42: 1-2 ("Q.  Okay, I see.  You weren't able – you were not able to see inside that filter device?  A.  They have a clear plastic here.  I can see it have filter inside.  Was **the material inside** concerned about filter inside?  I don't know.) (emphasis added), <u>id.</u> at 43: 13-21 ("Q.  Can you describe as best you can what that filtering material looked like?  A.  I don't know exactly, but I imagine at that time is thinking **same thing like water filter** in my home with water-filled machine, that kind of filter."); <u>id.</u> at 46: 8-21 ("Q.  Okay.  But you said from what you saw, it looked like the kind of water filter people might have at their house, right?  A.  Looked like that.  Q.  Okay.  You mean the type that people would attach to their faucet?  A.  Idea like that."), Ex. "14" (Iwaoka Depo. Tr.) at 49:

---

[3]  Yet another inconsistency - Ocean Duke produced a copy of an email to Aaron Borrowman dated April 16, 2002 from Shelley Romero of Ocean Duke stating that the smoke used to treat Ocean Duke's product is generated at a maximum temperature of 250°C.  <u>See</u> Ex. "12" ("The maximum temperature is 250°C.").

19-25, 50: 1 ("Q. When the Shih process then goes to the next step of removing water vapor, **that removal of water vapor removes not just the water vapor but some particulate matter as well as other things that were generated, right? A. It could. Q. Especially the highly water soluble things? A. That's correct. Q. [P]articulates that are suspended in the water would be removed when you remove the water? A. Yes.**") (emphasis added) <u>with</u> Ex. "9" (R. Lin Decl., dated 8/15/07) at ¶ 7 ("The Shih patent does not claim to "purify" the carbon monoxide by the method described in the Kowalski patent; rather it separates carbon monoxide from water vapor . . . .").

Additionally, the equipment that Roger Lin testified he observed at Citra Perkasa's facility, upon which his purported knowledge of Citra Perkasa's smoke generation and treatment of fish method is based, is most likely not the actual equipment and process used by Citra Perkasa to treat the millions (7,110,905) of pounds of product imported and sold by Ocean Duke. <u>See</u> Ex. "11" (Ocean Duke's Suppl. Response to Plts' 1st RAI") at 3, Ex. "26" (Annual Sales of Treated Fish). Roger Lin testified at his deposition that he saw a box-like thing at Citra Perkasa's facility, referring to the oven portion of the machine, which was so small in size that you could put it on a small desk or table, and measured no more than three-feet-by-three-feet-by-three-feet. <u>See</u> Ex. "10" (R. Lin Depo. Tr.) at 76: 8-16 ("Q. So this rectangular box-like thing, it was not as big as a room or as big as a house; right? A. No. Q. It was something that you could put on a desk or a small table; right? A. Yes, I believe so. Q. It was maybe less than three-feet-by-three-feet-by-three-feet approximately? A. Perhaps."). Roger Lin further testified that

he did not see any other smoke-generating and filtering equipment, had not heard anything or saw anything indicating that Citra Perkasa had changed its methods for making and filtering smoke, and did not hear anything about Citra Perkasa getting any new or additional equipment to generate and filter its smoke other than what he saw when he went to the plant. See id. at 83: 7-25, 84: 1-6.

It is commercially infeasible that an oven of the size described by Roger Lin at his deposition heating charcoal at the temperature of 180°C could possibly generate anywhere near the amount of smoke necessary to treat the volume of product imported and sold by Ocean Duke.  As explained in Dr. Maga's book smoke (and carbon monoxide) production increases at higher temperatures.  See Ex. "27" (Smoke in Food Processing) at K004687 ("the higher the combustion temperature, the higher the amount of gases produced").  Charcoal burned at a low heating temperature of 180°C, generates smoke (and carbon monoxide) in only small quantities unsuitable for commercial production.  See Ex. "30" (Kowalski Depo. Tr.) at 199: 8-20 ("Q.  Okay.  When you did it before just as part of your general investigation and learning, without focusing specifically to the Shih patent, did you come to any conclusions about the nature of smoke that is generated at the 180 degree temperature range?   A.   Yeah.   From our experience, we had experimented with charcoal and, you know, we – takes quite a bit of smoke to treat a lot of fish, and when we burned charcoal, we didn't get hardly any smoke from it,

