# The United States of America

## The Commissioner of Patents and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

## United States Patent

*Grants to the person(s) having title to this patent the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States of America or importing the invention into the United States of America for the term set forth below, subject to the payment of maintenance fees as provided by law.*

*If this application was filed prior to June 8, 1995, the term of this patent is the longer of seventeen years from the date of grant of this patent or twenty years from the earliest effective U.S. filing date of the application, subject to any statutory extension.*

*If this application was filed on or after June 8, 1995, the term of this patent is twenty years from the U.S. filing date, subject to any statutory extension. If the application contains a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121 or 365(c), the term of the patent is twenty years from the date on which the earliest application was filed, subject to any statutory extension.*

*Q. Todd Dickinson*
Acting Commissioner of Patents and Trademarks

Marjorie V. Turner
Attest

**Exhibit P-1**

EXHIBIT A

## NOTICE

*If the application for this patent was filed on or after December 12, 1980, maintenance fees are due three years and six months, seven years and six months, and eleven years and six months after the date of this grant, or within a grace period of six months thereafter upon payment of a surcharge as provided by law. The amount, number and timing of the maintenance fees required may be changed by law or regulation. Unless payment of the applicable maintenance fee is received in the Patent and Trademark Office on or before the date the fee is due or within a grace period of six months thereafter, the patent will expire as of the end of such grace period.*

US005972401A

## United States Patent [19]
### Kowalski

[11] Patent Number: 5,972,401
[45] Date of Patent: Oct. 26, 1999

[54] PROCESS FOR MANUFACTURING TASTELESS SUPER-PURIFIED SMOKE FOR TREATING SEAFOOD TO BE FROZEN AND THAWED

[76] Inventor: William R. Kowalski, 2161 Kalia Rd., No. 306, Honolulu, Hi. 96815

[21] Appl. No.: 08/980,392

[22] Filed: Nov. 28, 1997

Related U.S. Application Data

[63] Continuation-in-part of application No. 08/733,844, Oct. 18, 1996
[60] Provisional application No. 60/040,731, Mar. 12, 1997.
[51] Int. Cl.$^6$ .................................................. A23B 4/044
[52] U.S. Cl. ........................... 426/314; 426/478; 426/486; 426/524; 426/315
[58] Field of Search ................................. 426/314, 315, 426/478, 486, 524

[56] References Cited

U.S. PATENT DOCUMENTS

| 889,828 | 6/1908 | Trescott. |
| 3,122,748 | 6/1959 | Beebe, Jr. . |
| 3,663,237 | 5/1972 | Moller . |
| 3,851,078 | 11/1974 | Khayat et al. . |
| 4,359,481 | 11/1982 | Smits et al. .................. 426/533 |
| 4,522,835 | 6/1985 | Woodruff et al. . |
| 4,751,097 | 6/1988 | Melcer .......................... 426/650 |
| 5,484,619 | 1/1996 | Yamaoka et al. . |

FOREIGN PATENT DOCUMENTS

| 1717058 | 8/1970 | Germany . |
| 3010473C1 | 5/1982 | Germany . |
| 3010473C2 | 2/1991 | Germany . |
| 4104953A1 | 5/1992 | Germany . |
| 097944 | 12/1984 | Japan . |
| 251682 | 5/1987 | Japan . |
| 047667 | 9/1988 | Japan . |
| 406292503 | 10/1994 | Japan . |
| 847973 | 7/1923 | U.S.S.R. . |
| 11778395 | 9/1985 | U.S.S.R. . |
| 1360609 | 7/1974 | United Kingdom . |

OTHER PUBLICATIONS

Iowa State University, "Minimum Specifications For One Truck Laboratory Oven For Iowa State University", Section 1, 1988, p. 6.

The Kartridg Pak Co. flyer, "There Is No Substitute For The Flavor Of Natural Wood Smoke", 1989.

Smoke In Food Processing, Table 15, "Odor And Taste Recognition Thresholds (ppm) And Most Desirable Concentrations (ppm) Of The Phenolic Fraction Isolated From The Vapor And Particualte Phases Of Wood Smoke", p. 74.

"Cured, Salted, and Smoked Fish Establishments Good Manufacturing Practices: An Association of Food and Drug Official Model Code Adopted Jun. 1991", Section 5.4.

Andrade, et al., "Technological Utilization of Mandi Fish: Cold Smoking," English Abstract of Portuguese lecture, 1975.

PescaRich Global Marketing Corporation, "The PescaRich Process" brochure.

Primary Examiner—David Lacey
Assistant Examiner—Drew Becker
Attorney, Agent, or Firm—Martin E. Hsia

[57] ABSTRACT

Tasteless super-purified smoke is manufactured to treat seafood and meat to preserve the freshness, color, texture, and natural flavor, particularly after the food is frozen and thawed. The smoke is generated by burning an organic smoking material at preferably 500 to 800 degrees F. (260 to 571 degrees C.) in a smoke generator 1. It is then passed through a precipitation filtering tower 2 comprised of filters of ice, cloth, and activated carbon to remove taste imparting, and carcinogenic, particulates and vapors. The super-purified smoke is then stored and aged in a temporary pressure pot 3 or in canisters for treatment at the same time or at another place and time. The super-purified smoke is used to treat seafood or meat in plastic bags at temperatures between its variable freezing point and 46 degrees F. (7.8 degrees C.) for twelve to forty-eight hours, or until the desired effect is achieved. The product is then frozen, stored for up to one year, and quick or slow thawed with little degradation of the treated seafood or meat.

73 Claims, 3 Drawing Sheets





Fig. 1



Fig. 2(a)  Fig. 2(b)  Fig. 2(c)



Fig. 3(a)

Fig. 3(b)

Fig. 3(c)

5,972,401

5

model code states that "The temperature in the smoking chamber does not exceed 50 degrees Fahrenheit (10 degrees Centigrade) during a drying and smoking period that does not exceed 24 hours," ...

