IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI and HAWAII INTERNATIONAL SEAFOOD, INC.,<br><br>       Plaintiffs,<br><br>       v.<br><br>OCEAN DUKE CORPORATION,<br><br>       Defendant. | CIVIL NO. 04-00055 BMK<br><br>PLAINTIFFS' MEMORANDUM RE DEFENDANT'S WRITTEN DESCRIPTION DEFENSE |

PLAINTIFFS' MEMORANDUM RE
DEFENDANT'S WRITTEN DESCRIPTION DEFENSE

Patents, and all claims contained therein, are endowed by statute with a presumption of validity. See 35 U.S.C. § 282 ("A patent shall be presumed valid. **Each claim** of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims . . . .") (emphasis added); see also Abbott Lab. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1357 (Fed. Cir. 2003) ("all issued claims are presumed valid."). The presumption of validity is based in part on the recognition of the PTO's examiners' "expertise in interpreting the references and ... familiarity with the level of skill in the art." Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443,

**Exhibit 10**

447 (Fed. Cir. 1986).  As explained in <u>Grinnel Corp. v. American Monorail Co.</u>,

285 F.Supp. 219 (D. S.C. 1967):

> The presumption of validity, and the severe burden it places on
> defendant, are based largely on the fact that to hold a patent invalid in
> an infringement action involves overruling of a decision by an arm of
> a co-ordinate branch of Government specially empowered to pass
> upon patentability and specially trained in the technical questions
> involved.  Thus, it is the duty of the Patent Office carefully to
> examine each patent application in the light of all statutory
> requirements for patentability and to withhold issuance unless "it
> appears that the applicant is entitled to patent under the law" (35
> U.S.C. section 131).

<u>Id.</u> at 223.

Failure to meet 35 U.S.C. § 112's written description requirement constitutes

an affirmative defense.  <u>See</u> 35 U.S.C. § 282(3).  As such, Defendants carry the

burden of establishing invalidity for failure to satisfy the written description

requirement.  Their burden is a high one.  Given the presumption of validity,

Defendants must come forth with proof rising to the level of clear and convincing

evidence.  <u>See Cordis Corp. v. Medtronic Ave., Inc.</u>, 339 F.3d 1352, 1363 (Fed.

Cir. 2003) ("The burden at trial was on AVE to establish by clear and convincing

evidence that the written description requirement was not met, in light of the

presumption of validity."); <u>Abbott Lab.</u>, 334 F.3d at 1357 ("Syntron [the accused

infringer] failed to prove that, in light of the presumption of validity, no reasonable

jury could have decided that Syntron failed to prove by clear and convincing

evidence that the claims are invalid for failure to meet the written description

requirement.").

The written description requirement derives from 35 U.S.C. § 112, which provides in relevant part that "[t]he specification shall contain a written description of the invention." 35 U.S.C. § 112, see also Kao Corp. v. Unilever United States, Inc., 441 F.3d 963, 967-68 (Fed. Cir. 2006). "The purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not[.]" Amgen Inc. v. Hoechst Marion Roussell, Inc., 314 F.3d 1313, 1330 (Fed .Cir. 2003).

Section 112 requires "the patent specification to 'describe the claimed invention so that one skilled in the art can recognize what is claimed." Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1154 (Fed. Cir. 2004). "In evaluating whether a patentee has fulfilled this requirement, [the Federal Circuit's] standard is that the patent's disclosure must allow one skilled in the art to visualize or recognize the identify of the subject matter purportedly described." Id. The Federal Circuit cautions that "the disclosure as originally filed does not have to provide in haec verba support for the claimed subject matter at issue," Kao Corp., 441 F.3d at 968, and "[a] specification may, within the meaning of 35 U.S.C. § 112, para. 1, contain a written description of a broadly claimed invention without describing all species that the claim encompasses." Cordis Corp., 339 F.3d at 1365 (citation omitted).

