CADES SCHUTTE LLP

MILTON M. YASUNAGA    3058-0
MARTIN E. HSIA    2954-0
ALLISON MIZUO LEE    7619-0
1000 Bishop Street, Suite 1200
Honolulu, HI 96813-4216
Telephone: (808) 521-9200
E-mail: myasunaga@cades.com

Attorneys for Plaintiffs
WILLIAM R. KOWALSKI and
HAWAII INTERNATIONAL SEAFOOD, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM R. KOWALSKI and HAWAII INTERNATIONAL SEAFOOD, INC., <br><br> Plaintiffs, <br><br> v. <br><br> OCEAN DUKE CORPORATION, <br><br> Defendant. | CIVIL NO. 04-00055 BMK <br><br> **PLAINTIFF WILLIAM R. KOWALSKI'S MEMORANDUM IN OPPOSITION TO DEFENDANT OCEAN DUKE CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW NOTWITHSTANDING THE VERDICT FILED 12/28/07; DECLARATION OF MILTON M. YASUNAGA, EXHIBITS "1" TO "13"; CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.5; CERTIFICATE OF SERVICE** <br><br> **TRIAL: December 4-13, 2007** |

**PLAINTIFF WILLIAM R. KOWALSKI'S MEMORANDUM IN OPPOSITION TO DEFENDANT OCEAN DUKE CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW NOTWITHSTANDING THE VERDICT FILED 12/28/07**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   STANDARDS OF REVIEW ................................................ 1

III.  ARGUMENT ...................................................................... 2

    A.    The Jury's Verdict On Invalidity Was Reasonable and Supported By Substantial Evidence. ................................... 2

        1.    Whether the Kowalski Patent meets the written description requirement is not appropriate for summary determination by the Court as a matter of law .......................... 8

        2.    The trial record provides ample support that the claims of the Kowalski Patent are not impermissibly broader than the entirety of the specification ............................... 10

            a.    The specification does not clearly state that Kowalski's tasteless smoke invention is possible only if the smoke is generated by heating organic material between the temperatures of 204 to 510 degrees Centigrade ....................................... 13

            b.    Smoke generated by heating organic material at temperatures outside of the 204 to 510 degree Centigrade range is within the stated purpose of Mr. Kowalski's invention ............................................. 20

            c.    A person skilled in the art would understand that smoke could be generated by heating organic material at temperatures outside of 204 to 510 degrees Centigrade and that the 204 to 510 degree Centigrade temperature range was not essential to Kowalski's invention of not imparting smoke taste and odor .......................................................... 22

    B.    The Damage Award Was Reasonable and Supported By "Substantial Evidence." ...................................................... 27

IV.   CONCLUSION .................................................................. 33

I.  **INTRODUCTION**

WILLIAM R. KOWALSKI ("*Kowalski*") submits that The Motion for Judgment As A Matter Of Law Notwithstanding The Verdict, filed by OCEAN DUKE CORPORATION ("*Ocean Duke*") on December 28, 2007 (the "*Motion*") should be denied because, as discussed in detail below:

(1)  The jury's verdict that Ocean Duke did not prove by clear and convincing evidence that the Kowalski patent is invalid is reasonable and supported by substantial evidence, and

(2)  The jury's reasonable royalty damage award in the amount of $2.2 million is reasonable and supported by substantial evidence.

II.  **STANDARDS OF REVIEW**

The standards for prevailing on a motion for judgment as a matter of law ("*JMOL*") and for judgment notwithstanding the verdict ("*JNOV*") are onerous. "A jury's verdict must be upheld if it is supported by substantial evidence." Wallace v. City of San Diego, 479 F.3d 606, 624 (9th Cir. 2007). "Substantial evidence" means evidence that is adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence. See id. The court "must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." Id.; see also Mentor H/S, Inc. v. Medical Device Alliance, 244 F.3d 1365, 1374 (Fed. Cir. 2001) ("we must consider the record evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor without disturbing

the jurys [sic] credibility determinations or substituting our resolutions of conflicting evidence for those of the jury. We will affirm the grant of JMOL if substantial evidence does not support the jury's factual finding or if those factual findings do not support the jury's legal conclusions.").

A motion for JNOV is proper only if the evidence permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's verdict. See Peterson v. Kennedy, 771 F.2d 1244, 1252 (9th Cir. 1985). In making this determination, the court is to "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Id. In other words, if reasonable minds could differ over the verdict, a JNOV is improper. Id.

## III.  ARGUMENT

### A.  The Jury's Verdict On Invalidity Was Reasonable and Supported By Substantial Evidence.

Patents, and all claims contained therein, are endowed by statute with a presumption of validity. See 35 U.S.C. § 282 ("A patent shall be presumed valid. **Each claim** of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims . . . .") (emphasis added); and Abbott Lab. v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1357 (Fed. Cir. 2003) ("all issued claims are presumed valid."). The presumption of validity is based in part on the recognition of the PTO's examiners' "expertise in

interpreting the references and … familiarity with the level of skill in the art."

Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 447 (Fed.

Cir. 1986).  As explained in Grinnel Corp. v. American Monorail Co., 285 F.Supp.

219, 223 (D. S.C. 1967):

> The presumption of validity, and the severe burden it places on defendant, are based largely on the fact that to hold a patent invalid in an infringement action involves overruling of a decision by an arm of a co-ordinate branch of Government specially empowered to pass upon patentability and specially trained in the technical questions involved.    Thus, it is the duty of the Patent Office carefully to examine each patent application in the light of all statutory requirements for patentability and to withhold issuance unless "it appears that the applicant is entitled to patent under the law"' (35 U.S.C. section 131).

Ocean Duke had the burden of establishing invalidity for failure to satisfy

the written description requirement.  Given the presumption of validity, Ocean

Duke was required to come forth with proof rising to the level of clear and

convincing evidence.  Cordis Corp. v. Medtronic Ave., Inc., 339 F.3d 1352, 1363

(Fed. Cir. 2003) ("The burden at trial was on AVE to establish by clear and

convincing evidence that the written description requirement was not met, in light

of the presumption of validity."); Abbott Lab., 334 F.3d at 1357 ("Syntron [the

accused infringer] failed to prove that, in light of the presumption of validity, no

reasonable jury could have decided that Syntron failed to prove by clear and

convincing evidence that the claims are invalid for failure to meet the written

description requirement.").

