1

1    IN THE UNITED STATES DISTRICT COURT.

2    FOR THE DISTRICT OF HAWAII

3

4    WILLIAM R. KOWALSKI and          )  CIVIL NO. 04-00055BMK
     HAWAII INTERNATIONAL             )
5    SEAFOOD, INC.,                   )  Honolulu, Hawaii
                                      )  December 10, 2007
6              Plaintiff,             )
                                      )  TESTIMONY OF
7         vs.                         )  DAVID FRANCOM
                                      )
8    OCEAN DUKE CORPORATION,          )
                                      )
              Defendant.              )
9    _____ )

10

11        PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 4)
            BEFORE THE HONORABLE BARRY M. KURREN,
12             UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14      For the Plaintiff:       MILTON M. YASUNAGA
                                 ALLISON MIZUO LEE
15                               Cades Schutte LLP
                                 1000 Bishop St., Ste. 1200
16                               Honolulu, Hawaii  96813-4216

17      For the Defendant:       LOUISE K.Y. ING
                                 Alston Hunt Floyd & Ing
18                               1800 ASB Tower
                                 1001 Bishop Street
19                               Honolulu, Hawaii  96813

20                               PAUL MARKS
                                 Neufeld Law Group
21                               360 East 2nd Street, Ste. 703
                                 Los Angeles, California 90012

22   Official Court             GLORIA T. BEDIAMOL, RPR, RMR
     Reporter:                  United States District Court
23                              P.O. Box 50131
                                Honolulu, Hawaii 96850
24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

**EXHIBIT G**

25

1   A    So specific to Hawaii International, is it my opinion that
2   Hawaii International could have sold the Ocean Duke infringing
3   sales?  And my answer is, yes.  In my opinion it is.
4   Q    Can you run over the various factors or elements of
5   capacity that led you to that conclusion that Hawaii
6   International would have been able --  would have had those
7   sales?
8   A    Sure.  I take these calculations very seriously, as I
9   should as anybody in my position would, so I do independent
10   research to find out what the industry is like, what the firm
11   is like.  I talk to employees of the firm, I try to analyze as
12   best as I can given the data and the information available to
13   me, and then I use some reasonable understanding of what is
14   going on.
15        And what I specifically looked at is, in terms of
16   capacity, was Hawaii International able to produce that
17   increased number of fish.  And as I recall from my report,
18   there was almost 11 million pounds of fish that Ocean Duke
19   produced during that time frame from the patent issuing in late
20   1999 to this trial date.  It would have been around 11 million
21   pounds of fish.
22        So over that period of time, was Hawaii
23   International -- did their distribution system, were their
24   employees in place?  Did they have the financing or could they
25   have had the financing available in order to actually make the

1   fish and sell the fish?  And, based upon my analysis, yes, they

2   did.

3   Q    What are the different particulars now?  Let's start with

4   making the fish.  Actually, Hawaii International and Ocean Duke

5   don't process fish themselves, right?

6   A    That's my understanding, correct.

7   Q    They are importing and distributing companies?

8   A    Right.

9   Q    In terms of Hawaii International's system being able to

10  handle the increased --  the sales that Ocean Duke had, what

11  would you say about that?  How would they have handled it in

12  terms of getting the fish supply?

13  A    My understanding is that Hawaii International has trained

14  and essentially licensed several manufacturers to produce

15  tasteless smoke for them.  And that tasteless smoke is provided

16  to suppliers and processors of fish.  And then the processors

17  will actually inject or introduce that tasteless smoke into the

18  fish, freeze it, and then sell it --  or I'm sorry, send it to

19  the distributor.

20       So Hawaii International facilitates and finances and

21  finds the connections between the processor and the distributor

22  and ultimately the capacity that Hawaii International has to

23  have is to make sure that essentially that they can get it from

24  the distributor -- or from the supplier to the distributor.

25  There are large freezers and storage warehouses that the fish

59

1    would tend to push the royalty rate up and some would tend to

2    push it down, then what did you do next or what did you

3    conclude?

4    A      Well, also it needs to be stated that within this Georgia

5    Pacific analysis, I also looked at the presence or lack of

6    presence of noninfringing alternatives.  And that's a factor

7    that is not specifically stated in these 15; but since this

8    Georgia Pacific case had been decided, most experts will

9    determine that noninfringing or the existence or lack of

10   existence of noninfringing alternatives definitely also makes

11   an impact.

12          So I looked at that, and I came to the conclusion that

13   -- well, in my report I talked about a range from eight cents

14   to 20 cents, although I need to point out that that eight cents

15   is based upon license agreements that in most cases were a

16   result of litigation.  And, therefore, I didn't find it to be

17   comparable to what Ocean Duke and Hawaii International would

18   have negotiated prior to the first infringement.

19          So, in reality, my opinion is that the 20 cents per

20   pound for tuna, grouper, and swordfish is the appropriate

21   reasonable royalty and --  let me see where it's at -- four

22   cents per pound for the infringing shark, snapper, and

23   mahimahi.

24   Q    When you say "20 cents per pound," you mean a royalty rate

25   of 20 cents per pound for those expensive species?

1   might help you.

2   A    Thank you.  Right there.  Right.

3   Q    No, the next one.  The last table of this bunch.

4   A    Right there?

5   Q    That one.

6   A    Okay.  I think that presents it a little more simply.  So

7   with the four and eight cents per pound --

8   Q    Why don't you start with the one that's your actual

9   opinion --

10  A    That's what I wanted to emphasize.  Even though I do have

11  the four and eight cent up here, I put that up for the benefit

12  of the jury to see that calculation.

13       My calculation is the four cents and 20 cents per

14  pound.  And that total calculation is $2,009,073.  That's for

15  the four cent -- we'll call it the four cent and 20 cent

16  reasonable royalty.

17  Q    Now, in addition to royalty, I see you've got another line

18  below that?

19  A    Yes.

20  Q    What's that?

21  A    Prejudgment interest.  So that would be interest on that

22  amount, the two million dollars over that period of time that

23  we're talking about, from 99 to 2007, the prejudgment interest

24  is $777,943.

25  Q    Can you give the total then just to --