1

1          IN THE UNITED STATES DISTRICT COURT.

2                    FOR THE DISTRICT OF HAWAII

3

4     WILLIAM R. KOWALSKI and      )  CIVIL NO. 04-00055BMK
      HAWAII INTERNATIONAL         )
      SEAFOOD, INC.,               )  Honolulu, Hawaii
5                                  )  December 11, 2007
                Plaintiff,         )
6                                  )  TESTIMONY OF ROGER LIN
           vs.                     )  (DEFENSE WITNESS)
7                                  )
      OCEAN DUKE CORPORATION,      )
8                                  )
                Defendant.         )
9     _____    )

10

11          PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 5)
            BEFORE THE HONORABLE BARRY M. KURREN,
12                UNITED STATES MAGISTRATE JUDGE

13    APPEARANCES:

14       For the Plaintiff:        MILTON M. YASUNAGA
                                   ALLISON MIZUO LEE
15                                 Cades Schutte LLP
                                   1000 Bishop St., Ste. 1200
16                                 Honolulu, Hawaii  96813-4216

17       For the Defendant:        LOUISE K.Y. ING
                                   Alston Hunt Floyd & Ing
18                                 1800 ASB Tower
                                   1001 Bishop Street
19                                 Honolulu, Hawaii  96813

20                                 PAUL MARKS
                                   Neufeld Law Group
21                                 360 East 2nd Street, Ste. 703
                                   Los Angeles, California 90012

22    Official Court              GLORIA T. BEDIAMOL, RPR, RMR
      Reporter:                   United States District Court
23                                P.O. Box 50131
                                  Honolulu, Hawaii 96850
24

25    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).

**EXHIBIT J**

4

1   A    We are a hundred percent frozen seafood at this point.

2   Q    Is shrimp one of your products?

3   A    It is actually our main product, shrimp; that's correct.

4   Q    Can you give maybe some percentage estimates of what you

5   mean by "main product"?

6   A    Sure.  Ocean deals in various forms of shrimp, cooked

7   shrimp, raw shrimp, peeled, unpeeled, breaded, nonbreaded.  In

8   terms of the total quantity, shrimp is about 60 percent of our

9   overall sales quantity.

10  Q    So that leaves another 40 percent for something else?

11  A    That's correct.

12  Q    And what is that something else?

13  A    The 40 percent would consist of nontreated fish -- I'm

14  sorry, it would include the remaining fish treated and

15  untreated, products such as squid, crab meat, seafood mixes. So

16  anything related to seafood would be in that 40 percent.

17  Q    And I think you mentioned nontreated or treated.  The

18  treated seafood is the processed seafood that we're dealing

19  with in this lawsuit, right?

20  A    That's correct.  The product treated for color retention.

21  Q    Do you have a percentage estimate of the volume of

22  business that your company does in that particular line?

23  A    I would say about three percent.

24  Q    I think there's been testimony this, but where do you

25  obtain -- or what source do you get your treated seafood from?

1    Q    Is it possible that Ocean Duke initiated the solicitation?

2    A    Sure.   It's always possible, but our rule is we do not

3    solicit.

4    Q    Okay.   When Mr. Stalker came to look for a job, was there

5    any indication that he made that he had made phone calls on

6    behalf of Mr. Kowalski a year earlier?

7    A    No, he did not.

8    Q    Did Ocean Duke hire Mr. Stalker?

9    A    No, we did not.

10    Q    Why did you not hire Mr. Stalker?

11    A    I recall doing some analysis after our meeting with

12    Mr. Stalker in terms of the money he was asking for versus what

13    the business that he could bring us.   And from a financial

14    standpoint, it did not work out for the company to have him at

15    that point.

16    Q    Has Ocean Duke or have you personally had any contact with

17    Mr. Stalker since the time he came to interview for a job in

18    2001?

19    A    No.

20    Q    Up until yesterday?

21    A    That's correct.

22    Q    Just got one last question for you or one last topic.

23    Ocean Duke has obviously been sued in this case, right?

24    A    Yes.

25    Q    And you are one of the executives of Ocean Duke?

23

1   A    Yes.

2   Q    What is the attitude that Ocean Duke has about this

3   pending lawsuit?

4   A    Well, I could tell you that we -- first of all, we're

5   extremely upset.  This is something that we feel that we have

6   done nothing wrong in terms of all the actions that we have

7   taken.  The product that we purchase are, from a laymen's

8   perspective, clearly not infringing.  I have an expert attorney

9   telling us that our process is different; they are not

10  infringing.  So from a laymen's perspective we're upset that we

11  had to be dragged into this and defend a lawsuit like this.

12       Number two, the second attitude we have is just all

13  the wasted time in resources.  As much as I like you,

14  Mr. Marks, I would rather spend the money that I pay you to

15  grow my business or benefit my employees.  I am puzzled by

16  that -- how Mr. Kowalski has decided to pursue litigation over

17  all these years with different companies where the money and

18  the time could be spent building the business, growing the

19  industry, and perhaps if he does more of that there would be

20  more profitable sales than just that one year.  So from my

21  point, it's just a shame we have to be wasting time and

22  resources.

