```
 1           IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF HAWAII

 3
   WILLIAM R. KOWALSKI and       ) CIVIL NO. 04-00055BMK
 4 HAWAII INTERNATIONAL          )
   SEAFOOD, INC.,                ) Honolulu, Hawaii
 5                               ) December 7, 2007
           Plaintiff,            )
 6                               ) TESTIMONY OF ROGER LIN
       vs.                       )
 7                               )
   OCEAN DUKE CORPORATION,       )
 8                               )
           Defendant.            )
 9 _____)

10
        PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 3)
11       BEFORE THE HONORABLE BARRY M. KURREN,
            UNITED STATES MAGISTRATE JUDGE
12
   APPEARANCES:
13
   For the Plaintiff:       MILTON M. YASUNAGA
14                          ALLISON MIZUO LEE
                            Cades Schutte LLP
15                          1000 Bishop St., Ste. 1200
                            Honolulu, Hawaii  96813-4216
16
   For the Defendant:       LOUISE K.Y. ING
17                          Alston Hunt Floyd & Ing
                            1800 ASB Tower
18                          1001 Bishop Street
                            Honolulu, Hawaii  96813
19
                            PAUL MARKS
20                          Neufeld Law Group
                            360 East 2nd Street, Ste. 703
21                          Los Angeles, California  90012

22 Official Court           GLORIA T. BEDIAMOL, RPR, RMR
   Reporter:                United States District Court
23                          P.O. Box 50131
                            Honolulu, Hawaii 96850
24
   Proceedings recorded by machine shorthand, transcript produced
25 with computer-aided transcription (CAT).
```

**EXHIBIT C**

1  Corporation is infringing, but you didn't actually go to his
2  PT's factory until at least two years later, right?
3  A    That sounds about right.
4  Q    In fact, Ocean Duke Corporation didn't, from the documents
5  we have, there's no indication by a letter or anything like
6  that that Ocean Duke did anything in response to Mr. Kowalski's
7  letter in the year 2000 or the year 2001, right?
8  A    That's incorrect.
9  Q    Do you have some document that shows Ocean Duke
10 Corporation did something in the year 2000 to respond to -- in
11 response to his letter?
12 A    I think we have documents showing that we began the
13 process of responding.
14        MR. MARKS:  Your Honor, I hate to interrupt, but when
15 what's on the screen doesn't relate to the questioning --
16        THE COURT:  Okay.
17 Q    Not until at least over two years later, right?
18 A    That's correct, but it was in response to the letter
19 though.
20 Q    Right.  The first documents about any response or action
21 in response to Mr. Kowalski's January 2000 letter saying he
22 thought you were infringing, the first action was not until
23 more than two years later?
24 A    That's incorrect.  The first action was immediate.  We had
25 meetings internally about the letter, and my dad and I

1  discussed what we were going to do about this. And the
2  conversation that we had was that he recalls earliest trip to
3  Indonesia as early as 1997 where Mr. Shih, owner of the
4  factories, was in the process of applying for a patent.
5        So the discussion we had was -- the action we took was
6  that we followed up on Mr. Shih to see where the status of this
7  patent is. And in the meantime we decided to put it in a
8  holding pattern until we get a response from Mr. Shih. And
9  eventually he got his patent in the end of 2001, and we got a
10 hold of the copy of the patent early 2002. And that's when we
11 turned it over to our patent attorney. Those are the actions
12 that we took.
13 Q   Right. So you put Mr. Kowalski on a holding pattern until
14 2002 even though he wrote this letter in January and sent it to
15 you in 2000, right?
16 A   That's correct. Usually, when somebody is serious about
17 an issue, you get a pretty quick follow-up letter. When you
18 don't get a notice for two years, I mean, we really don't
19 consider that as a serious intent.
20 Q   You didn't consider that letter to be serious?
21 A   We did act upon it even though.
22 Q   You were --  so you were concerned when the letter came
23 in?
24 A   Of course.
25 Q   But you weren't concerned enough to go to the factory to

```
 1   look around?
 2   A    I did go.  If you see in my deposition, I did go in 2001
 3   to look around in the factory.
 4   Q    But you told me that when you went in 2001, it was just a
 5   general sanitation inspection, and you didn't really go to look
 6   at the smoke machine, and you can't really say you saw the
 7   smoke machine until you went back again in 2002, right?
 8   A    But I did see the machine in 2001.
 9   Q    Now, you're saying you saw the machine in 2001?
10   A    I believe that's what I testified to.
11   Q    Well, we're getting close to the end.  I'll check over it
12   and we can get into it.  All right.  So you saw it in January
13   of 2002, right?
14   A    I'm sorry, ask that again?
15   Q    You saw the machine in 2002?
16   A    That's for sure, definitely.
17   Q    And today you said you think you saw it in 2001, but you
18   don't really recall actually seeing it in 2001, as opposed to
19   seeing it in 2002, right?  That's what you told me in the
20   deposition.
21   A    I think I said one of the trips.  I was getting confused
22   on the years.
23   Q    You were confused back when I questioned you the first
24   time under oath and now you've got a better understanding?
25   A    No, I would stand by what I said.  I definitely saw the
```

1  machine in 2002, and I may have seen the machine in 2001.
2  Q    But you couldn't say that you actually remember seeing it
3  in 2001, right?
4  A    Definitely not, but my father definitely has seen it, and
5  we exchanged notes after our trips.
6  Q    You got this letter from Mr. Kowalski's attorney in
7  January of 2000 and then you went to the factory in 2001, but,
8  gee, you must have not have been focusing on that machine
9  because you don't really remember seeing it. And then in 2002,
10 you do remember seeing it; that's correct, right?
11 A    That would be accurate.
12 Q    And then when I questioned you back in October, and you
13 were under oath, I asked you about 2002 when you went to see
14 it. And you said you never got closer than 20 feet away,
15 right?
16 A    You could see a lot of things from 20 feet away.
17 Q    Okay, but your answer was, no, you didn't get closer than
18 20 feet away?
19 A    That's correct because I was in fear of breathing in any
20 CO.
21 Q    Okay. And you said you only saw it in passing on your
22 sanitation inspection for maybe five minutes, right?
23 A    That's correct. Inspections don't usually take that long.
24 So five minutes out of an inspection of 40, 30 minutes is a
25 significant portion.

1  Q    So were you interested in really checking out that machine
2  because Mr. Kowalski had written this letter, or were you --
3  did you just go past it as part of your sanitation inspection?
4  A    The purpose of that trip, if you recall, was really
5  two-fold.  The first and main focus was that we need to look at
6  the factory to make sure the quality, the product they produce,
7  meets our standards.  So my main focus on the trip was to make
8  sure the factory actually produces it according to their HACCP
9  guidelines.  That I did.
10       In passing during the trip, the visit, it was
11 inevitable to come to the machine which produces the gas or
12 smoke; so that would be part of the reason for that inspection
13 trip.
14 Q    Now, you just said the gas; but in fact when I questioned
15 you back in October, you said it was smoke, right?
16 A    I'm getting to know the case a lot more now.
17 Q    Well, you put "smoke" on your box labels, right?
18 A    Sure.
19 Q    In fact, you went to the meetings now, we just learned, of
20 the Tasteless Smoke Seafood Association, right?
21 A    I'll probably have to correct that but go ahead.
22 Q    I'm sorry, you probably have to correct what?
23 A    Tasteless Smoke Seafood Association, that's what you are
24 asking about?
25 Q    That's what your father I think just testified.