1          IN THE UNITED STATES DISTRICT COURT.

2                    FOR THE DISTRICT OF HAWAII

3

4    WILLIAM R. KOWALSKI and      )  CIVIL NO. 04-00055BMK
     HAWAII INTERNATIONAL         )
     SEAFOOD, INC.,               )  Honolulu, Hawaii
5                                 )  December 11, 2007
                                  )
6              Plaintiff,         )
                                  )  TESTIMONY OF ROGER LIN
     vs.                          )  (DEFENSE WITNESS)
7                                 )
     OCEAN DUKE CORPORATION,      )
8                                 )
               Defendant.         )
9    _____      )

10

          PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 5)
11          BEFORE THE HONORABLE BARRY M. KURREN,
                 UNITED STATES MAGISTRATE JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:       MILTON M. YASUNAGA
                              ALLISON MIZUO LEE
15                            Cades Schutte LLP
                              1000 Bishop St., Ste. 1200
16                            Honolulu, Hawaii  96813-4216

17   For the Defendant:       LOUISE K.Y. ING
                              Alston Hunt Floyd & Ing
18                            1800 ASB Tower
                              1001 Bishop Street
19                            Honolulu, Hawaii  96813

20                            PAUL MARKS
                              Neufeld Law Group
21                            360 East 2nd Street, Ste. 703
                              Los Angeles, California 90012

22   Official Court          GLORIA T. BEDIAMOL, RPR, RMR
     Reporter:               United States District Court
23                           P.O. Box 50131
                             Honolulu, Hawaii 96850

24

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

**EXHIBIT E**

1    discussion of whether you wanted to do business with

2    Mr. Kowalski brought up?

3    A    Sure.

4    Q    Had Ocean Duke Corporation, as of January 2000, done

5    business with Mr. Kowalski in the past?

6    A    Yes, we had.

7    Q    And what was that business?

8    A    It was selling fresh fish to Mr. Kowalski.

9    Q    When did that business take place?

10    A    I would say late '80s.

11        MR. YASUNAGA:  Now, Your Honor, hearsay again.  He

12    only joined the company in '96, and he is trying to bring in

13    what Mr. Duke Lin said, and Mr. Duke Lin was here and could

14    have talked about it.

15        THE COURT:  Objection is overruled.

16    Q    Is what Mr. Yasunaga said just true, you learned about

17    this from Duke Lin or someone else in Ocean Duke?

18    A    Sure, and also company records.

19    Q    Did that information that you learned go into the decision

20    that you made as to how to respond to this letter?

21    A    Definitely so.  I mean, when the company has a history or

22    a history with us of not paying us money, anything that they

23    send us to do business with us is going to be severely

24    discounted in terms of credibility.  I could not, in all

25    honesty, recommend to my dad saying, Here's a company that

1    didn't pay us before.  Let's go and do business with them now.

2    So it definitely affected our decision.

3    Q    Did you take this letter seriously?

4    A    Seriously in terms of taking action, yes.

5    Q    You discussed some of the action that you took before, so

6    I don't want to go over that except to bring in new

7    information.  Am I right that one of the things that you talked

8    about was going out and talking to a patent lawyer, right?

9    A    Yes.

10   Q    And that was a patent lawyer not associated with my law

11   firm, right?

12   A    That's correct.

13   Q    Do you remember the name of that patent lawyer?

14   A    Yeah, Mr. Aaron Borrowman.

15   Q    Did you hire Mr. Borrowman for anything?

16   A    Yes, we did.  When we received a copy of Steven Shih's

17   patent, we forwarded that patent and the Kowalski patent to

18   Aaron and asked him, Here are the two patents, we're not patent

19   attorneys, please take a look at this and tell us whether the

20   two patents are --  whether the Shih patent infringes on the

21   Kowalski patent.  And actually we also provided the Yamaoka

22   patent at that time.

23         So we had Aaron do an analysis and give us his opinion

24   on whether the Shih patent infringes on any of the other

25   patents.

1          THE COURT:  How do you spell Mr. Borrowman's last

2    name?

3          THE WITNESS: B-O-R-R-O-W-M-A-N.

4    Q    May I ask Madam Clerk if Exhibit 509 could be given to the

5    witness?

6          Have you taken a look at Exhibit 509.

7    A    Yes.

8    Q    Have you seen Exhibit 509 before?

9    A    Yes, I have.

10   Q    Is that the work product that Mr. Borrowman prepared at

11   your request?

