```
 1                    IN THE UNITED STATES DISTRICT COURT.

 2                      FOR THE DISTRICT OF HAWAII

 3
     WILLIAM R. KOWALSKI and      )  CIVIL NO. 04-00055BMK
 4   HAWAII INTERNATIONAL         )
     SEAFOOD, INC.,               )  Honolulu, Hawaii
 5                                )  December 10, 2007
               Plaintiff,         )
 6                                )  TESTIMONY OF
          vs.                     )  DAVID FRANCOM
 7                                )
     OCEAN DUKE CORPORATION,      )
 8                                )
               Defendant.         )
 9   _____)

10
               PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 4)
11              BEFORE THE HONORABLE BARRY M. KURREN,
                  UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     For the Plaintiff:          MILTON M. YASUNAGA
14                               ALLISON MIZUO LEE
                                 Cades Schutte LLP
15                               1000 Bishop St., Ste. 1200
                                 Honolulu, Hawaii  96813-4216
16
     For the Defendant:          LOUISE K.Y. ING
17                               Alston Hunt Floyd & Ing
                                 1800 ASB Tower
18                               1001 Bishop Street
                                 Honolulu, Hawaii  96813
19
                                 PAUL MARKS
20                               Neufeld Law Group
                                 360 East 2nd Street, Ste. 703
21                               Los Angeles, California 90012

22   Official Court             GLORIA T. BEDIAMOL, RPR, RMR
     Reporter:                  United States District Court
23                              P.O. Box 50131
                                Honolulu, Hawaii 96850
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

**EXHIBIT B**

1                              I N D E X

2  WITNESSES:                                          PAGE NO

3

4    DAVID FRANCOM

5          DIRECT EXAMINATION BY MR. YASUNAGA            3

6          VOIR DIRE EXAMINATION  BY MR. MARKS          7

7          DIRECT EXAMINATION (Continued)              16

8          BY MR. YASUNAGA

9          CROSS-EXAMINATION  BY MR. MARKS             63

10         REDIRECT EXAMINATION  BY MR. YASUNAGA       108

11         RECROSS-EXAMINATION BY MR. MARKS            112

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PARTIAL TRANSCRIPT
 2            TESTIMONY OF DAVID FRANCOM 12/10/07
 3                        --o0o--
 4          MR. YASUNAGA:  I would like to call Mr. David Francom.
 5          THE COURT:  Yes.
 6                    DAVID FRANCOM, SWORN
 7          THE CLERK:  As you know, speak towards the top of the
 8    microphone.  For the record, please state your full name and
 9    spell your last name.
10          THE WITNESS: David Brent Francom, F-R-A-N-C-O-M.
11                    DIRECT EXAMINATION
12    BY MR. YASUNAGA:
13    Q    Madam Clerk, can you -- I don't know what you put up
14    there, but can you also provide him with Exhibit 141?  Before
15    today, we broke it into two piles so we don't have to deal with
16    really a lot of paper.
17          Mr. Francom, I did not catch your middle name?
18    A    Brent, B-R-E-N-T.
19          THE COURT:  You need to speak closer to the
20    microphone.
21          THE WITNESS:  Is that better?
22          THE COURT:  Yes.
23    Q    Where do you normally reside?
24    A    I live in Salt Lake City, Utah.
25    Q    What is your role in this case?
```

1    A    I'm a damages expert to calculate damages for patent

2    infringement.

3    Q    Could you tell us about your educational and employment

4    background?

5    A    Sure.  Would it be okay if I showed a portion of my report

6    that talks about that, my CV?

7            THE COURT:  Any objection to that?

8            MR. MARKS:  Just on the CV.

9            THE WITNESS:  Yeah, it's on the CV I put together --

10           THE COURT:  CV is fine, right.

11           THE WITNESS:  Is it ready to go?  We need to get it

12    back to the first.  As this indicates, I prepared a report

13    documenting my research, documenting all of the calculations

14    that I did in order to determine the damages for this case.  As

15    specified, my name is David B. Francom.  I believe the question

16    that I was asked is what is my education.  It's down here.

17    Q    Well, actually education and --

18    A    And experience.  Currently I'm an economist with the firm

19    Campos & Stratis, which is an accounting and economics

20    consulting firm.  I have over six years doing damages analyses

21    and calculations for intellectual property infringement cases.

22    I have looked at and analyzed and calculated these damages for

23    many different industries.

24            My education experiences include a masters degree in

25    economics and a Ph.D. what is called an ABD, which means all

1    but dissertation, in economics as well from the University of

2    Utah. But that's my academic background as well as my

3    experience in this field.

4    Q    Thank you.  Now, you did some --  what did you do to

5    prepare yourself to give opinions -- professional opinions in

6    this case?

7    A    I actually read a lot of documents that were provided to

8    me from both sides of this case.  I also did independent

9    research, and I believe I've got a list in this power point

10   presentation that shows the documents that were provided to me

11   and that I researched and that I looked at.

12          May I go ahead and show that?

13          THE COURT:  Wait until the question is asked.

14   Q    Could you -- if you prepared that list of documents that

15   you consulted, could you please show that?

16          THE COURT:  Any objection to that?

17          MR. MARKS:  No.

18          THE COURT:  Very well.  Go ahead and show that.

19          THE WITNESS:  Here it is right here, Exhibit C of the

20   report shows a list of the documents, although I'm not going to

21   go through and show you the titles of every single one of them,

22   I just want you to get an understanding of how extensive the

23   list is of information that I went through to do my

24   calculations and to get a real understanding of the case.

25   Q    Actually, Mr. Francom, you were relying on that power

1   point, but I noticed that your CV in your report has a second

2   page that talks about University of Utah and then you got a

3   masters and a second bachelor's degree, right?

4   A    No, just one bachelor's degree.

5   Q    I see, the masters was in economics?

6   A    Yes, but I do also -- maybe I should point this out that I

7   do also teach economics at the University of Utah and the

8   University of Phoenix.

9   Q    Any professional affiliations or licensing?

10  A    Do I currently have any --

11  Q    Have you had any professional affiliations or licensing?

12  A    I'm a member of the National Association of Forensic

13  Economists.

14  Q    What does forensic economist mean?

15  A    Essentially going and looking at documents back in time to

16  piece together what happened and what would have happened, but

17  for this infringement.

18  Q    All right.  Thank you.  Besides looking at documents and

19  doing research, I guess you've been sitting through the trial?

20  A    Yes.

21  Q    And obtained some information that way?

22  A    Much of it was already familiar to me.  I read portions of

23  depositions as well that are pertinent to this case and sat in

24  this trial as you mentioned.

25  Q    And did you --  you generated a written report?

1   A      Correct.

2   Q      And part of the report --  the report has some backup

3   documents and exhibits, right?

4   A      Yes.

5   Q      And there's a lot of pages?

6   A      It's pretty extensive.

7   Q      Besides the stack of paper on the counter in front of you,

8   there was like a box of documents that was reduced to a CD, the

9   images were put onto a CD?

10  A      Yes, I remember receiving CDs as well as like some e-mails

11  and lots of documents involved in the case, yes.

12  Q      I'm saying that your office compressed all that box full

13  of documents into a CD?

14  A      Yes, that's correct.

15  Q      Are you prepared to render an opinion as to damages at

16  this time?

17  A      I am.

18          MR. YASUNAGA:  Your Honor, I would like to move to

19  have Mr. Francom admitted as an expert in the field of damages.

20          MR. MARKS:  May I void dire the witness?

21          THE COURT:  Yes.

22                    VOIR DIRE EXAMINATION

23  BY MR. MARKS:

24  Q      Do you prefer to be called Dr. Francom or Mr. Francom?

25  A      Mister.  I have not completed the Ph.D.

1  Q    I see, so once you get that ABD removed, then you get to

2  be called a doctor?

3  A    I think so, yes. So you can wait.

4  Q    I will.  Whatever you prefer.  Now we have met before,

5  right?

6  A    Yes, we have.

7  Q    We met at the deposition that I took of you?

8  A    In Los Angeles.

9  Q    Right.  A deposition is when I get to ask you questions

10  about, in this case, your expert witness report?

11  A    Yes.

12  Q    And you get to answer them, right?

13  A    Yes.

14  Q    I just want to ask three or four questions about some

15  foundational matters and then, Your Honor, if that's acceptable

16  I would like a side bar?

17        THE COURT:  Sure.

18  Q    Now, in your report, you talked about damages and one of

19  the analyses you did was about a lost profits damages; is that

20  right?

21  A    Yes.

22  Q    And in your report and in your deposition, when you were

23  talking about lost profits, you were talking about the lost

24  profits of the corporation, Hawaii International Seafood, Inc.;

25  correct?

1    A    Correct.

2    Q    You were not talking about the lost profits of William

3    Kowalski as an individual; correct?

4    A    My understanding was that is -- that Mr. Kowalski is the

5    owner of Hawaii International and therefore the profits would

6    be his.

7    Q    Okay.  But you didn't say that in your report, right?

8    A    I may not have specifically said that.

9    Q    But indeed at the time you wrote the report, you did know

10   that Mr. Kowalski was the one hundred percent owner, correct?

11   A    That was my understanding that Mr. Kowalski was the owner,

12   yes.

13   Q    Now, when you did your report, you were analyzing, as

14   you've shown, a great number of financial documents, right?

15   A    Correct.

16   Q    And some of those financial documents were financial

17   documents of the corporation Hawaii International Seafood,

18   correct?

19   A    Yes.

20   Q    And you obtained those documents from the Philippines,

21   right?

22   A    I obtained them from Hawaii International Seafood

23   employees.

24   Q    In the Philippines?

25   A    The employee, which I believe you must be referring to,

1    was in the Philippines; that's correct.

2    Q    And that would be Clint Taylor (phonetic)?

3    A    Correct.

4    Q    And what was your understanding that Clint Taylor is

5    essentially the head of the financial department, if you will,

6    of Hawaii International Seafood, Inc.?

7    A    That was my understanding, that he pretty much ran the

8    accounting and financial areas of Hawaii International, yes.

9    Q    And were the documents that you looked at about Hawaii

10   International Seafood's financials that you got from Mr. Taylor

11   in the Philippines, were those documents necessary for you to

12   reach the opinions that you reached?

13   A    I would say that certain of those documents were needed to

14   reach the opinions and the conclusions that I made, yes.

15         MR. MARKS:    Thank you, Mr. Francom.    May we have a

16   side bar, Your Honor?

17         THE COURT:    Yes.

18              (Sidebar on the record:)

19         MR. MARKS:    Paul Marks speaking.    I have two

20   objections -- I guess three objections really.    First, there's

21   no evidentiary support for any of the opinions that this

22   witness will be expressing, because none of the financial

23   records from the Philippines, none of the financial records of

24   Hawaii International Seafood, have been admitted into evidence.

25   And the reason I'm making the objection now is because I don't

1     believe it can be.  The only person who can authenticate them

2     is not going to be called as a witness in this case.  You want

3     me to get to my second objection?

4            THE COURT:  No, let's take them one at a time.

5            MR. MARKS:  No foundation is the technical objection.

6            THE COURT:  What about that?

7            MR. YASUNAGA:  Well, Your Honor, cases of damage --

8     Milton Yasunaga.  In situations of damage expert opinions, you

9     never call in every bean counter who said I counted the

10    inventory, this is an accurate count, and I tolled up this and

11    then you bring in the CPA and the tax advisor. You don't go

12    through all of this.  Rule 703 says that the basis for opinion

13    testimony by experts you don't even need to have all of that

14    stuff in evidence.

15           THE COURT:  I've heard enough.  The objection is

16    overruled.

17           MR. MARKS:  Objection number two.  As has been

18    testified, Mr. Francom wrote an expert witness report.  Replete

19    throughout that report is that his lost profits analysis and

20    his conclusions and opinions about lost profits or lost profits

21    of the company, they are not lost profits of the individual.

22           Now today he said, Well, I think you can have a

23    flow-through situation.  He admitted he did not write that in

24    his report.

25           THE COURT:  Right.

1           MR. MARKS:  So, I don't think he can choose a report.
2      He gave a report, I took a deposition of him, after that this
3      issue of the lack of standing of HIS came up, we think it's a
4      valid --

5           THE COURT:  My understanding is he is going to talk
6      about lost profits for the corporation, not for the individual
7      then.

8           MR. MARKS:  I have no objection to that.

9           THE COURT:  Is that the case?

10          MR. MARKS:  Because that's what his report says.

11          MR. YASUNAGA:  He said these are the damages that
12     Mr. Kowalski should get.  But let me say this:  One, Your Honor
13     has already ruled that with the proper showing, Mr. Kowalski's
14     entitled to collect lost profit damages.  I think the testimony
15     of Mr. Kowalski has shown that.

16          And, second, for Mr. Marks to say that to complain
17     that Mr. Francom's report was not written up with that issue in
18     mind is not really fair, because Mr. Marks never raised the
19     defense until way later.  Had he raised it in answer to a
20     discovery request, the report could have been slightly -- the
21     wording could have been slightly changed.  But I think he
22     should be able to testify, and he has given an explanation just
23     today already about why the profits to the company would flow
24     to Mr. Kowalski.

25          MR. MARKS:  That's a legally incorrect information.

1    He had all the informing at the time he wrote his report that

2    Mr. Yasunaga is talking about.  It's just that Kowalski is a

3    one-hundred-percent owner of the corporation.  I had an expert

4    witness excluded because he did --

5         THE COURT:  Right.

6         MR. MARKS:  Obviously reports are important.  The

7    report in this case is replete, and we can go through it line

8    by line, every time the word "lost profits" comes up it says

9    HIS.  It says nothing about Kowalski.  He's changing his

10   testimony in a way that he is going to switch his huge, huge

11   lost profits number from the corporation, which could be

12   theoretically be entitled to it if it had standing to an

13   individual who can't.

14        THE COURT:  The only basis that he has to indicate

15   that these profits are the profits of Mr. Kowalski is that

16   Mr. Kowalski is a hundred percent owner of the company.  This

17   is not a complex or difficult proposition.  I mean, whether or

18   not that's sufficient is another question.  But that is his

19   opinion.

20        Now, the purpose of a report is to avoid any

21   significant surprise.  That's why we have these expert reports,

22   but we don't follow these rules blindly.  In your case, there

23   was no report whatsoever on matters of some degree of

24   complexity.  And it issues that would require some assessment

25   and understanding.  That's why I struck the expert because we

1    don't have a report at all.

2           Here it's on this one particular point.  This is not a

3    matter of real surprise.  I have to build in some flexibility

4    to the rule here on whether an expert is excluded entirely for

5    not mentioning one particular point.  And on this particular

6    point, I don't think that's so complex that it would require

7    striking the opinion.

8           Now, there is however a more fundamental question, and

9    that is since he is only talking about profits for the company

10   essentially, and his opinion is that this is a flow-through to

11   Kowalski, does that require striking the expert at this time.

12           MR. MARKS:  I'm not asking that he be stricken.  I'm

13   just asking if it varied in his report that he not get up there

14   and say what he's already said.  He can talk at length about

15   this is my report, these are the profits of HIS that I

16   calculated, here's how I did it.  I'll even let him see the

17   report where it says HIS has lost profits.  Let him not stray

18   from that.  Let him not now say, Oh, I didn't mean what I said

19   in my report when I said throughout the report it HIS.  What I

20   really mean is it's Kowalski because, by the way ladies and

21   gentlemen of the jury, HIS might not be a plaintiff in a few

22   days.  He'd already snuck it in once very well prepared by

23   Mr. Yasunaga.  I don't think his testimony --  I mean, I can

24   envision that it's all going to be about how Kowalski is the

25   one that earns the lost profits.  I don't think that should be

1   allowed.

2            THE COURT:  I'm going to --  is there something you

3   want to say?

4            MR. YASUNAGA:  He didn't sneak it in.  You yourself

5   asked him the question, and you yourself put it into evidence.

6   It's already in evidence, Your Honor.

7            THE COURT:  What's in evidence?

8            MR. YASUNAGA:  That he believes that these profits are

9   Kowalski's because they would flow up to him as the hundred

10  percent owner.  He already brought it into evidence.  So now

11  for him to say he can talk about --

12           MR. MARKS:  May I respond?  It is in evidence and it

13  contradicts his report.  It can't contradict his report.

