1                        IN THE UNITED STATES DISTRICT COURT

2                            FOR THE DISTRICT OF HAWAII

3

4    WILLIAM R. KOWALSKI and      )   CIVIL NO. 04-00055BMK
     HAWAII INTERNATIONAL         )
     SEAFOOD, INC.,               )   Honolulu, Hawaii

5                                 )   December 7, 2007
                  Plaintiff,      )

6                                 )   TESTIMONY OF WAYNE
          vs.                     )   IWAOKA, PH.D.

7                                 )
     OCEAN DUKE CORPORATION,      )

8                                 )
                  Defendant.      )

9    _____)

10

                  PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 3)
11                BEFORE THE HONORABLE BARRY M. KURREN,
                      UNITED STATES MAGISTRATE JUDGE
12

     APPEARANCES:
13

     For the Plaintiff:        MILTON M. YASUNAGA
14                             ALLISON MIZUO LEE
                               Cades Schutte LLP
15                             1000 Bishop St., Ste. 1200
                               Honolulu, Hawaii  96813-4216
16

     For the Defendant:        LOUISE K.Y. ING
17                             Alston Hunt Floyd & Ing
                               1800 ASB Tower
18                             1001 Bishop Street
                               Honolulu, Hawaii  96813
19

                               PAUL MARKS
20                             Neufeld Law Group
                               360 East 2nd Street, Ste. 703
21                             Los Angeles, California 90012

22   Official Court            GLORIA T. BEDIAMOL, RPR, RMR
     Reporter:                 United States District Court
23                             P.O. Box 50131
                               Honolulu, Hawaii 96850
24

     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

**EXHIBIT AC**

1   Q     So that's your third opinion?

2   A     That's my third opinion, yes.

3   Q     So basically that you -- did you consider the processes

4   described in the Shih and the Kowalski -- let me ask it this

5   way.  Did you consider the process described in the Shih patent

6   to be the same as the process described in the Kowalski patent?

7   A     No, there are many differences.

8   Q     Okay.  So we'll get into those later.  Were there any

9   other opinions that you formed?

10  A     I thought that the end product from the Kowalski patent

11  and the Shih patent, the end products were different.

12  Q     Finally, I believe there was one more opinion that you

13  formed?

14  A     After looking at all of the information in both patents,

15  from a food scientist standpoint and from basically a consumer

16  advocate.  Smoking has been known for eons, for a long time.

17  And we know that it can give a good taste to food products.  It

18  can also preserve them by drying them out and putting in

19  antimicrobial compounds.  And carbon monoxide coloring of meat

20  has been studied since the 1950s.

21        And I thought this was more of a public domain issue.

22  You know, most of the information is -- people really should be

23  able to smoke and use the process, you know, because it's been

24  known for such a long time.  It's not, in my mind, a super

25  critical invention that would change the way things are done.

48

1   Carbon monoxide has been used for -- since the '50s.  And so

2   basically I thought this was more of information that would be

3   available to the general public.  So that's what I...

4          MR. YASUNAGA:  Objection, Your Honor.

5          THE COURT:  Well, sustained.

6          I'm going to ask the jury to ignore that portion of

7   the opinions that he has in this case.  It's not relevant to

8   what we are considering in this case.

9          MS. ING:  Very well, Your Honor.

10  BY MS. ING:

11  Q    Now, with respect -- we've covered -- you've described

12  your opinions with respect to 1 and 2, the super-purified

13  tasteless smoke and the terms you didn't understand.

14         Why don't -- if you said -- if you have given your

15  details on that, why don't we go on to opinion No. 3 and talk

16  about the differences between the processes.  And,

17  specifically, you mentioned eight differences.  What

18  differences did you determine existed between the Shih process?

19  A    Okay.  First of all, I noticed that the Shih process used

20  a vacuum oven in the heating of the charcoal.  The Kowalski

21  process packs saw dust in what he terms a retort or probably an

22  oven-like piece of equipment.  So one has a vacuum and one does

23  not have a vacuum.

24         The material used for -- No. 2 is the materials used

25  for burning.

1    Q    Are you familiar that in patent law, a patent can mention

2    many different variations or can cover many different

3    variations?

4    A    My -- my task in the Ocean Duke Corporation was to try to

5    compare the processes between -- that was mentioned in the Shih

6    patent and the Kowalski patent.

7    Q    Are you aware that a patent can cover more than one

8    process?

9    A    I was asked to compare the process between the Shih and

10   the Kowalski patent, and I didn't look at other aspects of --

11   the legal aspects of the patent law.  No.

12   Q    Doesn't the Kowalski patent mention different ways of

13   removing taste-causing components from smoke?

14   A    Can you point out the specific example?

15   Q    Well, let me ask you this way then.  Are you aware -- is

16   it your impression that the Kowalski patent mentions different

17   ways of removing taste-causing components, or do you think that

18   the Kowalski patent covers only that picture of the ice tower

19   and the cloth filter and the charcoal?

20   A    Well, reading the patent information, that's what I saw

21   and that's what I made my decision on.  If there was another

22   way that Mr. Kowalski can separate out compounds and it was not

23   mentioned, then I really wouldn't know about that.

24   Q    You talked about the use of the word "smoke" in the

25   Kowalski patent, and you had a problem with calling it smoke

1    when taste-causing components are removed.  Is that correct?

