<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
     WILLIAM R. KOWALSKI and    )  CIVIL NO. 04-00055BMK
 4   HAWAII INTERNATIONAL       )
     SEAFOOD, INC.,             )  Honolulu, Hawaii
 5                              )
                Plaintiff,      )  December 4, 2007
 6                              )
           vs.                  )  9:04 a.m.
 7                              )
     OCEAN DUKE CORPORATION,    )  JURY SELECTION
 8                              )
                Defendant.      )
 9   _____ )

10                  TRANSCRIPT OF JURY TRIAL (DAY 1)
11               BEFORE THE HONORABLE BARRY M. KURREN,
                   UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
       For the Plaintiff:      MILTON M. YASUNAGA
14                             ALLISON MIZUO LEE
                               Cades Schutte LLP
15                             1000 Bishop St., Ste. 1200
                               Honolulu, Hawaii  96813-4216
16
       For the Defendant:      LOUISE K.Y. ING
17                             Alston Hunt Floyd & Ing
                               1800 ASB Tower
18                             1001 Bishop Street
                               Honolulu, Hawaii  96813
19
                               PAUL MARKS
20                             Neufeld Law Group
                               360 East 2nd Street, Ste. 703
21                             Los Angeles, California 90012

22   Official Court           GLORIA T. BEDIAMOL, RPR, RMR
     Reporter:                United States District Court
23                            P.O. Box 50131
                              Honolulu, Hawaii 96850
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
</pre>

```
 1   Tuesday, December 4, 2007                        9:04 a.m.
 2            THE CLERK:  Civil number 04-00055BMK, William R.
 3   Kowalski, et al., versus Ocean Duke Corporation.
 4            This hearing has been called for jury selection and
 5   trial to follow.
 6            You may make your appearances.
 7            MR. YASUNAGA:  Good morning, Your Honor.  Milton
 8   Yasunaga, Allison Mizuo -- I'm sorry, Allison Mizuo Lee for
 9   plaintiffs William Kowalski, who is sitting in the courtroom.
10   And we also have a couple of equipment technical people, Ryan
11   Tatsutani, Lelia Kalama (phonetic).
12            THE COURT:  Yes.  Good morning.
13            MR. MARKS:  And good morning, Your Honor.  My name is
14   Paul Marks on behalf of Ocean Duke Corporation, and along side
15   is Louise Ing.  And with me today are Roger Lin, representing
16   Ocean Duke Corporation, and also Timothy Neufeld, who is also a
17   lawyer for Ocean Duke Corporation.
18            THE COURT:  Yes.  Good morning.  You may be seated.
19   Thank you.
20            And good morning, ladies and gentlemen.  I would like
21   to welcome you all, and I thank you for being here today.  At
22   the outset I'm going to have you all sworn in.
23            (The jury panel was duly sworn.)
24            THE COURT:  The panel of jurors qualified and selected
25   today will hear and decide a civil case.  And let me start by
```

 1    just telling you very briefly what this case is about.  We're

 2    going to be giving you much more information in a bit.  But

 3    this is an essentially a patent infringement case.  The

 4    plaintiffs William Kowalski and Hawaii International Seafood

 5    allege they are the lawful owners of a certain patent relating

 6    to the seafood industry, and they are seeking damages against

 7    the defendant Ocean Duke Corporation, claiming that Ocean Duke

 8    has infringed on the Kowalski patent by importing and selling

 9    in the United States frozen fish treated to retain a fresh-like

10    color.  And Ocean Duke denies the allegations that plaintiff --

11    plaintiffs have made.

12            The trial will not be a long trial.  I expect that it

13    will be -- that it will end either around the middle, towards

14    the end of next week.

15            The jury selection process will take place as follows:

16    As soon as I am done with a few opening comments, my courtroom

17    manager will call out the names, 14 names that had been

18    randomly selected.  And those individuals will be seated in the

19    jury box.

20            I will have several questions for the individuals who

21    are called.  And then I will permit the attorneys to ask some

22    questions as well.  Ultimately eight jurors will be qualified

23    in this case.  Except for today, trial each day will begin at

24    8:30 in the morning unless you are advised otherwise.  Each

25    trial day will end at 1:30 in the afternoons -- in the

1    afternoon.  In other words, and this is except for today, we

2    have just one session each day running from 8 -- 8:30 until

3    1:30.  We will take breaks periodically over the course of a

4    day.  But we will only have one session of court each day.

5         We are spending approximately the same amount of time

6    in court as in a more conventional schedule.  The advantage,

7    however, to this schedule is that you will have most of the

8    afternoon free for other matters.  It may be necessary for us

9    to make a schedule change at times, and when that is necessary,

10   I certainly will give you sufficient advance notice.

11        For those of you who may be serving for the first time

12   and are somewhat unsure and nervous about serving, please feel

13   at ease.  The mechanics of a jury trial are -- are fairly

14   simple and everything will be explained fully to you.

15        We are now going to begin the process by calling out

16   the names of 14 perspective jurors.  As your name is called,

17   please come forward and take your seat in the jury box as

18   directed.

19        THE CLERK:  First name is Kori Elia.  Is it Elia, is

20   that correct?

21        Next person is Renaye Oyer.

22        Number 3 is Larry Colton.

23        Fourth name is Jill Hisatake.

24        Next is Michael Dinneen.

25        Claudio Friederich.

1          Joanne Medeiros.

2          Ian Tabali.

3          Number 9 is Grant Ogata.

4          Number 10, Robert Bethune.

5          Number 11, Andrea Mirafuentes.

6          Number 12, Nathan Yanagi.

7          Number 13, Dianne Sutherland.

8          And then 14 is Korin Okada.

9          THE COURT:  Okay.  At this time, ladies and gentlemen,

10    I'm going to ask a number of questions.  I hope you understand

11    that the questions are not intended to embarrass or pry

12    unnecessarily into your personal affairs or lives.  They are

13    asked to discover if you have any knowledge about the case, if

14    you have any preconceived opinions which you might find

15    difficult to lay aside, or if you have personal or family

16    experiences which might cause you to identify with any of the

17    parties.  And to assure each party that the jury will be fair

18    and impartial.

19          Please do not withhold any information.  Be

20    straightforward in your answers, rather than answering in the

21    way you feel the lawyers or I expect you to answer.

22          If your answer to a question is yes, please raise your

23    hand so that I might follow up with some additional questions.

24    If your answer to a question is no, you need do nothing.  When

25    providing an answer to a question, please first state your name

1    so that the court reporter can take down all of the information

2    and that an accurate record can be made.

3           Now, if at any time you would prefer to approach the

4    bench to answer a question in private, you certainly may -- may

5    do so.  And when we have bench conferences in this courtroom, I

6    should explain at this point, that we do -- we have our

7    conferences outside the door.  That is because the acoustics in

8    this room are really pretty good, and it's certainly possible

9    to hear everything up at the bench or anywhere in the

10   courtroom.  So we have a way to have information recorded by

11   the court reporter outside.  We just go outside the door and we

12   have our sidebar or bench conferences there.

13          And so if there is any sensitive or private matter you

14   wish to discuss privately, just let me know, and -- and I'll

15   have you come up and we'll take that information outside.

16          I should tell you, though, that we do need to make a

17   record of everything that is said here in the courtroom, so

18   everything will be taken down by the court reporter.  And, of

19   course, also the attorneys have a right to participate in this

20   process fully, so they will be -- they will come with me

21   outside to hear any answer that any of you wish to provide

22   in -- in private.

23          Now, for all of you in the gallery, it is very

24   important that you follow along closely as well.  It may be

25   necessary at times to have you replace people who are in the --

1   in the jury box.  So I would ask you to do this:  Please make a

2   note in your -- in your mind of any question that I ask that

3   you would answer in the affirmative, question any that you

4   would raise your hand.  Because if you do come up to replace

5   someone who is in the jury box, the first thing that I will do

6   is to ask you if you would have raised your hand to any of the

7   questions that have already been asked.  So -- so please follow

8   along closely, and although you don't need to raise your hand

9   as I go through these questions at this point, but if you would

10  answer any question, if you would raise your hand, please make

11  a note of that so that we can -- we can track that if you are

12  asked to replace someone in the box.

13          The Court has previously received and acted upon

14  request for excuses that have been submitted by prospective

15  jurors called for jury selection.  So I'm assuming that you all

16  of you here are able to serve subject to being qualified and

17  selected.

18          I do realize, however, that there may be some

19  last-minute changes.  We'll get to that in just a moment for --

20  in circumstances for some of you.  So I'm going to consider

21  some last-minute excuses at this time.  I do want to point this

22  out, if you do have an excuse or there is some unusual

23  hardship, I'm going to need to follow up on that with some

24  additional questions.

25          You know, I recognize that jury service is -- is an

1    inconvenience, especially at this time of -- of year.  It does

2    take -- take you away from your jobs and family -- families,

3    and it is disruptive with respect to your daily routine.

4        I do want to point this out, however:  Jury service is

5    one of most important duties that citizens of our country are

6    called upon to perform.  It affords you the opportunity to be

7    part of the administration of justice by which the legal

8    affairs and liberties of your fellow citizens are determined

9    and protected.  So I know you will not take this duty lightly.

10        And I would also say this:  This case, I believe, is

11    an interesting case.  I'm sorry that not all of you will have

12    the opportunity to serve as a juror in this case.  So bearing

13    in mind the importance of this case and your duty to serve as a

14    juror, please raise your hand if serving on this jury would

15    pose an unreasonable hardship.

16        Okay, and let's see if I've got this right.  You are

17    Mr. Colter; is that correct?

18        THE PROSPECTIVE JUROR:  Mr. Colton, yes.

19        THE COURT:  Colton, I'm sorry.  And there is a problem

20    for you?

21        THE PROSPECTIVE JUROR:  Yes.

22        THE COURT:  You're going to need to get the microphone

23    too.

24        THE PROSPECTIVE JUROR:  Yes, sir.

25        THE COURT:  Okay.  And what is that, sir?

1          A PROSPECTIVE JUROR:  The first difficulty may not

2    actually be a problem, but I have a wedding of a daughter, and

3    I leave on the 16th.  It sounds like this case will be over by

4    then, but --

5          THE COURT:  The 16th is --

6          A PROSPECTIVE JUROR:  Is a Sunday.

7          THE COURT:  Right.

8          A PROSPECTIVE JUROR:  That's ten days.

9          THE COURT:  Oh, yeah.

10          THE PROSPECTIVE JUROR:  The other issue for me is that

11    I'm a professor at the university.  Next week is final exams.

12    I haven't written the finals yet.  I've got about 70 students

13    involved, and it could be a big mess because --

14          THE COURT:  Well, you know, we have made an adjustment

15    in our schedule so that you will have much of the afternoon

16    free each day.

17          A PROSPECTIVE JUROR:  I'm in Laia.  It's a one-hour

18    commute each way.

19          THE COURT:  Okay.  Well, tell me what you think.  Do

20    you think this is going to be too much to --

21          A PROSPECTIVE JUROR:  I think -- I think so.

22          THE COURT:  Need for a conference here?

23          MR. YASUNAGA:  No, Your Honor.

24          MR. MARKS:  No, Your Honor.

25          THE COURT:  Okay, Mr. Colton, I'm going to excuse you

1    at this time.  Thank you.

2              THE PROSPECTIVE JUROR:  Thank you.

3              THE COURT:  Go ahead and replace.

4              THE CLERK:  Thank you, Mr. Colton.  If you are

5    excused, you can go to the jury lounge and get an excuse.  Turn

6    left out here.

7              Okay.  The next person, Patricia Ohara.

8              MR. MARKS:  Your Honor, while that's happening, I

9    think counsel may have neglected to do something you asked us

10   to do, which was read a list of witnesses to the jury pool.

11             THE COURT:  Yeah, we'll take that up in a little bit.

12             MR. MARKS:  Thank you.

13             THE COURT:  Not -- that will come down the road.

14             THE CLERK:  Mrs. Ohara, will you please take the third

15   seat.  Thank you.

16             THE COURT:  Let me return to this question.  Would

17   serving on this jury pose an unreasonable hardship for anyone

18   else?

19             Yes, ma'am, and you are?

20             A PROSPECTIVE JUROR:  Renaye Oyer.

21             THE COURT:  Right.

22             THE PROSPECTIVE JUROR:  I'm a kindergarten teacher at

23   a private Christian school, and we're in the middle of

24   Christmas program, and it's actually next week Friday.  I'll be

25   missing a lot of our practices, and I don't know if a

1   substitute would be appropriate or okay to have for the

2   kindergarten students as we prepare.

3          THE COURT:  Well, you tell me.  I mean, you know, as I

4   indicated, I know this --

5          THE PROSPECTIVE JUROR: Yes.

6          THE COURT:  -- is difficult for everyone.  The other

7   thing about serving on a jury too, we always have this at the

8   outset of the process, but I'll tell you this:  At the end of

9   the day when this is all over, it is always the case that the

10   jurors are so grateful that they had the opportunity to

11   participate in the case, they feel like they have done, you

12   know, a great deal toward assisting in the administration of

13   justice.  There's a big difference between the way it is at the

14   beginning and the way it is at the end.

15          But, you know, I don't want to interfere where there

16   is a significant or serious problem.  So I'm going to really

17   sort of leave it to you.  It doesn't look like we're going to

18   have quite a number of people that are going to ask to be

19   excused.  But we'll take some adjustment, but, you know, we are

20   leaving a good deal of time open.  I would like to have you

21   with us if you could do it.  You tell me what you think.

22          A PROSPECTIVE JUROR:  I wouldn't mind serving.  I

23   would love to serve.  I'm just not sure if I want to miss next

24   week Friday, our Christmas program.

25          THE COURT:  Well, I hope we're done by -- by Friday.

1    I mean it is possible, certainly we'll go -- what time is the

2    program?

3              A PROSPECTIVE JUROR:  It's at 8:00 in the morning.

4              THE COURT:  Oh, it will run to how long?

5              A PROSPECTIVE JUROR:  It's very short, until 9:15.

6              THE COURT:  That won't be a problem.  I mean, you

7    know, on Friday -- if we're on session on Friday, I suspect

8    we'll probably be having closing arguments and committing the

9    case to the jury --

10              A PROSPECTIVE JUROR:  It's 8:00 in the morning.

11              THE COURT:  -- in which we would delay that until 9:00

12    or 9:30.

13              THE PROSPECTIVE JUROR:  Sorry.

14              THE COURT:  So I don't expect that that would be an

15    interference.  Could you serve otherwise?

16              A PROSPECTIVE JUROR:  I guess so.

17              THE COURT:  Thank you.

18              Anybody else?  Yes, ma'am.

19              A PROSPECTIVE JUROR:  Could I go outside.

20              THE COURT:  Okay.  Sure.  Why don't you come outside.

21              And, folks, you want to come out here as well, just

22    the --

23                        (Sidebar on the record:)

24              THE COURT:  Before she speaks, the rule for a

25    conferences out here --

```
1              THE CLERK:  You need to state your name first.
2              THE COURT:  Everybody got too much coffee this
3    morning.  Is as follows:  When anybody speaks in a sidebar
4    conference, please just say your name first so the court
5    reporter gets this down accurately.  And then say what you want
6    to say.
7              Okay, ma'am.  So why don't you come forward, state
8    your name and tell us what you would like to say.
9              A PROSPECTIVE JUROR:  I'm Andrea Mirafuentes.  I have
10   a disability.
11             THE COURT:  Okay.
12             THE PROSPECTIVE JUROR:  Muscular dystrophy.
13             THE COURT:  Okay.
14             THE PROSPECTIVE JUROR:  I wear leg braces.
15             THE COURT:  Okay.
16             THE PROSPECTIVE JUROR:  And then I have really bad leg
17   cramps.
18             THE COURT:  Ooh.
19             THE PROSPECTIVE JUROR:  Yeah.  And so sometimes when I
20   sit, I have to get up, stretch my muscles, and I don't mind if
21   I can sit at the end, but I think this is -- would disrupt the
22   court.
23             THE COURT:  Well, no, we would accommodate you in
24   that.  I mean, if you wanted to sit at the end, we certainly
25   would permit you to do that.  In addition, if you wanted to
```

1    stand up at any time, you would be more than welcome to do

2    that.

3                THE PROSPECTIVE JUROR:  Okay.

4                THE COURT:  That wouldn't be a problem.  But, you

5    know, we will be in court for quite a bit of time.  So I'm

6    going to sort of leave this to you.  With those accommodations

7    and if you need to take a break, you know, after a reasonable

8    period of time, you know, certainly you can let me know that as

9    well.  But what do you think, do you think you could serve on

10   the jury?

11               A PROSPECTIVE JUROR:  I think I could as long as I sit

12   at the end and I can get up whenever I get a cramp.

13               THE COURT:  Okay.  So do you want to sit at the end

14   right now, or is it all right if you sit where you are for a

15   little while?

16               A PROSPECTIVE JUROR:  No, I think I can, I think so.

17               THE COURT:  Okay.  Let's go forward with this

18   selection process.  If you want to stand up and move around at

19   any time, please feel free to do that.  If you need a break for

20   some reason.  But do you think you can stick it out for the

21   trial in this case with that assistance?

22               A PROSPECTIVE JUROR:  Yes.  Okay.

23               THE COURT:  Okay.  Need for any other follow-up here

24   at all?

25               MR. MARKS:  No, Your Honor.

1          MR. YASUNAGA:  No, Your Honor.

2          THE COURT:  Okay.  Great.  Thank you, ma'am.  You can

3    return to your seat.

4                    (End of sidebar conference.)

5          THE COURT:  Anyone else?  Very well.

6          Is there anyone here that has a particular physical

7    problem including a sight or hearing problem which would

8    prevent you from being an attentive and unbiased juror in this

9    case?

10          (No response)

11          Is there anyone here who has difficulty understanding

12    or speaking English?

13          (No response)

14          You know, I've given you very minimal information

15    about this case, but is there anyone here who feels that he or

16    she would be unable to be a fair and unbiased juror because of

17    the nature of this case?

18          (No response)

19          Have any of you heard anything about this case, the

20    facts or events of this case?

21          (No response)

22          Do any of you believe that a case of this nature

23    should not be brought into a court for determination by a jury?

24          (No response)

25          Do any of you know of any reason why you may not be

1    fair to the plaintiffs and -- or the defendant because of the

2    nature of this case or for any other reason?

3          Yes, sir.

4          A PROSPECTIVE JUROR:  My name is Claudio Friederich.

5          THE COURT:  Yes.

6          THE PROSPECTIVE JUROR:  I know that in trials there

7    have been circumstances where jurors were asked disregard

8    evidence or disregard what was just said.

9          THE COURT:  Yes.

10         A PROSPECTIVE JUROR:  I don't believe I am capable of

11   disregarding something I have heard or seen.  I cannot delete

12   what I have heard or seen and not consider it if it's something

13   nontrivial.  I just wanted particular attorneys to know that.

14         THE COURT:  Well, that's a good point, and I mean it

15   is difficult to put out of your mind something that -- that you

16   are told to disregard.  It's not an easy process, but it can be

17   done actually.  And one of the -- one of the fundamental rules

18   in -- in a trial for the jury is to follow the instructions of

19   the Court.  And I will be giving a number of instructions at

20   different times.

21         And so while that you can't put something out your

22   mind entirely, for purposes of actually considering it in

23   making your decision, you know, it may be necessary from time

24   to time to not consider or take into account some piece of

25   information because I have -- I have told you to disregard it.

1    It won't happen, you know, to any great extent in this case,

2    but it certainly may happen from time to time.

3          And, of course, it will be important that you follow

4    the law that I give it to you.  Regardless of what you may

5    think the law is, or should be, it is the -- the requirement of

6    the jury to -- to follow strictly the instructions of law

7    that -- that I will provide at the beginning of the case, at

8    various times during the case, and at the end of the case.