and it's the same thing. When we burned wood, it turns into charcoal before it's finished burning and that that phase we don't get much smoke volume, so . . . ."), 201: 9-18 ("A. Well, I have my doubts that they would be able to get enough smoke from – sufficient quantity of smoke from their system to treat the large volume of fish that they've marketed. Q. . . . . Why do you have those doubts? A. Because of my expertise in burning charcoal. A very, very small volume of smoke discharged from burning of charcoal."). A machine of the small size operated at the low temperature described by Roger Lin would not produce enough smoke to treat anything close to the millions of pounds (e.g., approx. 1.1 million lbs. of tuna, 134,490 lbs. of swordfish, etc. in 2005), see Ex. "26" (Ocean Duke Sales Chart)). See id. at 201: 22-25 ("I saw pictures of one little machine. You've probably seen pictures of our operation. We have lots of machines and big bags to collect smoke and that's what's needed to run a commercial operation."), 205: 5-18 ("Q. All right. That has the Bates page ODC5. A. Have a --- looks like a Indonesian or some person standing next to the machine. Q. Yes. A. And this is the only equipment that's been presented to me as being used to make the Shih patent or make the smoke for the Shih patent and this is maybe one cubic foot or so of area, maybe can hold a few kilos of – of – of charcoal. It's not gonna make much smoke. Q. Do you have an estimate as to how much smoke this unit could make? A. I don't have an exact estimate, but not very much."), 206: 17-22 ("THE

WITNESS:  Well, I have doubts that the Shih patent was used to process all their fish and, you know, I – based on other information that I presented yesterday, I feel they're using my process, but I don't see where this is going to produce the volume of smoke that they need to treat their fish.").  Thus, it is highly probable that the machine purportedly observed by Roger Lin and the process described by him, is not the actual machine or process used to treat the products imported and sold by Ocean Duke.

As discussed below, under these circumstances, Section 295 sanctions shifting the burden to Ocean Duke to establish that the process used to treat its imported product does not infringe the Kowalski Patent.

## III.    **ARGUMENT**

### A.    **Presumption of Infringement Under 35 U.S.C. § 295**

Plaintiffs allege a claim for infringement under 35 U.S.C. § 271(g) ("**Section 271(g)**"), which provides in relevant part:

> Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. . . . .

35 U.S.C. § 271(g).

In recognition of the "great difficulties a patentee may have in proving that the patented process was used in the manufacture of the product in question where the manufacturer is not subject to service of process in the United States,"

Congress enacted 35 U.S.C. § 295 ("*Section 295*").  S. Rep. No. 83, 100th Cong.,

1st Sess. 1987.  Section 295 provides:

> In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds –
>
> > (1) that a substantial likelihood exists that the product was made by the patented process, and
>
> > (2)  that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable so to determine,
>
> the product shall be presumed to have been so made, an the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

35 U.S.C. § 295.  The legislative history of Section 295 indicates that Congress

recognized that:

> While the defendant may not necessarily have in its possession the means necessary to rebut the presumption, it is likely to be in a far better position than the patentee to obtain them.  Importers, for example, because of their relationships with foreign manufacturers, may be able to exert pressure on such manufacturers to produce the necessary information.

S. Rep. No. 83, 100th Cong., 1st Sess. 1987.

The district court in <u>Pfizer Inc. v. F & S. Alloys & Minerals Corp.</u>, 856 F.

Supp. 808 (S.D.N.Y. 1994), held that application of the burden shifting mechanism

of Section 295 was appropriate under circumstances very similar to this case.

There, Pfizer first became aware that the process used by Anhui (the Chinese

corporation that manufactured the alleged infringing product) was very similar to

its patented product when its director of business, John McGowan, explored the possibility of a joint venture and spoke with employees about the production process used by Anhui to produce maltol. See id. at 810. Anhui, however, was reluctant to disclose the precise method of its process and the best and only version of the Anhui method available to the parties was the written inspection report by an engineer hired by F & S, the importer of Anhui's product, to visit the Anhui factory to obtain information about Anhui's process. See id. The report was inherently unreliable, however, because it was based predominantly on hearsay statements. See id. at 811-12.