The longer the smoking period in this model code, the lower the maximum smoking temperature. For smoking periods of 30 to 48 hours the maximum smoking temperature declines to as low as 32 degrees Fahrenheit (0 degrees Centigrade). Thus, it has been established since 1991 that maximum cold smoking temperatures for smoking periods of 24 to 48 hours can vary from 32 to 50 degrees Fahrenheit (0 to 10 degrees Centigrade) in order to keep the meat moist, succulent, and free from bacterial degeneration or contamination.

Cold smoking is an obvious choice for fresh seafood which normally requires constant cold storage to slow down decomposition and discoloration as evidenced by Section 4.1 (c) of this model code which states "Fresh fish, except those to be immediately processed, shall be iced or otherwise refrigerated to an internal temperature of 38 degrees Fahrenheit or below (3 degrees Centigrade or below) upon receipt and shall be maintained at that temperature until the fish are to be processed."

Section 4.2 states that "all operations involving the receiving, holding, processing and packaging of processed fish shall be conducted utilizing clean and sanitary methods and shall be conducted as rapidly as practical and at temperatures that will not cause any material increase in bacterial or other micro organic content or any degeneration or contamination of such processed fish." In addition, the 1994 U.S. Food and Drug Administration (F.D.A.) Fish and Fishery Products Hazards and controls Guide recommends a thorough organoleptic examination of seafood product that exceeds 40 degrees Fahrenheit (4.4 degrees Centigrade) at any time during processing.

In 1989 Alkar Inc. of Wisconsin designed and built a laboratory smokehouse for Iowa State University with specifications allowing for smoking at temperatures as low as 32 degrees Fahrenheit (0 degrees Centigrade). In this design Alkar utilized a refrigeration coil inside the smoking chamber to cool the smoke down and maintain it at these low temperatures. Subsequent commercial smokehouses throughout the industry have been outfitted with return air ducts with cooling coils to allow for cold smoking of fresh fish at temperatures specified in the model code above.

Furthermore, smokehouses have equipment for purifying the smoke during, and at the exhaust, of the smoking process. In 1995 Alkar presented a paper entitled "An Overview of Air Pollution Control Equipment for Smokehouses" and described all current types of exhaust control equipment divided into two major classes—particulate collection equipment, and gaseous control equipment. Particulate collection equipment includes electrostatic precipitators, venturi scrubbers, and ionizing wet scrubbers. Gaseous control equipment includes absorption systems such as packed columns and incinerators.

U.S. Pat. No. 5,484,619 to Yamaoka et al discloses a method and apparatus that use extra low temperature smoking of fish and meat to sterilize and prevent decomposition and discoloration while imparting an agreeable smoked taste and smell.

U.S. Pat. No. 889,828 to Trescott discloses a device for curing edible matter comprised of a curing apartment, a smoke supply source, and a combined smoke cooling, purifying, and drying chamber where a portion of moisture and carbon soot condenses on the walls of the chamber.

6

Trescott's method and apparatus, as with Yamaoka's, utilizes partially purified smoke containing odor and taste imparting particulate matter and vapors flowing freely in contact with the edible matter, imparting a smoke flavored taste.

U.S. Pat. No. 4,522,835 to Woodruff et al teaches a method of maintaining redness in fish and red meat by first subjecting such fish or meat to an oxygen deprived atmosphere and then exposing the fish or meat to a modified atmosphere containing a small amount of carbon monoxide. Industrially manufactured carbon monoxide gas is produced using caustic chemicals and can contain toxic impurities. Treatment of seafood or meats with carbon monoxide gas is therefore prohibited by the U.S. F.D.A. and the Japan Ministry of Public Health.

U.S. Pat. No. 3,122,748 to Beebe relates to a method of treating red meat with carbon monoxide to achieve the appearance of meat that has been freshly cut. As with Woodruff, Beebe's method utilizes a gas that is prohibited for such use in the U.S. and Japan. Conversely, treatment of seafood, poultry, or meat with a natural smoking process is generally recognized as safe (GRAS) by the U.S. F.D.A. and the Japan Ministry of Public Health.

Soviet Patent SU 847973 to Kichkar, Nasibov, and Bunin discloses a method for the cold curing of fish products by stabilizing the temperature and velocity of the smoke in a smoking chamber kept in a range of approximately 32 to 36 degrees Fahrenheit (0 to 2 degrees Centigrade). Kichkar et al's cold smoking process results in phenol levels rising in the body of salmon more quickly than earlier methods reducing processing time and producing quality smoked taste, color, and preservative characteristics.

German Patent DE 3826211 to Schich teaches a smoking process using a condenser cooled filtered smoke. Smoke from a smoke generator is passed through a cooling condenser maintained at 5 to 14 degrees Fahrenheit (−10 to −15 degrees Centigrade) to form a condensate of carbon, other suspended materials, tar and gum which is discharged. Schich's method removes substantially all tar, pollutants and carcinogens and does not impact the taste and aroma imparting ingredients in the smoke.

The burning of wood sawdust, in an oxygen restricted retort has been empirically discovered to be the most efficient way to produce high quality smoke from an organic material. However, other organic materials such as leaves, bagasse from sugar cane, pineapple husks, and rice hulls can all be used successfully to produce a volume of smoke in any substantially oxygen free chamber at a lesser amount than the volume achieved from burning wood sawdust in a retort.

The smoke produced from burning wood and other organic material fuels is a function of combustion temperature and amount of air intake. FIG. 1 shows the composition of wood smoke emissions at varying combustion temperatures. The formation of deleterious polycyclic aromatic hydrocarbons (PAHS), and oxidation of organic vapors, including both condensable organic compounds as well as volatile organic compounds (VOCs) can be prevented by combusting below 850 degrees Fahrenheit (454 degrees Centigrade). If wood is combusted above this temperature level and these compounds are formed, they can be successfully filtered later in the process.

To minimize formation of these compounds and to conform to empirical data from our laboratory tests, an operable combustion temperature range of 400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees

5,972,401

| | 7 | | 8 | |

Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) are established for the process described herein.