In <u>Gentry Gallery</u>, the Federal Circuit held that claim language that did not limit the location of controls to the console between the two seats was not supported by the written description based on the following reasoning:

> In this case, **the original disclosure clearly identifies the console as the only possible location for the controls.** It provides for only the most minor variation in the location of the controls, noting that the control "may be mounted on top or side surfaces of the console rather than on the front wall ... without departing from this invention." '244 patent, col. 2, line 68 to col. 3, line 3. **No similar variation beyond the console is even suggested. Additionally, the only discernible purpose for the console is to house the controls.** As the disclosure states, **identifying the only purpose relevant to the console,** "[a]nother object of the present invention is to provide ... a console positioned between [the reclining seats] that accommodates the controls for both of the reclining seats." *Id.* at col. 1, ll. 33-37. Thus, **locating the controls anywhere but on the console is outside the stated purpose of the invention.** . . . .
>
> . . . . It is true, as Gentry observes, that we noted that "an applicant ... is generally allowed claims, when the art permits, which cover more than the specific embodiment shown." *Ethicon*, 93 F.3d at 1582 n. 7, 40 USPQ2d at 1027 n. 7 (quoting *In re Vickers*, 141 F.2d 522, 525, 61 USPQ2d 122, 125 (CCPA 1944)). However, we were also careful to point out in that opinion that the applicant "was free to draft claim[s] broadly (within the limits imposed by the prior art) to exclude the lockout's exact location as a limitation of the claimed invention" only because he "did not consider the precise location of the lockout to be an element of his invention." *Id.* Here, as indicated above, **it is clear that Sproule considered the location of the recliner controls on the console to be an essential element of his invention.** . . . .
>
> Similarly, *In re Rasmussen* does not support Gentry's position. . . . . The claims at issue in *Rasmussen*, which were limited to the generic step of "adheringly applying" one layer to an adjacent layer, satisfied the written description requirement only because "one skilled in the art who read [the] specification would understand that it is unimportant how the layers are adhered, so long as they are adhered."

> **Here, on the contrary, one skilled in the art would clearly
> understand that it was not only important, but essential to
> Sproule's invention, for the controls to be on the console.**

Id. at 1479-80 (bold emphasis added).  Thus, deviation from the well-settled

"truism that a claim need not be limited to a preferred embodiment," see id. at

1479, was sanctioned in Gentry Gallery based on the following critical factors

present in that case: (1) the original disclosure identified the console between the

two seats as the **only** possible location for the controls, (2) the claimed matter

(locating the controls anywhere but on the console between the two seats) was

**outside the stated purpose of the invention**, i.e. the patent holder considered the

location of the recliner controls on the console between the two seats to be an

**essential element** of his invention, and (3) a person skilled in the art would clearly

understand that it was **not only important, but essential**, to the invention for the

controls to be on the console between the two seats.  See id. at 1479-80.

Numerous Federal Circuit decisions have since distinguished Gentry Gallery

where the above factors were not present, holding the written description

requirement fulfilled notwithstanding broad claim language.  For example, in

Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985 (Fed. Cir. 1999),

the Federal Circuit reasoned and held:

> Thus, this case, unlike *Gentry Gallery*, in which this court's
> determination that the patent disclosure did not support a broad
> meaning for the disputed claim terms was premised on clear
> statements in the written description that described the location of a

> claim element – the "control means" – as "the only possible location" and that variations were **"outside the stated purpose of the invention."** *Gentry Gallery*, then, considers the situation **where the patent's disclosure makes crystal clear that** a particular (*i.e.* narrow) understanding of a claim term is **an "essential element of the inventor's invention."** Here, however, the patent disclosure provide ample support for the breadth of the term 'heading' it does not "unambiguously limit" the meaning of "heading" to the direction of the motor.

Id. at 993 (internal citations omitted) (bold emphasis added).

Similarly, in Cordis Corp. v. Medtronic Ave., Inc., 339 F.3d 1352 (Fed. Cir. 2003), the Federal Circuit held that the "substantial evidence supports a finding that AVE failed to prove by clear and convincing evidence that the claims are invalid for failure to satisfy the written description requirement" and distinguished Gentry Gallery as follows:

> In *Gentry Gallery*, we concluded that the written description requirement was not satisfied because while the "original disclosure clearly identifies the console as the only possible location for the controls," the claims did not limit the location of the control to the console. *Gentry Gallery* thus applied "the proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope. In the present case, the entirety of the specification does not reflect that the invention goes to the narrower scope of a mixture of half and complete slots. Such a mixture was not conveyed as critical to the invention nor was it described as the only feasible design in the disclosure.