The written description requirement derives from 35 U.S.C. § 112, which provides that "[t]he specification shall contain a written description of the invention." 35 U.S.C. § 112, see also Kao Corp. v. Unilever United States, Inc., 441 F.3d 963, 967-68 (Fed. Cir. 2006). "The purpose of the written description requirement is to prevent an applicant from later asserting he invented that which he did not[.]" Amgen Inc. v. Hoechst Marion Roussell, Inc., 314 F.3d 1313, 1330 (Fed .Cir. 2003).[1]

Section 112 requires "the patent specification to 'describe the claimed invention so that one skilled in the art can recognize what is claimed." Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1154 (Fed. Cir. 2004). "In evaluating whether a patentee has fulfilled this requirement, [the Federal Circuit's] standard is that the patent's disclosure must allow one skilled in the art to visualize or recognize the identify of the subject matter purportedly described." Id. The Federal Circuit cautions that "the disclosure as originally filed does not have to provide *in haec verba* support for the claimed subject matter at issue," Kao Corp., 441 F.3d at 968, and "[a] specification may, within the meaning of 35 U.S.C. § 112, para. 1, contain a written description of a broadly claimed invention without

---

[1] Note, although a patent must involve some novel feature or step, most patents will also involve some steps or features that are not novel, and, as explained at page 5 herein, "the specification need not disclose what is well known in the art".

describing all species that the claim encompasses." <u>Cordis Corp.</u>, 339 F.3d at

1365.

Moreover, the specification need not teach what is already well-known in

the art. <u>See</u> <u>Hybritech Inc. v. Monoclonal Antibodies, Inc.</u>, 802 F.2d 1367, 1384

(Fed. Cir. 1986) (**"[A] patent need not teach, and preferably omits, what is well**

**known in the art."**); <u>Lindemann Maschinenfabrik GMBH v. American Hoist and</u>

<u>Derrick Co.</u>, 730 F.2d 1452, 1463 (Fed. Cir. 1984) (**"[T]he specification need not**

**disclose what is well known in the art."**); <u>Fonar Corp. v. General Electric Co.</u>,

107 F.3d 1543, 1549 (Fed. Cir. 1997) (where a patent concerns software, a

description disclosing merely the function of the software but not the actual source

code is sufficient because "normally, writing code for such software is within the

skill of the art, … once its functions have been disclosed.").

In <u>Gentry Gallery, Inc. v. Berkline Corp.</u>, 134 F.3d 1473 (Fed. Cir. 1998),

the Federal Circuit held that claim language that did not limit the location of

controls to the console between the two seats was not supported by the written

description based on the following reasoning:

> In this case, **the original disclosure clearly identifies the console as
> the only possible location for the controls.** It provides for only the
> most minor variation in the location of the controls, noting that the
> control "may be mounted on top or side surfaces of the console rather
> than on the front wall ... without departing from this invention." '244
> patent, col. 2, line 68 to col. 3, line 3. **No similar variation beyond
> the console is even suggested. Additionally, the only discernible
> purpose for the console is to house the controls.** As the disclosure

states, **identifying the only purpose relevant to the console**, "[a]nother object of the present invention is to provide ... a console positioned between [the reclining seats] that accommodates the controls for both of the reclining seats." *Id.* at col. 1, ll. 33-37. Thus, **locating the controls anywhere but on the console is outside the stated purpose of the invention.** . . . .

. . . . It is true ... that "an applicant ... is generally allowed claims, when the art permits, which cover more than the specific embodiment shown." *Ethicon*, 93 F.3d at 1582 n. 7 .... However, we were also careful to point out in that opinion that the applicant "was free to draft claim[s] broadly ... to exclude the lockout's exact location as a limitation of the claimed invention" only because he "did not consider the precise location of the lockout to be an element of his invention." *Id.* Here, as indicated above, **it is clear that Sproule considered the location of the recliner controls on the console to be an essential element of his invention.** . . . .

Similarly, *In re Rasmussen* does not support Gentry's position. . . . . The claims at issue in *Rasmussen*, which were limited to the generic step of "adheringly applying" one layer to an adjacent layer, satisfied the written description requirement only because "one skilled in the art who read [the] specification would understand that it is unimportant how the layers are adhered, so long as they are adhered." **Here, on the contrary, one skilled in the art would clearly understand that it was not only important, but essential to Sproule's invention, for the controls to be on the console.**

Id. at 1479-80. Thus, deviation from the well-settled "truism that a claim need not be limited to a preferred embodiment," see id. at 1479, was sanctioned in Gentry based on the following critical factors present in that case: (1) the original disclosure identified the console between the two seats as the **only** possible location for the controls, (2) the claimed matter (locating the controls anywhere but on the console between the two seats) was **outside the stated purpose of the invention**, i.e. the patent holder considered the location of the recliner controls on

the console between the two seats to be an **essential element** of his invention, and

(3) a person skilled in the art would clearly understand that it was **not only**

**important, but essential**, to the invention for the controls to be on the console

between the two seats.  Id.  Numerous Federal Circuit decisions have since

distinguished Gentry where, as in this case, the above factors were not present,

holding the written description requirement fulfilled notwithstanding broad claim

language.[2]

---

[2]  E.g., Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 993 (Fed. Cir. 1999) ("Thus, this case, unlike *Gentry Gallery*, in which this court's determination that the patent disclosure did not support a broad meaning for the disputed claim terms was premised on clear statements in the written description that described the location of a claim element – the "control means" – as "the only possible location" and that variations were **'outside the stated purpose of the invention.'**  *Gentry Gallery*, then, considers the situation **where the patent's disclosure makes crystal clear that** a particular (*i.e.* narrow) understanding of a claim term is **an "essential element of the inventor's invention."**  Here, however, the patent disclosure provide ample support for the breadth of the term 'heading' it does not "unambiguously limit" the meaning of "heading" to the direction of the motor."); Cordis Corp. v. Medtronic Ave., Inc., 339 F.3d 1365 (Fed. Cir. 2003) ("In *Gentry Gallery*, we concluded that the written description requirement was not satisfied because while the "original disclosure clearly identifies the console as the only possible location for the controls," the claims did not limit the location of the control to the console.  *Gentry Gallery* thus applied "the proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope.  In the present case, the entirety of the specification does not reflect that the invention goes to the narrower scope of a mixture of half and complete slots.  Such a mixture was not conveyed as critical to the invention nor was it described as the only feasible design in the disclosure.") (internal citations omitted); see also Cooper Cameron Corp., 291 F.3d at 1323 ("We are not persuaded by Kvaerner's arguments, relying on *Gentry*, that it is essential to the invention for the workover port to enter the assembly 'between the two plugs' and that claims reciting a location other than 'between the two plugs'

1.    Whether the Kowalski Patent meets the written description requirement is not appropriate for summary determination by the Court as a matter of law.