23  Q    Is the industry big enough for both you and Mr. Kowalski?

24  A    Definitely.  Obviously, it started from nothing, so we

25  grew to this point.  And I think if the tuna association, the

24

1    TSA had continued to stay in existence, perhaps there would

2    even be greater acceptance and more people using the product

3    without people suing each other.

4         My last attitude is I really miss my family.  We have

5    always stayed together lived together since we immigrated to

6    the U.S. 20 years.  In fact, I still with my parents with my

7    wife and my kids.  We're under the same roof, so we see each

8    other 24/7.  And the last two weeks -- I have been here the

9    last two weeks has been extremely hard for me, just being away

10   from my two-year-old daughter and my wife and everything else.

11   So definitely not happy about that.

12   Q    But you like Hawaii, right?

13   A    I love Hawaii.  I wish my wife and daughter were here but

14   not for this purpose.

15        MR. MARKS:  Nothing further, Your Honor.

16        THE COURT:  Mr. Yasunaga.

17        MR. YASUNAGA:  Yes, Your Honor.

18                    CROSS-EXAMINATION

19   BY MR. YASUNAGA:

20   Q    Mr. Lin, you talked about getting a letter from an

21   attorney, right?

22   A    Yes.

23   Q    Mr. Borrowman?

24   A    Yes.

25   Q    Mr. Borrowman has served as Ocean Duke's attorney for

25

1    other matters, right?

2    A    Not before this matter.  The answer would have been yes.

3    Q    In fact, didn't Mr. Borrowman get involved in looking at

4    and giving comments and suggestions to Dr. Iwaoka's draft

5    reports before the final report was made and given to us?

6    A    I don't know.

7    Q    Mr. Borrowman, in coming up with his opinion, he relied

8    upon information that came from Ocean Duke Corporation, right?

9    A    Indirectly.  We forwarded on information from Steven Shih

10   and the other patents, yes.

11   Q    The information that Ocean Duke Corporation gave to

12   Mr. Borrowman, your attorney, was that charcoal was heated in a

13   vacuum oven and what was produced was carbon monoxide and water

14   vapor, right?  That's what Mr. Borrowman was told?

15   A    I don't remember exactly.  I know he was handed the three

16   different patents.  So if the patent says that, then yes he was

17   handed that information.

18   Q    Don't you remember that the Shih patent says you heat

19   charcoal and all you get is carbon monoxide and water?  Don't

20   you remember that's what the patent says?

21   A    I believe so.

22   Q    Right.  And that's what Mr. Borrowman was told?

23   A    He was handed the patent, but yeah.

24   Q    The patent doesn't say that, as Dr. Iwaoka said, when you

25   heat charcoal you are going to get a lot more than just carbon

1   monoxide and water.  The patent doesn't say that, right?

2   A    Mr. Yasunaga, again, I'm not a patent attorney; that's why

3   I hired the expert to do the analysis.  So whatever the patent

4   says, he rendered an opinion and that's what we relied upon.

5   Q    Right.  And he relied on the information he was given,

6   right?

7   A    Sure.

8   Q    And he did not get information that when you heat charcoal

9   at 180 degrees in a vacuum oven, you are going to get smoke and

10  that smoke is going to have smoke taste and odor imparting

11  components as we heard earlier this morning from Dr. Maga,

12  right?  Your attorney was not told that --

13  A    Not by me.

14  Q    -- before he wrote his opinion letter?

15  A    I don't know what type of research he has done, but not by

16  me.

17  Q    As far as you know, you are not aware of anybody telling

18  him that before he wrote his opinion letter, right?

19  A    I'm not aware of anybody.

20  Q    Thank you.  And this Shih patent that was given to your

21  attorney talked about how the water would be condensed and the

22  water vapor condensed and the water removed, and he was not --

23  as far as you know, he was not told that condensation is a way

24  that is commonly used to get rid of smoke taste and smoke

25  odor-causing components in smoke, right?  You are not aware of

1   him being told that before he wrote his opinion letter?

2   A    I'm not aware.

3   Q    As far as you are aware, this Ocean Duke's attorney that

4   wrote this opinion letter is not an expert in smoking of foods,

5   right?

6   A    I don't know what he is an expert in.

7   Q    Mr. Kowalski's notice of infringement letter was received

8   by Ocean Duke on January 25, the year 2000, right, as indicated

9   by the FedEx receipt?

10  A    Yes.

11  Q    And you did not approach Ocean Duke's attorney about

12  coming up with an opinion letter until more than two years

13  later, right?

14  A    That's correct because the Shih patent was not issued

15  until that time.

16  Q    And you did not tell that attorney any information such as

17  that Mr. Ragone, the sales manager -- then sales manager of

18  Ocean Duke Corporation, told Mr. Stalker that Ocean Duke's

19  product was made with tasteless smoke, with smoke from which

20  smoke taste and odor-causing components were filtered out so

21  that the food would not end up with a smoke taste and odor.

22  You did not tell your attorney that before he wrote this

23  opinion letter, right?