12   A    Yes.

13   Q    Did you read that particular work product?

14   A    Yes, I did.

15   Q    And what was your response to having received and read the

16   work product that the lawyer gave you?

17   A    I felt good in terms of an expert attorney telling me that

18   the patent does not infringe on the others.

19          MR. MARKS:  Your Honor, I would ask that Exhibit 509

20   be admitted into evidence.

21          MR. YASUNAGA:  Your Honor, I object to this exhibit.

22   We prepared a written objection which I can hand to you.

23          THE COURT:  Let me take it up outside.

24               (Sidebar on the record:)

25          THE COURT:  Mr. Yasunaga, what's your objection?

1    redacted.  Okay.

2                MR. MARKS:  Will you tell them now?

3                THE COURT:  I'll tell them right now.

4                MR. MARKS:  Thank you.

5                      (End of sidebar.)

6                THE COURT:  Ladies and gentlemen -- Mr. Marks, would

7    you move the board here please?  Exhibit 509 is an opinion

8    letter by the attorney Mr. Borrowman given to Mr. Lin

9    concerning the patent and other patents.  I'm going to admit

10   this letter in some form for a limited purpose.  The letter,

11   the lawyer certainly makes arguments about the patents and of

12   course you are to consider the evidence in this case to decide

13   whether there has been patent infringement or not.  And you are

14   to apply the law that I give you, and you are to apply the

15   instructions and my definitions of the claims that I will again

16   provide to you at the conclusion of the case.  Not this

17   lawyer's analysis of the issues.

18               But I am going to allow you to consider it for the

19   purpose of notice to Mr. Lin and a basis for the actions that

20   Mr. Lin took, not for the truth of the matters and the analysis

21   that is in the letter.  And we're probably going to redact some

22   of the information in the letter.  But you are not to consider

23   this letter as evidence of the matters that are set forth in

24   the letter.  I mean, the truth of the matters or the analysis,

25   the legal analysis in particular, and the analysis of the

1    patents that the lawyer is making in this letter as well.  It's

2    really only for the purpose of the notice to Mr. Lin and a

3    basis for him to do whatever he did or didn't do after

4    receiving this letter.  Not for the truth of the matters

5    asserted in the letter.  And then we'll get this letter

6    appropriately taken care of before it is given to you as you

7    consider it during your deliberations.  Okay.

8              ( Exhibit 509 was received in evidence.)

9              MR. MARKS:  May I inquire?

10             THE COURT:  You may proceed.

11   Q    Mr. Lin, I want to move to a different topic now.  You

12   were in court yesterday when Mr. Stalker testified?

13   A    Yes.

14   Q    Did Ocean Duke Corporation ever have a face-to-face

15   meeting with Mr. Stalker?

16   A    Yes, we did.

17   Q    What was the purpose of that meeting?

18   A    We were approached by Mr. Stalker for employment or

19   brokerage opportunities so we looked into it.

20   Q    Now Mr. Stalker indicated that Ocean Duke approached him.

21   Do you have any knowledge, one way or the other, as to who

22   initiated the contact?

23   A    I could tell from our practice, this is a very strict

24   practice we adhere to, is that we'll wait for applicants to

25   call us.  We will not initiate a solicitation.

1    TSA had continued to stay in existence, perhaps there would

2    even be greater acceptance and more people using the product

3    without people suing each other.

4             My last attitude is I really miss my family.  We have

5    always stayed together lived together since we immigrated to

6    the U.S. 20 years.  In fact, I still with my parents with my

7    wife and my kids.  We're under the same roof, so we see each

8    other 24/7.  And the last two weeks -- I have been here the

9    last two weeks has been extremely hard for me, just being away

10    from my two-year-old daughter and my wife and everything else.

11    So definitely not happy about that.

12    Q    But you like Hawaii, right?

13    A    I love Hawaii.  I wish my wife and daughter were here but

14    not for this purpose.

15             MR. MARKS:  Nothing further, Your Honor.

16             THE COURT:  Mr. Yasunaga.

17             MR. YASUNAGA:  Yes, Your Honor.

18                        CROSS-EXAMINATION

19    BY MR. YASUNAGA:

20    Q    Mr. Lin, you talked about getting a letter from an

21    attorney, right?