14           MR. YASUNAGA:  It doesn't contradict his report.

15           THE COURT:  You can cross-examine him on that

16  particular point.  I will tell you there's a significant issue

17  in this case with regard to damages.  I'm going to deal with

18  that separately, and I'm not sure that Mr. Kowalski's

19  testimony, which is without any additional information, that he

20  is the hundred percent owner entitles him to get all of these

21  damages as a pass-through is going to be sufficient.  Now, I'm

22  going to have to give that some serious thought.  But your

23  objection as stated at this point is overruled.

24           MR. MARKS:  Objection number three is simply I would

25  ask the Court to remind Mr. Yasunaga especially now that we

1    have an expert witness who does not require leading, that the

2    leading questions should be kept in accordance with the rules.

3            THE COURT:  Well, it's nice that you waited for four

4    days to bring up this issue.  Okay.  I certainly would prefer

5    questions to be in a nonleading way, but we have gone for quite

6    a while down that road.  But that is the way we do business

7    here.  So hopefully that's the way it will work.  Okay.  Thank

8    you.

9            MR. YASUNAGA:  Thank you.

10                       (End of sidebar.)

11           THE COURT:  Ladies and gentlemen, at this time I will

12    permit Mr. Francom to testify as an expert on the subject of

13    damages.

14                   DIRECT EXAMINATION (Continued)

15    BY MR. YASUNAGA:

16    Q    Well, in discussing your opinions, would various charts

17    and tables from your report be helpful?

18    A    I think it would make it easier to explain what I did and

19    the conclusions that I reached, yes.

20           MR. YASUNAGA:  Your Honor, I would like to, at this

21    time, move into evidence parts of Mr. Francom's report.  I

22    don't want to put all the paper in, but there's a whole other

23    box.  I'm not going to try to put that in.  That's Exhibit 142.

24    It's backup documents.  And Exhibit 141, I have a small portion

25    clipped out of that six inches of paper, and I would like to

1    introduce his report and Exhibits A through J and V.

2              MR. MARKS:  Objection, hearsay.

3              THE COURT:  Sustained.  I tell you what, you can show

4    some of this as --  some of the calculations is that what you

5    --

6              MR. YASUNAGA:  Well, it's not --

7              THE COURT:  I'm not going to allow the report into

8    evidence.

9              MR. YASUNAGA:  You are not going to allow the report

10   in?

11             THE COURT:  Right.

12             MR. YASUNAGA:  Can he have the easel so he can write

13   --

14             THE COURT:  Absolutely, yes.

15             MR. YASUNAGA:  I think for the  explanation for the

16   jury, we will show pictures but, in addition, I would like to

17   --

18             THE COURT:  That would be fine.  You want to use the

19   easel?

20   Q    Shall we use the easel at the end?

21   A    If I can explain some of the theory of patent damages

22   first, maybe from a few quotes from my report explaining --

23             THE COURT:  Let's let Mr. Yasunaga ask the questions.

24   Q    I think as His Honor is saying, we can show the report.

25   He just doesn't want that to come into evidence.

1    A    Okay.

2    Q    Let's start out first to try to help the jury understand

3    what the task is.  Can you explain for the jury the theory of

4    damages in a patent infringement case?

5    A    Yes, the basic idea behind this economic damage concept is

6    to simply say, What if the infringement never happened?  Where

7    would the patent holder be?  What opportunities would the

8    patent holder have had and what profits would that person have

9    made or that company that that person owns would have made if

10   the patent infringement didn't occur?

11        So it's what we call a "but-for analysis."  But for

12   the infringement, where would this person have been?  And

13   that's explained in the -- let me just get to the slide.  In

14   Title 35, Section 284 of the U.S. Code, it explains -- this is

15   a quote from the U.S. Code, upon finding for the claimant in

16   court shall award the element of damages adequate to compensate

17   for the infringement.

18        So, first of all, we've got to determine what is

19   adequate to compensate for that infringement, to put that

20   person back in a position of being a whole, where they would

21   have been but for the infringement.  But then it goes on to

22   say, No event less than a reasonable royalty for the use of the

23   invention by the infringer together with interest and costs as

24   fixed by the Court.

25        So, there's really a few elements here.  First of all,

1    what would the patent holder have been able to have done with

2    his patent?  What profits would he or his business have been

3    able to make?  And then so that's one calculation.  We call

4    that the lost profits.

5           The second calculation is a reasonable royalty.  The

6    reasonable royalty is an alternate calculation.  So the jury is

7    to determine whether or not lost profits really makes sense in

8    this particular case or if the reasonable royalty makes sense.

9           And I plan to go through and explain what my opinions

10   are and why they make sense to me.

11   Q    Now that Title 35 Section 284 of the U.S. Code, that's

12   United States law?

13   A    Yes.

14   Q    And it says, "but in no event less than a reasonable

15   royalty."  What's the relationship between lost profits versus

16   reasonable royalty?

17   A    Sure.  If the patent holder didn't ever produce the

18   product, and I think one of the examples that has been thrown

19   out in court before was if somebody makes a patent for a

20   scratch resistant coating on eyeglasses, but that person never

21   manufactures that product, never sells it, never has the

22   capacity to produce it, would they be entitled to lost profits?

23   And the answer is no, because they didn't ever make that

24   product in the first place.

25           So in that event, we would have to look at a

1    reasonable royalty and say, Well, if I licensed out my patent

2    to this person who is actually making the product, then I would

3    be entitled to a reasonable royalty.   Those are the two things

4    to look at.

5    Q    But in this case, Mr. Kowalski has a company, but he

6    himself does not sell fish?

7    A    And the way I looked at it was, yes, Mr. Kowalski owns a

8    company that does in fact sell the product, and they could have

9    had that opportunity, but for the infringement to have made

10   those sales.

11        So, in my opinion, yes, lost profits was the

12   appropriate damage calculation.

13   Q    Does reasonable royalty normally -- is it normally more or

14   less than lost profits?

15   A    In most cases, reasonable royalty is less and the reason

16   why is because the license, if you are to do a royalty license,

17   you never manufacturing that product, never selling that

18   product yourself, you are only going to get a portion of the

19   profit which is represented in that license agreement.   Whereas

20   the lost profits you would get all of the profits that you

21   would have made but for the infringement.

22   Q    And if it's proven that lost profits are appropriate, then

23   what is supposed to be awarded, the bigger lost profit amount

24   or the smaller reasonable royalty amount?

25   A    Well, certainly if the jury finds that there are lost

1  profits because Mr. Kowalski and Hawaii International Seafood

2  were deprived of those sales that they otherwise could have

3  made, then lost profits is the appropriate calculation.

4  Q    For determining lost profits, what needs to be analyzed

5  and found in order for you to give an opinion that lost profits

6  are warranted and deserved and a certain amount of lost profits

7  would be appropriate?

8  A    In general, these patent infringement cases have been

9  going on for years and years and years, and so over time courts

10 have determined certain things to look at, necessary items that

11 need to be shown in order to show that lost profits were a

12 reasonable and in fact an appropriate calculation.

13         If I may flip to the next screen.  I believe it's the

14 next screen.  Yes, it talks about the patent statute.  It says

15 that there are methods to determine --

16         THE COURT:  Hold it a second.  This is the kind of

17 thing that I would prefer there to be testimony rather than

18 referring to matters that are in the report, Mr. Yasunaga.

19 Okay.  I mean you can certainly, if there are charts and the

20 like to refer to that, but the witness is here in court, we

21 certainly --

22         Ladies and gentlemen there is a report that's prepared

23 for the parties to be advised of what the opinions are.  But

24 the witnesses here I would rather have the witness testify

25 concerning the matters in his report rather than referring to a

1    report.

2    Q    Absolutely.  Mr. Francom, please go ahead and just explain

3    to them what -- these screens come in a certain order, so we're

4    going to flip through them.  So go ahead.

5    A    Well, maybe it would be easier for me to come down to the

6    chart and just talk about it.

7              THE COURT:  Sure, that's perfectly fine.

8              THE WITNESS:  Can I take off my jacket?

9              THE COURT:  You may.  Mr. Yasunaga I want you to ask

10   questions it's not just --

11             MR. YASUNAGA:  You got to have the judge see it.  In

12   case you --

13             THE COURT:  That's fine.  You can turn it more to the

14   jury though.  That's good.

15             THE WITNESS:  I'm going to wait to be prompted by a

16   question.

17   Q    Are there various --  can you tell us the various factors

18   that need to be analyzed in order to do a lost profits analysis

19   MARKS:  Before that happens would it be all right if I sat over

20   there.

21             MR. MARKS:  Your Honor, before the happens, would it

22   be all right if I maybe sat over there?

23             THE COURT:  Absolutely, sure.  Not a problem.

24             MR. MARKS:  Sorry to interrupt, Mr. Francom.

25             THE WITNESS:  That's all right.  I may forget to speak

1    into the microphone, but I'll do my best.

2         As I was mentioning, there's a case that was tried

3    many years ago called Panduit v. Stalen Brothers (phonetic).

4    We refer to it just as the Panduit.  And in that case it was

5    determined that  there were four factors that needed to be

6    established in order to award lost profit damages to the patent

7    holder.

8         And these four factors are demand -- let me list them

9    first --  capacity, noninfringing alternatives -- I'll just

10   I'll abbreviate that.  And, in fact, this should be a lack of

11   noninfringing alternatives, so I'll just put that right there.

12   Well we'll come back and talk about it.  The fourth one is

13   actually the calculation of the lost profits.

14        So this is the framework in which lost profits -- if a

15   calculation of lost profits is to be awarded, these are the

16   factors that we need to determine exists.

17   Q    Can you talk about the first factor "demand."  What's that

18   about?

19   A    In economics demand simply refers to do people want the

20   product?  Were people buying the product?

21        In this case, did people want the tuna, the grouper,

22   the seafood that has been treated with tasteless smoke for

23   color retention and fresh-like taste and color.

24        The reality is is when I do an industry analysis, yes,

25   people did want that.  There were millions of dollars of sales,

1    a lot of people were buying it.  It had, in some respects,

2    revolutionized at least a certain aspect of the food industry.

3    So that's essentially what it means:  Is there a demand for

4    this product?

5    Q    The second factor of capacity.  Can you explain that and

6    then give --  first explain what it is and then I'll ask you

7    follow-up questions about what you found about whether there

8    was capacity in this case?

9    A    Sure.  Simply "capacity" means, did the patent holder or

10   his company have the ability, the capacity both to sell, to

11   finance, and to make or produce the product.  And that's what

12   we're referring to to "capacity."  I mean, if it's a company

13   that can't do that, then we can't show that they would have

14   made those sales, and they would have made those profits.

15   Q    Now you talked earlier about -- I think you used the

16   phrase "but for"?

17   A    Right.

18   Q    So can you explain about how that "but for" relates to

19   this issue of could Hawaii International, Kowalski's company,

20   have made those sales?  What's the "but for" part?

21   A    I was worried about the spelling of "capacity," and it

22   occurred me that I spelled that wrong.  What was your question?

23   Q    All right.  So the capacity is, if Ocean Duke had not sold

24   or infringed, then could Mr. Kowalski's company have handled

25   those sales; is that the idea?

1   A    So specific to Hawaii International, is it my opinion that
2   Hawaii International could have sold the Ocean Duke infringing
3   sales?  And my answer is, yes.  In my opinion it is.
4   Q    Can you run over the various factors or elements of
5   capacity that led you to that conclusion that Hawaii
6   International would have been able --  would have had those
7   sales?
8   A    Sure.  I take these calculations very seriously, as I
9   should as anybody in my position would, so I do independent
10  research to find out what the industry is like, what the firm
11  is like.  I talk to employees of the firm, I try to analyze as
12  best as I can given the data and the information available to
13  me, and then I use some reasonable understanding of what is
14  going on.
15          And what I specifically looked at is, in terms of
16  capacity, was Hawaii International able to produce that
17  increased number of fish.  And as I recall from my report,
18  there was almost 11 million pounds of fish that Ocean Duke
19  produced during that time frame from the patent issuing in late
20  1999 to this trial date.  It would have been around 11 million
21  pounds of fish.
22          So over that period of time, was Hawaii
23  International -- did their distribution system, were their
24  employees in place?  Did they have the financing or could they
25  have had the financing available in order to actually make the

1    fish and sell the fish?  And, based upon my analysis, yes, they

2    did.

3    Q    What are the different particulars now?  Let's start with

4    making the fish.  Actually, Hawaii International and Ocean Duke

5    don't process fish themselves, right?

6    A    That's my understanding, correct.

7    Q    They are importing and distributing companies?

8    A    Right.

9    Q    In terms of Hawaii International's system being able to

10   handle the increased --  the sales that Ocean Duke had, what

11   would you say about that?  How would they have handled it in

12   terms of getting the fish supply?

13   A    My understanding is that Hawaii International has trained

14   and essentially licensed several manufacturers to produce

15   tasteless smoke for them.  And that tasteless smoke is provided

16   to suppliers and processors of fish.  And then the processors

17   will actually inject or introduce that tasteless smoke into the

18   fish, freeze it, and then sell it --  or I'm sorry, send it to

19   the distributor.

20        So Hawaii International facilitates and finances and

21   finds the connections between the processor and the distributor

22   and ultimately the capacity that Hawaii International has to

23   have is to make sure that essentially that they can get it from

24   the distributor -- or from the supplier to the distributor.

25   There are large freezers and storage warehouses that the fish

1    is sent directly to the United States -- to California in

2    particular.  And they are there in the freezer.

3            So their capacity isn't such that they are out there

4    actually producing this tasteless smoke and producing and

5    processing the fish.  They've got companies doing that all

6    along the way.

7    Q    Is the fact that they are able to train and rely on other

8    companies to actually process the fish, does --  is that a plus

9    for them as far as meeting the capacity requirement?

10   A    Well, certainly, because their capacity then is expanded

11   dramatically, because we've got several other companies that

12   have the capacity to meet that tasteless smoke, to meet that

13   processing, to meet that distribution requirement.

14   Q    If you relied only on your own factory that was only of a

15   certain size, then maybe that would -- a company like that

16   would have a capacity problem like that on the supply side?

17   A    Potentially.  I have done damage calculations for several

18   different types of cases.  And some we see where they've

19   manufacturing capacity and they could have wrapped it up

20   because their employees are sitting idle or they don't have as

21   much to do as what they could have done.

22           But, on the other hand, you're right.  If it's a

23   factory that is already running at full capacity and there's no

24   way they could have produced more, then this becomes a limiting

25   factor.

1    Q    But that's not a Hawaii International's situation?

2    A    That's correct.

3    Q    And, again, Hawaii International's situation in contrast

4    is what?

5    A    They are easily able to expand capacity.  Not only with

6    the companies with which they already have an agreement,

7    because I understand that some of these companies that they

8    were already working with could expand, just given their own

9    capacity, but also that they could expand to more and different

10   companies as well.

11   Q    Train new companies?

12   A    Exactly.

13   Q    That's on the supply side being able to get enough fish to

14   make the sales that Ocean Duke allegedly improperly made.  What

15   about on the sales side?  Did Mr. Kowalski and his company have

16   the capacity to make --  to handle the added sales that its

17   opposition that Ocean Duke should not have taken?