2    A    Well, whenever you separate out something that has a whole

3    bunch of other compounds in it, and you separate out a specific

4    group of chemicals, and you wouldn't be able to get that

5    information from that title, then I would have a problem with

6    that.  I would like to be able to know exactly what was being

7    formed and what was being mentioned.  So if Mr. Kowalski had

8    mentioned that it was carbon dioxide, carbon monoxide, obtained

9    from smoke, I have a really good idea of what he means by that

10    particular term.

11    Q    But smoke has hundreds, if not thousands, of different

12    components, right?

13    A    That's correct.

14    Q    And you can't name them all, right?

15    A    I can't name them all.

16    Q    And you didn't expect Mr. Kowalski to name all of them in

17    the patent, right?

18    A    Well, he may have been able to say something like volatile

19    components from smoke, for example, then I know that he is not

20    dealing with the acetic acid or the tars.  And if he says

21    organic compounds, then that would eliminate water.  So I'm

22    just saying it was difficult initially when I read the patent

23    that I didn't quite know what he was meaning when he talked

24    about that term.

25              After reading the patent thoroughly, I was able to

1    figure out, okay, this is what he is trying to get at.

2    Q    Right.  Okay.  But --

3    A    Basically he was trying to get to the carbon monoxide or

4    trying to produce carbon monoxide so that it could cause a red

5    color in fish.

6    Q    You had some initial confusion, but when you read the

7    whole patent, then you understood what the term meant.  Is that

8    what you are saying?

9    A    I had an idea, yes.

10         MR. YASUNAGA:  Your Honor, I would like to show

11   Exhibit 88, which was admitted yesterday.

12         THE COURT:  Yes.

13   BY MR. YASUNAGA:

14   Q    Professor Iwaoka, you talked about some -- I don't know,

15   you said truth in -- did you use the term "truth in labeling"

16   or something today, I think you said?

17   A    Yes.

18   Q    Okay.  And you never -- Ocean Duke's attorneys never

19   showed you this letter, this pronouncement from Anthony

20   Brunetti of the -- you see his e-mail address, FDA.dot.gov,

21   they didn't show you that, did they?

22   A    That's correct, I haven't seen this.

23   Q    And the subject is "Labeling of filtered smoke-treated

24   tuna."

25   A    Okay.

1   Q    Right?

2   A    Yes.

3   Q    And doesn't the subject line indicate that even after

4   smoke is filtered, the FDA thinks you can still call it

5   "smoke"?

6   A    Yes.

7   Q    And I'll show you another paragraph here.  It CSFAN is a

8   division of the Food and Drug Administration, and it says,

9   "CFSAN accepted the term, quote, tasteless smoke, quote, as the

10  common and usual name for the filtered smoke ingredients

11  resulting in tuna," and I think that's a typo, it should be

12  from, "the process described in the GRAS notice submitted by

13  Hawaii International," which is Mr. Kowalski's company.

14       And it says it is commonly -- this is what was

15  accepted by the FDA.  So you are not disputing that the FDA

16  said it was okay and the common and usual name for this smoke

17  that is results after you take out taste-causing components can

18  be properly called "tasteless smoke"?

19  A    If this is a true report or letter, the FDA can mention

20  this and say that it's legal.  However --

21  Q    Right.

22  A    However --

23  Q    Go ahead.

24  A    -- if you are going to be looking at this in terms of the

25  consumers and what you want to put on the ingredients label

1   there -- most of the average, I think, consumer wouldn't be

2   able to figure out what the heck tasteless smoke would be

3   unless you were to provide some kind of additional information.

4       Now, the FDA's legal arm of the government that deals

5   with food regulations, however the FDA does not go and

6   stipulate everything.  I would think on the consumer side or on

7   the processor side, you would want to put in information that

8   would be helpful for the consumers so that they can understand

9   what kind of product you are making or what they are consuming.

10      And we are having a lot of problems nationwide with,

11  not necessarily with filtered or tasteless smoke, but with poor

12  labeling or inadequate labeling.  So the FDA, I think, is

13  trying their best to cover all these areas, but, you know, they

14  are pretty slow in getting to the point where they can help the

15  consumers understand all of the things that are put into

16  different food products.

17  Q    Well, the government's agency that's in charge of trying

18  to make sure consumers are properly informed in labeling of

19  foods is the FDA on the national basis, right?

20  A    That's correct.

21  Q    And the FDA has said -- has accepted the term "tasteless

22  smoke" for the smoke from Mr. Kowalski's process, right?

23  A    Yes.

24  Q    Okay.

25  A    But on the other hand, when I read the patent, when I look

1    at tasteless smoke, I don't have any idea of what it says.  And

2    so if I'm confused, and I would think the consumers might be

3    confused as well.

4    Q    All right.  When you talked about -- actually where you

5    are criticizing the use of the term "smoke" was in the patent,

6    right?

7    A    That's correct.

8    Q    And consumers --

9    A    Also if it's labeled on packages, I would think that the

10   consumers might have a difficult time understanding what it is.

11   If you put down "tasteless smoke," and, parenthesis, carbon

12   monoxide, everybody would have a good idea of what it contains

13   or what the smoke is -- the contents of the smoke would be.

14   Q    And then in terms of -- are you an expert in serving

15   public perception?

16   A    I'm not sure I understand your question.  Could you

17   rephrase that?

18   Q    I'll ask a different question.  You were criticizing the

19   use of the term "smoke" in the patent, but you are not aware of

20   the patent law for -- regarding use of terms and what terms can

21   be used and that kind of stuff?

22   A    No, not in terms of the patent, yes.

23   Q    Right.  And as far as you know, the patent office had no

24   problem with Mr. Kowalski's wording in the patent, right?

25   A    Apparently not.