9          Now, Mr. Friederich, do you believe you would not be

10   able to follow these instructions?  Please take the microphone.

11         A PROSPECTIVE JUROR:  Depends on what I'm told to

12   disregard.  Totally hypothetical scenario.  If one of --

13         THE COURT:  What I'm saying is this:  You may

14   certainly continue to -- to remember a particular point that I

15   said to disregard.  But when it comes to actually taking it

16   into account and making your decision, you are not to take into

17   account that particular piece of information and follow the

18   instruction that I -- that I give.  Would that be too difficult

19   for you to do, do you think?

20         A PROSPECTIVE JUROR:  Well, again, depends on what I'm

21   told to disregard.  If for totally hypothetical scenario one of

22   either plaintiffs or defendant were to say confess to

23   something, which effectively decides a yes-or-no outcome, and

24   I'm told to disregard it, I don't think I can do that and make

25   a meaningful decision.  It's -- it's like the murdered body you

1    are told not to see and not consider in deciding a murder case.

2            THE COURT:  Well, this isn't --

3            THE PROSPECTIVE JUROR:  I know this isn't a murder

4    case.

5            THE COURT:  There won't be blood and guts in this

6    case, I don't think.  But -- and I don't think we're going to

7    have the kind of information you might be talking about.  But,

8    you know, I am going to need that promise from you, that you

9    will not take into account anything in particular that I may

10   ask you to disregard.  I don't think it will be so dramatic

11   as -- as you paint.  But, you know, if you say you can't do

12   this, you better let me know this upfront, Mr. Friederich,

13   because this really is a very important point.  It is important

14   that -- that each of you understand that you have to follow the

15   instructions that I give.

16           Now, you are judges just like I'm a judge in this

17   case, but we have a different role.  You are the judges of the

18   facts; I am the judge of the law.  And so it will be up to you

19   to decide the facts in this case.  Not -- not for me.  That is

20   for you.  But as far as the law is concerned, that's for me to

21   decide.  And so when based on some legal principle I instruct

22   you to disregard a particular point or issue, that is when you

23   have to follow that and not take that into account when making

24   a decision in this case.

25           It might be difficult, I don't think it will be too

1    difficult, but it could be.  But it is important that you have

2    to follow that instruction.

3            So what do you think, Mr. Friederich?

4            A PROSPECTIVE JUROR:  Well, of course, I would do my

5    best to follow your instructions, but I cannot guarantee that I

6    can disregard something.  I mean it's -- I can't guarantee that

7    I could do --

8            THE COURT:  You have to promise me that you will do

9    that.  If you think you can't do that, just let me know.

10           A PROSPECTIVE JUROR:  I cannot give you a definite

11   promise.  If you need a 100 percent definite promise, I'm

12   sorry, Your Honor, I don't think I can give you that.

13           THE COURT:  Any need bench conference in this matter?

14           MR. MARKS:  Not from the defense side.

15           MR. YASUNAGA:  No, Your Honor.

16           THE COURT:  Mr. Friederich, I'm going to excuse you at

17   this time.  Thank you.

18           THE CLERK:  Jermaine Napeahi.

19           THE COURT:  Okay.  Hold on.  What number is that?

20           THE CLERK:  This is number 16.

21           THE COURT:  Okay.  Good morning, Mrs. Napeahi.  Would

22   you take the microphone.  Would you have raised your hand to

23   any of the questions that I have asked so far?

24           You wouldn't have responded in the affirmative to

25   anything I have asked so far; is that correct?  You have to

1    answer out loud.

2            A PROSPECTIVE JUROR:  Yes.

3            THE COURT:  Okay.  Thank you.

4            Okay.  So on this point of -- of following the

5    instructions, why don't I follow up on this.  Is there anyone

6    else who feels that -- that they are not going to be able to

7    follow an instruction that I may give at any point during the

8    case?  And this may include disregarding something that might

9    be presented for purposes of making your decision.  Is there

10   anybody here that would not be able to do that?  Anyone else?

11           (No response)

12           Thank you.

13           I'm going to have the attorney introduce themselves to

14   you again and their clients, and also the law firms that they

15   are associated with because I'm going to ask if any of you, you

16   know, know any of these individuals.

17           So, Mr. Yasunaga, why don't I start with you, if you

18   would introduce the folks again, and then also indicate your

19   law firm as well.

20           MR. YASUNAGA:  Okay.  Milton Yasunaga, and colleague

21   Allison Mizuo Lee.  We're from the law firm called Cades

22   Schutte, LLP.  We represent Mr. William Kowalski, a plaintiff

23   and his company Hawaii International Seafood, Incorporated.

24           THE COURT:  Okay.  So do any of you know any of these

25   individuals or have any of you had any kind of dealings at all

1    with the Cades Schutte law firm?

2             (No response)

3             Okay.  Mr. Marks.

4             MR. MARKS:  Thank you, Your Honor.

5             My name is Paul Marks, and I work for a law firm

6    called Neufeld Law Group, and along side me here is Louise Ing.

7    She works for a law firm called Alston Hunt Floyd & Ing.  My

8    client who is with me here is Mr. Roger Lin of Ocean Duke

9    Corporation, and Mr. Timothy Neufeld is also present today.

10            THE COURT:  Okay.  Thank you, Mr. Marks.

11            Do any of you know any of these individuals?  Do any

12   of you -- have any of you had contact or dealings with the

13   company referred to or the law firms referred to by Mr. Marks?

14            (No response)

15            And at this point I'm going to have the attorneys also

16   identify the possible witnesses in this case.

17            So, Mr. Yasunaga, perhaps you can start, and after

18   maybe four or five or so, why don't we stop and just to see if

19   any of you know of any of these folks.

20            MR. YASUNAGA:  Thank you, Your Honor.

21            Of course, we're going to have Mr. Kowalski

22   testifying.  We'll also have a professor named Joseph Maga.  He

23   is from Colorado.  We're having another person named John

24   Stalker, S-T-A-L-K-E-R, and then we're also having a damage

25   expert named David Francom, F-R-A-N-C-O-M.

1          THE COURT:  Okay.  Are any of you acquainted with any
2   of these potential witnesses?
3          (No response)
4          Okay.  Mr. Marks.
5          MR. MARKS:  If Mr. Yasunaga is finished, then --
6          THE COURT:  I think so.
7          MR. MARKS:  -- the witnesses that we may call in our
8   case on behalf of Ocean Duke Corporation are Roger Lin, who is
9   with me here today; his father Duke Lin may also be called; his
10  mother Alice Lin may be called as a witness; a gentleman named
11  Steven Shih, spelled S-H-I-H, may be called as a witness;
12  Professor Wayne Iwaoka of the University of Hawaii may be
13  called as a witness on our behalf; a gentleman who works for
14  Ocean Duke Corporation named Christopher Ragone be called as a
15  witness; and two gentleman may also be called, and their names
16  are Rock Garay and Richard Friend.  And that's it.
17         THE COURT:  Okay.  Thank you, Mr. Marks.
18         Are any of you acquainted with any of these potential
19  witnesses?
20         (No response)
21         Now, do you all understand that this is a civil case
22  which is different from a criminal case?  Essentially, and
23  there maybe some differences in standards that I will talk with
24  you about later on, but essentially this case is decided by the
25  relative weight of the evidence on each side, as opposed to a

 1    criminal case that is decided with proof beyond a reasonable

 2    doubt, a much -- a much higher standard.

 3            Let me start by asking you this -- well, let me ask

 4    you this:  Would that -- would it be difficult for you to

 5    separate in your mind the standards that apply to a civil case

 6    as opposed to a criminal case?  I know folks sometimes when

 7    they come into a courtroom and all that they may have -- they

 8    may be familiar with in court proceedings really relates more

 9    to criminal cases than civil cases.  But a civil case, the

10    basic difference is the standard -- standard of proof.

11            Would any of you have any difficulty applying the

12    appropriate standard of proof for a civil case as distinguished

13    from -- from a criminal case?  And as I indicated, there may be

14    some differences here that we'll talk about down the road, but

15    it won't be proof beyond a reasonable doubt under any

16    circumstances.

17            Is there anyone here who would have difficulty in --

18    in doing that?

19            (No response)

20            Now, have any of you served on a jury before?

21            Okay.  Yes, sir.  You want to pass the microphone.

22    First your name and then --

23            A PROSPECTIVE JUROR:  My name is Robert Bethune.

24            THE COURT:  Okay.  Mr. Bethune, how long ago did you

25    serve on a jury?

1                A PROSPECTIVE JUROR:  Approximately two years ago.

2                THE COURT:  Was it here in federal court or in state

3    court?

4                A PROSPECTIVE JUROR:  It was state court.

5                THE COURT:  And was this a civil case or a criminal

6    case.

7                THE PROSPECTIVE JUROR:  It was a criminal case.

8                THE COURT:  What kind of a case, if I might ask?

9                A PROSPECTIVE JUROR:  It was an assault against a

10   police officer case.

11               THE COURT:  Okay.  And what was the result of that

12   case?

13               A PROSPECTIVE JUROR:  The result was a hung jury.

14               THE COURT:  Oh, okay.  Now, is there anything at all

15   from that experience that would make it difficult for you to be

16   a fair and impartial juror in this case?

17               A PROSPECTIVE JUROR:  I don't believe so, Your Honor.

18               THE COURT:  And, of course, you understand that that

19   basic difference between a criminal case and a civil case that

20   I just -- I just indicated?

21               A PROSPECTIVE JUROR:  Absolutely.

22               THE COURT:  And, of course, each and every one of

23   these cases is a different case.  And so it would be your

24   obligation in this case as a juror to base your decision solely

25   upon the evidence that is produced here in this courtroom and

1   in this case --

2           THE PROSPECTIVE JUROR:  Yes, sir.

3           THE COURT:  -- not taking into account what may have

4   happened in that other case or in any other case?

5           A PROSPECTIVE JUROR:  Correct, Your Honor.

6           THE COURT:  Would you be able to do that?

7           A PROSPECTIVE JUROR:  Yes, sir.

8           THE COURT:  Okay.  And, of course, to follow the

9   instructions of law that I will be giving during the course of

10  the proceeding?

11          A PROSPECTIVE JUROR:  Yes, sir.

12          THE COURT:  Okay.  Very well.  Thank you, Mr. Bethune.

13          Anything -- anyone else served on a jury before?

14          Yes, ma'am.

15          A PROSPECTIVE JUROR:  My name is Jill Hisatake.

16          THE COURT:  Okay.  And was this a criminal case or a

17  civil case?

18          A PROSPECTIVE JUROR:  I believe it was civil --

19          THE COURT:  Civil case?

20          THE PROSPECTIVE JUROR:  Drug related.

21          THE COURT:  I'm sorry?

22          THE PROSPECTIVE JUROR:  I don't know, it was a

23  state --

24          THE COURT:  A state case.

25          THE PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  Do you remember if it was civil or

2   criminal?

3          A PROSPECTIVE JUROR:  No, I don't know.

4          THE COURT:  How long ago was this about?

5          A PROSPECTIVE JUROR:  I think maybe like five or six

6   years ago.

7          THE COURT:  Okay.  Do you remember anything at all

8   about this case, what it was about?

9          A PROSPECTIVE JUROR:  It was about a drug related.

10         THE COURT:  Okay.  Probably a criminal case then, huh?

11   And do you remember what happened in the case?

12         A PROSPECTIVE JUROR:  No.

13         THE COURT:  No?  Is there anything at all about that

14   case that would cause you any difficulty to -- in serving as a

15   juror in this case?

16         A PROSPECTIVE JUROR:  No.

17         THE COURT:  Any particular negative experience about

18   your jury service in that case at all?

19         A PROSPECTIVE JUROR:  No.

20         THE COURT:  Okay.  And -- and do you believe you could

21   be a fair and impartial juror in this case?

22         A PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Okay.  Thank you very much.

24         Anybody else had any prior jury service?

25         (No response)

1          There is another type of jury, and that is a grand

2    jury.  Have any of you served on a grand jury before?  I'm

3    going to ask about at this point experiences in litigation or

4    in being involved in any kinds of claims.

5          So let me ask you this question first:  Have any of

6    you or has anyone close to you suffered injury, property loss,

7    or financial loss as a result of someone's wrongful conduct in

8    the past?  Any of you been in that type of a situation before?

9          Okay.  And, yes, sir, let me start with you in the

10   front first.

11         A PROSPECTIVE JUROR:  My name is Michael Dinneen.  My

12   first wife was involved in a traffic accident where there was

13   some litigation involved.

14         THE COURT:  Okay.  And what was the result of that?

15         A PROSPECTIVE JUROR:  The result was a juvenile

16   offender, so he didn't get any criminal penalty, but there was

17   a civil penalty where his insurance company had to pay some

18   money.

19         THE COURT:  Okay.  Was that -- was that settled or did

20   it actually go to trial?

21         A PROSPECTIVE JUROR:  I believe it was settled before

22   it went to trial, yes.

23         THE COURT:  Anything at all about that experience that

24   would cause you any difficulty in this case?

25         A PROSPECTIVE JUROR:  I don't believe so, Your Honor.

1          THE COURT:  Okay.  And you, of course, understand that

2     this case is to be decided on the evidence presented in this

3     case, not based on some other experience?

4          A PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  Okay.  Great.  Thank you.

6          Anybody else?

7          A PROSPECTIVE JUROR:  My name is Grant Ogata.

8          THE COURT:  Yes.

9          THE PROSPECTIVE JUROR:  It's pretty unrelated, but

10    just one time when I was renting an apartment when we signed

11    the lease and things, you kind of note with the landlord what's

12    already wrong with the apartment --

13         THE COURT:  Right.

14         THE PROSPECTIVE JUROR:  -- and then when we checked

15    out, we got charged for those kind of things.

16         THE COURT:  Okay.

17         THE PROSPECTIVE JUROR:  And then the debt collection

18    agency was pretty nice, but eventually we ended up paying

19    because it was too much hassle to take it to small claims

20    court.

21         THE COURT:  Okay.  Would -- would that experience

22    cause you any difficulty in being a fair juror in this case?

23         A PROSPECTIVE JUROR:  No, I don't think so.

24         THE COURT:  And would -- would that experience cause

25    you to favor one side or the other in this case in any way?

1          A PROSPECTIVE JUROR:  No, as long as they are not a

2    landlord.

3          THE COURT:  Well, some people might be landlords, but

4    they may not disclose that.  But could you be -- could you be,

5    you know, completely fair to the --

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  -- to the plaintiffs and completely fair

8    to the defendant in this case?

9          A PROSPECTIVE JUROR:  I think so.

10         THE COURT:  And -- and do you understand, of course,

11   that you are a judge, as I indicated, just like, you know, I am

12   a judge in this case.  That means that you have to listen

13   closely to all of the evidence, not, you know, make any

14   decision until all of the evidence is presented, keep an open

15   mind until the case is presented to you, and then with your

16   fellow jurors at the end of the case following the law that I

17   give, then decide the facts of this case as a judge of the

18   facts?

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Do you believe that you could do that in a

21   completely fair and impartial way?

22         A PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Thank you very much, Mr. Ogata.

24         THE PROSPECTIVE JUROR:  Sure.

25         THE COURT:  Anybody else have any experience of the

1    kind that I referred to?

2                    (No response)

3            So let me be more specific, have any of you, other

4    than what we have already identified, or has anyone close to

5    you filed a lawsuit or made a claim against someone?  Any other

6    claims or lawsuits?

7            Okay.

8            And I'll ask it the other way around.  Have you or has

9    anyone close to you been involved as a defendant, either had a

10   claim made against you or someone close to you or been a

11   defendant in a lawsuit before -- in -- in the past?  Any of you

12   have that type of experience?

13           Mr. --

14           A PROSPECTIVE JUROR:  Michael Dinneen.  My present

15   wife was sued over a traffic thing and it was handled by the

16   insurance company.  There wasn't any court proceedings or

17   anything like that.

18           THE COURT:  Okay.  This is something other than what

19   you referred to previously?

20           A PROSPECTIVE JUROR:  This is my present wife,

21   correct.

22           THE COURT:  Oh, your present wife, okay.  Any --

23   anything about that experience at all that would --

24           A PROSPECTIVE JUROR:  I would believe the insurance

25   company took care of all the stuff.

1           THE COURT:  Okay.

2           THE PROSPECTIVE JUROR:  So it was just a matter of

3    being notified by mail.

4           THE COURT:  Okay.  And just to follow up on this, do

5    you -- do you believe you could be a completely fair and

6    impartial juror in this case?

7           A PROSPECTIVE JUROR:  Yes, sir.

8           THE COURT:  Okay.  Thank you.  Have any of you

9    testified in a lawsuit or some other proceeding before, either

10   like an administrative hearing or some other proceeding or in

11   court or as a witness or in a deposition, which is a proceeding

12   for a hearing where a court reporter takes down information?

13          Yes, sir, why don't you take the microphone, if you

14   would pass it to the back.

15          A PROSPECTIVE JUROR:  My name is Nathan Yanagi.

16   Someone stole my car, so I ended up being in the District Court

17   as a witness.

18          THE COURT:  Okay.  And any particular negative

19   experience that you have from --

20          A PROSPECTIVE JUROR:  No.

21          THE COURT:  -- from that?  Would that affect you in

22   any way --

23          A PROSPECTIVE JUROR:  No.

24          THE COURT:  -- being able to serve as a fair juror in

25   this case?

1            A PROSPECTIVE JUROR:  No.

2            THE COURT:  Okay.  So you can be fair to the

3    plaintiffs and fair to the defendant --

4            THE PROSPECTIVE JUROR:  Yes.

5            THE COURT:  -- in the same manner?

6            A PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Thank you very much, Mr. Yanagi.

8            Anyone else?  Mr. Dinneen.

9            A PROSPECTIVE JUROR:  Divorce Court.  I was in court,

10   so I thought I would divulge it.

11           THE COURT:  Okay.  I'm glad you mentioned it.  And, of

12   course, you know this is a very different type of proceeding.

13   I gather you are going to be able to focus just on the evidence

14   that we present here and not allow anything that may have

15   happened from that other proceeding to influence you in this

16   case --

17           THE PROSPECTIVE JUROR:  Yes, sir.

18           THE COURT:  -- is that correct?

19           A PROSPECTIVE JUROR:  Yes, sir.

20           THE COURT:  Okay.  Yes, ma'am.  If we could pass the

21   microphone.

22           A PROSPECTIVE JUROR:  I'm Korin Okada, and I work for

23   the Traffic Violations Bureau District Court.  I had to witness

24   for an investigation on a fraud charge card.

25           THE COURT:  Would that in any way influence you in

1    thinking about this case?

2              A PROSPECTIVE JUROR:  No.

3              THE COURT:  And, of course, you know, you see a lot

4    that is involved up there in District Court.  This is obviously

5    a very different kind of case than --

6              THE PROSPECTIVE JUROR:  Yes.

7              THE COURT:  -- what goes on there.  Would you be able

8    to base your decision solely on the evidence presented in this

9    case and not allow anything that you may know or have any

10   connection to or experience from in District Court affect you

11   in this case?  Would you be able to be a fair and --

12             THE PROSPECTIVE JUROR:  Yes.

13             THE COURT:  -- impartial juror in this case?

14             A PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Okay, thank you.

16             Anybody else a witness?

17             Have you or anyone close to you been in a contract or

18   other type of business dispute of a significant nature, not

19   just some trivial thing but any -- any significant business

20   dispute or contract dispute?

21             (No response)

22             Now, you may be called in this case to assess money

23   damages at the conclusion of the case.  Do any of you have any

24   religious, philosophical or other belief that would prevent you

25   from awarding damages if the damages are established under the

1    appropriate standard of proof?