Pfizer's expert, Dr. Kemp, analyzed F & S's report and concluded, among other things, that it was highly unlikely that the process outlined in the report was the actual process used by Anhui because "it is exceptionally unlikely" to produce maltol in commercial quantities. See id. at 812. Pfizer's expert also opined that assuming that the process described in the report was Anhui's actual method, the process utilized chemical pathways that were covered by the claims of Pfizer's patent and constituted infringement. See id.

The court held that Pfizer had "fulfilled its burden under 35 U.S.C. § 295 and Anhui's process is presumed to infringe Pfizer's patent." In so doing, the Court reasoned:

> Through the testimony of McGowan and Dr. Kemp, Pfizer has established by a preponderance of the evidence that a substantial

likelihood exists that Anhui's maltol was made by Pfizer's patented process. Dr. Kemp's proposed mechanism for the Anhui process based on the Shiau Report contains all the elements covered by the Independent Claims of Pfizer's patent, and establishes, at the very least, infringement under the doctrine of equivalents, if not literal infringement.

From the discovery history of this case and the testimony of McGowan, Pfizer has also established that it made a reasonable effort to determine the process actually used by Anhui but was unable to do so.

Id. at 815. As a result, the court shifted the burden to F & S to prove that it did not infringe. See id. at 816.

As discussed in detail below, like Pfizer, Plaintiffs have met the requirements of Section 295. The burden at trial[4] should be shifted to Ocean Duke to prove that the products it imports from Citra Perkasa are not treated with a process that infringes the Kowalski Patent.

---

[4] It appears that the court determined the Section 295 issue in Pfizer after a bench trial. See Pfizer, 856 F. Supp. at 810. Given that this case involves a jury trial, it is likely more appropriate for the Court to rule on the Section 295 issue prior to trial. See, e.g., Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V., 369 F. Supp. 2d 1075, 1078 (S.D. Iowa 2005) ("As the case proceeded toward [jury] trial, the Court entered an order pursuant to 35 U.S.C. § 295, wherein the Court determined that given the lack of conclusive, reliable evidence of PIVEG's actual process for producing purified lutein and Kemin's inability to obtain such evidence through the discovery process due to PIVEG's business practices and foreign corporation status, the burden of proving infringement would fall on PIVEG. In essence, Section 295 establishes a presumption that PIVEG's purified lutein product is made by Kemin's patented process.").

**B.    A Substantial Likelihood Exists That The Product Ocean Duke Imports From Citra Perkasa Is Treated With A Process That Infringes Kowalski's Patent.**

Similar to <u>Pfizer</u>, Plaintiffs were alerted to the likelihood of infringement when the person responsible for Ocean Duke's marketing, Chris Ragone, described the process used to treat Ocean Duke's "Tasteless smoke Processed Ahi Saku" product to HISI's John Stalker in 2000.  Regone told Stalker that Ocean Duke's Ahi was treated with tasteless smoke, that the smoke flavor components have been removed from the smoke to make tasteless smoke, that the tasteless smoke treated seafood does not retain a smoke flavor after smoke treatment, that the tuna maintains its color at -10f, and that supplemental carbon monoxide was not added to the tasteless smoke.  <u>See</u> Ex. "6" (Stalker Survey).  In effect, Ragone admitted that the process used to treat Ocean Duke's Ahi met all of the elements of Kowalski's patented process which covers:

1.  Heating carbon containing materials (including charcoal) to make smoke ("***heating step***");

2.  Filtering or separating out or reducing (including by condensing) the parts of the smoke which impart or give smoke flavor to food at least enough so that the remaining smoke does not give smoke flavoring to food when the food is exposed to the smoke ("***filtering step***"),

3.  exposing to or bringing into contact with each other (a) the smoke and (b) the food, without giving a smoke flavor to that food ("***exposure step***").

<u>See</u> Ex. "21" (Plaintiffs' proposed (and unopposed) construction for Claims 1, 33,

67-69).