Typical wood fuels for smoking contain primarily a hydrocarbon composition of hydrogen and carbon along with other elements of sulfur, nitrogen, oxygen, and ash compounds of silicon dioxide, ferrous trioxide, titanium dioxide, aluminum trioxide, manganese tetrioxide, calcium oxide, magnesium oxide, sodium oxide, potassium oxide, sulfur dioxide, and chloride as shown in Table is

TABLE 1

TYPICAL WOOD FUEL CHEMICAL ANALYSIS

| | Oak Chips | Spruce Chips |
|---|---|---|
| Analysis (dry basis), % by weight | | |
| Proximate | | |
| Volatile matter | 76.0 | 69.5 |
| Fixed carbon | 18.7 | 26.6 |
| Ash | 5.3 | 3.8 |
| Ultimate | | |
| Hydrogen | 5.4 | 5.7 |
| Carbon | 49.7 | 51.8 |
| Sulfur | 0.1 | 0.1 |
| Nitrogen | 0.2 | 0.2 |
| Oxygen | 39.3 | 38.4 |
| Ash | 5.3 | 3.8 |
| Heating value, Btu/lb | 8,370 | 8,740 |
| Ash Analysis % by wt | | |
| $SiO_2$ | 11.1 | 32.0 |
| $Fe_2O_3$ | 3.3 | 6.4 |
| $TiO_2$ | 0.1 | 0.6 |
| $Al_2O_3$ | 0.1 | 11.0 |
| $Mn_3O_4$ | Trace | 1.5 |
| CaO | 64.5 | 25.3 |
| MgO | 1.2 | 4.1 |
| $Na_2O$ | 8.0 | 8.0 |
| $K_2O$ | 0.2 | 2.4 |
| $SO_3$ | 2.0 | 2.1 |
| Cl | Trace | Trace |

Source: "Wood residue—fired steam generator particulate matter control technology assessment, U.S. E.P.A., 1978.

The smoke produced from burning wood and other organic material fuels contains water vapor, $CO_2$, CO, $CH_4$ (methane); tiny particulates of creosote, tar, soot, and trace elements; and over 390 microscopic compounds occurring in either, or both, particulate and gaseous (vapor) phases. Larson and Koenig compiled "A Summary of the Emissions Characterization and Noncancer Respiratory Effects of Wood Smoke" in 1993. Table 2 from this report summarizes all the reported constituents in wood smoke and the ranges of their emission rates.

$CO_2$, CO, $NO_2$, NO, and monoaromatic phenols constituents in wood smoke all have preservative effects on treated seafood and meat. $CO_2$ is the preservative of choice in modified atmosphere packaging of fresh seafood as it is easily absorbed into the meat displacing oxygen and inhibiting bacterial growth. Phenols, which are present in much smaller amounts than $CO_2$, operate similarly as bacteria inhibitors. CO, $NO_2$, and NO undergo chemical reactions with myoglobin to retard decomposition.

The invention described herein is primarily concerned with super-purifying smoke to eliminate the flavor and aroma components of both the smoke and the seafood or meat subsequently treated. Maga compiled a comprehensive review of the literature in 1988 in "Smoke in Food Processing." In this review, he cites thirteen researchers who conclude that the most important flavor components of smoke are monoaromatic phenols occurring in both the particulate and gaseous vapor phases.

The phenolic particulate phase has lower odor and taste recognition thresholds than the gaseous vapor phase indicating that a smaller quantity of particulate is required to produce the same level of smoke odor and taste as the gaseous vapor phase. The particulate phase also contains high levels of undesirable pollutants including tar, soot, ash, and char which are desirably filtered.

Therefore, it is typical in smoking of foods to filter pollutants from the phenolic particulate phase while retaining the gaseous vapor phase for characteristic smoke flavoring. The amounts of tar, soot, ash, char and other microscopic particulates have been filtered and minimized by many methods in current practice including tar settling systems, baffling systems, and washing systems in the line from the smoke generator to the smoking chamber. In addition, cooling and storage reduces the concentrations of phenolic particulate through settling. Some of these filtering methods remove substantially all the tar and particulate from wood smoke leaving only the gaseous vapor phase which produces the characteristic smoke flavor.

Daun isolated the phenolic fraction from both the vapor and particulate phases of wood smoke and through dilution determined, with the aid of a sensory panel, their recognition threshold and most desirable concentration for both odor and taste sensations. These data are summarized in Table 3.

Yamaoka et al claim a smoking method comprising a step "passing the produced smoke through a filter to remove mainly tar." Such tar filters are standard elements in smoke generating systems sold today. However, since the flavor producing, monaromatic phenols in the gaseous vapor phase remain, Yamaoka's method imparts an "agreeable taste and smell" and does not produce tasteless smoke or tasteless food as does the process described herein.

Kichkar et al achieve up to 304 milligrams of phenols combined from both the particulate and gaseous vapor phases of wood smoke absorbed into the body of a salmon of approximately five kilograms, or 60.8 parts per million (ppm). This is the desirable concentration for quality smoked taste. Since the invention described herein is concerned with eliminating any flavor or aroma imparted to the treated seafood or meat, we have determined empirically that the recognition threshold for phenols in seafood or meat is approximately 9.4 ppm. However, even if the phenols in the seafood or meat are below this recognition threshold, they still exert positive preservative effects as bacteria inhibitors.