Id. at 1365 (internal citations omitted); see also Cooper Cameron Corp., 291 F.3d at 1323 ("We are not persuaded by Kvaerner's arguments, relying on *Gentry*, that it is essential to the invention for the workover port to enter the assembly 'between

the two plugs' and that claims reciting a location other than 'between the two plugs' are therefore invalid for inadequate description. . . . . There was no description or support whatever in the *Gentry* patent of the controls being other than on the console.  In contrast, in this case, Cooper's claims to the location of the workover port in the 119 patent are supported by the figures showing that the workover port is in fact above the tubing hanger and below the BOP bore.");  Amgen Inc., 314 F.3d at 1333-34 ("Here, to be sure, Amgen made statements that its invention is 'uniquely characterized' by exogenous expression of DNA.  When considered in context, however, these statements do not lead to the same conclusion as in *Gentry*.  Amgen's statements simply do not clearly indicate that exogenous expression is the *only* possible mode of the invention or that other methods were outside the stated purpose of the invention.").

As discussed in detail below, the facts of this case are similarly distinguishable from Gentry Gallery.  The specification adequately supports Kowalski's claim to heating organic materials at temperatures not limited to the 204 to 510 degree Centigrade range.

       1.    The specification does not clearly state that Kowalski's tasteless smoke invention is possible only if the smoke is generated by heating organic material between the temperatures of 204 to 510 degrees Centigrade.

Unlike the original disclosure of the patent in Gentry Gallery, which "clearly identifie[d] the console as the only possible location for the controls," 134 F.3d at

1479, the specification of the Kowalski Patent does not clearly state that

Kowalski's invention is possible only if the smoke is generated by burning organic

material at specific temperatures, i.e. between 204 and 510 degrees Centigrade.

The specific temperature ranges discussed in portions of the specification

expressly pertain to minimization of the **formation** of deleterious polycyclic

aromatic hydrocarbons (PAHS), and oxidation or organic vapors, including both

condensable organic compounds as well as volatile organic compounds (VOCs),

see Ex. "1" (Kowalski Patent) Col. 6 ln. 63-67, Col. 7, ln. 1-3 ("**To minimize**

**formation of these compounds** . . . an operable combustion temperature range of

400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range

of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade) and an optimal

range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) are

established for the process described herein.") (emphasis added). The Kowalski

Patent referred to 204 to 510° C as a range one might use **IF** one wanted to try "To

minimize formation of these compounds." The word "operable" was used as a

label for that range of temperatures that might be used if one wanted to try to

minimize formation of the compounds, the word "operable" certainly did not

indicate that the Kowalski process only worked within that temperature range.

This is clear because the specification unambiguously states that "**If wood is**

**combusted above this temperature level and these compounds are formed,**

they can be successfully filtered later in the process." Id. at Col. 6, ln. 60-63.

Thus, far from stating that the specific temperature ranges are the only possible

way to accomplish Kowalski's process, the specification discloses that it is entirely

possible to produce smoke by burning at higher temperature levels because the

compounds can be successfully filtered later in the process.

Furthermore, "[t]he original claims as filed are part of the patent

specification." Northern Telcom, Inc. v. Datapoint Corp., 908 F.2d 931, 938 (Fed.

Cir. 1990) (citing 35 U.S.C. § 112, ¶ 2 – "The specification shall conclude with

one or more claims").  The claims in Kowalski's original November 28, 1997

application do not contain a temperature limitation as to the "heating" step.  See

Ex. "2" at 41.  In fact, even Kowalski's March 12, 1997 provisional application

claims "a process comprising burning organic smoking material to produce

smoke," which does not contain a temperature limitation.  See Ex. "3" at 39.  Thus,

the specification of Kowalski's patent does support that the process is possible at

heating temperatures not limited to the 204 to 510 degree Centigrade temperature

range.

Finally, Figure 1 of the Kowalski Patent, entitled "Smoke Emissions," refers

to smoke generation at temperatures as high as 871° Centigrade and the Abstract

refers to a preferable range of 260° to 571° Centigrade.  See Ex. "1" at Fig. 1 and

Abstract ("The smoke is generated by burning an organic smoking material at

**preferably** . . . (260 to 571 degrees C) in a smoke generator") (emphasis added). Thus, the specification discloses that it is possible, and even preferable, to generate smoke by heating organic material at temperatures above 510° Centigrade. See Cooper Cameron Corp., 291 F.3d at 1323 ("In contrast . . . Cooper's claims to the location of the workover port in the 119 patent are supported by the figures . . . .").