It is well-settled in the Federal Circuit that whether a patent complies with the written description requirement is **a question of fact.**  See Amgen Inc., 314 F.3d at 1330 ("Compliance with the written description requirement is essentially a fact-based inquiry that will necessarily vary depending on the nature of the invention claimed."), Cordis Corp., 339 F.3d at 1364 ("whether the written description requirement has been satisfied is a question of fact"), Gentry, 134 F.3d at 1479 ("Whether a specification complies with the written description requirement of § 112, ¶ 1, is a question of fact, which we review for clear error on appeal from a bench trial.").    "In written description cases, 'the primary consideration is *factual* and depends on the nature of the invention and the amount of knowledge imparted to those skilled in the art by the disclosure.'"  Union Oil Company v. Atlantic Richfield Co., 208 F.3d 989, 996 (Fed. Cir. 2000).

---

are therefore invalid for inadequate description. . . . .  There was no description or support whatever in the *Gentry* patent of the controls being other than on the console.  In contrast, in this case, Cooper's claims to the location of the workover port in the 119 patent are supported by the figures showing that the workover port is in fact above the tubing hanger and below the BOP bore."); Amgen Inc., 314 F.3d at 1333-34 ("Here, to be sure, Amgen made statements that its invention is 'uniquely characterized' by exogenous expression of DNA.  When considered in context, however, these statements do not lead to the same conclusion as in *Gentry*. Amgen's statements simply do not clearly indicate that exogenous expression is the *only* possible mode of the invention or that other methods were outside the stated purpose of the invention.").

Ocean Duke's contention that whether the Kowalski Patent is invalid for failure to meet the written description requirement is a question of law appropriate for summary determination by the Court is incorrect. Ocean Duke, after acknowledging that "[i]ssues surrounding the written description defense often present questions of fact to be determined by the jury," relies on two easily distinguishable cases, i.e. Continuous Curve Contact Lenses, Inc. v. Rynco Scientific Corp., 680 F.2d 605 (9th Cir. 1982) (pertaining to the anticipation defense) and Amhil Enter. Ltd. v. Wawa, Inc., 81 F.3d 1554 (Fed. Cir. 1996) (pertaining to infringement), to urge the Court to override the jury's determination on invalidity. Continuous Curve Contact Lenses, Inc., however, aptly illustrates why summary determination of the written description defense as a matter of law would be improper. There, the Ninth Circuit held that:

> Although the alleged anticipatory art and patent in the instant case are separately understandable by intelligent laymen, whether the article anticipated the invention patented by '250 is not clear. A fact-finder unskilled in the art of contact lens making could not decide, without expert testimony, whether the general discussion of plastics in the article was capable of stimulating a person skilled in the art to produce a contact lens out of c. a. b. . . . . Because testimony is needed, this case does not fall under the exception to the rule that anticipation, as a factual issue, should not be decided on summary judgment.

680 F.3d at 607. Similarly, in this case, testimony and documentary evidence (such as patents and articles) on the issue of what a person of reasonable skill in the art would have understood from reading the Kowalski Patent are relevant and

helpful to determine whether the written description requirement is met.

>     2.    The trial record provides ample support that the claims of the
>           Kowalski Patent are not impermissibly broader than the entirety
>           of the specification.

Ocean Duke's contentions that "[t]he evidence at trial showed that the claims of the Kowalski patent are overwhelmingly broader than the scope of the invention as disclosed in the patent's specification,"[3] and that "the only evidence in the record at trial is that Mr. Kowalski's patented process – that is, his invention – is associated with specific temperature ranges," are contradicted by the evidence. The below evidence/facts show that this case is distinguishable from <u>Gentry</u> and that the jury's verdict that Ocean Duke did not sustain its burden of proving by clear and convincing evidence that the Kowalski Patent was invalid is supported by substantial evidence:

---

[3]  Ocean Duke asserts, as a ground supporting the Motion, that "[t]he claims of the Kowalski patent, as construed by the court, are impermissibly broader than the specification of the invention set forth in the written description." <u>See</u> Memo. In Support of Mot. at 1. It also contends that "a patent consists of two parts: a written description of the invention, and the claims of the patent." These are improper/imprecise formulations of the law. The written description requirement derives from Title 35, U.S.C. § 112, ¶ 1, which states "[t]he specification shall contain a written description of the invention." Thus, it is incorrect to say that the specification is set forth in the written description. Also, disclosure in an originally filed claim satisfies the written description requirement. <u>See Union Oil Co.</u>, 208 F.3d at 998, n. 4. As such, not all claims of the patent are separate and distinct from the written description. "[T]he original claim in itself [is considered] an adequate written description of the claimed invention. It was equally a written description whether located among the original claims or in the descriptive part of the specification." <u>Id.</u>

- <u>Dr. Maga Testimony</u>:  Dr. Maga testified, consistent with his October 31, 2007 Declaration attached hereto as Exhibit "1," that a person of reasonable skill in the art, at the time Mr. Kowalski applied for his patent in 1997: (1) would have understood how to perform the step of "heating organic material to generate smoke," would have known that smoke can be generated by heating at various temperatures – including above 510° C and below 204° C, and would have recognized that Mr. Kowalski's invention would work by generating smoke by heating at temperatures below or above the range of 204° to 510° Centigrade, (2) would have known, as his book Smoke In Food Processing (published 1988) contained references, that smoke generation could occur at temperatures as low as 100° C and well above 510° C, and (3) **would not, after reading the Kowalski Patent and drawing upon that person's knowledge in the field, have gotten the impression that the only possible temperatures that could be used to generate smoke for Mr. Kowalski's tasteless smoke process were the temperatures between 204 and 510 degrees C or that heating at temperatures between 204 to 510 degrees C was essential to Mr. Kowalski's invention of using smoke to treat food so that the food does not end up with a smoke taste.**  <u>See</u> Ex. "1" (Maga Decl. dated 10/31/07) attached hereto, at ¶¶ 6, 7, 10, 11.  Dr. Maga also testified that he understood that the reference to the temperature ranges in the Kowalski Patent referred to minimization of the formation of PAHs, not the only temperatures at which Mr. Kowalski's invention would work.  <u>See</u> Ex. "1" (Maga Decl. dated 10/31/07) attached hereto, at ¶ 8, 9.