24  A    No, that's not exactly correct because we had --  I

25  remember forwarding both of the demand letters to Aaron as

1    well, and he actually drafted a response to the demand letters.

2    Q    He drafted a response, but then that response was never

3    sent, right?

4    A    That's correct.

5    Q    And you said not to send it, right?

6    A    That's correct.

7    Q    In fact, you said do not send to Kowalski --  well, you

8    said not to send it because new changes have come up?

9    A    That's correct.

10   Q    And the letter response to -- the response to

11   Mr. Kowalski's letter was never sent.  By the way, when you say

12   "response," are you talking about --  I see, it's a response to

13   the January 2000 letter, right?

14   A    Probably to both letters at that point.

15   Q    Madam Clerk, may I have Exhibit 197, please?

16        Mr. Lin, Exhibit 197 was a document produced to us

17   from Ocean Duke's files, right?

18   A    Sure, yes.

19   Q    And this letter is dated June 6, 2000 and was written by

20   yet another law firm that Ocean Duke has used, right?

21   A    Sure.

22   Q    Not Mr. Paul Marks' law firm, not Ms. Ing's law firm, not

23   Mr. Aaron Borrowman's law firm, but a fourth different law firm

24   called Purdy Schroeder and Pelosi?

25   A    That's correct.

32

1    A    I don't remember at this point.

2    Q    Mr. Borrowman, in fact, is Ocean Duke's regular -- or one

3    of Ocean Duke's regular patent attorneys, right?

4    A    Yes, that's correct.

5    Q    Because Ocean Duke has used him for patents that Ocean

6    Duke wanted to create on its own, right?

7    A    Yeah, I believe subsequent to this.  I don't know the

8    exact time frame, but you are correct, he does do other work

9    for us.

10   Q    And Ocean Duke applies for patents it on its own so that

11   it can have rights under those patents, right?

12   A    That's correct.

13   Q    And when Ocean Duke gets a patent, it does not want other

14   people to infringe the patent and use Ocean Duke's invention

15   without Ocean Duke's permission, right?

16   A    Sure.  Actually, Mr. Yasunaga, it's actually the other way

17   around.  We've applied for patents as a defensive mechanism

18   because after seeing something like this, we realize that if

19   the process that we use is not documented in some fashion, we

20   may be liable -- just dragged into an exact situation like

21   this.  So we did apply for patents for products that we know

22   are processed a certain way that just to protect ourselves.

23   Q    Only to protect yourself?

24   A    That's correct.  We have not sued anybody or sent demand

25   letters for anybody for infringing on anything we do.

1   Q    Have you found anybody else infringing any of the Ocean

2   Duke patents?

3   A    That's not our business.  We only sell more seafood.

4   Q    I asked you have you found anyone who is infringing?

5   A    We have not looked.

6   Q    Okay.  So if you haven't found anyone who is infringing,

7   then you had no reason to sue anybody, right?

8   A    You are correct.

9        MR. YASUNAGA:  Your Honor, I would move Exhibit 234

10  into evidence.

11       MR. MARKS:  No objection.

12       THE COURT:  234 is admitted.

13       (Exhibit 234 was received in evidence.)

14  Q    Mr. Lin, you actually sent letters to your customers

15  telling them not to worry about the Kowalski patent, right?

16  A    I may have, I don't recall exactly.

17  Q    Didn't you, in fact, consult with an attorney about that?

18  A    Again, I may have.  I don't recall at this moment.

19  Q    Didn't you send a letter to your customers saying, Don't

20  deal with Kowalski.  Don't agree to license under his patent or

21  abide by his patent or settle with him?

22  A    I may have.  I just don't recall at this moment.

23  Q    Didn't you tell your customers to continue business as

24  usual despite the Kowalski patent?

25  A    I would give the same answer.  I think I may have, but I

34

1   don't know for sure.

2   Q    Madam Clerk, can I have Exhibit 202?

3        Exhibit 202 is a letter that you wrote to yet another

4   attorney that Ocean Duke has used, Mr. John Bauersfeld.

5   A    Yeah, John actually works with Aaron Borrowman.  They are

6   in the same office.

7   Q    Right.  In that letter, look at the second to the last

8   paragraph, third sentence.  It's the second line it says, "The

9   intent is to assure customers to continue business as usual and

10  not to enter into any agreement with Kowalski." That's what you

11  said you were going to tell your customers, right?

12  A    Yes, and then without exposing to Ocean Duke to

13  unnecessary risk or liability, yes.

14  Q    And did you send letters out to your customers telling

15  them to continue business as usual despite the Kowalski patent?

16  A    Again, I may have, I just don't recall.

17       MR. YASUNAGA:  Your Honor, I would move Exhibit 202

18  into evidence.

19       MR. MARKS:  No objection.

20       THE COURT:  202 is admitted.

21       (Exhibit 202 was received in evidence.)

22       MR. YASUNAGA:  Madam Clerk, is Exhibit 175 already

23  admitted?

24       THE CLERK:  No.

25  Q    Could I have Exhibit 175 handed to the witness?  Exhibit