22    A    Yes.

23    Q    Mr. Borrowman?

24    A    Yes.

25    Q    Mr. Borrowman has served as Ocean Duke's attorney for

1    other matters, right?

2    A    Not before this matter.  The answer would have been yes.

3    Q    In fact, didn't Mr. Borrowman get involved in looking at

4    and giving comments and suggestions to Dr. Iwaoka's draft

5    reports before the final report was made and given to us?

6    A    I don't know.

7    Q    Mr. Borrowman, in coming up with his opinion, he relied

8    upon information that came from Ocean Duke Corporation, right?

9    A    Indirectly.  We forwarded on information from Steven Shih

10    and the other patents, yes.

11    Q    The information that Ocean Duke Corporation gave to

12    Mr. Borrowman, your attorney, was that charcoal was heated in a

13    vacuum oven and what was produced was carbon monoxide and water

14    vapor, right?  That's what Mr. Borrowman was told?

15    A    I don't remember exactly.  I know he was handed the three

16    different patents.  So if the patent says that, then yes he was

17    handed that information.

18    Q    Don't you remember that the Shih patent says you heat

19    charcoal and all you get is carbon monoxide and water?  Don't

20    you remember that's what the patent says?

21    A    I believe so.

22    Q    Right.  And that's what Mr. Borrowman was told?

23    A    He was handed the patent, but yeah.

24    Q    The patent doesn't say that, as Dr. Iwaoka said, when you

25    heat charcoal you are going to get a lot more than just carbon

1  monoxide and water.  The patent doesn't say that, right?

2  A   Mr. Yasunaga, again, I'm not a patent attorney; that's why

3  I hired the expert to do the analysis.  So whatever the patent

4  says, he rendered an opinion and that's what we relied upon.

5  Q   Right.  And he relied on the information he was given,

6  right?

7  A   Sure.

8  Q   And he did not get information that when you heat charcoal

9  at 180 degrees in a vacuum oven, you are going to get smoke and

10  that smoke is going to have smoke taste and odor imparting

11  components as we heard earlier this morning from Dr. Maga,

12  right?  Your attorney was not told that --

13  A   Not by me.

14  Q   -- before he wrote his opinion letter?

15  A   I don't know what type of research he has done, but not by

16  me.

17  Q   As far as you know, you are not aware of anybody telling

18  him that before he wrote his opinion letter, right?

19  A   I'm not aware of anybody.

20  Q   Thank you.  And this Shih patent that was given to your

21  attorney talked about how the water would be condensed and the

22  water vapor condensed and the water removed, and he was not --

23  as far as you know, he was not told that condensation is a way

24  that is commonly used to get rid of smoke taste and smoke

25  odor-causing components in smoke, right?  You are not aware of

1   him being told that before he wrote his opinion letter?

2   A     I'm not aware.

3   Q     As far as you are aware, this Ocean Duke's attorney that

4   wrote this opinion letter is not an expert in smoking of foods,

5   right?

6   A     I don't know what he is an expert in.

7   Q     Mr. Kowalski's notice of infringement letter was received

8   by Ocean Duke on January 25, the year 2000, right, as indicated

9   by the FedEx receipt?

10  A     Yes.

11  Q     And you did not approach Ocean Duke's attorney about

12  coming up with an opinion letter until more than two years

13  later, right?

14  A     That's correct because the Shih patent was not issued

15  until that time.

16  Q     And you did not tell that attorney any information such as

17  that Mr. Ragone, the sales manager -- then sales manager of

18  Ocean Duke Corporation, told Mr. Stalker that Ocean Duke's

19  product was made with tasteless smoke, with smoke from which

20  smoke taste and odor-causing components were filtered out so

21  that the food would not end up with a smoke taste and odor.

22  You did not tell your attorney that before he wrote this

23  opinion letter, right?

24  A     No, that's not exactly correct because we had --  I

25  remember forwarding both of the demand letters to Aaron as

1    well, and he actually drafted a response to the demand letters.

2    Q    He drafted a response, but then that response was never

3    sent, right?

4    A    That's correct.

5    Q    And you said not to send it, right?

6    A    That's correct.

7    Q    In fact, you said do not send to Kowalski -- well, you

8    said not to send it because new changes have come up?