18   A    In terms of sales, my understanding is, yes, they did.

19   They have sales representatives throughout the United States,

20   regional sales people, and that those regional sales people

21   sell to distributors.  And one of the distributors --  or one

22   of the companies that have been mentioned in court that you've

23   heard about is the Ahold company that was requesting tasteless

24   smoked fish.  And then they have several grocery store chains

25   including Giant.  So my understanding is that, yes, that was

1    the process through which this fish was sold by Hawaii
2    International.
3    Q    Is on the same side as Hawaii International's situation
4    sort of like on the supply side in that they have flexible
5    help, rely on brokers or independent contractors, and they can
6    just bring on more if they've gotten more volume?
7    A    Sure.
8    Q    What other issues relating to capacity that you looked at?
9    A    An important one is finance.  If you've got the factory,
10   you've got everything else in place, but you can't finance that
11   growth, then that could be certainly a limiting factor.
12   Q    And what did you conclude about Mr. Kowalski and his
13   company, Hawaii International, in terms of did they have the
14   financing capacity to be able to handle the extra sales that
15   Ocean Duke Corporation allegedly wrongfully took from them?
16   A    Sure. My determination was that, yes, they would have had
17   that financial capacity because, as they increased sales, there
18   would have been an increase in the financial income to them,
19   which would then have facilitated an increased flow to be able
20   to finance shipping and handling and the sales through the
21   distributors and the brokers?
22   Q    Also, this fish is frozen and when all these --  if they
23   have twice as much frozen fish coming into the United States,
24   it needs to be warehoused in a cold storage place someplace,
25   how would Mr. Kowalski and his company have had the capacity to

1    handle cold storage twice as much -- well, the additional --

2    A    Sure.  It would have been a significant amount of poundage

3    increase, as I mentioned 11 million pounds, over that period of

4    time. And if Hawaii International owned their own warehouse

5    where they shipped everything and placed everything and kept

6    everything frozen before it was trucked out to the different

7    grocery stores, it could have presented a problem.

8         However, in this industry, these are public

9    warehouses.  And they are used by pretty much everybody as

10   needed.  So you pay for them -- it's kind of like a short-term

11   rent agreement.  You pay for them as you need them and then

12   they flow through.  So it's a public type of a warehouse.

13   Q    When you say "public," it means they are owned by other

14   people?

15   A    Yes.

16   Q    And they handle frozen goods of various companies?

17   A    That's correct.

18   Q    So if you got more fish coming in, you just deal with

19   these people, and they make more space available?

20   A    Yes.

21   Q    All right.

22   A    The space was there because somebody was using it, right.

23   I mean, the 11 million pounds was already coming into the

24   United States, so it was definitely available.

25   Q    Oh, I see.  The space that Ocean --

1    A    The space that Ocean Duke used would have been the space

2    that Hawaii International would have used.

3    Q    And Ocean Duke was not using its own personally owned cold

4    storage warehousing facilities?  It was hiring the same guys

5    that Mr. Kowalski's company would have or could have hired?

6    A    That's my understanding.

7    Q    Well, if you have anything more to say at this time about

8    the capacity requirement, you may.  But, if not, can you go on

9    to explain what point number 3 on that chart is?

10   A    Sure.  Let me just jot down a couple of points that we

11   spoke about:  Production, sales, warehousing I should put up

12   here too, finance.  And I think that probably covers it.

13            I'm sorry, what was your next question?

14   Q    Could you explain what the third Panduit factor is, lack

15   of noninfringing alternatives?

16   A    Yes.  And if there's an acceptable noninfringing

17   alternative, then it's going to be moot --  it's going to be a

18   difficult point to say, Well, if the alleged infringer, the

19   person who's using this patent inappropriately could have just

20   simply switched to something else, and the consumer wouldn't

21   have cared one bit, then it doesn't matter that they've got the

22   capacity produced.  It doesn't matter that there was the demand

23   because the alleged infringer could simply have switched to

24   something else and the consumer wouldn't have cared.

25            Now, what that goes on to say is that it's very

1    important that we determine that it's acceptable to the

2    consumer.  And that's what that means.

3    Q    You started out by saying that under this analysis lost

4    profits, if Ocean Duke had not infringed, then Mr. Kowalski's

5    company would have had those sales that Ocean Duke had, the 11

6    million pounds?

7    A    As I recall, it's just under 11 million -- about 10.9 or

8    something.

9    Q    But this third factor relates to whether you can come to

10   that conclusion, because if Ocean Duke did not infringe, then

11   maybe those sales would have gone to some other type of

12   product?

13   A    Sure.

14   Q    That's what you are talking about there?

15   A    Sure, yeah.  We wouldn't be able to say that Ocean Duke --

16   I'm sorry, that Hawaii International would have been able to

17   capture all of the sales that Ocean Duke allegedly took away

18   from them.

19   Q    Okay.  So can you tell us about what you found when you

20   explored whether or not there were noninfringing substitutes

21   for the tasteless smoke product that was allegedly protected by

22   Mr. Kowalski's patent?

23   A    Yes.  When I first started researching and getting

24   involved in understanding this part of this seafood industry,

25   it was immediate that carbon monoxide does very similar things

1    as the tasteless smoke.  But then as I continued to research, I

2    realized that most consumers have a very hard time when they

3    see something has been processed with carbon monoxide that they

4    just don't accept it as much.

5         It's not as --  you see something like smoke and you

6    know that that's been around for centuries.  And I think one of

7    the previous experts said that since the beginning of time,

8    people have been smoking food.  So that's something that we

9    understand, something that we accept, something that we have

10   probably all eaten.

11        But if it says on the product that it's processed with

12   carbon monoxide, I think in our very health-conscious society,

13   most people don't like that.  And I did research, and I saw

14   that there were groups of individuals that are protesting, that

15   are making a big issue out of the fact that the FDA will even

16   allow that food could be processed with carbon monoxide.

17   Q    So, you came to the conclusion --  so your conclusion as

18   to whether chemical carbon monoxide treated product would be an

19   acceptable noninfringing product for the alternative for these

20   sales of smoke that doesn't give a smoke taste that Ocean Duke

21   did, what was your conclusion then?

22   A    Actually, based upon this particular factor, I decided to

23   calculate two different lost profit damage analysis.

24   Q    Maybe it would be more clear if you start with the basic

25   opinion and then if you have some kind of backup alternative --

1    A    Essentially, my basic opinion is that there really is no

2    acceptable noninfringing alternative.  As I researched the

3    industry, it occurred to me --  I realized that in reality

4    consumers have a hard time with carbon monoxide.  So it's not

5    really an acceptable alternative.

6         For example, the letter that was shown or the call for

7    a proposed bid or whatever that was from Giant.  They

8    specifically said it's got to be treated -- the fish has to be

9    treated with tasteless smoke.  So, yes, there is a very

10   distinct desire to have the tasteless smoke as opposed to the

11   carbon monoxide.

12   Q    All right.  And then if you have anything more to say

13   about there not being any noninfringing alternatives -- or by

14   the way, the noninfringing part, is that required by Panduit

15   that for something to be an alternative, it would have to be a

16   noninfringing alternative?  That's part of the patent law --

17   A    It would not only have to be noninfrining, but it would

18   have to be an acceptable noninfringing -- acceptable to the

19   consumer, that the consumer didn't care or didn't recognize the

20   difference between the patented process and the nonpatented or

21   the noninfringing process.

22   Q    All right.  Can you go on to the fourth Panduit factor

23   which is the calculation of profits?

24   A    Sure.  This is where we actually do the calculation of the

25   lost profits.  So I take --  and this is where it gets maybe a

1    little bit more complicated in terms of actually doing the

2    calculation.  But I think the concept is still fairly

3    straightforward.  And the concept is, is you take the number of

4    units that are infringing and then you apply the profit of the

5    patent holder.

6           So if I had sold that 11 million pounds, how much

7    profit would I have made on those additional 11 million pounds?

8    So I have to apply Hawaii International profit to Ocean Duke

9    sales.

10   Q    Now, when you talk about profit, is it the overall company

11   profit or is it kind of more of a different concept?

12   A    Well, in this particular case, because there are so many

13   different cuts and species of fish and even different years you

14   are going to have different profit margins.  So I had that

15   information available, I applied the different profits per

16   species, per cut, per year and came up with that calculation

17   that way.  So it was the profit margin on each particular

18   product.

19   Q    At this point, if you like you can turn the page or you

20   can write lower on the page.  I think you need to put some

21   specifics on about what you calculated for the lost profits

22   damages that you feel are -- came to the conclusion that are

23   appropriate?

24           THE COURT:  Before doing that, I think this is an

25   appropriate time to take a recess.  We've been going for about

1    an hour and a half.  We'll take a 10 minute recess.

2    (Recess at 10:01 a.m.to 10:14 a.m. ).

3             THE COURT:  Mr. Yasunaga you may proceed.

4             MR. YASUNAGA:  Thank you, Your Honor.

5    Q    Mr. Francom, you were saying that Ocean Duke sold how many

6    million pounds of fish treated with tasteless smoke in your

7    calculations?

8    A    Over the entire period of time, I'm just referring to my

9    calculation, I have 10,945,048 pounds.  So nearly 11 million.

10   Q    And under the lost profit analysis, you are calculating

11   what additional profit Mr. Kowalski's company would have had,

12   had it had those 10.9 million pounds of fish sales?

13   A    Yes.  Essentially, the calculation is if Hawaii

14   International, Mr. Kowalski's company, had sold that 10.9

15   million pounds, what profit would they have made on those

16   sales?

17   Q    All right.  So then in order to determine that, what was

18   the next step or step you had to take?

19   A    I'm sorry, I'm not sure I understand your question.

20   Q    Okay.  After arriving at calculating how much fish --

21   tasteless smoked fish Ocean Duke sold, and then you said you

22   had to determine how much profit Hawaii International would

23   have had if it had had those 10.9 million in sales, so how did

24   you do that?

25   A    Okay.  If I may show a piece of my calculation on the

1    projector.

2              THE COURT:  You may do it that way, sure.

3              MR. YASUNAGA:  I'm going to move the board.

4              THE COURT:  Yes, right.

5              THE WITNESS:  I think I'm going to have to flip

6    through just a few of these.  Okay, here's the calculation for

7    the alleged infringing pounds.  This is just discussing or just

8    referring to tuna.  There are several other types of fish.

9    This particular chart lists out the tuna and the different cuts

10   of tuna.  It's not a very clear representation unfortunately,

11   but the first one on the list under Ocean Duke cut is kabob,

12   and then the next one is loin, and it looks like it's a certain

13   ounce, 10 ounce or whatever, then we've got steaks and saku.

14             So that's how specific and detailed we had the

15   information in terms of what the profit margins are and how we

16   were matching up the Ocean Duke sales, the infringing sales

17   with Hawaii International profit margin.  So it wasn't just

18   what was the company profit margin and let's apply that to all

19   of the sales.  It was more specific than that.

20   Q    What was the profit Hawaii International made on this type

21   of fish or this cut of fish for this year and on and on, that

22   kind of specificity?

23   A    Right.  Right.  So we did it by year in fact, so it was

24   even more specific.

25             The lost profit damage --  let me flip through to the

1    actual -- and you see the term "to supplier market."  What that

2    is referring to is that we have Hawaii International Seafood

3    that rightfully has the ability to apply the patented process

4    of tasteless smoke to the seafood, and then we have all others,

5    in this case Ocean Duke, which is also supplying that tasteless

6    smoke to seafood.

7              So, in this case, if Hawaii International is the only

8    other supplier and Ocean Duke is infringing, then in economic

9    terms, Hawaii International would have captured all of Ocean

10   Duke's sales.

11             And that's what this is going to.  Again, it's showing

12   the revenue, the gross profit, then the costs of this company.

13   And so the final calculation that I came up with on total lost

14   profits for this type of a to-supplier-market calculation is 6

15   million --  let me refer to the documents so I can see that

16   better -- 6,358,983.  I'll just write that up here.  That's for

17   the entire period of time, as you can see, from 1999 through

18   2007.

19   Q    And, again, can you add the words "lost profit" there so

20   --

21   A    Sure.  And it needs to be mentioned that Hawaii

22   International is also a company that has been making a fair

23   amount of sales as well.  Approximately the same size of

24   tasteless smoke sales as Ocean Duke.

25   Q    Could you also -- I think it would be useful lost profit

1    of six million, whatever that is, on 10.9 million pounds of

2    fish? I'm sorry your last statement was that -- okay, so this

3    is the amount, in your opinion, of profit that Hawaii

4    International would have received if Ocean Duke had not

5    infringed and Ocean Duke's 10.9 million pounds of sales had

6    been -- had gone to Hawaii International?

7    A    So, yes, in other words, every sale that Ocean Duke made

8    that infringed the patent would have been Hawaii

9    International's sales had that patent not been infringed.  And,

10   therefore, this would have been the profit number that they

11   would have -- Hawaii International would have earned on those

12   sales.

13   Q    And you said something about Hawaii International also had

14   its own other sales of fish besides this Ocean Duke sales,

15   right?

16   A    Yes.

17   Q    And from your research, you found that Hawaii

18   International also sold millions of pounds of fish?

19   A    Correct.  As I recall, and I can refer to my report, but

20   as I recall it was approximately the same number of pounds as

21   Ocean Duke.

22   Q    If Ocean Duke had not infringed then Hawaii International

23   would have had roughly double the amount of sales roughly?

24   A    Yes.

25   Q    Under the lost profits analysis, are there any kind of

1    other damages that go along with that, not only did they lose

2    the profit they would have made --  I'm sorry, not only did

3    they lose the profit on that fish that Ocean Duke allegedly

4    wrongfully took, are there any related damages -- consequential

5    damages?

6    A    Yes, actually there are.  There are a couple of different

7    other factors that I would like to mention on this $6,358,000

8    that Hawaii International would have had, but for the

9    infringement.  They would have also been able to have paid

10   lower interest fees.  As I did some research and found that the

11   company that was financing some of their operations actually

12   charged them a much higher interest rate than what they would

13   have charged, had this company, Hawaii International, had more

14   money, had nor financing, had been a larger company.  Which

15   this doubling in size certainly would have provided for them.

16          And that number that was calculated --  let's see.  I

17   call this the excess interest in bank fees is approximately two

18   million dollars.  It's $2,020,560.  So I'll just put excess

19   interest on here and bank fees.

20          And then if I may continue on that same question,

21   there is another calculation --

22   Q    Before we move on to the next one, maybe a little more

23   explanation on that two million dollar amount.  If Hawaii

24   International had had the 10.9 million pounds of additional

25   fish sales, it would have been stronger financially so it could

1    have borrowed at --

2    A    They would have borrowed at a lower rate.  It if it was

3    prime plus two percent that I calculated, they would have been

4    able to borrow at as opposed to their prime plus, and I'd have

5    to double check, but I think it was prime plus six percent.  So

6    it was significantly higher interest rates that Hawaii

7    International had to pay to finance their sales in order to get

8    the profits that they did have.

9    Q    And so if it was able to pay lower interest rate, it would

10   have made more money?

11   A    Certainly -- well, it would have paid less money.

12   Q    Paid less money and end up with more profit of that

13   amount?

14   A    That's correct.

15   Q    And then you were going on to it a third item?

16   A    Well --

17            THE COURT:  What?

18            THE WITNESS:  I thought you were going to say

19   something.

20            THE COURT:  No.  I'm always about to say something.

21            MR. YASUNAGA:  His eyes say yes, but the words say no.

22            THE WITNESS:  So the other piece is the interest rate

23   that --  I mean, this is -- the way we look at this in

24   calculating these damages is that because Hawaii International

25   and Mr. Kowalski in this case was deprived, they were deprived

1    of this profit that they would have received but for the

2    infringement.  They are also deprived of interest that they

3    could have earned on that.

4         So it's a fairly common concept that if you don't have

5    access to the money that you should have had access to that you

6    should also be entitled to some fair interest rate, which I did

7    calculate.  And the prejudgment interest that I calculated was

8    $2,782,716.  So that's the prejudgment interest.  And we call

9    it prejudgment because there has been no judgment made yet.  So

10   this is just up through the -- to date basically.

11   Q    The 10.9 million pounds of fish that would have been sold,

12   if Ocean Duke did not infringe, that would not have been sold

13   all on one day or one year?

14   A    Certainly.

15   Q    It would have been spread over what?

16   A    Actually the end of 1999 November through December of

17   2007.

18   Q    So that --

19   A    Approximately eight years.

20   Q    So the profits from that 10.9 million pounds of fish would

21   have been -- some would come in in '99, some would have come in

22   2000, 2001 on and on?

23   A    Certainly, and that's exactly how this interest is

24   calculated as well.  It's not just assuming that that six

25   million dollars was in place from 1999 forward.  It was taking

1   a portion that was available and then calculating interest on

2   each piece as it grows.

3   Q    So to get that prejudgment interest figure of 2.7 million

4   you would, one -- if they had had some of these 10.9 million

5   sales and profits in 2000, they could have earned interest on

6   that money until today?