2              (No response)

3              Now, do any of you feel that just because a lawsuit is

4    filed that there must be some liability, some responsibility of

5    someone who has been sued and is a defendant?  Do any of you

6    feel that way?

7              Now, in this trial we have an individual as a party in

8    the case, and we also have corporate entities as parties in the

9    case.  In the eyes of the law, all parties are to be treated

10   alike and given the same honest, fair and impartial treatment.

11   If selected to serve as a juror in this case, would you and

12   could you accept and apply this principle of law?  Is there

13   anyone who could not apply that principle?

14             (No response)

15             Now, have any of you or anyone close to you been

16   involved in the business of investigating or otherwise acting

17   upon claims for damages?

18             (No response)

19             Is there anyone here that has any connection to the

20   legal profession?

21             Okay.  Pass the microphone to the back.

22             A PROSPECTIVE JUROR:  Nathan Yanagi.  I'm a lawyer.

23             THE COURT:  Okay.  And, Mr. Yanagi, what -- what kind

24   of practice do you have?

25             A PROSPECTIVE JUROR:  Estate planning, we do wills and

 1    trusts, probate, conservatorship and guardianship.

 2         THE COURT:  Okay.  So this is an area where it's

 3    important for you to give me an honest answer here.  And, you

 4    know, you are going to be, if selected in this case, a juror

 5    like any other juror in this case.  Of course, it's very

 6    important that you follow the law as the Court gives it to you,

 7    that you work together with your fellow jurors in the same

 8    manner that every other juror will work together at the end of

 9    the case and base your decision solely upon the evidence in the

10    case.

11         Would you be -- would you be able to do that?

12         A PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Thank you, Mr. Yanagi.

14         Yes, ma'am.

15         A PROSPECTIVE JUROR:  Dianne Sutherland.  I am married

16    to but separated from an attorney.

17         THE COURT:  Okay.  And is that an attorney here in

18    Honolulu?

19         A PROSPECTIVE JUROR:  No, Maui.

20         THE COURT:  And the name of that attorney.

21         A PROSPECTIVE JUROR:  Clay Sutherland.

22         THE COURT:  Okay.  What kind of practice?

23         THE PROSPECTIVE JUROR:  Everything he said plus real

24    estate.

25         THE COURT:  Okay.  And so let me -- a couple of things

1    here.  First of all, let me ask you, would you be able to be a

2    fair juror in this case notwithstanding that relationship?

3              THE PROSPECTIVE JUROR:  Yes, sure.

4              THE COURT:  And, of course, one of the things that,

5    you know, is important here is that -- and I'll talk with all

6    of you about this more as we go down the road, but, you know,

7    it's important that you not discuss the case with anyone on the

8    outside.  Everything that you need to know about this case will

9    be presented to you here.  It's obviously, you know, just a

10   very common practice, of course, to talk with people you know

11   about the experiences that you have.

12             A trial is different, however.  It's important that

13   you keep everything about this case to yourself until the end

14   of the case, and then, of course, you work with your fellow

15   jurors in making a decision in this case.  Keeping an open mind

16   and not discussing the case with anyone.

17             Would you be able to do that, Mrs. Sutherland?

18             A PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Thank you very much.

20             Anybody else have any contact in any way, either

21   yourself or close family members, with the legal profession?

22             (No response)

23             Is there anyone here because of the nature of their

24   employment -- actually I should say I'm going to talk with you

25   about your jobs, each of you, in just a moment.

1          But let me ask this general question at this point,

2     and that is:  Do any of you because of the nature of your

3     employment feel uncomfortable in serving as a juror in this

4     case?

5          (No response)

6          Now, do any of you have any opinions about courts or

7     lawyers or the legal process that would prevent you from fairly

8     considering and deciding this case solely on the evidence that

9     is presented in this courtroom?

10         (No response)

11         Now, do any of you or is there anyone close to you

12    that has any knowledge, training or experience in importing

13    goods manufactured in the Philippines or in Asia?  Have any of

14    you traveled to Indonesia, the Philippines or Taiwan?

15         Mr. Dinneen.

16         A PROSPECTIVE JUROR:  Yes, I've traveled to the

17    Philippines a few times.

18         THE COURT:  Okay.  And -- and there may be some

19    evidence in connection with some activities in the Philippines

20    in this case.  Anything at all about your travels that would

21    affect you in any way in being a fair juror in this case?

22         A PROSPECTIVE JUROR:  No, I don't think so, Your

23    Honor.

24         THE COURT:  And your -- was this just for pleasure

25    purposes or --

1          A PROSPECTIVE JUROR:  My wife is from the Philippines.

2          THE COURT:  Oh, okay.  So this would be just

3    nonbusiness-related travel, I guess.

4          A PROSPECTIVE JUROR:  Correct.

5          THE COURT:  Anybody else have any travel experience?

6          (No response)

7          Now, do you or does anyone close to you have any

8    knowledge, training or experience in dealing with suppliers or

9    manufacturers from the Philippines or in Asia generally?

10         (No response)

11         Have any of you or anyone close to you worked in the

12   fresh food or fresh fish or seafood industry?

13         Mr. Ogata.

14         A PROSPECTIVE JUROR:  Yes, my father currently works

15   for a seafood distribution company.

16         THE COURT:  Okay.  And what's the name of that

17   company?

18         A PROSPECTIVE JUROR:  Seafood Connection, I believe.

19   He's worked for another one in the past.

20         THE COURT:  And what does he do for that company?

21         A PROSPECTIVE JUROR:  He is some kind of a manager

22   position.  I'm not really sure.

23         THE COURT:  Okay.  So do you have any familiarity at

24   all with any aspect of or issue that might be involved here?  I

25   know you haven't heard a lot about this case, so this case

1    involves a patent that does treat fresh fish to retain its --
2    its color.  Do you know anything about this process at all or
3    anything --
4            A PROSPECTIVE JUROR:  I know a little bit, I heard a
5    little bit about like adding carbon monoxide and other
6    different ways of doing it.
7            THE COURT:  Okay.  So would that -- do you have any
8    impression at all about what you know that would affect you
9    here in thinking about the evidence in this case?
10           A PROSPECTIVE JUROR:  I'm not really sure without
11   knowing more about the case, but I do -- I have worked in
12   restaurants, I work in a restaurant currently, so...
13           THE COURT:  Do you have any preconceived opinion about
14   the process of treating fish?
15           A PROSPECTIVE JUROR:  Yes, I do.
16           THE COURT:  What's that?
17           A PROSPECTIVE JUROR:  I'm not really for it
18   personally.  I did Hawaiian studies at the university, and we
19   did a lot of aqua culture that was more the Hawaiian way and --
20           THE COURT:  Well, I'll tell you this, and, you know,
21   the attorneys know a lot more about, you know, the facts and
22   evidence of this case than I do.  But as I understand it, you
23   know, to get fish to the market place from where, you know,
24   they catch it, they have to do something to it.  Otherwise, you
25   know, it's not going to retain its color, and that this is --

1  that's what's involved in this case.  There's a certain process

2  that -- that there is a patent here.

3          A PROSPECTIVE JUROR:  May I use the restroom?

4          THE COURT:  Excuse me?  Oh, you may stand, sure, sure.

5  Oh, the restroom.  Oh.  You know, hold on a second, sir.

6          You know, we have been going for about an hour, why

7  don't I take a 10-minute break for everyone.  I can't just

8  release one person.  We'll take a 10-minute recess, and then

9  we'll follow up, Mr. Ogata.  I'm sorry.  Take a 10-minute

10  recess at this time.

11          (Recess at 9:56 a.m. until 10:06 a.m.)

12          THE COURT:  Mr. Ogata, let me ask you a few questions.

13  First, you know, would your -- anything at all from your

14  experience or knowledge about the seafood industry treatment of

15  fish cause you to favor one side or the other in this case?

16          A PROSPECTIVE JUROR:  I don't think so.

17          THE COURT:  And also, you know, it's very important,

18  of course, that you decide this case solely on the evidence we

19  present here, not -- not base it upon what you may know or what

20  other information you might have about treating fish or the

21  seafood industry generally.

22          Now, this is not to say, of course, that -- that you

23  don't use your common sense in analyzing the evidence that is

24  presented here.  But as far as actually considering the facts,

25  all of the facts that you -- that you need are those facts that

1    are going to be presented here in this courtroom.

2         You think you can -- you can do that base, your

3    decision solely on the evidence that is presented here in this

4    courtroom?

5         A PROSPECTIVE JUROR:  Yes.

6         THE COURT:  Now, you mentioned you have some -- some

7    negative views perhaps about treating fish.  This case does

8    involve a patent that pertains to the process of treating fish.

9    If infringement of that patent is established, would you be

10   able to support that -- that particular point, if that's how

11   this case ultimately turns out?  Notwithstanding any view you

12   might have with regard to treating fish.

13        A PROSPECTIVE JUROR:  As far as infringing on patents

14   goes.

15        THE COURT:  And then similarly if -- if the plaintiffs

16   condition prove their case, based on what you know, and that's

17   the way the jury decides the case at the end, would you be able

18   to, you know, go that route as well, notwithstanding anything

19   you know or feel about -- about any issue in the seafood

20   business?

21        A PROSPECTIVE JUROR:  Yes.

22        THE COURT:  Okay.  So, do you believe you could be a

23   completely fair and impartial juror in this case?

24        A PROSPECTIVE JUROR:  I think so.

25        THE COURT:  Okay.  Good.  Thank you, Mr. Ogata.

1          Anybody else have any connection with the seafood
2     industry or seafood business at all?
3          (No response)
4          Any of you have any -- other than what you may have
5     talked about, Mr. Ogata, any particular experience with carbon
6     monoxide, particular impressions of carbon monoxide?
7          (No response)
8          Is there anyone here who is familiar with the term
9     "tasteless smoke"?
10          You have heard of that, Mr. Ogata?
11          A PROSPECTIVE JUROR:  Yes.
12          THE COURT:  What is it that you know?
13          A PROSPECTIVE JUROR:  I really don't know much, just I
14     know I've heard of that term before.
15          THE COURT:  Okay.  Well, we will be talking a fair
16     amount about this here in this case.  So, again, I need to get
17     your commitment that you'll decide this case on what is
18     presented here, not talk with anybody on the outside, not be
19     influenced by anything, you know, from the outside; really
20     decide this case solely on the evidence presented here.  Could
21     you -- could you do that?
22          A PROSPECTIVE JUROR:  Yes, I can try.
23          THE COURT:  Thank you.  Is there anyone here who has
24     had any particular experience, work experience or anybody in
25     your family with any of these agencies?  And I'll just read

1  them all.  U.S. Food and Drug Administration, the Department of

2  Commerce, National Oceanic and Atmospheric Administration,

3  National Marine Fishery Service or the United States Customs.

4  Anybody, you or close to you?

5          Mr. Yanagi, let me get the microphone up to you.

6          A PROSPECTIVE JUROR:  I deal with the DCCA as part of

7  my work for certain clients, but it's only for things filing

8  paperwork and that sort of thing.

9          THE COURT:  Okay.  Any particular impression that

10  might affect your ability to be a fair juror in this case?

11          A PROSPECTIVE JUROR:  No.

12          THE COURT:  Okay.  Thank you.

13          Anybody else?

14          Yes, sir, Mr. Dinneen.

15          A PROSPECTIVE JUROR:  My name is Michael Dinneen.  I

16  work for the United States Department of Agriculture, and when

17  I first started working with them, I worked with the Customs

18  folks, the canine handlers.

19          THE COURT:  Do you have any particular view about

20  Customs or the work they do at all that would -- would cause

21  you any issue or difficulty in this case?

22          A PROSPECTIVE JUROR:  I don't think so, Your Honor.

23          THE COURT:  Okay.  Now, have any of you or anyone

24  close to you ever held a patent or a trademark before?

25          (No response)

1             Have any of you ever been accused of infringing on a

2      patent or infringing on a trademark at any -- at any time?

3             (No response)

4             Have any of you had any involvement in inventions?

5             (No response)

6             Okay.  I am going to give you instructions about the

7      law at various points in the trial.  It's certainly possible

8      that some you may disagree with the law as given to you by the

9      Court, but it is important that you agree to this:  That you

10     have to set aside any interpretation of the law if you feel it

11     is different; that you must follow and apply the law as given

12     to you by the -- by the Court.

13            We covered this earlier, but I want to emphasize it

14     again.  So is there anyone here who cannot or will not follow

15     the Court's instruction -- instructions if your own personal

16     feelings may -- may differ?

17            (No response)

18            And is there anyone here who -- who feels that they

19     would not be able to follow the requirement to keep an open

20     mind until all of the testimony and all of the evidence is

21     presented here and -- and I've instructed you as to the law?

22     Anyone here who would not be able to do that?

23            (No response)

24            Okay.  I'm going to distribute some questionnaires and

25     ask each of you some questions about this at this time.

```
1              Okay.  Ladies and gentlemen, what I'm going to do at
2      this point, I am going to start with -- Ms. Elia, is it?  And,
3      ma'am, if you could stand and using the microphone, if you
4      could just sort of run down through this list and address each
5      of these items, tell us your name, where you live, that sort of
6      thing, so that we know just a little bit more about you.
7              A PROSPECTIVE JUROR:  Kori Elia, Mililani, took 31
8      years.  I work for Integrated Services Incorporated, a
9      subsidiary of HMSA.
10             THE COURT:  What do you do with them?
11             A PROSPECTIVE JUROR:  I'm the manager of like business
12     support services.
13             THE COURT:  Okay.
14             A PROSPECTIVE JUROR:  I have a BA in history from the
15     University of Hawaii.  My husband's name is Adam Elia.  He
16     works for Department of Defense.  He is a division historian
17     for the 25th infantry division.  I have a daughter, her name is
18     Addison Elia.  She's 14 months.
19             THE COURT:  Okay.  Anybody else living in your home?
20             A PROSPECTIVE JUROR:  No.
21             THE COURT:  Okay.  Great.  Thank you very much.
22             A PROSPECTIVE JUROR:  My name is Renaye Oyer.  I live
23     in Kaneohe.  I have been living here for 39 years.  I'm a
24     kindergarten teacher at Sacred Hearts Academy for 14 years.  I
25     have a bachelor degree from the University of Hawaii in
```

1    economics and a teaching certificate for elementary education.

2    My husband's name is Glenn Oyer, and he is a self-employed.

3            THE COURT:  Doing -- doing what?

4            A PROSPECTIVE JUROR:  He renovates kitchens and does

5    handyman kind of things.

6            THE COURT:  Okay.  Great.

7            THE PROSPECTIVE JUROR:  I have two children, Jeremy

8    and Mari.  Jeremy is 5 and Mari is two years old.  And no one

9    else lives in our home.

10            THE COURT:  Thank you very much.

11            A PROSPECTIVE JUROR:  My name is Patricia Ohara.  I

12    live in Mililani, 63 years.  I'm a barber and hair styling,

13    semiretired.  I went to barber and beauty school.  Spouse,

14    Raymond Ohara, retired from Pearl Harbor.

15            THE COURT:  What did he do at Pearl Harbor?

16            A PROSPECTIVE JUROR:  Repaired computer.

17            THE COURT:  Uh-hm.

18            A PROSPECTIVE JUROR:  Two children, Wendy and Melanie.

19    One occupation is -- my oldest is Wendy, works at -- I'm so

20    nervous.

21            THE COURT:  That's all right.  Take your time.

22            A PROSPECTIVE JUROR: Xerox Company, and the other one

23    works at issurance, life insurance.

24            THE COURT:  Okay.

25            A PROSPECTIVE JUROR:  I am employed at Pearl City

1    Barber Shop part-time.

2            THE COURT:  Okay.  Is there -- who lives in your

3    household?

4            A PROSPECTIVE JUROR:  No one.

5            THE COURT:  Okay.  Thank you very much.

6            A PROSPECTIVE JUROR:  My name is Jill Hisatake.  I

7    live in Hawaii Kai, I lived there for 30 -- 38 years.  I am a

8    personnel clerk for the State of Hawaii, Department of Human

9    Services.  I've been employed, I guess, around 17 years.  I

10   have a bachelor's degree.  My spouse's name is Calvin Hisatake.

11   He is a building inspector with the state Department of

12   Education.  And I have two children, my daughter is 11 and my

13   son is 9.

14           THE COURT:  Okay.  And is there anyone else living in

15   your house?

16           A PROSPECTIVE JUROR:  No.

17           THE COURT:  Thank you.

18           A PROSPECTIVE JUROR:  My name is Michael Dinneen.  I

19   live in Mililani, resided in Hawaii since 1983.  I work for the

20   United States Department of Agriculture since '92, and I'm also

21   a member of the Hawaii Air National Guard since '94.  I have an

22   associates degree.  My spouse's name is Marissa, and she works

23   for Zippy's.  My children's name, I have four children:  Reese,

24   Jeremy, Aaron and Mika.  And Reese is working for a computer

25   software company, Jeremy and Aaron work at a pizza place and go

1    to school, an Mika is still in school.  And my father-in-law

2    Emanuel Perry lives with us, and he works janitorial at

3    Schofield.

4             THE COURT:  Thank you.

5             A PROSPECTIVE JUROR:  My name is Jermaine Napeahi.  I

6    live in Kalihi.  25 years.  I babysit children, and I have four

7    people living in my house.

8             THE COURT:  Okay.  So educational background?

9             A PROSPECTIVE JUROR:  Graduated high school.

10            THE COURT:  Okay.  When you say you have four people

11   living in your house, what -- do they do?

12            A PROSPECTIVE JUROR:  My cousin and my sister, they

13   both go to school, and my mom works two jobs.

14            THE COURT:  Okay.  Thank you very much.

15            A PROSPECTIVE JUROR:  My name is Joanne Medeiros, and

16   I live in Waimanalo.  I reside 58 -- 58 years.  I am a

17   purchasing agent for Office of Hawaiian Affairs.  I'm a high

18   school graduate.  My husband is Clarence Medeiros, and he's a

19   horseshoer, carpenter.  And we have two children, but they are

20   both his.  One lives in the mainland, she's a nurse, and the

21   other one works for a ukulele factory.  And just him and I.

22            THE COURT:  Okay.  Thank you very much.

23            Okay.  Then we'll go back on the second row down at

24   the end.

25            A PROSPECTIVE JUROR:  Ian K. Tabali.  I live in Aiea,

1    born and raised, that's 26 years.  Occupation, I work warehouse

2    for A Point Distributing, been employed for three years.

3    Graduated high school.  Not married, no children.  I live with

4    my parents, Juan H. Tabali, who is retired, and my mother

5    Allison Tabali, who is a nurse at Kaiser.

6        THE COURT:  And what did your father used to do?

7        A PROSPECTIVE JUROR:  Federal fire department.

8        THE COURT:  Thank you, Mr. Tabali.

9        Mr. Ogata.

10        A PROSPECTIVE JUROR:  My name is Grant Ogata.  I live

11    in Mililani.  I've lived in Hawaii for 28 years.  I'm a server

12    at E&O Trading Company, been working there almost three years.

13    I have a bachelor degrees in anthropology and Hawaiian studies

14    from UH.  I'm not married, no children.  I live with my mom and

15    dad.  My dad's name is Randy, he works at Seafood Connection as

16    a manager.  My mother's name is Brenda, she's an office clerk

17    at the UH Cancer Institute.  And my youngest brother is a

18    student at UH.