In addition, infringement is substantially likely because as of January 1999, Ocean Duke's supplier Citra Perkasa was listed on NOAA's approved tasteless smoke facilities list.  See Ex. "5" (approved tasteless smoke facilities list).  This indicates that Citra Perkasa told the government that it was using the tasteless smoke process and government agencies inspected Citra Perkasa's facility and determined that it was using the tasteless smoke process having CO as a component of the gas which has been generated by smoke.  Moreover, Ocean Duke's customer Ahold requires "Frozen Tasteless Cold Smoked (wood origin) Processed Yellowfin Skinless Tuna Steaks" properly described as "YELLOWFIN TUNA STEAKS - #1 cooking grade, natural tasteless wood smoke used to maintain fresh-like taste and color." See Ex. "16" (Ahold specs).  Thus, that Ahold purchases Ocean Duke's product supports that the product Ocean Duke imports and sells in the U.S. falls within the Kowalski Patent.

Furthermore, as in Pfizer, assuming that the process described by Ocean Duke (through Roger Lin) is believed to be the actual process employed to treat the allegedly infringing product, that process meets all of the elements of the Kowalski Patent.  Roger Lin says that the following process is used to treat the seafood Ocean Duke imports:

1. heat charcoal in a vacuum oven to a temperature of about 180°C;

2. separate the resulting carbon monoxide by removing water vapor in a separating device;

3. draw carbon monoxide into an airbag, and then into a seafood processing device, where the carbon monoxide treats the seafood for color retention.

See Ex. "9" (R. Lin Decl., dated 8/15/07) at ¶ 6.

Assuming that Roger Lin's account of the process is accurate, all of the elements of the Kowalski Patent are performed. First, Kowalski's heating step is met because charcoal, which is an organic material, is heated. See Ex. "16" (Claims Construction Order for Yamaoka and Kowalski Patents, filed 10/17/07) at 21-22. It cannot be disputed that smoke is generated as the result of heating the charcoal at 180° C because Ocean Duke has repeatedly represented in this lawsuit and to its customers that its imported product is treated with filtered **smoke**. See, e.g., Ex. "11" (Suppl. Responses to Plts' 1st RAI) at 2 ("PT Inti Samudera Citra Perkasa produces its own filtered **smoke** using its own patented process") (emphasis added); Ex. "15" (D. Lin Depo. Tr.) at 32: 14-18 ("Q. oh, and that first fish Mr. Shih's plant that you started buying, that was treated with this **smoke** that was treated from burning charcoal? A. Yes."); Ex. "10" (R. Lin Depo. Tr.) at 64: 8-16 ("Q. And is that your knowledge, that all the fish that was labeled with the word "**smoke**" was in fact treated with smoke, that's the best of your knowledge? A. Yes. Q. And did Ocean Duke buy any fish treated with **smoke** from anybody other than PT Inti Samudera Citra Perkasa? A. Not to the best of my

knowledge.") (emphasis added); <u>see</u> Ex. "17" (Black Tie [Ocean Duke] label stating "Tuna, processed **smoke** (to promote color retention)") (emphasis added); <u>see</u> Ex. "18" (Ahold specification for only product made with natural tasteless wood **smoke**); Ex. "19" (PARADISE [Ocean Duke] CRYO-FREEZE TUNA STEAK labeled "THAWED TUNA AND PROCESSED WITH TASTELESS **SMOKE**") (emphasis added).

To the extent that Ocean Duke may contend that only carbon monoxide and water results (not smoke), though Ocean Duke is hard-pressed to take this position given its repeated representations that its product is treated with smoke, <u>see</u> <u>id.</u>, such contention is squarely contradicted by Plaintiffs' expert Dr. Maga and also even Ocean Duke's expert Dr. Iwaoka.    <u>See</u> Ex. "20" (Maga Report) at ¶ 5 ("Charcoal is an organic material. **Heating charcoal in an oven heated to about 180 degrees Centigrade as described in the Shih Patent would produce much more than just carbon monoxide and water – it would produce smoke, and that smoke would contain components or compounds that would impart smoke odor and smoke taste.**") (emphasis added); Ex. "14" (Iwaoka Depo. Tr.) at 46: 7-10 ("Q. But aren't there other volatile compounds also formed from heating the charcoal besides water and carbon monoxide?  A.  Probably, yes."). Thus, the step of heating charcoal in a vacuum oven at 180° C (which generates smoke) is covered by Kowalski's heating step of "heating carbon containing materials to

make smoke" either literally or under the doctrine of equivalents.