TABLE 2

CHEMICAL COMPOSITION OF WOOD SMOKE

| Species 1 | g/kg wood 2 | Physical State 3 | Reference |
|---|---|---|---|
| Water Vapor | 35–105 | v | 2 |
| Carbon Dioxide | 70–200 | v | 2 |
| Carbon Monoxide | 80–370 | v | 4,5 |
| Methane | 14–25 | v | 5 |
| VOCs (C2–C8) | 7–27 | v | 5 |
| Aldehydes | 0.6–5.4 | v | 4,6 |
| Formaldehyde | 0.1–0.7 | v | 4,6 |
| Acrolein | 0.02–01 | v | 6 |

5,972,401

11

TABLE 3

ODOR AND TASTE RECOGNITION THRESHOLDS (ppm)
AND MOST DESIRABLE CONCENTRATIONS (ppm) OF
THE PHENOLIC FRACTION ISOLATED
FROM THE VAPOR AND
PARTICULATE PHASES OF WOOD SMOKE

| Recognition threshold | | Most desirable concentration | |
|---|---|---|---|
| Odor | | | |
| Vapor | Particulate | Vapor | Particulate |
| 10.4 | 7.8 | 20.8 | 16.7 |
| Taste | | | |
| Vapor | Particulate | Vapor | Particulate |
| 2.3 | 1.4 | 15.6 | 8.3 |

Adapted from Daun, H., Lebensm. Wiss. Technol., 5, 102, 1972

The seafood or meat treated with wood smoke has myoglobin molecules with open receptors that can undergo a chemical reaction with a variety of compounds present in the smoke—$O_2$, CO, NO, $NO_2$ and $H_2O$. It is important in cold smoking to keep the meat raw and uncooked to maximize the amount of vital cells available for this reaction. The myoglobin in its natural state is purple. When the myoglobin binds with $O_2$ it produces oxymyoglobin which is bright red; with CO it produces carboxymyoglobin which is red; with NO and $NO_2$ it produces nitric oxide myoglobin and nitrogen dioxide myoglobin which are also red; and with $H_2O$ it produces metmyoglobin which is brown.

Carboxymyoglobin is preferred because of its stable organoleptic freshness characteristics as well as its stable red color. The organoleptic "sniff test" shows significant retardation of decomposition of cold smoked product high in carboxymyoglobin. For example, cold smoked and vacuum packed salmon can be refrigerated for several months without any decomposition.

SUMMARY OF THE INVENTION

The above and other objects are achieved by a process comprising the manufacturing of tasteless super-purified smoke, utilizing such manufactured smoke to treat seafood, and freezing and thawing of the treated seafood.

The manufacturing process begins with the smoke generating part of the apparatus using a natural gas or electric burner to combust wood sawdust packed into a multiple cylinder retort at temperatures in an operable range of 400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) in an oxygen deprived environment.

The apparatus can be adjusted to utilize wood sawdust or other organic burning materials producing less dense smoke by varying the number of cylinders in the retort from as little as one to as many as necessary to produce the volume of smoke desired. In addition, any substantially oxygen free chamber besides a retort can be used. Combusting a five cylinder retort packed with wood sawdust is the preferred embodiment described herein.

The pyrolysis of the wood sawdust into smoke creates byproducts of tar, moisture, and particulate residue at the outlet of the smoke generating subsystem. These byproducts are collected in liquid form in a tar/moisture/residue condensation chamber and drained out a purge valve near the end of the process. This valve also serves the dual purpose

12

of being a flush valve to allow air into the airtight system after the liquid residue is drained.

The smoke is next super-purified such that the phenols in both particulate and gaseous vapor phases are reduced to concentrations below recognition thresholds for odor and taste that impart a smoked flavor to the treated food. Commercial air pollution control equipment such as electrostatic precipitators, venturi scrubbers, ionizing wet scrubbers, and packed columns, normally used to clean smokehouse exhaust, can be used after smoke generation and before treatment of the product to remove a portion of these flavor imparting phenols from the smoke.

Complete super purification of smoke can be accomplished using one method, or a combination of methods, in current practice, including filtering, separating, distilling, scrubbing, cooling, freezing, inertial impact, centrifugal force, or settling. Filtering techniques of adsorption or molecular sieve absorption can be used effectively. For example, a very large activated carbon filter alone can substantially super-purify smoke, yet this method is expensive and requires extensive maintenance. Successful combinations include bubbling the smoke through a water filter and then a smaller activated carbon filter; using a water vapor wash and an activated carbon filter; and using the above combinations with cloth filters. Smoke can be super-purified by any method, or combination of methods, that reduce both the flavor imparting particulate and gaseous vapor phase phenols below their odor and taste recognition thresholds, or by using the preferred embodiment described as follows:

The smoke is most efficiently super-purified by flowing through a precipitation tower which washes and filters the smoke through ice and a combination of adsorbent and molecular sieve filters of cloth and activated carbon. Adsorption is the accumulation of gases, liquids, or solutes on the surface of a solid or liquid and occurs when the smoke flows through the activated carbon. The activated carbon filter in our invention effectively adsorbs phenols in the gaseous vapor phase to concentrations below their odor and taste recognition thresholds. The molecular sieve cloth filters absorb gaseous vapor and particulate matter.

The precipitation tower is preferably longer than it is wide and is positioned on a vertical axis. The tower has an ice chamber with a square cross section smaller at the bottom entry of the perforated smoke intake pipe and larger at the top entry to the activated carbon and cloth filters to ensure that the smoke flows evenly throughout the ice. Alternatively, a precipitation tower with an ice chamber that is wider than it is long, or positioned on a horizontal axis, can work successfully by using a series of horizontally spaced vertical intake pipes, using a horizontal intake pipe with spaced perforated dispensing holes, or by replacing the ice with another filtering material. In addition, an agitator can be installed to prevent clustering and clumping of filtering materials.

To maximize the yield of tasteless super-purified smoke, the ice, carbon, or any other filtering medium utilized should displace as much air space as possible inside the precipitation tower to minimize places where smoke can be trapped in the system. The filtering materials in the precipitation tower displace an operable range of more than 50%, a preferred range of more than 75%, and an optimal range of more than 90% of the tower's inner volume.

The precipitation tower operates as a miniature controlled earth atmosphere where ice is violently vaporized by hot smoke into steam. A portion of this "steamified" smoke

fish is complete. This desired penetration is complete after approximately twelve to forty-eight hours.

The minimum temperature during treatment varies with the type of seafood being treated and is approximately 0.2 degrees Fahrenheit (0.1 degree centigrade) above its variable freezing point. The treatment temperature is an operable range from above the variable seafood freezing point to 46 degrees Fahrenheit (7.8 degrees centigrade), a preferred range from above the variable seafood freezing point to 38 degrees Fahrenheit (3.4 degrees centigrade), and an optimal range from above the variable seafood freezing point to 35 degrees Fahrenheit (1.7 degrees centigrade).