The above-discussed evidence conclusively shows that the temperature range (204° to 510° Centigrade) mentioned in the specification is directed only toward the option of minimization of the **formation** of certain compounds [PAHs and VOCs]," **not** the only possible temperatures at which smoke can be generated to accomplish Kowalski's process of using smoke to treat food without adding smoke taste or flavor.

In fact, that temperature range is specifically described as being a preferred embodiment, see Ex. "1" (Kowalski Patent) at Col. 16, ln. 39-44 ("Best Mode For Carrying Out Invention . . . . The sawdust . . . is combusted by heating . . . to an operable temperature range of . . . 204 to 510 degrees centigrade"), while the "Background Act" portion explains that "if wood is combusted above this temperature and these compounds [PAHs and VOCs] are formed, they can be successfully filtered later in the process." Id. at Col. 6, ln. 60-63.

At the very least, the above evidence shows that reference in the specification to a 204 to 510 degree Centigrade "operable" temperature range is

merely a preferred embodiment of Kowalski's process in which formation of the

compounds is minimized during the smoke generation step (reducing need for

removal in a subsequent step), **not** an essential or critical element or the only

possible mode of Kowalski's invention. See Amgen Inc., 314 F.3d at 1333-34

("Amgen made statements that its invention is 'uniquely characterized' by

exogenous expression of DNA. . . . . Amgen's statements simply do not clearly

indicate that exogenous expression is the *only* possible mode of the invention or

that other methods were outside the stated purpose of the invention."). As such,

Gentry Gallery is distinguishable on this ground.

> 2. Smoke generated by heating organic material at temperatures outside of the 204 to 510 degree Centigrade range is within the stated purpose of Kowalski's invention.

In Gentry Gallery, the patentee was not allowed to claim matter that was

"outside the stated purpose of the invention." 134 F.3d at 1479. Unlike in Gentry

Gallery, however, smoke generated by heating organic material at temperatures

outside of the 204 to 510 degree Centigrade range is within the stated purpose of

Kowalski's tasteless smoke invention.

Nowhere in the specification of the Kowalski Patent, particularly the section

that recites the objects of the of the invention, see id. at Col. 2, ln. 66-67, Col. 3, ln.

1-67, Col. 4, ln. 1-17, is it stated that the purpose of the invention is to avoid the

formation of carcinogenic compounds (PAHs and VOCs). Rather, the

specification of Kowalski's Patent states:

> It is therefore an object of the present invention to provide a process of manufacturing **tasteless** super-purified smoke for the treatment of . . . . seafood species (and other meat . . . ) to be frozen and thawed.
>
> It is a further object of this invention to select a fuel, or fuels, and **a combustion process that will generate an all natural, organic smoke that can be filtered.**
>
> It is a still further object of this invention **to purify the smoke by filtering out a substantial amount of odor and taste imparting particulate matter and gaseous vapors, recovering super-purified smoke in a tasteless form.**
>
> It is a still further object of this invention **to super purify the smoke to be completely non-toxic by separating out or absorbing out certain undesirable components that may be carcinogenic.**

Ex. "1" (Kowalski Patent) at Col. 2, ln 66-67, Col. 3, ln. 1-13 (emphasis added).

The only objective regarding carcinogenic compounds relates to "separating" or "absorbing" out those compounds, thus supporting that burning at high temperatures (at which the compounds are formed) is within the purpose of the invention. None of the stated objectives includes limiting formation of possibly carcinogenic compounds. All of them support the step of heating organic material to generate smoke without limitation to any specific numeric temperature range.