- <u>Smoking Patents</u>:  Patents introduced into evidence as Trial Exhibits 167 (Underwood, attached as Exhibit "2"), 168 (Sophianopolous, attached as Exhibit "3"), 169 (Baker, attached as Exhibit "4"), and 170 (Fessman, attached as Exhibit "5"), supported that persons skilled in the art of food smoking knew that smoke generation could be accomplished at various temperatures, including those outside of the 204° to 510° C range, and that persons of ordinary skill in the art assumed that other persons skilled in the art reading their patent understood how to generate smoke and therefore need not, and did not, give details about the step of smoke generation.  <u>See</u>, <u>e.g.</u>, Ex. "4" (Baker) at col. 8: ln 24 ("generating smoke by subjecting a desired wood to heat").

- <u>Kowalski Patent</u> (Trial Exhibit 1, attached to Motion as Ex. "A"):  The specification of the Kowalski Patent refers to the temperature ranges in the following context:

The smoke produced from burning wood and other organic material fuels is a function of combustion temperature and amount of air intake. FIG. 1 shows the composition of wood smoke emissions at varying combustion temperatures. The formation of deleterious polycyclic aromatic hydrocarbons (PAHS) and oxidation of organic vapors, including both condensable organic compounds as well as volatile organic compounds (VOCs) can be prevented by combusting below 850 degrees Fahrenheit (454 degrees Centigrade). **If wood is combusted above this temperature level and these compounds are formed, they can be successfully filtered later in the process.**

**To minimize formation of these compounds** and to conform to empirical data from our laboratory tests, on operable temperature range of 400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade), and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) are established for the process described herein.

See Ex. "A" to Mot. at Col. 6, ln 60-67, Col. 7, ln. 1-3.

Regarding the objectives of the invention, the Kowalski Patent specification provides:

> It is therefore an object of the present invention to provide a process of manufacturing tasteless super-purified smoke for the treatment of . . . . seafood species (and other meat . . . ) to be frozen and thawed.

> It is a further object of this invention to select a fuel, or fuels, and **a combustion process that will generate an all natural, organic smoke that can be filtered.**

> It is a still further object of this invention **to purify the smoke by filtering out a substantial amount of odor and taste imparting particulate matter and gaseous vapors, recovering super-purified smoke in a tasteless form.**

> It is a still **further** object of this invention **to super purify the smoke to be completely non-toxic by separating out or absorbing out certain undesirable components that may be carcinogenic.**

Ex. "A" (Kowalski Patent) at Col. 2, ln 66-67, Col. 3, ln. 1-13.

- November 1997 (Trial Exhibit 2, attached as Exhibit "6") and March 1997 (Trial Exhibit 31, attached as Exhibit "7") Patent Applications:   The claims in Kowalski's original November 28, 1997 application do not contain a temperature limitation as to the smoke generation step.  See Ex. "6" (Trial Exhibit 2) at 41.  Even Kowalski's March 12, 1997 provisional application claims a process wherein the smoke generation step does not contain a temperature limitation.  See Ex. "7" (Trial Exhibit 31) at 39.

As discussed in detail below, this case differs significantly from the factors present in Gentry.  The evidence establishes that the entirety of the Kowalski Patent specification **does not** clearly indicate that Mr. Kowalski's invention is of a much narrower scope than what is claimed.  See Cooper Cameron Corp. v. Kvaerner Oilfield Prod., Inc., 291 F.3d 1317, 1323 (Fed. Cir. 2002) ("[I]n Gentry, we applied the unremarkable proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope.").  A reasonable jury could (and did) find that Ocean Duke did not carry its burden of proving by clear and convincing evidence that the Kowalski Patent was invalid for failure to meet the written description requirement.  See Peterson, 771 F.2d at 1252.

      a.    The specification does not clearly state that Kowalski's tasteless smoke invention is possible only if the smoke is generated by heating organic material between the temperatures of 204 to 510 degrees Centigrade.

Unlike the original disclosure of the patent in Gentry, which "clearly identifie[d] the console as the only possible location for the controls," 134 F.3d at

1479, the trial record contains evidence showing that the specification of the Kowalski Patent does not clearly state that Kowalski's invention is possible only if the smoke is generated by burning organic material at specific temperatures, i.e. between 204 and 510 degrees Centigrade.

The specific temperature ranges discussed in portions of the specification expressly pertain only to the **option** of the minimization of the **formation** of deleterious polycyclic aromatic hydrocarbons (PAHS), and volatile organic compounds (VOCs), see Ex. "A" (Kowalski Patent) to Mot. at Col. 6 ln. 63-67, Col. 7, ln. 1-3 ("**To minimize formation of these compounds** . . . an operable combustion temperature range of 400 to 950 degrees Fahrenheit (204 to 510 degrees Centigrade), a preferred range of 500 to 800 degrees Fahrenheit (260 to 571 degrees Centigrade) and an optimal range of 650 to 750 degrees Fahrenheit (343 to 399 degrees Centigrade) are established for the process described herein."). The Kowalski Patent referred to 204 to 510° C as a range one might use **IF** one wanted to try the option of "To minimize formation of these compounds."  The word "operable" was used just as a label for that range of temperatures that might be used if one wanted to try the option of minimizing formation of the compounds, the word "operable" certainly did not indicate that the Kowalski process of using smoke to preserve without smoke taste only worked within that temperature range. While Ocean Duke cites a dictionary definition of "operable" to urge the Court to

read this term out of the context in which it appears in the Kowalski Patent, see Memo. in Support of Mot. at 9, Federal Circuit law is clear that the inventor's intended meaning of a term governs regardless of whether another definition would ordinarily follow from looking at a dictionary. See Phillips v. AWH Corp., 415 F.3d 1303, 1320 (Fed. Cir. 2005) (rejecting use of dictionary definitions over the meaning of a term as derived from intrinsic evidence – i.e., the patent -- and remarking that "our cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."). Here, the clause "**To minimize formation of these compounds**" of the specification clearly indicates that the ranges refer to the **option** of minimizing the **formation** of PAHs, and do not constitute the limits of Kowalski's invention of using smoke to treat food without imparting smoke taste.