9    A    That's correct.

10    Q    And the letter response to -- the response to

11    Mr. Kowalski's letter was never sent.  By the way, when you say

12    "response," are you talking about --  I see, it's a response to

13    the January 2000 letter, right?

14    A    Probably to both letters at that point.

15    Q    Madam Clerk, may I have Exhibit 197, please?

16         Mr. Lin, Exhibit 197 was a document produced to us

17    from Ocean Duke's files, right?

18    A    Sure, yes.

19    Q    And this letter is dated June 6, 2000 and was written by

20    yet another law firm that Ocean Duke has used, right?

21    A    Sure.

22    Q    Not Mr. Paul Marks' law firm, not Ms. Ing's law firm, not

23    Mr. Aaron Borrowman's law firm, but a fourth different law firm

24    called Purdy Schroeder and Pelosi?

25    A    That's correct.

1                    (Exhibit 197 was received in evidence.)

2    Q      Madam Clerk, can I have Exhibit 205?

3                 Exhibit 205 is that e-mail between you and

4    Mr. Borrowman?

5    A      Yes.

6    Q    And the copy that was produced to me does not have a date

7    for Mr. Borrowman's response to your March 27, 2002 e-mail,

8    right?

9    A      No, it does not.

10   Q    At the bottom is his -- your e-mail to him March 27, 2002

11   and the top is his reply, right?

12   A      Yes.

13   Q      With no date?

14   A      It looks like there's no date.

15   Q      Do you know why the copy provided to us has no date for

16   that response?

17   A      I have no idea.

18   Q      Isn't there normally the date of the reply e-mail when you

19   print out a string of e-mail?

20   A      Sure, but I'm not sure why this one doesn't.

21   Q      Mr. Borrowman told you that he reviewed the Yamaoka and

22   Kowalski patents, and he said that it's clear there's no

23   infringement of the Yamaoka, right?

24   A      Yes.

25   Q      And then can you read the next sentence in the e-mail that

1   he sent to you?

2   A    It says, "However, it is not quite as clear if there's a

3   problem with Kowalski."

4           MR. YASUNAGA:  Your Honor, I would like to move

5   Exhibit 205 into evidence.

6           MR. MARKS:  No objection.

7           THE COURT:  205 is admitted.

8           (Exhibit 205 was received in evidence.)

9   Q    Now, Mr. Borrowman, your attorney who wrote this opinion

10  letter more than two years after Mr. Kowalski sent the notice

11  of infringement letter, you didn't tell Mr. Borrowman that in

12  the way that your supplier PT was actually creating smoke and

13  using it to process fish, you didn't tell him that your father

14  said he saw filtering material in the filter of the type that

15  would purify water, and you didn't tell him that, did you?

16  A    No, and he didn't ask for that information.

17  Q    As far as you know, Mr. Borrowman, in coming up with his

18  opinion letter, did not consult with any expert in the use of

19  food in --  use of smoke in food processing and food

20  preservation, right?

21  A    I don't know who he consulted or not consulted.

22  Q    Well, you paid his bill, right?

23  A    But that's true.

24  Q    And from that bill, couldn't you tell that all he did was

25  just spend a few hours comparing the two patents?

1    A    I don't remember at this point.

2    Q    Mr. Borrowman, in fact, is Ocean Duke's regular -- or one

3    of Ocean Duke's regular patent attorneys, right?

4    A    Yes, that's correct.

5    Q    Because Ocean Duke has used him for patents that Ocean

6    Duke wanted to create on its own, right?

7    A    Yeah, I believe subsequent to this.  I don't know the

8    exact time frame, but you are correct, he does do other work

9    for us.

10   Q    And Ocean Duke applies for patents it on its own so that

11   it can have rights under those patents, right?

12   A    That's correct.

13   Q    And when Ocean Duke gets a patent, it does not want other

14   people to infringe the patent and use Ocean Duke's invention

15   without Ocean Duke's permission, right?

16   A    Sure.  Actually, Mr. Yasunaga, it's actually the other way

17   around.  We've applied for patents as a defensive mechanism

18   because after seeing something like this, we realize that if

19   the process that we use is not documented in some fashion, we

20   may be liable -- just dragged into an exact situation like

21   this.  So we did apply for patents for products that we know

22   are processed a certain way that just to protect ourselves.

23   Q    Only to protect yourself?

24   A    That's correct.  We have not sued anybody or sent demand

25   letters for anybody for infringing on anything we do.