7   A    Correct.

8   Q    It would be x amount and then you said for the money

9   coming in in 2001, they could have earned interest and that

10  would be so much.  And then you totalled all that interest it

11  could have earned on this money coming in over the last many

12  years, and that's the number?

13  A    So the total is 2.7 --

14  Q    And then did you have a total figure for those three

15  elements of lost profit and damages?

16  A    Yes, the total is $11,162,259 when totalling each of these

17  together.

18  Q    Now, you said that -- is that your opinion of the lost

19  profits damages that would be appropriate in this case?

20  A    Yes.

21  Q    Did you do some kind of alternative calculation for lost

22  profits to cover the possibility of if the jury decided that

23  carbon monoxide was an acceptable substitute for fish treated

24  with natural smoke that did not give the fish a smoke taste or

25  odor?  Did you do an alternate calculation in case they

44

1    disagreed with you and found that carbon monoxide would have

2    been an alternative acceptable to some consumers?

3    A    Yes, I did.

4    Q    Can you flip the page?  Maybe you should put a title on

5    this page of no acceptable --  what's the term?

6    A    I'll put --

7    Q    How about a more descriptive --

8    A    I'll put "to supplier" because that's what I titled this

9    as "to supplier market" which means that there is no

10   noninfringing alternative.  If you can read that.

11   Q    Why don't you go --

12   A    So the alternate calculation I believe is what you are

13   asking me for.

14   Q    If CO is an alternative or deemed an alternative?

15   A    I call this a multisupplier market because that means that

16   there's more than just the tasteless smoke product that could

17   be used to meet this demand for the consumer.  So if you

18   determine that CO is an alternative that's acceptable to the

19   consumer, then you would want to look at this multisupplier

20   scenario which says that, yes, there is a noninfringing

21   alternative.  And in this case it would be carbon monoxide.

22   Q    Well, go ahead --

23   A    You want me to go ahead?

24   Q    So under this scenario if Ocean Duke did not infringe,

25   then the 10.9 million pounds that were handled by Ocean Duke,

 1    some of it would have gone to Mr. Kowalski's company and some

 2    of it would have gone to who?

 3    A    We're still assuming that Ocean Duke was infringing --

 4    Q    Right.

 5    A    -- the tasteless smoke patent.

 6              THE COURT:  If you stand over there --  why don't you

 7    stand over there.

 8              THE WITNESS:  I have to stand over here.

 9    Q    If Ocean Duke did not have those sales, then it would have

10    gone to who?

11    A    Carbon monoxide producers.

12    Q    All of them?

13    A    Well, no, that's what I'm attempting to explain is that

14    there is market share information.  And really what this is

15    showing is that within the market of treated fish for color

16    retention and fresh-like taste, there's a portion of the market

17    that goes to tasteless smoke that consumers purchase the

18    tasteless smoke and then there's a portion -- there are some

19    sales of fish treated with carbon monoxide.

20              So that's what I look at with this multisupplier

21    market that there is some carbon monoxide suppliers and there

22    are tasteless smoke suppliers.

23    Q    And then you come out with dividing a hundred percent by

24    so many percent for carbon monoxide?

25    A    Right.  So in the early years, there was very little sale.

1    There were very little market share -- and I'm trying to find

2    the page in my report where I'm talking about what the market

3    share amount is -- very little market share of carbon monoxide

4    treated product.

5         So in the year 2000, based on the information that I

6    could find on this industry, it looked essentially that all

7    sales of treated fish were with tasteless smoke.  So one

8    hundred percent market share went to tasteless smoke.  Then in

9    2001 through 2003, approximately 95 percent market share was

10   tasteless smoke and then the remainder was carbon monoxide,

11   five percent.

12        In 2004, we had 93 percent of the market share was

13   tasteless smoke and so on.  And in 2007 and 2006, the market

14   share for tasteless smoke is about 84 percent.  So those are

15   just numbers that helped me calculate, well, if carbon monoxide

16   really is an alternative for the consumer, then that portion of

17   sales of Ocean Duke theoretically could have gone and been

18   carbon monoxide sales.  So they really wouldn't have been

19   infringing, at least that portion of their sales would not have

20   been infringing the patent.

21        So, for instance, in 2007, 16 percent of Ocean Duke's

22   sales would not have been infringing the patent.

23   Q    You got the hundred percent of Ocean Duke's sales, say, in

24   some year 2005 and then you figure out how many of those --

25   how much of those sales would have gone to Mr. Kowalski's

1    company and how much would have gone to carbon monoxide

2    suppliers?

3    A     That's correct because Mr. Kowalski's company is the

4    tasteless smoke producer and supplier of treated fish with

5    tasteless smoke, but anybody else could do the carbon monoxide.

6    Q     All right.  So when --  you say 95 percent for a year

7    where 95 percent of the market was tasteless smoke,

8    Mr. Kowalski's company would get lost profits on 95 percent

9    of --

10   A     Of Ocean Duke's sales.

11   Q     And what about the remanning five percent of sales?  Does

12   that just go away or is there some kind of remaining type of

13   calculation of damages for that five percent that

14   Mr. Kowalski's company would not have had?

15   A     Well, for instance, if we're talking about the years 2001

16   through 2003 where there's five percent that I don't calculate

17   lost profits for Mr. Kowalski and Hawaii International, that

18   five percent was still in fact treated with tasteless smoke.

19   Therefore, Mr. Kowalski, Hawaii International, is entitled to

20   at minimum -- that minimum reasonable royalty calculation.

21          So 95 percent would receive lost profits and the

22   remaining five percent would have that reasonable royalty.

23   Q     Do you want to put out your conclusion on this thing?

24   A     Yes.  Thank you.  In the case of a lost profit and

25   reasonable royalty analysis, the multisupplier market, five

1    million nine hundred sixty-three thousand -- so this is lost

2    profit plus the reasonable royalty on that remaining market

3    share.  So that's the calculation that I came up with.

4    Q    And did you calculate --  in that scenario, would there be

5    some prejudgment interest that would be appropriate?

6    A    Yes.

7    Q    Actually, if there's another type of damage you should

8    probably go in the same order as your last chart?

9    A    Well, again, we've got the excess of interest in bank fees

10   calculation.  And that is $2,020,560.  So that's the excess

11   interest paid by Hawaii International.  And the prejudgment

12   interest would be $2,664,745.  And I will put the total up

13   there and that is $10,648,814.  And hopefully you can read that

14   writing, it's a little messy.  So we're adding these together

15   to get that.

16   Q    Do you have anything else you wanted to add in regards to

17   this lost profits way of analyzing the damages?  Or, are you

18   ready to move on to the other alternative of just reasonable

19   royalty -- the minimum type of damage of reasonable royalty?

20   A    Maybe just a quick overview.  Simply that this to-supplier

21   market assumed no noninfringing alternatives, the thinking is

22   on this lost profit analysis is that any sale that Ocean Duke

23   made would have been Hawaii International sales --

24   Mr. Kowalski's business sales but for the infringement.

25              So, with that in mind, on the to-supplier, Hawaii

1    International would have captured every single one of the
2    sales, whereas on the multisupplier, if you believe that carbon
3    monoxide is an acceptable alternative to the consumer, then
4    Hawaii International would have captured only the market share
5    that tasteless smoke currently has in the market, and this
6    would be the calculation.
7        Same basic concepts except for the portion of sales
8    that Hawaii International would not have captured.  They would
9    have been entitled to receive a reasonable royalty.  And the
10   total on that is the 10.6 million.
11   Q    Now, you said this scenario would apply if the jury
12   decided the carbon monoxide was a reasonable acceptable
13   alternative to the consumer.  But aren't you talking about not
14   just consumers in general, but you're talking about the buyers
15   of Ocean Duke, right?
16   A    Well, as I mentioned, Giant for example, the large
17   supermarket chain is one example, one instance, where the
18   consumer, or in this case the purchaser of the product, is the
19   supermarket chain because they specify specifically tasteless
20   smoke presumably because the end consumer didn't want carbon
21   monoxide, and they knew that they had to sell through to the
22   end user.
23   Q    All right.  Now, go on with your opinions.  Are you ready
24   to turn to the alternative way of calculating damages which
25   would be the minimum way of calculating damages?

1  A     Sure.  Maybe I can refer to an exhibit that will help me
2  --  there's that.  This is the tasteless smoke market share for
3  the alternative of the multisupplier market.  If I could go
4  back to the patent statute, it talks about the established
5  method is to calculate damages of lost profits or at a minimum
6  the calculation of a royalty.
7        So if for some reason Hawaii International could not
8  have captured all of the sales of Ocean Duke, then at minimum
9  they should receive a reasonable royalty calculation.  And the
10 essence of determining a reasonable royalty is going to be
11 different for every single case.
12       And you look at the two parties involved.  You go back
13 to just before the infringement occurred and you look at what
14 they call a hypothetical negotiation.  If these two parties,
15 Hawaii International and Ocean Duke, had sat down together and
16 negotiated out what this license rate is going to be, what
17 would they have come up with?
18       So, again, it's an economic "but for" analysis.  You
19 know, what would have happened "but for."
20 Q    Now, you say it's a hypothetical, you are supposed to go
21 back to right before the time the infringement started.  Is
22 that just your opinion, or is there some law that says that's
23 how reasonable royalties are --
24 A    Yes, again that's established on a case many years ago.
25 We call it the Georgia Pacific factors that came out with 15

```
1   different factors to make this determination of what the
2   reasonable royalties should end up at.
3   Q    You said "they came out with"?
4   A    The Court.  I'm sorry the Court came out with this case
5   determined that there were 15 factors.
6   Q    And economists, after that time, are required to follow
7   the law that was created in that case and those factors or --
8   A    Yes.  It's been a road map essentially of what to look at
9   in determining through this hypothetical negotiation what a
10  reasonable royalty would have been.
11  Q    All right.  So what does the law coming from that Georgia
12  Pacific case say about how one should determine what a
13  reasonable royalty is?
14  A    Well, the 15 factors that I mentioned.  And in each case,
15  depending on who the parties are, what information is
16  available, it will be different for every single case.
17  Q    You mean the result, but not the --
18  A    No, the 15 factors are the same, but the emphasis of the
19  different factors, the information that's pertinent in every
20  single case will end up with a different result.
21  Q    And did you apply those 15 factors to this case and use
22  that to come up with your determination of what would be a
23  reasonable royalty?
24  A    I did.
25  Q    All right.  I'm not sure what the next specific point you
```

1    want to discuss about that is.

2    A    Well, I think maybe giving you an overview of what these

3    Georgia Pacific factors are, what I did are the specific

4    points.

5    Q    Before you get into the factors, I think -- aside from

6    talking about you've got to look at this hypothetical

7    negotiation just before the infringement began, are there

8    certain other assumptions that the law tells, from a Georgia

9    Pacific case, tells you need to be made?

10    A    Sure.  The assumption is that these two parties are a

11    willing licensor and licensee, that they are going into this

12    negotiation because they both recognize that the patent is

13    valid.

14        So I think that's a critical point that Ocean Duke is

15    entering, or at least hypothetically entering this negotiation

16    agreement, because they recognize that the patent is valid.

17    Q    That's what the law tells you to assume in calculating a

18    reasonable royalty?

19    A    That's correct.

20    Q    And when you say willing licensor and willing licensee,

21    that means the law tells you to assume --

22    A    That there's no pending litigation, there's no threat, but

23    there's an acknowledgement that the patent is valid.

24    Q    If Ocean Duke recognized that the patent was valid and

25    infringed and wanted a license and Mr. Kowalski wanted to give

1    a license, what number would they have come up with?

2    A    Well, the calculation that I came up with is on a

3    per-pound basis.  And really to determine --  you know, there's

4    a lot of economic analysis to go into this, but a starting

5    point that we generally look at in these types of calculations

6    is, What is the profit of the invention?  How much

7    profitability does this tasteless smoke provide to the user of

8    tasteless smoke?  If it's just a few cents, it doesn't make

9    sense to charge a royalty of a lot of money.  If it's very

10   profitable and you can make a lot of money off of it, then the

11   company, the individual who wants to use that patented

12   invention, is much more willing and likely to pay a higher

13   royalty rate.  So that's really the beginning point is, what is

14   the profitability on the invention?

15   Q    And what did your work and research and analysis find

16   about that issue?

17   A    Well, I found that profitability varied between species,

18   that tuna was a much higher profitability because you could

19   sell that tuna that has been treated with tasteless smoke for a

20   much, much higher profit than tuna that was not treated.

21             And then there were other species, I believe, grouper

22   and a few other species that had been treated with tasteless

23   smoke had improved profitability but not by that same dramatic

24   increase.

25             So I came up with a per-pound royalty rate on certain

 1   species at a higher rate and a per-pound royalty rate per

 2   species for the lower-profit species.

 3   Q    Do you want to quickly maybe show a screen about that

 4   or --

 5   A    Let me see if I can find it.  Let me go back to this one.

 6   This is where I talk about my opinion of the alternative, the

 7   reasonable royalty.  And you can see that there's a range.

 8   Q    Don't you have an opinion three before that one?

 9   A    I believe that that's a different opinion.

10   Q    Okay.

11   A    So for the four cents per pound for shark, snapper,

12   mahimahi, and 20 cents per pound for tuna, swordfish and

13   grouper.  I've got a range of eight cents and 20 cents.

14   Q    I was asking you to explain the profits per pound, and I

15   think you just --  you jumped to the royalty.

16   A    I'm sorry, maybe I did.  Here we go.  Based on its profit

17   summary, Ocean Duke earned on average 53 cents per pound for

18   treated fish.  And then specifically for mako shark, scarlet

19   snapper and mahimahi, the average profit was 16 cents, 20

20   cents, and 24 cents respectfully.  It then talks about --

21   Q    What about the line above that for tuna?

22   A    Yeah, for tuna, and I wanted to explain this 25 percent

23   rule of thumb, but for tuna and grouper and swordfish, we have

24   got profit margins of 53 cents, 52 cents, and 72 cents.

25           So a typical starting point, when you are doing a

1   reasonable royalty calculation, is to assume or to calculate

2   that 75 percent of the profits stays with the manufacturer of

3   the product.

4   Q    Wait, wait.  Here we're talking about --

5   A    Ocean Duke.

6   Q    Importer/seller?

7   A    Who is importing and selling.  And I'm just kind of

8   talking in general about what this 25 percent rule does because

9   we apply it to all of the --  essentially a good portion, if

10  not all, of the reasonable royalty calculations, but it's a

11  rule of thumb that helps us decide kind of what the breakdown

12  of this profit should be.  75 percent would stay with Ocean

13  Duke, 25 percent would go to the patent holder, Hawaii

14  International and Mr. Kowalski.  And, like I said, it's a

15  starting point that gives us a frame of reference to base these

16  15 Georgia Pacific factors on.  Whether the factor would

17  increase that starting point or decrease it, is something that

18  we would then determine specifically with each factor.

19        So, in this case, what we have is the 53 cents per

20  pound for treated fish on average for these three types.  And

21  then on average we have for scarlet snapper, mako shark, and

22  mahimahi a much lower per pound average.  So then the starting

23  point that I come up with is four cents for the lower types of

24  fish, the mako shark, scarlet snapper, and 18 cents per pound

25  for the higher profit margins of tuna, grouper, and swordfish.

1    Q    Okay, so the starting point would be starting with a

2    royalty of four cents to 18 cents per pound of treated fish.

3    And then what do you do?  Do you just use those numbers, 25

4    percent of the profit?

5    A    No, as I mentioned, that's really just a starting point

6    that gives a frame of reference to Ocean Duke, to Hawaii

7    International, when they sit down in this hypothetical

8    negotiation and say, okay, let's figure out a reasonable

9    royalty rate that we can come up with.

10   Q    So what happens next then?

11   A    Well, then as the economist, I go through these Georgia

12   Pacific factors.

13   Q    Those are the factors that the court in Georgia Pacific

14   ruled that people should look at?

15   A    That's correct.

16   Q    So the first one we would look at is what other license

17   agreements has Hawaii International and Mr. Kowalski negotiated

18   on this same patent?  It's some established rate.  Is there an

19   established rate out there?