19        THE COURT:  Thank you very much.

20        A PROSPECTIVE JUROR:  My name is Robert Bethune.  I

21    have lived -- in the Makiki area currently.  I have lived in

22    Hawaii for 24 years.  I am retired, about 10 years now.

23    Educational background, graduated from high school.

24        THE COURT:  Excuse me, what kind of work did you do

25    when you --

1            A PROSPECTIVE JUROR:  I retired from the surfing

2    industry.  I was with Town & Country Surf, operations inside

3    type.  Didn't do any surfing.  My educational background, I

4    graduated from high school, two years of college.  I'm

5    currently divorced.  I have three children.  My son, the

6    oldest, is an administrator in the LA school system.  I have a

7    lawyer who also lives in the LA area, she's now gone.  Just the

8    ones that cross all the T's and dot all the I's on contracts

9    and deals and such, actuary.  My youngest daughter is a job

10   placement manager in San Francisco, with one child, my

11   grandson.  And --

12           THE COURT:  What did your former wife do?

13           THE PROSPECTIVE JUROR:  My former wife, she was a

14   housewife.  That's what she did, raised my son.  And there's no

15   one currently living with me.  That's it.

16           THE COURT:  Okay.  Thank you very much.

17           A PROSPECTIVE JUROR:  My name is Andrea Mirafuentes.

18   I live in the Honolulu area.  I've been here all my life, 58

19   years.  I work at Longs as a clerk.  High school.  I'm single.

20   I have a son who lives in Vegas, and he is a plumber.

21           THE COURT:  Okay.  Thank you very much.  Anybody else

22   living in your household with you?

23           A PROSPECTIVE JUROR:  No.

24           A PROSPECTIVE JUROR:  My name is Nathan K. Yanagi.  I

25   reside in Honolulu.  I have been residing here for over 40

1    years.  I'm an attorney with Neil T. Nakamura & Associates.

2    I've been there for about four years.  I have a bachelors at

3    UH., a JD from Boston College.  Single, no children.  My

4    parents reside with me, they are both retired.  They're names

5    are Nancy and Garrett Yanagi.

6              THE COURT:  And what kind of work do they do?

7              THE PROSPECTIVE JUROR:  I'm sorry?

8              THE COURT:  What kind of work do they do?

9              A PROSPECTIVE JUROR:  My father was a clinical

10   psychologist.  My mother was a housewife.

11             THE COURT:  Thank you, Mr. Yanagi.

12             A PROSPECTIVE JUROR:  Hi, my name is Dianne

13   Sutherland.  I reside in Kula, Maui.  I was born and raised

14   here, so over 40 years.  I'm a homemaker and a realtor, but not

15   active right now.  Couple years of college and my real estate

16   license.  My spouse's name is Clay Sutherland.  He is an

17   attorney and he is self-employed.  I have three daughters:

18   Lindsay, 18, that's at school in Boulder, and two younger

19   daughters, 16-year-old Anna Maria, and youngest daughter, 13,

20   Anuhea, and they are both in school.

21             THE COURT:  Okay.  And is there anyone else living in

22   your household?

23             THE PROSPECTIVE JUROR:  No.

24             THE COURT:  Thank you.

25             A PROSPECTIVE JUROR:  My name is Korin Okada.  I live

1    in the Honolulu area for 39 years.  I'm employed by the

2    District Court for 17 years.  I have an associates degree from

3    the University of Hawaii.  My husband Brian Okada is a teacher

4    at a high school in the Honolulu District.  I have two

5    children, Casey, who is 9, and Peyton, who is 5.  And we live

6    with our parents.  My dad is a retired carpenter and my mom

7    works part-time at a credit union.

8              THE COURT:  Okay.  Thank you very much.

9              Well, we are moving quite -- right along here.  I'm

10   going to speak -- yes, ma'am.

11             A PROSPECTIVE JUROR:  I was nervous.  My nephew lives

12   with me and he is --

13             THE COURT:  And your name again for the record.

14             A PROSPECTIVE JUROR:  Joanne Medeiros.

15             THE COURT:  And what does he do?

16             THE PROSPECTIVE JUROR:  He is a horseshoer with my

17   husband.

18             THE COURT:  Okay.  Great.  Thank you very much.

19             I'm going to speak with the attorneys outside for a

20   brief moment.  And we'll get right back to the question in just

21   a second.

22                      (Sidebar on the record:)

23             THE COURT:  First of all, are there any challenges for

24   cause at this point?  Challenges for cause?

25             MR. MARKS:  No.

1           MR. YASUNAGA:  No.

2           THE COURT:  Okay.  So do either of you have -- are

3   there any questions you want me to ask?  At this point I'm

4   going to turn it over to you for a little bit.  If there's

5   anything in particular you feel I have missed or want me to

6   cover at this point, you know, I'll consider it, but you can

7   ask some questions too.

8           Mr. Yasunaga, anything in particular you want me to

9   cover?  You need to come up here.

10          MR. YASUNAGA:  Milton Yasunaga.  Mr. Ogata said his

11  father worked for another seafood business.  I guess I was

12  curious what the name of that other company was, if he knows.

13          THE COURT:  You want me to ask that?

14          MR. YASUNAGA:  Yes, that might --

15          THE COURT:  Okay.  And I know there might be some

16  follow-up you might want to do with him, but I'll let you do

17  that.  Anything else --

18          MR. YASUNAGA:  No.

19          THE COURT:  -- you want me to ask?

20          Okay.  Anything from you?

21          MS. ING:  Louise Ing.  No, Your Honor.

22          THE COURT:  So I'm thinking, you know, maybe in the

23  10- to 15-minute range for each of you.  Does that sound about

24  right?

25          MR. MARKS:  Sure.

1          THE COURT:  Okay.  I'll follow up on that point, and

2    then wrap her up.

3                    (End of sidebar conference.)

4          THE COURT:  Mr. Ogata, you mentioned that your father

5    worked for another company other than Seafood Connection.

6    Could you identify what company that is?

7          A PROSPECTIVE JUROR:  Currently I can't remember the

8    name of it.  All I know is that it was in Barbers Point area.

9    I can't remember the name off the top of my head.

10         THE COURT:  Very good.  Thank you.

11         THE PROSPECTIVE JUROR:  You're welcome.

12         THE COURT:  At this point, ladies and gentlemen, I

13   want to let the attorneys ask a few questions as well.  As I

14   indicated, we are moving right along, and I do expect that we

15   will be done with this process in fairly short order.

16         But, Mr. Yasunaga, I will allow you at this time to

17   ask some questions.

18         MR. YASUNAGA:  Thank you, Your Honor.

19         Hi.  Milton Yasunaga.  I'm going to ask some general

20   questions, okay?  Does anybody have any experience in smoking

21   foods?

22              (No response)

23         Does anybody have any experience in eating smoked

24   foods?

25              Almost everybody.

1           And does anybody have any negative impression about

2   smoked foods?

3           (No response)

4           Does anybody barbecue at home?

5           And how many people barbecue on a gas grill?

6           And how many people, if any, barbecue on charcoal

7   hibachi?

8           Oh, some people both.  Okay.

9           Has anybody worked in a supermarket?

10          Kori Elia.  What supermarket?

11          A PROSPECTIVE JUROR:  Times Supermarket.

12          MR. YASUNAGA:  And how long ago was that?

13          A PROSPECTIVE JUROR:  15 years ago.

14          MR. YASUNAGA:  What job did you do or what department?

15          THE PROSPECTIVE JUROR:  Produce and I was a fruit

16  basket maker.

17          MR. YASUNAGA:  Okay.  No fish then.

18          A PROSPECTIVE JUROR:  No fish.

19          MR. YASUNAGA:  Thank you very much.

20          Anybody work in a restaurant that sold fish or seafood

21  besides I think Mr. Ogata mentioned that?

22          Yeah, hi.  Okay.  What --

23          A PROSPECTIVE JUROR:  Year ago.

24          THE COURT:  Hold on.  You need to first, take the

25  microphone, and then if you could identify --

1          A PROSPECTIVE JUROR:  Joanne Medeiros.  I used to work

2    in a restaurant business in Princess Kaiulani just serving

3    regular kind food.

4          MR. YASUNAGA:  Okay.  Princess K.  Thank you.  And, of

5    course, some of it was fish?

6          A PROSPECTIVE JUROR:  Yes.

7          MR. YASUNAGA:  All right.  If you need to pick up the

8    microphone, was any of it -- the fish that was served and

9    cooked, was any of it frozen before it was prepared, like

10   previously frozen?

11         A PROSPECTIVE JUROR:  I never paid attention.

12         MR. YASUNAGA:  Okay.  Has anyone had problems or

13   difficulties getting some kind of government approval that you

14   needed or wanted to get?

15         (No response)

16         And I think Mr. Ogata mentioned that he had this legal

17   matter where it was too much of a hassle to fight, so he

18   just -- he just paid it.  Okay.  Anybody else have any kind of

19   legal problem where they thought that the expenses of kind of

20   fighting for their rights was too expensive or too much

21   trouble?

22         (No response)  Thank you.

23         Does anyone -- has anyone started a business or built

24   up a business?  No?

25         Go ahead, Ms. Medeiros.

1          A PROSPECTIVE JUROR:  My husband has his own business.

2    I help him with that.

3          MR. YASUNAGA:  Oh, the carpentry?

4          THE PROSPECTIVE JUROR:  Well, actually horseshoeing.

5          MR. YASUNAGA:  Horseshoeing.

6          A PROSPECTIVE JUROR:  Yeah, blacksmith.

7          MR. YASUNAGA:  Wow.  And how long has he been doing

8    that?

9          A PROSPECTIVE JUROR:  I guess about 28 years.

10          MR. YASUNAGA:  That's pretty interesting.  For that

11   blacksmithing, what does he do to -- for the heat to soften up

12   the steel?

13          A PROSPECTIVE JUROR:  Nowadays they don't need to do

14   that.  The shoe is already made.

15          MR. YASUNAGA:  I see.  Did he do it before with the

16   4-H or something?

17          A PROSPECTIVE JUROR:  Yeah, yeah.

18          MR. YASUNAGA:  Could you describe what -- what that

19   was to the best that you remember?

20          A PROSPECTIVE JUROR:  Well, nowadays they have -- that

21   are made, they just heat it up and then they put the shoes in.

22   Heat it up, and then when they pull out the shoes, they shape

23   it to the way they want it.

24          MR. YASUNAGA:  How -- what's -- how does it heat up?

25   Is it like wood, charcoal or electricity?

1              A PROSPECTIVE JUROR:  Electric.

2              MR. YASUNAGA:  Electric.  Was his blacksmithing

3    business or horseshoeing business right at your home property?

4              A PROSPECTIVE JUROR:  Yes.

5              MR. YASUNAGA:  And he also does carpentry work?

6              A PROSPECTIVE JUROR:  Yes.  He was first a carpenter.

7              MR. YASUNAGA:  Oh, I see.  Does he still do the

8    horseshoeing?

9              A PROSPECTIVE JUROR:  Oh, yes.

10             MR. YASUNAGA:  Does anyone have any impressions,

11   positive or negative, about experts, professors?

12             Nothing to mention?  Okay.

13             There are going to be some professors testifying here

14   in a couple of different areas.  Does anyone have any knowledge

15   about accounting or -- I know there was somebody who majored in

16   economics, right?

17             Yeah.  Do you ever -- have you ever used it after

18   college?

19             THE COURT:  Hold on just a second.  Name first, then

20   the answer.

21             A PROSPECTIVE JUROR:  Renaye Oyer.  No, I have not.

22             MR. YASUNAGA:  Just like me.

23             Do you remember anything more than supply and demand?

24             A PROSPECTIVE JUROR:  No, I don't.

25             MR. YASUNAGA:  Just like me.

1          Has anyone been involved in any kind of business

2     dispute?

3          No.  Okay.

4          Mr. Dinneen, I see some mention about biotechnician.

5     Could you tell us a little bit about that?

6          A PROSPECTIVE JUROR:  When I first worked for the

7     United States Department --

8          THE COURT:  Hold on just a second, need to get a

9     microphone.

10          A PROSPECTIVE JUROR:  My name is Michael Dinneen.

11     When I first started with United States Department of

12     Agriculture, I worked over in Waimanalo with the fruit fly

13     facility where we raised fruit flies, and that's been shut

14     down, but they still radiate there.  Now I'm working with the

15     canine unit at the airport with the USDA.

16          MR. YASUNAGA:  A lot of interesting stuff happening in

17     Waimanalo, huh?

18          THE PROSPECTIVE JUROR:  Yeah.

19          MR. YASUNAGA:  And that's the fruit fly for papaya?

20          A PROSPECTIVE JUROR:  It's actually for the

21     Mediterranean fruit fly.  We have four different fruit flies

22     here in Hawaii, and they sterilize them and send them to

23     California and release them with the population so that when

24     they breed, no more keikis.

25          MR. YASUNAGA:  Oh, you are not sterilizing the fruit,

1    you are sterilizing the --

2              A PROSPECTIVE JUROR:  The fly, yeah.

3              MR. YASUNAGA:  -- the fly.  And what kind of -- did

4    you have any educational background for that kind of thing?

5    What kind of technology is needed for that?

6              A PROSPECTIVE JUROR:  Actually, when I started I

7    started right off the street working as an insect production

8    worker, and worked my way up.

9              MR. YASUNAGA:  So by experience --

10             THE PROSPECTIVE JUROR:  On-the-job type thing, yes.

11             MR. YASUNAGA:  So, obviously, you don't see anything

12   wrong with experience learned by experience as opposed to some

13   fancy degree or something?

14             THE PROSPECTIVE JUROR:  Sometimes that's the best way

15   to learn.  Sometimes you need both, yeah.

16             MR. YASUNAGA:  Ms. Napeahi, you -- what school did you

17   go to?

18             A PROSPECTIVE JUROR:  Farrington.

19             MR. YASUNAGA:  Okay.  I did too.  That was -- you went

20   a lot more recently than I did.  And what do you like to do for

21   fun?  If you don't mind saying.

22             A PROSPECTIVE JUROR:  A lot of stuffs.

23             MR. YASUNAGA:  I'm sorry?

24             THE PROSPECTIVE JUROR:  A lot of stuffs, like reading

25   -- oh, I play football with my brothers.

1            MR. YASUNAGA:  You play football with your brothers?

2            THE PROSPECTIVE JUROR:  Yeah.

3            MR. YASUNAGA:  Still?

4            A PROSPECTIVE JUROR:  Yep.

5            MR. YASUNAGA:  And you said reading.  What kind of

6    things do you like to read?

7            A PROSPECTIVE JUROR:  Our family is religious, so we

8    read the Bible.  We're like family oriented.

9            MR. YASUNAGA:  Great.  Okay.  Thank you very much.

10           Ms. -- it's Hisatake?  Okay.  You work for the State.

11   Who is the head of that state agency now?

12           A PROSPECTIVE JUROR:  Lillian Kohler.

13           MR. YASUNAGA:  I see.  And you've been there how many

14   years?

15           A PROSPECTIVE JUROR:  Maybe about nine.

16           MR. YASUNAGA:  Who would have been the heads going

17   back?

18           A PROSPECTIVE JUROR:  Susan Chandler, and I think

19   that's it, I started when she was there.

20           MR. YASUNAGA:  Okay.  Thank you.  And what do you like

21   to do for recreation or fun to the extent it's not real

22   private?

23           A PROSPECTIVE JUROR:  I have two kids, so they are in

24   sports, so that's mostly what we do.

25           MR. YASUNAGA:  What kind of sports?

```
 1              A PROSPECTIVE JUROR:  My son plays judo and baseball,
 2    and my daughter plays soccer and basketball.
 3              MR. YASUNAGA:  What's the judo club?
 4              THE PROSPECTIVE JUROR:  Tenri.
 5              MR. YASUNAGA:  Where is that?
 6              A PROSPECTIVE JUROR:  It's on Nuuanu Avenue.
 7              MR. YASUNAGA:  Right across the condos?
 8              THE PROSPECTIVE JUROR:  Yeah.
 9              MR. YASUNAGA:  Yeah, I know that school.  A good
10    school.
11              Mr. Chow -- Mr. Chow is at that Judo school?
12              A PROSPECTIVE JUROR:  Oh, yes.
13              MR. YASUNAGA:  Okay.  Thank you.  And you don't see
14    any problem with serving in this case?
15              A PROSPECTIVE JUROR:  No.
16              MR. YASUNAGA:  Ms. Ohara, I know about three Pat
17    Oharas.
18              A PROSPECTIVE JUROR:  Not related.
19              MR. YASUNAGA:  Not you.  No relation.  Do you think
20    you can sit okay on this case even though it's about patents?
21              A PROSPECTIVE JUROR:  I'll try.
22              MR. YASUNAGA:  You are willing to try.  Thank you.
23    And what do you like to do for enjoyment?
24              A PROSPECTIVE JUROR:  Watch T.V., football.
25              MR. YASUNAGA:  Ah.  So are you going to go to the
```

1  Sugar Bowl?

2            A PROSPECTIVE JUROR:  No.  Too far.

3            MR. YASUNAGA:  Besides UH football, any particular

4  kind of T.V.?

5            A PROSPECTIVE JUROR:  No.

6            MR. YASUNAGA:  No?  Okay.  All right.  Thank you very

7  much.

8            Ms. Oyer, you are planning for this Christmas -- your

9  class is planning for this Christmas program?

10           A PROSPECTIVE JUROR:  Yes.  Yes.

11           MR. YASUNAGA:  And -- okay.  You are at Sacred Hearts?

12           A PROSPECTIVE JUROR:  Yes.  I'm a --

13           MR. YASUNAGA:  How long have you been there?

14           THE PROSPECTIVE JUROR:  14 years.

15           MR. YASUNAGA:  And what do you like to do for

16  recreation?

17           A PROSPECTIVE JUROR:  Spend time with my kids.

18           MR. YASUNAGA:  That is work and recreation.

19           THE PROSPECTIVE JUROR:  Yes.

20           MR. YASUNAGA:  They are only 5 and 2, so they are not

21  really into a lot of --

22           A PROSPECTIVE JUROR:  Just swimming and gymnastics.

23           MR. YASUNAGA:  Where do they do the swimming?

24           A PROSPECTIVE JUROR:  At the Pacific Club.

25           MR. YASUNAGA:  Your husband has a home renovation

1    business remodeling kitchens.

2            A PROSPECTIVE JUROR:  Yes.  Remodeling, yes.

3            MR. YASUNAGA:  Is there a name for that company?

4            A PROSPECTIVE JUROR:  Blue Chip Builders.

5            MR. YASUNAGA:  Okay.  Thank you.  All right.

6            Ms. Elia, what do you do at the subsidiary of HMSA?

7            A PROSPECTIVE JUROR:  I run the call center and

8    administrative services for the subsidiary of HMSA.

9            MR. YASUNAGA:  What is the call center, is that

10   emergency calls?

11           A PROSPECTIVE JUROR:  Health Pass.  HMSA has Health

12   Pass, and then we take appointments for that.  We also work

13   under a contract with HMSA for the Quest population to provide

14   preventative care calls for them and various other kind of

15   internal support services.

16           MR. YASUNAGA:  Okay.  What do you like to do for fun?

17           A PROSPECTIVE JUROR:  Watch T.V., make jewelry.

18           MR. YASUNAGA:  Make jewelry?

19           A PROSPECTIVE JUROR:  Yeah.

20           MR. YASUNAGA:  Not in Waimanalo, huh?

21           A PROSPECTIVE JUROR:  No, not Waimanalo.

22           MR. YASUNAGA:  You're in Mililani.

23           THE PROSPECTIVE JUROR:  Yes.

24           MR. YASUNAGA:  Okay.  Almost.

25           I would like to ask Mr. Tabali couple of questions.

1          8 Point Distributing is the company?

2          THE PROSPECTIVE JUROR:  Yes.

3          MR. YASUNAGA:  What are they a warehouse?

4          A PROSPECTIVE JUROR:  Frozen food, I guess.  Ice

5    cream, pizza.

6          MR. YASUNAGA:  Not fish, though.

7          A PROSPECTIVE JUROR:  Not fish.

8          MR. YASUNAGA:  And they what, they are a distributor

9    to what, supermarkets?