Second, the step described by Roger Lin as "separating the resulting carbon monoxide by removing water vapor in a separating device" is covered by Kowalski's filtering step. The term "filter," properly construed as proposed by Plaintiffs (and unopposed by Ocean Duke), includes, but is not limited to separating out or reducing, by, among other things, cooling, condensing, settling out and/or aging. See Ex. "21" (Summary of Plt's Proposed (and unopposed) Claim Construction). Dr. Iwaoka acknowledged in his deposition that the removal of water vapor in the Shih process removes, i.e. reduces or separates out, not just water vapor but particulate matter as well. See Ex. "14" (Iwaoka Depo. Tr.) at 49: 19-25, 50: 1 ("Q. When the Shih process then goes to the next step of removing water vapor, that removal of water vapor removes not just the water vapor but some particulate matter as well as other things  that were generated, right?  A.  It could.  Q.  Especially the highly water soluble things?  A.  That's correct.  Q. [P]articulates that are suspended in the water would be removed when you remove the water?  A.  Yes."). Dr. Iwaoka's testimony supports Dr. Maga's expert opinion that the water vapor removal step of Citra Perkasa's process, in effect, removes the smoke taste and odor causing components which are condensed into or settled into the liquid. See Ex. "20" (Maga Report) at ¶ 7. Thus, Kowalski's filtering step, in which components or parts of the smoke which impart or give smoke flavor to

food are filtered/reduced/separated out at least enough so that the resulting smoke does not give smoke flavoring to food, covers Roger Lin's description of "separating the resulting carbon monoxide by removing water vapor in a separating device" if not literally, then at least by the doctrine of equivalents.

Last, Kowalski's exposure step is met. According to Roger Lin, the "carbon monoxide," i.e. (filtered smoke)[5] treats the seafood for color retention. Ocean Duke admits that the product it imports from Citra Perkasa does not have a smoke taste. See Ex. "9" (Roger Lin Depo. Tr.) at 169: 9-16 ("Q. But in fact, as far as you know, the fish treated for color retention that Ocean Duke sells and has sold does not have a smoke odor or smoke taste; right? A. Not to the best of my knowledge. Q. It does not have a smoke odor or smoke taste to the best of your knowledge; correct? A. That's correct."). "Where the carbon monoxide treats the seafood for color retention," is literally the same thing as, or at least an equivalent of, Kowalski's step of exposing the filtered smoke to the food, without giving a smoke flavor to that food.

The method of treating the seafood that Ocean Duke imports and sells in the U.S. described by Roger Lin meets all of the elements of Kowalski's patented process. See Ex. "9" (Maga Report) at ¶¶ 4-8. As such, Plaintiffs have fulfilled

_____

[5] It is well-known in the industry that the active ingredient in the filtered smoke that promotes color retention is carbon monoxide. See, e.g., Ex. "2" (Ltr. from FDA explaining that CO deceptively alters the color of tuna).

their burden of establishing that that there is a substantial likelihood that the method used to treat the products imported and sold by Ocean Duke in the U.S. infringes Kowalski's patented process.  See Pfizer, 856 F. Supp. at 815.