If treatment at another time and/or place is desired, a compressor can be attached to the outlet hose from the pressure pot or, in an abbreviated process, to the carbon and cloth filter outlet of the precipitation tower. The compressor compresses the tasteless super-purified smoke into canisters at a desired pressure level. Utilizing these canisters, the following treatment procedure requires a delivery system consisting of a regulator, hose with injection nozzle, plastic bags, and a heat sealer.

As an alternative to the preferred treatment in plastic bags, the tasteless super-purified smoke can go from the storage canisters into any type of sealed treatment chamber containing the seafood. As a still further alternative to a smoke flushing treatment in plastic bags or other chambers, the tasteless super-purified smoke can be administered successfully by injection needles directly into the seafood. This alternative is preferable for thicker loin fillets where multiple injections of tasteless super-purified smoke treat the meat completely with overlapping conical areas.

After treatment is complete in the preferred embodiment, each plastic bag is emptied and the fish is repacked, preferably with an absorbent material in a semi-permeable vacuum pouch.

These vacuum packed pouches are next ideally frozen cryogenically at −76 degrees Fahrenheit (−60 degrees centigrade) or less and stored at −4 degrees Fahrenheit (−20 degrees centigrade) or less for up to one year without losing their vitality characteristics of freshness, flavor, color, and moisture retention after thawing.

Preferably, five pouches of steaks of 5.0 pounds (2.27 kilograms) each or 10 pouches of sashimi of 2.2 pounds (1.0 kilogram) each are packed in each master carton with optional instructions for either quick or slow thawing printed on the vacuum packs or included with the product.

The seafood product retailer, restaurant, or sushi bar either quick thaws only the number of pouches needed in cold water, preferably with a salt solution for approximately twenty to forty minutes or until the product is partially thawed; or slow thaws in a refrigerator, generally overnight for twelve to twenty-four hours. Each pouch is dried, cut open, and the sashimi slices or steaks are displayed for sale in a store or served in a restaurant. The product can also be retailed in frozen packages.

The carboxymyoglobin, nitric oxide myoglobin, and nitrogen dioxide myoglobin present in the treated product, as well as absorbed $CO_2$ and phenols from the super-purified smoke, result in both stable organoleptic freshness characteristics and stable red color after freezing and thawing. Such product will organoleptically stay fresh longer than untreated product before decomposition begins. However, this characteristic of enhanced freshness longevity does not often come into play since the product is thawed in small quantities only as needed and does not require extended shelf life in its thawed state.

BRIEF DESCRIPTION OF THE DRAWINGS AND CHARTS

FIG. 1 is a graph showing the composition of wood and hardwood charcoal smoke emissions at varying temperatures.

FIG. 2 (a) shows a presently preferred embodiment of a tasteless super-purified smoke manufacturing apparatus used in the practiced process.

FIG. 2 (b) shows the flush treatment plastic barrier bag subsystem.

FIG. 2 (c) shows the compressor and storage canister subsystem.

FIG. 3 (a) shows a front view of the retort subsystem of the super-purified smoke manufacturing process.

FIG. 3 (b) shows a top view of the retort subsystem.

FIG. 3 (c) shows a side view of the retort subsystem.

BEST MODE FOR CARRYING OUT INVENTION

The presently preferred embodiment of the tasteless super-purified smoke manufacturing apparatus used in the practiced process shown in FIG. 2 (a) is comprised of a smoke generator 1, a precipitation filtering tower 2, and a temporary pressure pot storage chamber 3. FIG. 2 (b) shows a flush treatment plastic bag subsystem and FIG. 2 (c) shows an alternative intermediate step of a compressor and storage canister subsystem.

The smoke generator 1 is comprised of a 10" high by 15" wide by 24" (15.4 cm×38.1 cm×61.0 cm) deep shell lined with refractory insulation 5, a refractory insulated door 6 with air vents, a retort subsystem 7 (shown in detail in FIGS. 3 (a–c)), a shelf 8, a natural gas burner 9, and thermostat 10.

In the preferred embodiment the retort subsystem 7 is made up of five parallel cylinders approximately 1 ½" (3.8 cm) in diameter and 21" (53.3 cm) long packed full of a measured amount of wood sawdust. The length of each cylinder is preferably greater than its diameter, with an operable range of the ratio of length to diameter from 1.1:1 to 50:1, a preferred range from 2:1 to 25:1, and an optimal range from 10:1 to 16:1.

The sawdust packed in this highly oxygen restricted closed system retort is combusted by heating the cylinders with the natural gas burner 9 to an operable temperature range of 400 to 950 degrees Fahrenheit (204 to 510 degrees centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees centigrade). The thermostat 10 controls the combustion temperature.

The apparatus is highly duplicable and scalable with measured amounts of wood sawdust, ice, and activated carbon used in the smoke manufacturing apparatus described herein. The dimensions of the elements of the apparatus may vary proportionately with one another to create greater or lesser amounts of tasteless super-purified smoke. In other words, a proportionately larger or smaller smoke generator 1 with a greater or lesser number of retort cylinders 7, each of a larger or smaller diameter, filled with a greater or lesser amount of sawdust and super-purified by a larger or smaller filtering tower 2 will fill a proportionately larger or smaller temporary pressure pot storage chamber 3.

The combustion within the retort cylinders packed full of wood sawdust produces water vapor and the smoke emissions described in Table 2. Closing the vent to outside air produces a highly oxygen restricted environment where all of the sawdust is pyrolyzed completely and flows out of the smoke generator 1 towards the precipitation tower 2.

A percentage of the tar, moisture, and residue byproducts of the combustion condense as liquid immediately and flow into the residue condensation chamber 11 which is sealed at

approximately 90% of the air has been evacuated and the accordion bladder 33 collapses towards the top of the pressure pot 31. Then valves 27 and 30 are closed to contain the vacuum holding up the collapsed bladder 33 in the temporary pressure pot storage chamber 3.