The above-cited "objectives" show that the creation of tasteless smoke – i.e. smoke that does not leave the food with a smoke taste or odor – is the "essential element" of Kowalski's invention. See id. An interview summary, attached hereto as Ex. "4, " reinforces this point by stating that "applicant [Kowalski] defines over

prior art of record by not imparting smoke taste & flavor & odor[.]" Furthermore, Kowalski's claims, including Claims 1 and 67, were expressly allowed by the patent examiner because "the claimed process for treating food defines over the prior art of record by comprising the steps of generating smoke, removing smoke odor and/or taste compounds from said smoke, and treating food with said smoke such that the food does not retain a smoky odor or taste." See Ex. "5" (Notice of Allowability) at 3. Thus, the main purpose of Kowalski's invention is clearly using smoke to treat foods without leaving the food with a smoke taste or odor, not the minimization of the formation of possibly carcinogenic substances.

Neither Kowalski's Patent nor its prosecution history indicate that minimization of the formation of possibly carcinogenic compounds is "essential" to Kowalski's invention. Heating at temperatures above 510° Centigrade is still within the stated purpose of Kowalski's invention, i.e. tasteless smoke, because if **"the [possibly carcinogenic] compounds are formed, they can be successfully filtered later in the process."** Ex. "1" (Kowalski Patent) at Col. 6, ln. 60-63. Heating at temperatures of 204 to 510 degrees Centigrade is simply one way (not the only way) to achieve the generic step of smoke generation. Thus, Gentry Gallery is also distinguishable on this ground.

3.  A person skilled in the art would understand that smoke could be generated by heating organic material at temperatures outside of 204 to 510 degrees Centigrade and that the 204 to 510 degree Centigrade temperature range was not essential to Kowalski's invention of not imparting smoke taste and odor.

In <u>Gentry Gallery</u>, the Federal Circuit reasoned that "one skilled in the art would clearly understand that it was not only important, but essential to [the] invention, for the controls to be on the console."  134 F.3d at 1480.  In this case, however, the evidence discussed below supports that a person with skill in the art would readily understand that the temperature at which the organic material is heated to generate smoke is not only unessential, but unimportant because it was known in the food smoking industry at the time of Kowalski's patent application in 1997-1999 that suitable smoke can be generated at temperatures outside of the 204 to 510 degree Centigrade temperature range.  <u>See id.</u>  Put another way, there was no need for Kowalski to state a broader numeric range of heating temperatures because it was already well-known in the food smoking industry.  <u>See Hybritech Inc. v. Monoclonal Antibodies, Inc.</u>, 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("[A] patent need not teach, and preferably omits, what is well known in the art."); <u>Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.</u>, 730 F.2d 1452, 1463 (Fed. Cir. 1984) ("[T]he specification need not disclose what is well known in the art."); <u>Fonar Corp. v. General Electric Co.</u>, 107 F.3d 1543, 1549 (Fed. Cir. 1997) (where a patent concerns software, a description disclosing merely

the function of the software but not the actual source code is sufficient because

"normally, writing code for such software is within the skill of the art, ... once its

functions have been disclosed.").

Given the state of knowledge in the field at the time, see Capon v. Eshhar,

418 F.3d 1349, 1357 (Fed. Cir. 2005) ("The descriptive text needed to meet these

[written description] requirements varies with the nature and scope of the invention

at issue, and with the scientific and technologic knowledge already in existence."),

the phrase "heating organic material to generate smoke" is sufficiently

straightforward that a "detailed description in the specification was not necessary."

Kao Corp., 441 F.3d at 968.  The U.S. Patent and Trademark Office's Manual of

Patent Examining Procedure (8th Ed. 2006) ("PTO Manual") states:

> The following Guidelines establish the policies and procedures to be
> followed by Office personnel in the evaluation of any patent application for
> compliance with the written description requirement of 35 U.S.C. 112...
>
> The description need only describe in detail that which is new or not
> conventional.  See Hybritech Inc. v. Monoclonal Antibodies, 802 F.2d at
> 1384 ...; Fonar Corp. v. General Electric Co., 107 F.3d at 1549 ... (source
> code description not required 1367, 1384 (Fed. Cir. 1986)...
>
> What is conventional or well known to one of ordinary skill in the art need
> not be disclosed in detail.  See Hybritech Inc. v. Monoclonal Antibodies,
> 802 F.2d at 1384 ....