It is clear that the reference to an "operable" range of 204 to 510 degrees C does not refer to the only temperatures at which Kowalski's invention is possible because the specification unambiguously states "**If wood is combusted above this temperature level and these compounds are formed, they can be successfully filtered later in the process.**"  Ex. A at Col. 6, ln. 60-63.  Thus, far from stating that the specific temperature ranges are the only possible way to accomplish Kowalski's tasteless smoke process, the specification, especially when viewed in

the light most favorable to Plaintiff, discloses that it is entirely possible to produce tasteless smoke by burning at higher temperature levels because any deleterious compounds formed at the higher temperatures can be **successfully** filtered later in the process.

Furthermore, the jury was properly instructed that **"[t]he original claims as filed are part of the patent specification."** Northern Telcom, Inc., 908 F.2d at 938 (citing 35 U.S.C. § 112, ¶ 2 – "The specification shall conclude with one or more claims"); see also Union Oil Co., 208 F.3d at 994. The claims in Kowalski's original November 28, 1997 application do not contain a temperature limitation as to the smoke generation step. See Ex. "6" at 41. In fact, even Kowalski's March 12, 1997 provisional application claims a process which does not contain a temperature limitation for the smoke generation step. See Ex. "7" at 39. Thus, the specification of the Kowalski Patent **does** support that the process is possible at smoke generation temperatures not limited to the 204 to 510 degree Centigrade temperature range mentioned regarding the option of trying to minimize formation of PAH's. See Union Oil Co., 208 F.3d at 998, n. 4 (**"One of this court's predecessor courts clarified that disclosure in an originally filed claim satisfied the written description requirement.** *See In re Gardner*, 480 F.2d 879, 880, (1973) ("Under these circumstances, **we consider the original claim in itself adequate written description of the claimed invention. It was equally a**

**'written description' whether located among the original claims or in the descriptive part of the specification."**)).

Furthermore, the temperature range for minimizing the formation of PAH and VOC compounds is specifically described as being part of the preferred embodiment, as opposed to being the limit of the tasteless smoke process, see Ex. "A" to Mot. at Col. 16, ln. 39-44 ("Best Mode For Carrying Out Invention . . . . The sawdust . . . is combusted by heating . . . to an operable temperature range of . . . 204 to 510 degrees centigrade"), while the "Background Act" portion explains that "if wood is combusted above this temperature and these compounds [PAHs and VOCs] are formed, they can be successfully filtered later in the process." Id. at Col. 6, ln. 60-63.    Reference in the specification to a 204 to 510 degree Centigrade "operable" temperature range is merely a feature of a preferred embodiment of Kowalski's process in which formation of the PAH and VOC compounds is minimized during the smoke generation step (reducing need for removal in a subsequent step), **not** an essential or critical element or the only possible mode of Kowalski's invention of treating with smoke without imparting smoke taste or outside the purpose of the invention. See, e.g., Amgen Inc., 314 F.3d at 1333-34, which shows the very high burden for finding that something is an essential element or the only possible mode ("Amgen made statements that its invention is 'uniquely characterized' by exogenous expression of DNA. . . . .

Amgen's statements simply do not clearly indicate that exogenous expression is the *only* possible mode of the invention or that other methods were outside the stated purpose of the invention.").

Finally, contrary to Ocean Duke's contention, Kowalski did not "confirm[] that it is actually preferable to heat the sawdust at an even higher range than was disclosed in the 'written description' section of the patent." Memo. in Support of Mot. at 8. Kowalski's actual testimony at trial was as follows:

> Q.    Is it correct, Mr. Kowalski, that after you applied for your patent and after you received the generally regarded as safe notice, that you learned that producing smoke by burning saw dust at temperatures far higher than 500 degrees centigrade is benefit for the tasteless smoke process?
>
> A.    Yes, it's a beneficial method.
>
> Q.    And is it also correct that the facilities in the Philippines that at least at within the time generated your tasteless smoke, in fact, burned saw dust at temperatures far higher than 500 degrees centigrade to create the tasteless smoke.  Is that also correct?
>
> A.    Yes.
>
> Q.    You are familiar with the term, because you know a lot about patents, "best mode"?
>
> A.    Yes.
>
> Q.    Okay.  If you were to do a patent today for your process, would you agree that the best mode would be higher than 500 degrees for burning the saw dust?
>
> A.    I don't know.
>
> . . . .

Q.    Okay.  Now, would you agree with me or disagree with me that the claims of your patent, which I think you've already agreed, maybe you didn't say very broad but they are broad, are broad enough to cover not just your invention but also the Shih patent?

A.    Yes.

Q.    The claims are not nearly limited to the invention that you made and that you patented; would you agreed with that?

A.    No.  They are not already limited to the way that I'm using the invention in my business.

Ex. "13" (Trial Tr. of Day 2) at 121: 25, 122: 1-18, 126: 7-16.

Thus, Mr. Kowalski merely stated that after his patent was granted, he learned that generating smoke by burning at temperatures above 500 degrees C was a beneficial method and that one of his former smoke suppliers in the Philippines generated smoke by burning above 500 degrees C.[4]  Contrary to Ocean Duke's innuendo, Mr. Kowalski did not say anything to the effect that the "written description" of his invention was limited to temperatures below 500 degrees C or that the claims were not limited to the invention that Mr. Kowalski patented.

---

[4] Although Ocean Duke long ago waived any right to raise a best mode defense, it should be pointed out that the best mode requirement only requires the applicant to state in the application what **at the time of the filing of the application** he perceived as the best mode of his invention, so Kowalski's later coming to believe that a higher temperature was better cannot constitute a violation of the best mode requirement.  See, e.g., Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1535 (9th Cir. 1987).

   b. Smoke generated by heating organic material at temperatures outside of the 204 to 510 degree Centigrade range is within the stated purpose of Mr. Kowalski's invention.