20        The second one would be, has Ocean Duke ever paid

21   license fees or royalty rates on any comparable type of a

22   technology?  So, again, looking at what people have actually

23   done, what these two parties, Ocean Duke and Hawaii

24   International, have actually paid in licenses or received in

25   licenses.

1          Another one that is -- well, of course, I went

2     through all 15 factors.  Some of them were not as critical or

3     did not have as much information to determine any significant

4     change in the starting point.  This, in particular, the

5     commercial relationship between Hawaii International and Ocean

6     Duke, I found to be a particularly important factor because

7     they are competitors.

8          Now, if we looked at --  if the same two companies

9     were not competitors, but in fact one was a supplier and the

10    other one was a commercializer/developer, and they did not

11    compete for the same markets, it would have a much different

12    impact on that negotiated royalty rate than if they were both

13    competing for the same market. And of course, when the

14    competitors and Hawaii International realizes that every sale

15    that Ocean Duke makes, Hawaii International is going to lose

16    that sale.  That's going to have a large impact on what Hawaii

17    International would be willing to negotiate a royalty for.

18    Q     In which direction?

19    A     Well, as stated here, the impact on the royalty rate would

20    increase.  And, in my opinion, it would increase relatively a

21    significant amount because of that commercial relationship.

22    And I won't go through all of these, but the utility and

23    advantages of the patent over the old modes, number 9, as

24    you've heard through other testimony, that the tasteless smoke

25    invention actually has had a relatively strong impact on the

1    industry.

2            And so that also would increase that starting point

3    that I discussed in the beginning.  And so we go through -- I

4    go through each of these and determine whether it's a neutral

5    impact or, in other words, didn't it really change that

6    starting point, or if it increases the starting point, or if

7    there is some decrease in the starting point because of the

8    Georgia Pacific factors, and then in the conclusion determine

9    what the interest --  what the royalty rate would have been.

10   Q    So, if as you go through the 15 Georgia Pacific factors,

11   if most of them are increased, then the royalty rate you would

12   end up with would be a higher rate than that 25 percent

13   starting point?

14   A    I wouldn't say that it's a simple matter of counting up

15   and saying, well, we've got six increase and seven decrease or

16   whatever.  It's more really specific to each case and the

17   importance of each of those.  So if this were a relatively

18   minor point, but it was still an increase, it wouldn't

19   necessarily impact the same as another one that had more

20   importance.  But, in fact, this relationship between Hawaii

21   International and Ocean Duke is an important one, and it is an

22   increase.

23   Q    So after you went through the Georgia Pacific factors and

24   decided whether some would be neutral, so that they wouldn't

25   have an impact on the starting point royalty rate and some

1   would tend to push the royalty rate up and some would tend to

2   push it down, then what did you do next or what did you

3   conclude?

4   A    Well, also it needs to be stated that within this Georgia

5   Pacific analysis, I also looked at the presence or lack of

6   presence of noninfringing alternatives.  And that's a factor

7   that is not specifically stated in these 15; but since this

8   Georgia Pacific case had been decided, most experts will

9   determine that noninfringing or the existence or lack of

10   existence of noninfringing alternatives definitely also makes

11   an impact.

12         So I looked at that, and I came to the conclusion that

13   -- well, in my report I talked about a range from eight cents

14   to 20 cents, although I need to point out that that eight cents

15   is based upon license agreements that in most cases were a

16   result of litigation.  And, therefore, I didn't find it to be

17   comparable to what Ocean Duke and Hawaii International would

18   have negotiated prior to the first infringement.

19         So, in reality, my opinion is that the 20 cents per

20   pound for tuna, grouper, and swordfish is the appropriate

21   reasonable royalty and --  let me see where it's at -- four

22   cents per pound for the infringing shark, snapper, and

23   mahimahi.

24   Q    When you say "20 cents per pound," you mean a royalty rate

25   of 20 cents per pound for those expensive species?

1    A    That is correct.

2    Q    And that's what Ocean Duke should have to pay for each

3    pound of that fish that it sold if you go by the reasonable

4    royalty?

5    A    Yes.  Assuming again, that the lost profits don't apply,

6    if the jury says Hawaii International did not lose profits, at

7    a minimum Hawaii International, according to the law, should

8    receive a reasonable royalty.  And this is my calculation of

9    what the reasonable royalty would be, based upon that

10   hypothetical negotiation between Ocean Duke and Hawaii

11   International.

12   Q    Now, you said Hawaii International.  The patent holder is

13   actually who?

14   A    Mr. Kowalski.

15   Q    And the reasonable royalty goes to who?

16   A    The reasonable royalty would go to the patent holder.

17   Q    What was your conclusion about if the jury decided not to

18   award lost profit damages and went with the minimum type of

19   damage, which is reasonable royalty, what was your conclusion

20   then?

21   A    Yeah --

22   Q    Could you do it on the tablet?

23   A    I will.  Let me see if I can find the numbers up here.

24   With the four cent and 20 cent per pound reasonable royalty --

25   Q    Mr. Francom, I think the next sheet might be a chart that

1    might help you.

2    A    Thank you.  Right there.  Right.

3    Q    No, the next one.  The last table of this bunch.

4    A    Right there?

5    Q    That one.

6    A    Okay.  I think that presents it a little more simply.  So

7    with the four and eight cents per pound --

8    Q    Why don't you start with the one that's your actual

9    opinion --

10   A    That's what I wanted to emphasize.  Even though I do have

11   the four and eight cent up here, I put that up for the benefit

12   of the jury to see that calculation.

13        My calculation is the four cents and 20 cents per

14   pound.  And that total calculation is $2,009,073.  That's for

15   the four cent -- we'll call it the four cent and 20 cent

16   reasonable royalty.

17   Q    Now, in addition to royalty, I see you've got another line

18   below that?

19   A    Yes.

20   Q    What's that?

21   A    Prejudgment interest.  So that would be interest on that

22   amount, the two million dollars over that period of time that

23   we're talking about, from 99 to 2007, the prejudgment interest

24   is $777,943.

25   Q    Can you give the total then just to --

1    A    Sure.  Adding those two together we have $2,787,016.

2    Q    Does that conclude your basic opinions?  We can give

3    Mr. Marks a chance to question you about some details, or is

4    there something else that you feel should be added?

5    A    I believe that concludes my opinions on those.

6    Q    But your main opinion is that the appropriate damages

7    should be that lost profit amount that you set out first,

8    right?

9    A    Yes, based upon my analysis and calculations and research.

10   Q    Could you put a star --

11   A    I found that that one made the most sense to me.

12   Q    And then the next page would be, if the jury found that

13   some people who are buying Ocean Duke tasteless smoke product

14   might choose to buy carbon monoxide and find that acceptable

15   substitute, then it's this multisupplier scenario?

16   A    Correct.

17   Q    And then that last reasonable royalty analysis was only if

18   the jury found that Mr. Kowalski's company would not have had

19   any of those sales and so would not have had lost profit

20   damages?

21   A    Correct.

22            MR. YASUNAGA:  Your Honor, I'm done for now.

23            THE COURT:  Very well.  Mr. Marks.

24            MR. MARKS:  Thank you, Your Honor.

25            Mr. Yasunaga, is there any way to take that off the

1    board?   Thank you.

2            Your Honor, could I have a few minutes to set up?

3            THE COURT:   Sure, we can do that in court.   Do you

4    want to --

5            MR. MARKS:   Is there a chance we could have a restroom

6    break?

7            THE COURT:   Sure.   Let's take a short break because I

8    don't want us to run out of time this morning.   We'll need to

9    finish at 1:30 today, and I just want to make sure that we

10   finish.

11           MR. MARKS:   I should be finished by noon.

12           THE COURT:   Let's take a short recess at this time.

13   (Recess at 11:05 a.m.to 11:14 a.m. )

14           THE COURT:   We need a witness.

15           MR. MARKS:   He's very subdued right now.

16           THE COURT:   Let's take an in-court recess for a

17   moment.   Do you know where they are?

18           MS. LEE:   No, Your Honor.

19           THE COURT:   You may proceed.

20                        CROSS-EXAMINATION

21   BY MR. MARKS:

22   Q    Good morning, Mr. Francom.

23   A    Good morning.

24   Q    I have taken your microphone away from you and now I get

25   to use it.

1    A    Okay.

2    Q    I want to start by talking to you about a few things that

3    I think there's a pretty good chance we're actually going to be

4    in agreement on.  Do you believe that?

5    A    It's possible.

6    Q    You are not an expert in patent law; is that correct?

7    A    Correct.

8    Q    And you are also not an expert in the scientific fields

9    relating to the generation of smoke, the generation of carbon

10   monoxide, chemistry, all of the things that relate to the

11   technical side of the this lawsuit; is that fair?

12   A    Correct.

13   Q    And you are, in fact, the second expert witness who's

14   testified in this case, right?

15   A    I believe that's correct.

16   Q    And you've been here for the whole trial?

17   A    Yes.

18   Q    Do you remember Dr. Iwaoka on Friday?

19   A    I do.

20   Q    He talked a lot about smoke and carbon monoxide and things

21   like that?

22   A    Right.

23   Q    None of your opinions are contradicting his opinion from

24   the point of view of your expertise; is that right?

25   A    Mine is essentially economics, market analysis and

1    economics.

2    Q    Would you agree with me then that you are not qualified to

3    give an opinion and, in fact, you are not giving an opinion on

4    whether or not there was patent infringement in this lawsuit;

5    would you agree with that?

6    A    I'm not here to determine.  I do agree that that's the

7    jury's responsibility.

8    Q    You are just here to talk about patent damages, if there

9    is patent infringement; do you agree with that?

10   A    I agree with that.

11   Q    I would like to use this easel as you did.  I just want to

12   talk about the basic opinions that you gave just a short while

13   ago in summary.  What I'm going to write here is if infringe --

14   I'll put a period there for infringement.  You have some

15   alternative damages calculations, right?

16   A    Yes.

17   Q    And the one that you like the best was the largest number

18   out there.  I'm going to write in capital letters here

19   millions.  Okay.  That was lost profits, right?

20   A    Yes.

21   Q    And then there was an alternative measure of damages that

22   you referred to as reasonable royalty; is that right?

23   A    Correct.

24   Q    And that one was millions, but not quite as big, so I'm

25   going to write it a little smaller here.  And when Mr. Yasunaga

1    was questioning you, he made reference, and maybe you can

2    remember this question, to the fact that under the law, as he

3    read the law or as he interpreted the law, the alternative

4    reasonable royalty measure of damages was the minimum or the

5    floor of damages.  Do you remember him saying something like

6    that?

7    A    That's my recollection and my understanding as well.

8    Q    But, in fact, in this case there is a floor that's even

9    below that, and that floor is zero dollars and zero cents, if

10   this jury finds that there is no patent infringement.  Would

11   you agree with that?

12   A    Absolutely.

13   Q    And, in fact, would your answer be the same if the jury

14   finds that Mr. Kowalski's patent is invalid whether or not

15   there is patent infringement?  Would you also agree that the

16   damages amount that they should give is zero dollars and zero

17   cents?

18   A    Well, as I specified in my report and want to clarify

19   here, my assumption, when I calculated these damages, is that

20   the patent is valid and infringed.  I had to make that

21   assumption in order to make sense of the calculations that I

22   did.  So, yes, my assumption is that it's valid and infringed.

23   Q    Okay.  And if it's not valid or not infringed, no damages,

24   right?

25   A    Correct.

1    Q    Now, you mentioned the assumptions that you made.  Would

2    you agree with me that the opinion that an expert witness gives

3    in a case is really only as good as the assumptions that the

4    expert makes?

5    A    I would agree with that.

6    Q    So if, for example, an assumption that you made in

7    rendering your opinions turns out to be factually wrong or

8    factually incorrect, then that would -- I'm trying to think of

9    a word other than "undermine" -- that would weaken the opinions

10   that you have given.  Would you agree would that?

11   A    I don't know that it would render everything weakened.

12   There may be information that comes to light later on that

13   maybe I would need to clarify or change here and there a few

14   things.  But other than that, I don't know that it would

15   necessarily undermine or weaken everything that I've done.

16   Q    Many of the assumptions that you reached in this case to

17   reach your expert opinions were given to you by Mr. Yasunaga --

18   or at least you discussed those with him; is that right?

19   A    I actually was retained by the plaintiff.  However, in my

20   position as an economic patent damages expert, I do try to

21   remain independent in my thinking.  I do try to look at the

22   facts as I see them and as I researched them and as I

23   understand them.  But you are correct, the information was

24   given to me by the plaintiff.

25   Q    But you are not really independent in this case, right?

1  A    Well, as I said, the information did flow from the

2  plaintiff.  So in that respect, I received that information

3  from them, but I did remain independent in my thinking and in

4  my analysis.

5  Q    Well, let me ask you this:  Are you being compensated

6  today by the plaintiffs in this case?

7  A    The firm Campos & Stratis, for which I'm employed, is

8  actually receiving compensation.  I am not being compensated

9  for my testimony.  I receive a salary whether I'm here or not.

10  Q    But your company gets paid by the plaintiff or the

11  plaintiff's law firm, right?

12  A    That's how we make the money, yes.

13  Q    And you've been here in court all week last week, right?

14  A    Correct.  I believe it was three days:  Tuesday, Thursday

15  and Friday.

16  Q    And were you being paid for that time as well?

17  A    The firm is being compensated.

18  Q    Sorry, the firm was being compensated at the rate of $200

19  an hour?

20  A    That's correct.

21  Q    Your firm has been hired by Mr. Kowalski or his company on

22  other litigations that he has brought for patent infringement;

23  is that right?

24  A    True.

25  Q    And would I be correct in assuming that you would like to

1    continue doing work for Mr. Kowalski and his company?

2    A    As I said, it's not something that really affects me one

3    way or the other.  We've got plenty of work.  If you are

4    suggesting that I'm going to change my testimony because I

5    think I'm going to get more work from them, that's an invalid

6    comment.

7    Q    But wouldn't Mr. Kowalski be more likely to hire you, or

8    any other witness, if the witness does a good job for him in

9    litigation?  Would you agree with that?

10   A    I would like to do a good job whenever I'm working for or

11   with, but I have not discussed that with Mr. Kowalski or

12   Mr. Yasunaga; so I couldn't answer whether they plan on hiring

13   me for other jobs or not.

14   Q    But from Mr. Kowalski's point of view, would you agree

15   with me that your doing a good job means --

16            MR. YASUNAGA:  Objection, Your Honor.

17            THE COURT:  Overruled.

18   Q    That your doing a good job means convincing a jury that

19   the damages number should be higher, relatively speaking,

20   rather than lower, relatively speaking; do you agree or

21   disagree with that?

22   A    You know, I haven't even given that any consideration

23   because my opinion is based upon my analysis and my own ethics

24   and responsibility to do what I know I need to do.  So I'm not

25   trying to be evasive.  I'm just trying to say that I'm not

1    really even considering that.

2    Q    Let me get back to some of the assumptions you made.  You

3    are familiar of course with the Kowalski patent?

4    A    Yes.

5    Q    And in your report that's sometimes referred to as the 401

6    patent; is that right?

7    A    Those are the last three digits that the U.S. patent

8    office provided for that patent; so yes, it's the 401 patent.

9    Q    Those terms are interchangeable. The Kowalski patent is

10   the 401 patent?

11   A    Yes.

12   Q    And you also heard about the Shih patent, right?

13   A    Yes.

14   Q    And you heard about the Yamaoka patent?

15   A    I have.

16   Q    And you've discussed those with Mr. Yasunaga, right?

17   A    Yes.

18   Q    Did Mr. Yasunaga ever tell you that the Kowalski patent

19   covered all tasteless smoke processes and that therefore it

20   covered the Shih patent as well?

21   A    That is my understanding, yes.

22   Q    And he actually told you that, right?

23   A    Yes.

24   Q    And you made that assumption, right?

25   A    Yes, based upon conversations with Mr. Yasunaga and other

1    information that I received.

2    Q    Sure.  And if that assumption is wrong, then that would

3    affect your opinions, right?

4    A    If the assumption that the --  I'm sorry, maybe you can

5    give me that question again.  What assumption are we making?