10         A PROSPECTIVE JUROR:  Supermarkets like Times,

11   Safeway, I think Longs, Sam's Club.

12         MR. YASUNAGA:  And you work in the warehouse where

13   cold storage?

14         A PROSPECTIVE JUROR:  Yes.

15         MR. YASUNAGA:  I see.  Where is the cold storage

16   facility located?

17         A PROSPECTIVE JUROR:  I think airport industrial area.

18         MR. YASUNAGA:  Okay.  What do you like to do for fun?

19         A PROSPECTIVE JUROR:  Watch T.V., hang around with my

20   friends.

21         MR. YASUNAGA:  What kind of T.V.?

22         A PROSPECTIVE JUROR:  CSI.

23         MR. YASUNAGA:  Which one?  There is like so many on

24   every channel.

25         A PROSPECTIVE JUROR:  I like the original better.

1          MR. YASUNAGA:  Okay.  And do you see any problem with

2    serving in the case?

3          A PROSPECTIVE JUROR:  No.

4          MR. YASUNAGA:  Do you think you would find it boring

5    because it's not about blood and guts, as His Honor has said?

6          A PROSPECTIVE JUROR:  No.

7          MR. YASUNAGA:  Okay.  Have you invented anything?

8          A PROSPECTIVE JUROR:  No.

9          MR. YASUNAGA:  Not yet.  Okay.  Thank you.

10         And, Mr. Ogata, have you heard -- you've heard about

11    tasteless smoke treated fish?

12         A PROSPECTIVE JUROR:  I don't know if it was directly

13    related to fish per se, but I heard the term.

14         MR. YASUNAGA:  You heard the term.  But you really

15    don't know any other details other than --

16         A PROSPECTIVE JUROR:  I mean I can assume things, but

17    I mean I don't -- I don't know any facts about it.

18         MR. YASUNAGA:  Do you have any impressions or anything

19    more?

20         A PROSPECTIVE JUROR:  Just that would be kind of like

21    smoke you can't taste.

22         MR. YASUNAGA:  Are you -- you told me that you are

23    into this Hawaiian studies and kind of doing things the natural

24    Hawaiian way.  Are you willing to keep an open mind to follow

25    His Honor's instructions?

1              A PROSPECTIVE JUROR:  Oh, yeah.  Yes.  Interesting.

2              MR. YASUNAGA:  Okay.  Great.  Thank you.

3              Mr. Bethune, what do you like to do for fun now?

4              A PROSPECTIVE JUROR:  I play a lot of basketball.

5              MR. YASUNAGA:  Basketball?

6              THE PROSPECTIVE JUROR:  Yes.

7              MR. YASUNAGA:  Where do you play?

8              THE PROSPECTIVE JUROR:  At UH mostly.

9              MR. YASUNAGA:  How do you get on to the courts there?

10             A PROSPECTIVE JUROR:  I get on.

11             MR. YASUNAGA:  You are resourceful in --

12             THE PROSPECTIVE JUROR:  I'm resourceful, yeah.

13             MR. YASUNAGA:  And where did you live before you came

14      to Hawaii?

15             A PROSPECTIVE JUROR:  I came to Hawaii from Los

16      Angeles.

17             MR. YASUNAGA:  I see.  Is the fact that the Ocean Duke

18      is in Los Angeles going to -- and Mr. Kowalski lives in Hawaii,

19      is that going to affect you one way or another?

20             A PROSPECTIVE JUROR:  No, sir.

21             MR. YASUNAGA:  All right.  Thank you very much.

22             Oh, do you do -- you are retired, but do you do any

23      part-time work or volunteer work or anything?

24             A PROSPECTIVE JUROR:  No.  No.  I'm not doing any

25      part-time volunteer work at this time.

1          MR. YASUNAGA:  Okay.  And who do you play basketball
2  with?
3          THE PROSPECTIVE JUROR:  Anybody that comes along.
4  Sometimes some of the guys from the UH team.
5          MR. YASUNAGA:  Wow.
6          THE PROSPECTIVE JUROR:  Yeah.
7          MR. YASUNAGA:  Where did you -- so did you play at
8  kind of a high level before?
9          A PROSPECTIVE JUROR:  Yes, I did.
10         MR. YASUNAGA:  Where was that?
11         THE PROSPECTIVE JUROR:  The East Coast, and then I
12  played at Virginia State for a while.
13         MR. YASUNAGA:  Wow.  Did you grow up on the East
14  Coast?
15         A PROSPECTIVE JUROR:  I did.
16         MR. YASUNAGA:  Where?
17         THE PROSPECTIVE JUROR:  From Pittsburgh, Pennsylvania.
18         MR. YASUNAGA:  Ah.  Okay.  I've been there.
19         A PROSPECTIVE JUROR:  Great town to be from.  Too many
20  steel mills.
21         MR. YASUNAGA:  Not anymore.
22         A PROSPECTIVE JUROR:  Well, not anymore, but when I
23  was there it was, yeah.
24         MR. YASUNAGA:  Okay.  Thank you very much.
25         Ms. Mirafuentes, what do you like to do for fun?

1          A PROSPECTIVE JUROR:  I don't hardly do anything.

2   When I get off -- when I get off from work, I go home and I am

3   pooped.  I don't do anything.

4          MR. YASUNAGA:  But that's fun.

5          A PROSPECTIVE JUROR:  Well, except on my day off,

6   yeah, I go out to Waianae to be with my mom.  She's 99 years

7   old.  I need to spend time with her.

8          MR. YASUNAGA:  Is she living on her then at that age?

9          THE PROSPECTIVE JUROR:  No.  She -- she lives with my

10  brothers.

11          MR. YASUNAGA:  Well, as His Honor mentioned, aside

12  from today, we'll be ending at 1:30, so you'll have -- maybe

13  you'll have some time in the afternoon.  Okay.  Thank you very

14  much.

15          Oh, no problem in sitting through a case about

16  patents.

17          THE PROSPECTIVE JUROR:  I'm sorry?

18          MR. YASUNAGA:  No problem in being on a case about

19  patents?

20          A PROSPECTIVE JUROR:  No.

21          MR. YASUNAGA:  Okay.  All right.  Mr. Yanagi, you are

22  an attorney?

23          A PROSPECTIVE JUROR:  Yes.

24          MR. YASUNAGA:  Do the attorneys here have any reason

25  to be concerned that you as the attorney will, you know, have

1   too much influence on anybody else who is not an attorney on

2   the jury?

3            A PROSPECTIVE JUROR:  No.

4            MR. YASUNAGA:  You are just going to play your part?

5            A PROSPECTIVE JUROR:  Right.

6            MR. YASUNAGA:  And what do you like to do for fun?

7            A PROSPECTIVE JUROR:  Travel when I get the

8   opportunity.

9            MR. YASUNAGA:  Where do you like to travel?

10            THE PROSPECTIVE JUROR:  Europe, Canada.

11            MR. YASUNAGA:  Bad exchange rate now, huh?

12            A PROSPECTIVE JUROR:  Very bad, yes.

13            MR. YASUNAGA:  Where do you like to go in Europe?

14            A PROSPECTIVE JUROR:  Paris.

15            MR. YASUNAGA:  You are like Mike Tom.  Do you know

16   Mike Tom?

17            A PROSPECTIVE JUROR:  No.

18            MR. YASUNAGA:  He's another attorney who has an

19   apartment in Paris because he goes so much.

20            THE PROSPECTIVE JUROR:  I think I heard his name, but

21   I'm not familiar with him.

22            MR. YASUNAGA:  Okay.  Thank you.

23            Ms. Sutherland, what do you like to do for fun?

24            A PROSPECTIVE JUROR:  Ride and train horses.

25            MR. YASUNAGA:  You ought to get together with

1    Ms. Medeiros.

2            A PROSPECTIVE JUROR:  Different islands, though.

3            MR. YASUNAGA:  I guess so.  And do you have a big plot

4    of land out there.

5            THE PROSPECTIVE JUROR:  We have a couple acres.  We

6    have a pony at home, but we keep horses at other places, at

7    barns.

8            MR. YASUNAGA:  Oh, Kula.  Do you live in Kula?

9            A PROSPECTIVE JUROR:  Um-hmm, yes.

10           MR. YASUNAGA:  Oh, nice place.

11           A PROSPECTIVE JUROR:  Yeah.

12           MR. YASUNAGA:  All right.  Do you have any

13   preconceived notions about a patent case or patents?

14           THE PROSPECTIVE JUROR:  No, not at all.

15           MR. YASUNAGA:  Do you think you have -- well, His

16   Honor explained basically about patents, but do you have some

17   basic understanding about what a patent is?

18           THE PROSPECTIVE JUROR:  Yes, I do.

19           MR. YASUNAGA:  It's to protect people's

20   inventions that they worked hard --

21           A PROSPECTIVE JUROR: Uh-hm, yeah.

22           MR. YASUNAGA:  Thank you very much.

23           And, Ms. Okada, your name looks like it's spelled

24   Korin, but it's pronounced Corrine (phonetic).

25           A PROSPECTIVE JUROR:  Yes.

1           MR. YASUNAGA:  I see.  That must throw people off all

2    the time.

3           A PROSPECTIVE JUROR:  Yes.

4           MR. YASUNAGA:  And what do you like to do for fun?

5           A PROSPECTIVE JUROR:  Take my kids around to their

6    sports and support my husband with his coaching.

7           MR. YASUNAGA:  What does he coach?

8           A PROSPECTIVE JUROR:  Football.  High school football.

9           MR. YASUNAGA:  For which high school?

10          A PROSPECTIVE JUROR:  Farrington High School.

11          MR. YASUNAGA:  Oh, another Farrington.  And your kids

12   are in what kind of activities?

13          A PROSPECTIVE JUROR:  They're into basketball, karate,

14   soccer, and my son coming up will be T-ball.

15          MR. YASUNAGA:  What does your husband teach in high

16   school?

17          A PROSPECTIVE JUROR:  He teaches math at this time.

18          MR. YASUNAGA:  Did he ever teach sciences, chemistry,

19   biology?

20          A PROSPECTIVE JUROR:  No, he didn't.

21          MR. YASUNAGA:  All right.  Well, Your Honor, I'm --

22   thank you very much.  I'm sorry to hear so many people their

23   fun activities is taking their kids around, but I guess that's

24   how it is.

25          MR. MARKS:  Your Honor, if it please the Court, may I

1    ask that my colleague, Ms. Ing, conduct the voir dire?

2                THE COURT:  Yes, absolutely.

3                MR. MARKS:  Thank you, Your Honor.

4                MS. ING:  Thank you, Your Honor.

5                Good morning.  My name is Louise Ing, and I'm

6    representing Ocean Duke Corporation.  I'm what you call the

7    local attorney.  I'm born and raised here and practice here in

8    Hawaii.  Because Ocean Duke Corporation is in LA but based in

9    Los Angeles, they also have their California attorneys here, so

10   Mr. Marks and Mr. Neufeld are from California.

11               I'm going to, like Milton, ask some general questions

12   and then also some specific questions.  And, you know, we're

13   really not trying to be niele or nosy or pry into your personal

14   life, as the judge said.  What we have to do is, there are

15   going to be eight of you who are going to be ending up sitting

16   here.  All of you are on a really important mission right now,

17   which is to help us figure out who the eight are going to be,

18   kind of like expanded version of American Idol or something.

19   And then the eight of you are going to go to patent school with

20   us, kind of.  And after you learn something about patents, you

21   are going to -- it will be your job to make a just and fair

22   decision about this dispute.

23               But I thank all of you, even though you really had no

24   choice to be here today, and answer all of our questions.

25               First of all, I know that we have heard of some people

1  have relatives who are in a family business.  You'll hear that

2  Ocean Duke is a family business started by Mr. Lin, who came

3  from Taiwan, and his family has built the business.

4       But has anybody -- I know a few of you -- has anybody

5  else been involved in a family business?  Okay.

6       A PROSPECTIVE JUROR:  I was never part of the

7  business, but my grandparents.

8       THE COURT:  We need to get a name first.

9       A PROSPECTIVE JUROR:  Oh, I'm sorry.  Jill Hisatake.

10  I was never part of the business, but my grandparents owned the

11  restaurant, owned a restaurant.

12       MS. ING:  Ah, which restaurant was that?

13       A PROSPECTIVE JUROR:  Flamingo.

14       MS. ING:  Oh, Flamingo.

15       THE PROSPECTIVE JUROR:  So my mom runs it now.

16       MS. ING:  Okay.  So it is still in the family?

17       THE PROSPECTIVE JUROR:  Yes.

18       MS. ING:  They make the banana pie, right?

19       A PROSPECTIVE JUROR:  Yes.

20       MS. ING.  That's ono.  And so did you ever work in the

21  business when you were growing up?

22       THE PROSPECTIVE JUROR:  Just in the office during the

23  summers, helping out --

24       MS. ING:  Right.

25       THE PROSPECTIVE JUROR:  -- when I was in high school

1    and college.

2              MS. ING:  Um-hmm, because the family is always brought

3    in to work in the business, and then you decided to do

4    something else on your own after that?

5              THE PROSPECTIVE JUROR:  Yeah, I went to school, and

6    now I'm a personnel clerk.

7              MS. ING:  Um-hmm.  Well, I hope that -- that's one of

8    the old-time restaurants, so I hope it stays around for a

9    while.

10             Anybody else?  I know that Ms. Medeiros, you -- you

11   have worked -- you are involved in a family business helping

12   your husband.

13             THE PROSPECTIVE JUROR:  Yes.

14             MS. ING:  Maybe you can state your name and --

15             THE PROSPECTIVE JUROR:  Joanne Medeiros.

16             MS. ING:  All right.  And what kind of work do you

17   help him with?

18             THE PROSPECTIVE JUROR:  I order their supplies.  I

19   don't do the actual work.  He does that.

20             MS. ING:  So is that a business that he started?

21             THE PROSPECTIVE JUROR:  Actually my father did.

22             MS. ING:  Oh.  And so he was the lucky one to take

23   over for the family?

24             THE PROSPECTIVE JUROR:  Actually all my brothers do

25   this also.

1          MS. ING:  Oh, I see.  So how many of your family is

2    involved in the business?

3          THE PROSPECTIVE JUROR:  Well, I have six brothers that

4    do it, that are horseshoers, but they are not all here.  They

5    are spread around the mainland.

6          MS. ING:  Doing horseshoe work?

7          THE PROSPECTIVE JUROR:  Yes, blacksmith.

8          MS. ING:  And how have you felt about being involved

9    in the family business?

10          THE PROSPECTIVE JUROR:  We have always been there.  We

11    have always stood up for my father.  I did it for him.

12          MS. ING:  Yeah.  And it sounds like, you know, it's

13    always a big issue is whether the business is going to continue

14    with the next generation.  It sounds like you did get your

15    son --

16          THE PROSPECTIVE JUROR:  My nephew.

17          MS. ING:  Your nephew.  Very good.  At least it will

18    go on for another generation.

19          THE PROSPECTIVE JUROR:  Yeah.

20          MS. ING:  As long as there's a horses.

21          THE PROSPECTIVE JUROR:  Yeah.  And there's a lot here.

22          MS. ING:  There are a lot, yeah.

23          Anybody else involved in a family business or was

24    involved?

25          As I mentioned, Mr. Duke Lin came from -- moved his

1    family from Taiwan to the U.S. to start another life here and

2    start a business, but has anybody either moved here from

3    another country or had someone in their immediate family who

4    has come from another country?

5            Mr. Dinneen.

6            THE PROSPECTIVE JUROR:  Hi, Michael Dinneen.  Yes, my

7    wife is from the Philippines.

8            MS. ING:  Okay.  And how long has she been in the

9    U.S.?

10           THE PROSPECTIVE JUROR:  Be 10 years.

11           MS. ING:  Did you know her when she moved over here?

12           THE PROSPECTIVE JUROR:  No, I met her in the

13    Philippines.

14           MS. ING:  Uh-huh.  How was her experience of adjusting

15    to life in the U.S.?

16           THE PROSPECTIVE JUROR:  We had some family issues that

17    we had to work out because I had three boys from my previous

18    marriage and a blended family type thing.  So we had some

19    issues there, but we were able to work through it.

20           MS. ING:  Um-hmm.  Well, then it sounds like maybe the

21    issues of blending into a family were bigger than being a

22    person in a new land then, or dealing with both?

23           THE PROSPECTIVE JUROR:  Yeah, well, both.  In Hawaii

24    there's a big Filipino population, so it's not like being

25    isolated more in the mainland.

1          MS. ING:  So does she -- how do you think she's been
2   able to adjust to living here after having spent her life in
3   the Philippines?
4          THE PROSPECTIVE JUROR:  She's adjusted real well.  She
5   really likes it.
6          MS. ING:  That's great.
7          Okay.  Anybody else with family, immediate family who
8   came from another country?
9          (No response)
10          Does anyone here feel that food that's been processed
11   in Asia is not as high quality as food that's processed in the
12   U.S.?
13          (No response)
14          That reminds me, speaking of food, Mr. Ogata, you work
15   at E&O Trading, where corn fritters is my favorite there, but
16   do you work with any kind of seafood there?  Obviously serve
17   seafood.
18          THE PROSPECTIVE JUROR:  Well, by working, do you mean
19   do I prepare any of it or --
20          MS. ING:  Well, I guess you serve the seafood, right?
21          THE PROSPECTIVE JUROR:  Yeah, all I do is carry the
22   plate out.
23          MS. ING:  Are you familiar with whether the seafood
24   that you serve at E&O is -- has gone through any kind of a
25   processing or treatment process?

1                THE PROSPECTIVE JUROR:  All -- all I know is whether

2        it's fresh or frozen.

3                MS. ING:  And you work with -- you serve the frozen

4        seafood too at E&O?

5                THE PROSPECTIVE JUROR:  Yes.  Certain fish.

6                MS. ING:  Um-hmm.  Do you know if any of it comes from

7        Asia?

8                THE PROSPECTIVE JUROR:  Let's see.  I know we have got

9        fish from New Zealand, but not -- not necessarily Asia per se.

10               MS. ING:  Okay.  Now, I know some people have very

11       sensitive palates and can taste the difference, but -- you get

12       to taste the food at E&O when you serve it, right?

13               THE PROSPECTIVE JUROR:  Um-hmm.

14               MS. ING:  Can you tell the difference between like a

15       fresh and a frozen fish product?

16               THE PROSPECTIVE JUROR:  Well, with ahi, I can, but

17       with certain fishes, it's always pretty much going to be

18       frozen, like cod and things like that.  So I never had it

19       fresh.  So only with ahi I would say, and which is always

20       pretty much served fresh.

21               MS. ING:  Yeah, and at -- here we're lucky because we

22       often do get fresh ahi that's -- do you serve frozen ahi or I

23       guess defrosted ahi at -- do you know?

24               THE PROSPECTIVE JUROR:  I don't know.

25               THE PROSPECTIVE JUROR:  May I get a drink of water,

1    please?

2              THE COURT:  Oh, sure.  We'll get you something.

3              MS. ING:  Shall I wait, Your Honor?

4              THE COURT:  Go ahead.

5              MS. ING:  How about does anybody like to cook or bake?

6    Do we have any bakers here?

7              Okay.  And, Mr. Dinneen, what do you like to cook or

8    bake?

9              THE PROSPECTIVE JUROR:  At the time of year --

10             THE COURT:  Excuse me, you need to get the microphone.

11             A PROSPECTIVE JUROR:  Usually around this time of year

12   I like to make mango bread.

13             MS. ING:  Oh, mango bread.

14             THE PROSPECTIVE JUROR:  Um-hmm.

15             MS. ING:  Mangos aren't in season anymore?

16             THE PROSPECTIVE JUROR:  You put them in a blender,

17   then you throw them in the freezer and --

18             MS. ING:  So you give them away as gifts?

19             THE PROSPECTIVE JUROR:  Correct.

20             MS. ING:  Okay.  Because you are going to hear about

21   different temperature ranges, temperatures in this case, and

22   how things -- how certain gas or smoke is processed at

23   different temperatures.  So you are very much aware then, I am

24   sure, that the temperature at which you bake something is

25   important?