**C.    Plaintiffs Made A Reasonable Effort To Determine The Process Actually Used By Citra Perkasa But Were Unable To Do So.**

From the early stages of this lawsuit, Ocean Duke indicated that it was knowledgeable of the process Citra Perkasa used/uses to treat the products imported and sold by Ocean Duke.  See discussion supra Section II.D.1.  However, when questioned about the specifics of that process and the equipment used by Citra Perkasa, Roger Lin, who had previously declared under oath that he understood Citra Perkasa's process having inspected its facilities "several times," see Ex. "9" (R. Lin Decl., dated 5/19/04) at ¶ 3, had difficulty remembering, and admitted that his "personal knowledge" was based on looking at Citra Perkasa's machine from 20 feet away for about five minutes.  See Ex. "10" (R. Lin Depo. Tr.) at 75: 7-19 ("Q.  Let's talk about the first component.  Was that like a rectangular oven?  A.  I'm having trouble answering the question because I really don't recall exactly what the machine looks like, so I don't know what is a first component versus there might be something before that.  Q.  Well, tell me what you recall seeing.  Did you see something in which charcoal had been placed?  A. I may have.  Q.  You don't remember?  A.  Like I said, I was standing quite a distance away."), id. at 157: 1-4 ("And your personal observations, you said you

looked at the machine from 20 feet away for about five minutes; right?  A.  Yes.").

Indeed, as discussed _supra_ Section II.D.2., the evidence revealed in discovery by Ocean Duke is inconsistent with the process that Roger Lin described in his declaration.  To list a few examples, (1) a document produced by Ocean Duke purporting to explain Citra Perkasa "carbon monoxide generator" includes a step of "letting a small amount of air enter the vacuum over from the bottom right" which Roger Lin does not mention in his description of the process (and which the Shih Patent does not mention either – _see_ Ex. "28" (Shih Patent)), (2) Ocean Duke's expert admitted in his deposition that more than carbon monoxide and water vapor results when charcoal is heated at 180° C in the vacuum oven, and (3) Duke Lin's deposition testimony in which he said that he saw filtering material, of the nature of a home water filtration/purification device, and Dr. Iwaoka's testimony that water soluble things and particulate matter, not just water vapor, would be removed in the Shih process, contradicts Roger Lin's statement that all that occurs is separation of carbon monoxide from water vapor.  _See_ discussion _supra_ Section II.D.2.

Furthermore, just as in _Pfizer_, the process that Roger Lin purportedly observed at Citra Perkasa's facility, and upon which he bases his knowledge of the specific steps of Citra Perkasa's method, is commercially infeasible.  _See_ discussion supra Section II.D.2.  At a low heating temperature of 180°C, charcoal

generates smoke (and carbon monoxide) in very small quantities, not adequate for commercial production. See Ex. "30" (Kowalski Depo. Tr.) at 201: 9-18. A machine of the small size described by Roger Lin and shown in Exhibit "25," would not produce smoke (carbon monoxide) to treat anything close to the millions of pounds (e.g., approx. 1.1 million pounds of tuna, 134,490 pounds of swordfish, etc. in 2005, see Ex. "26" (Ocean Duke Sales Chart) of seafood products imported and sold by Ocean Duke on an annual basis. See Ex. "30" (Kowalski Dep. Tr.) at 201: 22-25, 205: 5-18, 206: 17-22. Given this practical consideration, the inconsistencies discussed in detail above, and the fact that Roger Lin's recitation of the process used to treat fish is based primarily on hearsay statements of Mr. Shih, or Roger Lin's assumption at the prompting of counsel that the Shih Patent is being followed (despite ample evidence to the contrary), see discussion supra Section II.D.1. and II.D.2, not his own personal knowledge, it is very likely that Citra Perkasa's actual process and equipment for treating fish is different than what Ocean Duke purports it to be. Application of Section 295's burden shifting mechanism is appropriate here. See Pfizer, 856 F. Supp. at 815.

## IV.    CONCLUSION

For the foregoing reasons, the Motion should be granted. The Court should apply Section 295 such that the burden is shifted to Ocean Duke to establish at trial

that the process used to treat the product imported and sold by Ocean Duke in the

U.S. is not made with Kowalski's patented process.

DATED:  Honolulu, Hawaii, November 13, 2007.


CADES SCHUTTE LLP


/s/ Allison Mizuo Lee
MILTON M. YASUNAGA
MARTIN E. HSIA
ALLISON MIZUO LEE
Attorneys for Plaintiffs
WILLIAM R. KOWALSKI and HAWAII
INTERNATIONAL SEAFOOD, INC.