The temporary pressure pot storage chamber 3 is equal in size to the volume of sufficiently concentrated smoke produced by the smoke generator 1. The storage chamber 3 remains at the slightly evacuated pressure with its inner bladder 33 collapsed until the smoke passing through the precipitation tower 2 reaches a desired concentration and flow as indicated by the smoke sensor 21 and the flow meter 22 in the line.

The smoke is pumped out the exhaust pipe 24 by pump 23 with three way valve 25 open in the exhaust and precipitation tower 2 directions and closed in the temporary storage chamber 3 direction until the smoke reaches the desired concentration and flow. At this time, valve 25 closes the exhaust pipe 24, valve 26 opens the pipe in the direction of the storage chamber 3, and valve 30 opens to allow the smoke to naturally flow to the reduced pressure temporary storage chamber 3 with its inner bladder 33 expanding. As long as the concentration and flow levels as measured by the smoke sensor 21 and the flow meter 22 meet or exceed the minimum desired, the smoke flows on its own.

When the smoke falls below the prescribed levels, the purge valve 12 opens, the liquid residue drains, and flush air is allowed to enter the system. At the same time, the two way pump 28 begins pumping the remaining smoke in the system into the pressure pot storage chamber 3. This pump 28 turns off when the smoke sensor 21 indicates the system has been flushed and valve 30 is closed to contain the smoke in the inner bladder 33 of the temporary pressure pot 31 in a slightly pressurized state in an operable range of 37 to 107 psi (2.58 to 7.45 kg per square centimeter) and a preferred range of 52 to 72 psi (3.62 to 5.01 kg per square centimeter).

The inner accordion bladder 33 of the temporary pressure pot storage chamber 3 is preferably lined with absorbent material to absorb remaining flavor imparting gaseous vapor or particulate phase phenols, and any other remaining carcinogens, in the smoke as they settle.

This settling step of aging the smoke for treatment directly from the inner accordion bladder 33 has an operable range of one hour to 72 hours, a preferable range of 12 hours to 60 hours, and an optimal range of 24 hours to 48 hours. Aging the smoke for treatment at another time or place from storage canisters 40 has an operable range of greater than one hour, a preferable range of one week to one year, and an optimal range of two weeks to six months.

The shorter preferable aging time range for smoke directly from the inner accordion bladder 33 is a function of practical process design efficiencies. The longer preferable aging time range for smoke in storage canisters 40 is a function of the further reduction of flavor imparting phenols which lose potency due to decomposition and chemical reaction with other compounds over time. This longer aging time range in storage canisters 40 has an upper limit of preferably one year or less due to a reduction of beneficial phenols over time which contribute to the preservative effect on the seafood.

This substantially tasteless, super-purified smoke may now be used for the immediate treatment of seafood shown in FIG. 2 (b) flush treatment plastic bag subsystem, or stored in canisters as shown in FIG. 2 (c).

If immediate treatment is desired, whole small fish may be used, or each whole tuna or other seafood species is filleted, generally into four loins, and then a percentage is filleted into sashimi slices and a percentage is filleted into tuna or other seafood steaks. Seafood needs to be kept chilled during the filleting process to avoid spoilage. Therefore, the fish are kept chilled at temperatures immediately above their freezing points which vary from fish to fish as a function of the salt content of the meat. Such freezing points can be as low as 27 degrees Fahrenheit (−2 degrees Centigrade). The operable range is between the fish's freezing point and ten degrees greater than its freezing point; the preferred range is between its freezing point and five degrees greater than its freezing point; and the optimal range is between its freezing point and two degrees greater than its freezing point.

Each sashimi slice is next placed in a dipping solution to stabilize color, enhance flavor and firm the texture of the sashimi. This added step of dipping is used for sashimi slices and not for tuna steaks, since the enhanced flavor is noticeable when the sashimi slices are thawed and eaten raw and would not be noticeable for cooked tuna steaks.

As shown in FIG. 2 (b), the filleted and dipped sashimi slices or the filleted tuna steaks 37 are placed in plastic bags 36. The air in each bag 36 is removed and a hose with dispensing nozzle 35 from the pressure pot 31 are inserted. The hose with dispensing nozzle 35 has a control at the dispensing point similar to the air nozzles for tires at gas stations. If pressures above 40 psi (2.79 kg per square centimeter) are used a regulator is also required.

The outlet valve 34 to the temporary storage chamber 3 is opened and the hose with dispensing nozzle control 35 is inserted in a plastic bag 36 and opened to flush the seafood with a volume of tasteless super-purified smoke with the gaseous vapor and particulate phenol concentrations below both the odor and taste recognition thresholds cited above. Most smoking processes have a continuous flow of smoke passing in contact with the seafood or meat. The process described herein limits the amount of smoke and as a result minimizes the total amount of flavor imparting phenols remaining in the smoke that come in contact with the seafood or meat.

The volume of tasteless super-purified smoke that flushes the seafood is in an operable range of the ratio of volume of smoke to seafood of 0.05:1 or greater; in a preferred range from 1:1 to 100:1; and in an optimal range from 1.5:1 to 20:1. When sufficient smoke is dispensed, the dispensing control nozzle 35 is closed, the outlet valve 34 is closed and the plastic bag 36 is sealed.

Desired penetration of the super-purified smoke in the seafood is achieved in an operable range from 1 second to 60 hours; a preferred range of 12 hours to 54 hours; and an optimal range of 24 to 48 hours. This treatment period is an additional period of aging the smoke as the flavor imparting phenols continue to lose potency. Empirical evidence indicates the treatment time to achieve the desired penetration varies with the seafood to be treated. In addition, the minimum temperature during treatment varies with the type of seafood being treated and is approximately 0.2 degrees Fahrenheit (0.1 degree Centigrade) above its variable freezing point.