Thus, it is common for the USPTO to issue patents that contain steps very similar

to the Kowalski patent's "heating an organic material to generate smoke."  See,

e.g., Ex. "11" (US Patent No. 3,615,729, issued in 1976, directed to "Smoking of

Food Products") at Col. 8, ln. 14 (claiming "generating smoke by subjecting a desired wood to heat" as a step in the process without any specific numerical temperature limitation), Ex. "12" (US Patent 4,883,676, issued in 1989, directed to "Method of Forming Liquid Smoke") at Col. 9, ln. 66-68 (claiming "heating said combustion zone to a temperature at least sufficient to effect combustion of said sawdust" as a step in the process without any specific numerical temperature limitation), Ex. "13" (US Patent 5,135,770, issued in 1992, directed to High Browning Liquid Smoke Composition and Method of Making a High Browning Liquid Smoke Composition) at Col. 16, ln. 25-29 (claiming "collecting the condensable liquids produced by the fast pyrolysis of wood or cellulose to give a raw liquid" without describing the smoke generation step at all).

The above patents show that it was well-known in the art that smoke can be generated by heating at all kinds of temperatures, including above and below the range of 204 degrees C and 510 degrees C. This point is also established by Professor Joseph A. Maga's ("*Prof. Maga*") book entitled "Smoke in Food Processing," published in 1988, which teaches that "the higher the combustion temperature, the higher the amount of gases produced," Ex. "6" at K004687, and demonstrates that smoke generation by heating at temperatures such as 540, 650, 760 and 870, and as high as 1000 degrees Centigrade was known to persons of ordinary skill in the art. See id. at K004688 (Table 12 – Influence of Combustion

Temperature On Product Yields) and K004766-67 ("They noted a linear increase

in benzo[a]pyrene concentration as smoke generation temperature was increased

from 400 to 1000°C.).  Persons skilled in the art also understood that carcinogenic

compounds such as PAHs generated at higher temperatures could be filtered or

removed.  See Ex. "7" at K004769 ("As mentioned elsewhere, the filtration of

smoke can significantly lower PAH concentration."), id. at K004766 ("Toth and

Blaas reported on numerous smoke-processing techniques that can significantly

lower PAH levels."), id. at K004769 ("Relative to filtration of smoke as a means of

reducing PAH content, Potthast et al. have shown that the technique can reduce

PAH levels up to 97%").

Generating smoke at temperatures below 204 degrees Centigrade was also

well-known by persons skilled in the art of food smoking.  United States Patent

No. 3,462,282, issued in 1969 to Fessmann, et al. and directed to "a process and

apparatus for preparing smoking fluid and smoking foodstuffs therewith,"

disclosed for a process for creating a liquid smoke by heating sawdust with steam

at **180 degrees C**.  See Ex. "8" (Fessman Patent) at Col. 2, ln. 35-37 (emphasis

added).  Also, Prof. Maga, in "Smoke in Food Processing," in 1988 discussed

earlier studies showing that "[e]ven at a temperature **slightly above 100° C**,

significant changes [relating to pyrolysis] can occur in wood," Ex. "9" at K004680

(emphasis added), and that "[a]ctual loss of cellulose polymerization can occur in

the **150 to 190°C** temperature range in the absence or presence of air." Id. at K004681 (emphasis added); see also id. at K004686-87 ("Fenner and Lephardt followed lignin decomposition over a wide temperature range and found that initial lignin decomposition occurred at **120** to 300°C.").

Where, as here, the literature provides the non-disclosed information, "the written description requirement does not require either the recitation or incorporation by reference (where permitted) [of that information]." Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1368 (Fed. Cir. 2006).

The above-discussed evidence[1] shows that the specification of Kowalski's patent described his invention in sufficient detail that one skilled in the art could clearly conclude that Kowalski's invented process encompassed smoke generated by heating organic material at temperatures outside of the 204° to 510° Centigrade range. See Cordis Corp., 339 F.3d at 1364. Persons with ordinary skill in the art, reading the phrase "heating organic material to generate smoke," would understand how to perform that step and understand that it is unessential to Kowalski's invention to generate the smoke by heating organic material at the specific temperature range of 204° to 510° Centigrade. Thus, Gentry Gallery is distinguishable on this ground as well.

DATED:  Honolulu, Hawaii, December 11, 2007.

CADES SCHUTTE LLP

/s/ Milton M. Yasunaga
MILTON M. YASUNAGA
MARTIN E. HSIA
ALLISON MIZUO LEE