In <u>Gentry Gallery</u>, the patentee was not allowed to claim matter that was "outside the stated purpose of the invention." 134 F.3d at 1479. Unlike in <u>Gentry Gallery</u>, however, the trial record in this case contains evidence showing that the claimed matter (i.e. smoke generated by heating organic material at temperatures outside the 204 to 510 degrees Centigrade range) is within stated purpose of the invention.

Nowhere in the specification of the Kowalski Patent, particularly the section that recites the objects of the of the invention, <u>see</u> <u>id.</u> at Col. 2, ln. 66-67, Col. 3, ln. 1-67, Col. 4, ln. 1-17, is it stated that the purpose of the invention is to avoid the formation of carcinogenic compounds (PAHs and VOCs) or to refrain from generating smoke at temperatures below or above the range of 204 to 510 degrees Centigrade. Rather, the specification of Kowalski's Patent states:

 It is therefore an object of the present invention to provide a process of manufacturing **tasteless** super-purified smoke for the treatment of . . . . seafood species (and other meat . . . ) to be frozen and thawed.

 It is a further object of this invention to select a fuel, or fuels, and **a combustion process that will generate an all natural, organic smoke that can be filtered.**

 It is a still further object of this invention **to purify the smoke by filtering out a substantial amount of odor and taste imparting particulate matter and gaseous vapors, recovering super-purified smoke in a tasteless form.**

It is a still further object of this invention **to super purify the smoke to be completely non-toxic by separating out or absorbing out certain undesirable components that may be carcinogenic.**

Ex. "1" (Kowalski Patent) at Col. 2, ln 66-67, Col. 3, ln. 1-13 (emphasis added). The only objective regarding carcinogenic compounds relates to "separating" or "absorbing" out those compounds, thus supporting that burning at high temperatures (at which the compounds are formed) is within the purpose of the invention. None of the stated objectives includes limiting formation of possibly carcinogenic compounds. All of them support the step of heating organic material to generate smoke without limitation to any specific numeric temperature range.

The above-cited "objectives" show that using smoke to preserve food without giving the food a smoke taste or odor – is the "essential element" of Kowalski's invention. See id. The USPTO's Interview Summary, admitted into evidence as Trial Exhibit 9 and attached hereto as Ex. "11," reinforces this point by stating that "applicant [Kowalski] defines over prior art of record by not imparting smoke taste & flavor & odor[.]" Furthermore, Kowalski's claims, including Claims 1 and 67, were expressly allowed by the patent examiner because "the claimed process for treating food defines over the prior art of record by comprising the steps of generating smoke, removing smoke odor and/or taste compounds from said smoke, and treating food with said smoke such that the food does not retain a smoky odor or taste." See Ex. "12" (Trial Exhibit 11, Notice of Allowability)

attached hereto, at 3. Thus, the trial record shows that the essential element of Mr. Kowalski's invention is clearly using smoke to treat foods without leaving the food with a smoke taste or odor, not the minimization of the formation of possibly carcinogenic substances.

Neither Kowalski's Patent nor its prosecution history indicate that minimization of the formation of possibly carcinogenic compounds is "essential" to Kowalski's invention. Heating at temperatures above 510° Centigrade is still within the stated purpose of Kowalski's invention, i.e. smoking to treat food without imparting smoke taste, because if **"the [possibly carcinogenic] compounds are formed, they can be successfully filtered later in the process."** Ex. "A" (Kowalski Patent) to Mot. at Col. 6, ln. 60-63. Heating at temperatures of 204 to 510 degrees Centigrade is simply one way (not the only way) to achieve the not-novel step of smoke generation.

> c.  A person skilled in the art would understand that smoke could be generated by heating organic material at temperatures outside of 204 to 510 degrees Centigrade and that the 204 to 510 degree Centigrade temperature range was not essential to Kowalski's invention of not imparting smoke taste and odor.

In Gentry Gallery, the Federal Circuit reasoned that "one skilled in the art would clearly understand that it was not only important, but essential to [the] invention, for the controls to be on the console." 134 F.3d at 1480. In this case, however, the evidence at trial overwhelmingly supported that a person with skill in

the art would readily understand that the temperature at which the organic material is heated to generate smoke is not only unessential, but unimportant because it was known in the food smoking industry at the time of Kowalski's patent application in 1997 that suitable smoke can be generated at temperatures outside of the 204 to 510 degree Centigrade temperature range, and that that range referred only to the option of minimization of the formation of PAH compounds. See id. Put another way, there was no need for Mr. Kowalski to state a broader numeric range of heating temperatures because it was already well-known in the food smoking industry. See Hybritech Inc., 802 F.2d at 1384 (**"[A] patent need not teach, and preferably omits, what is well known in the art."**); Lindemann Maschinenfabrik GMBH, 730 F.2d at 1463 (**"[T]he specification need not disclose what is well known in the art."**); Fonar Corp., 107 F.3d at 1549.

Given the state of knowledge in the field at the time, see Capon v. Eshhar, 418 F.3d 1349, 1357 (Fed. Cir. 2005), the phrase "heating organic material to generate smoke" is sufficiently straightforward that a "detailed description in the specification was not necessary." Kao Corp., 441 F.3d at 968. The U.S. Patent and Trademark Office's Manual of Patent Examining Procedure (8th Ed. 2006) (**"*PTO Manual*"**) states:

> The following Guidelines establish the policies and procedures to be followed by Office personnel in the evaluation of any patent application for compliance with the written description requirement of 35 U.S.C. 112…

**The description need only describe in detail that which is new or not conventional.** ....

**What is conventional or well known to one of ordinary skill in the art need not be disclosed in detail.** ….

Thus, it is common for the USPTO to issue patents that contain steps very similar to the Kowalski patent's "heating an organic material to generate smoke," or even broader and with less disclosure. <u>See</u>, <u>e.g.</u>, Ex. "4" (Trial Exhibit 169 – Baker, US Patent No. 3,615,729, 1976) attached hereto, at Col. 8, ln. 14 (claiming "generating smoke by subjecting a desired wood to heat" as a step in the process without any specific numerical temperature limitation), Ex. "3" (Trial Exhibit 168 – Sophianopolous, US Patent 4,883,676, 1989) attached hereto, at Col. 9, ln. 66-68 (claiming "heating said combustion zone to a temperature at least sufficient to effect combustion of said sawdust" as a step in the process without any specific numerical temperature limitation), Ex. "2" (Trail Exhibit 167 – Underwood, US Patent 5,135,770, 1992), attached hereto, at Col. 16, ln. 25-29 (claiming "collecting the condensable liquids produced by the fast pyrolysis of wood or cellulose to give a raw liquid" without describing the smoke generation step at all).