6    Q    Sure.  If in fact the Kowalski patent is determined not to

7    cover the Shih patent or the processes in the Shih patent, then

8    that would affect your opinions, right?

9    A    Well, as we specified before, I'm not a patent attorney or

10   legal expert in that respect.  But I would agree with you that

11   if the Kowalski patent is not valid and is not infringed, then

12   these calculations would not apply.

13   Q    Thank you.  Now, in this case, there are in fact two

14   separate plaintiffs, right?

15   A    Mr. Kowalski and Hawaii International Seafood.  I

16   understand Mr. Kowalski is the owner of Hawaii International

17   Seafood.

18   Q    And Mr. Kowalski himself is the owner of the patent as

19   well?

20   A    Correct.

21   Q    And Hawaii International Seafood, Inc. is not the owner of

22   the patent, right?

23   A    They are not on the patent itself, no.

24   Q    What Hawaii International Seafood does is it sells seafood

25   that's treated with Mr. Kowalski's patented process; is that

1    right?

2    A    I'm sorry, say that again?

3    Q    What Hawaii International Seafood does is it sells seafood

4    that has been treated with Mr. Kowalski's patented process,

5    right?

6    A    I agree.

7    Q    Am I correct that when you did your work on your report,

8    you remember the report that you showed up on the board many

9    times?

10    A    Right.

11    Q    When you did your work on that report, you assumed that

12    HIS, in other words Hawaii International Seafood, the company

13    plaintiff in this case, would be entitled to recover lost

14    profits even though HIS was not the patent owner?

15    A    So your question is, is my opinion that HIS would --  what

16    is your question?

17    Q    When you did your work on your report, whenever you spoke

18    about lost profits, what you spoke about were the lost profits

19    of Hawaii International Seafood, Inc. and not the lost profits

20    of William Kowalski individually?

21    A    Right.  If I may clarify that.  My understanding, again,

22    is that Mr. Kowalski is the owner of Hawaii International

23    Seafood; therefore, that profit would flow to Mr. Kowalski.

24    Q    I want to talk about what's in your report and about some

25    of the testimony you've given -- in fact, the testimony you

1    just gave.  In your report, what you said was lost profits

2    belong to Hawaii International Seafood, right?

3    A    Okay.

4    Q    Yes?

5    A    Yes.

6    Q    Okay.  And today you are saying something that you did not

7    say in your report, which is lost profits can flow through

8    to -- I'm going to put WK for William Kowalski.  That's what

9    you said today a couple of times, and you didn't say that in

10   your report.  Am I right about that?

11   A    It's been several months since I've written the report,

12   but I believe that you are correct that I didn't specify that

13   profits necessarily flow through to Mr. Kowalski in the report.

14   Q    Okay.  Has something changed since the time you wrote your

15   report in August that is causing you to now say something in

16   your testimony today that you didn't say in your report?

17         In other words, has something changed such that today

18   you are, for the first time, saying that the lost profits can

19   flow through to Mr. Kowalski, whereas in your report all you

20   spoke about was that the lost profits were of the company and

21   not of Mr. Kowalski.  Has something changed?

22   A    Essentially, the way the questions are being asked.  It

23   didn't occur to me that there was an issue when I wrote the

24   report because I understood that Mr. Kowalski was the owner of

25   Hawaii International.  But now the questions are coming out

1    that I'm trying to clarify that.

2    Q    Okay.  Since you wrote your report, you've had discussions

3    with Mr. Kowalski and Mr. Yasunaga, right?

4    A    Correct.

5    Q    In those discussions that you've had recently, say within

6    the past week, have you discussed whether it would be stronger

7    for your testimony if the lost profits were the lost profits of

8    William Kowalski as opposed to the lost profits of the company,

9    you had those discussions?

10   A    We did discuss the fact that Mr. Kowalski is the owner of

11   Hawaii International and that the profits --  I actually asked,

12   Are you the one hundred percent owner and all of the profits

13   would flow to you?  And the answer was yes.  I did confirm

14   that, yes.

15   Q    And has something happened in those discussions that

16   causes you to think that Hawaii International Seafood might not

17   be entitled to lost profits in this case?

18   A    No.

19   Q    Have you been asked to make any assumptions about whether

20   Hawaii International Seafood can obtain lost profits, if it is

21   not the owner of the patent, and if it is not the assignee of

22   the patent, and if it is not the exclusive licensee of the

23   patent?

24   A    If I have been asked to make assumptions?

25   Q    Right.

1   A    No, not that I --  maybe I don't understand your question,

2   but what I understand is that --  no, I'm not --

3   Q    Let me ask the question this way.  Are you today

4   testifying that Mr. Kowalski should be entitled to lost profits

5   because you are concerned that Hawaii International Seafood,

6   which is the company that you talked about having lost profits

7   in your damages report, is not legally entitled to lost

8   profits?

9   A    I'm not legally making an opinion because I'm not a legal

10  expert.  But my understanding is that Mr. Kowalski is the one

11  hundred percent owner of Hawaii International Seafood;

12  therefore, what benefits Hawaii International Seafood benefits

13  Mr. Kowalski.  That's what I'm basing my opinion on.

14  Q    Would you agree with me that your testimony today about

15  Mr. Kowalski being the one to get the lost profits doesn't find

16  any reference in the report?

17  A    I think we did establish that, yes.

18  Q    Now, when you were talking about your credentials, you

19  said you belonged to the National Association of Forensic

20  Economics (sic)?

21  A    Economists.

22  Q    Is it economist or economics?

23  A    I think it's forensic economists.

24  Q    How long have you belonged to that group?

25  A    Not long.  Maybe a year and a half.

1    Q    Have you ever looked at the principles of professional

2    practice of that group?

3    A    I have.

4    Q    Are you familiar with professional practice number 1 which

5    is called engagement?

6    A    I don't recall exactly what it says right now.

7    Q    Let me read that to you and you tell me if you remember

8    that's what it says.  "Practitioners of forensic economics

9    should decline involvement in any litigation when they are

10   asked to assume invalid representations of fact or alter their

11   methodologies without foundation or compelling analytical

12   reason."

13          This is the only copy I have so you can take a look

14   that.

15   A    I agree with that.  I accept that.

16          MR. YASUNAGA:  Your Honor.  Ordinarily I would object

17   that he has not shown me; but in this case, I'll just let it

18   go.

19          MR. MARKS:  Thank you for that nonobjection,

20   Mr. Yasunaga.

21          MR. YASUNAGA:  Thank you for the nonshowing.

22          THE COURT:  We're getting a little loose here, guys.

23   Q    Can you tell me what compelling analytical rationale you

24   have for saying today that lost profits can flow through to

25   Mr. Kowalski?

1    A    My understanding, if I own a business and I own one

2    hundred percent of that business, and whatever that business

3    earns, loses, gains, then that also flows through to me.

4    Q    Now, there are reasons why people set up corporations,

5    right?

6    A    Yes.

7    Q    And you are an economist, so you are schooled in what

8    those reasons are, right?

9    A    Yes.

10   Q    You've heard of "limited liability," right?

11   A    Yes.

12   Q    Can you explain what "limited liability" is?

13   A    That the liability of the corporation --  actually, the

14   corporation itself is an independent entity, and so any

15   liability stays with that corporation and doesn't flow through

16   to the shareholders.

17   Q    So there's a benefit to owning a corporation because an

18   individual shareholder can avoid personal liability if

19   something goes wrong with the corporation, right?

20   A    Correct.

21   Q    But by the same token, the fact that the law gives people

22   this ability to avoid liability, means that there are other

23   things on the other side of the ledger, so to speak, that the

24   shareholders of the corporation cannot benefit from; would you

25   agree with that?

1   A     What do you mean by "the other side of the ledger"?

2   Q     If you have a corporation, the benefit is that you limit

3   your personal liability, right?

4   A     Yes.

5   Q     Would you agree with me that the detriment to having a

6   corporation is that the profits are not your personal profits,

7   but they are the profits of the corporation; would you agree

8   with that or disagree?

9   A     It depends on how the corporation is established.  If it's

10  an LLC, an S-Corp, what type of a corporation.

11  Q     I want to move now to some of the numbers that you were

12  talking about in your testimony, all right?

13  A     Sure.

14  Q     If I can just take a moment I'm going to remove that from

15  the board.  Now, over the last couple of hours you've shown

16  quite a bit of numbers on the board, and you did quite a bit of

17  work back when you wrote your report analyzing and calculating

18  those numbers; is that fair?

19  A     I agree.

20  Q     As you sit here today, are you confident in the accuracy

21  of the numerical conclusions that you've reached?

22  A     There is always a potential for clerical error or using

23  certain Excel spreadsheets.  Sometimes things may not flow

24  through.  But I believe that I have used reasonable approach to

25  try to avoid that.  They are not infallible numbers per se.

1    There's always a calculation error that may slip through.

2    Q    In fact, you did say, when Mr. Yasunaga was asking you

3    questions, that you take your calculations seriously; is that

4    right?

5    A    Yes.

6    Q    You said one thing in your expert witness report back

7    in -- was it August that you wrote it?

8    A    July.

9    Q    July.  You said one thing in that report that you didn't

10   talk about here today.  You talked about the fact that back in

11   July you talked about the fact that in your view Ocean Duke

12   Corporation had underreported some sales numbers.  Do you

13   remember that?

14   A    If I am correct, what you are referring to is that the

15   documents that were provided to me by Ocean Duke, the amount of

16   grouper sales actually were contradictory in one particular

17   year.  And I did point that out in my report, yes.

18   Q    So you remember that, don't you?

19   A    I do.

20   Q    Do you remember what the exact numbers were?

21   A    No, I would have to refer to the report.

22   Q    Okay.  You have your report in front of you?

23   A    I do.

24   Q    Could I ask you to look at page 8 of the report?

25   A    Sure.

1   Q    Do you have page 8?

2   A    I do.

3   Q    In just a second I'm going to show the Ocean Duke document

4   that you talk about on page 8 of the report.  I don't know if

5   you can see that, Mr. Francom, but does that look familiar to

6   you?

7   A    Yes, it does.

8   Q    It's called Annual Sales of Treated Fish 1999 to 2005.  Is

9   it your understanding that this is a document that Ocean Duke

10  prepared in this litigation in order to summarize some of its

11  sales of treated fish during those years?

12  A    That's my understanding, yes.

13  Q    And what you did and what you talk about on page 8 of your

14  report is that you look at the year 2003; right?

15  A    Right.

16  Q    And notice that Ocean Duke says that it sold six hundred

17  pounds of grouper in the year 2003; right?

18  A    Yes.

19  Q    And that's what you say in your report?

20  A    Yes.

21  Q    Now, what you did is you went back to probably several

22  thousands of pages of invoices that were turned over by Ocean

23  Duke in this case; right?

24  A    What I received from Ocean Duke was invoices for only one

25  of those years which was 2003.  So that was the year that I was

1    able to go through and confirm the sales.

2    Q    And the number that you found from the invoices was

3    1,248,883 pounds of treated grouper; right?

4    A    According to the invoices, yes.

5    Q    Now, when you looked at those invoices -- actually, let me

6    just bring the circle around.  So based on those two numbers,

7    you concluded that Ocean Duke Corporation had underreported the

8    actual amount of its sales in this summary; is that right?

9    A    Actually, I just concluded that, based upon that

10   information, that grouper had been underreported --  you know

11   just comparing the invoices with the summary, but of course I

12   didn't project that out because I don't have any other

13   information.

14   Q    But you did increase the damages calculations that you

15   made based on your belief that there was underreporting,

16   correct?

17   A    I don't believe that is correct, except for the grouper

18   category I increased that by the invoice amount as opposed to

19   the six hundred that was shown in the summary.

20   Q    Now when you went and looked at the invoices --  by the

21   way, did you personally look at the invoices or did you have

22   someone on your staff do it?

23   A    Actually, somebody did do the calculations, typed in all

24   of the manual --  all of the manual numbers and then I went

25   back through and did an audit of those.

1    Q    Can you tell by looking at the invoices that Ocean Duke

2    does whether the grouper that was being sold in the year 2003

3    was treated grouper or nontreated grouper?

4    A    We did our best.

5    Q    And, in fact, only treated grouper is relevant in this

6    lawsuit?

7    A    I agree.

8    Q    Because what we're talking about in this lawsuit is the

9    process for treating fish for color retention, right?

10    A    Correct.

11    Q    And Ocean Duke deals in an awful lot of fish that's not

12    treated at all, right?

13    A    I think that's true, yes.

14    Q    In fact, you've heard testimony that the approximate

15    percentage of its business that is treated seafood, as opposed

16    to nontreated seafood, is about three percent -- just three

17    percent treated, right?

18    A    That's what I heard, yes.

19    Q    Okay.

20    A    Now, generally, we would expect to receive something more

21    than just the representation from the defendant that this is

22    what they sold; so invoices help.  Invoices help to determine

23    this is an accurate number.

24         So as a person trying to calculate the damages, I want

25    to get this information that I've got, use it as I've got it,

1    and be as accurate as I possibly can.

2    Q     Sure.  Now, in fact, the number that you calculated for

3    the invoices of 1.2 million, you assumed that that was all

4    treated grouper; correct?

5    A     Based upon the information on the invoices, some of them

6    would have said, as I recall, "tasteless smoke" or would have

7    had that brand Black Tie or Cryofresh.  And I believe my

8    understanding was that Cryofresh was treated with tasteless

9    smoke.

10   Q     And you're an expert witness, and I get to ask you

11   hypothetical questions, and I'll ask you one right now.  If, in

12   fact, this number consists of only grouper that has not been

13   treated and the actual true number was six hundred pounds, as

14   was represented by Ocean Duke for treated grouper, then the

15   analysis that you did was incorrect; would you agree with that?

16   A     No, I don't believe my analysis is incorrect.  The

17   calculation could be adjusted.  If you can show me that that is

18   in fact -- the invoices are incorrect.

19   Q     Let's talk about the invoices.  You just said you assumed

20   that if an invoice said "cryo" --

21   A     I was informed that that was the case.

22   Q     Who informed you of that?

23   A     Mr. Yasunaga who I understand deposed the defendants.

24   Q     Well, he did, but do you know whether he deposed the

25   defendants -- that means he took the deposition of the

1    defendants, right?

2    A    Yes.

3    Q    Do you know if he did that after or before you did your

4    report?

5    A    I would have to check the dates.

6    Q    Okay.  So Mr. Yasunaga told you that if an invoice said

7    "cryo," you were to assume it meant treated, right?

8    A    That's my recollection.  It has been several months, but I

9    recall that being the case.

10    Q    So, again asking a hypothetical question, if in fact cryo,

11    as Ocean Duke sends out its invoices, can mean both treated and

12    nontreated fish, then the assumption that you made was

13    incorrect and, therefore, that calls into question the final

14    opinions that you made; would you agree with that?

15    A    I would say again that the assumptions that the analysis

16    it still stands, but the number that it may apply to would be

17    slightly different.  And maybe I can refer to my report and

18    actually look at --  I think I might have some information in

19    here that will help me determine if it was the Cryofreeze --

20    it could have been several different things.  As I recall, it

21    could have said Cryofreeze, it could have said actually treated

22    with tasteless smoke, it could have been the Black Tie --  at

23    this point, I'm just not remembering exactly if that's all

24    inclusive.

25    Q    Okay.

1    A    Essentially that's --

2        MR. YASUNAGA:  Excuse me,  Your Honor, I would like to

3    object and I would like a brief side bar.

4                    (Sidebar on the record:)

5        MR. YASUNAGA:  Milton Yasunaga.  Your Honor, I object

6    to them bringing in late evidence that they never produced,

7    even though they should have produced it.  They did it with

8    John Stalker, they whipped out the e-mail --

9        THE COURT:  That's impeachment.  You know what the --

10       MR. YASUNAGA:  He should have produced it.  Someone

11   cannot comply with discovery, not produce things that are

12   clearly within the discovery reports --

13       THE COURT:  That was entirely permissible under the

14   rules, I'm just going to say that.  That's the end of it.  That

15   was entirely permissible under the rules.  So what's the point

16   here?

17       MR. YASUNAGA:  Now, they only produced so much

18   accounting information.  Here's the e-mail from me begging him

19   please produce reports, please produce this product codes.