1          THE PROSPECTIVE JUROR:  Yes.

2          MS. ING:  And you've probably, like me, run into

3     burning things every so often?

4          THE PROSPECTIVE JUROR:  Unfortunately, yes.

5          MS. ING:  Okay.  Could you pass that back to

6     Ms. Sutherland.

7          Ms. Sutherland, what kind of cooking or baking do you

8     like to do?

9          THE PROSPECTIVE JUROR:  Dianne Sutherland.  Anything,

10    you know, cakes, brownies, cookies.  Yeah.

11         MS. ING:  So -- and so you are aware too that baking

12    something at 350 is going to be different than baking something

13    at 400?

14         THE PROSPECTIVE JUROR:  Oh, yeah.  Yeah.

15         MS. ING:  And we know what the difference is, having

16    baked, right?

17         THE PROSPECTIVE JUROR:  Uh-hm.

18         MS. ING:  Okay.  Now, one of the things that we're

19    going to want to prove in this case is that Mr. Kowalski's

20    patent is invalid, and we're going to ask you to give us a

21    verdict that says it's invalid and not legally enforceable,

22    even though the patent office issued him a patent.  Issued

23    Mr. Kowalski a patent.

24         Does anyone feel that just because Ocean Duke's been

25    sued and has been accused of infringing on Mr. Kowalski's

1  patent that Ocean Duke must have done something wrong?

2        Good.  I'm glad to see that people will be able to

3  keep an open mind on that.

4        Does anyone feel that if someone got a patent from the

5  federal government a jury has no business overturning it?

6        Thank you.

7        Does anyone feel that because this case has gotten

8  this far that we're here picking a jury today that Ocean Duke

9  must have done something wrong?

10        Thank you.

11        You may hear from plaintiffs that Ocean Duke has made

12  a lot of money over the life of its business.  Does anyone feel

13  that the more money a company makes the more money they should

14  pay if they are found liable?

15        Thank you.

16        Well, I guess this comes to the Miss America part

17  where I get to ask each of you questions too, like Mr. Yasunaga

18  did.  My questions, think about this, is going to be what three

19  terms would you use to describe yourself?

20        And we luckily Ms. Elia gets to start.

21        THE PROSPECTIVE JUROR:  Three things.

22        MS. ING:  Three words, three things to describe

23  yourself.

24        THE PROSPECTIVE JUROR:  Hard working, nice, fair.

25        MS. ING:  Thank you.  You have the hard one because

1  you had to think of something to say first.

2          Ms. Oyer?

3          THE PROSPECTIVE JUROR:  Trustworthy, compassionate and

4  shy.

5          MS. ING:  Thank you.

6          Ms. Ohara.

7          THE PROSPECTIVE JUROR:  Honest -- I cannot --

8          MS. ING:  I know, you know what, if you are nervous,

9  we're nervous too, and here we are putting you on the spot.

10  I'm sure, if you are like me, you will probably think about all

11  of these things you could have said later on, but, you know...

12          THE PROSPECTIVE JUROR:  Hard working.  And happy.

13          MS. ING:  Sorry?

14          THE PROSPECTIVE JUROR:  Happy.

15          MS. ING:  Happy.  Thank you.

16          THE PROSPECTIVE JUROR:  I guess quiet, honest, and

17  hard working.

18          MS. ING:  Thank you.

19          THE PROSPECTIVE JUROR:  I would say loyal, optimistic,

20  generous.

21          A PROSPECTIVE JUROR:  Nervous, shy, and quiet.

22          MS. ING:  I forgot.  You better state your name.

23          A PROSPECTIVE JUROR:  Joanne Medeiros.  I'm hard

24  working, honest, and fair.

25          MS. ING:  Thank you.

1          Let's see, Mr. Tabali.

2          A PROSPECTIVE JUROR:  Ian Tabali.  Hard working,

3    quiet, honest.

4          MS. ING:  Thank you.

5          Mr. Ogata.

6          THE PROSPECTIVE JUROR:  Trustworthy, procrastinator,

7    and pretty open minded, I would like to think.

8          MS. ING:  Mr. Ogata is the honest one about being a

9    procrastinator.  I am too, I confess.

10          THE PROSPECTIVE JUROR:  Robert Bethune.  Honest, loyal

11    and discerning.

12          MS. ING:  Thank you.

13          Ms. Mirafuentes.

14          THE PROSPECTIVE JUROR:  I'm shy, I'm patient, and I

15    got a big mouth.

16          MS. ING:  Mr. Yanagi.

17          THE PROSPECTIVE JUROR:  Introverted, average,

18    studious.

19          MS. ING:  Ms. Sutherland?

20          THE PROSPECTIVE JUROR:  Confession time.  Resilient,

21    supportive, and sensitive.

22          THE PROSPECTIVE JUROR:  Korin Okada.  Honest, hard

23    working, and supportive.

24          MS. ING:  Thank you very much for sharing.  I know

25    that really put you on the spot.  Good to see we have everybody

1    is hard working here, because I think we're going to be putting

2    you to work, but thank you very much.

3            Let me see if I have anything else.

4            Just let me check with Mr. Marks.

5            Thank you very much.

6    THE COURT:  So, ladies and gentlemen, we really are

7    just about at the end of the process.  What I'm going to do at

8    this point, I want to keep you in the courtroom as I talk with

9    the lawyers for a moment.  What we'll do is pare it down to the

10   eight jurors, and at that conclusion, then we'll take a break,

11   I'll excuse the folks who are not in the jury, and continue on

12   with some preliminary instructions at that particular time.

13           So I'm going to meet with the lawyers outside to

14   handle any of the last challenges and peremptories.

15                   (Sidebar on the record:)

16   THE COURT:  So, first of all, let me ask you this to

17   start with -- you can stay out here if you want.  Okay.  First

18   of all, any challenges for cause at all?

19   MR. MARKS:  No.

20   THE COURT:  Okay.  So the way this will work is we'll

21   just alternate on the peremptories.  You'll have the first

22   choice and exercise your first peremptory, or can waive it.  Of

23   course, if you waive it you are essentially knocking off No.

24   14.  Then we'll just alternate.  Then we'll go to the defense,

25   then back to you for your second, then to the defense, back to

1    you for your third.

2              MR. YASUNAGA:  With my challenges, can I -- Milton

3    Yasunaga.  With my challenges, does it make any sense to knock

4    anybody besides the first eight?

5              THE COURT:  Yeah, I mean because it will be the

6    remaining eight.

7              MR. YASUNAGA:  I see.

8              THE COURT:  So anybody from the 14.  In other words,

9    this is what happens.  If each of you uses your three

10   peremptories, it will be the eight remaining people.  If it's

11   waived, of course, then it will be, you know, the first eight.

12             So you're first.

13             MR. YASUNAGA:  Okay.  Milton Yasunaga.  Plaintiffs

14   strike Nathan Yanagi.

15             MR. MARKS:  Paul Marks.  Defendant strike Juror No. 5,

16   Mr. Dinneen.

17             THE COURT:  Okay.  Back to plaintiff, two.

18             MR. YASUNAGA:  This will be pass.

19             THE COURT:  That means it's going to be No. 14 then,

20   you understand that?

21             MR. YASUNAGA:  Yes.

22             THE COURT:  Then your number 2.

23             MR. MARKS:  Paul Marks speaking.  The defense will

24   strike Juror No. 10, Mr. Bethune.

25             THE COURT:  You have one more.

```
1              MR. YASUNAGA:  May I have a second?

2              THE COURT:  Sure.

3              MR. YASUNAGA:  Milton Yasunaga for plaintiffs.  Juror

4    No. 13, Sutherland.

5              THE COURT:  And your last.

6              MR. MARKS:  So if I do nothing that means juror number

7    --

8              THE COURT:  Mirafuentes.

9              MR. MARKS:  -- Mirafuentes is the -- okay.

10             Paul Marks speaking for the defense.  We strike Juror

11   No. 9, Mr. Ogata.

12             THE COURT:  So if I've got this correctly, the jurors

13   are Elia, Oyer, Ohara, Hisatake, Napeahi, Medeiros, Tabali, and

14   Mirafuentes, correct?

15             MR. MARKS:  Yes.

16             MR. YASUNAGA:  Yes.

17             THE COURT:  Is that right, Mr. Yasunaga?

18             MR. YASUNAGA:  Yes.

19             THE COURT:  Come up here.

20             MR. YASUNAGA:  I'm sorry.  Yes.  Milton Yasunaga, yes.

21             THE COURT:  Okay.  So are there any objections to the

22   way in which this jury was selected?

23             MR. YASUNAGA:  No.

24             MR. MARKS:  None from the defense side.

25             MR. YASUNAGA:  Not from the plaintiffs.
```

1              THE COURT:  Okay.  What I'm going to do now then is

2     excuse everyone else, get these folks sworn in, and then we'll

3     take a break.  I'll let you put any objections you want on the

4     record during the break.  I'll bring them back, we'll do

5     preliminary instructions, and then we're going to break for

6     lunch, and then do opening statements after lunch.  Is that all

7     right with everyone?

8              MR. MARKS:  Of course, Your Honor.

9              MR. YASUNAGA:  Yes.

10             MS. ING:  That's fine, Your Honor.

11             THE COURT:  Okay?  Okay.  Good.

12                  (End of sidebar conference.)

13             THE COURT:  Let me thank all of you for -- for your

14    patience and attention.  We are done with the process at this

15    time.  I'm going to announce the -- the jurors who will serve

16    in this case, and after I'm done, all of you that I did not

17    call and everybody in the gallery, you will be excused, and

18    then we'll proceed further.

19             So the jurors in this case are Ms. Elia, Ms. Oyer, Ms.

20    Ohara, Ms. Hisatake, Ms. Napeahi, Ms. Medeiros, Mr. Tabali, and

21    Ms. Mirafuentes.

22             Okay.  Again, I thank all of you for coming down this

23    morning and for participating in this process.  If I did not

24    call your name, you are all excused at this time.

25             For those I did call, if you would stay right in your

1    seats for just a moment, and then we'll make some adjustments

2    here and take a break in a few minutes.

3            So the rest of you are excused.  Thank you all very

4    much.

5                    (Court and Clerk conferring.)

6            THE COURT:  My courtroom manager is going to readjust

7    the seating here a little bit.

8            We have you all on that side because when the

9    witnesses testify, it will be over here, and the lawyers will

10    be asking questions from right over there.  So this is the best

11    way to get your sight line to witnesses.  So for the course of

12    the trial, when you come into the courtroom, if you could take

13    your seats there, I would appreciate it.

14            So what I'm going to do now is have you sworn in, and

15    then I'll just tell you a few things after that occurs.

16            THE CLERK:  Please rise and raise your right hand.

17            (The jury was dually sworn and impanelled.)

18            THE COURT:  Okay.  Have a seat.

19            So, ladies and gentlemen, at this time we're going to

20    take a break, take about a 10-minute -- or actually -- yeah,

21    about a 10-minute recess.  And my courtroom manager will show

22    you where the jury room is.

23            I do have a number of preliminary instructions that I

24    need to give you, some general and some specific.  I'll wait

25    until you come back to give you those instructions.

1              Just let me tell you a couple of things right now.

2     The first is, please do not discuss this case with anyone at

3     any time.  This really does go against the human nature, but it

4     really is important, especially -- well, at any time actually

5     until the case is presented to you for deliberations.

6              Also keep an open mind until you hear all of the

7     evidence until this case is fully presented to you.

8              So you want to have them go to the jury room at this

9     point?

10             So I'll have you go to the jury room.  Then we'll

11    going to get some juror identification badges issued to you.

12    And then in about 10 minutes or so, we'll come back, I'll give

13    you a number of preliminary instructions, and after that is

14    finished, then we'll break for lunch, the opening statements

15    will take place right after lunch.

16             So we'll take a 10-minute recess now, and then -- then

17    I'll give you the preliminary instructions.

18             THE CLERK:  All rise for the jury.

19             THE COURT:  And leave whatever you want on the seat

20    there too, if you wish.

21             (At 11:16 a.m., the jury was excused and the following

22    proceedings were held:)

23             THE COURT:  The record will reflect we're out the

24    presence of the jury.

25             Prior to the start of trial we did consider some

1    preliminary instructions that have been requested.  And I know

2    that there may be some objections that one or the two of you

3    would like to place on the record before these instructions are

4    given.

5         So, Mr. Yasunaga, I will allow you to do that at this

6    time.  And I gather your objections are in reference to

7    invalidity, I think.  Whatever you would like to --

8         MR. YASUNAGA:  I'll leave it to Ms. Lee.

9         MS. LEE:  I am just going to state, put on the record

10   a few objections.

11        THE COURT:  Yes.

12        MS. LEE:  First, plaintiffs object to the deletion of

13   the second paragraph of Plaintiffs Proposed Jury Instruction

14   No. 7.  Paragraph was taken from the ABA's antitrust pattern

15   rules and explains the underlying policy for why patents are

16   granted to inventors, which we feel is important for the jury

17   to understand.

18        Plaintiffs object to Ocean Duke's Proposed Jury

19   Instruction 1, which adds language to Plaintiffs Proposed Jury

20   Instruction No. 8 on grounds stated in objections to defendants

21   proposed set of jury instructions and for the reasons stated in

22   Plaintiffs Motion in Limine number --

23        THE COURT:  You may want to --

24        MS. LEE:  Slow down?

25        THE COURT:  -- slow down so we can get it all.

1          MS. LEE:  The objection to Ocean Duke's Instruction

2     No. 1 is the same stated in our objections to defendant's

3     proposed set of jury instructions and also the objections

4     stated in the Motions in Limine Nos. 2 and 8.

5          And we object to Ocean Duke's Proposed Jury

6     Instruction No. 2, which adds language to Plaintiffs' Proposed

7     Instruction 9, for the same reasons stated in our objections to

8     defendants' set of jury instructions and also Motions in Limine

9     2 and No. 8.

10         Same, plaintiffs object to the reference to

11    "invalidity" in the language, which I believe is going to be

12    taken from Ocean Duke's Proposed Jury Instruction No. 9 that

13    will be given after the Court's claim instruction.  And those

14    objections are also the same as stated in our objections to

15    their set of instructions, and also our Motions in Limine 2 and

16    8.

17         And, finally, we object to the language from Ocean

18    Duke's Instruction No. 6, which will be added to paragraph 5 of

19    Plaintiffs' Proposed Instruction 15 for the reasons stated in

20    our objections and also Motions in Limine 2 and 8.

21         THE COURT:  Okay.  Thank you.

22         Mr. Marks, do you have any objections to any of the

23    preliminary instructions?

24         MR. MARKS:  No, I don't.  Thank you, Your Honor.

25         THE COURT:  So let's take a short recess, we'll come

1    back, I'll give them the instructions.  I'm going to give them

2    a copy of the patent, the Kowalski patent, and the claim

3    description language.  I assume that's all right with each of

4    you.

5            MR. YASUNAGA:  Yes, fine.

6            MR. MARKS:  It is, Your Honor.

7            Just one other procedural issue that we addressed

8    yesterday.

9            THE COURT:  What's that?

10           MR. MARKS:  The witness exclusion order, which we

11   believe should apply to all witnesses, Mr. Yasunaga believes

12   that his expert witness --

13           THE COURT:  Okay.  I'll tell you what, that's

14   something we can take up after we're done with the jury before

15   lunch.  Okay?

16           MR. MARKS:  Okay.  Thank you.

17           THE COURT:  So we'll take a short recess at this time.

18               (Recess at 11:19 a.m. until 11:35 a.m.)

19           THE COURT:  Members of the jury, now that you've been

20   selected as jurors in this case, I am going to give you some

21   preliminary instructions to guide you as you listen to the

22   evidence.  At the end of trial, however, I will be giving you

23   more detailed instructions.  Those instructions will control

24   your deliberations.

25           Generally speaking, my responsibility is to conduct

1  the trial of this case in an orderly, fair and efficient

2  manner, to rule upon questions of law arising in the course of

3  trial and to instruct you on the law which applies to this

4  case.  It is your duty to accept the law as the Court states it

5  to you, notwithstanding what you feel the law is or should be.

6       You will be the judges of the facts in this case.  You

7  alone must decide upon the believability of the evidence, its

8  weight and value.

9       In considering the testimony of any witness, you must

10  -- you may, excuse me, take into account into consideration the

11  appearance, attitude, memory and behavior of the witness; the

12  interest of the witness in the outcome of the case; the

13  relation of the witness to any of the parties to the suit; the

14  inclination of the witness to speak truthfully or not; the

15  probability or improbability of the statements of the witness.

16  Thus, you may give the testimony of any witness just such

17  weight and value as you believe the testimony of such witness

18  is entitled to receive.

19       Normally a witness is not permitted to give an

20  opinion.  A witness can testify as to facts as to what

21  happened.  Where, however, a witness has some specialized

22  knowledge concerning a particular subject matter which might

23  assist the Court and the jury to understand a complicated or

24  technical field, that witness is called an expert witness, and

25  that witness is permitted to give an opinion.

1          There is going to be some expert testimony in this

2    case.  You should understand that it is permissible testimony.

3    You should endeavor to evaluate the testimony of an expert

4    witness just as you would evaluate the testimony of any other

5    witness under the factors I've already mentioned.

6    Additionally, in the case of an expert you should evaluate

7    the -- evaluate the expert's training, qualifications and

8    knowledge of the subject matter concerning which the expert is

9    testimony -- is testifying.

10         Furthermore, you should realize that the testimony of

11   the expert is no more controlling than that of any other

12   witness because -- because it is your judgment which is the

13   final answer insofar as these questions are concerned.

14         Now, as judges of the facts it is your duty to

15   determine the facts and to determine them from the evidence and

16   reasonable inferences arising from such evidence.  And in doing

17   so, you must not indulge in guesswork or speculation.  The

18   evidence which you are to consider shall consist of testimony

19   of witnesses and the exhibits that are received into evidence.

20         "Witness" means anyone who testifies here in Court,

21   but it also means someone who testifies by way of a deposition.

22   And a deposition is testimony that is taken of a witness before

23   the trial began, that witness testifies under oath, and if the

24   witness is not available to testify at trial, for some other

25   reason can't be here, the deposition testimony can be used just

1    as though the witness were here in Court to test -- testify.

2          Now, the following things are not evidence and you

3    must not consider them as evidence when you decide the facts of

4    this case.  One, statements and arguments of the attorneys are

5    not evidence.  Any questions that attorneys ask and any

6    objections that the attorneys make, they are not evidence as

7    well.  And testimony that I instruct you to disregard also is

8    not evidence for you to consider.

9          And then, furthermore, anything you may see or hear

10   when Court is not in session, even if what you see or hear is

11   done by or said by one of the parties or one of the witnesses.

12   So the evidence will only -- is that which is presented here in

13   Court, either through exhibits or by any of the witnesses.

14   What the attorneys say is not evidence.  It may help you to

15   understand the evidence, but it is not evidence in the case.

16   Anything that happens outside of this courtroom is not

17   evidence.

18         There are two kinds of evidence.  We have direct

19   evidence and we have circumstantial evidence.

20         Direct evidence is testimony by a witness about what

21   the witness personally saw or heard or did.

22         Circumstantial evidence is indirect evidence.  That

23   is, it is proof of one or more facts from which one can find or

24   infer another fact.  You may consider both direct and

25   circumstantial evidence in deciding the case.  The law permits

1  you to give equal weight to both, but it is for you to decide

2  how much weight to give any evidence that is presented in this

3  court.

4         Some evidence may be admitted for a limited purpose.

5  If I instruct you that an item of evidence has been admitted

6  for a limited purpose, you must consider it only for that

7  particular purpose that I identify.  And for no other.