Therefore, the treatment temperature is an operable range from 0.2 degree Fahrenheit (0.1 degree Centigrade) above the variable seafood freezing point to 46 degrees Fahrenheit (7.8 degrees Centigrade), a preferred range from 0.2 degree Fahrenheit (0.1 degree Centigrade) above the variable seafood freezing point to 38 degrees Fahrenheit (3.4 degrees Centigrade), and an optimal range from 0.2 degree Fahrenheit (0.1 degree Centigrade) above the variable seafood freezing point to 35 degrees Fahrenheit (1.7 degrees Centigrade).

5,972,401

21

Desired penetration of the super-purified smoke in the seafood is achieved while imparting total phenols from both gaseous vapor and particulate phases at concentrations below flavor and aroma recognition thresholds into the seafood. The phenol levels within the treated product are of concern here, whereas the phenol levels within the wood smoke are of concern during the super-purifying filtering process. Such recognition thresholds of phenols within the treated product also vary with the olfactory and taste senses of each individual. We have determined empirically an operable range of less than 14.1 parts per million (ppm) of total phenol weight per total weight of seafood, a preferred range of less than 9.4 ppm, and an optimal range of less than 4.7 ppm.

If treatment at another time and/or place is desired a compressor 38 as shown in FIG. 2 (c) is preferably attached to the outlet hose from the pressure pot 31 with its expandable inner bladder, or directly to the outlet of the precipitation tower 2 in an abbreviated process. In the preferred embodiment the outlet valve 34 is opened and the tasteless super-purified smoke is compressed and pumped through the pressure valve/gauge 39 into the canister 40 to a desired pressure in an operable range of 200 to 2,500 psi (13.9 to 174.1 kg per square centimeter) and a preferred range of 1,800 to 2,200 psi (125.4 to 153.2 kg per square centimeter). Then the outlet valve 34 and the pressure valve 39 are closed.

Each canister 40 can be used at a future time and place with a delivery system consisting of a regulator and a hose with dispensing nozzle 35 which is attached to an evacuated plastic bag 36 filled with filleted seafood 37 as described in FIG. 2 (b). The pressure valve 39 is opened and the regulator regulates the flow rate into the bag 36 until the ratio of the volume of tasteless super-purified smoke to seafood being treated is in an operable range of 0.05:1 or greater, a preferred range of 1:1 to 100:1; and an optimal range of 1.5:1 to 20:1 with the gaseous vapor and particulate phenol concentrations below both the odor and taste recognition thresholds cited above. When sufficient smoke is dispensed, the pressure valve 39 is closed and the bag 36 is sealed.

The treated seafood is next stored as described above for an operable range from 1 second to 60 hours; a preferred range of 12 hours to 54 hours; and an optimal range of 24 to 48 hours, or until the desired penetration of tasteless super-purified smoke into the fish is complete.

After treatment is complete, each bag 36 is opened and emptied and the seafood is repackaged preferably with an absorbent material in a semi-permeable vacuum pouch. The absorbent material absorbs excess moisture lost during freezing and thawing and prevents the seafood from soaking in such liquid resulting in a texture similar to fresh product after thawing.

The vacuum packed pouches are next frozen at an operable range of 10 degrees Fahrenheit or less (−12 degrees Centigrade or less), a preferred range of −40 degrees Fahrenheit or less (−40 degrees Centigrade or less), and an optimal range of cryogenic freezing of −76 degrees Fahrenheit or less (−60 degrees Centigrade or less). The frozen pouches can then be stored at an operable range of 25 degrees Fahrenheit or less (−4 degrees Centigrade or less), a preferred range of −10 degrees Fahrenheit or less (−23 degrees Centigrade or less, and an optimal range of −40 degrees Fahrenheit or less (−40 degrees Centigrade or less) for up to one year optimally without losing their vitality characteristics of freshness, flavor, color, and moisture retention after thawing.

22

Preferably, five pouches of tuna steaks of approximately 5.0 pounds (2.27 kilograms) each or 10 pouches of sashimi of approximately 2.2 pounds (1.0 kilogram) each are packed in master shipping cartons which are waxed or treated with a water resistant coating to prevent deterioration. Within each carton layers of cushioning material are placed between the packaged seafood to cushion the layers of product.

The quick thawing procedure is identical for frozen sashimi slice or steak pouches. The retailer, restaurant, or sushi bar thaws only enough for immediate sale by preparing a solution of cold water and one tablespoon of salt per gallon of cold water for each pouch to be thawed. The salt prevents discoloration if the meat contacts the solution which is in an operable range of 33 to 65 degrees Fahrenheit (1 to 18 degrees Centigrade), a preferred range of 40 to 50 degrees Fahrenheit (4 to 10 degrees Centigrade), and an optimal temperature of 45 degrees Fahrenheit (7 degrees Centigrade).

Each pouch of approximately 5.0 pounds (2.27 kilograms) of seafood steaks is submersed for approximately fifty minutes or until partially thawed with the pieces inside easily separated. Each pouch of approximately 2.2 pounds (1.0 kilogram) of sashimi slices requires approximately twenty-five minutes of quick thawing. Each pouch is then removed from the solution and dried with a paper towel. The vacuum pouch is then cut open, the sashimi slices or steaks towel dried if necessary, and displayed for sale in a refrigerated seafood section or prepared for sale in a restaurant or sushi bar.

The slow thawing procedure involves leaving the vacuum pouch in a refrigerator in an operable range of 33 to 50 degrees Fahrenheit (1 to 10 degrees Centigrade), a preferred range of 35 to 40 degrees Fahrenheit (2 to 4 degrees Centigrade), and an optimal temperature of 37 degrees Fahrenheit (3 degree Centigrade) for twelve hours or longer. The semi-permeable vacuum pouch is designed to allow oxygen to permeate into the pouch after partial thawing as its plastic becomes more malleable. This slight thawing begins normal decomposition of the seafood. This is a safety feature for both the retailer and the consumer. If the product is left in the pouch after thawing for too long, or if it is abused by temperatures above the operable range, then the normal signs of decomposition and spoilage, such as developing a bad smell, will occur similar to fresh product.