The above patents, which were introduced into evidence at trial, as well as Dr. Maga's testimony support that it was well-known in the art that smoke can be generated by heating at all kinds of temperatures, including above and below the range of 204 degrees C and 510 degrees C.  <u>See</u> Ex. "1" (Maga Decl. ) attached

hereto, at ¶ 10 (remarking that smoke generation by heating at temperatures as high as 1000 degrees Centigrade and as low as 100 degrees Centigrade was known to persons of ordinary skill in the art).  Dr. Maga's testimony also supported that persons skilled in the art also understood that carcinogenic compounds such as PAHs generated at higher temperatures could be filtered or removed.  See id..  **Significantly, a person of ordinary skill in the art would not, after reading the Kowalski Patent and drawing upon that person's knowledge in the field, have gotten the impression that the only possible temperatures that could be used to generate smoke for Mr. Kowalski's tasteless smoke process were the temperatures between 204 to 510 degrees C or that heating at temperatures between 204 to 510 degrees C was essential to Mr. Kowalski's inventio**n.  See id. at ¶ 7.

The above-discussed evidence shows that the specification of Kowalski's patent described his invention for treating with smoke without imparting smoke taste in sufficient detail that one skilled in the art could clearly conclude that Kowalski's invented process encompassed smoke generated by heating organic material at temperatures outside of the 204° to 510° Centigrade range.  See Cordis Corp., 339 F.3d at 1364.  As supported by Dr. Maga's testimony,[5] persons with

---

[5] To the extent that Dr. Maga testified, as Ocean Duke contends, that "there are many ways to generate smoke containing carbon monoxide, and that for many of them 'you don't even need a patent,'" Memo. in Support of Mot. at 13, this

ordinary skill in the art, reading the phrase "heating organic material to generate smoke," would understand how to perform that step and understand that it is unessential to Kowalski's invention to generate the smoke by heating organic material at the specific temperature range of 204° to 510° Centigrade.  See Ex. "1" (Maga Decl.) attached hereto, at ¶ 4, 7.

Ocean Duke emphasizes that the claims of the Kowalski Patent are broad, pointing to statements in Plaintiff's January 2000 Notice of Infringement letter and the conclusory testimony of its own expert Prof. Iwaoka[6] that the Kowalski Patent is "too broad."  See Memo. in Support of Mot. at 12-13.  It is plain that a patent is not invalid merely because the PTO grants broad coverage.  Pioneering inventions, such as Mr. Kowalski's, "enjoy the benefits of their contribution to the art in the form of broader claims.  Without extensive prior art to confine and cabin their claims, pioneers acquire broader claims than non-pioneers who must craft narrow claims to evade the strictures of a crowded art field.  Thus, the claim scope itself

---

testimony supports Plaintiff's position that the step of smoke generation was not an essential or critical element of Mr. Kowalski's invention, but rather a generic or non-novel step, and that persons of ordinary skill in the art would have understood that smoke generation could be achieved in ways not limited to the temperature ranges described in the Kowalski Patent for the option of minimizing the formation of PAHs.

[6]  Notably, Prof. Iwaoka admitted that he had no professional training or experience in smoking foods (except for personal consumption).  Thus, his testimony is not probative of what a person of ordinary skill in the art of food processing with smoke would have understood when reading the Kowalski Patent.

generally supplies broader exclusive entitlements to the pioneer." <u>Augustine Med.,</u>
<u>Inc. v. Gaymar Indus., Inc.</u>, 181 F.3d 1291, 1301 (Fed. Cir. 1999).

To summarize, there is "substantial evidence" in the record supporting that
the claims of the Kowalski Patent are not impermissibly broad because the entirety
of the specification does not clearly indicate that Mr. Kowalski's invention is of a
much narrower scope. <u>See</u> <u>Cooper Cameron Corp.</u>, 291 F.3d at 1323. Especially
when viewed in the light most favorable to Plaintiff, there can be no doubt that the
a reasonably jury could find (as it did) that Ocean Duke failed to prove by clear
and convincing evidence that the Kowalski Patent is invalid. <u>See</u> <u>Peterson</u>, 771
F.2d at 1252; <u>see also</u> <u>Union Oil Co.</u>, 208 F.3d at 999 ("the jury in this case
reached the same conclusion [that the inventors possessed the claimed invention at
the time of filing in the assessment of those of ordinary skill in the petroleum
reefing art] as a matter of fact – a proposition that this court cannot disturb on this
record which supplies substantial evidence to support that finding.").

### B.    <u>The Damage Award Was Reasonable and Supported By</u> <u>"Substantial Evidence."</u>

Ocean Duke contends that the damage award was not supported by sufficient
evidence because the testimony of Plaintiff's damage expert, Mr. David Francom
("***Mr. Francom***") should be stricken. According to Ocean Duke, Mr. Francom's
testimony was speculative and not supported by admitted evidence, but rather
based on the "scantest of evidence from Ocean Duke." Memo. in Support of Mot.

at 15. Ocean Duke also contends that if Mr. Francom's testimony is allowed to remain in the record, the Court should re-weight it, and in effect, over-ride the jury's determination that Mr. Francom's opinion was credible and sufficiently supported. Significantly, Ocean Duke did not even suggest an alternative number to counter the approximately $2 million figure proposed by Mr. Francom, choosing instead to insist that damages in any amount should not be awarded.

The Ninth Circuit instructs that courts should afford "substantial deference to a jury's finding of the appropriate amount of damages." <u>Del Monte Dunes at Monterey, Ltd. v. City of Monterey</u>, 95 F.3d 1422, 1435 (9th Cir. 1995). The jury's finding on damages must be upheld "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." <u>Id.</u> Where "the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof," the court should not "'play Monday morning quarterback' and supplant the jury's evaluation[.]" <u>Los Angeles Mem. Coliseum Comm. v. Nat'l Football League</u>, 791 F.2d 1356, 1366 (9th Cir. 1984).