20   They never produced it and now he is going to go in and he is

21   allowed to dredge up all this stuff and say, you were wrong

22   because of this and this that we never produced.  That's not

23   fair.

24       MR. MARKS:  He made an assumption that "cryo" meant

25   this, which was information that was never asked until the

1    deposition of Mr. Duke Lin, which occurred after his report.

2    The assumption is incorrect, and that's what I'm exploring.

3           MR. YASUNAGA:  You said never asked.  We asked.  We

4    said any product codes so we can determine --  you never

5    responded to this, Paul.

6           MR. MARKS:  I don't know what happened a year and a

7    half ago.

8           MR. YASUNAGA:  This is not a year and a half ago.

9    This is May 4, 2007.  His report was due real soon, and I

10    wanted that information.

11           MR. MARKS:  Whatever.  Listen, Paul Marks speaking.

12    I'm done with this line of questioning.  He made an incorrect

13    assumption about what the invoices said.  For example, I'm

14    going ask him one more question.  None of the invoices ever say

15    "tasteless smoke."  Because if we had an invoice that said

16    tasteless smoke, I'm sure it would have been put up there.  We

17    don't use the term "tasteless smoke."  So I'm going to examine

18    him on that and then I'm going to move on to something else if

19    the court allows me.

20           THE COURT:  I'll allow that.  Go ahead and do that and

21    move on.

22           MR. YASUNAGA:  Again, he should not be allowed to

23    bring in and cross-examine with evidence that he should have

24    produced.

25           MR. MARKS:  I'm almost done.

1              THE COURT:  Okay.

2              MR. MARKS:  Thank you, Your Honor.

3                         (End of sidebar.)

4    BY MR. MARKS:

5    Q    Just to finish up with this pie chart that I drew. You

6    assumed that "cryo" meant everything is treated.  And my

7    assumption to you that I would ask you to consider is that when

8    Ocean Duke uses the word "cryo," it's only a small part that

9    means nontreated --  I'm sorry, a small part that's treated and

10   the rest is nontreated.  And if you make this assumption, then

11   that would change your opinions; agree or disagree?

12   A    I believe, based upon the information that I had to write

13   the report, I made reasonable assumptions.  But certainly if

14   the numbers are based upon information that needs to be

15   clarified or further refined, then yes.

16   Q    Now, you also made a statement that some of the invoices

17   for Ocean Duke have the words "tasteless smoke" on them, didn't

18   you say that?

19   A    You know, I think what I'm trying to say is that I don't

20   really recall exactly.  They may have had the tasteless smoke,

21   they may have had the Black Tie brand, they may have had the

22   Cryofreeze.  Right now, I'm just not certain exactly.  I would

23   have to go back to the invoices and look at them again.  It's

24   been many months.

25   Q    Okay.  You've been sitting in this trial all week, and you

1    didn't see any invoice from Ocean Duke that had the word

2    "tasteless smoke" admitted into evidence or shown up on the

3    screen; is that right?

4    A    I don't recall seeing invoices.

5    Q    Okay.  Let me ask you to take a look at page 11 of your

6    report.  Do you see in there where it refers to a comparison

7    between how much, in terms of sales, in terms of pounds, Ocean

8    Duke did in the year 2005 for treated product compared to what

9    Mr. Kowalski's company did?

10   A    You are asking me if I can tell from this page what Hawaii

11   International sales were in 2005 compared to Ocean Duke's sales

12   in 2005?

13   Q    Correct.  I'm talking only about treated seafood which is

14   all that's really relevant in this lawsuit; would you agree?

15   A    The tasteless smoke product, yes.  Apparently, this is

16   what you are referring to on paragraph 26, page 11.  In 2005,

17   Hawaii International sales record showed 2.5 million pounds in

18   tasteless smoke product, and Ocean Duke sold nearly 1.3 million

19   pounds of product treated with tasteless smoke in 2005.

20   Q    And 2005 is the last year for which you have this type of

21   records for both companies; is that right?

22   A    That's correct.

23   Q    But you have similar records if you go back from 1999 up

24   to 2005?

25   A    To determine the number of pounds?

1    Q    Yes.

2    A    Yes.

3    Q    And if you did, would you agree that in each year

4    Mr. Kowalski's company, Hawaii International Seafood, is

5    actually selling more treated product than Ocean Duke

6    Corporation?

7    A    I would have to go back and refresh my memory on that; but

8    as I recall, I think I recall them being fairly comparable and,

9    of course, in this year HIS had significantly higher sales.

10   Yeah, it is what it is.

11   Q    But there's been testimony and discussion about how large

12   Ocean Duke is in terms of it's annual revenues.  But in reality

13   for what we're talking about in this lawsuit, which is the

14   treated fish product, would you agree that Hawaii International

15   Seafood is actually a bigger company than Ocean Duke?

16   A    In terms of the number of pounds of sales, again, I would

17   need to refresh my memory on the number of sells.  But if you

18   represent that, I don't see there's any reason that it's not

19   true.

20   Q    Fair enough, thank you.  Now, you keep referring to the

21   tasteless smoke product and the tasteless smoke invention.

22   You've said at that many times today, haven't you?

23   A    Uh-hm.

24   Q    Is that a "yes"?

25   A    Yes.

1    Q    Sorry, this will be eventually transcribed.  But it's your

2    understanding that the Kowalski patent is a process patent,

3    right?

4    A    Correct.

5    Q    And a process patent means that it's a process for

6    creating an end product, right?

7    A    Yes.

8    Q    And in this case, the end product that Mr. Kowalski

9    creates is something he refers to as tasteless smoke, right?

10   A    Yes.

11   Q    But you were in court listening to him testify, when

12   Mr. Kowalski said that he doesn't have a patent for tasteless

13   smoke product, right?

14   A    Correct.

15   Q    And that he doesn't have a trademark for tasteless smoke,

16   right?

17   A    That's my understanding, yes.

18   Q    So is there a particular reason why you keep referring to

19   the tasteless smoke product?

20   A    More of just a shorthand in my own mind.  It's nothing

21   that's trying to say anything more than the patented invention,

22   the patented process, the technology of the process.

23   Q    Because there are many different ways to generate smoke to

24   treat fish, right?

25   A    My understanding is the jury is going to determine that.

1    Q    Okay.  Let me ask you to take look at page 12 of your

2    report.

3    A    Okay.

4    Q    If you look there you say something about making the

5    assumption that the 401 patent, or Mr. Kowalski's patent, is

6    unique.  Do you see that?

7    A    Yes.

8    Q    Did you hear Mr. Kowalski testify that tasteless smoke is

9    a generic term?

10   A    I did and I believe what I understood from that that it

11   was generic in the representation of what the smoke without

12   taste was, yes.

13   Q    Now, you've testified today that carbon monoxide, does not

14   have good reputation in the marketplace.  I know you didn't use

15   those words --

16   A    Based on my research, that's certainly what I came to

17   understand, yes.

18   Q    And one of the researches you looked at was a website

19   called carbonmonoxidekills.com?

20   A    That was one.

21   Q    You talked about people who are organizing to try to get

22   carbon monoxide banished?

23   A    Yes.

24   Q    And that was some of the research that you relied on in

25   coming to the conclusions that you testified to, right?

1    A    It was a piece of it, certainly.  Also the understanding

2    that producers or sellers of this fish treated with carbon

3    monoxide have to actually specify carbon monoxide rather than

4    the abbreviation CO, which may be somewhat misleading.  And

5    even as recently as a few months ago, we're still hearing about

6    people who think that carbon monoxide is --  it's not healthy.

7    And certainly not everybody thinks that, but I think there's a

8    portion of the consumers that do.  But the users, or rather I

9    should say, the clients, the customers of Hawaii International

10   and Ocean Duke, as we have seen in testimony throughout trial,

11   have specified that they want the tasteless smoke product as

12   opposed to the carbon monoxide.  That's been a clear

13   representation.

14   Q    That was a clear representation by Mr. Kowalski, right?

15   A    Well, I think it was by the Ahold corporation that said

16   that they specifically wanted the tasteless smoke product.

17   Q    So there's one corporation and Mr. Kowalski have said

18   that, right?

19   A    That's what we have seen in this trial, yes.

20   Q    Wouldn't' you agree with me that the ingredient of

21   tasteless smoke that causes it to work is carbon monoxide?

22   A    You are asking me to testify as a smoke expert, but I do

23   know, from what I have researched and from listening to experts

24   that Dr. Iwaoka, that a portion of the smoke is carbon

25   monoxide.  Certainly not one hundred percent of it.  I mean,

1    that's a natural by-product of smoke is carbon monoxide.

2    Q    Now, you've also discussed how the FDA requires labels to

3    be either tasteless smoke or carbon monoxide, right?

4    A    That's my understanding, yes.

5    Q    It can't just be CO.  It's got to be spelled out?

6    A    Yes.

7    Q    Isn't there a third option that the FDA permits?

8    A    There must be.

9    Q    Just because I'm asking it --

10   A    Exactly.

11   Q    I like you even more.  How about filtered smoke?

12   A    Okay.

13         MR. YASUNAGA:  Your Honor, this is going outside of

14   the scope of the direct and outside of this --

15         THE COURT:  Is it sounds that way to me.

16         Mr. Marks, why don't we move on.

17         MR. MARKS:  I will.  Thank you.

18   Q    Now, you said in your testimony, when you were talking

19   about the Panduit factors, you remember that case?

20   A    Yes.

21   Q    Those were the four factors.  One was demand, right, one

22   of them was called noninfringing alternatives, is that right?

23   A    Yes.

24   Q    Basically you were assuming that there was really nothing

25   else out there besides Mr. Kowalski's patented process that

1    could deliver seafood treated for color retention except for

2    carbon monoxide; is that right? In other words, no

3    noninfringing alternative?

4    A    Other than the carbon monoxide.

5    Q    Right.

6    A    Yes.

7    Q    But you think people don't like carbon monoxide, so it's

8    not really an appropriate thing to use as an alternative?

9    A    Well, and I made those two calculations for the jury to

10   choose.  But, yes, my opinion would be that carbon monoxide

11   really isn't an acceptable alternative.

12   Q    And in the process of doing that, you said on the witness

13   stand, do you remember saying this, the customers must look at

14   the two products?

15   A    The two products being the carbon monoxide and the

16   tasteless smoke?

17   Q    Right.

18   A    Yes.

19   Q    Okay.  Or the two products being Mr. Kowalski's product

20   and Ocean Duke's product to be more precise?

21   A    I can't recall the reference that you are coming to, but I

22   probably did say that if you made a note of it.

23   Q    Let me ask you this:  Did you actually go out and look at

24   any of Ocean Duke's products or look at any of Mr. Kowalski's

25   products?

1    A      Those specific products, no; but I did go out and look at

2    tuna treated for color retention.  I'm not sure that the market

3    in which I'm at actually has Ocean Duke or Hawaii

4    International, but I did look at some.

5    Q      Okay.  Another one of those so-called Panduit factors that

6    you talked about was capacity; you remember that?

7    A      Uh-hm, yes.

8    Q      And I believe your opinion was that Mr. Kowalski's company

9    had the ability to soak up the capacity, in other words, what

10   you believe are the infringing sales by Ocean Duke; is that a

11   fair way to put it?

12   A      Again, I'm not --  in belief of infringement or not

13   infringement, so I would have to correct you on that

14   representation on what I believe to be infringing or not.  But

15   if the jury finds infringement --  I've forgotten your

16   question.

17   Q      I'll ask another one.  I'm moving forward to try to wrap

18   this up quickly.  One thing you said, and I did write it down,

19   is they, being Hawaii International Seafood, are easily able to

20   expand capacity; do you remember that?

21   A      I do, yes.

22   Q      Basically they contract out with facilities, and they

23   don't have their own facilities, right?

24   A      Sure.

25   Q      Would you agree with me that to increase capacity, you

1    need to have a good financial footing?

2    A    As I did specify that finances are certainly a part of

3    capacity, yes.

4    Q    Is it correct that Hawaii International Seafood has had

5    only one year in which it showed a net profit during all the

6    years that we have been looking at 1999 up to the present; is

7    that correct?

8    A    I believe you are absolutely right when looking at their

9    accounting records.

10    Q    Did you consider that in determining whether Hawaii

11    International Seafood could easily absorb the excess capacity?

12    A    Sure.  And the point I think that needs to be made is that

13    with those additional sales that Hawaii International would

14    have received, but for the infringement, they would have had

15    that additional profit available to them, and they would have

16    been able to make a profit and finance their continued growth.

17    Q    Did you hear Mr. Kowalski testify about financial

18    difficulties he is experiencing?

19    A    Currently?

20    Q    Yes.

21    A    Yes.

22    Q    Did you take that into account?

23    A    Well, as you know, the damage periods spans many years.

24    So back to '99 through today, I have to look at that whole

25    damage period and not just focus on this little piece right

1    now.   But my understanding is is that litigation is very

2    expensive.   Protecting your patent rights is something that can

3    be very difficult for a small innovator, a small patent holder,

4    and that's something that we need to consider with we look at

5    the net profit, that bottom line.   But that doesn't mean that

6    the profits on those different cuts of fish did not occur,

7    because they did.

8    Q    Okay.   Do you remember the testimony you gave about a

9    two-million-dollar charge that you want to make Ocean Duke for

10   excess interest?

11   A    Yes.

12   Q    That's based on the fact that Mr. Kowalski has to borrow

13   money at very high interest rates, right?

14   A    I agree, yes.

15   Q    Do you know from whom he is borrowing that money?

16   A    I believe one of them -- one of the companies is Moon

17   Marine.

18   Q    Do you know whether Mr. Kowalski has in fact paid those

19   fees to Moon Marine?

20   A    The fees that shows being expensed on his --

21   Q    Yes.

22   A    That's my understanding, yes.

23   Q    Have you inquired of Mr. Kowalski as to whether Moon

24   Marine has initiated litigation against him?

25   A    Have I asked Mr. Bill Kowalski?   I don't believe I asked

1    him specifically, but I believe in his deposition or something

2    to that effect.

3    Q    If Moon Marine asserts that it's owed 2.1 million dollars

4    from Mr. Kowalski's company, is that something that you would

5    take into account in determining whether Mr. Kowalski's company

6    can absorb excess capacity?

7            MR. YASUNAGA:  Objection, Your Honor.

8            THE COURT:  Overruled.

9            THE WITNESS:  If Moon Marine is owed 2.1 million

10    dollars by Hawaii International, is that something that impacts

11    capacity?

12    BY MR.  MARKS:

13    Q    Yes.

14    A    I think it goes back again to the concept that if Hawaii

15    International were in fact receiving --  or able to get the

16    sales that Ocean Duke had, because of using the patented

17    technology, that they wouldn't have had that same problem.

18            In other words, because of the infringement or the

19    alleged infringement, Hawaii International is having the

20    financial difficulties.

21    Q    But Ocean Duke isn't the only company that Mr. Kowalski

22    alleges is infringing his product, right?

23    A    I understand that to be true.

24    Q    In fact, have you heard any information that you find to

25    be credible that Mr. Kowalski has named many people in lawsuits

1    because he believes that he has a patent on tasteless smoke?

2    A    Have I heard that he --  I'm not sure what the question

3    is.

4    Q    Tell you what, I'll move on.  I'll give you another

5    question.

6          Would you agree with me that if a person has had

7    either a personal or business bankruptcy in his or her past,

8    that it's difficult to obtain credit?

9    A    It certainly can be for a period of time.

10   Q    Did you take into account the fact that Mr. Kowalski has a

11   business bankruptcy in his past in determining whether he had

12   the financial ability to take these Ocean Duke sales and make

13   them his own; did you take that into account?

14   A    My understanding is that Hawaii International is the

15   company that is borrowing the money.

16   Q    Okay.  Maybe you don't know this, but is it not standard

17   practice in loan applications for there to be questions and

18   disclosures about prior bankruptcies?

19   A    For the officers of the company?

20   Q    For the officers, for prior companies, for related

21   entities?

22   A    I believe that's true, yes.

23   Q    Very well.  Moving on, I'm almost done, Mr. Francom.  You

24   spoke in your report about a customer list, right?