8         During the course of the trial you will hear

9  objections that are made by the attorneys.  It is their duty to

10  make objections when they think it should be done.  This does

11  help the Court to decide this case concerning the

12  appropriate -- on the appropriate issues and to keep out

13  matters that are not relevant.  Please do not hold it against

14  the attorneys or feel that they are trying to keep something

15  from you if they do make an objection from time to time.

16         During the trial I will be asked to rule on the

17  objections and motions that are made by the attorneys.  You

18  should not infer from any of my rulings that I have any

19  particular opinion on the merits of the case favoring one side

20  or the other.

21         If I should sustain an objection to a question and not

22  allow it to be answered, you should not speculate on what the

23  answer might be, nor draw inference from the question itself.

24         You must not take anything I say or do during the

25  trial as indicating what your verdict should be in this case.

1    Please do not be influenced at all by any action or any

2    note-taking or anything on my part with respect to the

3    consideration of the evidence in this case.

4           At times it may be necessary to take up certain

5    matters outside of your presence.  By law certain technical

6    matters and certain legal issues have to be considered out of

7    the presence of the jury.

8           If trial does not commence promptly at the beginning

9    of a day or after a recess that I have identified, it certainly

10    may be that we are taking up some matter that hopefully will

11    expedite the course of the -- of the trial and get the case

12    heard on the appropriate issues.

13           And please do not hold it against anybody if we do

14    have to take up certain matters out of your presence in a bench

15    conference or sidebar conference that I will hold outside.

16           Until the case is submitted to you for deliberation,

17    you should not discuss this case even among yourselves.  Please

18    do not discuss this case with anyone, friends, family, or

19    household members.  Do not allow anyone to discuss this case

20    with you.

21           Please do not talk to the parties.  Please do not talk

22    to the attorneys or any of the witnesses in this case.  If

23    anyone does approach you to talk with you about anything in

24    connection with this case, please let me know immediately.

25           This is very important, please do not make any

1    investigation concerning any issue in this case.  Don't read
2    any media account, if there is any, about this case.  Do not
3    access the internet about any issue in this case.  Don't make
4    any investigation.  Don't do any research, consult any sources,
5    attempt to try to figure out anything outside of the courtroom
6    in this case.
7             We're going to provide you all you need to know to
8    decide this case here in this courtroom.  It would be improper
9    for you to do any outside investigation or outside research.
10   Don't look up any of the parties.  Don't look up any of the
11   subject matter on the internet about this case.  Everything you
12   will want to know, and maybe more, will be presented to you
13   here in this courtroom during the trial in this case.
14            Your decision must be based exclusively and strictly
15   on the evidence you receive in the courtroom and the
16   instructions of law that I -- I give to you.
17            Now, it's also important that you keep an open mind
18   and do not decide any issue in this case until it's submitted
19   to you for deliberation.  The trial is like, you know, like
20   kind of a puzzle.  You'll get different pieces, maybe even some
21   pieces that are kind of out of order in the way the evidence is
22   presented to you.  So it's really important that you keep an
23   open mind, that you wait until you've heard all the evidence
24   and my final instructions of law before you decide the issues
25   in this case.

1          Now, if you choose to take notes, and I see some of

2    you have been doing a little bit of that now, it certainly is

3    permissible for you to do so.  But I do have a few rules about

4    note-taking that I want you to keep in mind.

5          The first rule is this:  Please do not permit your

6    note-taking to interfere with your consideration of the

7    evidence, to listening to the witnesses or viewing any of the

8    exhibits that are presented to you.  You must not permit your

9    note-taking to interfere in any significant way with your

10   observation of the witnesses while they testify, because your

11   observation of the witnesses is one means that you are using in

12   evaluating the credibility and honesty of the witness.

13         Also, please do not take your notes outside the

14   courtroom.  So, when we are finished at a recess or at the end

15   of the day, just leave your notepad, you know, covered, on your

16   chair.  We will secure the courtroom.  No one will have access

17   to your notes at any time.  But after a recess or after the end

18   of the day, just leave your notes right on your own seat.

19         Now, when you go to the jury room, of course, you will

20   take notes with you, your notepad with you at that time.  And

21   when you leave that room for any break, just leave your notepad

22   on your particular seat in the -- in the jury room.

23         A couple of other important rules.  Please do not show

24   your notes to any other person.  And that even goes as far as

25   the jury deliberations are concerned as well.  Keep your notes

1    to yourself.  If there is any inconsistency between your memory
2    of the evidence and what you have recorded in your notes, it's
3    your memory of the evidence that you will treat as accurate and
4    controlling.
5            Now, when a party -- and I'm going to talk with you a
6    bit about this some more in just a moment.  But, generally, the
7    burden of proof on a claim by a preponderance of the evidence,
8    it means that you are persuaded by the evidence that the claim
9    is more probably true than not true.  But, you know, it is
10   important that you base your decision on all of the evidence
11   regardless of which party presented it to you.  And at the end
12   of trial will you have to make your decision on what you recall
13   of the evidence.
14           This is another important point that I want to
15   emphasize to you at this time.  In all likelihood, we will not
16   be presenting to you any transcript of the -- any portion of
17   the trial.  So -- and this often comes up in jury questions
18   when the case is presented to you.  And so I really try to
19   emphasize this at the outset.  Unless there is some
20   extraordinary reason, we don't -- we don't have any portion of
21   the trial transcribed for you during deliberation.  So it's
22   important that you carefully listen to the testimony and
23   consider the evidence that is presented to you.
24           Now, I have some other preliminary instructions that
25   I'm going to read to you at this time.  And we're going to

1    start to get into a few technical things.  Let me tell you just

2    generally this to start with.  At the end of the trial before

3    the attorneys give you their closing arguments, I will give you

4    all of the instructions of law in writing that you will have

5    during your deliberation process.  So you'll have these

6    instructions and you will have other instructions that very

7    most definitely control you in your deliberations.

8         I'm reading these instructions to you at this time so

9    that you can at least start to get some understanding of some

10   of the -- of the issues that are involved here.  Not everything

11   but just some of the issues to -- to help you.  And in just a

12   moment I am going to give you a copy of the patent that is

13   involved in this case with you as well.

14        Please don't think that you've got to start -- you

15   have to memorize or, you know, you've got to know all of this

16   stuff, you know, right now.  This is really to give you some

17   preliminary understanding of some of these matters.  I'm not

18   going to give you these instructions in writing at this time.

19   But I will give them to you at the end of the case.  So you

20   don't necessarily need to, you know, think that you've got to

21   get all of this -- all of this in.  You'll have these with you

22   when you go to the jury room.  I want you to hear some of this

23   stuff now so that you can begin to be thinking about the

24   evidence in connection with some of these matters that I will

25   be talking with you about.

1          Now, as I mentioned to you earlier, this case involves

2     a dispute relating to a United States patent.  Before

3     summarizing the positions of the parties and the legal issues

4     involved in the dispute, let me take a moment to explain what a

5     patent is and how it is obtained.

6          Patents are issued by the United States Patent and

7     Trademark Office, which is part of our government.  The

8     government is authorized by the United States Constitution to

9     enact patent laws and issue patents to protect inventions.

10    Inventions that are protected by patents may be of products,

11    compositions or of methods for doing something or for using or

12    making a product or composition.

13         A patent that protects an invention, that is a method

14    or process for making a product, is sometimes called a process

15    patent.  This lawsuit involves a process patent.

16         The owner of a patent has the right for the life of

17    the patent to prevent others from making, using, offering for

18    sale, selling or importing the invention covered by the patent.

19         Whereas in this case a process patent is involved, the

20    owner of the patent has the right for the life of the patent to

21    prevent others from importing into the United States or selling

22    or using within the United States a product which was made by

23    the process or method covered by the patent.

24         A patent is granted for a set period of time, which in

25    this case is 20 years from the time of the application of the

1    patent was filed.  Once a patent expires, anyone is free to use

2    the invention covered by the patent.  During the term of the

3    patent, however, if another person makes, uses, offers to sell,

4    sells or imports something that is covered by the patent

5    without the patent owner's consent, that said person is said to

6    infringe the patent.  The patent owner enforces a patent

7    against persons believed to be infringers in a lawsuit in

8    federal court such as in this case.

9           In enforcing his or her rights to exclude anyone else

10   from using the patented invention, without the patent owner's

11   permission, the patent owner may seek in the lawsuit to stop

12   the alleged infringement to recover money damages for the

13   alleged infringement or both.

14          As I mentioned, patents are granted by the United

15   States Patent and Trademark Office.  Sometimes called the PTO.

16   That's how I'll refer to that office.  The process of obtaining

17   a patent is called patent prosecutous -- prosecution.  To

18   obtain a patent, one must file an application with the PTO.

19   The PTO is the agency of the federal government and employs

20   trained examiners who review applications for patents to

21   determine whether or not the inventions described in the patent

22   applications meet the requirements of the patent laws for

23   patentable intentions.

24          The application includes what is called a

25   specification, which -- which must contain a written

1  description of the claimed invention telling what the invention

2  is, how it works, how to make it, how to use it, so others

3  skilled in the -- in the field will know how to make or use it.

4      The specification concludes with one or more numbered

5  sentences.  These are the patent claims.  When the patent is

6  eventually granted by the PTO, the claims described -- excuse

7  me, define the boundaries of its protection and give notice to

8  the public of those boundaries.

9      After the applicant files the application, the PTO

10  patent examiner reviews the patent application to determine

11  whether the claims are patentable and whether the specification

12  adequately describes the invention claimed.

13      The patent examiner then informs the applicant in

14  writing what the examiner has found and whether any claim is

15  patentable and, thus, will be allowed.

16      This writing from the patent examiner is called an

17  office action.  If the examiner rejects the claims, the

18  applicant then responds and sometimes changes the claims or

19  submits new claims.  This process which takes place only

20  between the examiner and the patent applicant may go back and

21  forth for some time until the examiner is satisfied that the

22  application and claims meet the requirements for a patent.  The

23  papers generated during this time of communicating back and

24  forth between the patent examiner and the applicant make up

25  what is called the prosecution history.

1    All of this material becomes available to the public

2    no later than the date when the patent issues.

3    The fact that the PTO grants a patent does not

4    necessarily mean that any invention claimed in the patent in

5    fact deserves the protection of a patent.

6    A person accused of infringement has the right to

7    argue in federal court that a claimed invention in the patent

8    is invalid because it does not meet the requirements for a

9    patent.

10    A patent includes two basic parts:  A written

11    description of the invention and the patent claims.  The

12    written description, which may include drawings, is often

13    referred to as the specification of the patent.  However,

14    sometimes the term "specification" is also used to include the

15    claims.

16    You are going to be provided at this time with a copy

17    of the Kowalski patent.  And I'm going to ask you to refer to

18    the patent as I identify its different sections, so we're going

19    to give you a copy of the patent at this time.

20    Why don't you give to them as well.

21    (Handing out documents.)

22    THE COURT:  Now, these documents that I have given to

23    you, you may keep and use during the course of the trial since

24    this trial does essentially concern the Kowalski patent.  I'm

25    going to talk with you a little about the patent at this time.

1    We're not going to go through everything here, but I want you

2    to have this over the course of the trial.

3            Now, the cover page of the Kowalski patent provides

4    identifying information, including the date the patent issued

5    and the patent number along the top, as well as the inventor's

6    name, the filing date, and a list of the prior art publications

7    considered in the patent office when the patent was applied

8    for.

9            The specification of the Kowalski patent begins with

10   an abstract found on the cover page.  The abstract is a brief

11   statement about the subject matter of the -- of the invention.

12           Now, next is a graph which appears as figure 1.  Then

13   there are drawings behind this, and they appear as Figures 1,

14   2A, 2B, 2C, 3A, 3B and 3C, and these are on the next two pages.

15           These drawings depict various aspects or features of

16   the invention that is involved in the patent.  They are

17   described in words later used in the patent specification.

18           And the written description of the invention appears

19   next.  In this portion of the patent, each page is divided into

20   two columns, which are numbered at the top of the page.  The

21   lines on each page are also numbered.  And you will see that

22   the written description of the Kowalski patent begins at column

23   1, line 1, and continues on to column 22, line 55.  And,

24   generally speaking, it includes a background section, a summary

25   of the invention, and a detailed description of the invention,

1    including some specific examples.

2          The specification ends with one or more numbered

3    paragraphs.  These are called the claims.  The claims may be

4    divided into a number of steps referred to as claim

5    limitations.  In the Kowalski patent, the claims begin at

6    column 22, line 65, and continue to the end of the patent at

7    column 28, line 47.

8          Now, to help you follow the evidence, I will now give

9    you a summary of the position of the parties.  And this is very

10   general and brief at this time.

11         The parties that filed this lawsuit, referred to in

12   the law as the plaintiffs, are William Kowalski and Hawaii

13   International Seafood, Incorporated, which is Mr. Kowalski's

14   company that imports and sell -- sells fish in the United

15   States.

16         The party on the opposite side is Ocean Duke

17   Corporation, which is another company that imports and sells

18   fish in the United States.  This case involves a United States

19   patent obtained by Mr. William R. Kowalski on October 26, 1999.

20   The patent involved in this case is United States patent No.

21   5972401, which lists William R. Kowalski as the inventor.  And

22   for convenience, the parties and I will often refer to this

23   patent as the Kowalski patent.

24         Mr. Kowalski and Hawaii International Seafood, Inc.,

25   filed suit in this case seeking money damages from Ocean Duke

1    Corporation for allegedly infringing the Kowalski patent by

2    importing and offering for sale in the United States products

3    that Mr. Kowalski and Hawaii International argue were made with

4    a process covered by the following claims that are in this

5    patent:  1, 33, 67, 68 and/or 69 of the Kowalski patent.

6           The products that are alleged to have been produced by

7    a process infringing the Kowalski patent are the frozen --

8    frozen fish treated to retain a fresh-like color imported and

9    sold in the United States by Ocean Duke Corporation, which fish

10   Ocean Duke says it buys from an Indonesian company called PT

11   Intisamudera Citra Perkasa.

12          Did I get that right?

13          MR. YASUNAGA:  Yes, Your Honor.

14          THE COURT:  Close enough.

15          Ocean Duke Corporation denies that it has infringed

16   Claims 1, 33, 67, 68 and 69 of the Kowalski patent and argues

17   that in addition the claims are invalid.

18          Your job will be to decide whether Claims 1, 33, 67,

19   68 and/or 69 of the Kowalski patent have been infringed.  And

20   whether those claims are invalid.

21          Patent infringement exists if even one claim of the

22   patent has been infringed.  Therefore, if you decide that any

23   claim of the Kowalski patent has been infringed and is not

24   valid, you will then need to decide any money damages to be

25   awarded to plaintiffs to compensate them for the patent

1    infringement.  You will also need to make a finding as to

2    whether the infringement was willful.  If you decide that any

3    infringement was willful, that decision should not affect any

4    damage award that you give.  That is because I will take

5    willfullness -- willfulness into account later.

6            It is my job as judge to determine the meaning of any

7    claim language that needs interpretation.  You must accept the

8    meanings I give you and use them when you decide whether any

9    claim of the patent has been infringed and when any claim is

10   invalid.

11           My definitions of the language of Claims 1, 33, 67, 68

12   and 69 have been printed up and have now been handed to you.

13   That is the second document that I have given to you.

14           You must use the definitions I provide to you in

15   considering whether the Kowalski patent has been infringed by

16   Ocean Duke.  And I'm going to read my definitions to you at

17   this time.  You have these, of course, with you and you, of

18   course, can keep them and use them during the course of the

19   trial.

20           So turning to Claim No. 1.  And this is what I am

21   telling you Claim No. 1 means.  It is a process for treating

22   meat including the meat of fish or other seafood comprising or

23   including, and before I going on to what is included, you will

24   note that "comprising" means including the following

25   limitations set forth in the claim so that a process infringes

1  if it includes those limitations in the claim, regardless of

2  whether it also includes other steps or features.

3          And it includes heating carbon-containing materials,

4  including wood, sawdust and charcoal that can be made from wood

5  to make smoke.

6          Reducing the taste-imparting parts of the produced

7  smoke, at least enough so that the resulting or remaining smoke

8  would not give smoke odor or taste to meat when brought into

9  contact with the meat.  And treating meat with the resulting

10  smoke.

11          Now, for Claim 33, this is the Court's definition of

12  what the claim language means.  And it is a process for

13  treating meat, including the meat of fish or other seafood,

14  comprising -- same definition of "comprising."  Or including

15  heating carbon-containing materials, including wood, and the

16  sawdust and charcoal that can be made from wood, to make smoke

17  at, at referring to the temperature of the heating apparatus or

18  medium, between about 400 degrees centigrade and about 950

19  degrees centigrade.

20          MR. YASUNAGA:  Your Honor, there's a mixup between the

21  Fahrenheit and centigrade.

22          THE COURT:  What's the problem?

23          MR. YASUNAGA:  In my version -- may I approach the

24  bench?

25          THE COURT:  Sure.

1          MR. YASUNAGA:  The versions submitted, it has the

2     Fahrenheit, then the centigrade in parentheses, and I don't

3     know if that got lost out when the Court printed its version.

4          THE COURT:  Apparently it did.  Any problem with this?

5          MR. MARKS:  No, Mr. Yasunaga is correct.

6          THE COURT:  Okay.  Okay.  Good.  As I said, we're

7     going to give you these in writing at the end, but let me read

8     this the correct way.

9          So 33, I'm going to start over and I'm going to read

10    it with the language that apparently was omitted from my copy

11    here.

12         And it is, a process for treating meat, including the

13    meat of fish or other seafood, comprising or including its

14    heating carbon-containing materials, including wood and the

15    sawdust and charcoal that can be made from wood to make smoke

16    -- actually you have a copy of this, so we're going to replace

17    this and give it to you -- at, referring to the temperature of

18    the heating apparatus or medium.

19         And here's where it's different:  Between about 400

20    degrees Fahrenheit, paren, 204 degrees centigrade, and about

21    950 degrees Fahrenheit, paren, 510 degrees centigrade -- we'll

22    get you a replacement copy for you -- reducing the taste

23    imparting parts of the produced smoke, at least enough so the

24    resulting or remaining smoke would not give smoke odor and

25    taste to meat when brought into contact with the meat, treating

1  meat with the resulting smoke.

2      Okay.  That's the definition of what Claim 33 is.  And

3  as I indicated to you, you can keep that with you during the

4  course of the trial.

5      Then for 67, it is a process for treating food

6  comprising, and "comprising" means including the following

7  limitations set forth in the claims so that a process infringes

8  if it includes those limitations in the claim, regardless of

9  whether it also includes other steps or features, or including

10 heating carbon-containing materials, including wood and the

11 sawdust and charcoal that can be made from wood to make smoke.

12     Filtering or separating out or reducing, including --

13 and then that has a footnote here, and the word "including" as

14 used here means including, but not limited to, as opposed to

15 including only the following.  Okay.  It's including by

16 cooling, condensing, settling out and/or aging the parts of the

17 smoke which gives smoke flavor to food, at least enough so that

18 the resulting or remaining smoke does not give smoke flavoring

19 to food when food is exposed to that smoke.  And exposing to or

20 bringing into contact with each other the smoke and the food

21 without giving a smoke flavor to that food.

22     Okay.  Then turning to Claim 68, this is a process for

23 treating food comprising, and this says "comprising" means

24 including the following limitations set forth in the claim, so

25 that a process infringes if it includes those limitations in

1    the claim, regardless of whether it also includes other steps

2    or features.  And -- or including heating carbon-containing

3    materials, including wood and the sawdust and charcoal that can

4    be made from wood to make smoke.  Removing parts of smoke that

5    give smoke odor.  Bringing the food and the smoke into contact

6    with each other whereby the amount of smoke odor giving parts

7    that were removed is sufficient to prevent a smoke odor to the

8    food.