Thus, the present process for manufacturing tasteless super-purified smoke or treating seafood meets the objectives of preserving the vitality characteristics of freshness, color, texture, natural flavor, moisture retention, and shelf life of the seafood, particularly after it is frozen and thawed. In addition, the tasteless super-purified smoke, which can be stored and transported in canisters 40, greatly reduces equipment and facility costs enabling low cost treatment of seafood to be convenient and affordable throughout the seafood industry.

Industrial Applicability

This invention can be used to treat varying types of tuna species and other seafood containing red color flesh that would tend to turn brown after being frozen and thawed without this treatment. Although this tasteless super-purified smoke is primarily intended to be used to treat seafood it can also be used with meat and poultry.

What is claimed is:

1. A process for treating meat comprising:
   heating organic material to generate smoke having a gaseous vapor phase;

5,972,401

23

super purifying said smoke to reduce taste imparting components below thresholds for imparting smoke odor and taste, whereby a substantially tasteless super-purified smoke is created; and

treating meat having a freezing point with said tasteless super-purified smoke.

2. A process according to claim 1, wherein said treating step occurs for between approximately 1 second and approximately 60 hours, at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 46 degrees Fahrenheit (7.8 degrees Centigrade).

3. A process according to claim 2, further comprising:
freezing said treated meat for storage, whereby frozen meat is created.

4. A process according to claim 2 or 3, wherein said treating step occurs at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 38 degrees Fahrenheit (3.4 degrees Centigrade).

5. A process according to claim 2 or 3, wherein said treating step occurs at a temperature between approximately 0.2 degrees Fahrenheit (0.1 degrees Centigrade) above said meat's freezing point, and approximately 35 degrees Fahrenheit (1.7 degrees Centigrade).

6. A process according to any one of claims 1 to 3, wherein said treating step is carried out for between approximately 12 hours and approximately 54 hours.

7. A process according to any one of claims 1 to 3, wherein said treating step is carried out for between approximately 24 hours and approximately 48 hours.

8. A process according to claim 3, wherein said freezing step occurs at a temperature of at most approximately 10 degrees Fahrenheit (-12 degrees Centigrade).

9. A process according to claim 3, wherein said freezing step occurs at a temperature of at most approximately -40 degrees Fahrenheit (-40 degrees Centigrade).

10. A process according to claim 3, wherein said freezing step occurs at a temperature of at most approximately -76 degrees Fahrenheit (-60 degrees Centigrade).

11. A process according to any one of claims 1 to 3, wherein said heating step generates smoke also having a particulate phase, further comprising:
filtering the particulate phase of said smoke to eliminate tar, moisture, particulate and other solid matter residue after said heating step.

12. A process according to claim 11, further comprising:
filtering the gaseous vapor phase of said smoke to eliminate any remaining odor and taste imparting gaseous vapor compounds and phenols.

13. A process according to any one of claims 1 to 3, wherein said super purifying step is carried out by reducing phenols in said smoke to concentrations below recognition thresholds for imparting smoke odor to said meat.

14. A process according to claim 13, wherein said super purifying step is carried out until the gaseous vapor phase of said super purified smoke contains less than approximately 15.6 parts per million of aromatic phenols.

15. A process according to claim 13, wherein said super purifying step is carried out until the gaseous vapor phase of said super purified smoke contains less than approximately 10.4 parts per million of aromatic phenols.

16. A process according to claim 13, wherein said super purifying step is carried out until the gaseous vapor phase of said super purified smoke contains less than approximately 5.2 parts per million of aromatic phenols.

24

17. A process according to claim 11, wherein said super purifying step is carried out until the particulate phase of said super purified smoke contains less than approximately 11.7 parts per million of aromatic phenols.

18. A process according to claim 11, wherein said super purifying step is carried out until the particulate phase of said super purified smoke contains less than approximately 7.8 parts per million of aromatic phenols.

19. A process according to claim 11, wherein said super purifying step is carried out until the particulate phase of said super purified smoke contains less than approximately 3.9 parts per million of aromatic phenols.

20. A process according to claim 13, wherein said treating step is carried out so that said meat contains less than 14.1 parts per million of total aromatic phenols by weight per total weight of the meat.

21. A process according to claim 13, wherein said treating step is carried out so that said meat contains less than 9.4 parts per million of total aromatic phenols by weight per total weight of the meat.

22. A process according to claim 13, wherein said treating step is carried out so that said meat contains less than 4.7 parts per million of total aromatic phenols by weight per total weight of the meat.

23. A process according to any one of claims 1 to 3, further comprising:
aging said smoke for more than one hour before said treating step.

24. A process according to claim 3, further comprising:
storing said frozen meat at a temperature of at most 25 degrees Fahrenheit (-4 degrees Centigrade) for up to one year; and
thawing said meat, whereby said meat retains vitality after said thawing step.

25. A process according to claim 3, further comprising:
storing said frozen meat at a temperature of at most -10 degrees Fahrenheit (23 degrees Centigrade) for up to one year; and
thawing said meat, whereby said meat retains vitality after said thawing step.

26. A process according to claim 3, further comprising:
storing said frozen meat at a temperature of at most -40 degrees Fahrenheit (-40 degrees Centigrade) for up to one year; and
thawing said meat, whereby said meat retains vitality after said thawing step.

27. A process according to any one of claims 1 to 3, wherein said treating step is carried out to prevent smoke odor or taste from being imparted to said meat while preserving said meat, whereby said meat tastes fresh, without smoke odor or taste from said smoke, when said meat is thawed and eaten raw.

28. A process according to any one of claims 1 to 3, wherein said treating step is carried out by injecting said super purified smoke into said meat.

29. A process according to any one of claims 1 to 3, further comprising:
compressing said tasteless super purified smoke after said super purifying step; and
storing said compressed tasteless super purified smoke in canisters.

30. A process according claim 29, wherein said treating step is carried out with said compressed tasteless super-purified smoke.

31. A process according to claim 29, wherein said compressed tasteless super purified smoke is compressed and