Ocean Duke's contention that Mr. Francom's testimony should be stricken because it is not based on financial documents that were admitted into evidence, as the Court has already ruled during trial, lacks merit. Fed. R. Evid. 703 provides in relevant part:

> If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Thus, Mr. Francom's testimony should not be stricken as Ocean Duke urges because none of Plaintiff's/HISI's[7] voluminous financial records and documents were not admitted into evidence. Economists and accountants regularly rely on the financial statements and records of the nature provided to and analyzed by Mr. Francom to calculate damages. See Int'l Adhesive Coating Co., Inc v. Bolton Emerson Int'l Inc., 851 F.2d 540, 545 (1st Cir. 1988) ("Vesey [expert] testified that he derived his damage estimates by reviewing International's business and financial records and through interviews with company personnel. We think it obvious that these are sources of information normally and reasonably relied upon by accountants, and Vesey testified to this effect as well. The jury was entitled to believe Vesey's testimony. The verdict demonstrates that it did."). Mr. Francom testified about the time consuming analysis of the records and financial data provided by Plaintiff's company HISI and the methodology employed, factors considered, and references consulted to form his opinion on the appropriate

---

[7] Given that the Court ruled as a matter of law that Plaintiff was not entitled to lost profit damages and this issue was not submitted to the jury, Mr. Francom's reliance on Hawaii International Seafood, Inc.'s business records does not appear to be relevant to whether the jury's reasonably royalty damage award was excessive.

reasonable royalty damages sustained by Plaintiff.  Mr. Francom's report, which was timely produced to Ocean Duke during discovery, summarized these opinions and included the voluminous back-up in the form of data and spreadsheets, was not admitted into evidence because Ocean Duke objected, and the Court apparently felt that the underlying records were not necessary.  Despite Ocean Duke's attempts to discredit Mr. Francom and cast doubt on his calculations during cross-examination, the jury determined that Mr. Francom's opinions/damage figures were credible and reasonably certain.

Second, Ocean Duke's contention that Mr. Francom's testimony regarding the reasonable royalty damages "consisted of opinion testimony that completely lacked a foundation in any of the evidence admitted at trial" is simply incorrect.[8] As testified to at trial and reflected in his report, see Ex. "8" (Francom Report) at 19, Mr. Francom relied upon the chart summarizing Ocean Duke's profits on treated seafood from 1999 to 2005 put together by Ocean Duke.  This document was admitted into evidence as Trial Exhibit 193.  See Ex. "9" attached hereto.

---

[8] Ocean Duke's criticism that Mr. Francom relied on the "scantest of evidence from Ocean Duke," Memo. in Support of Mot. at 15, is particularly disturbing because Ocean Duke failed to provide any additional data regarding Ocean Duke's finances and operations despite discovery requests specifically designed to elicit responsive documents of the nature Ocean Duke faults Mr. Francom for not relying upon and a stipulated protective order compelling Ocean Duke to produce those documents.  See Yasunaga Decl. ¶ 2; see also Ex. "10" (email from Yasunaga to Marks dated 5/04/07).

Ocean Duke's Chief Operating Officer and majority shareholder Roger Lin verified on the stand that the figures stated in Trial Exhibit 193 were accurate.

Finally, the record shows ample support for the jury's reasonable royalty damage award in the amount of $2.2 million. Trial Exhibit 193 provided evidence that in the years 1999 to 2005 alone (not including 2006 and 2007), Ocean Duke realized revenue in the amount of $30,239,543 from sales of the infringing product with a net profit of $3,768,523 after subtracting out "cost of goods" in the amount of $24,136,827 and "overhead & expenses" in the amount of $2,334,193. When asked by Plaintiff's counsel at trial what type of expenses were included in the "overhead & expenses" figure, Roger Lin could not explain, suggesting that this category of expenses was made up and the net profit amount was actually higher than what Ocean Duke had reported in Trial Exhibit 193. As indicated in his report and testimony, Mr. Francom used the data available and his expert training in the field to reasonably come up with estimates for the missing 2006 and 2007 sales figures, so the total pounds sold and profits realized from infringing product were justifiably greater than those shown on Ex. 193, which left out 2006 and 2007. In addition, Mr. Francom testified that his opinions were based on conservative assumptions and that, among other things, (1) the starting point for determining reasonable royalty damages is that the licensor would receive approximately 25% of the expected future benefit (net profit on the infringing

product), (2) it appeared that Ocean Duke had understated its sales of certain species of treated fish based on an analysis of the invoices produced by Ocean Duke, and (3) the royalty rate could be adjusted upward based on the Georgia-Pacific 15 Factors. Although Mr. Francom testified that in his opinion the reasonable royalty damages that should be awarded Plaintiff was just over $2 million, the jury was entitled, based on the above evidence, to award a higher, especially the only slightly higher, amount of $2.2 million. See Robinson v. Shapiro, 484 F. Supp. 91, 97-98 (S.D.N.Y. 1980) (jury entitled to award $750,000 even though Plaintiff's expert's estimate of damages was $485,139), *affirmed on appeal* 646 F.2d 735 (2nd Cir. 1981), Poulot v. Paul Arpin Van Lines, Inc., 235 F.R.D. 537, 549 (D. Conn. 2006) (jury entitled to determine that past lost wages could have been higher than figure based on expert's estimate). Also, the law, as properly reflected in the jury instructions, expressly directed the jury to make the reasonable royalty determination for itself, taking into account various factors specified in the instructions, only one of which was the opinion of experts, so the fact that the jury's award differed slightly from the expert's figure should not be surprising or deemed improper.

A reasonable jury could, and did, find that Plaintiff was entitled to $2.2 million in reasonable royalty damages suffered as a result of Ocean Duke's infringement. See Peterson, 771 F.2d at 1252. "Substantial evidence" supports the

damage award. <u>Wallace</u>, 479 F.3d at 624.

## IV.    **CONCLUSION**

For the foregoing reasons, the Motion should be denied.  In the event that the Court permits Ocean Duke's request that it be allowed to supplement the Motion when additional trial transcripts are available, Plaintiff respectfully requests that it be allowed an opportunity to respond to such supplementation.

DATED:  Honolulu, Hawaii, January 8, 2008.

CADES SCHUTTE LLP

/s/ Milton M. Yasunaga
MILTON M. YASUNAGA
MARTIN E. HSIA
ALLISON MIZUO LEE