25   A    Yes.

1  Q    And you actually have access to a customer list of

2  Mr. Kowalski's company, right?

3  A    Yes, a list of customers was provided.

4  Q    Okay.  Did you do anything to determine whether those

5  customers were in fact customers that buy seafood from

6  Mr. Kowalski?

7  A    I did not call the customers to determine if they were in

8  fact buying seafood from Mr. Kowalski.

9  Q    Okay.  Do you know how that customer list was compiled?

10 A    My understanding is that past invoices were referenced and

11 customers were taken from those past invoices.

12 Q    Okay.  Do you think that there might be have some mistakes

13 in the compilation of those past invoices?

14 A    Again, people make mistakes.  I mean, we're all human, so

15 it's certainly possible.

16 Q    Okay.  But you have, on the customer list for Hawaii

17 International Seafood, several trucking companies, the Food and

18 Drug Administration, and several storage warehouses for cold

19 freezing.  Do you think that those came off of invoices

20 which -- and they are not really customers of Mr. Kowalski's?

21        MR. YASUNAGA:  Objection, Your Honor.  Can we have

22 some reference to what he is talking about?  Because I think he

23 is talking about a contact list.

24        THE COURT:  What are you referring to?

25 Q    It's exhibit N2 in your report, sir.

1    A    Okay.

2    Q    I'm not going to take a lot of time with this.  I'll just

3    ask you --

4    A    Did you say the FDA was on this list?

5    Q    Let's take a look.

6    A    Because I don't see the FDA on here.

7    Q    Number 54.

8    A    I'm looking at 54.  It says Royal Lagoon.  I'm looking at

9    -- okay.  Let me explain what I used this information for.  I

10   wanted to determine the customers that were common between

11   Ocean Duke and Hawaii International to make certain that there

12   was an overlap in terms of sales capacities, so that Ocean Duke

13   didn't sell strictly on the east coast and Hawaii International

14   sold strictly on the west coast, and that they wouldn't have

15   had that overlap anyway.

16        So I wanted to make sure that there was an overlap of

17   customers.  So if I have extra names on here, if it didn't

18   overlap, it didn't matter.  I was only looking at the specific

19   overlap.

20   Q    Okay.  So if there are mistakes in this document, it

21   doesn't matter to your final conclusion?

22   A    Well, not in terms of the customers that Ocean Duke had in

23   common with Hawaii International because if --  I have a list

24   of Ocean Duke customers and a list of Hawaii International, and

25   then I looked at the common customers.  And I, in fact, found

1    there was a relatively significant number of overlap.

2           And since I have this customer list of Ocean Duke and

3    Hawaii International, I have since understood from trial that

4    Ahold actually represents -- or is the owner of Giant as well

5    as many other customers and clients.  And Ahold does not show

6    up on here.  And, as such, it's probably not exactly complete.

7    But the point is is that there's an overlap.

8    Q    You keep mentioning Ahold.  That's the company that

9    Mr. Kowalski testified that he believed had been stolen from

10   him?

11   A    Well, my understanding was that Ocean Duke got a contract

12   with Ahold, yes.

13   Q    From the testimony, is it your recollection that that

14   contract was the result of an RFP or a request for proposal?

15   A    Yes.

16   Q    That's a bidding process, right?

17   A    Right.  Right.

18   Q    Do you have any evidence or information that suggests that

19   Ocean Duke, in fact, was part of that bidding process?

20   A    I don't have that evidence, no.

21   Q    Since you keep mentioning -- Mr. Yasunaga likes to call it

22   Ahold.  There was a wrapper of an Ocean Duke product that had a

23   separate receipt that said "tasteless smoke," right?  Remember

24   that?

25   A    Yes, I do.

```
 1    Q    Did you do any analysis or investigation to determine

 2    where the word "tasteless smoke" came from on that product?

 3    A    On that specific product?

 4    Q    Yes.

 5    A    Or tasteless smoke in general?

 6    Q    No, on that specific document that was shown in this trial

 7    and that you saw since you were sitting back there.

 8    A    I'm not sure what you mean from where it came from.   I

 9    mean, your question is, where did the term tasteless smoke come

10    from --

11    Q    No --

12    A    -- for that specific product?

13    Q    Who put the words "tasteless smoke" on that particular

14    document?  Do you know who did that?

15    A    I do not.

16    Q    You didn't do any investigation into that?

17    A    I did not.

18    Q    Okay.  And this was a document from the year 2004.  Do you

19    remember that?

20    A    Yes.

21    Q    And if I were to tell you that Ocean Duke did not have a

22    direct buying-and-selling relationship with this entity until

23    the year 2005, would that change any of your opinions about

24    Ahold?

25    A    No, this is just one example of several different
```

1    customers.  So my opinion is still the same.   This is just one

2    specific example, like you say, has been brought out several

3    times in court; so that's why I mention it.

4    Q    And you don't have any evidence to suggest that it was

5    Ocean Duke, as opposed to, say, the retailer that put the words

6    "tasteless smoke" on that product, correct?

7    A    That's correct.

8    Q    While I'm up here, I want to use the board on one last

9    issue.  I've just got a couple of more questions, then I'll be

10   done.

11        Am I correct that when you talk about your alternative

12   reasonable royalty calculation, that that work that you did is

13   based in part on your lost profits analysis?

14   A    It was since that I also look at acceptable noninfringing

15   alternatives or the existence or lack thereof, some of it is,

16   yes.

17   Q    Okay.  So if your lost profits analysis is faulty for some

18   reason, then there would be a carryover into the reasonable

19   royalty analysis; is that fair?

20   A    Not necessarily.  I think it depends on what you mean by

21   "faulty."  And if you are implying that it is faulty, what part

22   of it is and how would that affect reasonable royalty?  I think

23   I would have to look at it a lot more in detail.

24   Q    Okay, I understand, but I'm not going to do that right

25   now.  I want to talk about your interest calculation.  I don't

1    know if you have it at your hands, but you are suggesting that,

2    in your opinion, if the jury finds infringement that the jury

3    should award prejudgment interest of over two million dollars,

4    right?

5    A    Well, that is the calculation that I came up with; but of

6    course, it's up to the jury to determine what is appropriate.

7    Q    Is it?

8    A    That's my understanding.

9    Q    What was the number by the way?  2.7 million?

10    A    Let me just refer to that.  The prejudgment interest is

11    $2,782,716.

12    Q    And that's an amount that you believe should be added to

13    whatever damages are appropriate, right?

14    A    Well, if I may refer to my report, and I will --

15    Q    Let me ask you to do this.  Rather than you refer to your

16    report, let me take that question back.

17    A    Well, let me just clarify what interest rate was used and

18    why.  If somebody is deprived of the use of money that is

19    rightfully theirs, they should in fact receive interest.  I

20    mean, there are many economic reasons why, one of which is

21    inflation the other is opportunity cost, they could have done

22    something else with it; for example, made your company that

23    much stronger.

24           I understand that using Hawaii's 10 percent statutory

25    rate is what I used.  Now, whether a different rate should be

1    determined, I used Hawaii's 10 percent statutory rate.

2    Q    Did somebody tell you to use that?

3    A    Yes.

4    Q    Was it Mr. Yasunaga?

5    A    He provided information that let me know that that was the

6    statutory rate.

7    Q    Okay.  Did Mr. Yasunaga tell you that this was a statutory

8    rate in state courts in Hawaii?

9    A    I don't know if that was specified one way or the other.

10   Q    Right now, as you know, we're in federal Court, right?

11   A    I understand that.

12   Q    Do you know if there's a different rate for federal court?

13   A    My understanding is that Hawaii's statutory rate --  and

14   that's not uncommon to use the state rate based upon the state

15   in which the federal court is located.

16   Q    Well, if I were to tell you that the --  if I were to ask

17   you to assume that the currently prevailing interest rate under

18   the federal procedure is under four percent, because it's tied

19   to the one-year treasury bills, that would reduce your

20   prejudgment interest calculation by more than half, right?

21   A    It certainly would affect it.  It would have to calculate

22   specifically how it would impact it, but --

23   Q    Well, you chose 10 percent, and if I asked you to choose

24   four percent instead --

25   A    Well, it's a matter of timing because it depends on how

1    much money we're calculating interest on in each year and how

2    that then compounds over the remainder of the years.

3    Q    Do you remember at the start of your testimony you put up

4    a page from your report that had a quote from Section 284 of

5    the U.S. Code?

6    A    Yes.

7    Q    Do you have that handy?

8    A    I believe so. Yes, on page 9.

9    Q    You see the last clause in that statement where it

10   includes damages that are, quote, together with interest and

11   costs as fixed by the court?

12   A    Yes.

13   Q    Did Mr. Yasunaga tell you that, in fact, the jury, as

14   opposed to the Court, gets to award prejudgment interest?

15   A    No, my understanding is the Court determines.

16   Q    Okay.

17          MR. MARKS:    I'm almost done.

18          THE COURT:    Okay.

19   Q    Okay, Mr. Francom, after all of this, I'm going to ask you

20   one final time if you would agree or disagree with this.    If

21   the jury determines there's no patent infringement, damages

22   should be zero; correct?

23   A    If the patent is not infringed, there is no damage.

24          MR. MARKS:    Thank you, sir.    Your Honor.

25          THE COURT:    Mr. Yasunaga.

1          MR. YASUNAGA:  Couple of things.

2                  REDIRECT EXAMINATION

3    BY MR. YASUNAGA:

4    Q    Mr. Marks talked about why the FDA would be on the Hawaii

5    International customer list.  Are you aware that government

6    agencies come in and take product from companies away for

7    testing?  You are aware they do that?

8    A    Sure.

9    Q    And if the government agencies, when they take it, pay the

10   company because they are taking good saleable product, there

11   would be an invoice in the company's records?

12   A    Correct.

13   Q    And so anyone going through the invoices of the company to

14   see who has paid us for fish would come across various regular

15   supermarket customers, but they would also come across that FDA

16   invoice where the FDA paid the company for the fish the FDA

17   took?

18          THE COURT:  Mr. Yasunaga, could you please not lead

19   the witness?

20   Q    All right.  Is that a possible reason why the FDA shows up

21   on Hawaii International's customer list?

22   A    Certainly.  Certainly.  It may not make sense to say they

23   are a customer per se, but they would show up on the invoice.

24   Q    And then Mr. Marks was talking to you about the interest

25   rate, and didn't you follow --  apply that rate because you,

1    in your professional opinion, thought that was appropriate as

2    opposed to me telling you to use that rate?

3    A    Well, as I mentioned, each state has a statutory rate, and

4    that can be used and frequently is used to calculate interest

5    on damages.  That's not to say that there are not other

6    interest rates that could be used.  But, in my opinion, that is

7    an appropriate rate, yes.

8    Q    Right.  I merely supplied you a copy of Hawaii's rate?

9    A    That is correct.

10   Q    And you have a partner named Scott Hampton (phonetic) who

11   also found it appropriate to use the state rate in such damage

12   calculations?

13   A    As I've said, we have used, at Campos & Stratis, that rate

14   in other cases as well, yes.

15   Q    Also, I think you mentioned something about Ocean Duke

16   sells products to supermarkets through certain intermediaries?

17   A    Yes.

18   Q    Sometimes, right.  And so the fact that Ocean Duke didn't

19   start selling directly to Ahold --

20        MR. MARKS:  Objection, leading.

21        THE COURT:  Sustained.

22        MR. YASUNAGA:  Okay.

23   Q    And so through intermediaries, Ocean Duke product could

24   get to various customers, even if Ocean Duke was not selling

25   directly; is that what you're --

1    A    Well, I think that was the point I was trying to make, is

2    that certain customers on the Ocean Duke list and certain

3    customers on the Hawaii International list may not actually

4    show up because they go through --  in this particular case

5    that I was saying, Ahold, which is a huge corporation that has

6    Giant supermarket as well as other supermarkets under them.  So

7    those names may not have been on the list, even though many of

8    Ocean Duke's customers and Hawaii International customers were

9    on the list and did correspond to each other.

10    Q    Now, today you spoke for what may seem like a long time to

11    the jury, but in relation to the amount of time you and others

12    at your firm put into it, could you give the jury some idea

13    about how much time, how many people, how many calculations and

14    charts and exhibits and analyses, since we didn't want to run

15    through that stack plus the other box?

16    A    Yes, several weeks of hard work went into my calculations

17    and my opinions.  I also had some consultants that work at

18    Campos & Stratis that also helped do the calculations in

19    checking the numbers.  And these were what I call my work

20    papers that have the documents that I have used, the

21    calculations, the exhibits, the report that I came up with.  So

22    many, many, many hours.  Many weeks of work.

23    Q    It's not --

24    A    It's not something that I've taken lightly.

25    Q    How many different people at your firm would have helped

1  under your supervision?

2  A    Two others.

3  Q    How many exhibits in your report there, just roughly?

4  A    I think it goes from A to V.

5  Q    Each of those --

6  A    Each of those could be multiple pages that have like D1,

7  D2, D3, so there's many exhibits that flow back through the

8  documents that have been provided to me to show where I got the

9  information, why I used that information, and then ultimately

10  how I came up with my calculation.

11  Q    And by the way, Mr. Marks was telling you that I had

12  provided you the information, but in fact, wasn't a lot of the

13  --  was a lot of the information actually from Ocean Duke that

14  they had given to me?

15  A    Absolutely.  And there's a document control number at the

16  bottom of the documents that have been --  that I received.

17  And the ones that Ocean Duke provided has an Ocean Duke control

18  number.  So, yeah, there were significant numbers, of course,

19  from Ocean Duke.

20            MR. YASUNAGA:  Your Honor, may I at least put into

21  evidence his --  the CV type information and statement about

22  his firm and also the list of documents that he had at his

23  disposal and consulted in order to come up with his opinions?

24            THE COURT:  Any objection.

25            MR. MARKS:  No objection.

1          THE COURT:  Very well.  You have a number for that?

2    You are going to create it?

3          MR. YASUNAGA:  I'll create the number, but they are

4    portions of 141.

5          THE COURT:  The documents you are referring to they

6    are admitted.  And just for housekeeping purposes, we'll get

7    that set and give it a number and make sure it's in the record.

8          MR. YASUNAGA:  Your Honor, would you let me move his

9    charts into evidence?  I can't expect the jury to understand

10   those numbers.

11         THE COURT:  Any objections?

12         MR. MARKS:  Can we discuss that at side bar or the

13   next appropriate break?

14         THE COURT:  Okay.  We'll take that up.  You don't need

15   to question him about it further, in terms of the evidentiary

16   aspect of it, but I'll hear what Mr. Marks has to say before

17   deciding on that.

18         MR. YASUNAGA:  I'm done with Mr. Francom.

19         THE COURT:  Anything else?

20         MR. MARKS:  I do.  Just one final question.

21                    RECROSS-EXAMINATION

22   BY MR. MARKS:

23   Q    You spoke with Mr. Yasunaga just now about all the work

24   and all the papers and all the people that worked under you.

25   Could you give me your best estimate of the total amount of

1    compensation that you --  I'm sorry, that your company received

2    for this project up until now?

3    A    I don't do the invoicing.  It would be very difficult for

4    me to be able to --  it would be difficult for me to guess, I'm

5    sorry.

6    Q    Not even a best estimate?

7    A    I would be wrong if I estimated it, I'm sure.  So it may

8    not be wise.

9         MR. MARKS:  Thank you.

10        THE COURT:  Thank you, Mr. Francom, you may step down.

11   Why don't we take a short recess then we'll finish up for the

12   day.  We'll take a 10 minute recess at this time.

13   (Recess at 12:28 a.m. to 12:41 a.m).

14    (END OF DAVID FRANCOM'S TESTIMONY.)

15              ---------------

16

17

18

19

20

21

22

23

24

25

1          COURT REPORTER'S CERTIFICATE

2          I, Gloria T. Bediamol, Official Court Reporter, United

3     States District Court, District of Hawaii, do hereby certify

4     that the foregoing is a correct transcript from the record of

5     proceedings in the above-entitled matter.

6

7          DATED at Honolulu, Hawaii, January 12, 2008.

8

9

10                         /s/ Gloria T. Bediamol

11                         GLORIA T. BEDIAMOL.

12                         RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25