9          And then turning to 69, the last claim involved here,

10   and this is a process for treating food comprising, and

11   "comprising" means including the following limitations set

12   forth in the claims so that a process infringes if it includes

13   those limitations in the claim, regardless of whether it also

14   includes other steps or features.  Or including, heating

15   carbon-containing materials, including wood and the sawdust and

16   charcoal that can be made from wood, to make smoke that

17   contains vapor having smoke odor and flavor-giving parts.

18   Filtering or separating out or reducing or removing, including,

19   and the word "including" as used here means including, but not

20   limited to, as opposed to including only the following:

21   Including by cooling, condensing, settling out and/or aging,

22   smoke odor and flavor-giving parts from the smoke, bringing

23   food into contact with a sufficiently reduced amount of smoke

24   so as to prevent the food from having a smoke flavor.

25          Okay.  We'll replace that one -- on page for you.

1          Now, as I told you, Plaintiffs Kowalski and
2     International Seafood contend that Ocean Duke infringes the
3     Kowalski patent by selling fish that was made or treated with a
4     process that falls within the claims of the Kowalski patent.
5     This is called direct infringement.  Direct infringement can
6     occur in two ways.  The first is called literal infringement.
7     Literal infringement exists if the process used to make Ocean
8     Duke's product contains each and every limitation of one or
9     more of the Kowalski patent claims.
10         The second type of infringement is called infringement
11     under Doctrine of Equivalents.  Infringement under the Doctrine
12     of Equivalents occurs when for each claim limitation not
13     literally found in the process used to make Ocean Duke's fish
14     the process contains an equivalent step.  In order to be
15     equivalent, the differences between the missing claim
16     limitation and the step used to make Ocean Duke's fish must be
17     insubstantial.  I will explain in more detail in my final
18     instructions the various ways by which you may determine
19     whether or not these differences, if they exist, are
20     insubstantial.
21         You should not take my definition of the language in
22     the claims as an indication that I have a view regarding how
23     you should decide the issues that you are being asked to
24     decide, such as "infringement" and "invalidity."  Those issues
25     are for you to decide.

1          I'm going to read a glossary to you at this time of

2     some various terms.  And they are going to be defined in more

3     detailed -- in more detail in the instructions that I give you

4     at the end of the case.  You're just going to hear some of

5     these, so I'm going to introduce you to some of these terms at

6     this time.  The definitions in the instructions must be

7     followed and must control in your deliberations, and that is at

8     the end of the case.  You'll get all of this in writing.

9          Abstract:  That is a brief summary of the technical

10    disclosure in a patent to enable the U.S. Patent and Trademark

11    Office and the public to determine quickly the nature and gist

12    of the technical disclosure in the patent.

13         Amendment:  A patent's application -- applicant's

14    change to one or more claims to the specification either in

15    response to an office action taken by a patent examiner or

16    independently by the patent application during the patent

17    application examination process.

18         Best mode:  The best way the inventory actually knew

19    to make or use the invention at the time of the patent

20    application.  If the applicant had a best mode as of the time

21    of the ap -- as of the time the application was first filed, it

22    must be set forth in the patent specification.

23         Claim:  Each claim of a patent is a concise formal

24    definition of an invention.  It appears at the end of the

25    specification in a separately numbered paragraph.  In concept,

1    a patent claim marks the boundaries of the patent in the same

2    way that a legal description in a deed specifies the boundaries

3    of land.   Meaning, similar to a -- i.e., similar to a landowner

4    who can prevent others from trespassing on the bounded

5    property, the inventor can prevent others from using what is

6    claim.

7        Claims may be independent or dependent.   An

8    independent claim stands alone.   A dependent claim does not

9    stand alone and refers to one or more other claims.   A

10   dependent claim incorporates whatever the other referenced

11   claim or claims say.

12       Drawings:   The drawings are visual representations of

13   the claimed invention or examples or parts of the claimed

14   invention contained in a patent application and issued patent.

15   And usually includes several figures illustrating various

16   aspect of the claimed invention or examples of it.

17       Elements:   The required parts of a device or the

18   required steps of a method.   A device or method infringes a

19   patent if it contains each and every requirement of a patent

20   claim.

21       Embodiment:   This is a product or method that contains

22   the claimed invention.

23       Examination:   The procedure before the United States

24   Patent and Trademark Office whereby a patent examiner reviews

25   the filed patent application to determine if the claimed

1    invention is patentable.

2         Filing date:  The date a patent application with all

3    of the required sections has been submitted to the United

4    States Patent and Trademark Office.

5         Infringement:  This is a violation of a patent

6    occurring when someone makes, uses or sells a patented

7    invention without permission of the patent holder within the

8    United States during the term of the patent.

9         In the case of a process patent, infringement is also

10   violation of a patent occurring when someone imports into the

11   United States or sells or uses within the United States a

12   product which is made by a process patented in the United

13   States without permission of the patent holder during the term

14   of the patent.

15        Limitation:  As a required part of an invention set

16   forth in a patent claim.  A limitation is a requirement of the

17   invention.  The word "limitation" is often used to

18   interchangeably -- is often used interchangeably with the word

19   "requirement."

20        Office action:  This is a written communication from

21   the patent examiner to the patent applicant in the course of

22   the patent examination process.

23        Patent:  A patent is an exclusive right granted by the

24   United States Patent and Trademark Office to an inventory to

25   prevent others from making, using or selling an invention for a

1    period of 20 years from the date the patent application was

2    filed.  When the patent expires, the right to make, use, or

3    sell the invention is dedicated to the public.

4         The patent has three parts, which are the

5    specification, drawings and claims.  The patent is granted

6    after examination by the United States Patent and Trademark

7    Office of a patent application filed by the inventor, which has

8    these parts, and, thus, examination is called the prosecution

9    history.

10        Patent and Trademark Office, PTO:  This is the

11   administrative branch of the United States Department of

12   Commerce that is charged with overseeing and implementing the

13   federal laws of patents and trademarks.  It is responsible for

14   examining all of the patent applications and issuing all

15   patents in the United States.

16        Prior art:  This is previously known subject matter in

17   the field of a claimed invention for which a patent is being

18   sought.  It includes issued patents, publications and knowledge

19   deemed to be publicly available such as trade skills, trade

20   practices and the like.

21        Prosecution history:  The prosecution history is the

22   complete written record of the proceedings in the PTO from the

23   initial application to the issued patent.

24        The prosecution history includes the office actions

25   taken by the PTO, and the amendments to the patent application

1    filed by the applicant during the examination process.

2           Reads on:  A patent claim reads on a device or method

3    when each required part and each requirement of the claim is

4    found in the device or method.

5           Requirement:  This is a required part or step of an

6    invention set forth in a patent claim.  The word "requirement"

7    is often used interchangeably with the word "limitation."

8           Royalty:  A royalty is a payment made to the owner of

9    a patent by a nonowner in exchange for rights to make, use or

10   sell the claimed invention or import or sell products made with

11   the patented process.

12          Specification:  The specification is a required part

13   of a patent application and issued patent.  It is a written

14   description of the intention and of the manner and process of

15   making and using the claimed invention.

16          Plaintiffs Kowalski and Hawaii International Seafood,

17   Incorporated, also assert claims against Ocean Duke for

18   trademark infringement and unfair competition.  Ocean Duke

19   denies infringing the trademark and unfairly competing.  To

20   help you understand the evidence that will be presented in this

21   case, I will explain some of the legal terms you will hear

22   during this trial.

23          A trademark is a word, a name, a symbol, a device or a

24   combination of them, that indicates the source of goods.  The

25   owner of a trademark has the right to exclude others from using

1    that trademark.

2            The trial is now -- will now begin.  First, each side

3    will make an opening statement.  An opening statement is not

4    evidence, it's simply an outline to help you understand what

5    the party expects the evidence to show.

6            The presentation of the evidence will then begin.

7    There are two standards of proof that you will apply to the

8    evidence depending on the issue you are deciding.  On some

9    issues you must decide whether something is more likely true

10   than not true.  That's the probability of the -- of the

11   evidence.

12           On -- on the other issues you must use a higher

13   standard and decide whether it is highly probable that

14   something is true.  And I'm going to give you more detail

15   concerning these standards and what is to be judged under what

16   standard later on in the -- in the trial.

17           Plaintiffs will present their evidence on this

18   contention that some of the claims of the Kowalski patent have

19   been and continue to be infringed by Duke Corp -- by Ocean Duke

20   Corporation and that the infringement has been and continues to

21   be willful.  To prove infringement of any claim, plaintiffs

22   must persuade you that it is more likely than not that Ocean

23   Duke Corporation has infringed that claim.

24           To persuade you that Ocean Duke's infringement was

25   willful, plaintiffs must prove that it is highly probable that

1    the infringement was willful.

2          Now, to prove trademark infringement, plaintiffs have

3    the burden of proving that is more likely than not that Hawaii

4    International Seafood, Inc., has a valid trademark and that the

5    Ocean Duke -- and that Ocean Duke infringed that trademark.

6          Ocean Duke will go next to present its evidence that

7    the claims of the Kowalski patent are invalid.  To prove

8    invalidity of any claim, Ocean Duke must persuade you that it

9    is highly probable that the claim is invalid.  In addition to

10   presenting its evidence of invalidity, Ocean Duke will put on

11   evidence responding to plaintiff's infringement and willfulness

12   contentions.

13         Plaintiffs will then return and put on -- and may put

14   on evidence responding to Ocean Duke's contention that the

15   claims of the Kowalski patent are invalid.  Plaintiffs will

16   have -- also have the option to put on what -- well, they don't

17   have the option, they may have the option, depending upon what

18   I decide in this case to put on what is referred to as rebuttal

19   evidence to any evidence offered by Ocean Duke of

20   noninfringement or lack of willfulness.

21         Finally, Ocean Duke may have the option to put on

22   rebuttal evidence to any evidence offered by plaintiffs and the

23   validity of the claims of the Kowalski patent.  I guarantee

24   there will be an end to this presentation of evidence.  And it

25   won't be that long.

1          During the presentation of the evidence the attorneys

2     will be allowed brief opportunities to explain what they

3     believe the evidence has shown or what they believe the

4     upcoming evidence will show.  As I indicated to you earlier,

5     such comments are not evidence, are being allowed solely for

6     the purpose of helping you understand the evidence in this

7     case.

8          And because the evidence is introduced piecemeal, you

9     will need to keep an open mind as the evidence comes in and

10    wait for all the evidence before you make any decisions in this

11    case.  In other words, you should keep an open mind throughout

12    the entire trial.  After the evidence has been presented, the

13    attorneys will make closing arguments and I will give you final

14    instructions of law that apply to this case.  Closing arguments

15    also are not evidence but may assist you in understanding the

16    evidence and applying the law.

17         And then after the closing arguments and after you

18    have the instructions, then it will be up to you working with

19    your fellow jurors to decide the facts in this case.

20         Have I missed anything in the preliminary instructions

21    at all?

22         MR. YASUNAGA:  Not that I saw, Your Honor.

23         MR. MARKS:  No, Your Honor.

24         THE COURT:  Okay.  So, ladies and gentlemen, we're

25    going to take a lunch break at this time.  And let's get back

1    at -- why don't we start at quarter to 2:00, 1:45, we will

2    start with the opening statements.  So we'll take a lunch break

3    now until 1:45.

4           I want to remind you of two important rules.  I will

5    be mentioning these to you each day.  They are very important

6    for you to keep in mind.  They are, one, please keep an open

7    mind until all the evidence is presented.  Also very important,

8    please do not discuss this case with anyone.  Please do not do

9    any research or conduct any investigation.

10          We'll see you back here at 1:45.  Stand in recess

11   before the jury until 1:45.

12          (At 12:20 p.m., the jury was excused and the following

13   proceedings were held:)

14          THE COURT:  The record will reflect we're out of the

15   presence of the jury.  Give me a second.

16          So the issue of witness exclusion is controlled by

17   Rule 615 of the rules of evidence.

18          And, Mr. Marks, what do you want to say about this?

19          MR. MARKS:  Well, my understanding of the rules is

20   that parties, including, of course, corporate representatives,

21   have a right to be present.

22          THE COURT:  Right.

23          MR. MARKS:  And my understanding of the rules, that

24   the purpose behind the rule is so that witnesses who will be

25   presenting testimony are unable to shape their testimony based

1   on what they hear from the witness stand.  And as I understand

2   the request from the plaintiffs in this case, it is that

3   Mr. Francom, who I believe is actually sitting here today --

4   there he is, Your Honor -- should be allowed special status or

5   special privilege to sit and listen to testimony.

6           I think that is especially unfair in the case of an

7   expert witness because expert witnesses are in fact compensated

8   precisely to be professional testifiers.  So that being the

9   case, I would move that the exclusion order, which I understand

10  the Court has already entered --

11          THE COURT:  Generally.

12          MR. MARKS:  -- generally be held to exclude all

13  witnesses in this case.

14          THE COURT:  Okay.  So, Mr. Yasunaga, Rule 615 in

15  pertinent part reads as follows:  "At the request of a party

16  the Court shall order witnesses excluded so they cannot hear

17  the testimony of other witnesses.  And it may make the order of

18  its own motion."

19          But then it has an exception, and that exception is in

20  relevant part subpart 3, which is:  "A person whose presence is

21  shown by a party to be essential to the presentation of the

22  party's cause."

23          So how would this particular witness's being in the

24  courtroom be essential to the presentation of the plaintiffs'

25  case?

 1          MR. YASUNAGA:  Excuse me, Your Honor.  In the case

 2    Polythane Systems, Inc., versus Marina Ventures, 993 F.2d 1201

 3    at 1209, it says:  "Expert witnesses clearly fall within Rule

 4    615(3)'s exception.  The advisory committee's notes state that

 5    Rule 615(3) contemplates such persons as an agent who handled

 6    the transaction" -- that's not relevant here -- "or an expert

 7    needed to advise counsel in the management of the litigation."

 8          I certainly would be relying on our damage expert's

 9    advice in managing the litigation.

10          In addition, in Scarlata versus Scarlata, 127 BR

11    1004 --

12          THE COURT:  Well, there's really no -- no dispute

13    about the law here.  It's really -- you know, how is he

14    essential to your case?  That's what you really sort of need --

15    I know what the cases say.  The cases certainly permit this

16    where you can show its essential to your case.

17          MR. YASUNAGA:  Well, it's to prevent --

18          THE COURT:  The rule says essential to your case.

19    That's the rule of evidence applicable here.  So tell me that.

20          MR. YASUNAGA:  The purpose of the sequestration rule

21    is to prevent the shaping of testimony and to discourage

22    fabrication.  Well, an expert witness is not going to fabricate

23    facts because he takes facts that are really, you know, there,

24    and he is not a percipient witness.

25          THE COURT:  He is just going to offer opinion

1    testimony.

2            MR. YASUNAGA:  Right.  So you don't have to worry

3    about fabrication because he heard something, it's not like two

4    witnesses colluding as to what color the traffic light is.

5            THE COURT:  I would like you to identify for me,

6    though, why you think his presence here in this trial really is

7    essential to your -- to your case.  If you could spell that out

8    for me, I would like -- I just would like to know it.

9            MR. YASUNAGA:  It will -- well, one, he certainly

10   will -- we will ask him for advice as we go on about what other

11   things we need in the litigation; and, two, his expert opinion

12   testimony will be helped.  Now, the rule --

13           THE COURT:  How?

14           MR. YASUNAGA:  Rule seven -- I'm sorry, Rule 703, 703,

15   bases of opinion testimony by experts says that the opinion may

16   be based on evidence before at the trial.  And so that clearly

17   contemplates him sitting in and hearing evidence at the trial.

18           THE COURT:  Is that what's going to happen here in

19   this case?  There's some evidence that you are going to present

20   here in this trial that he is going to be basing his opinions

21   on?

22           MR. YASUNAGA:  Yes.  I'll give you one example.  One

23   issue about his opinion in damages is, are there any

24   substitutes?  Well, he ought to be able to hear the testimony

25   about the existence or lack of existence of substitutes.  That

1    affects his opinion and how he testifies about it.

2            THE COURT:  Okay.  Anything else?

3            MR. YASUNAGA:  There are other issues like that such

4    as market share, the capability -- Mr. Marks is going to grill

5    Mr. Kowalski, I'm sure, about did your business have the

6    capacity to have Ocean Duke's sales, could they handle, did

7    they have the sales, the warehousing, etcetera, etcetera,

8    etcetera.  And Mr. Francom ought to listen to that detailed

9    testimony.  He has been told some stuff before, but, say,

10   Mr. Francom -- I mean Mr. Marks brings out more details or

11   there is some variations, the experts should be able to talk

12   about them instead of come in and be bushwhacked, and then he

13   said something, and he said, Oh, but Mr. Kowalski testified at

14   this trial that this and that and this.  And he can't really

15   respond to it.

16           So he's an expert witness, Your Honor, and under Rule

17   703 he is entitled to base his opinion on facts before the case

18   -- before the trial and at the trial.

19           THE COURT:  But the rule doesn't, you know, indicate

20   that experts across the board have a right to be present during

21   the trial, correct?  Because you're sort of describing it as

22   when you are an expert, you can be here.

23           MR. YASUNAGA:  I don't know about every case, but I

24   don't see any harm for this damage expert, and I've just laid

25   out at least two or three examples of why it's important for

1    him to hear the testimony so that he can testify properly and

2    handle cross-examination.

3         THE COURT:  Okay.  Mr. Marks, anything you wish to say

4    in response to that?

5         MR. MARKS:  Actually, no.

6         THE COURT:  Okay.  I think I've heard enough to

7    persuade me that there would not be any -- any particular

8    problem with this witness -- witness's presence during the

9    course of the trial, given what his role is in this case.  And

10   I believe Mr. Yasunaga has made enough of a showing how he will

11   assist him and be essential for presenting the evidence.  And

12   actually it might expedite getting the testimony concerning the

13   damages side presented rather than having to remind him on A,

14   B, C and D as it comes out in the case.  And his testimony is

15   essentially that of -- is essentially opinion testimony,

16   anyway.  It isn't really concerning the facts of this case.

17        So on that basis, I think there's enough of a showing

18   to indicate to me that under Rule 16, the exclusion rule will

19   not apply -- I'm sorry, what is his name again?

20        MR. YASUNAGA:  Mr. David Francom.

21        THE COURT:  Mr. David Francom.

22        MR. YASUNAGA:  Actually it's Dr. David Francom.

23        THE COURT:  Okay.  Dr. Francom will be permitted to

24   sit in during the course of the trial.

25        MR. YASUNAGA:  Thank you, Your Honor.

1          THE COURT:  Okay.  Anything else to take up out of the
2    presence of the jury before we break for the morning?
3          MR. MARKS:  I still need to get Mr. Yasunaga's opening
4    statement demonstrative.
5          THE COURT:  Oh, yes.  Make sure you guys cover that
6    before opening statements because I don't like to, you know,
7    interfere with opening statements, but if somebody is using
8    something that hasn't been shown, then, you know, that's taboo
9    number one.  So that can't be done.  So show it.  If there's a
10   problem, let me know before we start.  Okay?
11         MR. MARKS:  Thank you, Your Honor.
12         (Recess at 12:30 p.m. until 1:47 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        COURT REPORTER'S CERTIFICATE

2              I, Gloria T. Bediamol, Official Court Reporter, United

3      States District Court, District of Hawaii, do hereby certify

4      that the foregoing is a correct transcript from the record of

5      proceedings in the above-entitled matter.

6

7              DATED at Honolulu, Hawaii, June 23, 2008.

8

9

10                              /s/ Gloria T. Bediamol

11                              GLORIA T. BEDIAMOL.

12                              RPR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25